```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3      THE UNITED STATES OF AMERICA,)
                                     )
 4                   Plaintiff,      )
                                     )
 5      vs.                          )      File No:  CR 08-360
                                     )
 6      Paul Alvin Slough,           )
        Evan Shawn Liberty,          )
 7      Dustin Laurent Heard,        )
                                     )
 8                   Defendants.     )      Date:  July 31, 2014
                                            Time:  2:11 p.m.
 9
        ----------------------------   DAY 31 - P.M. Session
10
        THE UNITED STATES OF AMERICA,)
11                                   )
                     Plaintiff,      )
12                                   )      File No:  CR 14-107
        Vs.                          )
13                                   )
        Nicholas Abram Slatten,      )
14                                   )
                     Defendant.      )
15
        _____
16

17                    TRANSCRIPT OF JURY TRIAL
                            HELD BEFORE
18             THE HONORABLE ROYCE C. LAMBERTH
                  UNITED STATES DISTRICT JUDGE
19
        _____
20

21

22
        Court Reporter:            Vicki Eastvold, RMR, CRR
23                                 Official Court Reporter
                                   U.S. Courthouse, Room 6722
24                                 333 Constitution Avenue, NW
                                   Washington, DC  20001
25                                 202-354-3242
```

```
 1    APPEARANCES:

 2
      For the Plaintiff:      Mr. Anthony Asuncion
 3                            Mr. John Crabb, Jr.
                              Mr. T. Patrick Martin
 4                            Mr. Christopher R. Kavanaugh
                              UNITED STATES ATTORNEY'S OFFICE
 5                            Criminal Division
                              555 Fourth Street, NW
 6                            Washington, DC   20530

 7
      For Defendant Slough:   Mr. Brian M. Heberlig
 8                            Ms. Linda C. Bailey
                              Mr. Michael J. Baratz
 9                            Mr. Scott P. Armstrong
                              STEPTOE & JOHNSON, LLP
10                            1330 Connecticut Avenue, NW
                              Washington, DC   20036
11

12    For Defendant Liberty:  Mr. William F. Coffield, IV
                              COFFIELD LAW GROUP, LLP
13                            1330 Connecticut Avenue, NW
                              Suite 220
14                            Washington, DC   20036

15
      For Defendant Heard:    Mr. David Schertler
16                            Ms. Janet Foster
                              SCHERTLER & ONORATO, LLP
17                            575 7th Street, NW, Suite 300 South
                              Washington, DC   20004
18

19    For Defendant Slatten:  Mr. Thomas G. Connolly
                              Mr. Steven A. Fredley
20                            HARRIS, WILTSHIRE & GRANNIS, LLP
                              1200 18th Street, NW, Suite 1200
21                            Washington, DC   20036

22

23

24

25
```

I N D E X


JEREMY RIDGEWAY
     (*Continuing*)  Cross-Examination by Mr. Heberlig......  4

```
 1                    (Upon resuming at 2:11 p.m.)

 2              THE COURT:  All right.  Mr. Heberlig, you may

 3       proceed.

 4              MR. HEBERLIG:  Thank you, Your Honor.

 5       BY MR. HEBERLIG:

 6       Q.  Good afternoon, Mr. Ridgeway.

 7       A.  Good morning.

 8              MR. HEBERLIG:  Your Honor, at the break I had

 9       moved in Defense Exhibit 1025, and I'd offer it again at

10       this time.

11              THE COURT:  Received.

12              (Exhibit 1025 received into evidence.)

13       BY MR. HEBERLIG:

14       Q.  Lets pull that up for the witness, Andrej.

15              So Mr. Ridgeway, we were talking before the break

16       about the late summer of 2008.  And just to reorient us,

17       that was obviously after the period in which you had

18       obtained a lawyer, correct?

19       A.  Yes, sir.

20       Q.  It was after the period in which you had been threatened

21       with a 30-year mandatory minimum criminal charge, correct?

22       A.  Yes, sir.

23       Q.  And in response to that threat, your lawyer wrote a

24       letter to the prosecutor who was handling the investigation

25       at the time on your behalf, correct?
```

1    A.  Yes.

2    Q.  And this is that letter?

3    A.  It appears that way.

4    Q.  You recognize the law firm of Winston and Strawn to be

5    the law firm that your attorney William Sullivan was a

6    partner at, correct?

7    A.  Yes, sir.

8    Q.  All right.  And the date of this letter again is August

9    14, 2008, correct?

10   A.  That is correct.

11   Q.  Now, let's go if we can to the second page.  And, by the

12   way, I'll represent to you, sir, that this was provided to

13   us in this redacted form.  But I do want to focus on the

14   portion of the letter that's unredacted.  And let's start

15   with that paragraph right there.

16           Okay.  So, again, in August of 2008 on your behalf

17   your attorney wrote to the prosecutor handling the Nisur

18   Square investigation and he represented that Mr. Ridgeway

19   conducted himself honorably, courageously and responsibly at

20   every point during the incident.  Correct?

21   A.  It says that, yes.

22   Q.  And unambiguously he says Mr. Ridgeway did nothing

23   wrong.  Right?

24   A.  It says that, sir, yes.

25   Q.  And you maintain now that those statements were lies?

1   A.  Yes, sir.

2   Q.  So you were willing to use your own lawyers to make

3   misrepresentations to the prosecutors on your behalf.

4          MR. ASUNCION:  Object, Your Honor, to the form of

5   that question.

6          THE COURT:  Sustained.

7   BY MR. HEBERLIG:

8   Q.  All right.  We'll come back to this letter, but let's

9   move forward.  After your lawyer sent that letter, you had

10  an in-person meeting with the prosecutors and the FBI agents

11  who were handling the investigation, correct?

12  A.  Yes, sir, we had --

13  Q.  That meeting took place before you pled guilty.

14  A.  Yes, sir.

15  Q.  All right.  And at that meeting, the prosecutors asked

16  you questions about what happened in Nisur Square, right?

17  A.  Yes, sir.

18  Q.  They asked you both about your personal actions,

19  correct?

20  A.  Yes, sir.

21  Q.  And the actions of your fellow --

22  A.  Excuse me.

23  Q.  That's okay.  Take some water.  At that same meeting

24  they also asked you questions about the actions of your

25  colleagues on Raven 23, correct?

1    A.  Yes, sir.

2    Q.  Let's focus on your actions, first.  Now, during this

3    interview, you acknowledged firing your weapons, correct?

4    A.  I believe I did.

5    Q.  And you informed the prosecutors that you shot at a

6    limited number of targets.

7    A.  I believe so.  I don't quite remember exactly what I

8    told them during the meeting.

9    Q.  Recognize that it's difficult to remember exactly what

10   you said.  I'm interested in generally what you recall.  Am

11   I right that you maintained that the targets you shot at

12   were real threats?

13   A.  I did maintain that, yes, sir.

14   Q.  And you maintained that you followed the applicable

15   rules at the time?

16   A.  Yes, sir.

17   Q.  Now, am I right that during this first interview with

18   the prosecutors and the FBI you identified three targets

19   that you fired upon.  Does that ring a bell?

20   A.  No, sir.  You'd have to refresh my memory.  I'm not

21   quite sure what I told them.

22   Q.  One of the things you told the prosecutors you fired at

23   was the white Kia sedan, correct?

24   A.  Yes, sir.

25   Q.  And one of the things that you said you fired upon was

1    muzzle flashes coming from the southwest of the traffic

2    circle, correct?

3    A.  Yes, sir, I did tell them that.

4    Q.  You also informed them that you fired upon this white

5    Chevrolet Celebrity that was north of the traffic circle

6    while the convoy was exiting, correct?

7    A.  Yes, sir, I do recall that.

8    Q.  And prior to your plea agreement, those were the only

9    targets that you acknowledged personally shooting at,

10   correct?

11   A.  That I recall.

12   Q.  Now, a significant portion of that first interview

13   consisted of you telling the prosecutors about the actions

14   of your colleagues on Raven 23, correct?

15   A.  I believe so.  I don't recall what I told them.

16   Q.  You hoped to convince the prosecutors to use you as a

17   witness against your former colleagues, correct?

18   A.  Again, I don't recall what I told them.  If you have

19   something that can refresh my memory --

20   Q.  I'm just asking for your general recollection.  Do you

21   recall at the first meeting you had with the prosecutors and

22   the FBI that your hope was that they would choose to use you

23   as a witness against your former teammates?

24   A.  I don't remember, sir, what I told them, so I couldn't

25   say.

1    Q.  Did you hope to convince the prosecutors that you had

2    done nothing wrong at Nisur Square?

3    A.  Yes, sir, that was my hope.

4    Q.  Did you hope to convince the prosecutors not to charge

5    you with a criminal offense?

6    A.  Yes.

7    Q.  You hoped that perhaps you could get immunity?

8    A.  I don't remember what we had asked for.  I did not want

9    to get charged.  That was --

10   Q.  The goal going in was to avoid a charge and you knew

11   that to do that you had to provide information about your

12   former teammates, correct?

13   A.  I'm not sure what we -- in that beginning meeting I

14   don't remember what took place.

15   Q.  Well, do you think that just going in and telling them

16   that you'd done nothing wrong they'd say, Mr. Ridgeway, we

17   believe you, you got a free pass?  Is that how it worked

18   with them?

19   A.  No.  No, sir.

20   Q.  You knew that the only way you had a shot at getting

21   that free pass was if you provided information against your

22   former teammates, isn't that correct?

23   A.  Sir, at that point I don't remember what transpired in

24   that meeting so I couldn't say.  I did -- at one point I did

25   tell the prosecution about what the defendants had done in

1    Nisur Square.

2    Q.  And my question, sir, is didn't you understand going in

3    to that meeting that the way -- the only way -- you could

4    possibly avoid a criminal charge is by cooperating against

5    your former teammates?

6    A.  As I mentioned before, sir, I don't remember what that

7    first meeting -- I don't remember.

8    Q.  Well, in any event, after that first meeting, the

9    prosecutors didn't buy it, did they?

10   A.  No, sir, they did not.

11   Q.  They insisted that you plead guilty or face indictment.

12   A.  Yes, sir.

13   Q.  And you knew that meant you would face the 30-year

14   mandatory minimum charge if you didn't cut a deal.

15   A.  I suspected that, yes, sir.

16   Q.  So you cut the deal.

17   A.  I agreed to plead guilty, yes, sir.

18   Q.  And you ultimately did plead guilty only a few weeks

19   later.  At least you executed your plea agreement a few

20   weeks later in mid November 2008, correct?

21   A.  Sounds about right.  Yes, sir.

22   Q.  And that was only a few weeks after your first interview

23   with the prosecutors.

24   A.  I believe so.

25   Q.  All right.  Now, before we get to your plea agreement I

1    want to talk to you about your arrest.  The prosecutor asked

2    you some questions about the fact that you were arrested.

3    Do you remember that?

4    A.  I do, sir.

5    Q.  And it's true that at the time that you pled guilty you

6    were as a technical matter arrested, correct?

7    A.  I'm sorry.  Say again, sir?

8    Q.  You were arrested, at least as a technical matter,

9    correct?

10   A.  Oh, sir, I couldn't speculate.  I was told I was under

11   arrest, so that's my understanding of it.  So --

12   Q.  Did that occur here in Washington, DC?

13   A.  Yes, sir.

14   Q.  You did not live in Washington, DC, at the time, did

15   you?

16            MR. ASUNCION:  Objection, relevance, Your Honor.

17            THE COURT:  Overruled.

18   BY MR. HEBERLIG:

19   Q.  You did not live in Washington, DC, at the time, did

20   you?

21   A.  No, sir.

22   Q.  You lived in California?

23   A.  Yes, sir.

24   Q.  No one came to your home in California to arrest you?

25   A.  No, I was not arrested in California, sir.

1    Q.  You were told what date to appear for your plea hearing,

2    correct?

3    A.  Sir, I was told to fly to -- I was asked to fly to

4    Washington, DC, on my own.  I flew on my own.  And at a

5    point I met with the prosecution and FBI agents and it was

6    my understanding I was under arrest.

7    Q.  All right.  So you flew to DC on a commercial flight,

8    correct?

9    A.  Yes, sir.

10   Q.  You were not transported by any federal officials?

11   A.  No, sir.

12   Q.  And when you got here you surrendered to the FBI and

13   they handed you an arrest warrant, is that correct?

14   A.  Yes, I believe that's the way --

15   Q.  Were you ever handcuffed?

16   A.  No, but the agent dangled his handcuffs in front of me

17   and said, If you can behave yourself I will not put these on

18   you.

19   Q.  Okay.  So the answer is you were never handcuffed,

20   correct?

21   A.  Yes, sir.

22   Q.  Did they read you any of your Miranda rights when they

23   arrested you?

24   A.  I don't remember if they did or not, sir.

25   Q.  Were you ever locked in a cell?

1    A.  No, sir, I was not.

2    Q.  You were processed by the FBI and then you pled guilty

3    in court, correct?

4    A.  Yes, sir.

5    Q.  All on the same day?

6    A.  I'm not sure, sir.  I'm not sure of the process of it.

7    Q.  And then after your guilty plea you were permitted to go

8    home, correct?

9    A.  Yes, sir, I did go home.

10   Q.  All right.  Now, had they asked you to just voluntarily

11   appear for your plea hearing you would have done so,

12   wouldn't you?

13   A.  I'm sorry.  Could you repeat the question, please?

14   Q.  Had they asked you to just arrive in court at 11 a.m.

15   whatever day it was, you would have just come to court and

16   entered your plea of guilty, correct?

17           MR. ASUNCION:  Objection, relevance.

18           THE COURT:  Overruled.

19   BY MR. HEBERLIG:

20   Q.  I'll repeat the question.  Had they asked you to just

21   show up at the appointed time and hour, you would have come

22   to court voluntarily of your own accord, correct?

23   A.  Yes, sir.

24   Q.  Because you wanted to plead guilty.  That was your

25   intent at the time, correct?

```
 1    A.  Yes, sir.

 2    Q.  All right.  I want to ask you some questions now about

 3    your plea agreement.

 4              MR. HEBERLIG:  And Your Honor, this has been

 5    admitted as a government exhibit.  I have it marked in our

 6    system just with a different number.  It's 2292-R, defense

 7    exhibit.  And I'd ask if we could display it to the jury at

 8    this time?

 9              THE COURT:  You may.

10    BY MR. HEBERLIG:

11    Q.  All right.  Let me see if I can highlight this for you

12    as we begin here.  Sir, this is the document you were shown

13    during your direct examination that constitutes your plea

14    agreement, correct?

15    A.  Yes, sir.

16    Q.  It's a letter dated November 15, 2008, right?

17    A.  Yes, sir.

18    Q.  From the same U.S. Attorney's Office that had sent you

19    the target letter, correct?

20    A.  Yes, sir.

21    Q.  And addressed to the same lawyer who had written that

22    letter on your behalf that we looked at a moment ago,

23    correct?

24    A.  Yes, sir.

25    Q.  All right.  If we could go to the last page, Andrej.
```

1          One back.

2          Okay.  And just so we're all together, that's your

3      signature and you signed it on November 18, 2008, correct?

4      A.  Yes, sir.

5      Q.  Did you recall that a couple of weeks later you actually

6      went to court and formally entered the plea before a judge?

7      A.  I do recall going to court shortly after I -- I don't

8      remember what the proceeding was, but --

9      Q.  You actually appeared before Judge Lamberth, correct?

10     A.  I do remember appearing before Judge Lamberth.  And then

11     later shortly after, I believe it was Judge Urbina.

12     Q.  Judge Urbina.

13     A.  Yes, sir.

14     Q.  We can take that portion down, Andrej, and go back to

15     the first page.

16          Before we look at some of the specifics here, I'm

17     correct that you agreed to plead guilty to two criminal

18     charges, right?

19     A.  Yes, sir.

20     Q.  The first was a charge of voluntary manslaughter, right?

21     A.  Yes, sir.

22     Q.  And that was based on you killing the passenger of the

23     white Kia sedan, right?

24     A.  Yes, sir.

25     Q.  The second charge was attempted manslaughter, right?

1    A.  Yes, sir.

2    Q.  That charge related to wounding the driver of the white

3    Chevrolet Celebrity to the north of Nisur Square?

4    A.  Yes, sir.

5    Q.  Those were the only two charges to which you were

6    required to plead guilty?

7    A.  Yes, sir.

8    Q.  And, in fact, in this agreement the government

9    affirmatively agreed not to charge you with any other

10   offenses arising out of the Nisur Square incident.

11   A.  Sir, that we know of.  I don't -- those were the two

12   that -- those were the two instances that I knew about my

13   actions, and I -- and I pled guilty to.

14   Q.  I won't make you guess here.  Let's go to page 2,

15   paragraph 3.  And highlight the additional charges

16   paragraph, please.

17           All right.  This is part of your plea agreement,

18   obviously.  It's a section that talks about additional

19   charges.  And in essence what it says, that other than the

20   offenses to which you have agreed to plead guilty, the

21   United States government agreed not to charge you with any

22   other criminal offenses.  Correct?  Is that a fair reading

23   of what we have on the screen?

24   A.  That's what it says on the screen, sir, yes.

25   Q.  We can take that paragraph down, Andrej.

```
 1              And I'm correct that you have not yet been
 2     sentenced in your case?
 3     A.  No, sir, I have not.
 4     Q.  And sitting here today, you don't know precisely what
 5     sentence you will receive.
 6     A.  No, sir, I have no idea.
 7     Q.  Your plea agreement does contain some information about
 8     the potential sentence you could receive, right?
 9     A.  I believe so, yes, sir.
10     Q.  All right.  Do you understand that the plea agreement
11     caps the amount of prison exposure that you face?
12     A.  I think it does.
13     Q.  And why don't we highlight the second paragraph up top,
14     the potential penalties.
15              All right.  So the first charge to which you pled
16     guilty, the voluntary manslaughter charge, has a maximum
17     penalty of ten years in prison and then some other financial
18     penalties, correct?
19     A.  Yes, sir.  $250,000 fine, as well.
20     Q.  And a potential term of supervised release.  And the
21     charge of attempt to commit manslaughter has a potential
22     penalty of not more than seven years, correct?
23     A.  Yes, sir.
24     Q.  So you understand that the worst case scenario for you
25     at sentencing if you get the max for both charges, and
```

1    they're added together, is 17 years?

2    A.   That is my understanding, sir.

3    Q.   So that's 13 less than the 30-year mandatory minimum

4    right off the top.

5    A.   That is -- yes.

6    Q.   But you certainly hope to do much better than that at

7    sentencing, don't you?

8    A.   I do.

9    Q.   Your plea agreement also has a stipulation about the

10   United States Sentencing Guidelines, correct?

11   A.   Pardon me, sir?

12   Q.   Your plea agreement also has a provision about the

13   United States Sentencing Guidelines.  Are you aware of that?

14   A.   You'd have to show me, sir, I'm not quite --

15   Q.   Why don't we go to page 4, paragraph 6(C), which is up

16   top, the applicable guidelines range.  Sir, you're familiar

17   generally, are you not, with the concept of the United

18   States Sentencing Guidelines?

19   A.   I have an idea.

20   Q.   You understand that they're a factor the judges who

21   sentence criminal defendants have to consider when imposing

22   a sentence?

23   A.   I'm sorry.  Would you repeat the question, sir?

24   Q.   You understand that the United States Sentencing

25   Guidelines are a factor that judges must consider when

1    imposing sentence on a criminal defendant.  Correct?

2    A.  That's my understanding, sir.

3    Q.  They're no longer binding on the court, but they are a

4    factor for the court to consider, correct?

5    A.  That's my understanding.

6    Q.  All right.  Now, your plea agreement has some

7    information about the potential sentencing guidelines range.

8    And that's in the paragraph that I've highlighted here,

9    correct?

10   A.  I believe it does, sir.

11   Q.  And with respect to that voluntary manslaughter charge,

12   the plea agreement indicates that your guideline range that

13   the parties have agreed to is 63 to 78 months of potential

14   imprisonment, correct?

15   A.  That's what it says on here, sir.

16   Q.  And the attempt to commit manslaughter is 21 to 27,

17   right?

18   A.  Yes, that's what it says on here.

19   Q.  So if the Court were to follow the high end of the

20   sentencing guidelines range for the most serious charge that

21   you're facing, you would get about six and-a-half years,

22   correct?  The 78 months.

23   A.  That's what it says on here, sir.

24   Q.  But you hope to do much better than that in this case,

25   don't you?

1   A.  Sir, I put myself at the mercy of the Court.

2   Q.  Well, one of the things you're hoping for is that the

3   prosecutors seek leniency for you at sentencing, correct?

4   A.  That is correct, sir.

5   Q.  And you are hoping that they ask the judge to sentence

6   you to a lower term of imprisonment than what's called for

7   here in the sentencing guidelines, correct?

8   A.  Yes, sir.  I would hope for that.

9   Q.  And your plea agreement, in fact, contains what's known

10   as a cooperation provision.  Do you understand that?

11   A.  I believe so.

12   Q.  Why don't we take a look at it.  It's at paragraph 11

13   which is I think on page -- there it is.  Page 5.  Why don't

14   you highlight entirety of paragraph 11.

15           And I'm not going to read the entire thing.  But

16   in a nutshell, you understand that this agreement obligates

17   you to cooperate fully with the prosecutors in this case,

18   correct?

19   A.  Yes, sir.

20   Q.  You're required to be interviewed when they ask, right?

21   A.  Yes, sir.

22   Q.  And you're required to testify in proceedings related to

23   this case?

24   A.  Yes, sir.

25   Q.  And you're testifying today pursuant to that cooperation

1    agreement.

2    A.  Yes, sir.

3    Q.  Now, do you understand that at the end of your period of

4    cooperation, the prosecutors will evaluate whether you have

5    provided them with substantial assistance in the prosecution

6    of another.  Do you understand that?

7    A.  My understanding is if I provide truthful testimony

8    according to my testimony, then, yes, then they will

9    submit -- they will consider submitting a letter on my

10   behalf.

11   Q.  All right.  Why don't we move forward to paragraph 12 of

12   the agreement.  And just highlight that paragraph.  And

13   again, I'm not going to read it out loud or ask you about

14   the entirety of it.  But essentially you understand that

15   what goes into that decision, whether the prosecutors seek

16   leniency on your behalf, is an evaluation of whether you

17   have helped in the investigation or prosecution of other

18   individuals.  You understand that, right?

19   A.  That is my understanding, sir.

20   Q.  And if the prosecutors so conclude that you have

21   provided such assistance, they've agreed to provide a motion

22   on your behalf to the sentencing judge requesting leniency

23   for you.  Do you understand that?

24   A.  Yes, sir.

25   Q.  And that motion requesting leniency for you would be

 1    filed with your sentencing judge, right?

 2    A.   That is my understanding.

 3    Q.   Again, that would be Judge Lamberth.

 4    A.   Yes, sir.   That's my understanding.

 5    Q.   And you understand that if the judge grants that

 6    request, he can impose a sentence more lenient than what's

 7    called for in the sentencing guidelines, right?

 8    A.   That is my understanding, sir.

 9    Q.   If the judge wanted to, he has the discretion to

10    sentence you to as low as probation for your conduct arising

11    out of this matter, isn't that correct?

12    A.   I'm not sure, sir.

13    Q.   As you sit here, you certainly hope that the government

14    files that cooperation motion for you, correct?

15    A.   Yes, sir.

16    Q.   That cooperation motion is very important to you, isn't

17    it?

18    A.   Yes, sir.

19    Q.   Your whole future turns on that motion, doesn't it?

20    A.   Not my whole future, sir.

21    Q.   Well, it has the potential to shave years of prison off

22    the potential sentence you may face in this matter, correct?

23    A.   It does, sir.

24    Q.   You could go all the way from the max of 17 down to 1,

25    2, 3, somewhere in that vicinity, right?

```
 1    A.   That's right, sir.

 2    Q.   And that's very important to you.

 3    A.   It is important to me, sir.

 4    Q.   Now, when do you understand the government will decide

 5    whether to request leniency on your behalf?

 6    A.   I'm not sure, sir, when they make that decision.

 7    Q.   You know enough to know that decision has not been made

 8    yet, correct?

 9    A.   That's correct, sir.

10    Q.   It won't be made until after this trial, right?

11    A.   I'm not sure, sir.  I'm not sure when they make that

12    decision.

13    Q.   You certainly don't expect to be sentenced before the

14    conclusion of this trial, is that correct?

15    A.   Yes, sir.

16    Q.   Now, have you tried to provide prosecutors with

17    substantial assistance in this case?

18    A.   I've told the prosecution the truth.  Just what I know

19    from that day, sir.

20    Q.   You've met with them on multiple occasions, correct?

21    A.   Yes, sir.

22    Q.   How many meetings, ballpark, would you say you've had

23    with either prosecutors or the FBI from the time you pled

24    guilty to now?

25    A.   Quite a few, sir.
```

1   Q.   More than ten?

2   A.   I couldn't say, sir, but quite a few.

3   Q.   More than ten?  You can say that, can't you?

4   A.   I think.  It would be a guess.  You're trying to lock me

5   into a number of meetings, just I'm not sure.  I'd say

6   around ten, maybe more.

7   Q.   Ten or more.  You've testified in the grand jury?

8   A.   I have.

9   Q.   You prepared for your testimony here today?

10   A.   I have.

11   Q.   How many trial preparation meetings did you have with

12   the prosecutors?

13   A.   For this, sir?

14   Q.   For this.

15   A.   I'm not sure.  Maybe five, sir.

16   Q.   Okay.  Did you practice for your testimony?

17   A.   We reviewed, sir, yes.

18   Q.   Did one of the prosecutors pretend to be a defense

19   attorney and ask you some mock cross-examination?

20   A.   Yes, sir.

21   Q.   Now do you believe you will have provided substantial

22   assistance to the prosecutors in this case if the defendants

23   are found not guilty?

24   A.   I'm sorry.  Would you repeat that, sir?

25   Q.   Do you believe that you will have provided substantial

1   assistance to the prosecutors in this case if the defendants

2   are found not guilty?

3   A.  I wouldn't say substantial, sir, no.  I wouldn't

4   think -- I think I provide a piece of information.  I

5   believe that there are other defendants in this case that

6   will provide -- if not the same or maybe more information

7   than I provided.  My understanding is I'm providing a piece

8   of the puzzle, sir.  That's what I've been told.

9   Q.  Do you believe the prosecutors will ask the Court for a

10  lesser sentence for you if the defendants are found not

11  guilty?

12  A.  I believe they -- I would hope they would.

13  Q.  All right.  Now, you testified in direct examination

14  that your plea agreement requires you to tell the truth,

15  right?

16  A.  Yes, sir.

17  Q.  I'd like to take a look at those provisions.  If we can

18  look again at paragraph 11.  If we could highlight the

19  cooperation paragraph again.

20          In the very first sentence it says that -- you

21  understand that "your client" is a reference to you,

22  correct?

23  A.  Yes, sir.

24  Q.  So you agree to cooperate fully, completely and

25  truthfully and so on.  Do you see that?

 1    A.  Yes, sir.

 2    Q.  All right.  And the same paragraph says that your

 3    cooperation obligation includes truthfully providing all

 4    information in your possession to the -- for lack -- to

 5    shorthand it, prosecutors or FBI, correct?

 6    A.  That is my understanding, sir.

 7    Q.  So you can't withhold relevant information, right?

 8    A.  Correct.

 9    Q.  You must disclose everything you know about the case.

10    A.  Everything I know and remember.

11    Q.  And that was your understanding at the time you signed

12    this plea agreement on November 18, 2008.

13    A.  That's correct, sir.

14    Q.  And you also understood, and you understand today, that

15    there are potential consequences to you if you don't tell

16    the truth under this agreement.

17    A.  Yes, sir.

18    Q.  Let's look at those.  It's at paragraph 13.  Breach of

19    agreement.  Why don't you just do the top paragraph.

20    Actually take that back.  I want you to highlight a little

21    lower down.  Sorry about that.  Go on to the next page --

22    I'm sorry, the bottom of page 7.  Misspoke.  "Nothing in

23    this plea agreement."  All right, let's start here.

24              This part of your agreement says:  Nothing in the

25    agreement shall be construed to permit you to commit

1   perjury, to make false statements or declarations, to

2   obstruct justice or to protect you from prosecution for any

3   crimes not included within this agreement or committed after

4   the execution of the agreement.

5          And you understand that to be part of your

6   agreement, correct?

7   A.  Yes, sir.

8   Q.  All right.  And then carrying on it says:  Your client

9   understands and agrees that the United States -- let's just

10   go to the next page -- reserves the right to prosecute you

11   for any such offenses.  You further understand that any

12   perjury, false statements or declarations or obstruction of

13   justice relating to your obligations under this agreement

14   shall constitute a breach of this agreement.  However, in

15   the event of such a breach, your client will not be allowed

16   to withdraw this guilty plea.

17          And I've read that accurately, correct?

18   A.  I believe so, sir.

19   Q.  Let me just unpack it a little bit.  You're not

20   permitted to lie under the agreement, right?

21   A.  That's correct, sir.

22   Q.  And you can, in fact, be prosecuted for lies that you

23   tell during your cooperation, right?

24   A.  Yes, sir.

25   Q.  Any perjury, false statement or obstruction of justice

1   by you constitutes a breach of this plea agreement, correct?

2   A.  Yes, sir.

3   Q.  And you know and you understood when you signed this

4   agreement that if there is such a breach, you're not

5   permitted to withdraw your guilty plea, correct?

6   A.  Yes, sir.

7   Q.  So the two crimes that you've pled guilty to remain

8   intact, even if you breach the agreement, right?

9   A.  That was my understanding.

10  Q.  But you can be separately prosecuted by the government

11  for those additional crimes that we just talked about, false

12  statements and the like, correct?

13  A.  That's my understanding, sir.

14  Q.  And, in fact, you can also be prosecuted for any other

15  criminal offenses relating to the Nisur Square incident,

16  correct?

17  A.  Yes, sir, I believe --

18  Q.  And you understand, and you understood at the time that

19  you signed this agreement, that the decision whether to

20  prosecute you for any false statements is left to the

21  discretion of the prosecutors, correct?

22  A.  I wasn't sure, but --

23  Q.  Well, you understand that the defense attorneys have no

24  ability to prosecute you for making any false statements

25  under your plea agreement, correct?

1    A.  That's correct, sir.

2    Q.  So the only person who can institute criminal charges --

3    or, people who could institute criminal charges against you

4    for lying under your plea agreement are United States

5    federal prosecutors, correct?

6    A.  Yes, sir.

7    Q.  Including the gentlemen at this table.

8    A.  Yes, sir.

9    Q.  And it's solely up to them to make the decision whether

10   you've lied.  Correct?

11   A.  I believe so.

12   Q.  Then let's talk about your acceptance of responsibility

13   in this case.  Am I correct that your acceptance of

14   responsibility for engaging in wrongdoing has evolved over

15   time?

16   A.  It has, sir.

17   Q.  At the time of your guilty plea, you accepted

18   responsibility for two criminal charges, right?

19   A.  Yes, sir.

20   Q.  And again, those related to the passenger of the white

21   Kia and the driver of that white Chevrolet Celebrity,

22   correct?

23   A.  Yes, sir.

24   Q.  But during your initial interview with the prosecutors,

25   you defended shooting at both targets, did you not?

1    A.  I did, sir.

2    Q.  Nonetheless, a few weeks later your guilty plea was

3    based on shooting those two people, correct?

4    A.  Yes, sir.

5    Q.  But I'm right, am I not, that the factual basis for your

6    guilty plea is actually quite narrow?

7    A.  I'm sorry, sir.  Would you repeat the question?

8    Rephrase it a little more understandably?

9    Q.  Sure.  Isn't it true that the facts that you admitted to

10   to support your guilty plea were actually quite narrow?

11   Would you agree with that statement?

12            MR. ASUNCION:  Objection.  It's a confusing

13   question.

14            THE COURT:  Sustained.

15   BY MR. HEBERLIG:

16   Q.  Well, I can put it in more direct terms.  When you pled

17   guilty, first of all, there was an agreed-upon -- sorry.

18            You okay to proceed?

19   A.  Go ahead, sir.

20   Q.  When you pled guilty, there was an agreed-upon statement

21   of facts that accompanied your guilty plea, correct?

22   A.  There was -- yes, sir.

23   Q.  And that was a document that was filed in court and it

24   accompanied the other paperwork that constituted your guilty

25   plea.

1    A.   Yes, sir.

2    Q.   Do you need more water up there?  Are you out?

3    A.   The water made me cough.  Went down the wrong --

4    Q.   We'll give it a second.

5    A.   I'm good.

6    Q.   So talking about that factual proffer, if you will, or

7    the statement of facts that supported your guilty plea,

8    that's what my questions relate to, okay?

9    A.   Understood.

10   Q.   You're familiar with that document, generally?

11   A.   Yes, sir.

12   Q.   Now, you admitted in that document only that when you

13   used deadly force at those two individuals, your actions

14   were not objectively reasonable.  Is that correct?

15   A.   Not objectively reasonable?

16   Q.   Yes.

17   A.   I had no good reason, if that's what you're referring

18   to.

19   Q.   No.  I'm actually talking about your mindset at the time

20   that you pled guilty and the statement of facts that you

21   agreed to.  Am I right that what you pled guilty to was that

22   your actions in shooting those individuals were not

23   objectively reasonable?

24   A.   Objectively -- no, they were not.

25   Q.   All right.  Why don't we pull up the document.  For the

 1    witness only at the moment.  Court's indulgence.  This is

 2    Defense Exhibit 2293.  And why don't we just highlight the

 3    top portion up here.

 4            Do you recognize this to be a court document that

 5    constitutes your factual proffer in support of the guilty

 6    plea?

 7    A.  Yes, sir.

 8            MR. HEBERLIG:  I'd offer it, Your Honor?

 9            MR. ASUNCION:  No objection.

10            THE COURT:  Received.

11            (Exhibit 2293 received into evidence.)

12    BY MR. HEBERLIG:

13    Q.  All right.  If we can go to paragraph 14 of the

14    document.  And if we can highlight just that paragraph 14.

15    All right.  This paragraph is specifically related to that

16    white Kia sedan, correct?

17    A.  Yes, sir.

18    Q.  And I'm focused on the end of this page -- it will carry

19    over on the next page -- where you agreed that a reasonable

20    person in your situation would have recognized that there

21    were other safe alternatives to the -- go to the next

22    page -- to the use of deadly force against the passenger of

23    the white Kia sedan.  Do you see that?

24    A.  Yes, sir.

25    Q.  And that's what you agreed to?

```
1    A.  Yes, sir.

2    Q.  Let's go back one page for a moment.  And if we can

3    highlight paragraph 13, please.  All right.  And this is

4    actually in reference to both the white Kia sedan and the

5    white Chevrolet Celebrity.  The last sentence of this

6    paragraph says that your use of deadly force in both

7    instances was not objectively reasonable under all of the

8    circumstances as they appeared to you at the time.  Correct?

9    A.  That's correct, sir.

10   Q.  And that's what you agreed to, right?

11   A.  Yes, sir.

12   Q.  And as a result of that, you had no -- you agreed that

13   you had no legitimate claim of self-defense with respect to

14   shooting those two individuals, right?

15   A.  Yes, sir.

16   Q.  But am I right that nowhere in your statement of facts

17   does it say that you personally thought that there were

18   alternatives to using deadly force?

19              MR. ASUNCION:  Objection, Your Honor.

20              MR. HEBERLIG:  Your Honor?

21              THE COURT:  Yes.

22              MR. HEBERLIG:  I'll repeat the question.

23   BY MR. HEBERLIG:

24   Q.  Am I correct --

25              THE COURT:  Go ahead.
```

```
 1                    (Pause.)
 2               THE COURT:  Go ahead and repeat it.
 3    BY MR. HEBERLIG:
 4    Q.  Am I correct, sir, and I'm referring now to the
 5    statement of facts you agreed to, that nowhere in that
 6    statement of facts does it say that you personally thought
 7    that there were alternatives to using deadly force against
 8    those two people?
 9    A.  I'm sorry.  Could you ask -- rephrase the question
10    maybe, sir?
11    Q.  Yes.  We've established that -- you agreed that an
12    objective, hypothetical reasonable person would have
13    concluded there were alternatives to deadly force.  Correct?
14               MR. ASUNCION:  Objection, Your Honor.
15               THE WITNESS:  Yes.
16               THE COURT:  Overruled.
17    BY MR. HEBERLIG:
18    Q.  You agreed to that, correct?
19    A.  Yes.
20    Q.  I think, as you said just a moment ago, that meant that
21    you had no legitimate claim of self-defense, correct?  You
22    agreed to that?
23    A.  Yes, sir.
24    Q.  And my question -- maybe I'll take a step back -- you
25    understand that self-defense has two components.  You have
```

1    to personally believe you're acting in self-defense,

2    correct?

3    A.  I believe so, yes, sir.

4    Q.  You understood that.  And you understood that it also

5    needs to have an objective component.  And that is in

6    addition to personally believing that you're acting in

7    self-defense, that belief must be objectively reasonable.

8    You understood that, correct?

9    A.  Yes, sir.

10   Q.  And my question, sir, is even though you agreed in this

11   document that your actions were not objectively reasonable,

12   you never admitted that you yourself weren't acting in fear

13   and in need of using self-defense.  Isn't that right?

14   A.  I'm sorry, sir.  Repeat the question.

15   Q.  I want to get into your own subjective mindset and what

16   you agreed to in this factual proffer in support of your

17   guilty plea.  And I'm asking you, am I correct that when you

18   pled guilty, you never admitted in this document that you

19   personally thought that there were alternatives to firing at

20   those two cars?

21   A.  That I never thought -- you'll have to repeat the

22   question, sir.

23   Q.  You were still defending your own actions, weren't you?

24        MR. ASUNCION:  Objecting to that question,

25   Your Honor.

1          THE COURT:  Sustained.

2    BY MR. HEBERLIG:

3    Q.  You were maintaining that you personally still thought

4    that deadly force was necessary against those two cars.

5    A.  Sir, I don't know exactly what you're getting at.  In

6    reference to what, sir?

7    Q.  In reference to the two cars that you pled guilty to

8    shooting.  At the time of your guilty plea you were still

9    hanging on to the belief, your personal belief, that it was

10   necessary to fire at those cars, weren't you?

11   A.  I don't recall it, sir.

12   Q.  Okay.  We can take that down, Andrej.

13          Now, after you pled guilty you had additional

14   meetings with the FBI and prosecutors as part of your

15   cooperation obligation, correct?

16   A.  Yes, sir.

17   Q.  And yesterday I believe you testified that during those

18   initial meetings following your guilty plea, you continued

19   to lie to prosecutors and to the FBI, correct?

20   A.  Yes, sir.

21   Q.  All right.  And you also withheld relevant information

22   during those meetings after your guilty plea from the

23   prosecutors and the FBI.

24   A.  I'm not sure what I withheld, sir.

25   Q.  Well, you didn't own up to everything you shot at,

1    correct?

2    A.   You'd have to refresh my memory, sir.

3    Q.   Wasn't it only much later that you admitted firing shots

4    at that black Chevrolet Suburban you testified about?

5    A.   I don't recall, sir, if I told them in the beginning or

6    not.   I'm not sure.

7    Q.   So you acknowledge lying, correct?

8    A.   About the muzzle flashes to southwest, yes, I did.

9    Q.   But you're not sure at this moment whether you withheld

10   information?

11   A.   Yes, I'm not sure, sir.

12   Q.   I think you said you lied about seeing -- you said you

13   lied about seeing gunfire and muzzle flashes in Nisur

14   Square.   That was the topic that you lied about to the FBI

15   and the prosecutors, correct?

16   A.   Yes, sir.

17   Q.   In other words, what you've said during those first

18   meetings after your guilty plea was that you did see

19   incoming gunfire and muzzle flashes in Nisur Square.

20   A.   I did say that, sir.   I did tell them that I saw muzzle

21   flashes.

22   Q.   And to be clear, you did say that after you signed your

23   plea agreement, after you pled guilty before the judge, and

24   interviews with the FBI and the prosecutors.   Correct?

25   A.   Yes, sir.

1    Q.  And you say today that was a lie.

2    A.  It was, sir.

3    Q.  Now, the prosecutor asked you about when it was that you

4    came clean and told the FBI that you had been lying.  Do you

5    remember that question?

6    A.  I do, sir.

7    Q.  You testified that occurred sometime in roughly the fall

8    of 2009, correct?

9    A.  That sounds about right, sir.

10   Q.  That was a little less than a year after you pled

11   guilty.

12   A.  Yes, sir.

13   Q.  Now, sir, we talked at the outset of this examination

14   about the fact that I'd asked you some questions at a prior

15   proceeding.  Do you remember that?

16   A.  Yes, sir.

17   Q.  And one of the questions I asked you during that prior

18   proceeding was whether you had been honest with the

19   prosecutors and the FBI from the moment of your guilty plea

20   forward.  Do you remember that?

21   A.  Yes, sir.

22   Q.  And do you remember telling me that you believe you had

23   been honest from the moment of your guilty plea forward?

24   A.  I don't recall -- I don't recall.

25   Q.  Well, why don't we take a look.

 1    A.   Okay, sir.

 2    Q.   And this is defense exhibit for the witness only, 3590,

 3    and let's just look at the first page first.  This is

 4    December 9, 2013, p.m. transcript of a prior hearing in this

 5    case.  And I'd like to take you specifically to pages 103

 6    and 104.

 7              And if we can highlight, Andrej, starting at page

 8    103, lines 24 and 25.  And then on the next page, if you're

 9    able to pull that up next to it, from lines 1 to 7.

10              Okay.  So, again, just so the record's clear, this

11    is a December 9 hearing, 2013, in the p.m. session, pages

12    103, lines 24 and 25, to 104, lines 1 to 7.  Can you scroll

13    that a little bit down, Andrej, to make sure we have that

14    line?  Some questions about you --

15              MR. HEBERLIG:  Your Honor, I'd like to publish

16    this to the jury at this time as an inconsistent statement.

17              THE COURT:  You may.

18    BY MR. HEBERLIG:

19    Q.   Can we publish this, please?

20              All right.  Again, this is me asking questions and

21    you're giving the answers, correct?

22    A.   Yes, sir.

23    Q.   My question to you, sir, was:  And isn't it true that

24    you lied to the prosecutors even after you pled guilty.

25    Your answer:  I don't remember lying to the prosecutors

 1   after I pled guilty.  My question:  Do you think that you

 2   didn't?  Do you think you were honest from the moment of

 3   your plea forward?  Answer:  From the moment of my plea

 4   forward?  Question:  Correct.  Answer:  I believe I was.

 5            That's the testimony you gave at that prior

 6   proceeding in 2013, correct?

 7   A.  Sir, yes.  But it was also established that I couldn't

 8   remember the dates, and I freely admitted that I came clean

 9   with the prosecution throughout my testimony --

10   Q.  You did.

11   A.  -- several times.

12   Q.  You did?

13   A.  I may have misspoken on here, but I made it clear during

14   my testimony that I had lied to the prosecutors, and I did

15   come clean.

16   Q.  Let's examine that.  Is it your testimony that you were

17   just misspeaking here when you said that you believe that

18   you were honest from the moment of your plea forward?

19   A.  Probably, sir.

20   Q.  You may have just forgotten?

21   A.  Confused, sir, maybe.  I'm not sure.  But I did -- it

22   was fairly obvious to the court, at least to -- to myself,

23   that --

24   Q.  Speak for yourself, Mr. Ridgeway.  I'm not sure you can

25   speak for the Court.

1   A.   Okay.  But I did make it clear that I did lie regarding

2   the muzzle flashes.  And at some point I did come clean,

3   sir.

4   Q.   Well, coming clean was a pretty big deal, was it not?

5   A.   Yes, sir.

6   Q.   It was a fundamental shift in your story, a complete

7   180, right?

8   A.   I wouldn't say a 180, but I came clean, sir.

9   Q.   How would you characterize it?  Because at first you

10  said there was incoming gunfire and there were muzzle

11  flashes, correct?

12  A.   Yes, sir.

13  Q.   Then when you came clean, you said there was no incoming

14  gunfire and no muzzle flashes.  That's not a complete 180?

15  A.   Well, sir, there was one portion that I withheld or I

16  lied about.  And then I came clean on that one area.  So

17  regarding that specific area, yes, sir, it would have been

18  180.

19  Q.   I see.  And is that the only area you withheld and came

20  clean about?

21  A.   Pardon me, sir?

22  Q.   Was that the only area that you lied about and that you

23  came clean about?

24  A.   With regards to the muzzle flashes?

25  Q.   With regard to any of your conduct in Nisur Square.

1    A.  I believe it was.

2    Q.  Well, I guess we'll see.  But my question to you, sir,

3    is, when you were testifying less than six months ago, you

4    were confused about whether you lied to the FBI after you

5    pled guilty in this case?

6    A.  I think it was regarding the date, sir.  I wasn't sure

7    on what date it was.

8    Q.  The dates are very clear in this question.  Before or

9    after your guilty plea.  Your guilty plea was a significant

10   moment in your life, was it not?

11   A.  It was, sir.

12   Q.  And you agreed in your guilty plea that you would

13   testify truthfully and provide accurate information to these

14   gentlemen from that moment forward, did you not?

15   A.  Yes, sir, I did.

16   Q.  We've established that by looking at your agreement,

17   haven't we?

18   A.  Yes, sir.

19   Q.  So it was a pretty big deal when for almost a year after

20   your agreement you continued to lie to them, correct?

21   A.  I did lie, yes, sir.

22   Q.  And four or five months ago when you testified, you're

23   telling me that you didn't know whether you lied to the FBI

24   after you pled guilty.  Is that your testimony?

25   A.  I believe I was confused, sir.  I wasn't sure.  Maybe it

1    was the question.  I don't recall.

2    Q.  We can take that down.

3          Let's talk for a minute about why.  Why did you

4    change your testimony in this fundamental way?  And I want

5    to refer you specifically to what you said yesterday.  You

6    were asked by the prosecutor what persuaded you to

7    supposedly come clean.  Do you remember that question?

8    A.  I did, sir.

9    Q.  And one of the reasons you gave -- and I want to be

10   precise here, and I'll quote from yesterdays transcript.

11   Page 61 of the a.m. session, lines 22 to 25.  Quote:  Quite

12   frankly, I was looking at -- I wasn't telling the truth.

13   And if I continued to lie, I knew that the government would

14   exercise their right to tear up my agreement.

15          That was your testimony yesterday, correct?

16   A.  Is it on here, sir?  Were you showing it to me on here?

17   Q.  Do you need to see it to know that's what you testified

18   to yesterday?

19   A.  I believe I said that, but I didn't know if you were --

20   Q.  I was just reading from yesterday.

21   A.  Understood.

22   Q.  That's consistent with your memory of what you testified

23   to yesterday, correct?

24   A.  That sounds about right, yes, sir.

25   Q.  Now, the reason you were concerned that the prosecutors

1    would tear up your agreement is because they had already

2    told you they didn't believe what you were saying, correct?

3    A.   That is correct, sir.

4    Q.   At some point in these meetings after the time of your

5    guilty plea but before you came clean, they told you they

6    didn't believe your story, right?

7    A.   They did tell me that, yes, sir.

8    Q.   And the prosecutors put pressure on you to come clean.

9    A.   Yes, sir.  They wanted me to tell the truth.  Yes, sir.

10   Q.   They told you they did not believe you when you said

11   that there was incoming gunfire directed at the convoy,

12   right?

13   A.   Sir, specifically what -- I don't recall what

14   specifically it was that they didn't believe.  But -- yeah,

15   they didn't believe me, sir.

16   Q.   They pressured you to change your story to support the

17   narrative that they maintained, correct?

18   A.   No, sir.  They pressured me to tell the truth.

19   Q.   It was soon after this that you told the prosecutors

20   that you had lied in those earlier interviews, right?

21   A.   Yes, sir.

22   Q.   And this pressure from the prosecutors played a major

23   role in your decision to flip flop, didn't it?

24   A.   Repeat the question, sir.

25   Q.   This pressure from the prosecutors played a major role

1    in your decision to change your testimony.

2    A.  Yes, it did play a role, sir.

3    Q.  Now let's talk about what happened after you admitted to

4    the prosecutors that you had lied to them and the FBI after

5    your guilty plea.  Okay?  Did the prosecutors ever tear up

6    your agreement?

7    A.  Not that I know of -- no.  No, sir.

8    Q.  Did the prosecutors ever prosecute you for making false

9    statements or committing obstruction of justice by telling

10   those lies?

11   A.  No, sir.

12   Q.  You understood from your plea agreement that they could

13   have deemed you in breach, correct?

14   A.  Yes, sir.

15   Q.  They could have started over and prosecuted you for any

16   offenses whatsoever related to Nisur Square, save those two

17   charges that you already pled guilty to, correct?

18   A.  That is, sir.

19   Q.  And they could have brought the 30-year mandatory

20   minimum charge back into the mix, right?

21   A.  Yes, sir.

22   Q.  But they did none of that, did they?

23   A.  Not as of yet, sir.

24   Q.  They didn't even force you to amend your plea agreement

25   in any respect to increase the exposure that you faced, did

1    they?

2    A.  Not that I know, sir.

3    Q.  There were no consequences to you whatsoever for lying

4    to the FBI and the prosecutors after you pled guilty, were

5    there?

6    A.  No, sir.

7    Q.  That's because you understood that they needed you to

8    make their case, correct?

9    A.  No, sir, I don't think they needed me.  They used me as

10   a piece of their case.  That was my understanding all along,

11   sir.

12   Q.  Well, you understood if they tore up your agreement and

13   charged you with additional offenses, you no longer would

14   have been obligated to cooperate in this matter, correct?

15   A.  Sir, would you repeat that?

16   Q.  You understood if they tore up that agreement and

17   charged you with additional offenses related to Nisur

18   Square, deemed you in breach, you no longer would have been

19   obligated to cooperate, correct?

20   A.  That's correct, sir.

21   Q.  So nothing happened.  You lied to the FBI with impunity,

22   correct?

23   A.  I did lie, yes, sir.

24   Q.  Now let's talk for a minute about how your testimony

25   changed.  First you said there was incoming gunfire,

1    correct?

2    A.  Yes, sir, I did.

3    Q.  And you said that you returned fire at those muzzle

4    flashes that you saw, right?

5    A.  Yes, sir, I did.

6    Q.  But then when you flipped and you changed your testimony

7    in this fundamental way, you said there was no incoming

8    gunfire, correct?

9    A.  That's right, sir.

10   Q.  And you said you did not return fire at any muzzle

11   flashes that day.

12   A.  That's right, sir.

13   Q.  And I think we've already established that this was a

14   major change in your story, correct?

15   A.  Yes, sir.

16   Q.  And your new version of events is more incriminating for

17   these defendants if it's believed, correct?

18   A.  It would be, sir.

19   Q.  And you understood that this new version of events if

20   believed makes it more likely that the defendants will be

21   convicted in this case.

22   A.  Sir, that was not my intent, sir.  I needed to come

23   clean, sir.  I came clean.

24   Q.  Do you believe that this change in your testimony

25   increases your chances for leniency?

1    A.  I'm sorry.  Repeat the question.

2    Q.  Do you believe that this fundamental change in your

3    testimony increases your chances at leniency?

4    A.  No, I don't think it does.

5    Q.  Your position is that you're now telling the truth about

6    the absence of incoming gunfire in Nisur Square?

7    A.  Yes, sir.

8    Q.  And that truth was not in your sworn statement to the

9    Department of State?

10   A.  Say it again, sir.

11   Q.  That truth was not in your sworn statement to the

12   Department of State?

13   A.  I lied in my -- about the muzzle flashes in my

14   Department of State interview, yes, sir, I did.

15   Q.  And you didn't tell that truth to your dad the day after

16   the Nisur Square incident, did you?

17   A.  No, I wouldn't tell my father that.  I don't want him to

18   be disappointed in me.  I was embarrassed.

19   Q.  And your lawyers didn't speak that truth when they told

20   prosecutors that you acted honorably and courageously at

21   Nisur Square, did they?

22   A.  I'm sorry.  Would you repeat that, sir?

23   Q.  Your lawyers didn't speak that truth when they told the

24   prosecutors that you acted honorably and courageously at

25   Nisur Square, did they?

1    A.  My lawyers were representing my interest.

2    Q.  You only spoke that truth after the prosecutors told you

3    that they didn't believe your story, right?

4    A.  I'm sorry, sir.  One more time.

5    Q.  You only told that truth after the prosecutors told you

6    they didn't believe your story.

7    A.  I did come clean, yes, sir.

8    Q.  And you only told that truth after the prosecutors

9    pressured you, right?

10   A.  I was receiving pressure, and yes, sir, I did come

11   clean.

12   Q.  All right.  Let's back up for a moment.  I want to talk

13   about when you started working for Blackwater in Baghdad.

14   Am I right that your first assignment when you arrived in

15   Baghdad after -- let me take that back.  You said you had an

16   initial assignment with some other team, correct?

17   A.  Yes, sir.

18   Q.  But shortly thereafter you joined Raven 23, right?

19   A.  I was assigned, yes, sir.

20   Q.  And you stayed on that team from thereafter during the

21   rest of your tenure in Baghdad, correct?

22   A.  Yes, sir.

23   Q.  And Raven 23 was one of the tactical security teams.

24   A.  Yes, sir.

25   Q.  And they were one of those teams that were on call to

1    provide security to any other teams if there was some

2    trouble out in the Red Zone, right?

3    A.  Yes, sir.

4    Q.  Now, on a typical day if Raven 23 was one of the primary

5    or secondary teams, you'd receive a morning briefing,

6    correct?

7    A.  Typically, yes, sir.

8    Q.  One of the aspects of that morning briefing was to

9    review the use of force rules?

10   A.  Yes, sir.

11   Q.  And those rules included a protocol for what to do if a

12   vehicle came too close to the convoy, correct?

13   A.  Yes, sir.

14   Q.  And you were briefed on that topic every day that you

15   had a mission, or pretty close thereto?

16   A.  Almost every day, yes, sir.

17   Q.  And what you were trained on was that if a car came too

18   close to the convoy, it posed a threat as a potential

19   suicide car bomb or a VBIED, correct?

20   A.  Yes, sir.

21   Q.  And VBIEDs, during your tenure at Blackwater, were a

22   constant threat in Baghdad, were they not?

23   A.  It was a threat, yes, sir.

24   Q.  And there were various escalating steps you were told to

25   attempt to go through to stop a VBIED threat before it got

1      to a convoy, correct?

2      A.  Yes, sir.

3      Q.  If you had the ability to do them all, you'd first give

4      some sort of verbal or hand warning, correct?

5      A.  Yes, sir.

6      Q.  And then you might throw a water bottle at the car,

7      correct?

8      A.  Yes, sir.

9      Q.  Pen flare is an option?

10     A.  Yes, sir.

11     Q.  You might fire shots into the grille of the car to

12     disable it, correct?

13     A.  Yes, sir.

14     Q.  And if the vehicle kept coming, you would shoot the

15     driver, correct?

16     A.  Yes, sir.

17     Q.  And you'd shoot the passenger, right?

18     A.  Yes, sir.

19     Q.  Because the passenger might have some secondary device

20     that could set off the bomb, correct?

21     A.  Yes, sir.

22     Q.  So you did receive specific training to engage the

23     passenger of a suspected VBIED if necessary, correct?

24     A.  Yes, sir.

25     Q.  And not to state the obvious, but that means you

1   received training that potential VBIEDs could have more than

2   one occupant of the vehicle.  Correct?

3   A.  Yes, sir.

4   Q.  Now, under this protocol if the threat was imminent, you

5   could escalate all the way to the top as circumstances

6   warranted, correct?

7   A.  Yes, sir.

8   Q.  All right.  Shift gears a little bit and talk about the

9   conditions in Baghdad.  Can you describe the environment in

10  Baghdad when you went out into the Red Zone?

11  A.  It was dangerous, sir.

12  Q.  Can you elaborate any more than that?

13  A.  Maybe you could rephrase the question.

14  Q.  Can you just describe for us generally what it was like

15  when you went out with Raven 23 into the Red Zone in

16  Baghdad?

17  A.  Well, it was a very hostile environment.  You were --

18  your senses were quite high.  You were scared.

19  Q.  You feared for your life every time you went out there,

20  didn't you?

21  A.  Yes, sir.

22  Q.  And you faced multiple kinds of threats in the Red Zone,

23  right?

24  A.  Yes, sir.

25  Q.  Anything from AK-47 fire?

1    A.  Yes.

2    Q.  To VBIEDs.  We talked about those, right?

3    A.  Yes, sir.

4    Q.  To sniper fire?

5    A.  Yes.

6    Q.  Sometimes rocket-propelled grenades?  RPGs?

7    A.  Yes, sir.

8    Q.  And you faced the threat of ambush attacks in the Red

9    Zone too, correct?

10   A.  Yes, we have.

11   Q.  And it was difficult in Baghdad to determine who the

12   insurgents were, right?

13   A.  Yes, sir.

14   Q.  They didn't wear terrorist uniforms or other apparel

15   signifying that they were the enemy?

16   A.  No, sir.

17   Q.  They often tried to blend in among the civilian

18   population?

19   A.  Yes, sir.

20   Q.  And occasionally they sometimes tried to disguise

21   themselves by wearing uniforms of either the Iraqi police or

22   the Iraqi army, correct?

23   A.  Yes, sir.

24   Q.  Now, you were asked some questions yesterday about your

25   feelings toward the Iraqi people.  Do you remember those

1    questions?

2    A.  Yes, sir.

3    Q.  And I think you said as general matter you did not care

4    for the Iraqi people in Baghdad?

5    A.  Yes, sir.

6    Q.  And you testified that you used a derogatory term to

7    refer to Iraqi people, at least in Baghdad, correct?

8    A.  Upon occasion, yes, sir.

9    Q.  Now, am I right that Iraqis are not the only ethnic or

10   racial group you have referred to with a derogatory term

11   like that?

12   A.  Yes.  Yes, sir, I have.  I mean, I have, yes.  I have

13   before, yes.

14   Q.  You've used racial slurs in a derogatory manner towards

15   African Americans, haven't you?

16   A.  Yes, sir.

17   Q.  In fact, you have used the "N" word to refer to

18   President Barack Obama.

19   A.  I believe I did, yes, sir.

20   Q.  Is that commonly how you banter with your friends?

21   A.  Pardon me, sir?

22   Q.  That's just a term you used with your friends?

23   A.  It was an inappropriate term, yes, sir.  I regret saying

24   it.

25   Q.  Do you have disregard for the entire African American

1    population?

2    A.  No, not at all, sir.

3    Q.  In the six months leading up to the Nisur Square

4    engagement, am I right that the conditions in Baghdad were

5    getting progressively worse?

6    A.  Would you repeat the question, sir?

7    Q.  Yes.  In the six months leading up to what happened at

8    Nisur Square, am I correct that the conditions in Baghdad

9    were getting progressively worse?

10   A.  It seemed that way, sir.

11   Q.  And that's, in fact, something that you told your

12   brother a few days before this incident happened in an

13   email, correct?

14   A.  I don't recall the email, sir.

15   Q.  Why don't we pull up Defense Exhibit 4101 for the

16   witness only, please.  And if we can highlight just the top

17   paragraph.

18          MR. HEBERLIG:  I'd offer it, Your Honor, 4101.

19          MR. ASUNCION:  No objection.

20          THE COURT:  Received.

21          (Exhibit 4101 received into evidence.)

22   BY MR. HEBERLIG:

23   Q.  This is an email -- actually, take it down for a moment.

24   Can you highlight the whole thing so we can see the to/from?

25   Thank you.

1          This is an email from your brother to you,

2    September 13, 2007, do you see that?

3    A.  Yes, sir.

4    Q.  So that's less than a week prior to the Nisur Square

5    incident, right?

6    A.  Yes, sir.

7    Q.  Just sort of a "how you doing" email from your brother,

8    and then you wrote him back in the top email.  And I'm

9    focused particularly on the second line:  Been quite busy.

10   Things around this place have become progressively worse in

11   the last six months.

12          Do you see that?

13   A.  Yes, sir.

14   Q.  And that's correct?  That was true what you were

15   representing to your brother?

16   A.  I believe it was, sir.

17   Q.  And am I right that in the month leading up to the Nisur

18   Square incident, the conditions in Baghdad had gotten

19   particularly bad?

20   A.  Yes, sir.

21   Q.  In fact, by the end of August, 2007, isn't it true that

22   you had decided to leave Blackwater by mid November because

23   you had a gut feeling you'd be killed on the job?

24   A.  Yes, sir.

25   Q.  And in fact, you said that to your cousin in an email,

1    correct?

2    A.  I don't recall the email, sir.

3    Q.  Why don't we pull up Defense Exhibit 4102.  And if we

4    could just highlight the top couple of emails -- actually

5    all the way down the page.  There you go.

6           You recognize this to be an email exchange with

7    your cousin Joe, I don't know that I can pronounce the last

8    name.  Postiglione?

9    A.  Postiglione.

10   Q.  This is your email, correct?

11   A.  Yes, sir.  It appears that way.

12           MR. HEBERLIG:  I'd offer it, Your Honor.

13           THE COURT:  Received.

14           (Exhibit 4102 received into evidence.)

15   BY MR. HEBERLIG:

16   Q.  Let's start with the bottom email from you to your

17   cousin, which was Wednesday, August 29 of 2007.  Among other

18   things, you write him that you wanted some help -- maybe we

19   could highlight right here, Andrej.

20           I decided to end my contract effective mid

21   November.  I'm back on the job market.  Could you keep your

22   eyes open for something that I might like?

23           Do you see that?  And that's what you said to him,

24   correct?

25   A.  Yes, sir.

```
 1    Q.  Then in the next line you wrote him:  Anyway, I've been
 2    having this gut feeling that my luck is eventually going to
 3    run out.  And I want to see my kids grow up.
 4             Right?
 5    A.  Yes, sir.
 6    Q.  And that's how you felt at the time here about three
 7    weeks prior to the Nisur Square incident.
 8    A.  Yes, sir.
 9    Q.  All right.  Let me just for the witness only for the
10    moment show you Defense Exhibit 4103.  If we can
11    highlight -- yes, all of the text there.
12             All right, sir.  Do you recognize this to be the
13    email exchange dated September 12, 2007, with a Robert
14    Stebbing about some things that had gone down in Baghdad in
15    roughly the week leading up to the date of this email?
16    A.  Yes, sir.
17             MR. HEBERLIG:  I'd offer it, Your Honor.
18             MR. ASUNCION:  No objection.
19             THE COURT:  Received.
20             (Exhibit 4103 received into evidence.)
21    BY MR. HEBERLIG:
22    Q.  All right.  And your first email -- who is Robert
23    Stebbing, by the way?
24    A.  He was a member on Raven 2-3, sir.
25    Q.  But he was not present with the convoy on September 16,
```

 1    correct?

 2    A.  No, sir, he was not.

 3    Q.  And you wrote to him sort of a "when are you coming

 4    back," something unrelated.  And he responded.  And asks you

 5    toward the end of his email:  Did I miss anything good?  Or,

 6    I miss anything good?

 7            Do you see that?

 8    A.  Pardon me.  Can you repeat where you want me to look?

 9    Q.  Just where we're highlighting there.  Mr. Stebbing wrote

10    to you -- I think what he's trying to say, did I miss

11    anything good, correct?

12    A.  Yes, sir.

13    Q.  That's how you interpreted it?  And you responded to it

14    on September 12, 2007, correct?

15    A.  Yeah, I'm not sure which one was the first --

16    Q.  Why don't we highlight the "yeah, bro," and go through

17    the end of that email.

18            And I'd ask you if you could, Mr. Ridgeway, just

19    to read that highlighted portion of the email, what you

20    wrote to Mr. Stebbing on September 12, 2007?

21    A.  I said:  Yeah, bro, you've missed some shit.  We had

22    contact near Gray 55, the next day one of our helos was shot

23    down on the way to Hillah and 12 of us got on the medium

24    lift to provide security for the -- sanitation?  Minor

25    injurism.

1   Q.   "Injuries" perhaps?

2   A.   I don't know, but we got some.  That day after 2-6 was

3   hit with an IED, no threatening injuries.  Everyone is

4   asking about you so try to get back, bro.

5   Q.   Let's see if I can break this down.  Am I right that

6   you're talking about three separate things that occurred the

7   week prior to what happened in Nisur Square?

8   A.   Appears that way, yes, sir.

9   Q.   One of them is contact near Gray 55.  And that's another

10   word for Amanant City Hall?

11   A.   That's my understanding, sir.

12   Q.   You talked about the next day one of our helos.  That's

13   a helicopter, correct?

14   A.   Yes, sir.

15   Q.   Was shot down on the way to Hillah.  That's a city in

16   Iraq to the south of Baghdad?

17   A.   That's my understanding.

18   Q.   All right.  And:  12 of us got on the medium lift.

19   That's a reference to a helicopter?

20   A.   Yes, sir.

21   Q.   To go out there.  And then finally you say:  The day

22   after that 26 was hit with an IED.

23          That's a reference to Raven 26?

24   A.   I believe so, sir.

25   Q.   Okay.  So I want to ask you -- we can take that down --

1   about some of these prior incidents that occurred leading up

2   to September 16.  And specifically I want to go back to some

3   of the things the prosecutor asked you about yesterday.

4   Okay?

5   A.  Yes, sir.

6   Q.  And let me start with the incident that occurred on

7   January 23 of 2007.

8   A.  Yes, sir.

9   Q.  Do you recall that you answered some questions yesterday

10  about an aircraft recovery type mission?

11  A.  Yes, sir --

12  Q.  On that day?

13  A.  Yes, sir.

14  Q.  Sorry.  I didn't mean to interrupt you.  That was early

15  in your time with Blackwater in Baghdad, correct?

16  A.  January 23?

17  Q.  Yes.

18  A.  Yes, very.

19  Q.  You said that you got there sometime around New Year's

20  Day?

21  A.  Yes, sir.  I wasn't assigned -- I'd only been on the

22  team for maybe a week.

23  Q.  So this is inside of your first month with Blackwater in

24  Baghdad, correct?

25  A.  Yes, sir.

1    Q.  And on this day, you were a member of Raven 23, correct?

2    A.  Yes, sir.

3    Q.  You were one of the fire team members that day?

4    A.  Yes, sir.

5    Q.  And you were notified along with the rest of the team at

6    some point that a Blackwater helicopter had crashed out in

7    the Red Zone, right?

8    A.  Yes.

9    Q.  And you were also notified that another helicopter owned

10   by Blackwater had been engaged by gunfire and a sniper was

11   killed in action, right?

12   A.  Yes, sir.

13   Q.  Your team was called to respond to help extract the

14   Blackwater personnel on-site, right?

15   A.  Yes, sir.

16   Q.  And on the way there, Raven 23 itself came under attack,

17   correct?

18   A.  Yes.

19   Q.  In fact, isn't it correct that the team was directed by

20   Iraqi police officers through a checkpoint that led directly

21   to an ambush?

22   A.  Yes, sir, that's true.

23   Q.  And after you were directed through that checkpoint am I

24   right that the streets -- there were no one on the streets,

25   correct?

1   A.  No, there was none, sir.

2   Q.  And that was highly unusual in Baghdad, right?

3   A.  Yes, sir.

4   Q.  And it led you to believe you were about to be ambushed,

5   right?

6   A.  Yes, sir.

7   Q.  In fact, almost immediately the team came under a

8   tremendous amount of incoming gunfire, right?

9   A.  Yes, sir.

10  Q.  And the team returned fire to defend itself?

11  A.  Yes, sir.

12  Q.  And you managed to escape and get to the site where that

13  helicopter had crashed, right?

14  A.  Yes, sir.

15  Q.  And you described some information about that yesterday.

16  I won't repeat it all.  But am I right that when you got

17  there, you specifically were directed to go collect the dead

18  bodies of the Blackwater employees and transport them back

19  to the Green Zone?

20  A.  Myself and others, yes, sir.

21  Q.  And between the pilot and the crew members, isn't it

22  true that four Blackwater employees had been executed by

23  Iraqi insurgents?

24  A.  Yes, sir.

25  Q.  You had to transport them back to your vehicles?

1    A.  Yes, sir.

2    Q.  Did you have to put them in body bags?

3    A.  They were already in body bags, sir.

4    Q.  And during that process you were attacked with even more

5    gunfire, weren't you?

6    A.  Yes, sir.

7    Q.  But you were able to escape and get back to the Green

8    Zone?

9    A.  Yes, sir.

10   Q.  And don't you believe that you were set up by the Iraqi

11   police who had let you through that checkpoint?

12   A.  Yes, sir.

13   Q.  Well, let me move you forward then to the incident you

14   described from May of 2007 at the ministry of rail, okay?

15   Do you remember being asked about that by the prosecutor

16   yesterday?

17   A.  Yes, sir.

18   Q.  And that day you said you were the driver of one of the

19   Raven 23 vehicles?

20   A.  Yes, sir.

21   Q.  May have been your one and only effort as a driver?

22   A.  Yes, sir, I think so.

23   Q.  I'm not going to go back through all the details of that

24   engagement, but I do want to cover one detail that I don't

25   think came out during your testimony, and that is whether

1    there were any injuries to Blackwater personnel who

2    responded that day.  Do you remember that there were?

3    A.  Yes, there was, sir.

4    Q.  And in fact, isn't that correct that a Blackwater sniper

5    was shot in the stomach that day?

6    A.  Yes, sir, he was.

7    Q.  He was shot with a 50 caliber round, correct?

8    A.  Yes, sir, he was.

9    Q.  What's a 50 caliber round?

10   A.  That's a very large caliber round, sir.

11   Q.  Typically fired by machine guns?

12   A.  Typically, yes, sir.

13   Q.  Belt-fed machine guns?

14   A.  Yes, sir.

15   Q.  Like a Dishka machine gun?

16   A.  Or a 50 caliber sniper rifle, yes, sir.

17   Q.  Those were weapons known to be used by insurgents?

18   A.  I believe so, sir.  I couldn't say, but --

19   Q.  And this colleague suffered substantial injuries as a

20   result of that shot to the stomach, correct?

21   A.  Yes, sir, he did.

22            (Pause.)

23   BY MR. HEBERLIG:

24   Q.  Let me move you forward, then, to another incident you

25   described in your direct testimony.  And I think that's been

1    referred to as the DART mission.  You know what I'm

2    referring to when I say that?

3    A.  Yes, sir.

4    Q.  That stands for downed aircraft recovery something?

5    A.  Team.  Sounds about right, sir.

6    Q.  Team or response.  Do you remember that incident taking

7    place on September 10, 2007?

8    A.  It was around that.  I'm not sure of the exact day, sir.

9    Q.  It was within the week leading up to what happened at

10   Nisur Square.

11   A.  Yes, sir.

12   Q.  And you along with other members of Raven 23 were part

13   of a team that went out to recover a downed helicopter,

14   correct?

15   A.  Yes, sir.

16   Q.  And you actually, instead of going out in your convoy

17   vehicles, you were transported by another helicopter out to

18   where that crash site had occurred, correct?

19   A.  Yes, sir.

20   Q.  And your mission as you understood it that day was to

21   provide security for the downed helicopter and help get the

22   passengers back to the Green Zone.  Is that fair?

23   A.  That sounds about right, sir.

24   Q.  And also perhaps to destroy the helicopter, if needed?

25   A.  I believe so.

1    Q.  And several members of Raven 23 were with you that day?

2    A.  Yes, sir.

3    Q.  And you testified that when you got to the site you set

4    up a 360-degree perimeter around that downed helicopter?

5    A.  Yes, sir.

6    Q.  And you said you were located near the team sniper Nick

7    Slatten, right?

8    A.  Yes, sir.

9    Q.  I think you testified on direct that Mr. Slatten fired a

10   shot in the direction of a building some two or three

11   hundred meters away, correct?

12   A.  I don't recall saying how many meters away, but he did

13   fire a shot, yes.

14   Q.  Is that a fair estimate, two or three hundred meters

15   away to those buildings?

16   A.  Sounds about right, sir.

17   Q.  Well, let me ask this.  Your interpretation of the

18   situation was that Mr. Slatten had fired without

19   provocation.  Is that what you said yesterday?

20   A.  Yes, sir.

21   Q.  But isn't it true that Mr. Slatten told all of the team

22   members present that he had seen through his scoped weapon a

23   potential target in that building who had pointed a weapon

24   at your team?

25   A.  He did say that, yes.

1    Q.  And isn't it true that Mr. Slatten said he only fired

2    his weapon after that hostile suspect had directed a weapon

3    at the Raven 23 team?

4    A.  Yes, he said that, sir.

5    Q.  You obviously did not see what Mr. Slatten saw through

6    his scope, correct?

7    A.  No, I did not, sir.

8    Q.  His sniper rifle had a high-powered magnification that

9    was not present on your weapon, correct?

10   A.  That's correct, sir.

11   Q.  And if Mr. Slatten had seen someone through his scope

12   pointing a weapon at the team about to fire, you would agree

13   it was his job to take that person out, correct?

14   A.  Yes, sir.

15   Q.  Because he was the team's designated defensive marksman,

16   right?

17   A.  Yes, sir.

18   Q.  Now, isn't it true that immediately after Mr. Slatten

19   fired his weapon that other gunfire erupted?

20   A.  Yes, sir.

21   Q.  And your team began taking incoming gunfire from the

22   same building and various other places around there,

23   correct?

24   A.  We did receive some incoming fire, yes, sir.

25   Q.  Right after he fired, right?

1    A.  I don't believe it was right after, no, sir.  Shortly

2    after.

3    Q.  Well, you recall that the Army was also on the scene,

4    correct?

5    A.  Yes, sir.

6    Q.  And they had Bradley tanks with them?

7    A.  Yes, sir.

8    Q.  And they had Apache helicopters, correct?

9    A.  Yes, sir.

10   Q.  And the Army tanks and the Apache helicopters also fired

11   on these buildings, correct?

12   A.  Yes, they did, sir.

13   Q.  And you knew from your experience in the Army that

14   soldiers in those tanks and in those helicopters would have

15   been equipped with high quality optics, correct?

16   A.  Maybe with the -- no, I did not, sir.  Not with a

17   Bradley.  And I don't know what's in an Apache.

18   Q.  So the Bradleys and the Apaches that the Army maintained

19   did not have high quality optics?

20   A.  I wouldn't say the Bradley had -- that Bradley had high

21   quality optics.

22   Q.  Well, is it your testimony that the Army --

23   A.  They had optics.

24   Q.  You did testify that the Army tanks and the helicopters

25   opened fire, correct?

1    A.  They did, sir.

2    Q.  Is it your testimony that they opened fire without

3    provocation?

4    A.  Sir, I couldn't say.  I don't know what -- at what point

5    they started, I don't recall.  They may have fired it after

6    we received incoming fire.  I'm not sure, sir.

7         MR. HEBERLIG:  Going into a new area, Your Honor.

8    I can continue or --

9         THE COURT:  We can stop, take our afternoon break.

10        (Break in the proceedings at 3:25 p.m.)

11

12        (Upon resuming at 3:40 p.m.)

13        THE COURT:  All right.  Mr. Heberlig, you may

14   proceed.

15        MR. HEBERLIG:  Thank you, Your Honor.

16   BY MR. HEBERLIG:

17   Q.  Good afternoon again, Mr. Ridgeway.

18   A.  Good afternoon, sir.

19   Q.  Let me switch gears a little bit.  Had some questions

20   for you about drug use, okay?

21   A.  Yes, sir.

22   Q.  During the time that you worked for Blackwater in

23   Baghdad, am I correct that you took prescription drugs

24   without a valid prescription?

25   A.  Yes, sir, I have.

1    Q.   Took Valium?

2    A.   Yes, sir.

3    Q.   You also took Abilify?

4    A.   I'm not sure, sir.  I may have.

5    Q.   You're not sure?

6    A.   I'm not sure, sir.  I may have.

7    Q.   Why don't we pull up for the witness only Defense

8    Exhibit 2310.  And let's just highlight first the date of

9    this memorandum down here.

10           This is a memorandum summarizing an interview of

11   you by the FBI on November 29, 2012.  If you can, let's go

12   to pages 2 and 3.  Bottom of page 2.

13           This is the right page?  Just highlight down at

14   the bottom there.

15           All right, sir.  Does this -- why don't we

16   highlight this sentence right here.  Right there.

17   A.   Yes, sir.

18   Q.   Okay.  I'm correct that one of the drugs that you took

19   in Baghdad without a prescription while you were working for

20   Blackwater was a drug called Abilify?

21   A.   I believe I may have told them it was Ambien.  I don't

22   recall Abilify.  But I was taking from time to time a sleep

23   aid.  Yes, sir.

24   Q.   You took Ambien, as well?

25   A.   Yes, sir.

```
 1    Q.  But you also took Abilify, correct?

 2    A.  I don't recall, sir.  Ambien, Abilify.  Along the same

 3    lines.  And I'm not going to deny it, sir.

 4    Q.  Okay.  And I'm right that you did not have a

 5    prescription for any of those drugs that you took in

 6    Baghdad, correct?

 7    A.  No, sir.

 8    Q.  You were self medicating.

 9    A.  Yes, sir.

10    Q.  And -- you can take that down.

11             And I'm right that you obtained those drugs in

12    Jordan, correct?

13    A.  Yes, sir.

14    Q.  And that's a Middle Eastern country you visited on the

15    way to Baghdad?

16    A.  Yes, sir.

17    Q.  Were you aware at the time that Valium was a controlled

18    substance?

19    A.  Yes, sir.

20    Q.  Were you aware at the time that Ambien was a controlled

21    substance?

22    A.  In Jordan or --

23    Q.  In the United States.

24    A.  In the United States?  Yes, sir, I did understand that.

25    Q.  You aware at the time that Abilify is an antipsychotic
```

1    drug?

2    A.   I'm not sure what Abilify is, but --

3    Q.   You know that it's used to treat schizophrenia and

4    bipolar disorder?  Correct?

5    A.   No, sir, I did not know that.

6    Q.   That's not your understanding.

7    A.   Pardon me?

8    Q.   That's not your understanding?

9    A.   I don't know that that's what they use to treat it for.

10   Q.   You don't have either of those two diseases?

11   A.   Bipolar or schizophrenia?

12   Q.   Correct.

13   A.   No, sir.

14   Q.   You knew it was illegal to use controlled substances

15   without a valid prescription from a doctor, correct?

16   A.   Yes, sir.

17   Q.   But you did it anyway.

18   A.   Yes, sir.

19   Q.   Now, you also knew that the contract that you signed

20   with Blackwater, in that contract you agreed to refrain from

21   using drugs while on and off duty.  Correct?

22   A.   Yes, sir.

23   Q.   So you violated that contract, as well, when you used

24   drugs in Baghdad.

25   A.   Yes, sir.

1    Q.  And you also knew it was against Blackwater policy to

2    take any prescription drugs in Baghdad without reporting it

3    to your chain of command whether or not you had a

4    prescription.  Isn't that right?

5    A.  I believe so, sir.

6    Q.  But you violated that policy, too.

7    A.  Yes, sir, I did.

8    Q.  And you never told your chain of command in Baghdad that

9    you were taking Valium, Abilify and Ambien without a

10   prescription.

11   A.  No, sir, I did not.

12   Q.  And you also knew that the State Department had policies

13   governing the use of prescription drugs and controlled

14   substances, correct?

15   A.  Yes, sir.

16   Q.  And, in fact, it was part of the State Department's

17   mission firearm policy that you looked at yesterday, right?

18   A.  I didn't see it in there.

19   Q.  Why don't we take a look at Defense Exhibit 0802 for the

20   witness only.

21            MR. HEBERLIG:  And I believe this was admitted by

22   the government, Your Honor, under a different number

23   yesterday.  I'd ask that I be permitted to display it to the

24   jury at this time.

25            THE COURT:  Any objection?

```
 1              MR. ASUNCION:  No, Your Honor.

 2              THE COURT:  All right.

 3   BY MR. HEBERLIG:

 4   Q.  And, sir, before we turn the page, you recognize this to

 5   be the document you looked at yesterday?  The Department of

 6   State's mission firearms policy dated August of 2006?

 7   A.  Yes, sir.

 8   Q.  Let's go to page 7.  And let's go to section XIV -- this

 9   paragraph right here.  This is a portion of the mission's

10   firearm policy that talks about the use of alcohol and

11   drugs, correct?

12   A.  Yes, sir.

13   Q.  It says that employees -- I'm starting right here --

14   using any illegal -- I'm sorry -- using any prescription

15   medication that would impair their judgment may not carry a

16   firearm.  Do you see that?

17   A.  Yes, sir.

18   Q.  And it also says use that use of illegal drugs or

19   controlled substances while armed is strictly prohibited.

20   Do you see that?

21   A.  Yes, sir.

22   Q.  Now, did you ever violate this policy?

23   A.  Yes, sir.

24   Q.  So you used drugs while you were armed?

25   A.  It wasn't during working hours.  I had taken them -- I
```

 1     had taken upon occasion.  This was not an every day thing.

 2     And, no, it was not during working hours, no, sir.

 3     Q.  Well, were you taking any drugs on September 16, 2007?

 4     A.  I was not, no.

 5     Q.  That was a stressful period, correct?

 6     A.  It was, sir.

 7     Q.  Had you run out of your stash?

 8     A.  I'm sorry, sir.  May I answer that question -- re-answer

 9     that question?

10     Q.  Sure.

11     A.  On September 16 in the evening after, I think I did.

12     Q.  Okay.  And how soon in the lead-up to September 16, how

13     many days prior had you been using illegal drugs in Baghdad?

14     A.  I don't recall, sir.

15     Q.  What did you take on the evening of September 16?

16     A.  In the evening?  Valium, I believe.

17     Q.  Did you ever go out on a mission high?

18     A.  No, sir, I have not.

19     Q.  Now, you testified yesterday that you're taking a

20     variety of medication today, correct?

21     A.  That is correct, sir.

22     Q.  And I believe you said Wellbutrin for depression?

23     A.  Yes, sir.

24     Q.  Xanax for anxiety?

25     A.  Yes, sir.

```
 1    Q.  And morphine for your back?

 2    A.  Yes, sir.

 3    Q.  You normally take those every day?

 4    A.  The Wellbutrin I take every day.  The Xanax I take as

 5    needed.  And the same with the morphine.

 6    Q.  And you stopped taking them -- or, you refrained from

 7    taking them yesterday during the day of your testimony?

 8    A.  I did, yes, sir.

 9    Q.  Did you take any last night?

10    A.  I took -- let me back up, sir.  I did take the

11    Wellbutrin.  I did not take the Ambien or the Xanax -- I'm

12    sorry -- the morphine or the Xanax.

13    Q.  And I'm just a little confused.  You took some

14    combination last night, or no?

15    A.  No.  I took my -- the sleep aid last night.  I took the

16    Wellbutrin during the morning of yesterday's testimony.  And

17    I took the Wellbutrin in the evening of yesterday.  I took

18    the Wellbutrin this morning, and I'll take it again this

19    evening.

20    Q.  So you did take at least one of the medications

21    yesterday before your testimony?

22    A.  Yes, sir.

23    Q.  I thought you said yesterday that you went off prior to

24    testifying.

25    A.  I took my Wellbutrin.  I didn't take the pain meds or
```

1   the Xanax.

2   Q.  But you're feeling okay today?

3   A.  I feel fine, sir.  Nervous, but fine.

4   Q.  Well, let's now turn to the events of September 16,

5   2007, okay?  And just to orient us, obviously you were

6   assigned to Raven 23 that day?

7   A.  The date, sir?

8   Q.  September 16, 2007?

9   A.  Yes, sir.

10  Q.  And Raven 23 was the secondary team, correct?

11  A.  I believe it was, sir.

12  Q.  And you were the front turret gunner of the last or

13  follow vehicle, correct?

14  A.  That's correct, sir.

15  Q.  You got your regular morning briefing that day?

16  A.  I believe we may have.  I'm not sure if it was the

17  evening before or that morning.

18  Q.  And after that morning briefing, am I correct that you

19  went back to your room to take a nap?

20  A.  That's correct, sir.

21  Q.  And sometime around midday someone knocked on your door?

22  A.  That's correct, sir.

23  Q.  While you were taking a nap?

24  A.  Yes, sir.

25  Q.  Did he have to wake you up?

1    A.  Yes, sir.

2    Q.  And he told you there had been an explosion, correct?

3    A.  Yes, sir.

4    Q.  And that a team, a Blackwater team, that was out on

5    venue had had a bomb going off outside of where they were

6    located, correct?

7    A.  That's how I remember it, yes, sir.

8    Q.  He told you that your team, Raven 2-3, was rolling out.

9    A.  That sounds about right.

10   Q.  So you grab your stuff and you ran down to the vehicles.

11   A.  Yes, sir.

12   Q.  And you got there right as the team was rolling out,

13   correct?

14   A.  They were about ready to roll out, yes, sir.

15   Q.  Were the vehicles moving yet?  Or no?

16   A.  They were just about to move, yes, sir.

17   Q.  All right.  So you almost missed the team's departure,

18   but you got there in time.

19   A.  Yes, sir.

20   Q.  You got in that follow vehicle and you took your

21   position in the turret?

22   A.  Yes, sir.

23   Q.  And then the convoy rolled out from the parking lot to

24   Checkpoint 12.

25   A.  Sounds about right, yes, sir.

1    Q.  And Checkpoint 12 was the gate that separated the Green

2    Zone and the Red Zone, correct?

3    A.  That's my understanding, yes, sir.

4    Q.  I think you said it was on a road that was known as

5    Route Irish?

6    A.  I think that's the checkpoint.  Just the numbers.  It's

7    been awhile.

8    Q.  Now, during your trip there from the parking lot to

9    Checkpoint 12, you had to get your gear on, correct?

10   A.  Just -- my gear -- most of my gear was on.  It was my

11   ear piece -- not the ear piece, but the wire that connected

12   my radio to my surveillance kit was not connected.

13   Q.  Did you wear body armor?

14   A.  I did, sir.

15   Q.  What did that entail?  What type of body armor?  What

16   did it cover?  What did it involve?

17   A.  It was a vest.  It covered my chest and back.

18   Q.  You wore that every time you went out in the Red Zone?

19   A.  Yes, sir.

20   Q.  In terms of weapons, you had your M-4 rifle?

21   A.  Yes, sir.

22   Q.  And in your turret there was an M-240 Bravo machine gun?

23   A.  Yes, sir.

24   Q.  And it was mounted, correct?

25   A.  Yes, sir.

1    Q.  You mentioned this about your radio.  Am I right that

2    sometime around halfway to Checkpoint 12 is when you

3    realized it wasn't connected and you hooked it up.

4    A.  That sounds about right, sir.

5    Q.  And that radio was tuned in to the internal Raven 2-3

6    channel?

7    A.  I believe it was, sir.

8    Q.  That was the channel that allowed team members to

9    communicate with one another while they were out in the

10   field, correct?

11   A.  Yes, sir.

12   Q.  All right.  So let's talk now about when you entered

13   Nisur Square.  I think you testified that you entered from a

14   road roughly to the east or little bit to the southeast,

15   correct?

16   A.  Yes, sir.

17   Q.  And when the convoy arrived, the vehicles set up in a

18   row along the bottom of the traffic circle, correct?

19   A.  Yes, sir.

20   Q.  Why don't we pull up --

21   A.  You talking about --

22   Q.  I'll pull up the map.  Government Exhibit 323, please.

23   This is admitted.

24          Let's just make it a little larger around the

25   circle if we can.  That's about right.  Let's start here.

1          So am I correct that this is the road -- this is

2     the road here you came in on, and then the convoy came

3     around here, set up on the southern portion of the circle?

4     A.  That looks about right, sir.

5     Q.  And you said that you initially were looking to the

6     north or the northwest as you entered the traffic circle,

7     correct?

8     A.  Yes, sir.  I was looking over -- over the fountain in

9     this area.  About that way.  Could have been a little more

10    to the right.

11    Q.  If I put an arrow on it.  But you're generally looking

12    in this direction?

13    A.  More or less.  I was looking -- I remember looking over

14    the circle.  Could have been maybe a little bit more north.

15    In that direction.

16    Q.  All right.  Generally to the north or northwest of the

17    circle, correct?

18    A.  Yes, sir.

19    Q.  And after entering the circle you almost immediately

20    heard gunfire, correct?

21    A.  Yes, sir.

22    Q.  And it sounded like it was coming from your left, right?

23    A.  Yes, sir.

24    Q.  And you didn't see those first shots fired, right?

25    A.  I just heard the gunfire.  So, no, I did not see the

1    first shots fired, no.

2    Q.  And upon hearing it you immediately turned to your left

3    to look in the direction where you'd heard gunfire, correct?

4    A.  Yes, sir.

5    Q.  And that's when you saw my client, Paul Slough, shooting

6    his weapon, correct?

7    A.  Yes, sir.

8    Q.  He was firing his M-4.

9    A.  Yes, sir.

10   Q.  And you could see that what he was shooting at was a

11   white vehicle, correct?

12   A.  Yes, sir.

13   Q.  And that's a vehicle that you know to be and we've

14   referred to in this trial as the white Kia sedan, correct?

15   A.  Yes, sir.

16   Q.  And you'll understand if that's the term I refer to it

17   as?

18   A.  Yes, sir.

19   Q.  When you turned and look, the white Kia was moving

20   forward toward the convoy, correct?

21   A.  Yes, sir.

22   Q.  And am I right that on this first glance over, you don't

23   recall seeing the bullets fired by Paul actually striking

24   the vehicle?

25   A.  No, I don't recall seeing them.  I saw him -- his weapon

1    was oriented at that vehicle.  My assumption was he was

2    firing at that vehicle.

3    Q.  But in terms of actual bullet impacts you didn't see

4    where, if at all, they struck the vehicle, correct?

5    A.  No, sir, I did not.

6    Q.  Now, am I correct that those first shots that you saw

7    him fire after you turned and look, that you perceive to be

8    directed at the white Kia, were the only shots that you saw

9    him firing at the white Kia that day?

10   A.  Yes, sir.

11   Q.  All right.  So let's get back to your actions.  When you

12   saw Paul firing, you immediately began to fire at the white

13   Kia, too, correct?

14   A.  Yes, sir.

15   Q.  You heard the shots, swiveled your head in that

16   direction, saw Paul firing, and you immediately jumped in,

17   right?

18   A.  Yes, sir.

19   Q.  It was one fluid motion.

20   A.  Yeah -- well, put my selector switch from safe.

21   Q.  You had to turn your gun on.

22   A.  Yes, sir.

23   Q.  But, basically, one moment you turned that direction and

24   you shot.

25   A.  Yes, sir.

1   Q.  From the time you heard the first shots to the time you

2   fired on the white Kia, only a second or two had gone by.

3   A.  Would you repeat the question, sir?

4   Q.  From the time that you heard the first shots to the time

5   you actually fired your own weapon after that fluid

6   movement, only a second or two had gone by.

7   A.  I guess about that, sir.

8   Q.  Your first shots were aimed at the driver of the white

9   Kia, correct?

10  A.  Yes, sir.

11  Q.  You fired somewhere between three and five shots.

12  A.  Somewhere -- yes, sir, about that.

13  Q.  With your M-4 rifle.

14  A.  Yes, sir.

15  Q.  In semiautomatic mode.

16  A.  Yes, sir.

17  Q.  And you fired those shots through the driver's side of

18  the windshield of that white Kia sedan.

19  A.  Yes, sir.  I had aimed at that.  I believe my rounds

20  were worked up.

21  Q.  Now, again, the white Kia was coming at the convoy at

22  the time you fired.

23  A.  Yes, sir.

24  Q.  When you turned and looked you could see that other cars

25  were stopped in traffic or were pulled over to the side of

1   the road, correct?

2   A.  Yes, sir.

3   Q.  But this white car was approaching the convoy, passed

4   all of the other stopped vehicles.

5   A.  Yes, sir.

6   Q.  And the white Kia had a clear path to the convoy,

7   correct?

8   A.  Yes, sir.

9   Q.  Now, let's talk for a minute about how fast the white

10   Kia was moving.  You were asked a question on that topic

11   yesterday by the prosecutor, correct?

12   A.  Yes, sir.

13   Q.  And when he asked you to describe the speed at which the

14   car was moving, you said you couldn't be accurate on that,

15   correct?

16   A.  That's correct, sir.

17   Q.  All you could say at least yesterday was:  I did not

18   have the impression that it was accelerating.

19         Is that what you said yesterday?

20   A.  Yes, sir.

21   Q.  But that didn't really answer the question about how

22   fast it was moving, correct?

23   A.  That's correct, sir.

24   Q.  And am I right that the white Kia was moving at a faster

25   rate of speed than you would have liked?

1    A.  I did say that in the grand jury, sir.  My impression

2    was -- one, I did not judge that vehicle's -- I did not take

3    a second to judge the speed of that vehicle before I fired.

4    I would have liked that vehicle to not be driving at all.

5    Q.  Understood.

6    A.  Driving past other vehicles at all.  But I -- I'm

7    talking about my actions, sir.  I did not pause the second

8    that I could have.  That vehicle was far enough away where I

9    could have made the judgment whether or not that vehicle was

10   a threat or not.  I'm just talking about my actions.  And I

11   fired on that vehicle.

12   Q.  Are you finished?

13   A.  Yes, sir.

14   Q.  I'm correct that you testified previously in the grand

15   jury when you were asked this very question that the white

16   car appeared to be moving at a faster rate of speed than I

17   would have liked.  That was your prior testimony, correct?

18   A.  Yes, sir.

19   Q.  Under oath.

20   A.  Yes, sir.

21   Q.  And that's true.

22   A.  I would have liked that vehicle not to have been moving

23   at all, sir.

24   Q.  Because it was moving, as you testified under oath, at a

25   faster rate of speed than you would have liked.  True or

1    false?

2    A.  Yes, sir.

3    Q.  That's correct.  The statement I just gave.

4    A.  It was moving at a faster rate of speed than I would

5    have liked.

6    Q.  Thank you.  Now, when you were asked in the grand jury

7    about this issue, you said you really didn't know and you

8    didn't feel comfortable giving an estimate about how fast it

9    was moving.  Is that fair?

10   A.  Yes, sir.

11   Q.  But then the prosecutor pressed and he asked you if it

12   was coming at 50 miles an hour.  Do you remember that

13   question?

14   A.  I don't, sir, but he had asked -- I remember him asking

15   questions about speed.

16   Q.  Why don't we take a look.  Defense Exhibit 317 for the

17   witness only, please.  This is a copy of your grand jury

18   transcript from testimony of May 9, 2013.

19   A.  Yes, sir.

20   Q.  And if we could turn to page 67 at lines 2 to 9.  You

21   could highlight that.  Lines 2 to 9, please.

22          All right.  Were you asked a question, sir --

23          MR. HEBERLIG:  I'd like to publish this to the

24   jury if I may, Your Honor.

25          MR. ASUNCION:  No problem with that, Your Honor.

 1    No objection.

 2              THE COURT:   Okay.

 3    BY MR. HEBERLIG:

 4    Q.  All right.  Again, this is from your sworn grand jury

 5    testimony in May of last year, correct?

 6    A.  Yes, sir, it is.

 7    Q.  And the prosecutor asked you the following question:

 8    Let me put it to you this way.  Was it 50 miles per hour?

 9    Did it look like it was coming at 50 miles per hour?  And

10    your answer:  I don't think so.  Question:  All right.  Your

11    answer:  I think -- I think under 50.  Question:  Okay.

12    What about 25 miles per hour?  Answer:  Honestly, I don't

13    know.

14              And that was the testimony you gave, correct?

15    A.  Yes, sir.

16    Q.  And you're no expert at estimating how many miles an

17    hour a car is traveling just upon sight, correct?

18    A.  No, sir.  Not at a glance.

19    Q.  But you would certainly agree from your personal

20    observations that that white Kia was traveling faster than

21    two to five miles per hour, correct?

22    A.  Faster than two to five miles an hour?

23    Q.  Yes.

24    A.  Yeah -- maybe.  I would feel comfortable.  It was

25    moving, so I would say maybe, yeah, two to five would be --

1    I'd be comfortable saying that it was that.

2    Q.  You'd be comfortable saying it was moving faster than

3    two to five miles per hour, correct?

4    A.  Around that, sir.

5    Q.  Are you saying it was moving around two to five miles

6    per hour?

7    A.  Sir, I'm just not comfortable judging the speed at all.

8    It didn't look like it was -- it wasn't bolting towards us,

9    it wasn't accelerating towards us.  I don't want to sit here

10   and make guesses.  I'm not here to speculate.

11   Q.  Can you tell the difference from having lived in this

12   world and driven a car between a car traveling five miles an

13   hour and a car traveling 25 miles an hour?

14   A.  More than likely.

15   Q.  Okay.  And when you were asked under oath in the grand

16   jury, How about 25 miles per hour?  You said, I don't know.

17             Correct?

18   A.  It says it there, yes, sir.

19   Q.  So if the car was traveling two to five miles an hour,

20   you would have known and you could have said, Sure, it was

21   traveling under 25 miles per hour.  Correct?

22   A.  Sir, I just didn't want to commit to any speed.  I

23   didn't want to commit to a speed, just like I don't want to

24   here.  Because I don't know how fast it was going.  I know

25   it wasn't going 50 miles an hour.

1    Q.  We got that.  But you couldn't answer whether it was

2    going 25.  And you're telling us today that it could have

3    been going two to five, yet you couldn't answer this

4    question about 25 miles an hour?  Is that your testimony?

5    A.  No, sir.  I don't want to commit to faster than that.

6    Q.  Bottom line is the white Kia was heading at the convoy

7    at a speed you were not comfortable with, correct?

8    A.  That's correct, sir.

9    Q.  And you perceived that white Kia as a threat.

10   A.  I did not give that white Kia the opportunity to

11   perceive it as a threat.

12   Q.  I'm not sure I understand what that means.  When you

13   looked at that car and it was traveling directly at the

14   convoy with nothing in front of it at an uncomfortable rate

15   of speed, are you saying you didn't view it as a threat?

16   A.  Sir, the vehicle was passing other vehicles.  Therefore,

17   that in and of itself to me was traveling at a faster rate

18   of speed.  However, that vehicle was far enough away at the

19   time that I fired on it where I could have paused, made a

20   judgment, and observed that that vehicle was slowing down or

21   stopping even.

22   Q.  Well, let me ask you this:  On your behalf your lawyer

23   represented that the white Kia was a threat to the

24   prosecutors, didn't he?

25   A.  Pardon me?

1    Q.  On your behalf your lawyer represented to the

2    prosecutors that the white Kia was a threat, didn't he?

3    A.  I believe he did.

4    Q.  Why don't we take a look at Defense Exhibit 1025 in

5    evidence.  Let's go to page 2.

6            This is that letter we looked at earlier.  Do you

7    remember that?

8    A.  I remember you showing me, yes, sir.

9    Q.  Why don't we highlight the bottom paragraph, please.

10   And let's just start with the first sentence.

11           So your lawyer wrote to the prosecutors back in

12   2008:  Shortly after Raven 23 entered the traffic circle a

13   white Kia sedan directly approached Raven 2-3 in a highly

14   threatening manner, circumventing several other stopped

15   Iraqi vehicles, ignoring the warnings of Blackwater

16   personnel and Iraqi civilians and refusing to stop.

17           That's a representation he made on your behalf,

18   correct?

19   A.  My attorney did make a -- make representations on my

20   behalf.

21   Q.  And is that true or false?

22   A.  That he had said that?

23   Q.  No.  This statement that we're reading right now that

24   you authorized your lawyer to represent to the prosecutors

25   on your behalf.  Is it true or false?

1    A.  I'm sorry.  You'll have to repeat the question.

2    Q.  You can see the sentence that I've highlighted the

3    screen, correct?

4    A.  Yes, sir.

5    Q.  Is that sentence true or false?

6    A.  It's -- it's false.

7    Q.  So this is another one of those lies that you directed

8    your lawyer to make to the prosecutors on your behalf.

9    A.  Yes, sir.

10   Q.  All right.  We can take this one down.

11          Now, you also described this white Kia sedan as a

12   threat in your sworn statement to the Department of State,

13   did you not?

14   A.  I did, sir.

15   Q.  Why don't we take a look at that one.  That's Defense

16   Exhibit 220 in evidence.  Let's go to page 2, please.  This

17   is a little difficult to read but I'll try to make it

18   larger.

19          Hang on one second, Andrej.  Start right about

20   here and see if you can blow up that area.  You're going to

21   have to go a little bit higher.  I'm sorry.

22          All right.  I'm going to do my best here.  But

23   let's look at starting right here.  The "I heard the sound"

24   sentence.  If you could highlight that, Andrej.

25          And again just to make it clear what we're talking

1    about here, this is the sworn statement that you submitted

2    to investigators in this case, correct?

3    A.  Yes, sir.

4    Q.  And you affirmed under oath that everything in this

5    statement was true and correct.  Right?

6    A.  I did say that, sir.

7    Q.  All right.  And so this sentence of your statement says:

8    I heard the sound of gunfire and observed a white sedan

9    entering the traffic circle from the south heading directly

10   toward -- towards our convoy.  All other vehicles had

11   stopped, however this vehicle continued towards our convoy

12   and was within approximately 20 meters of our convoy.

13            Let's stop right there.  Is that sentence true or

14   false?

15   A.  It's true.

16   Q.  Okay.  So at least so far that sentence is true.

17   A.  Yes, sir.  Speed -- distance-wise I'm not quite sure,

18   but there was -- that white vehicle, it had moved past other

19   vehicles.

20   Q.  And it was heading directly toward your convoy.

21   A.  Yes, sir.

22   Q.  Let's go to the next sentence:  From my training and

23   experience I perceived this as an immediate threat upon my

24   life and the lives of those in my convoy.

25            Do you see that sentence?

1    A.  Yes, sir.

2    Q.  And you're saying today that's false.

3    A.  I am.

4    Q.  And one more sentence:  I immediately began to fire at

5    the driver's window with my State Department issued M-4

6    carbine in an attempt to stop the threat.

7            Let's just stop right there.  At least a portion

8    of that's true, correct?

9    A.  I did fire, yes, sir.

10   Q.  You did fire.  And you fired at the driver's window,

11   correct?

12   A.  Yes, sir.

13   Q.  With your M-4?

14   A.  Yes, sir.

15   Q.  But what's false is that it was in an attempt to stop

16   your threat.  That's what you're saying today?

17   A.  Yes.

18   Q.  All right.  Take this one down.

19            Now, on this very same topic you were asked a

20   question in the grand jury by a grand juror about whether

21   you perceived the white Kia to be a threat.  Do you remember

22   that?

23   A.  I don't.

24   Q.  Why don't we take a look.

25   A.  Okay.

```
1    Q.  It's Defense Exhibit 317.  Right now just for the

2    witness only.  This is your grand jury transcript.  Again,

3    let's turn to page 123.  And if we can enlarge from lines 21

4    to the bottom of the page.  And if it's possible, if we

5    could do on the second page lines -- on the next page I

6    should say -- lines 1 through 6.

7            Bear with us one moment.  So on the left page,

8    Andrej, if you could highlight 23 to 25.  I'm sorry.  21 to

9    25.  And on the right side 1 to 6.

10           MR. HEBERLIG:  All right.  And, Your Honor, I'd

11   ask to publish this to the jury while we read along.

12           MR. ASUNCION:  No objection.

13           THE COURT:  All right.

14   BY MR. HEBERLIG:

15   Q.  Again from your grand jury testimony.  Question from a

16   juror:  So did you perceive it at the time as a threat?

17           And I'll represent that this is in reference to

18   the white Kia.  And if you like we can look back.  But are

19   you prepared to accept that representation?

20   A.  Yes, sir.

21   Q.  So did you perceive it at the time as a threat?  And

22   your answer:  Again, it's hard to explain.  When you see

23   your team mate firing -- again, everything happened so

24   quickly.  So the vehicle is coming in your -- you see your

25   team mate firing on it.  For me, I -- my instinct was
```

1      immediately to fire because of the two actions I put

2      together from the time I -- again, it was one fluid

3      movement.  I completely turned, heard, saw, fired.  To

4      answer -- I'm trying to be careful how I answer that

5      question.  I'm sorry.  That's hard to -- hard to explain.

6              That was your testimony back in 2013, correct?

7      A.  Yes, sir.

8      Q.  And when you were asked the question, Did you perceive

9      it at the time to be a threat, you didn't answer no, did

10     you?

11     A.  Did I -- I'm sorry.  One more time?

12     Q.  When you were asked the question from that juror -- that

13     grand juror -- Did you perceive it at that time as a threat,

14     you didn't answer, no.  You said it's hard to explain.

15     A.  That's what I said, yes, sir.

16     Q.  And, in fact, you said that your instinct was

17     immediately to fire upon it, correct?

18     A.  Yes, sir.  I did say that.

19     Q.  And that instinct was shaped in part by the fact that

20     you had repeatedly been trained that if a vehicle approaches

21     a convoy at an unsafe rate of speed, it poses an immediate

22     threat as a suicide car bomb.  Correct?

23     A.  Could repeat that, sir?

24     Q.  That instinct, your instinct to immediately fire, was

25     based in part on the training you had received that when a

1    vehicle is approaching a convoy at an unsafe rate of speed

2    that it poses a threat as a suicide car bomb.  Isn't that

3    correct?

4    A.  Sir, I don't believe that in and of itself.  There are

5    other factors to consider.

6    Q.  Why won't you acknowledge that you believe the white Kia

7    was a threat at the time you fired?

8    A.  I believe I mentioned it a few times.

9    Q.  Is it because you think it would hurt the government's

10   case against the defendants?

11   A.  No, sir.  I've said that if I had paused a moment, that

12   vehicle was far enough away where I would have realized that

13   vehicle was already stopping at the time that I fired.

14   Q.  Already stopping.  Now, nowhere in your prior statements

15   or even yesterday have we ever heard that one before, have

16   we?

17   A.  That vehicle was slowing down, sir.  It was not

18   accelerating.

19   Q.  It was not accelerating.  That's different than slowing

20   down, correct?

21   A.  It appeared to be slowing down, sir.

22   Q.  Did you ever -- have you ever said that in this case

23   prior to this moment?

24   A.  I'm not sure if I said it in court.  I may have told the

25   prosecution.  I don't know.

1   Q.  How many questions were you asked about the white car in

2   the grand jury?

3   A.  I'm not sure, sir.

4   Q.  Did you ever say in the grand jury that the white car

5   was slowing down?  Did that word ever come out -- did that

6   phrase ever come out of your mouth before right now?

7   A.  Excuse me, sir?

8   Q.  Did that ever come out of your mouth before right now?

9   A.  I don't know, sir.

10  Q.  You know you didn't say it before, correct?

11  A.  No, I don't know, sir.

12  Q.  Why didn't you say that when the grand juror asked you

13  did you perceive it at that time as a threat?  Why didn't

14  you say to her:  No, I didn't.  That car was slowing down.

15  A.  Sir, when I fired on that vehicle, it was --

16  Q.  I'd like you to answer my question.

17  A.  Okay.

18  Q.  Why didn't you answer when she said, Did you perceive it

19  at that time as a threat?  Why didn't you tell her, No, I

20  didn't.  That car was slowing down and I had plenty of time

21  to stop and assess the situation.

22          Why didn't you answer that back in 2013?

23  A.  I couldn't answer that, sir.  I'm not sure why I didn't.

24  Q.  You can take that down.

25          Now after your first four or five shots at the

1    white Kia you stopped firing, correct?

2    A.  Yes, sir.

3    Q.  And it's your testimony that the white Kia came to a

4    stop after you fired.

5    A.  Not completely.

6    Q.  I thought I heard you yesterday say after you fired your

7    first shots the reason why you stopped was because the

8    vehicle had stopped.  Is that not correct?

9    A.  Well, sir, I was trying to be careful because the

10   vehicle did roll a little bit.

11   Q.  Haven't you testified previously under oath when asked

12   why did you stop firing, that the vehicle had stopped?  Is

13   that not your testimony?

14   A.  Yes, sir.

15   Q.  So what were you just fighting me about?  What was

16   incorrect with my assertion?

17   A.  The vehicle had rolled a little bit when the Iraqi

18   traffic officer had put his hand up.  And I testified to

19   that.

20   Q.  I'll get to that.

21   A.  Well, I still wasn't sure if that's what you were

22   getting at.  I apologize.

23   Q.  I don't mean to talk over you.  Let me focus you first,

24   then, on your first shots prior to that Iraqi policeman

25   approaching the car.  Okay?

1    A.  Understood, sir.

2    Q.  So you fired those first four or five shots and then you

3    stopped firing, correct?

4    A.  Yes, sir.

5    Q.  All right.  And your testimony, I believe yesterday, is

6    at that moment the reason why you stopped firing was because

7    the white Kia had come to a stop, correct?

8    A.  Yes, sir.

9    Q.  And it was only then when you saw those two men approach

10   the car, correct?

11   A.  Yes, they did, sir.

12   Q.  And one of those men you testified was dressed in an

13   Iraqi police uniform.  Right?

14   A.  Yes, sir.

15   Q.  And the other man -- that man with the Iraqi police

16   uniform, he approached the car on the driver's side, right?

17   A.  I believe I said Iraqi traffic officer.  But a uniformed

18   Iraqi -- I believe it was driver's side, yes, sir.

19   Q.  Driver's side.

20   A.  Yes, sir.

21   Q.  And the other man was wearing a *dishdasha*, correct?

22   A.  Yes, sir.

23   Q.  And that was a type of traditional men's apparel in

24   Baghdad?

25   A.  Yes.

1    Q.  Sort of an ankle length robe?

2    A.  Yes, sir.

3    Q.  And he approached the vehicle on the other side,

4    correct?

5    A.  Yes.  From the other side, correct.  Yes, sir.

6    Q.  From the passenger side.

7    A.  Yes, sir.

8    Q.  All right.  And is it your testimony that at that time

9    the white Kia started rolling again toward the convoy?

10   A.  Slightly, it did, yes.

11   Q.  So it looked to you as if these individuals were pushing

12   the white Kia toward the convoy, correct?

13   A.  That's how I explained it at first.  It just looked

14   strange.  I couldn't make sense of it.

15   Q.  Well, when you say you explained it at first, do you

16   mean by that that you testified under oath in the grand jury

17   that it looked as if they were pushing it?

18   A.  Almost as if it was, but they were not.  I mean -- look,

19   it appeared -- they -- it's easy to figure out he put his

20   hand on that vehicle, it was still rolling.  But thoughts

21   crossed my mind, okay, it's rolling but it looks weird

22   because he had his hand on it.

23   Q.  Did it appear to you as if they were pushing it or not?

24   A.  It's -- it's not as simple as that, sir.

25   Q.  Let's go to Defense Exhibit 317, please.  Your prior

 1    grand jury.  Page 69, line 12.  I'm sorry.  Why don't you

 2    start at -- there you go.

 3                MR. HEBERLIG:  I'd like to publish this,

 4    Your Honor, while we're reading it.

 5                MR. ASUNCION:  No objection, Your Honor.

 6                THE COURT:  All right.

 7    BY MR. HEBERLIG:

 8    Q.  Okay.  And you recognize from this -- it's displayed on

 9    the screen -- that we're talking about the white Kia,

10    correct?

11    A.  Yes, sir.

12    Q.  All right.  And I want to start on line 10:  It looked a

13    little strange at first because the vehicle was still -- it

14    had rolled a little bit.

15                And then this is the portion I believe we were

16    just talking about:  And it also looked as if they were

17    pushing it.  It gave that -- it gave that appearance.

18                Correct?  Is that the truth?

19    A.  More or less, sir.  Again, he had put his hand on the

20    door.  It gave that appearance that he was pushing it.  But

21    he wasn't pushing it.

22    Q.  He wasn't pushing it.

23    A.  No, he wasn't pushing it.  The vehicle was still

24    rolling.  He had his hand on the driver's window.

25    Q.  Okay.

1    A.  It rolled slightly.

2    Q.  I just want to make sure I understand.  Your testimony

3    is he wasn't pushing the car.

4    A.  I don't think he was, sir.

5    Q.  Do you recall testifying under oath at that hearing

6    we've talked about back in December of last year?

7    A.  Maybe I should have explained it a little better, sir.

8    Q.  Why don't we take a look at what you did say at the

9    time.  Let's go to Defense Exhibit 3590.  This is the

10   December 9, 2013, p.m. transcript.  And I'd like to direct

11   you to page 87 at line 16 to 17.

12           Why don't we actually take it up a bit and start

13   at 14 and go to 19.

14           MR. HEBERLIG:  Can I publish this, Your Honor?

15           MR. ASUNCION:  No objection, Your Honor.

16           THE COURT:  All right.

17   BY MR. HEBERLIG:

18   Q.  All right.  This is again from that hearing at which you

19   also testified under oath.  And your answer was:  That I saw

20   the -- that I saw the vehicle being pushed and then I fired

21   on it.  My question to you was:  Did you see the vehicle

22   being pushed?  Answer:  Yes.  Question:  So that part's

23   accurate.  Answer:  Yes.

24           And that's correct.  You did see the vehicle being

25   pushed, correct?

1   A.  Sir, again, it's -- I don't think it was really being

2   pushed.  I may have misspoken on here.  I didn't accurately

3   explain the pushing.  It looked like it was pushed, but he

4   wasn't really pushing it.

5   Q.  Was anything about my question to you ambiguous?  Was

6   anything ambiguous?

7   A.  What is the question, sir?

8   Q.  The question, did you see the vehicle being pushed,

9   ambiguous?

10  A.  Did I see the vehicle being pushed?

11  Q.  Answer the question.

12  A.  I answered it, sir.

13  Q.  Was the question that I asked you less than six months

14  ago, did you see the vehicle being pushed, ambiguous or

15  confusing in any way?

16  A.  I'm not sure, sir.

17  Q.  Well, you didn't say in response to my question, I don't

18  understand your question, did you?

19  A.  No, I didn't.

20  Q.  You said, Yes.  And then I went on to say that part's

21  accurate, and you said, Yes.

22  A.  Sir --

23  Q.  Because that's the truth, correct?

24  A.  No, it's not the truth.  It's not as cut and dry as

25  that.

1    Q.  So last year less than six months ago is your testimony

2    that you lied under oath at that last hearing?

3    A.  Sir, I wouldn't say it's a lie.  I saw the guy, he had

4    his hand on it, the vehicle rolled.  That's the best

5    explanation I could give to it.  I probably should have

6    explained it better.

7    Q.  We can take that down.

8              Now these two men that you saw, pushing or not,

9    the white Kia, depending on whatever you say today, those

10   men were not shot, correct?

11   A.  Pardon me?

12   Q.  Those men who were either pushing the white Kia, or

13   whatever you say today, were not shot, correct?

14   A.  Were not shot?

15   Q.  Were not shot.  Let's start with Iraqi traffic

16   policeman, okay?

17   A.  Okay.

18   Q.  Was that man shot?  Did you see that man get shot?

19   A.  No, I did not see him get shot.

20   Q.  How about the man in the *dishdasha*?  You testified you

21   fired some shots in his direction, correct?

22   A.  That's correct.

23   Q.  All right.  But did you hit him or not?

24   A.  I did not.  Not that I know of.  I didn't aim for his

25   feet.  And he got up and ran away.

1   Q.  Well, let's talk about that.  You said that man in the

2   *dishdasha* was behind the white Kia at the time you fired

3   those shots, correct?

4   A.  Yes, sir.

5   Q.  And you said that you fired approximately three rounds

6   near his feet.  Correct?

7   A.  Yes, that's about correct.

8   Q.  What were you trying to do?

9   A.  I wanted to get him out of there.  I didn't know what he

10   was doing behind that vehicle.  I wanted him to move.  I

11   wanted him to get out of there.

12   Q.  So are these shots -- because I was a little confused by

13   your testimony yesterday -- do you maintain that these shots

14   were justified?

15   A.  No, sir.  It was not justified.

16   Q.  You were trained, were you not, only to shoot to kill.

17   Correct?

18   A.  Shoot to stop the threat, yes, sir.

19   Q.  And that means shoot to kill.  You were not trained --

20   in fact, you were specifically trained that you could not

21   fire warning shots at people, correct?

22   A.  That's correct.

23   Q.  The only shots you could fire at people to stop the

24   threat, as you said, were shots to kill.

25   A.  To stop the threat, yes, sir.

1   Q.  But yet you fired these shots at the feet of this man to

2   get him out of there?

3   A.  Yes, sir, I did.

4   Q.  And it was right after that, am I correct, that you saw

5   these hand movements from the passenger in the white Kia.

6   A.  It was shortly after there, yes, sir.

7   Q.  And when you saw the hand movements you immediately

8   fired several shots at the passenger of the white Kia,

9   correct?

10  A.  Yes, sir.

11  Q.  And you saw no more movement after you fired those

12  shots.

13  A.  No, sir.

14  Q.  I know it's difficult for you to estimate precisely how

15  much time has passed between the various events that you've

16  testified about today, is that fair?

17  A.  Yes, sir.

18  Q.  But I am correct that everything happened very quickly.

19  A.  I wouldn't say very quickly.  I couldn't judge the

20  amount of time.  It was -- it's -- I mean --

21  Q.  You wouldn't say very quickly?

22  A.  From what point to what point are you referring to, sir?

23  Q.  The time that passed between when you first shot the

24  white Kia and when you shot the passenger of the white Kia,

25  didn't that happen very quickly?

1     A.  No, sir.

2     Q.  It didn't?  Is that correct?

3     A.  That's correct, sir.  It wasn't very quickly.

4     Q.  You sure about that?

5     A.  Am I sure?  I mean, I couldn't sit there and estimate,

6     sir.  But I don't think it did.

7     Q.  Let's take a look again at Defense Exhibit 317.

8     A.  Okay, sir.

9     Q.  For the witness only at the moment, please.  And this,

10    again, sir, is your grand jury testimony.  And if we could

11    turn to page 93.  Why don't we start at line 14 and

12    highlight all the way down to line 23.

13            MR. HEBERLIG:  And I'd ask again to publish that,

14    Your Honor.

15            MR. ASUNCION:  No objection.

16            THE COURT:  All right.

17    BY MR. HEBERLIG:

18    Q.  All right, sir.  This is back in the grand jury.  And

19    you were asked again if you're able to put a time on it in

20    terms of seconds or minutes, how much time goes by from when

21    you fire your shots and the vehicle stops -- the white

22    vehicle stops -- to when you next fire into the vehicle at

23    the passenger.  Do you see that question?

24    A.  I do, sir.

25    Q.  All right.  At first you say:  I couldn't say.  Time

1    wise --

2    A.  Yes, sir.

3    Q.  But then you're asked only if you're able to.  And you

4    answer:  I don't feel comfortable saying the time.  It was

5    very fast.  It happened very quickly.  The incident didn't,

6    you know --

7            Those were your words, correct?

8    A.  Yes, sir.

9    Q.  And they were in response to this very question that I

10   just asked you.  When the prosecutor asked you in the grand

11   jury, your answer was it all happened very quickly, correct?

12   A.  It's not as simple, cut and dry as that, sir.  The

13   incident -- it seemed to have gone by fast.  I know that

14   from the time that the man in the *dishdasha* ran over to the

15   side of the road, ran back over to the white car, enough

16   time had gone by for me to judge.  I'm just trying to take

17   responsibility for my actions, so I'm explaining it.  There

18   wasn't enough time -- there was enough time for me to judge.

19   Q.  Were you confused by the prosecutor's question in the

20   grand jury?

21   A.  Maybe, sir.  I'm not sure.

22   Q.  So --

23   A.  Maybe I just didn't --

24   Q.  -- the question how much time passed, that one threw

25   you?  Is that your testimony?

1    A.  Could be, sir.

2    Q.  Yet somehow you were able to testify under oath in front

3    of a grand jury that it happened very quickly, yet you're

4    unwilling to admit that today.  Is that right?

5    A.  I don't -- no, it did not happen very quickly, sir.

6    Q.  So you lied under oath in the grand jury?

7    A.  It's not as simple as that, sir.  I did not purposely

8    lie, no.

9    Q.  You can take that down.

10            You testified that you perceived at some point

11   M-203s being fired while you were in the traffic circle,

12   correct?

13   A.  Yes, sir.

14   Q.  And by that you meant you perceived the explosions,

15   right?

16   A.  Yes, sir.

17   Q.  You did not see anyone fire an M-203.

18   A.  That's correct, sir.

19   Q.  And you perceived those explosions to occur in rapid

20   succession both before and after you shot the passenger of

21   the white Kia sedan, correct?

22   A.  Correct.

23   Q.  I think your testimony may have been earlier today --

24   A.  It's a little bit before, as well, and after.

25   Q.  And you also, I believe, testified that those -- you saw

```
 1    three explosions, is that correct?

 2    A.  I saw three, yes, sir.

 3    Q.  And you testified earlier today that you saw them within

 4    a few seconds of each other.  Correct?

 5    A.  Within a few seconds of each -- yes, sir.

 6    Q.  And I'm right that sometime after the incident you had a

 7    conversation with Jimmy Watson on the subject of M-203s,

 8    right?

 9    A.  Yes, sir.

10    Q.  And Watson during that conversation told you, in fact,

11    that he had fired M-203s during the incident, correct?

12    A.  Yes, sir.

13    Q.  And he told you that within a day or two of this

14    incident taking place.

15    A.  Pardon me, sir?

16    Q.  Did he tell you that within a day or two of the incident

17    taking place?

18    A.  He told me the day of, sir.

19    Q.  The day of.  And in that conversation he told you he

20    fired more than one M-203 round out the door of the command

21    vehicle during the incident, correct?

22    A.  Yes, sir.  He said he was pumping rounds out the window.

23    Q.  One last series of questions about the white Kia, and

24    then I'm going to move on.

25            I want you to think about the very first time you
```

1    saw that Kia and then the location of the car when it came

2    to a stop for good.  Okay?

3    A.  Okay.

4    Q.  Do you get what I'm asking about?  Then I'll have some

5    questions.

6    A.  I believe so.

7    Q.  I want you to have in your mind the very first time you

8    saw the car and then the location of the car when it stopped

9    and moved no more.  Okay?

10   A.  Yes, sir.

11   Q.  Am I right that you've estimated that the car traveled

12   at least 50 feet from where you first saw it to where it

13   came to a stop for good?

14   A.  I'm sorry.  Repeat the question, sir?

15   Q.  Am I right that that white car from when you first saw

16   it to when it stopped for good traveled at least 50 feet.

17   A.  I couldn't say, sir.  I'm not sure.

18   Q.  Do you recall being asked questions about this earlier

19   in the grand jury?

20   A.  I don't -- maybe you could refresh my memory, sir.  That

21   would be great.

22   Q.  Why don't we go to Defense Exhibit 317 again.  Page 124,

23   at line 7 to 24.  Actually, 7 all the way down to the bottom

24   of the page.

25              MR. HEBERLIG:  All right.  And I'd ask to publish

1    this again, Your Honor?

2              MR. ASUNCION:  That's fine, Your Honor.

3              THE COURT:  All right.

4    BY MR. HEBERLIG:

5    Q.  Okay, sir.  We're back in the grand jury here, 2013.

6    May of that year.  This again is a grand juror asking you a

7    question.  That grand juror said:  Can you say about how far

8    away it was when you first saw it compared to what you drew

9    on the diagram, which is where it stopped?

10             See that question?

11   A.  Yes, sir.

12   Q.  Which is essentially the same question I just asked you.

13   A.  Yes, sir.

14   Q.  And you answered:  Yeah.  The vehicle came to -- almost

15   like you could see the front end coming down when the

16   vehicle is coming at you.  So it was almost as if the driver

17   had either hit their brakes or it got in gear.  I don't know

18   what type of vehicle, you know, if it was -- it was very --

19   the way it stopped was confusing to me because it had jerked

20   forward a bit.  If you remember earlier, I said it rolled --

21   had rolled a bit.  So it was about, I don't know, maybe 50

22   feet from me to the end of the room, somewhere around that

23   from where it stopped.

24             And then the grand juror asked for clarification:

25   I'm asking when you first saw it when it was still moving

1    when you first saw it, about how far away do you think it

2    was?  And your answer was:  About maybe double that, close

3    to maybe a hundred feet, maybe a little more.

4              Do you see that?

5    A.  Yes, sir.

6    Q.  So if we can break that down, what you testified to

7    under oath is when it came to a stop -- and that's the first

8    highlighted portion -- it was maybe 50 feet from you.

9    Correct?

10   A.  I said maybe 50 feet from me.  Yes, I said that.

11   Q.  And then when the grand juror asked, Well, where was it

12   when you first saw it?  You said, Maybe double that.  Close

13   to maybe a hundred feet, maybe a little more.  Correct?

14   A.  I said that, sir.

15   Q.  And that was truthful testimony at the time.

16   A.  It was an estimate, sir.  I said maybe -- I said maybe.

17   So it was an estimate.

18   Q.  It's accurate to the best of your ability, correct?

19   A.  To the best of my ability, yes, sir.

20   Q.  Because you were telling the truth in the grand jury and

21   doing your best to be accurate, correct?

22   A.  I was doing my best to be accurate.

23   Q.  So you'd agree with me to your best recollection the

24   white car traveled at least 50 feet from when you first saw

25   it to when it came to a stop for good.

1   A.  Sir, I said maybe.

2   Q.  Were you or were you not doing your best to give an

3   estimate in the grand jury?

4   A.  I was doing my best.  But I was not comfortable giving a

5   distance, sir.

6   Q.  Well, you answered the question.  You didn't say, I'm

7   not comfortable giving an answer.  Did you?

8   A.  I had said that earlier on about the whole subject.  I

9   wasn't comfortable with the speed.  I wasn't comfortable

10  giving distances.

11  Q.  But yet when you were asked a question by that grand

12  juror, you didn't say, You know what?  I just can't answer

13  that one.  Move on to something else.  You gave your best

14  estimate.  And that best estimate was it traveled at least

15  50 feet.

16  A.  In retrospect, I probably should have said that.  I gave

17  a good guesstimate, sir.

18  Q.  A good guesstimate.  Correct?

19  A.  Yes, sir.

20  Q.  All right.  We can take that down.

21          Now I want to focus on the period after you shot

22  the passenger of the white car, okay?

23  A.  Yes, sir.

24  Q.  Am I right that the next shots that you fired were

25  directed to the southeast of the traffic circle down the

1    road?

2    A.  Yes, sir.

3    Q.  Can we pull up Government Exhibit 323?  This is in

4    evidence.  And why don't we just highlight from roughly here

5    to there.

6             All right.  So again, sir, your vehicle was in the

7    traffic circle at the time you fired the shots, correct?

8    A.  Yes, sir.

9    Q.  And the shots you fired were roughly in this direction,

10   correct?

11   A.  Roughly, sir.

12   Q.  And they were near a structure that you now know to be a

13   bus stop.  Correct?

14   A.  Yes, sir.

15   Q.  What happened is you transitioned at that point from

16   your M-4 rifle to your M-240 machine gun, right?

17   A.  Yes, sir.

18   Q.  And you fired your weapon.

19   A.  Yes, sir.

20   Q.  How many bursts?

21   A.  I'd say about three, sir.

22   Q.  Three bursts.

23   A.  I'd say, yes, sir.

24   Q.  And the M-240 Bravo machine gun when you fire a burst

25   fires somewhere around six to eight rounds.  Correct?

1    A.  All depends how long your bursts are, sir.  I'm not

2    going to guess on that.

3    Q.  You won't guess your own rounds that day?

4    A.  Not on the burst.  I couldn't say.

5    Q.  Well, do you have any recollection?  How long did you

6    hold it down?  The standard is --

7    A.  Because if you -- maybe a second, two, three.  I don't

8    know.  And there were several -- several bursts.  Three,

9    maybe.

10   Q.  And that several second burst with the M-240 machine gun

11   you know from your training to be roughly a six to eight

12   round burst, correct?

13   A.  I'm not going to argue it, sir.

14   Q.  When you fired those shots you saw that they hit a

15   vehicle, correct?

16   A.  Yes, sir.

17   Q.  You saw that they hit a dark-colored Chevy suburban.

18   A.  That's what it appeared to be, yes, sir.

19   Q.  And that's when you say you fired -- excuse me -- that's

20   when you say you stopped firing, correct?

21   A.  Yes, sir.

22   Q.  Your shots also hit some other vehicles to the south of

23   the traffic circle, did they not?

24   A.  I couldn't say, sir.

25   Q.  You're not sure --

1    A.  I did not see the impacts.

2    Q.  And you were asked some questions I believe on direct

3    examination about whether you saw any threats coming at you

4    from that area, correct?

5    A.  That's correct.

6    Q.  And you said, no.

7    A.  That's correct.

8    Q.  And you were asked similar questions in the grand jury.

9    And, likewise, in essence you said you saw no incoming

10   gunfire coming from that direction.  Correct?

11   A.  That's correct.

12   Q.  All right.  So just looking at this map, sir --

13           And can we go a little bit further south, Andrej?

14           This little structure I'm circling right now you

15   know that now to be the bus stop, correct.

16   A.  Yes, sir.

17   Q.  All right.  Can we go to a different exhibit in

18   evidence, Defense Exhibit 2413.

19           Do you recognize this, sir, to be a picture of

20   that bus stop?

21   A.  From what I know now, sir.  Yes.  I've been shown the

22   picture.  I wouldn't have recognized it.  It wasn't pointed

23   out --

24   Q.  But you do know today that this is that bus stop that

25   was located right near where I just highlighted on the map,

1    to the southeast of Nisur Square in the vicinity of where

2    you were firing those rounds with your 240.

3    A.  Yes, sir.

4    Q.  You see in this photograph down here --

5            If you can enlarge that area, please.

6            I don't know if you can make it out.  But you can

7    see there a blue bottle cap right around there.  Do you see

8    that?

9    A.  Yes, sir.

10   Q.  Or whatever it is.  And you also see over here this

11   cloth like or dark colored object?  Do you see that?

12   A.  Yes, sir.

13   Q.  And I don't know if you can make them out, but there

14   appear to be some objects in between those two things in the

15   picture.  Do you see that?

16   A.  Yes, sir.

17   Q.  All right.  If we can go to Defense Exhibit 414 in

18   evidence.  I want you to keep in mind that blue cap and the

19   line of cloth-like substance we're looking at.  2414 is what

20   I meant to say.

21           All right.  And this is just a zoomed-in

22   photograph of that exact area behind the bus stop that we

23   were just looking at, okay?  And you see again that blue

24   bottle cap and that black piece of cloth, correct?

25   A.  Yes, sir.

1    Q.  And you can see in between them eight spent shell

2    casings, right?

3    A.  Yes, sir.

4    Q.  And can you tell from your experience that those appear

5    to be AK-47 shell casings?

6    A.  They appear to be, sir.

7    Q.  And can you tell from your experience whether those

8    appear to be fresh brass?

9    A.  No, I could not, sir.

10   Q.  You can't say.

11   A.  No, sir.

12   Q.  Were you ever shown these photographs before at any

13   point prior to today?

14   A.  Yes, sir, I was.

15   Q.  When were you first shown them?

16   A.  A few days ago, sir.

17   Q.  You were never shown these photographs prior to your

18   plea of guilty?

19   A.  No, sir.

20   Q.  You were never shown these photographs prior to when you

21   testified in the grand jury?

22   A.  No, sir.

23   Q.  You were shown them just a couple of days ago for the

24   very first time?

25   A.  Yes, sir, I was.

1    Q.  Okay.  And what you understood and recognize them to be

2    were photographs of AK-47 expended brass in that area behind

3    the bus stop directly where you were aiming your 240.

4    Correct?

5    A.  That wasn't directly where I was aiming it, but it's in

6    that vicinity, sir.

7    Q.  We can take that down.

8              Now you testified at some point you saw my client,

9    Paul, firing his weapon to the south, correct?

10   A.  Yes, sir.

11   Q.  He was shooting his M-4 weapon, correct?

12   A.  Yes, he was.

13   Q.  And you perceived him to be firing to the south.  Right?

14   A.  Yes, sir.

15   Q.  But you did not see where his shots impacted.  Correct?

16   A.  No, I did not.

17   Q.  And you saw him firing for only a second or two.

18   A.  Sounds about right.

19   Q.  You only caught a glimpse of him firing in this manner.

20   Correct?

21   A.  I wouldn't say "glimpse."  I got a good look.

22   Q.  In fact, you have said "a glimpse."  Correct?

23   A.  Pardon me?

24   Q.  You have said in a prior proceeding that it was just a

25   glimpse, correct?

1    A.  It was enough to see him firing, yes.  I saw him.

2    Q.  Understood.  But you agree with me that that's accurate.

3    You testified in a prior proceeding that when you looked at

4    him and you saw him firing south in that manner, it was just

5    a glimpse?

6    A.  I saw him, sir.  A glimpse -- I saw him -- sure.  If you

7    want to use that word, that's fine.

8    Q.  Well, it's not my word.  You've used that word, correct?

9    A.  That's true, sir.  You're right.

10   Q.  Okay.  And you couldn't see what targets he was shooting

11   at, right?

12   A.  No, I could not, sir.

13   Q.  Now, you've testified about the Bearcat vehicle, the

14   command vehicle, needing to be towed out of the traffic

15   circle, right?

16   A.  Yes, sir.

17   Q.  I'm going to get to that in a minute.  But I want you to

18   focus on that period of time between when the first shots

19   you heard were fired and the tow was set up, okay?

20   A.  Okay.

21   Q.  You said during that period you saw Paul fire his M-4

22   rifle at the white Kia, correct?

23   A.  Yes, sir.

24   Q.  Those first shots.  But then stopped, right?

25   A.  Yes, sir.

1    Q.   Now you just testified that you saw him fire his M-4

2    rifle somewhere to the south for a second or two when you

3    caught this glimpse of him, correct?

4    A.   That's correct, sir.

5    Q.   And those are the only shots that you saw Paul fire with

6    his weapons at the time from when those first shots were

7    fired at least to the time that the tow was set up, correct?

8    A.   Just those two times, yes, sir.

9    Q.   And I'm right that you never saw at any point in time

10   during this incident Paul shoot his M-240 machine gun.

11   A.   No, I did not.

12   Q.   And you were in the front turret of the follow vehicle,

13   correct?

14   A.   Yes, sir.

15   Q.   And the follow vehicle was the fourth in the line of

16   cars, correct?

17   A.   Yes, sir.

18   Q.   And the command vehicle where Paul was located was the

19   third vehicle in the line of four cars, correct?

20   A.   Yes, sir.

21   Q.   And from where you were located in the front turret of

22   that follow vehicle to where Paul was located in the turret

23   of the command vehicle, nothing obstructed your view.

24   A.   Between my view with Mr. Slough and --

25   Q.   Correct.

 1    A.   No.   There was nothing obstructing my view.

 2    Q.   All right.   Let's move forward a bit.   You testified at

 3    some point that you perceived the vehicles lining up to

 4    prepare a tow-out, correct?

 5    A.   Yes, sir.

 6    Q.   And what happened is you looked around and you saw that

 7    the vehicles in the convoy were repositioning themselves to

 8    set up this wall of steel.   Correct?

 9    A.   It appeared that way, yes, sir.

10    Q.   And that's the procedure that you know from your

11    training that's employed when one of the vehicles has to tow

12    another vehicle out of harm's way.   Correct?

13    A.   It's just a normal standard operating procedure, period.

14    But, yes.

15    Q.   Normal operating procedure when one vehicle goes down is

16    for another vehicle to tow it.   Correct?

17    A.   Yes, sir.

18    Q.   And normal operating procedure did not involve, in your

19    experience, ever having one vehicle push another vehicle

20    that was disabled, correct?

21    A.   Not that I recall.   Unless it was necessary.

22    Q.   All right.   And given how far away you were in Nisur

23    Square from where you had to get to back in the Green Zone,

24    pushing the command vehicle out would have been utterly

25    impractical, correct?

1    A.  Pardon me, sir?

2    Q.  If one were to suggest that a different way to get that

3    command vehicle back to the Green Zone, different than

4    towing it, was to have one of the vehicles push it from

5    behind, that would be completely impractical in this

6    situation.  Correct?

7    A.  I would think so.

8    Q.  All right.  Now, you saw some men get out of one of the

9    vehicles and set up the tow strap, correct?

10   A.  I didn't see him set up.  It looked like they were

11   taking -- undoing the tow strap which were attached to the

12   back of the vehicle.  So I didn't actually see them make the

13   connection.

14   Q.  But you were able -- or at least you perceived that the

15   tow strap was set up, and then men got back in their vehicle

16   and the convoy was ready to go.  Correct?

17   A.  I believe that was it.

18   Q.  And after this tow got set up, am I right that the

19   second vehicle, the ERV vehicle, towed the Bearcat, or the

20   command vehicle, out of the traffic circle?

21   A.  It may have been the ERV.  I'm not 100 percent sure.  It

22   could have been the first vehicle.  But one of the vehicles

23   did tow him out.  It wasn't us.

24   Q.  So you're not sure which one was the one pulling the

25   other, but you're confident that the vehicle that had gone

1    down and needed to be towed was the command vehicle.

2    A.  Yes.

3    Q.  All right.  And then after that was set up the convoy

4    exited the traffic circle, correct?

5    A.  Yes, sir.

6    Q.  Let's go back to Government Exhibit 323 which is in

7    evidence.  And we can leave it in that view right there.

8         So when the convoy pulled out, your vehicle -- the

9    follow vehicle was still the last vehicle in line, correct?

10   A.  Yes, sir.

11   Q.  And am I right that the convoy pulled around in this

12   manner and exited -- I may have missed a lane -- but roughly

13   in that direction?

14   A.  Roughly, yes, sir.

15   Q.  So you traveled around the traffic circle counter flow

16   of traffic?

17   A.  Yes, sir.

18   Q.  And while the convoy was exiting, your vehicle was

19   fairly close to the two vehicles in front of you, correct?

20   A.  Yes, sir.  I believe so.

21   Q.  And you were continuing to scan for any threats while

22   you were exiting the traffic circle, correct?

23   A.  Yes, sir.

24   Q.  And in general, as the front turret gunner of the follow

25   vehicle, you were generally oriented to the front in the

1    direction in which your car was traveling.  Correct?

2    A.  To either side, sir.  Could have been front, could have

3    been left or right.

4    Q.  Sure.  You were swiveling around a bit, but your general

5    orientation was to the front as opposed to the rear of the

6    vehicle, correct?

7    A.  It was not to the rear.

8    Q.  And that's because your rear turret gunner, Dustin

9    Heard, was in that position.  Right?

10   A.  Yes, sir.

11   Q.  As the rear turret gunner of the follow vehicle his job,

12   per those standard operating procedures, was to take care of

13   any threats from behind the convoy, correct?

14   A.  Typically, yes.  Yes, sir, he would be.

15   Q.  Now, while you were exiting around the traffic circle,

16   am I correct that you did not see anyone from the team fire

17   to the west side of the traffic circle?

18   A.  To the west side of the -- I did not see anyone firing.

19   Q.  In other words --

20              And why don't we blow it up, Andrej.  Just roughly

21   there.

22              All right.  So in other words, as you were

23   traveling -- whoop.  As you were traveling around this way

24   to exit to the north, am I correct that you did not see any

25   shots fired, first of all, in that general direction?

1   A.  No, sir, I did not.

2   Q.  And that was the direction to the west, correct?

3   A.  Yes, sir.

4   Q.  And am I also correct that you did not see any shots --

5   whoops, I shouldn't have done that -- while the convoy was

6   exiting, fired in that direction on that road that exits the

7   traffic circle on roughly the northwest corner?

8   A.  No, sir, I did not.

9   Q.  And we're talking here about the entire convoy.  You saw

10   no one fire in those directions, correct?

11   A.  No, sir.  No one in the convoy.

12   Q.  To include my client, Paul.

13   A.  I did not see anyone in the convoy firing.

14   Q.  So let's talk, then, about the exit north.  Am I right

15   that the convoy left the traffic circle and traveled north

16   in that counter flow lane that you described?

17   A.  Yes, sir.

18   Q.  And that was against traffic, right?

19   A.  Yes, sir.

20   Q.  You testified the traffic was congested in that area?

21   A.  Yes, sir.

22   Q.  And it was slow going.

23   A.  Yes, sir.

24   Q.  Now, this was a fairly stressful period, correct?

25   A.  Yes, sir.

1    Q.  Because you had a lot of civilian vehicles in close

2    proximity to the convoy, right?

3    A.  Yes, sir, there was.

4    Q.  And in general, your convoy when traveling through the

5    Red Zone liked to keep civilian vehicles as far away from

6    you as possible.  Correct?

7    A.  That would be a -- yes, sir.

8    Q.  Because of the risk of suicide VBIED bombers.

9    A.  Yes, sir.

10   Q.  And while you were traveling around to the north in this

11   direction, am I correct that just as we talked about on the

12   exit to the circle, as a general matter you were facing

13   forward, although obviously capable of swiveling left to

14   right.  Correct?

15   A.  Sir, I'm not sure which direction I was looking at.  I

16   believe I may have been looking more towards -- more towards

17   the east, but I don't recall.

18   Q.  But in terms of your general body orientation in the

19   turret, like when you were exiting, you were generally

20   speaking facing forward, although you could have been

21   looking in almost 180 degree direction, correct?

22   A.  Yes, sir.

23   Q.  Now, you've testified that you saw my client, Paul, fire

24   his weapon again when the convoy was north of the traffic

25   circle.  Correct?

1    A.  Yes, sir.

2    Q.  And just to be clear, those shots to the north of the

3    traffic circle were the first shots that you saw Paul fire

4    after the towing of the command vehicle began.  Correct?

5    A.  Yes, sir.

6    Q.  And, frankly, the only shots you saw him fire after

7    those shots you saw to the south that you caught for only a

8    glimpse or two.

9    A.  Yes, sir.

10   Q.  And they were also the last shots that you saw Paul fire

11   that day.

12   A.  Yes, sir.

13   Q.  Now, I'm going to get to the shots that you described

14   yourself firing at the white Celebrity in just a minute.

15   But as I understood your testimony on direct, you said that

16   the shots that Paul fired came after you fired at that white

17   Celebrity, is that correct?

18   A.  I believe so.

19   Q.  But isn't it true, sir, that you told prosecutors back

20   in 2012 that Paul fired those shots before you fired your

21   shots at the white Celebrity?

22   A.  I don't recall that, sir.

23   Q.  Why don't I see if I can refresh your recollection.  And

24   for the witness only can we please go to Defense Exhibit

25   2310.

1          And just so we know what we're looking at here,

2     can we highlight the bottom and give Mr. Ridgeway the date

3     of this memorandum?

4          Do you see, sir, that this is an FBI memorandum of

5     an interview of you on November 29, 2012, in Washington, DC?

6     A.  I see that, sir.

7     Q.  All right.  Andrej, if you could please go to page 7 of

8     this memorandum.  And bear with me one moment.  If you could

9     highlight the bottom two paragraphs, please.

10         All right.  Sir, what I would ask you to do is

11    just to read to yourself those two paragraphs, and then I'll

12    have a question for you.

13         (Pause.)

14    Q.  Are you finished reading?

15    A.  Yes, sir.

16    Q.  And, sir, my question to you is isn't it correct that

17    during this interview with the FBI in November of 2012 you

18    actually described the sequence that Paul fired his shots

19    first, and then subsequently your vehicle bumped into that

20    white Celebrity?

21    A.  That's what it says on here, sir.

22    Q.  And that's accurate, correct?

23    A.  I could have been out of sequence.  The way I recall it,

24    it was the other way around.

25    Q.  Was it fair to say that seven years later -- or in this

1    instance five years later -- you're not certain of the

2    sequence of those two events?

3    A.  No, sir.  The way I remember it, I had -- I had fired,

4    then I saw Mr. Slough fired, and then we started moving.

5    Q.  But you acknowledge --

6    A.  That's how I recall it.

7    Q.  I'm sorry.  You do acknowledge that back in 2012 you

8    described the sequence differently.

9    A.  It does say it, yes, sir.

10   Q.  I want you to -- you can take that down, Andrej.

11              And let me just focus you still on the shots that

12   you said that Paul fired, and then we'll get to your own

13   shots, at this rate perhaps on Monday.

14              You described Paul firing somewhere off in the

15   general westerly direction, correct?

16   A.  It was -- yes, sir.

17   Q.  So just to -- can we go back to Government Exhibit 323,

18   please, in evidence?  This is in evidence.

19              So as the convoy is heading north in this

20   direction, am I correct that you saw him generally firing

21   somewhere off to the west?

22   A.  That's about right, sir.

23   Q.  And where I drew the arrow, is that about roughly where

24   you saw him firing?

25   A.  I would think it was a little more -- a little more

1   north, but I'm not sure, sir.  It's hard to tell on this.

2   Q.  Perhaps there, perhaps somewhere a little bit north.

3   Correct?

4   A.  Yes, sir.

5   Q.  And he was using his M-4 rifle?

6   A.  Yes, sir.

7   Q.  And, again, you never saw him at any point using his

8   M-240 on September 16.

9   A.  That's correct, sir.

10  Q.  You couldn't see where Paul was firing, but I think you

11  testified it appeared that there was nothing there, correct?

12  A.  That's correct.

13  Q.  And you, in fact, did a demonstration with the

14  prosecutor in which you stood up and tried to demonstrate to

15  the jury how it was he was holding his weapon, correct?

16  A.  Yes, sir.

17  Q.  And correct me if I'm wrong, but you shouldered the

18  weapon and you held your hands up as if he was firing

19  directly perpendicular away from where he was located.

20  Correct?

21  A.  Yes, sir.

22  Q.  And that's what you saw, right?

23  A.  I saw him do it, yes, sir.

24  Q.  So did you not see him holding his weapon and pointing

25  it down like that, correct?

1    A.  No, I did not.

2    Q.  It looked to you like he was shooting somewhere either

3    toward or past that concrete wall that you were passing.

4    Right?

5    A.  It seemed that way, sir.

6    Q.  So you did not see Paul's shots impact any people,

7    correct?

8    A.  No, sir.

9    Q.  You did not see Paul's shots impact any cars?

10   A.  No, sir.

11   Q.  And you did not see Paul shoot any red sedan, correct?

12   A.  No, sir.

13   Q.  And you did not see Paul shoot any white station wagon,

14   correct?

15   A.  No, sir.

16   Q.  And at the time you saw Paul firing those shots, he was

17   at least 40 to 50 feet away from you.  Is that correct, sir?

18   A.  It's within that -- I'm not going to dispute that.

19   Q.  Okay.  If I represent that that's what you testified to

20   in a prior proceeding you wouldn't disagree with that?

21   A.  That would be fine.

22   Q.  So there was some --

23   A.  I'm comfortable with that.

24   Q.  I'm sorry.

25   A.  I'm comfortable with that.

1   Q.  So there was some separation between the follow vehicle

2   and the command vehicle in front of you, correct?

3   A.  Correct.

4   Q.  And that's how convoys usually traveled, with some

5   separation between the vehicles.

6   A.  That's correct.

7              MR. HEBERLIG:  Your Honor, I'm about to get into a

8   new area, if this is a good time.

9              THE COURT:  Monday at 10.  Don't talk about the

10  case.  Don't let anyone talk to you about the case.  Don't

11  read or listen to anything about the case.  Don't Twitter or

12  tweet.

13             Do I sound like a broken record?  Y'all have a

14  nice weekend.

15             (NOTE:  The jury exiting the courtroom at

16  4:57 p.m.)

17

18             (NOTE:  The following proceedings were held

19  outside the presence of the jury.)

20             THE COURT:  Okay.  Thursday Follies?

21             MR. KAVANAUGH:  Yes, Your Honor.  For next week we

22  will have Mr. Jeremy Ridgeway.

23             THE COURT:  Let me ask defense now how long you

24  expect the cross to go?  More than Monday or not?

25             MR. HEBERLIG:  I would say that I probably will

1      get us to close to lunch.  Maybe a little shy of lunch.

2                  THE COURT:  Okay.  Mr. Slatten will go longer.

3                  MR. CONNOLLY:  Your Honor, you've seen what I do.

4                  THE COURT:  I know you want to be invisible.

5      Okay.

6                  MR. SCHERTLER:  Your Honor, I think maybe an hour,

7      hour and-a-half at the most.

8                  THE COURT:  Okay.  All right.  So conceivably we

9      could get to redirect anyway Monday.  All right.  Then where

10     we going?

11                 MR. KAVANAUGH:  Your Honor, Jeremy Krueger, Kevin

12     Rhodes.  Those are both members of Raven 23.  Tyler Hill,

13     who was a Blackwater mechanic at the time.

14                 And then, Your Honor, we have at least eight

15     witnesses with the FBI related to evidence collection and

16     chain of custody.  I'm going to see if in speaking with the

17     defense, particularly with respect to the vehicle evidence,

18     if we can reach some sort of stipulation.  But in any event,

19     although there are eight, they should be fairly quick.

20                 And I will also say that many of these agents were

21     part of the -- they were all part of the old team and I

22     believe that they had significant exposure to many other

23     things, but I'm only going to be calling these people for

24     evidence collection.

25                 Jean O'Connor, Sean Joyce, Daniel Lindstrom,

1    Carolyn Murphy, Angela Sercer, Tom O'Connor, Timothy Nock,

2    and John Gardner, Ronald Peterman.  And then, Your Honor, we

3    may get to Mr. Brandon Giroux who is a firearms expert with

4    the FBI who did the lion's share of the ballistics testing.

5    And I think that's going to fill the week, but --

6                THE COURT:  All right.  We'll see.

7                MR. BARATZ:  Your Honor, I'm going to work with

8    Mr. Kavanaugh on the chain of custody issues as it relates

9    to the FBI, the evidence recovery team.  But just to alert

10   Your Honor, Brandon Giroux, he also testifies about some of

11   the -- he's an expert witness.  He also plans to testify

12   about some of the evidence that was collected by Iraqi

13   officials.  And I haven't heard Mr. Kavanaugh name Colonel

14   Atif that was the link in the conditional admittance of the

15   evidence before.  And I'll work with him more.  And perhaps

16   they've come up with another link for that first part of the

17   chain.  But we wouldn't want the expert to testify about

18   conditional evidence at this point.

19               MR. KAVANAUGH:  Your Honor, we believe he'll have

20   to given when the next plane from Iraq is going to come in.

21   And even if he doesn't come in, I actually believe -- I have

22   case law I think that would support the admission of the

23   evidence.  But I don't even think we need to get there

24   because we anticipate him testifying.

25               MR. SCHERTLER:  Your Honor, one final matter.  I

1    know this is a question I ask at the end of each week.  But

2    we're now in the process of trying to logistically prepare

3    the defense case.  And we have a lot of witnesses we have to

4    call from out of town.  If the government could give us some

5    kind of estimate in terms of when they think they might

6    finish their case so we can start apprising witnesses when

7    they need to be here.

8              MR. KAVANAUGH:  I'm having *déjà vu*.  I thought we

9    talked about this last week, Your Honor.

10             THE COURT:  You did, but maybe you speeded it up.

11             MR. KAVANAUGH:  Well, Your Honor, I said it last

12   week and I'll say it again.  I think 8-18 or the following

13   week.  The week of 8-18 or the following week, the week of

14   8-25.

15             I actually think that we'll be able to finish that

16   week of 8-18 towards the end of that week.  A lot of it

17   depends on how quickly these last remaining Raven 23

18   witnesses will be.  But we -- assuming that they are of

19   similar length to Mr. Mealy and Mr. Frost, I think that is a

20   fairly good estimate.

21             MR. SCHERTLER:  Fair enough.

22             THE COURT:  The defendants expect to file a reply

23   on the *Brady* brief I got from the government?  I'm not

24   asking you to, but if you want it in the record I'll take

25   it.

1              MR. HEBERLIG:  I think we're prepared to address

2      it orally, you know, or largely let it rest on the papers.

3      But I don't know if the Court wants to hear --

4              THE COURT:  5:00 Monday if we're going to do it

5      orally.

6              MR. HEBERLIG:  Okay.  As opposed to now.

7              THE COURT:  As opposed to now.

8              MR. HEBERLIG:  We do have an interest in

9      resolutions, because the more time that goes by I think the

10     greater prejudice.  But, yes.  So we'll either file a reply

11     or address it orally briefly on Monday.  Thank you.

12             THE COURT:  Anything anybody else wants to raise?

13             I'll see you all Monday.

14             (Court Adjourned at 5:03 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT.)
                                  ) ss.
2   FOR THE DISTRICT OF COLUMBIA )

3

4

5                **CERTIFICATE OF OFFICIAL COURT REPORTER**

6

7              I, VICKI EASTVOLD, do hereby certify that the

8   above and foregoing, constitutes a true and accurate

9   transcript of my stenographic notes and is a full, true and

10  complete transcript of the proceedings to the best of my

11  ability.

12      Dated this 1st day of August, 2014.

13

14                          _____s/Vicki Eastvold_____
                            Official Court Reporter
15                          United States Courthouse
                            Room 6722
16                          333 Constitution Avenue, NW
                            Washington, DC   20001
17                          202-354-3242

18

19

20

21

22

23

24

25

## $

**$250,000** [1] - 17:19

## 0

**08-360** [1] - 1:5
**0802** [1] - 74:19

## 1

**1** [5] - 22:24, 39:9, 39:12, 96:6, 96:9
**10** [3] - 66:7, 103:12, 136:9
**100** [1] - 126:21
**1025** [3] - 4:9, 4:12, 92:4
**103** [3] - 39:5, 39:8, 39:12
**104** [2] - 39:6, 39:12
**11** [4] - 13:14, 20:12, 20:14, 25:18
**12** [11] - 21:11, 58:13, 59:14, 59:20, 59:23, 60:18, 79:24, 80:1, 80:9, 81:2, 103:1
**1200** [2] - 2:20
**123** [1] - 96:3
**124** [1] - 113:22
**13** [4] - 18:3, 26:18, 33:3, 56:2
**1330** [2] - 2:10, 2:13
**14** [5] - 5:9, 32:13, 32:14, 104:13, 109:11
**14-107** [1] - 1:12
**15** [1] - 14:16
**16** [10] - 58:25, 61:2, 76:3, 76:11, 76:12, 76:15, 78:4, 78:8, 104:11, 134:8
**17** [3] - 18:1, 22:24, 104:11
**18** [2] - 15:3, 26:12
**180** [5] - 41:7, 41:8, 41:14, 41:18, 130:21
**18th** [1] - 2:20
**19** [1] - 104:13
**1st** [1] - 141:12

## 2

**2** [8] - 16:14, 22:25, 71:12, 88:20, 88:21, 92:5, 93:16
**2-3** [4] - 58:24, 79:8, 81:5, 92:13
**2-6** [1] - 60:2
**20** [1] - 94:12
**20001** [2] - 1:24, 141:16
**20004** [1] - 2:17
**20036** [3] - 2:10, 2:14, 2:21
**2006** [1] - 75:6
**2007** [12] - 56:2, 56:21, 57:17, 58:13, 59:14, 59:20, 61:7, 64:14, 66:7, 76:3, 78:5, 78:8

**2008** [8] - 4:16, 5:9, 5:16, 10:20, 14:16, 15:3, 26:12, 92:12
**2009** [1] - 38:8
**2012** [5] - 71:11, 131:20, 132:5, 132:17, 133:7
**2013** [10] - 39:4, 39:11, 40:6, 88:18, 97:6, 99:22, 104:10, 114:5
**2014** [2] - 1:8, 141:12
**202-354-3242** [2] - 1:25, 141:17
**20530** [1] - 2:6
**21** [3] - 19:16, 96:3, 96:8
**22** [1] - 43:11
**220** [2] - 2:13, 93:16
**2292-R** [1] - 14:6
**2293** [2] - 32:2, 32:11
**23** [21] - 6:25, 8:14, 49:18, 49:23, 50:4, 52:15, 61:7, 61:16, 62:1, 62:16, 64:19, 66:12, 67:1, 68:3, 78:6, 78:10, 92:12, 96:8, 109:12, 137:12, 139:17
**2310** [2] - 71:8, 131:25
**24** [3] - 39:8, 39:12, 113:23
**240** [2] - 120:2, 122:3
**2413** [1] - 119:18
**2414** [1] - 120:19
**25** [11] - 39:8, 39:12, 43:11, 89:12, 90:13, 90:16, 90:21, 91:2, 91:4, 96:8, 96:9
**26** [2] - 60:22, 60:23
**27** [1] - 19:16
**29** [3] - 57:17, 71:11, 132:5
**2:11** [2] - 1:8, 4:1

## 3

**3** [3] - 16:15, 22:25, 71:12
**30-year** [4] - 4:21, 10:13, 18:3, 45:19
**300** [1] - 2:17
**31** [2] - 1:8, 1:9
**317** [5] - 88:16, 96:1, 102:25, 109:7, 113:22
**323** [4] - 81:22, 117:3, 127:6, 133:17
**333** [2] - 1:24, 141:16
**3590** [2] - 39:2, 104:9
**360-degree** [1] - 67:4
**3:25** [1] - 70:10
**3:40** [1] - 70:12

## 4

**4** [2] - 3:4, 18:15
**40** [1] - 135:17
**4101** [3] - 55:15, 55:18, 55:21
**4102** [2] - 57:3, 57:14

**4103** [2] - 58:10, 58:20
**414** [1] - 120:17
**4:57** [1] - 136:16

## 5

**5** [1] - 20:13
**50** [16] - 65:7, 65:9, 65:16, 88:12, 89:8, 89:9, 89:11, 90:25, 113:12, 113:16, 114:21, 115:8, 115:10, 115:24, 116:15, 135:17
**55** [2] - 59:22, 60:9
**555** [1] - 2:5
**575** [1] - 2:17
**5:00** [1] - 140:4
**5:03** [1] - 140:14

## 6

**6** [2] - 96:6, 96:9
**6(C** [1] - 18:15
**61** [1] - 43:11
**63** [1] - 19:13
**67** [1] - 88:20
**6722** [2] - 1:23, 141:15
**69** [1] - 103:1

## 7

**7** [7] - 26:22, 39:9, 39:12, 75:8, 113:23, 132:7
**78** [2] - 19:13, 19:22
**7th** [1] - 2:17

## 8

**8-18** [3] - 139:12, 139:13, 139:16
**8-25** [1] - 139:14
**87** [1] - 104:11

## 9

**9** [6] - 39:4, 39:11, 88:18, 88:20, 88:21, 104:10
**93** [1] - 109:11

## A

**a.m** [2] - 13:14, 43:11
**Abilify** [8] - 71:3, 71:20, 71:22, 72:1, 72:2, 72:25, 73:2, 74:9
**ability** [5] - 28:24, 51:3, 115:18, 115:19, 141:11
**able** [7] - 39:9, 64:7, 109:19, 110:3, 111:2, 126:14, 139:15
**Abram** [1] - 1:13
**absence** [1] - 48:6

**accelerating** [4] - 86:18, 90:9, 98:18, 98:19
**accept** [1] - 96:19
**acceptance** [2] - 29:12, 29:13
**accepted** [1] - 29:17
**accompanied** [2] - 30:21, 30:24
**accord** [1] - 13:22
**according** [1] - 21:8
**accurate** [10] - 42:13, 86:14, 104:23, 105:21, 115:18, 115:21, 115:22, 123:2, 132:22, 141:8
**accurately** [2] - 27:17, 105:2
**acknowledge** [4] - 37:7, 98:6, 133:5, 133:7
**acknowledged** [2] - 7:3, 8:9
**acted** [2] - 48:20, 48:24
**acting** [3] - 35:1, 35:6, 35:12
**action** [1] - 62:11
**actions** [15] - 6:18, 6:21, 6:24, 7:2, 8:13, 16:13, 31:13, 31:22, 35:11, 35:23, 84:11, 87:7, 87:10, 97:1, 110:17
**actual** [1] - 84:3
**added** [1] - 18:1
**addition** [1] - 35:6
**additional** [6] - 16:15, 16:18, 28:11, 36:13, 46:13, 46:17
**address** [2] - 140:1, 140:11
**addressed** [1] - 14:21
**Adjourned** [1] - 140:14
**admission** [1] - 138:22
**admit** [1] - 111:4
**admittance** [1] - 138:14
**admitted** [10] - 14:5, 30:9, 31:12, 35:12, 35:18, 37:3, 40:8, 45:3, 74:21, 81:23
**affirmatively** [1] - 16:9
**affirmed** [1] - 94:4
**African** [2] - 54:15, 54:25
**afternoon** [4] - 4:6, 70:9, 70:17, 70:18
**agent** [1] - 12:16
**agents** [3] - 6:10, 12:5, 137:20
**ago** [8] - 14:22, 34:20, 42:3, 42:22, 105:14, 106:1, 121:16, 121:23
**agree** [6] - 25:24, 30:11, 68:12, 89:19, 115:23, 123:2
**agreed** [22] - 10:17, 15:17, 16:9, 16:20, 16:21, 19:13, 21:21, 30:17, 30:20, 31:21, 32:19, 32:25, 33:10, 33:12, 34:5, 34:11, 34:18, 34:22, 35:10, 35:16, 42:12, 73:20

2

**agreed-upon** [2] - 30:17, 30:20
**agreement** [46] - 8:8, 10:19, 10:25, 14:3, 14:14, 16:8, 16:17, 17:7, 17:10, 18:9, 18:12, 19:6, 19:12, 20:9, 20:16, 21:1, 21:12, 25:14, 26:12, 26:16, 26:19, 26:23, 26:24, 26:25, 27:3, 27:4, 27:6, 27:13, 27:14, 27:20, 28:1, 28:4, 28:8, 28:19, 28:25, 29:4, 37:23, 42:16, 42:20, 43:14, 44:1, 45:6, 45:12, 45:24, 46:12, 46:16
**agrees** [1] - 27:9
**ahead** [3] - 30:19, 33:25, 34:2
**aid** [2] - 71:23, 77:15
**aim** [1] - 106:24
**aimed** [2] - 85:8, 85:19
**aiming** [2] - 122:3, 122:5
**aircraft** [2] - 61:10, 66:4
**AK-47** [3] - 52:25, 121:5, 122:2
**alcohol** [1] - 75:10
**alert** [1] - 138:9
**allowed** [2] - 27:15, 81:8
**almost** [9] - 42:19, 50:16, 63:7, 79:17, 82:19, 102:18, 114:14, 114:16, 130:21
**alternatives** [5] - 32:21, 33:18, 34:7, 34:13, 35:19
**Alvin** [1] - 1:6
**Amanant** [1] - 60:10
**Ambien** [6] - 71:21, 71:24, 72:2, 72:20, 74:9, 77:11
**ambiguous** [4] - 105:5, 105:6, 105:9, 105:14
**ambush** [2] - 53:8, 62:21
**ambushed** [1] - 63:4
**amend** [1] - 45:24
**AMERICA** [2] - 1:3, 1:10
**American** [1] - 54:25
**Americans** [1] - 54:15
**amount** [3] - 17:11, 63:8, 108:20
**and-a-half** [2] - 19:21, 137:7
**Andrej** [15] - 4:14, 14:25, 15:14, 16:25, 36:12, 39:7, 39:13, 57:19, 93:19, 93:24, 96:8, 119:13, 128:20, 132:7, 133:10
**Angela** [1] - 138:1
**ankle** [1] - 102:1
**answer** [30] - 12:19, 39:25, 40:3, 40:4, 76:8, 86:21, 89:10, 89:11, 89:12, 91:1, 91:3, 96:22, 97:4, 97:9, 97:14, 99:16, 99:18, 99:22, 99:23, 104:19, 104:22,

104:23, 105:11, 110:4, 110:11, 115:2, 116:7, 116:12
**answered** [4] - 61:9, 105:12, 114:14, 116:6
**answers** [1] - 39:21
**Anthony** [1] - 2:2
**anticipate** [1] - 138:24
**antipsychotic** [1] - 72:25
**anxiety** [1] - 76:24
**anyway** [3] - 58:1, 73:17, 137:9
**Apache** [2] - 69:8, 69:10, 69:17
**Apaches** [1] - 69:18
**apologize** [1] - 100:22
**apparel** [2] - 53:14, 101:23
**appear** [7] - 12:1, 13:11, 102:23, 120:14, 121:4, 121:6, 121:8
**appearance** [2] - 103:17, 103:20
**aPPEARANCES** [1] - 2:1
**appeared** [8] - 15:9, 33:8, 87:16, 98:21, 102:19, 118:18, 125:9, 134:11
**appearing** [1] - 15:10
**applicable** [2] - 7:14, 18:16
**appointed** [1] - 13:21
**apprising** [1] - 139:6
**approach** [1] - 101:9
**approached** [3] - 92:13, 101:16, 102:3
**approaches** [1] - 97:20
**approaching** [3] - 86:3, 98:1, 100:25
**area** [13] - 41:16, 41:17, 41:19, 41:22, 70:7, 82:9, 93:20, 119:4, 120:5, 120:22, 122:2, 129:20, 136:8
**argue** [1] - 118:13
**arising** [2] - 16:10, 22:10
**armed** [2] - 75:19, 75:24
**armor** [2] - 80:13, 80:15
**Armstrong** [1] - 2:9
**Army** [6] - 69:3, 69:10, 69:13, 69:18, 69:22, 69:24
**army** [1] - 53:22
**arrest** [5] - 11:1, 11:11, 11:24, 12:6, 12:13
**arrested** [5] - 11:2, 11:6, 11:8, 11:25, 12:23
**arrive** [1] - 13:14
**arrived** [2] - 49:14, 81:17
**arrow** [2] - 82:11, 133:23
**aspects** [1] - 50:8
**assertion** [1] - 100:16
**assess** [1] - 99:21
**assigned** [3] - 49:19, 61:21,

78:6
**assignment** [2] - 49:14, 49:16
**assistance** [5] - 21:5, 21:21, 23:17, 24:22, 25:1
**assuming** [1] - 139:18
**assumption** [1] - 84:1
**ASUNCION** [17] - 6:4, 11:16, 13:17, 30:12, 32:9, 33:19, 34:14, 35:24, 55:19, 58:18, 75:1, 88:25, 96:12, 103:5, 104:15, 109:15, 114:2
**Asuncion** [1] - 2:2
**Atif** [1] - 138:14
**attached** [1] - 126:11
**attack** [1] - 62:16
**attacked** [1] - 64:4
**attacks** [1] - 53:8
**attempt** [5] - 17:21, 19:16, 50:25, 95:6, 95:15
**attempted** [1] - 15:25
**attorney** [4] - 5:5, 5:17, 24:19, 92:19
**ATTORNEY'S** [1] - 2:4
**Attorney's** [1] - 14:18
**attorneys** [1] - 28:23
**August** [6] - 5:8, 5:16, 56:21, 57:17, 75:6, 141:12
**authorized** [1] - 92:24
**Avenue** [4] - 1:24, 2:10, 2:13, 141:16
**avoid** [2] - 9:10, 10:4
**aware** [4] - 18:13, 72:17, 72:20, 72:25
**awhile** [1] - 80:7

# B

**bad** [1] - 56:19
**Baghdad** [27] - 49:13, 49:15, 49:21, 50:22, 52:9, 52:10, 52:16, 53:11, 54:4, 54:7, 55:4, 55:8, 56:18, 58:14, 60:16, 61:15, 61:24, 63:2, 70:23, 71:19, 72:6, 72:15, 73:24, 74:2, 74:8, 76:13, 101:24
**bags** [2] - 64:2, 64:3
**Bailey** [1] - 2:8
**ballistics** [1] - 138:4
**ballpark** [1] - 23:22
**banter** [1] - 54:20
**Barack** [1] - 54:18
**BARATZ** [1] - 138:7
**Baratz** [1] - 2:8
**based** [3] - 15:22, 30:3, 97:25
**basis** [1] - 30:5
**bear** [2] - 96:7, 132:8
**Bearcat** [2] - 123:13, 126:19

**become** [1] - 56:10
**BEFORE** [1] - 1:17
**began** [4] - 68:21, 84:12, 95:4, 131:4
**begin** [1] - 14:12
**beginning** [2] - 9:13, 37:5
**behalf** [14] - 4:25, 5:16, 6:3, 14:22, 21:10, 21:16, 21:22, 23:5, 91:22, 92:1, 92:17, 92:20, 92:25, 93:8
**behave** [1] - 12:17
**behind** [6] - 107:2, 107:10, 120:22, 122:2, 126:5, 128:13
**belief** [3] - 35:7, 36:9
**bell** [1] - 7:19
**belt** [1] - 65:13
**belt-fed** [1] - 65:13
**best** [12] - 93:22, 106:4, 115:18, 115:19, 115:21, 115:22, 115:23, 116:2, 116:4, 116:13, 116:14, 141:10
**better** [4] - 18:6, 19:24, 104:7, 106:6
**between** [11] - 63:21, 85:11, 90:12, 108:15, 108:23, 120:14, 121:1, 123:18, 124:24, 136:1, 136:5
**big** [2] - 41:4, 42:19
**biopolar** [1] - 19:3
**bipolar** [2] - 73:4, 73:11
**bit** [18] - 27:19, 39:13, 52:8, 70:19, 81:14, 82:14, 93:21, 100:10, 100:17, 103:14, 104:12, 111:24, 114:20, 114:21, 119:13, 125:2, 128:4, 134:2
**black** [2] - 37:4, 120:24
**Blackwater** [19] - 49:13, 50:21, 56:22, 61:15, 61:23, 62:6, 62:10, 62:14, 63:18, 63:22, 65:1, 65:4, 70:22, 71:20, 73:20, 74:1, 79:4, 92:15, 137:13
**blend** [1] - 53:17
**blow** [2] - 93:20, 128:20
**blue** [3] - 120:7, 120:18, 120:23
**bodies** [1] - 63:18
**body** [5] - 64:2, 64:3, 80:13, 80:15, 130:18
**bolting** [1] - 90:8
**bomb** [5] - 50:19, 51:20, 79:5, 97:22, 98:2
**bombers** [1] - 130:8
**bottle** [3] - 51:6, 120:7, 120:24
**bottom** [11] - 26:22, 57:16, 71:12, 71:14, 81:18, 91:6,

3

92:9, 96:4, 113:23, 132:2, 132:9
**Bradley** [4] - 69:6, 69:17, 69:20
**Bradleys** [1] - 69:18
**Brady** [1] - 139:23
**brakes** [1] - 114:17
**Brandon** [2] - 138:3, 138:10
**brass** [2] - 121:8, 122:2
**Bravo** [2] - 80:22, 117:24
**breach** [8] - 26:18, 27:14, 27:15, 28:1, 28:4, 28:8, 45:13, 46:18
**Break** [1] - 70:10
**break** [5] - 4:8, 4:15, 60:5, 70:9, 115:6
**Brian** [1] - 2:7
**brief** [1] - 139:23
**briefed** [1] - 50:14
**briefing** [4] - 50:5, 50:8, 78:15, 78:18
**briefly** [1] - 140:11
**bro** [3] - 59:16, 59:21, 60:4
**broken** [1] - 136:13
**brother** [4] - 55:12, 56:1, 56:7, 56:15
**brought** [1] - 45:19
**building** [3] - 67:10, 67:23, 68:22
**buildings** [2] - 67:15, 69:11
**bullet** [1] - 84:3
**bullets** [1] - 83:23
**bumped** [1] - 132:19
**burst** [4] - 117:24, 118:4, 118:10, 118:12
**bursts** [4] - 117:20, 117:22, 118:1, 118:8
**bus** [6] - 117:13, 119:15, 119:20, 119:24, 120:22, 122:3
**busy** [1] - 56:9
**buy** [1] - 10:9
**BY** [24] - 4:5, 4:13, 6:7, 11:18, 13:19, 14:10, 30:15, 32:12, 34:3, 34:17, 36:2, 39:18, 55:22, 57:15, 58:21, 65:23, 70:16, 75:3, 89:3, 96:14, 103:7, 104:17, 109:17, 114:4

## C

**caliber** [4] - 65:7, 65:9, 65:10, 65:16
**California** [3] - 11:22, 11:24, 11:25
**cap** [3] - 120:7, 120:18, 120:24
**capable** [1] - 130:13
**caps** [1] - 17:11

**car** [32] - 50:17, 50:19, 51:6, 51:11, 86:3, 86:14, 87:16, 89:17, 90:12, 90:13, 90:19, 91:13, 97:22, 98:2, 99:1, 99:4, 99:14, 99:20, 100:25, 101:10, 101:16, 104:3, 110:15, 113:1, 113:8, 113:11, 113:15, 115:24, 116:22, 128:1
**carbine** [1] - 95:6
**care** [2] - 54:3, 128:12
**careful** [2] - 97:4, 100:9
**Carolyn** [1] - 138:1
**carry** [2] - 32:18, 75:15
**carrying** [1] - 27:8
**cars** [8] - 35:20, 36:4, 36:7, 36:10, 85:24, 124:16, 124:19, 135:9
**case** [25] - 17:2, 17:24, 19:24, 20:17, 20:23, 23:17, 24:22, 25:1, 25:5, 26:9, 29:13, 39:5, 42:5, 46:8, 46:10, 47:21, 94:2, 98:10, 98:22, 136:10, 136:11, 138:22, 139:3, 139:6
**casings** [2] - 121:2, 121:5
**caught** [3] - 122:19, 124:3, 131:7
**Celebrity** [8] - 8:5, 16:3, 29:21, 33:5, 131:14, 131:17, 131:21, 132:20
**cell** [1] - 12:25
**certain** [1] - 133:1
**certainly** [4] - 18:6, 22:13, 23:13, 89:19
**CERTIFICATE** [1] - 141:5
**certify** [1] - 141:7
**chain** [5] - 74:3, 74:8, 137:16, 138:8, 138:17
**chances** [2] - 47:25, 48:3
**change** [6] - 43:4, 44:16, 45:1, 47:14, 47:24, 48:2
**changed** [2] - 46:25, 47:6
**channel** [2] - 81:6, 81:8
**characterize** [1] - 41:9
**charge** [14] - 4:21, 9:4, 9:10, 10:4, 10:14, 15:20, 15:25, 16:2, 16:9, 16:21, 17:15, 17:16, 17:21, 19:11, 19:20, 45:20
**charged** [3] - 9:9, 46:13, 46:17
**charges** [9] - 15:18, 16:5, 16:15, 16:19, 17:25, 29:2, 29:3, 29:18, 45:17
**checkpoint** [4] - 62:20, 62:23, 64:11, 80:6
**Checkpoint** [4] - 79:24, 80:1, 80:9, 81:2
**chest** [1] - 80:17

**Chevrolet** [5] - 8:5, 16:3, 29:21, 33:5, 37:4
**Chevy** [1] - 118:17
**choose** [1] - 8:22
**Christopher** [1] - 2:4
**circle** [27] - 8:2, 8:5, 81:18, 81:25, 82:3, 82:6, 82:14, 82:17, 82:19, 92:12, 94:9, 111:11, 116:25, 117:7, 118:23, 123:15, 126:20, 127:4, 127:15, 127:22, 128:15, 128:17, 129:7, 129:15, 130:12, 130:25, 131:3
**circling** [1] - 119:14
**circumstances** [2] - 33:8, 52:5
**circumventing** [1] - 92:14
**City** [1] - 60:10
**city** [1] - 60:15
**civilian** [3] - 53:17, 130:1, 130:5
**civilians** [1] - 92:16
**claim** [2] - 33:13, 34:21
**clarification** [1] - 114:24
**clean** [17] - 38:4, 40:8, 40:15, 41:2, 41:4, 41:8, 41:13, 41:16, 41:20, 41:23, 43:7, 44:5, 44:8, 47:23, 49:7, 49:11
**clear** [8] - 37:22, 39:10, 40:13, 41:1, 42:8, 86:6, 93:25, 131:2
**client** [7] - 25:21, 27:8, 27:15, 83:5, 122:8, 129:12, 130:23
**close** [8] - 50:12, 50:15, 50:18, 115:2, 115:12, 127:19, 130:1, 137:1
**cloth** [3] - 120:11, 120:19, 120:24
**cloth-like** [1] - 120:19
**Coffield** [1] - 2:12
**COFFIELD** [1] - 2:12
**colleague** [1] - 65:19
**colleagues** [3] - 6:25, 8:14, 8:17
**collect** [1] - 63:17
**collected** [1] - 138:12
**collection** [2] - 137:15, 137:24
**Colonel** [1] - 138:13
**colored** [2] - 118:17, 120:11
**COLUMBIA** [2] - 1:1, 141:2
**combination** [1] - 77:14
**comfortable** [8] - 88:8, 89:24, 90:1, 90:2, 90:7, 91:7, 110:4, 116:4, 116:7, 116:9, 135:23, 135:25
**coming** [13] - 8:1, 41:4,

**Chevrolet** 51:14, 59:3, 82:22, 85:21, 88:12, 82:9, 96:24, 114:15, 114:16, 119:3, 119:10
**command** [12] - 74:3, 74:8, 112:20, 123:14, 124:18, 124:23, 125:24, 126:3, 126:20, 127:1, 131:4, 136:2
**commercial** [1] - 12:7
**commit** [6] - 17:21, 19:16, 26:25, 90:22, 90:23, 91:5
**committed** [1] - 27:3
**committing** [1] - 45:9
**commonly** [1] - 54:20
**communicate** [1] - 81:9
**compared** [1] - 114:8
**complete** [3] - 41:6, 41:14, 141:10
**completely** [4] - 25:24, 97:3, 100:5, 126:5
**component** [1] - 35:5
**components** [1] - 34:25
**conceivably** [1] - 137:8
**concept** [1] - 18:17
**concerned** [1] - 43:25
**conclude** [1] - 21:20
**concluded** [1] - 34:13
**conclusion** [1] - 23:14
**concrete** [1] - 135:3
**conditional** [2] - 138:14, 138:18
**conditions** [4] - 52:9, 55:4, 55:8, 56:18
**conduct** [2] - 22:10, 41:25
**conducted** [1] - 5:19
**confident** [1] - 126:25
**confused** [6] - 40:21, 42:4, 42:25, 77:13, 107:12, 110:19
**confusing** [3] - 30:12, 105:15, 114:19
**congested** [1] - 129:20
**connected** [3] - 80:11, 80:12, 81:3
**Connecticut** [2] - 2:10, 2:13
**connection** [1] - 126:13
**CONNOLLY** [1] - 137:3
**Connolly** [1] - 2:19
**consequences** [2] - 26:15, 46:3
**consider** [5] - 18:21, 18:25, 19:4, 21:9, 98:5
**consisted** [1] - 8:13
**consistent** [1] - 43:22
**constant** [1] - 50:22
**constitute** [1] - 27:14
**constituted** [1] - 30:24
**constitutes** [4] - 14:13, 28:1, 32:5, 141:8

**Constitution** [2] - 1:24, 141:16
**construed** [1] - 26:25
**contact** [2] - 59:22, 60:9
**contain** [1] - 17:7
**contains** [1] - 20:9
**continue** [1] - 70:8
**continued** [4] - 36:18, 42:20, 43:13, 94:11
**continuing** [2] - 3:4, 127:21
**contract** [4] - 57:20, 73:19, 73:20, 73:23
**controlled** [5] - 72:17, 72:20, 73:14, 74:13, 75:19
**conversation** [3] - 112:7, 112:10, 112:19
**convicted** [1] - 47:21
**convince** [3] - 8:16, 9:1, 9:4
**convoy** [41] - 8:6, 44:11, 50:12, 50:18, 51:1, 58:25, 66:16, 79:23, 81:17, 82:2, 83:20, 85:21, 86:3, 86:6, 91:6, 91:14, 94:10, 94:11, 94:12, 94:20, 94:24, 97:21, 98:1, 102:9, 102:12, 125:7, 126:16, 127:3, 127:8, 127:11, 127:18, 128:13, 129:5, 129:9, 129:11, 129:13, 129:15, 130:2, 130:4, 130:24, 133:19
**convoys** [1] - 136:4
**cooperate** [4] - 20:17, 25:24, 46:14, 46:19
**cooperating** [1] - 10:4
**cooperation** [9] - 20:10, 20:25, 21:4, 22:14, 22:16, 25:19, 26:3, 27:23, 36:15
**copy** [1] - 88:17
**corner** [1] - 129:7
**correct** [359] - 4:18, 4:21, 4:25, 5:6, 5:9, 5:10, 5:20, 6:11, 6:19, 6:25, 7:3, 7:23, 8:2, 8:6, 8:10, 8:14, 8:17, 9:12, 9:22, 10:20, 11:6, 11:9, 12:2, 12:8, 12:13, 12:20, 13:3, 13:8, 13:16, 13:22, 13:25, 14:14, 14:19, 14:23, 15:3, 15:9, 15:17, 16:22, 17:1, 17:18, 17:22, 18:10, 19:1, 19:4, 19:9, 19:14, 19:22, 20:3, 20:4, 20:7, 20:18, 22:11, 22:14, 22:22, 23:8, 23:9, 23:14, 23:20, 25:22, 26:5, 26:8, 26:13, 27:6, 27:17, 27:21, 28:1, 28:5, 28:12, 28:16, 28:21, 28:25, 29:1, 29:5, 29:10, 29:13, 29:22, 30:3, 30:21, 31:14, 32:16, 33:8, 33:9, 33:24, 34:4, 34:13,

34:18, 34:21, 35:2, 35:8, 35:17, 36:15, 36:19, 37:1, 37:7, 37:15, 37:24, 38:8, 39:21, 40:4, 40:6, 41:11, 42:20, 43:15, 43:23, 44:2, 44:3, 44:17, 45:13, 45:17, 46:8, 46:14, 46:19, 46:20, 46:22, 47:1, 47:8, 47:14, 47:17, 49:16, 49:21, 50:6, 50:12, 50:19, 51:1, 51:4, 51:7, 51:12, 51:15, 51:20, 51:23, 52:2, 52:6, 53:9, 53:22, 54:7, 55:8, 55:13, 56:14, 57:1, 57:10, 57:24, 59:1, 59:11, 59:14, 60:13, 61:15, 61:24, 62:1, 62:17, 62:19, 62:25, 65:4, 65:7, 65:20, 66:14, 66:18, 67:11, 68:6, 68:9, 68:10, 68:13, 68:23, 69:4, 69:8, 69:11, 69:15, 69:25, 70:23, 71:18, 72:1, 72:6, 72:12, 73:12, 73:15, 73:21, 74:14, 75:11, 76:5, 76:20, 76:21, 78:10, 78:13, 78:14, 78:18, 78:20, 78:22, 79:2, 79:6, 79:13, 80:2, 80:9, 80:24, 81:10, 81:15, 81:18, 82:1, 82:7, 82:17, 82:20, 83:3, 83:6, 83:11, 83:14, 83:20, 84:4, 84:6, 84:13, 85:9, 86:1, 86:7, 86:11, 86:15, 86:16, 86:22, 86:23, 87:14, 87:17, 88:3, 89:5, 89:14, 89:17, 89:21, 90:3, 90:17, 90:21, 91:7, 91:8, 92:18, 93:3, 94:2, 94:5, 95:8, 95:11, 97:6, 97:17, 98:3, 98:20, 99:10, 100:1, 100:8, 101:3, 101:7, 101:10, 101:21, 102:4, 102:5, 102:12, 103:10, 103:18, 104:24, 104:25, 105:23, 106:10, 106:13, 106:21, 106:22, 107:3, 107:6, 107:7, 107:17, 107:21, 107:22, 108:4, 108:9, 108:18, 109:2, 109:3, 110:7, 110:11, 111:12, 111:18, 111:21, 111:22, 112:1, 112:4, 112:11, 112:21, 115:9, 115:13, 115:18, 115:21, 116:18, 117:7, 117:10, 117:13, 117:25, 118:12, 118:15, 118:20, 119:4, 119:5, 119:7, 119:10, 119:11, 119:15, 120:24, 122:4, 122:9, 122:11, 122:15, 122:20, 122:25, 123:8, 123:22, 124:3, 124:4, 124:7,

124:13, 124:16, 124:19, 124:25, 125:4, 125:8, 125:12, 125:16, 125:20, 125:25, 126:6, 126:9, 126:16, 127:4, 127:9, 127:19, 127:22, 128:1, 128:6, 128:13, 128:16, 128:24, 129:2, 129:4, 129:10, 129:24, 130:6, 130:11, 130:14, 130:21, 130:25, 131:4, 131:17, 132:16, 132:22, 133:15, 133:20, 134:3, 134:9, 134:11, 134:12, 134:15, 134:17, 134:20, 134:25, 135:7, 135:11, 135:14, 135:17, 136:2, 136:3, 136:6
**Correct** [3] - 73:4, 97:22, 122:22
**cough** [1] - 31:3
**counter** [2] - 127:15, 129:16
**country** [1] - 72:14
**couple** [3] - 15:5, 57:4, 121:23
**courageously** [3] - 5:19, 48:20, 48:24
**COURT** [42] - 1:1, 4:2, 4:11, 6:6, 11:17, 13:18, 14:9, 30:14, 32:10, 33:21, 33:25, 34:2, 34:16, 36:1, 39:17, 55:20, 57:13, 58:19, 70:9, 70:13, 74:25, 75:2, 89:2, 96:13, 103:6, 104:16, 109:16, 114:3, 136:9, 136:20, 136:23, 137:2, 137:4, 137:8, 138:6, 139:10, 139:22, 140:4, 140:7, 140:12, 141:1, 141:5
**court** [12] - 13:3, 13:14, 13:15, 13:22, 15:6, 15:7, 19:3, 19:4, 30:23, 32:4, 40:22, 98:24
**Court** [9] - 1:22, 1:23, 19:19, 20:1, 25:9, 40:25, 140:3, 140:14, 141:14
**Court's** [1] - 32:1
**Courthouse** [2] - 1:23, 141:15
**courtroom** [1] - 136:15
**cousin** [3] - 56:25, 57:7, 57:17
**cover** [2] - 64:24, 80:16
**covered** [1] - 80:17
**CR** [2] - 1:5, 1:12
**Crabb** [1] - 2:3
**crash** [1] - 66:18
**crashed** [2] - 62:6, 63:13
**crew** [1] - 63:21

**crimes** [3] - 27:3, 28:7, 28:11
**Criminal** [1] - 2:5
**criminal** [11] - 4:21, 9:5, 10:4, 15:17, 16:22, 18:21, 19:1, 28:15, 29:2, 29:3, 29:18
**cross** [2] - 24:19, 136:24
**Cross** [1] - 3:4
**cross-examination** [1] - 24:19
**Cross-Examination** [1] - 3:4
**crossed** [1] - 102:21
**CRR** [1] - 1:22
**custody** [2] - 137:16, 138:8
**cut** [4] - 10:14, 10:16, 105:24, 110:12

## D

**dad** [1] - 48:15
**dangerous** [1] - 52:11
**dangled** [1] - 12:16
**Daniel** [1] - 137:25
**dark** [2] - 118:17, 120:11
**dark-colored** [1] - 118:17
**DART** [1] - 66:1
**date** [8] - 5:8, 12:1, 42:6, 42:7, 58:15, 71:8, 78:7, 132:2
**Date** [1] - 1:8
**Dated** [1] - 141:12
**dated** [3] - 14:16, 58:13, 75:6
**dates** [2] - 40:8, 42:8
**David** [1] - 2:15
**DAY** [1] - 1:9
**days** [4] - 55:12, 76:13, 121:16, 121:23
**DC** [13] - 1:24, 2:6, 2:10, 2:14, 2:17, 2:21, 11:12, 11:14, 11:19, 12:4, 12:7, 132:5, 141:16
**dead** [1] - 63:17
**deadly** [7] - 31:13, 32:22, 33:6, 33:18, 34:7, 34:13, 36:4
**deal** [4] - 10:14, 10:16, 41:4, 42:19
**December** [4] - 39:4, 39:11, 104:6, 104:10
**decide** [1] - 23:4
**decided** [2] - 56:22, 57:20
**decision** [8] - 21:15, 23:6, 23:7, 23:12, 28:19, 29:9, 44:23, 45:1
**declarations** [2] - 27:1, 27:12
**deemed** [2] - 45:13, 46:18
**defend** [1] - 63:10
**Defendant** [5] - 1:14, 2:7, 2:12, 2:15, 2:19

**defendant** [1] - 19:1
**defendants** [10] - 9:25, 18:21, 24:22, 25:1, 25:5, 25:10, 47:17, 47:20, 98:10, 139:22
**Defendants** [1] - 1:8
**defended** [1] - 29:25
**defending** [1] - 35:23
**defense** [13] - 14:6, 24:18, 28:23, 33:13, 34:21, 34:25, 35:1, 35:7, 35:13, 39:2, 136:23, 137:17, 139:3
**Defense** [18] - 4:9, 32:2, 55:15, 57:3, 58:10, 71:7, 74:19, 88:16, 92:4, 93:15, 96:1, 102:25, 104:9, 109:7, 113:22, 119:18, 120:17, 131:24
**defensive** [1] - 68:15
**degree** [1] - 130:21
**demonstrate** [1] - 134:14
**demonstration** [1] - 134:13
**deny** [1] - 72:3
**Department** [7] - 48:9, 48:12, 48:14, 74:12, 75:5, 93:12, 95:5
**Department's** [1] - 74:16
**departure** [1] - 79:17
**depression** [1] - 76:22
**derogatory** [3] - 54:6, 54:10, 54:14
**describe** [3] - 52:9, 52:14, 86:13
**described** [9] - 63:15, 64:14, 65:25, 93:11, 129:16, 131:13, 132:18, 133:8, 133:14
**designated** [1] - 68:15
**destroy** [1] - 66:24
**detail** [1] - 64:24
**details** [1] - 64:23
**determine** [1] - 53:11
**device** [1] - 51:19
**diagram** [1] - 114:9
**difference** [1] - 90:11
**different** [6] - 14:6, 74:22, 98:19, 119:17, 126:2, 126:3
**differently** [1] - 133:8
**difficult** [4] - 7:9, 53:11, 93:17, 108:14
**direct** [8] - 14:13, 25:13, 30:16, 65:25, 67:9, 104:10, 119:2, 131:15
**directed** [8] - 44:11, 62:19, 62:23, 63:17, 68:2, 84:8, 93:7, 116:25
**direction** [19] - 67:10, 82:12, 82:15, 83:3, 84:16, 84:23, 106:21, 117:9, 119:10,

127:13, 128:1, 128:25, 129:2, 129:6, 130:11, 130:15, 130:21, 133:15, 133:20
**directions** [1] - 129:10
**directly** [6] - 62:20, 91:13, 92:13, 94:9, 94:20, 122:3, 122:5, 134:19
**disable** [1] - 51:12
**disabled** [1] - 125:20
**disagree** [1] - 135:20
**disappointed** [1] - 48:18
**disclose** [1] - 26:9
**discretion** [2] - 22:9, 28:21
**diseases** [1] - 73:10
**disguise** [1] - 53:20
**dishdasha** [4] - 101:21, 106:20, 107:2, 110:14
**Dishka** [1] - 65:15
**disorder** [1] - 73:4
**display** [1] - 14:7, 74:23
**displayed** [1] - 103:8
**dispute** [1] - 135:18
**disregard** [1] - 54:25
**distance** [2] - 94:17, 116:5
**distance-wise** [1] - 94:17
**distances** [1] - 116:10
**DISTRICT** [5] - 1:1, 1:1, 1:18, 141:1, 141:2
**Division** [1] - 2:5
**doctor** [1] - 73:15
**document** [10] - 14:12, 30:23, 31:10, 31:12, 31:25, 32:4, 32:14, 35:11, 35:18, 75:5
**done** [5] - 9:2, 9:16, 9:25, 13:11, 129:5
**door** [3] - 78:21, 103:20, 112:20
**double** [2] - 115:2, 115:12
**down** [44] - 15:14, 16:25, 22:24, 26:21, 31:3, 36:12, 39:13, 43:2, 55:23, 57:5, 58:14, 59:23, 60:5, 60:15, 60:25, 71:9, 71:13, 72:10, 79:10, 91:20, 93:10, 95:18, 98:17, 98:20, 98:21, 99:5, 99:14, 99:20, 99:24, 106:7, 109:12, 111:9, 113:23, 114:15, 115:6, 116:20, 116:25, 118:6, 120:4, 122:7, 125:15, 127:1, 133:10, 134:25
**downed** [4] - 66:4, 66:13, 66:21, 67:4
**dressed** [1] - 101:12
**drew** [2] - 114:8, 133:23
**driven** [1] - 90:12
**driver** [7] - 16:2, 29:21, 51:15, 64:18, 64:21, 85:8,

114:16
**driver's** [7] - 85:17, 95:5, 95:10, 101:16, 101:18, 101:19, 103:24
**driving** [2] - 87:4, 87:6
**drug** [3] - 70:20, 71:20, 73:1
**drugs** [13] - 70:23, 71:18, 72:5, 72:11, 73:21, 73:24, 74:2, 74:13, 75:11, 75:18, 75:24, 76:3, 76:13
**dry** [2] - 105:24, 110:12
**during** [23] - 5:20, 7:2, 7:8, 7:17, 14:13, 27:23, 29:24, 36:17, 36:22, 37:17, 38:17, 40:13, 49:20, 50:21, 64:4, 64:25, 70:22, 75:25, 76:2, 77:7, 77:16, 80:8, 112:10, 112:11, 112:21, 123:21, 124:10, 132:17
**Dustin** [2] - 1:7, 128:8
**duty** [1] - 73:21
**déjà** [1] - 139:8

### E

**ear** [2] - 80:11
**early** [1] - 61:14
**east** [2] - 81:14, 130:17
**Eastern** [1] - 72:14
**Eastvold** [2] - 1:22, 141:14
**EASTVOLD** [1] - 141:7
**easy** [1] - 102:19
**effective** [1] - 57:20
**effort** [1] - 64:21
**eight** [5] - 117:25, 118:11, 121:1, 137:14, 137:19
**either** [8] - 23:23, 53:21, 73:10, 106:12, 114:17, 128:2, 135:2, 140:10
**elaborate** [1] - 52:12
**email** [17] - 55:13, 55:14, 55:23, 56:1, 56:7, 56:8, 56:25, 57:2, 57:6, 57:10, 57:16, 58:13, 58:15, 58:22, 59:5, 59:17, 59:19
**emails** [1] - 57:4
**embarrassed** [1] - 48:18
**employed** [1] - 125:11
**employees** [3] - 63:18, 63:22, 75:13
**end** [17] - 19:19, 21:3, 32:18, 56:21, 57:20, 59:5, 59:17, 114:15, 114:22, 139:1, 139:16
**enemy** [1] - 53:15
**engage** [1] - 51:22
**engaged** [1] - 62:10
**engagement** [2] - 55:4, 64:24
**engaging** [1] - 29:14

**enlarge** [2] - 96:3, 120:5
**entail** [1] - 80:15
**entered** [6] - 13:16, 15:6, 81:12, 81:13, 82:6, 92:12
**entering** [2] - 82:19, 94:9
**entire** [3] - 20:15, 54:25, 129:9
**entirety** [2] - 20:14, 21:14
**environment** [2] - 52:9, 52:17
**equipped** [1] - 69:15
**erupted** [1] - 68:19
**ERV** [2] - 126:19, 126:21
**escalate** [1] - 52:5
**escalating** [1] - 50:24
**escape** [2] - 63:12, 64:7
**essence** [2] - 16:19, 119:9
**essentially** [2] - 21:14, 114:12
**established** [4] - 34:11, 40:7, 42:16, 47:13
**estimate** [11] - 67:14, 88:8, 108:14, 109:5, 115:16, 115:17, 116:3, 116:14, 139:5, 139:20
**estimated** [1] - 113:11
**estimating** [1] - 89:16
**ethnic** [1] - 54:9
**evaluate** [1] - 21:4
**evaluation** [1] - 21:16
**Evan** [1] - 1:6
**evening** [6] - 76:11, 76:15, 76:16, 77:17, 77:19, 78:17
**event** [3] - 10:8, 27:15, 137:18
**events** [5] - 47:16, 47:19, 78:4, 108:15, 133:2
**eventually** [1] - 58:2
**evidence** [21] - 4:12, 32:11, 55:21, 57:14, 58:20, 92:5, 93:16, 117:4, 119:18, 120:18, 127:7, 133:18, 137:15, 137:17, 137:24, 138:9, 138:12, 138:15, 138:18, 138:23
**evolved** [1] - 29:14
**exact** [2] - 66:8, 120:22
**exactly** [3] - 7:7, 7:9, 36:5
**Examination** [1] - 3:4
**examination** [5] - 14:13, 24:19, 25:13, 38:13, 119:3
**examine** [1] - 40:16
**exchange** [2] - 57:6, 58:13
**excuse** [3] - 6:22, 99:7, 118:19
**executed** [2] - 10:19, 63:22
**execution** [1] - 27:4
**exercise** [1] - 43:14
**Exhibit** [27] - 4:9, 4:12, 32:2, 32:11, 55:15, 55:21, 57:3,

6

57:14, 58:10, 58:20, 71:8, 74:19, 81:22, 88:16, 92:4, 93:16, 96:1, 102:25, 104:9, 109:7, 113:22, 117:3, 119:18, 120:17, 127:6, 131:24, 133:17

**exhibit** [4] - 14:5, 14:7, 39:2, 119:17

**exit** [3] - 128:24, 129:14, 130:12

**exited** [2] - 127:4, 127:12

**exiting** [7] - 8:6, 127:18, 127:22, 128:15, 129:6, 130:19, 136:15

**exits** [1] - 129:6

**expect** [2] - 23:13, 136:24, 139:22

**expended** [1] - 122:2

**experience** [5] - 69:13, 94:23, 121:4, 121:7, 125:19

**expert** [4] - 89:16, 138:3, 138:11, 138:17

**explain** [4] - 96:22, 97:5, 97:14, 105:3

**explained** [4] - 102:13, 102:15, 104:7, 106:6

**explaining** [1] - 110:17

**explanation** [1] - 106:5

**explosion** [1] - 79:2

**explosions** [3] - 111:14, 111:19, 112:1

**exposure** [3] - 17:11, 45:25, 137:22

**extract** [1] - 62:13

**eyes** [1] - 57:22

---

**F**

**face** [4] - 10:11, 10:13, 17:11, 22:22

**faced** [3] - 45:25, 52:22, 53:8

**facing** [3] - 19:21, 130:12, 130:20

**fact** [20] - 11:2, 16:8, 20:9, 27:22, 28:14, 38:14, 54:17, 55:11, 56:21, 56:25, 62:19, 63:7, 65:4, 74:16, 97:16, 97:19, 107:20, 112:10, 122:22, 134:13

**factor** [3] - 18:20, 18:25, 19:4

**factors** [1] - 98:5

**facts** [7] - 30:9, 30:21, 31:7, 31:20, 33:16, 34:5, 34:6

**factual** [4] - 30:5, 31:6, 32:5, 35:16

**fair** [7] - 16:22, 66:22, 67:14, 88:9, 108:16, 132:25, 139:21

**fairly** [5] - 40:22, 127:19,

129:24, 137:19, 139:20

**fall** [1] - 38:7

**false** [15] - 27:1, 27:12, 27:25, 28:11, 28:20, 28:24, 45:8, 88:1, 92:21, 92:25, 93:5, 93:6, 94:14, 95:2, 95:15

**familiar** [2] - 18:16, 31:10

**far** [8] - 87:8, 91:18, 94:16, 98:12, 114:7, 115:1, 125:22, 130:5

**fast** [6] - 86:9, 86:22, 88:8, 90:24, 110:5, 110:13

**faster** [6] - 86:24, 87:16, 87:25, 88:4, 89:20, 89:22, 90:2, 91:5, 91:17

**father** [1] - 48:17

**FBI** [26] - 6:10, 7:18, 8:22, 12:5, 12:12, 13:2, 23:23, 26:5, 36:14, 36:19, 36:23, 37:14, 37:24, 38:4, 38:19, 42:4, 42:23, 45:4, 46:4, 46:21, 71:11, 132:4, 132:17, 137:15, 138:4, 138:9

**fear** [1] - 35:12

**feared** [1] - 52:19

**fed** [1] - 65:13

**federal** [2] - 12:10, 29:5

**feelings** [1] - 53:25

**feet** [13] - 106:25, 107:6, 108:1, 113:12, 113:16, 114:22, 115:3, 115:8, 115:10, 115:13, 115:24, 116:15, 135:17

**fellow** [1] - 6:21

**felt** [1] - 58:6

**few** [11] - 10:18, 10:19, 10:22, 23:25, 24:2, 30:2, 55:12, 98:8, 112:4, 112:5, 121:16

**field** [1] - 81:10

**fighting** [1] - 100:15

**figure** [1] - 102:19

**File** [2] - 1:5, 1:12

**file** [2] - 139:22, 140:10

**filed** [2] - 22:1, 30:23

**files** [1] - 22:14

**fill** [1] - 138:5

**final** [1] - 138:25

**finally** [1] - 60:21

**financial** [1] - 17:17

**fine** [6] - 17:19, 78:3, 114:2, 123:7, 135:21

**finish** [2] - 139:6, 139:15

**finished** [2] - 87:12, 132:14

**fire** [37] - 36:10, 47:3, 47:10, 51:11, 52:25, 53:4, 62:3, 63:10, 67:13, 68:12, 68:24, 69:25, 70:2, 70:6, 84:7,

84:12, 95:4, 95:9, 95:10, 97:1, 97:17, 97:24, 107:21, 107:23, 109:21, 109:22, 111:17, 117:24, 123:21, 124:1, 124:5, 128:16, 129:10, 130:23, 131:3, 131:6, 131:10

**firearm** [3] - 74:17, 75:10, 75:16

**firearms** [2] - 75:6, 138:3

**fired** [59] - 7:19, 7:22, 7:25, 8:4, 65:11, 67:9, 67:18, 68:1, 68:19, 68:25, 69:10, 70:5, 82:24, 83:1, 83:23, 85:2, 85:5, 85:11, 85:17, 85:22, 87:3, 87:11, 91:19, 95:10, 97:3, 98:7, 98:13, 99:15, 100:4, 100:6, 101:2, 104:20, 106:21, 107:2, 107:5, 108:1, 108:8, 108:11, 111:11, 112:11, 112:20, 116:24, 117:7, 117:9, 117:18, 118:14, 118:19, 123:19, 124:7, 128:25, 129:6, 131:16, 131:20, 132:18, 133:3, 133:4, 133:12

**fires** [1] - 117:25

**firing** [31] - 7:3, 35:19, 37:3, 83:8, 84:2, 84:9, 84:12, 84:16, 96:23, 96:25, 100:1, 100:12, 101:3, 101:6, 118:20, 120:2, 122:9, 122:13, 122:17, 122:19, 123:1, 123:4, 128:18, 129:13, 131:14, 133:14, 133:20, 133:24, 134:10, 134:18, 135:16

**firm** [2] - 5:4, 5:5

**first** [61] - 7:2, 7:17, 8:12, 8:21, 10:7, 10:8, 10:22, 15:15, 15:20, 17:15, 25:20, 30:17, 37:17, 39:3, 41:9, 46:25, 49:14, 51:3, 58:22, 59:15, 61:23, 71:8, 82:24, 83:1, 83:22, 84:6, 85:1, 85:4, 85:8, 92:10, 99:25, 100:7, 100:23, 100:24, 101:2, 102:13, 102:15, 103:13, 108:23, 109:25, 112:25, 113:7, 113:12, 113:15, 114:8, 114:25, 115:1, 115:7, 115:12, 115:24, 121:15, 121:24, 123:18, 123:24, 124:6, 126:22, 128:25, 131:3, 132:19, 138:16

**five** [14] - 24:15, 42:22, 85:11, 89:21, 89:22, 89:25, 90:3, 90:5, 90:12, 90:19,

91:3, 99:25, 101:2, 133:1

**flare** [1] - 51:9

**flashes** [12] - 8:1, 37:8, 37:13, 37:19, 37:21, 41:2, 41:11, 41:14, 41:24, 47:4, 47:11, 48:13

**flew** [2] - 12:4, 12:7

**flight** [1] - 12:7

**flip** [1] - 44:23

**flipped** [1] - 47:6

**flop** [1] - 44:23

**flow** [2] - 127:15, 129:16

**fluid** [3] - 84:19, 85:5, 97:2

**fly** [2] - 12:3

**focus** [6] - 5:13, 7:2, 100:23, 116:21, 123:18, 133:11

**focused** [2] - 32:18, 56:9

**Follies** [1] - 136:20

**follow** [10] - 19:19, 78:13, 79:20, 124:12, 124:15, 124:22, 127:9, 127:24, 128:11, 136:1

**followed** [1] - 7:14

**following** [5] - 36:18, 89:7, 136:18, 139:12, 139:13

**FOR** [1] - 1:1

**force** [9] - 31:13, 32:22, 33:6, 33:18, 34:7, 34:13, 36:4, 45:24, 50:9

**foregoing** [1] - 141:8

**forgotten** [1] - 40:20

**form** [2] - 5:13, 6:4

**formally** [1] - 15:6

**former** [5] - 8:17, 8:23, 9:12, 9:22, 10:5

**forward** [15] - 6:9, 21:11, 38:20, 38:23, 40:3, 40:4, 40:18, 42:14, 64:13, 65:24, 83:20, 114:20, 125:2, 130:13, 130:20

**Foster** [1] - 2:16

**fountain** [1] - 82:8

**four** [5] - 42:22, 63:22, 99:25, 101:2, 124:19

**fourth** [1] - 124:15

**Fourth** [1] - 2:5

**frankly** [2] - 43:12, 131:6

**Fredley** [1] - 2:19

**free** [2] - 9:17, 9:21

**freely** [1] - 40:8

**fresh** [1] - 121:8

**friends** [2] - 54:20, 54:22

**front** [13] - 12:16, 78:12, 91:14, 111:2, 114:15, 124:12, 124:21, 127:19, 127:24, 127:25, 128:2, 128:5, 136:2

**Frost** [1] - 139:19

**full** [1] - 141:9

**fully** [2] - 20:17, 25:24

**fundamental** [4] - 41:6, 43:4, 47:7, 48:2
**future** [2] - 22:19, 22:20

## G

**Gardner** [1] - 138:2
**gate** [1] - 80:1
**gear** [4] - 80:9, 80:10, 114:17
**gears** [2] - 52:8, 70:19
**general** [9] - 8:20, 54:3, 127:24, 128:4, 128:25, 130:4, 130:12, 130:18, 133:15
**generally** [9] - 7:10, 18:17, 31:10, 52:14, 82:11, 82:16, 127:25, 130:19, 133:20
**gentlemen** [2] - 29:7, 42:14
**Giroux** [2] - 138:3, 138:10
**given** [2] - 125:22, 138:20
**glance** [2] - 83:22, 89:18
**glimpse** [8] - 122:19, 122:21, 122:22, 122:25, 123:5, 123:6, 124:3, 131:8
**goal** [1] - 9:10
**governing** [1] - 74:13
**government** [10] - 14:5, 16:8, 16:21, 22:13, 23:4, 28:10, 43:13, 74:22, 139:4, 139:23
**Government** [4] - 81:22, 117:3, 127:6, 133:17
**government's** [1] - 98:9
**grab** [1] - 79:10
**grand** [34] - 24:7, 87:1, 87:14, 88:6, 88:17, 89:4, 90:15, 95:20, 96:2, 96:15, 97:13, 99:2, 99:4, 99:12, 102:16, 103:1, 109:10, 109:18, 110:10, 110:20, 111:3, 111:6, 113:19, 114:5, 114:6, 114:7, 114:24, 115:11, 115:20, 116:3, 116:11, 119:8, 121:21
**GRANNIS** [1] - 2:20
**grants** [1] - 22:5
**Gray** [2] - 59:22, 60:9
**great** [1] - 113:21
**greater** [1] - 140:10
**Green** [6] - 63:19, 64:7, 66:22, 80:1, 125:23, 126:3
**grenades** [1] - 53:6
**grille** [1] - 51:11
**GROUP** [1] - 2:12
**group** [1] - 54:10
**grow** [1] - 58:3
**guess** [6] - 16:14, 24:4, 42:2, 85:7, 118:2, 118:3
**guesses** [1] - 90:10

**guesstimate** [2] - 116:17, 116:18
**guideline** [1] - 19:12
**Guidelines** [4] - 18:10, 18:13, 18:18, 18:25
**guidelines** [5] - 18:16, 19:7, 19:20, 20:7, 22:7
**guilty** [57] - 6:13, 10:11, 10:17, 10:18, 11:5, 13:2, 13:7, 13:16, 13:24, 15:17, 16:6, 16:13, 16:20, 17:16, 23:24, 24:23, 25:2, 25:11, 27:16, 28:5, 28:7, 29:17, 30:2, 30:6, 30:10, 30:17, 30:20, 30:21, 30:24, 31:7, 31:20, 31:21, 32:5, 35:17, 35:18, 36:7, 36:8, 36:13, 36:18, 36:22, 37:18, 37:23, 38:11, 38:19, 38:23, 39:24, 40:1, 42:5, 42:9, 42:12, 42:24, 44:5, 45:5, 45:17, 46:4, 121:18
**gun** [7] - 65:15, 80:22, 84:21, 117:16, 117:24, 118:10, 124:10
**gunfire** [18] - 37:13, 37:19, 41:10, 41:14, 44:11, 46:25, 47:8, 48:6, 62:10, 63:8, 64:5, 68:19, 68:21, 82:20, 82:25, 83:3, 94:8, 119:10
**gunner** [4] - 78:12, 127:24, 128:8, 128:11
**guns** [2] - 65:11, 65:13
**gut** [2] - 56:23, 58:2
**guy** [1] - 106:3

## H

**half** [2] - 19:21, 137:7
**halfway** [1] - 81:2
**Hall** [1] - 60:10
**hand** [9] - 51:4, 100:18, 102:20, 102:22, 103:19, 103:24, 106:4, 108:5, 108:7
**handcuffed** [2] - 12:15, 12:19
**handcuffs** [1] - 12:16
**handed** [1] - 12:13
**handling** [3] - 4:24, 5:17, 6:11
**hands** [1] - 134:18
**hang** [1] - 93:19
**hanging** [1] - 36:9
**hard** [5] - 96:22, 97:5, 97:14, 134:1
**harm's** [1] - 125:12
**HARRIS** [1] - 2:20
**head** [1] - 84:15
**heading** [4] - 91:6, 94:9,

94:20, 133:19
**hear** [1] - 140:3
**Heard** [3] - 1:7, 2:15, 128:9
**heard** [13] - 82:20, 82:25, 83:3, 84:15, 85:1, 85:4, 93:23, 94:8, 97:3, 98:15, 100:6, 123:19, 138:13
**hearing** [8] - 12:1, 13:11, 39:4, 39:11, 83:2, 104:5, 104:18, 106:2
**Heberlig** [3] - 2:7, 4:2, 70:13
**HEBERLIG** [49] - 4:4, 4:5, 4:8, 4:13, 6:7, 11:18, 13:19, 14:4, 14:10, 30:15, 32:8, 32:12, 33:20, 33:22, 33:23, 34:3, 34:17, 36:2, 39:15, 39:18, 55:18, 55:22, 57:12, 57:15, 58:17, 58:21, 65:23, 70:7, 70:15, 70:16, 74:21, 75:3, 88:23, 89:3, 96:10, 96:14, 103:3, 103:7, 104:14, 104:15, 109:14, 114:1, 114:2, 136:7, 136:21, 137:3, 137:6, 137:11, 137:14, 138:2, 138:7, 138:10, 138:19, 138:25, 139:9, 139:11
**HONORABLE** [1] - 1:18
**honorably** [3] - 5:19, 48:20, 48:24
**hooked** [1] - 81:3
**hope** [9] - 8:22, 9:1, 9:3, 9:4, 18:6, 19:24, 20:8, 22:13, 25:12
**hoped** [2] - 8:16, 9:7
**hoping** [2] - 20:2, 20:5
**hostile** [2] - 52:17, 68:2
**hour** [19] - 13:21, 88:12, 89:8, 89:9, 89:12, 89:17, 89:21, 89:22, 90:3, 90:6, 90:13, 90:16, 90:19, 90:21, 90:25, 91:4, 137:6, 137:7
**hours** [2] - 75:25, 76:2
**hundred** [4] - 67:11, 67:14, 115:3, 115:13
**hurt** [1] - 98:9
**hypothetical** [1] - 34:12

## I

**idea** [2] - 17:6, 18:19
**identified** [1] - 7:18
**IED** [2] - 60:3, 60:22
**ignoring** [1] - 92:15
**illegal** [4] - 73:14, 75:14, 75:18, 76:13
**immediate** [2] - 94:23, 97:21
**immediately** [11] - 63:7, 68:18, 82:19, 83:2, 84:12, 84:16, 95:4, 97:1, 97:17, 97:24, 108:7
**imminent** [1] - 52:4
**immunity** [1] - 9:7
**impact** [2] - 135:6, 135:9
**impacted** [1] - 122:15
**impacts** [2] - 84:3, 119:1
**impair** [1] - 75:15
**important** [3] - 22:16, 23:2, 23:3

**Heberlig.....** [1] - 3:4
**held** [2] - 134:18, 136:18
**HELD** [1] - 1:17
**helicopter** [10] - 60:13, 60:19, 62:6, 62:9, 63:13, 66:13, 66:17, 66:21, 66:24, 67:4
**helicopters** [4] - 49:8, 69:10, 69:14, 69:24
**helos** [2] - 59:22, 60:12
**help** [3] - 57:18, 62:13, 66:21
**helped** [1] - 21:17
**hereby** [1] - 141:7
**high** [7] - 19:19, 52:18, 68:8, 69:15, 69:19, 69:20, 76:17
**high-powered** [1] - 68:8
**higher** [1] - 93:21
**highlight** [28] - 14:11, 16:15, 17:13, 20:14, 21:12, 25:18, 26:20, 32:2, 32:14, 33:3, 39:7, 55:16, 55:24, 57:4, 57:19, 58:11, 59:16, 71:8, 71:13, 71:16, 88:21, 92:9, 93:24, 96:8, 109:12, 117:4, 132:2, 132:9
**highlighted** [5] - 19:8, 59:19, 93:2, 115:8, 119:25
**highlighting** [1] - 59:9
**highly** [2] - 63:2, 92:13
**Hill** [1] - 137:12
**Hillah** [2] - 59:23, 60:15
**himself** [1] - 5:19
**hit** [7] - 60:3, 60:22, 106:23, 114:17, 118:14, 118:17, 118:22
**hold** [1] - 118:6
**holding** [2] - 134:15, 134:24
**home** [3] - 11:24, 13:8, 13:9
**honest** [4] - 38:18, 38:23, 40:2, 40:18
**honestly** [1] - 89:12
**Honor** [41] - 4:4, 4:8, 6:4, 11:16, 14:4, 32:8, 33:19, 33:20, 34:14, 35:25, 39:15, 55:18, 57:12, 58:17, 70:7, 70:15, 74:22, 75:1, 88:24, 88:25, 96:10, 103:4, 103:5, 104:14, 104:15, 109:14, 114:1, 114:2, 136:7, 136:21, 137:3, 137:6, 137:11, 137:14, 138:2, 138:7, 138:10, 138:19, 138:25, 139:9, 139:11

8

**impose** [1] - 22:6
**imposing** [2] - 18:21, 19:1
**impractical** [2] - 125:25, 126:5
**impression** [2] - 86:18, 87:1
**imprisonment** [2] - 19:14, 20:6
**impunity** [1] - 46:21
**IN** [1] - 1:1
**in-person** [1] - 6:10
**inappropriate** [1] - 54:23
**incident** [20] - 5:20, 16:10, 28:15, 48:16, 55:12, 56:5, 56:18, 58:7, 61:6, 64:13, 65:24, 66:6, 110:5, 110:13, 112:6, 112:11, 112:14, 112:16, 112:21, 124:10
**incidents** [1] - 61:1
**include** [1] - 129:12
**included** [2] - 27:3, 50:11
**includes** [1] - 26:3
**including** [1] - 29:7
**incoming** [12] - 37:19, 41:10, 41:13, 44:11, 46:25, 47:7, 48:6, 63:8, 68:21, 68:24, 70:6, 119:9
**inconsistent** [1] - 39:16
**incorrect** [1] - 100:16
**increase** [1] - 45:25
**increases** [2] - 47:25, 48:3
**incriminating** [1] - 47:16
**indicates** [1] - 19:12
**indictment** [1] - 10:11
**individuals** [5] - 21:18, 31:13, 31:22, 33:14, 102:11
**indulgence** [1] - 32:1
**information** [12] - 9:11, 9:21, 17:7, 19:7, 25:4, 25:6, 26:4, 26:7, 36:21, 37:10, 42:13, 63:15
**informed** [2] - 7:5, 8:4
**initial** [3] - 29:24, 36:18, 49:16
**injuries** [4] - 60:1, 60:3, 65:1, 65:19
**injurism** [1] - 59:25
**inside** [1] - 61:23
**insisted** [1] - 10:11
**instance** [1] - 133:1
**instances** [2] - 16:12, 33:7
**instead** [1] - 66:16
**instinct** [5] - 96:25, 97:16, 97:19, 97:24
**institute** [2] - 29:2, 29:3
**insurgents** [3] - 53:12, 63:23, 65:17
**intact** [1] - 28:8
**intent** [2] - 13:25, 47:22

**interest** [2] - 49:1, 140:8
**interested** [1] - 7:10
**internal** [1] - 81:5
**interpretation** [1] - 67:17
**interpreted** [1] - 59:13
**interrupt** [1] - 61:14
**interview** [9] - 7:3, 7:17, 8:12, 10:22, 29:24, 48:14, 71:10, 132:5, 132:17
**interviewed** [1] - 20:20
**interviews** [2] - 37:24, 44:20
**investigation** [4] - 4:24, 5:18, 6:11, 21:17
**investigators** [1] - 94:2
**invisible** [1] - 137:4
**involve** [2] - 80:16, 125:18
**Iraq** [2] - 60:16, 138:20
**Iraqi** [18] - 53:21, 53:22, 53:25, 54:4, 54:7, 62:20, 63:23, 64:10, 92:15, 92:16, 100:17, 100:24, 101:13, 101:15, 101:17, 101:18, 106:15, 138:12
**Iraqis** [1] - 54:9
**Irish** [1] - 80:5
**issue** [1] - 88:7
**issued** [1] - 95:5
**issues** [1] - 138:8
**itself** [4] - 62:16, 63:10, 91:17, 98:4
**IV** [1] - 2:12

## J

**Janet** [1] - 2:16
**January** [2] - 61:7, 61:16
**Jean** [1] - 137:25
**jEREMY** [1] - 3:4
**Jeremy** [2] - 136:22, 137:11
**jerked** [1] - 114:19
**Jimmy** [1] - 112:7
**job** [4] - 56:23, 57:21, 68:13, 128:11
**Joe** [1] - 57:7
**John** [2] - 2:3, 138:2
**JOHNSON** [1] - 2:9
**joined** [1] - 49:18
**Jordan** [2] - 72:12, 72:22
**Joyce** [1] - 137:25
**Jr** [1] - 2:3
**judge** [12] - 15:6, 20:5, 21:22, 22:1, 22:5, 22:9, 37:23, 87:2, 87:3, 108:19, 110:16, 110:18
**JUDGE** [1] - 1:18
**Judge** [5] - 15:9, 15:10, 15:11, 15:12, 22:3
**judges** [2] - 18:20, 18:25
**judging** [1] - 90:7
**judgment** [3] - 75:15, 87:9,

91:20
**July** [1] - 1:8
**jumped** [1] - 84:16
**juror** [10] - 95:20, 96:16, 97:12, 97:13, 99:12, 114:6, 114:7, 114:24, 115:11, 116:12
**jury** [34] - 14:7, 24:7, 39:16, 74:24, 87:1, 87:15, 88:6, 88:17, 88:24, 89:4, 90:16, 95:20, 96:2, 96:11, 96:15, 99:2, 99:4, 102:16, 103:1, 109:10, 109:18, 110:11, 110:20, 111:3, 111:6, 113:19, 114:5, 115:20, 116:3, 119:8, 121:21, 134:15, 136:15, 136:19
**JURY** [1] - 1:17
**justice** [4] - 27:2, 27:13, 27:25, 45:9
**justified** [2] - 107:14, 107:15

## K

**Kavanaugh** [3] - 2:4, 138:8, 138:13
**KAVANAUGH** [5] - 136:21, 137:11, 138:19, 139:8, 139:11
**keep** [3] - 57:21, 120:18, 130:5
**kept** [1] - 51:14
**Kevin** [1] - 137:11
**Kia** [46] - 7:23, 15:23, 29:21, 32:16, 32:23, 33:4, 83:14, 83:19, 84:8, 84:9, 84:13, 85:2, 85:9, 85:18, 85:21, 86:6, 86:10, 86:24, 89:20, 91:6, 91:9, 91:10, 91:23, 92:2, 92:13, 93:11, 95:21, 96:18, 98:6, 100:1, 100:3, 101:7, 102:9, 102:12, 103:9, 106:9, 106:12, 107:2, 108:5, 108:8, 108:24, 111:21, 112:23, 113:1, 123:22
**kids** [1] - 58:3
**kill** [3] - 107:16, 107:19, 107:24
**killed** [2] - 56:23, 62:11
**killing** [1] - 15:22
**kind** [1] - 139:5
**kinds** [1] - 52:22
**kit** [1] - 80:12
**knocked** [1] - 78:21
**known** [4] - 20:9, 65:17, 80:4, 90:20
**Krueger** [1] - 137:11

## L

**lack** [1] - 26:4
**Lamberth** [3] - 15:9, 15:10, 22:3
**LAMBERTH** [1] - 1:18
**lane** [2] - 127:12, 129:16
**large** [1] - 65:10
**largely** [1] - 140:2
**larger** [2] - 81:24, 93:18
**last** [18] - 14:25, 33:5, 56:11, 57:7, 77:9, 77:14, 77:15, 78:12, 89:5, 104:6, 106:1, 106:2, 112:23, 127:9, 131:10, 139:9, 139:11, 139:17
**late** [1] - 4:16
**Laurent** [1] - 1:7
**law** [3] - 5:4, 5:5, 138:22
**LAW** [1] - 2:12
**lawyer** [9] - 4:18, 4:23, 6:9, 14:21, 91:22, 92:1, 92:11, 92:24, 93:8
**lawyers** [4] - 6:2, 48:19, 48:23, 49:1
**lead** [1] - 76:12
**lead-up** [1] - 76:12
**leading** [6] - 55:3, 55:7, 56:17, 58:15, 61:1, 66:9
**least** [16] - 10:19, 11:8, 40:22, 54:7, 77:20, 86:17, 94:16, 95:7, 113:12, 113:16, 115:24, 116:14, 124:7, 126:14, 135:17, 137:14
**leave** [2] - 56:22, 127:7
**led** [2] - 62:20, 63:4
**left** [7] - 28:20, 82:22, 83:2, 96:7, 128:3, 129:15, 130:13
**legitimate** [2] - 33:13, 34:21
**length** [2] - 102:1, 139:19
**leniency** [7] - 20:3, 21:16, 21:22, 21:25, 23:5, 47:25, 48:3
**lenient** [1] - 22:6
**less** [8] - 18:3, 38:10, 42:3, 56:4, 82:13, 103:19, 105:13, 106:1
**lesser** [1] - 25:10
**letter** [11] - 4:24, 5:2, 5:8, 5:14, 6:8, 6:9, 14:16, 14:19, 14:22, 21:9, 92:6
**Liberty** [2] - 1:6, 2:12
**lie** [10] - 27:20, 36:19, 38:1, 41:1, 42:20, 42:21, 43:13, 46:23, 106:3, 111:8
**lied** [16] - 29:10, 37:12, 37:13, 37:14, 39:24, 40:14, 41:16, 41:22, 42:4, 42:23,

9

44:20, 45:4, 46:21, 48:13, 106:2, 111:6
**lies** [4] - 5:25, 27:22, 45:10, 93:7
**life** [3] - 42:10, 52:19, 94:24
**lift** [2] - 59:24, 60:18
**likely** [2] - 47:20, 90:14
**likewise** [1] - 119:9
**limited** [1] - 7:6
**Linda** [1] - 2:8
**Lindstrom** [1] - 137:25
**line** [14] - 39:14, 56:9, 58:1, 91:6, 103:1, 103:12, 104:11, 109:11, 109:12, 113:23, 120:19, 124:15, 124:19, 127:9
**lines** [11] - 39:8, 39:9, 39:12, 43:11, 72:3, 88:20, 88:21, 96:3, 96:5, 96:6
**lining** [1] - 125:3
**link** [2] - 138:14, 138:16
**lion's** [1] - 138:4
**listen** [1] - 136:11
**live** [2] - 11:14, 11:19
**lived** [2] - 11:22, 90:11
**lives** [1] - 94:24
**LLP** [4] - 2:9, 2:12, 2:16, 2:20
**located** [7] - 67:6, 79:6, 119:25, 124:18, 124:21, 124:22, 134:19
**location** [2] - 113:1, 113:8
**lock** [1] - 24:4
**locked** [1] - 12:25
**logistically** [1] - 139:2
**look** [24] - 15:16, 20:12, 25:17, 25:18, 26:18, 38:25, 39:3, 59:8, 74:19, 83:3, 83:19, 84:7, 88:16, 89:9, 90:8, 92:4, 93:15, 93:23, 95:24, 96:18, 102:18, 104:8, 109:7, 122:21
**looked** [16] - 14:22, 74:17, 75:5, 85:24, 91:13, 92:6, 102:11, 102:13, 102:17, 103:12, 103:16, 105:3, 123:3, 125:6, 126:10, 135:2
**looking** [14] - 42:16, 43:12, 82:5, 82:8, 82:11, 82:13, 119:12, 120:19, 120:23, 130:15, 130:16, 130:21, 132:1
**looks** [2] - 82:4, 102:21
**loud** [1] - 21:13
**low** [1] - 22:10
**lower** [2] - 20:6, 26:21
**luck** [1] - 58:2
**lunch** [2] - 137:1
**lying** [5] - 29:4, 37:7, 38:4, 39:25, 46:3

# M

**M-203** [2] - 111:17, 112:20
**M-203s** [3] - 111:11, 112:7, 112:11
**M-240** [6] - 80:22, 117:16, 117:24, 118:10, 124:10, 134:8
**M-4** [10] - 80:20, 83:8, 85:13, 95:5, 95:13, 117:16, 122:11, 123:21, 124:1, 134:5
**machine** [8] - 65:11, 65:13, 65:15, 80:22, 117:16, 117:24, 118:10, 124:10
**magnification** [1] - 68:8
**maintain** [3] - 5:25, 7:13, 107:13
**maintained** [4] - 7:11, 7:14, 44:17, 69:18
**maintaining** [1] - 36:3
**major** [3] - 44:22, 44:25, 47:14
**man** [9] - 101:15, 101:21, 106:18, 106:20, 107:1, 108:1, 110:14
**managed** [1] - 63:12
**mandatory** [4] - 4:21, 10:14, 18:3, 45:19
**manner** [5] - 54:14, 92:14, 122:19, 123:4, 127:12
**manslaughter** [6] - 15:20, 15:25, 17:16, 17:21, 19:11, 19:16
**map** [3] - 81:22, 119:12, 119:25
**marked** [1] - 14:5
**market** [1] - 57:21
**marksman** [1] - 68:15
**Martin** [1] - 2:3
**mate** [2] - 96:23, 96:25
**matter** [8] - 11:6, 11:8, 22:11, 22:22, 46:14, 54:3, 130:12, 138:25
**max** [2] - 17:25, 22:24
**maximum** [1] - 17:16
**mealy** [1] - 139:19
**mean** [7] - 54:12, 61:14, 100:23, 102:16, 102:18, 108:20, 109:5
**means** [3] - 51:25, 91:12, 107:19
**meant** [4] - 10:13, 34:20, 111:14, 120:20
**mechanic** [1] - 137:13
**medicating** [1] - 72:8
**medication** [2] - 75:15, 76:20
**medications** [1] - 77:20
**medium** [2] - 59:23, 60:18
**meds** [1] - 77:25

**meeting** [11] - 6:10, 6:13, 6:15, 6:23, 7:8, 8:21, 9:13, 9:24, 10:3, 10:7, 10:8
**meetings** [8] - 23:22, 24:5, 24:11, 36:14, 36:18, 36:22, 37:18, 44:4
**member** [2] - 58:24, 62:1
**members** [7] - 62:3, 63:21, 66:12, 67:1, 67:22, 81:8, 137:12
**memorandum** [5] - 71:9, 71:10, 132:3, 132:4, 132:8
**memory** [5] - 7:20, 8:19, 37:2, 43:22, 113:20
**men** [7] - 101:9, 101:12, 106:8, 106:10, 106:12, 126:8, 126:15
**men's** [1] - 101:23
**mentioned** [3] - 10:6, 81:1, 98:8
**mercy** [1] - 20:1
**met** [2] - 12:5, 23:20
**meters** [4] - 67:11, 67:12, 67:14, 94:12
**Michael** [1] - 2:8
**mid** [3] - 10:20, 56:22, 57:20
**midday** [1] - 78:21
**Middle** [1] - 72:14
**might** [5] - 51:6, 51:11, 51:19, 57:22, 139:5
**miles** [16] - 88:12, 89:8, 89:9, 89:12, 89:16, 89:21, 89:22, 90:3, 90:5, 90:12, 90:13, 90:16, 90:19, 90:21, 90:25, 91:4
**mind** [3] - 102:21, 113:7, 120:18
**mindset** [2] - 31:19, 35:15
**minimum** [4] - 4:21, 10:14, 18:3, 45:20
**ministry** [1] - 64:14
**minor** [1] - 59:24
**minute** [5] - 43:3, 46:24, 86:9, 123:17, 131:14
**minutes** [1] - 109:20
**Miranda** [1] - 12:22
**misrepresentations** [1] - 6:3
**miss** [3] - 59:5, 59:6, 59:10
**missed** [3] - 59:21, 79:17, 127:12
**mission** [7] - 50:15, 61:10, 66:1, 66:20, 74:17, 75:6, 76:17
**mission's** [1] - 75:9
**misspeaking** [1] - 40:17
**misspoke** [1] - 26:22
**misspoken** [2] - 40:13, 105:2
**mix** [1] - 45:20
**mock** [1] - 24:19
**mode** [1] - 85:15

**moment** [22] - 14:22, 32:1, 33:2, 34:20, 37:9, 38:19, 38:23, 40:2, 40:3, 40:18, 42:10, 42:14, 49:12, 55:23, 58:10, 84:23, 96:7, 98:11, 98:23, 101:6, 109:9, 132:8
**Monday** [6] - 133:13, 136:24, 137:9, 140:4, 140:11, 140:13
**monday** [1] - 136:9
**month** [2] - 56:17, 61:23
**months** [9] - 19:13, 19:22, 42:3, 42:22, 55:3, 55:7, 56:11, 105:13, 106:1
**morning** [8] - 4:7, 50:5, 50:8, 77:16, 77:18, 78:15, 78:17, 78:18
**morphine** [3] - 77:1, 77:5, 77:12
**most** [3] - 19:20, 80:10, 137:7
**motion** [6] - 21:21, 21:25, 22:14, 22:16, 22:19, 84:19
**mounted** [1] - 80:24
**mouth** [2] - 99:6, 99:8
**move** [9] - 6:9, 21:11, 64:13, 65:24, 79:16, 107:10, 112:24, 116:13, 125:2
**moved** [3] - 4:9, 94:18, 113:9
**movement** [3] - 85:6, 97:3, 108:11
**movements** [2] - 108:5, 108:7
**moving** [16] - 79:15, 83:19, 86:10, 86:14, 86:22, 86:24, 87:16, 87:22, 87:24, 88:4, 88:9, 89:25, 90:2, 90:5, 114:25, 133:4
**MR** [76] - 4:4, 4:5, 4:8, 4:13, 6:4, 6:7, 11:16, 11:18, 13:17, 13:19, 14:4, 14:10, 30:12, 30:15, 32:8, 32:9, 32:12, 33:19, 33:20, 33:22, 33:23, 34:3, 34:14, 34:17, 35:24, 36:2, 39:15, 39:18, 55:18, 55:19, 55:22, 57:12, 57:15, 58:17, 58:18, 58:21, 65:23, 70:7, 70:15, 70:16, 74:21, 75:1, 75:3, 88:23, 88:25, 89:3, 96:10, 96:12, 96:14, 103:3, 103:5, 103:7, 104:14, 104:15, 104:17, 109:13, 109:15, 109:17, 113:25, 114:2, 114:4, 136:7, 136:21, 136:25, 137:3, 137:6, 137:11, 138:7, 138:19, 138:25, 139:8, 139:11, 139:21, 140:1, 140:6, 140:8
**multiple** [2] - 23:20, 52:22

10

**Murphy** [1] - 138:1
**must** [3] - 18:25, 26:9, 35:7
**muzzle** [12] - 8:1, 37:8,
37:13, 37:19, 37:20, 41:2,
41:10, 41:14, 41:24, 47:3,
47:10, 48:13

## N

**name** [2] - 57:8, 138:13
**nap** [2] - 78:19, 78:23
**narrative** [1] - 44:17
**narrow** [2] - 30:6, 30:10
**near** [6] - 59:22, 60:9, 67:6,
107:6, 117:12, 119:25
**necessary** [4] - 36:4, 36:10,
51:23, 125:21
**need** [5] - 31:2, 35:13, 43:17,
138:23, 139:7
**needed** [6] - 46:7, 46:9,
47:22, 66:24, 77:5, 127:1
**needing** [1] - 123:14
**needs** [1] - 35:5
**nervous** [1] - 78:3
**never** [9] - 12:19, 35:12,
35:18, 35:21, 74:8, 121:17,
121:20, 124:9, 134:7
**new** [4] - 47:16, 47:19, 70:7,
136:8
**New** [1] - 61:19
**next** [15] - 26:21, 27:10,
32:19, 32:21, 39:8, 39:9,
58:1, 59:22, 60:12, 94:22,
96:5, 109:22, 116:24,
136:21, 138:20
**nice** [1] - 136:14
**Nicholas** [1] - 1:13
**Nick** [1] - 67:6
**night** [3] - 77:9, 77:14, 77:15
**Nisur** [26] - 5:17, 6:16, 9:2,
10:1, 16:3, 16:10, 28:15,
37:13, 37:19, 41:25, 45:16,
46:17, 48:6, 48:16, 48:21,
48:25, 55:3, 55:8, 56:4,
56:17, 58:7, 60:7, 66:10,
81:13, 120:1, 125:22
**Nock** [1] - 138:1
**none** [2] - 45:22, 63:1
**nonetheless** [1] - 30:2
**normal** [3] - 125:13, 125:15,
125:18
**normally** [1] - 77:3
**north** [14] - 8:5, 16:3, 82:6,
82:14, 82:16, 128:24,
129:14, 129:15, 130:10,
130:24, 131:2, 133:19,
134:1, 134:2
**northwest** [3] - 82:6, 82:16,
129:7
**NOTE** [2] - 136:15, 136:18

**notes** [1] - 141:9
**nothing** [10] - 5:22, 9:2, 9:16,
26:22, 26:24, 46:21, 91:14,
124:23, 125:1, 134:11
**notified** [2] - 62:5, 62:9
**November** [9] - 10:20, 14:16,
15:3, 26:12, 56:22, 57:21,
71:11, 132:5, 132:17
**nowhere** [3] - 33:16, 34:5,
98:14
**number** [4] - 7:6, 14:6, 24:5,
74:22
**numbers** [1] - 80:6
**nutshell** [1] - 20:16
**NW** [7] - 1:24, 2:5, 2:10, 2:13,
2:17, 2:20, 141:16

## O

**O'Connor** [2] - 137:25, 138:1
**oath** [12] - 87:19, 87:24,
90:15, 94:4, 100:11,
102:16, 104:5, 104:19,
106:2, 111:2, 111:6, 115:7
**Obama** [1] - 54:18
**object** [2] - 6:4, 120:11
**objecting** [1] - 35:24
**objection** [14] - 11:16, 13:17,
30:12, 32:9, 33:19, 34:14,
55:19, 58:18, 74:25, 89:1,
96:12, 103:5, 104:15,
109:15
**objective** [2] - 34:12, 35:5
**objectively** [7] - 31:14,
31:15, 31:23, 31:24, 33:7,
35:7, 35:11
**objects** [1] - 120:14
**obligated** [2] - 46:14, 46:19
**obligates** [1] - 20:16
**obligation** [2] - 26:3, 36:15
**obligations** [1] - 27:13
**observations** [1] - 89:20
**observed** [2] - 91:20, 94:8
**obstruct** [1] - 27:2
**obstructed** [1] - 124:23
**obstructing** [1] - 125:1
**obstruction** [3] - 27:12,
27:25, 45:9
**obtained** [2] - 4:18, 72:11
**obvious** [2] - 40:22, 51:25
**obviously** [5] - 4:17, 16:18,
68:5, 78:5, 130:13
**occasion** [2] - 54:8, 76:1
**occasionally** [1] - 53:20
**occasions** [1] - 23:20
**occupant** [1] - 52:2
**occur** [2] - 11:12, 111:19
**occurred** [5] - 38:7, 60:6,
61:1, 61:6, 66:18
**OF** [6] - 1:1, 1:3, 1:10, 1:17,

141:2, 141:5
**offense** [1] - 9:5
**offenses** [8] - 16:10, 16:20,
16:22, 27:11, 28:15, 45:16,
46:13, 46:17
**offer** [5] - 4:9, 32:8, 55:18,
57:12, 58:17
**Office** [1] - 14:18
**OFFICE** [1] - 2:4
**officer** [2] - 100:18, 101:17
**officers** [1] - 62:20
**OFFICIAL** [1] - 141:5
**Official** [1] - 1:23
**official** [1] - 141:14
**officials** [2] - 12:10, 138:13
**often** [1] - 53:17
**old** [1] - 137:21
**on-site** [1] - 62:14
**one** [61] - 7:22, 7:25, 9:24,
11:24, 15:1, 20:2, 24:18,
33:2, 38:17, 41:15, 41:16,
43:9, 49:4, 49:23, 49:25,
50:4, 50:8, 52:2, 59:15,
59:22, 60:9, 60:12, 62:3,
62:24, 64:18, 64:21, 64:24,
71:18, 77:20, 81:9, 84:19,
84:23, 87:2, 93:7, 93:10,
93:15, 93:19, 95:4, 95:18,
96:7, 97:2, 97:11, 98:15,
101:12, 110:24, 112:20,
112:23, 116:13, 125:11,
125:15, 125:19, 126:2,
126:4, 126:8, 126:22,
126:24, 129:10, 129:11,
132:8, 138:25
**ONORATO** [1] - 2:16
**open** [1] - 57:22
**opened** [2] - 69:25, 70:2
**operating** [4] - 125:13,
125:15, 125:18, 128:12
**opportunity** [1] - 91:10
**opposed** [3] - 128:5, 140:6,
140:7
**optics** [4] - 69:15, 69:19,
69:21, 69:23
**option** [1] - 51:9
**orally** [3] - 140:2, 140:5,
140:11
**orient** [1] - 78:5
**orientation** [2] - 128:5,
130:18
**oriented** [2] - 84:1, 127:25
**outset** [1] - 38:13
**outside** [2] - 79:5, 136:19
**overruled** [3] - 11:17, 13:18,
34:16
**own** [10] - 6:2, 12:4, 13:22,
35:15, 35:23, 36:25, 85:5,
118:3, 133:12
**owned** [1] - 62:9

## P

**p.m** [9] - 1:8, 4:1, 39:4,
39:11, 70:10, 70:12,
104:10, 136:16, 140:14
**P.M** [1] - 1:9
**page** [37] - 5:11, 14:25,
15:15, 16:14, 18:15, 20:13,
26:21, 26:22, 27:10, 32:18,
32:19, 32:22, 33:2, 39:3,
39:7, 39:8, 43:11, 57:5,
71:12, 71:13, 75:4, 75:8,
88:20, 92:5, 93:16, 96:3,
96:4, 96:5, 96:7, 103:1,
104:11, 109:11, 113:22,
113:24, 132:7
**pages** [3] - 39:5, 39:11,
71:12
**pain** [1] - 77:25
**papers** [1] - 140:2
**paperwork** [1] - 30:24
**paragraph** [24] - 5:15, 16:15,
16:16, 16:25, 17:13, 18:15,
19:8, 20:12, 20:14, 21:11,
21:12, 25:18, 25:19, 26:2,
26:18, 26:19, 32:13, 32:14,
32:15, 33:3, 33:6, 55:17,
75:9, 92:9
**paragraphs** [2] - 132:9,
132:11
**pardon** [10] - 18:11, 41:21,
54:21, 59:8, 73:7, 91:25,
106:11, 112:15, 122:23,
126:1
**parking** [2] - 79:23, 80:8
**part** [11] - 16:17, 26:24, 27:5,
36:14, 66:12, 74:16, 97:19,
97:25, 137:21, 138:16
**part's** [2] - 104:22, 105:20
**particularly** [3] - 56:9, 56:19,
137:17
**parties** [1] - 19:13
**partner** [1] - 5:6
**pass** [2] - 9:17, 9:21
**passed** [4] - 86:3, 108:15,
108:23, 110:24
**passenger** [13] - 15:22,
29:20, 32:22, 51:17, 51:19,
51:23, 102:6, 108:5, 108:8,
108:24, 109:23, 111:20,
116:22
**passengers** [1] - 66:22
**passing** [2] - 91:16, 135:3
**past** [3] - 87:6, 94:18, 135:3
**path** [1] - 86:6
**Patrick** [1] - 2:3
**Paul** [24] - 1:6, 83:5, 83:23,
84:12, 84:16, 122:9,
123:21, 124:5, 124:10,
124:18, 124:22, 129:12,

130:23, 131:3, 131:10, 131:16, 131:20, 132:18, 133:12, 133:14, 134:10, 135:11, 135:13, 135:16
**Paul's** [2] - 135:6, 135:9
**Pause** [3] - 34:1, 65:22, 132:13
**pause** [1] - 87:7
**paused** [2] - 91:19, 98:11
**pen** [1] - 51:9
**penalties** [2] - 17:14, 17:18
**penalty** [2] - 17:17, 17:22
**people** [10] - 29:3, 30:3, 34:8, 53:25, 54:4, 54:7, 107:21, 107:23, 135:6, 137:23
**per** [9] - 89:8, 89:9, 89:12, 89:21, 90:3, 90:6, 90:16, 90:21, 128:12
**perceive** [8] - 84:7, 91:11, 96:16, 96:21, 97:8, 97:13, 99:13, 99:18
**perceived** [9] - 91:9, 94:23, 95:21, 111:10, 111:14, 111:19, 122:13, 125:3, 126:14
**percent** [1] - 126:21
**perhaps** [7] - 9:7, 60:1, 66:24, 133:13, 134:2, 138:15
**perimeter** [1] - 67:4
**period** [9] - 4:17, 4:20, 21:3, 76:5, 116:21, 123:18, 123:21, 125:13, 129:24
**perjury** [3] - 27:1, 27:12, 27:25
**permit** [1] - 26:25
**permitted** [4] - 13:7, 27:20, 28:5, 74:23
**perpendicular** [1] - 134:19
**person** [5] - 6:10, 29:2, 32:20, 34:12, 68:13
**personal** [3] - 6:18, 36:9, 89:19
**personally** [7] - 8:9, 33:17, 34:6, 35:1, 35:6, 35:19, 36:3
**personnel** [3] - 62:14, 65:1, 92:16
**persuaded** [1] - 43:6
**Peterman** [1] - 138:2
**photograph** [2] - 120:4, 120:22
**photographs** [4] - 121:12, 121:17, 121:20, 122:2
**phrase** [1] - 99:6
**picture** [3] - 119:19, 119:22, 120:15
**piece** [6] - 25:4, 25:7, 46:10, 80:11, 120:24

**pilot** [1] - 63:21
**place** [6] - 6:13, 9:14, 56:10, 66:7, 112:14, 112:17
**places** [1] - 68:22
**Plaintiff** [3] - 1:4, 1:11, 2:2
**plane** [1] - 138:20
**plans** [1] - 138:11
**play** [1] - 45:2
**played** [2] - 44:22, 44:25
**plea** [53] - 8:8, 10:19, 10:25, 12:1, 13:7, 13:11, 13:16, 14:3, 14:13, 15:6, 16:17, 17:7, 17:10, 18:9, 18:12, 19:6, 19:12, 20:9, 25:14, 26:12, 26:23, 27:16, 28:1, 28:5, 28:25, 29:4, 29:17, 30:2, 30:6, 30:10, 30:21, 30:25, 31:7, 32:6, 35:17, 36:8, 36:18, 36:22, 37:18, 37:23, 38:19, 38:23, 40:3, 40:18, 42:9, 42:12, 44:5, 45:5, 45:12, 45:24, 121:18
**plead** [7] - 10:11, 10:17, 10:18, 13:24, 15:17, 16:6, 16:20
**pled** [22] - 6:13, 11:5, 13:2, 16:13, 17:15, 23:23, 28:7, 30:16, 30:20, 31:20, 31:21, 35:18, 36:7, 36:13, 37:23, 38:10, 39:24, 40:1, 42:5, 42:24, 45:17, 46:4
**plenty** [1] - 99:20
**point** [18] - 5:20, 9:23, 9:24, 12:5, 41:2, 44:4, 62:6, 70:4, 108:22, 111:10, 117:15, 121:13, 122:8, 124:9, 125:3, 134:7, 138:18
**pointed** [1] - 67:23, 119:22
**pointing** [2] - 68:12, 134:24
**police** [5] - 53:21, 62:20, 64:11, 101:13, 101:15
**policeman** [2] - 100:24, 106:16
**policies** [1] - 74:12
**policy** [6] - 74:1, 74:6, 74:17, 75:6, 75:10, 75:22
**population** [2] - 53:18, 55:1
**portion** [11] - 5:14, 8:12, 15:14, 32:3, 41:15, 59:19, 75:9, 82:3, 95:7, 103:15, 115:8
**posed** [1] - 50:18
**poses** [2] - 97:21, 98:2
**position** [3] - 48:5, 79:21, 128:9
**possession** [1] - 26:4
**possible** [2] - 96:4, 130:6
**possibly** [1] - 10:4
**Postiglione** [2] - 57:8, 57:9

**potential** [12] - 17:8, 17:14, 17:20, 17:21, 19:7, 19:13, 22:21, 22:22, 26:15, 50:18, 52:1, 67:23
**powered** [1] - 68:8
**practice** [1] - 24:16
**precise** [1] - 43:10
**precisely** [2] - 17:4, 108:14
**prejudice** [1] - 140:10
**preparation** [1] - 24:11
**prepare** [2] - 125:4, 139:2
**prepared** [2] - 24:9, 96:19, 140:1
**prescription** [10] - 70:23, 70:24, 71:19, 72:5, 73:15, 74:2, 74:4, 74:10, 74:13, 75:14
**presence** [1] - 136:19
**present** [3] - 58:25, 67:22, 68:9
**President** [1] - 54:18
**pressed** [1] - 88:11
**pressure** [4] - 44:8, 44:22, 44:25, 49:10
**pressured** [3] - 44:16, 44:18, 49:9
**pretend** [1] - 24:18
**pretty** [3] - 41:4, 42:19, 50:15
**previously** [2] - 87:14, 100:11
**primary** [1] - 50:4
**prison** [3] - 17:11, 17:17, 22:21
**probation** [1] - 22:10
**problem** [1] - 88:25
**procedure** [4] - 125:10, 125:13, 125:15, 125:18
**procedures** [1] - 128:12
**proceed** [3] - 4:3, 30:18, 70:14
**proceeding** [7] - 15:8, 38:15, 38:18, 40:6, 122:24, 123:3, 135:20
**proceedings** [4] - 20:22, 70:10, 136:18, 141:10
**process** [3] - 13:6, 64:4, 139:2
**processed** [1] - 13:2
**proffer** [3] - 31:6, 32:5, 35:16
**progressively** [3] - 55:5, 55:9, 56:10
**prohibited** [1] - 75:19
**pronounce** [1] - 57:7
**propelled** [1] - 53:6
**prosecute** [4] - 27:10, 28:20, 28:24, 45:8
**prosecuted** [4] - 27:22, 28:10, 28:14, 45:15
**prosecution** [8] - 9:25, 12:5, 21:5, 21:17, 23:18, 27:2,

40:9, 98:25
**prosecutor** [12] - 4:24, 5:17, 11:1, 38:3, 43:6, 61:3, 64:15, 86:11, 88:11, 89:7, 110:10, 134:14
**prosecutor's** [1] - 110:19
**prosecutors** [58] - 6:3, 6:10, 6:15, 7:5, 7:18, 7:22, 8:13, 8:16, 8:21, 9:1, 9:4, 10:9, 10:23, 20:3, 20:17, 21:4, 21:15, 21:20, 23:16, 23:23, 24:12, 24:18, 24:22, 25:1, 25:9, 26:5, 28:21, 29:5, 29:24, 36:14, 36:19, 36:23, 37:15, 37:24, 38:19, 39:24, 39:25, 40:14, 43:25, 44:8, 44:19, 44:22, 44:25, 45:4, 45:5, 45:8, 46:4, 48:20, 48:24, 49:2, 49:5, 49:8, 91:24, 92:2, 92:11, 92:24, 93:8, 131:19
**protect** [1] - 27:2
**protocol** [2] - 50:11, 52:4
**provide** [10] - 9:11, 21:7, 21:21, 23:16, 25:4, 25:6, 42:13, 50:1, 59:24, 66:21
**provided** [7] - 5:12, 9:21, 21:5, 21:21, 24:21, 24:25, 25:7
**providing** [2] - 25:7, 26:3
**provision** [2] - 18:12, 20:10
**provisions** [1] - 25:17
**provocation** [2] - 67:19, 70:3
**proximity** [1] - 130:2
**publish** [8] - 39:15, 39:19, 88:23, 96:11, 103:3, 104:14, 109:13, 113:25
**pull** [9] - 4:14, 31:25, 39:9, 55:15, 57:3, 71:7, 81:20, 81:22, 117:3
**pulled** [3] - 85:25, 127:8, 127:11
**pulling** [1] - 126:24
**pumping** [1] - 112:22
**purposely** [1] - 111:7
**pursuant** [1] - 20:25
**push** [2] - 125:19, 126:4
**pushed** [8] - 104:20, 104:22, 104:25, 105:2, 105:3, 105:8, 105:10, 105:14
**pushing** [14] - 102:11, 102:17, 102:23, 103:17, 103:20, 103:21, 103:22, 103:23, 104:3, 105:3, 105:4, 106:8, 106:12, 125:24
**put** [13] - 12:17, 20:1, 30:16, 44:8, 64:2, 82:11, 84:20, 89:8, 97:1, 100:18, 102:19, 103:19, 109:19

**puzzle** [1] - 25:8

## Q

**quality** [3] - 69:15, 69:19, 69:21
**questions** [20] - 6:16, 6:24, 11:2, 14:2, 31:8, 38:14, 38:17, 39:14, 39:20, 53:24, 54:1, 61:9, 70:19, 88:15, 99:1, 112:23, 113:5, 113:18, 119:2, 119:8
**quick** [1] - 137:19
**quickly** [11] - 96:24, 108:18, 108:19, 108:21, 108:25, 109:3, 110:5, 110:11, 111:3, 111:5, 139:17
**quite** [11] - 7:7, 7:21, 18:14, 23:25, 24:2, 30:6, 30:10, 43:11, 52:18, 56:9, 94:17
**quote** [1] - 43:10
**Quote** [1] - 43:11

## R

**racial** [2] - 54:10, 54:14
**radio** [3] - 80:12, 81:1, 81:5
**rail** [1] - 64:14
**raise** [1] - 140:12
**ran** [4] - 79:10, 106:25, 110:14, 110:15
**range** [4] - 18:16, 19:7, 19:12, 19:20
**rapid** [1] - 111:19
**rate** [9] - 86:25, 87:16, 87:25, 88:4, 91:14, 91:17, 97:21, 98:1, 133:13
**Raven** [22] - 6:25, 8:14, 49:18, 49:23, 50:4, 52:15, 58:24, 60:23, 62:1, 62:16, 64:19, 66:12, 67:1, 68:3, 78:6, 78:10, 79:8, 81:5, 92:12, 92:13, 137:12, 139:17
**re** [1] - 76:8
**re-answer** [1] - 76:8
**reach** [1] - 137:18
**read** [9] - 12:22, 20:15, 21:13, 27:17, 59:19, 93:17, 96:11, 132:11, 136:11
**reading** [5] - 16:22, 43:20, 92:23, 103:4, 132:14
**ready** [2] - 79:14, 126:16
**real** [1] - 7:12
**realized** [2] - 81:3, 98:12
**really** [4] - 86:21, 88:7, 105:1, 105:4
**rear** [4] - 128:5, 128:7, 128:8, 128:11
**reason** [4] - 31:17, 43:25,

100:7, 101:6
**reasonable** [8] - 31:14, 31:15, 31:23, 32:19, 33:7, 34:12, 35:7, 35:11
**reasons** [1] - 43:9
**receive** [5] - 17:5, 17:8, 50:5, 51:22, 68:24
**received** [13] - 4:11, 4:12, 32:10, 32:11, 52:1, 55:20, 55:21, 57:13, 57:14, 58:19, 58:20, 70:6, 97:25
**receiving** [1] - 49:10
**recognize** [9] - 5:4, 7:9, 32:4, 57:6, 58:12, 75:4, 103:8, 119:19, 122:1
**recognized** [2] - 32:20, 119:22
**recollection** [4] - 8:20, 115:23, 118:5, 131:23
**record** [2] - 136:13, 139:24
**record's** [1] - 39:10
**recover** [1] - 66:13
**recovery** [3] - 61:10, 66:4, 138:9
**Red** [9] - 50:2, 52:10, 52:15, 52:22, 53:8, 62:7, 80:2, 80:18, 130:5
**red** [1] - 135:11
**redacted** [1] - 5:13
**redirect** [1] - 137:9
**refer** [4] - 43:5, 54:7, 54:17, 83:16
**reference** [7] - 25:21, 33:4, 36:6, 36:7, 60:19, 60:23, 96:17
**referred** [3] - 54:10, 66:1, 83:14
**referring** [4] - 31:17, 34:4, 66:2, 108:22
**refrain** [1] - 73:20
**refrained** [1] - 77:6
**refresh** [5] - 7:20, 8:19, 37:2, 113:20, 131:23
**refusing** [1] - 92:16
**regard** [1] - 41:25
**regarding** [3] - 41:1, 41:17, 42:6
**regards** [1] - 41:24
**regret** [1] - 54:23
**regular** [1] - 78:15
**relate** [1] - 31:8
**related** [7] - 16:2, 20:22, 29:20, 32:15, 45:16, 46:17, 137:15
**relates** [1] - 138:8
**relating** [2] - 27:13, 28:15
**release** [1] - 17:20
**relevance** [2] - 11:16, 13:17
**relevant** [2] - 26:7, 36:21
**remain** [1] - 28:7

**remaining** [1] - 139:17
**remember** [33] - 7:7, 7:9, 8:24, 9:8, 9:14, 9:23, 10:6, 10:7, 11:3, 12:24, 15:8, 15:10, 26:10, 38:5, 38:15, 38:20, 38:22, 39:25, 40:8, 43:7, 53:25, 64:15, 65:2, 66:6, 79:7, 82:13, 88:12, 88:14, 92:7, 92:8, 95:21, 114:20, 133:3
**reorient** [1] - 4:16
**repeat** [20] - 13:13, 13:20, 18:23, 24:24, 30:7, 33:22, 34:2, 35:14, 35:21, 44:24, 46:15, 48:1, 48:22, 55:6, 59:8, 63:16, 85:3, 93:1, 97:23, 113:14
**repeatedly** [1] - 97:20
**rephrase** [3] - 30:8, 34:9, 52:13
**reply** [2] - 139:22, 140:10
**Reporter** [3] - 1:22, 1:23, 141:14
**REPORTER** [1] - 141:5
**reporting** [1] - 74:2
**repositioning** [1] - 125:7
**represent** [4] - 5:12, 92:24, 96:17, 135:19
**representation** [2] - 92:17, 96:19
**representations** [1] - 92:19
**represented** [3] - 5:18, 91:23, 92:1
**representing** [2] - 49:1, 56:15
**request** [2] - 22:6, 23:5
**requesting** [2] - 21:22, 21:25
**required** [3] - 16:6, 20:20, 20:22
**requires** [1] - 25:14
**reserves** [1] - 27:10
**resolutions** [1] - 140:9
**respect** [4] - 19:11, 33:13, 45:25, 137:17
**respond** [1] - 62:13
**responded** [3] - 59:4, 59:13, 65:2
**response** [4] - 4:23, 66:6, 105:17, 110:9
**responsibility** [4] - 29:12, 29:14, 29:18, 110:17
**responsibly** [1] - 5:19
**rest** [3] - 49:21, 62:5, 140:2
**result** [2] - 33:12, 65:20
**resuming** [2] - 4:1, 70:12
**retrospect** [1] - 116:16
**return** [1] - 47:10
**returned** [2] - 47:3, 63:10
**review** [1] - 50:9
**reviewed** [1] - 24:17

**Rhodes** [1] - 137:12
**RIDGEWAY** [1] - 3:4
**Ridgeway** [10] - 4:6, 4:15, 5:18, 5:22, 9:16, 40:24, 59:18, 70:17, 132:2, 136:22
**rifle** [8] - 65:16, 66:8, 80:20, 85:13, 117:16, 123:22, 124:2, 134:5
**rights** [1] - 12:22
**ring** [1] - 7:19
**risk** [1] - 130:8
**RMR** [1] - 1:22
**road** [8] - 80:4, 81:14, 82:1, 82:2, 86:1, 110:15, 117:1, 129:6
**robe** [1] - 102:1
**Robert** [2] - 58:13, 58:22
**rocket** [1] - 53:6
**rocket-propelled** [1] - 53:6
**role** [3] - 44:23, 44:25, 45:2
**roll** [2] - 79:14, 100:10
**rolled** [7] - 79:23, 100:17, 103:14, 104:1, 106:4, 114:20, 114:21
**rolling** [6] - 79:8, 79:12, 102:9, 102:20, 102:21, 103:24
**Ronald** [1] - 138:2
**Room** [2] - 1:23, 141:15
**room** [2] - 78:19, 114:22
**roughly** [12] - 38:7, 58:15, 81:14, 117:4, 117:9, 117:11, 118:11, 127:12, 127:14, 128:20, 129:7, 133:23
**round** [5] - 65:7, 65:9, 65:10, 112:20, 118:12
**rounds** [6] - 85:19, 107:5, 112:22, 117:25, 118:3, 120:2
**Route** [1] - 80:5
**row** [1] - 81:18
**ROYCE** [1] - 1:18
**RPGs** [1] - 53:6
**rules** [3] - 7:15, 50:9, 50:11
**run** [2] - 58:3, 76:7

## S

**s/Vicki** [1] - 141:14
**safe** [2] - 32:21, 84:20
**sanitation** [1] - 59:24
**save** [1] - 45:16
**saw** [57] - 37:20, 47:4, 68:5, 83:5, 83:25, 84:6, 84:8, 84:12, 84:16, 97:3, 101:9, 104:19, 104:20, 106:3, 106:8, 108:4, 108:7, 108:11, 111:25, 112:2,

13

112:3, 113:1, 113:8, 113:12, 113:15, 114:8, 114:25, 115:1, 115:12, 115:24, 118:14, 118:17, 119:3, 119:9, 122:8, 122:17, 123:1, 123:4, 123:6, 123:21, 124:1, 124:5, 124:9, 125:6, 126:8, 129:9, 130:23, 131:3, 131:6, 131:7, 131:10, 133:4, 133:20, 133:24, 134:7, 134:22, 134:23, 135:16

**scan** [1] - 127:21
**scared** [1] - 52:18
**scenario** [1] - 17:24
**scene** [1] - 69:3
**Schertler** [1] - 2:15
**SCHERTLER** [4] - 2:16, 137:6, 138:25, 139:21
**schizophrenia** [2] - 73:3, 73:11
**scope** [2] - 68:6, 68:11
**scoped** [1] - 67:22
**Scott** [1] - 2:9
**screen** [4] - 16:23, 16:24, 93:3, 103:9
**scroll** [1] - 39:12
**Sean** [1] - 137:25
**second** [16] - 5:11, 15:25, 17:13, 31:4, 56:9, 85:2, 85:6, 87:3, 87:7, 93:19, 96:5, 118:7, 118:10, 122:17, 124:2, 126:19
**secondary** [3] - 50:5, 51:19, 78:10
**seconds** [3] - 109:20, 112:4, 112:5
**section** [2] - 16:18, 75:8
**security** [4] - 49:23, 50:1, 59:24, 66:21
**sedan** [12] - 7:23, 15:23, 32:16, 32:23, 33:4, 83:14, 85:18, 92:13, 93:11, 94:8, 111:21, 135:11
**see** [71] - 14:11, 25:25, 32:23, 37:18, 41:19, 42:2, 43:17, 55:24, 56:2, 56:12, 57:23, 58:3, 59:7, 60:5, 68:5, 74:18, 75:16, 75:20, 82:24, 82:25, 83:10, 84:3, 85:24, 93:2, 93:20, 94:25, 96:22, 96:24, 104:21, 104:24, 105:8, 105:10, 105:14, 106:18, 106:19, 109:23, 111:17, 114:10, 114:15, 115:4, 119:1, 120:4, 120:7, 120:10, 120:11, 120:15, 120:23, 121:1, 122:15, 123:1,

123:10, 126:10, 126:12, 128:16, 128:18, 128:24, 129:4, 129:13, 131:23, 132:4, 132:6, 134:10, 134:24, 135:6, 135:9, 135:11, 135:13, 137:16, 138:6, 140:13
**seeing** [4] - 37:12, 37:13, 83:23, 83:25
**seek** [2] - 20:3, 21:15
**selector** [1] - 84:20
**self** [7] - 33:13, 34:21, 34:25, 35:1, 35:7, 35:13, 72:8
**self-defense** [6] - 33:13, 34:21, 34:25, 35:1, 35:7, 35:13
**semiautomatic** [1] - 85:15
**sense** [1] - 102:14
**senses** [1] - 52:18
**sent** [2] - 6:9, 14:18
**sentence** [23] - 17:5, 17:8, 18:21, 18:22, 19:1, 20:5, 22:6, 22:10, 22:22, 25:10, 25:20, 33:5, 71:16, 92:10, 93:2, 93:5, 93:24, 94:7, 94:13, 94:16, 94:22, 94:25, 95:4
**sentenced** [2] - 17:2, 23:13
**Sentencing** [4] - 18:10, 18:13, 18:18, 18:24
**sentencing** [9] - 17:25, 18:7, 19:7, 19:20, 20:3, 20:7, 21:22, 22:1, 22:7
**separate** [1] - 60:6
**separated** [1] - 80:1
**separately** [1] - 28:10
**separation** [2] - 136:1, 136:5
**September** [14] - 56:2, 58:13, 58:25, 59:14, 59:20, 61:2, 66:7, 76:3, 76:11, 76:12, 76:15, 78:4, 78:8, 134:8
**sequence** [4] - 132:18, 132:23, 133:2, 133:8
**Sercer** [1] - 138:1
**series** [1] - 112:23
**serious** [1] - 19:20
**Session** [1] - 1:9
**session** [2] - 39:11, 43:11
**set** [13] - 51:20, 64:10, 67:3, 81:17, 82:3, 123:19, 124:7, 125:8, 126:9, 126:10, 126:15, 126:18, 127:3
**seven** [2] - 17:22, 132:25
**several** [7] - 40:11, 67:1, 92:14, 108:8, 118:8, 118:10
**shall** [2] - 26:25, 27:14
**shaped** [1] - 97:19
**share** [1] - 138:4
**shave** [1] - 22:21

**Shawn** [1] - 1:6
**shell** [2] - 121:1, 121:5
**shift** [2] - 41:6, 52:8
**shit** [1] - 59:21
**shoot** [8] - 51:14, 51:17, 107:16, 107:18, 107:19, 124:10, 135:11, 135:13
**shooting** [11] - 8:9, 29:25, 30:3, 31:22, 33:14, 36:8, 83:5, 83:10, 122:11, 123:10, 135:2
**shorthand** [1] - 26:5
**shortly** [6] - 15:7, 15:11, 49:18, 69:1, 92:12, 108:6
**shot** [23] - 7:5, 7:11, 9:20, 36:25, 59:22, 60:15, 65:5, 65:7, 65:20, 67:10, 67:13, 84:24, 106:10, 106:13, 106:14, 106:15, 106:18, 106:19, 108:23, 108:24, 111:20, 116:21
**shots** [54] - 37:3, 51:11, 82:24, 83:1, 84:6, 84:8, 84:15, 85:1, 85:4, 85:8, 85:11, 85:17, 99:25, 100:7, 100:24, 101:2, 106:21, 107:3, 107:12, 107:13, 107:21, 107:23, 107:24, 108:1, 108:8, 108:12, 109:21, 116:24, 117:7, 117:9, 118:14, 118:22, 122:15, 123:18, 123:24, 124:5, 124:6, 128:25, 129:4, 131:2, 131:3, 131:6, 131:7, 131:10, 131:13, 131:16, 131:20, 131:21, 132:18, 133:11, 133:13, 135:6, 135:9, 135:16
**shouldered** [1] - 134:17
**show** [3] - 13:21, 18:14, 58:10
**showing** [2] - 43:16, 92:8
**shown** [7] - 14:12, 119:21, 121:12, 121:15, 121:17, 121:20, 121:23
**shy** [1] - 137:1
**side** [13] - 85:17, 85:25, 96:9, 101:16, 101:18, 101:19, 102:3, 102:5, 102:6, 110:15, 128:2, 128:17, 128:18
**sight** [1] - 89:17
**signature** [1] - 15:3
**signed** [6] - 15:3, 26:11, 28:3, 28:19, 37:22, 73:19
**significant** [3] - 8:12, 42:9, 137:22
**signifying** [1] - 53:15
**similar** [2] - 119:8, 139:19
**simple** [3] - 102:24, 110:12,

111:7
**sit** [3] - 22:13, 90:9, 109:5
**site** [4] - 62:14, 63:12, 66:18, 67:3
**sitting** [1] - 17:4
**situation** [4] - 32:20, 67:18, 99:21, 126:6
**six** [9] - 19:21, 42:3, 55:3, 55:7, 56:11, 105:13, 106:1, 117:25, 118:11
**Slatten** [11] - 1:13, 2:19, 67:7, 67:9, 67:18, 67:21, 68:1, 68:5, 68:11, 68:18, 137:2
**sleep** [2] - 71:22, 77:15
**slightly** [2] - 102:10, 104:1
**Slough** [5] - 1:6, 2:7, 83:5, 124:24, 133:4
**slow** [1] - 129:22
**slowing** [7] - 91:20, 98:17, 98:19, 98:21, 99:5, 99:14, 99:20
**slurs** [1] - 54:14
**sniper** [6] - 53:4, 62:10, 65:4, 65:16, 67:6, 68:8
**soldiers** [1] - 69:14
**solely** [1] - 29:9
**someone** [2] - 68:11, 78:21
**sometime** [5] - 38:7, 61:19, 78:21, 81:2, 112:6
**sometimes** [2] - 53:6, 53:20
**somewhere** [10] - 22:25, 85:11, 85:12, 114:22, 117:25, 124:2, 133:14, 133:21, 134:2, 135:2
**soon** [2] - 44:19, 76:12
**sorry** [26] - 11:7, 13:13, 18:23, 24:24, 26:21, 26:22, 30:7, 30:17, 34:9, 35:14, 48:1, 48:22, 49:4, 61:14, 75:14, 76:8, 77:12, 93:1, 93:21, 96:8, 97:5, 97:11, 103:1, 113:14, 133:7, 135:24
**sort** [5] - 51:4, 56:7, 59:3, 102:1, 137:18
**sound** [3] - 93:23, 94:8, 136:13
**sounded** [1] - 82:22
**sounds** [10] - 10:21, 38:9, 43:24, 66:5, 66:23, 67:16, 79:9, 79:25, 81:4, 122:18
**south** [9] - 60:16, 94:9, 118:22, 119:13, 122:9, 122:13, 123:4, 124:2, 131:7
**South** [1] - 2:17
**southeast** [3] - 81:14, 116:25, 120:1
**southern** [1] - 82:3

**southwest** [2] - 8:1, 37:8
**speaking** [2] - 130:20, 137:16
**specific** [2] - 41:17, 51:22
**specifically** [8] - 32:15, 39:5, 43:5, 44:13, 44:14, 61:2, 63:17, 107:20
**specifics** [1] - 15:16
**speculate** [2] - 11:10, 90:10
**speed** [17] - 86:13, 86:25, 87:3, 87:16, 87:25, 88:4, 88:15, 90:7, 90:22, 90:23, 91:7, 91:15, 91:18, 94:17, 97:21, 98:1, 116:9
**speeded** [1] - 139:10
**spent** [1] - 121:1
**Square** [26] - 5:18, 6:16, 9:2, 10:1, 16:3, 16:10, 28:15, 37:14, 37:19, 41:25, 45:16, 46:18, 48:6, 48:16, 48:21, 48:25, 55:3, 55:8, 56:4, 56:18, 58:7, 60:7, 66:10, 81:13, 120:1, 125:23
**ss** [1] - 141:1
**standard** [3] - 118:6, 125:13, 128:12
**stands** [1] - 66:4
**start** [13] - 5:14, 26:23, 57:16, 61:6, 81:25, 92:10, 93:19, 103:2, 103:12, 104:12, 106:15, 109:11, 139:6
**started** [5] - 45:15, 49:13, 70:5, 102:9, 133:4
**starting** [3] - 39:7, 75:13, 93:23
**stash** [1] - 76:7
**state** [1] - 51:25
**State** [7] - 48:9, 48:12, 48:14, 74:12, 74:16, 93:12, 95:5
**State's** [1] - 75:6
**statement** [17] - 27:25, 30:11, 30:20, 31:7, 31:20, 33:16, 34:5, 34:6, 39:16, 48:8, 48:11, 88:3, 92:23, 93:12, 94:1, 94:5, 94:7
**statements** [8] - 5:25, 27:1, 27:12, 28:12, 28:20, 28:24, 45:9, 98:14
**STATES** [6] - 1:1, 1:3, 1:10, 1:18, 2:4, 141:1
**States** [10] - 16:21, 18:10, 18:13, 18:18, 18:24, 27:9, 29:4, 72:23, 72:24, 141:15
**station** [1] - 135:13
**stayed** [1] - 49:20
**Stebbing** [4] - 58:14, 58:23, 59:9, 59:20
**steel** [1] - 125:8
**stenographic** [1] - 141:9

**step** [1] - 34:24
**steps** [1] - 50:24
**STEPTOE** [1] - 2:9
**Steven** [1] - 2:19
**still** [10] - 35:23, 36:3, 36:8, 100:21, 102:20, 103:13, 103:23, 114:25, 127:9, 133:11
**stipulation** [2] - 18:9, 137:18
**stomach** [2] - 65:5, 65:20
**stood** [1] - 134:14
**stop** [24] - 50:25, 70:9, 92:16, 94:13, 95:6, 95:7, 95:15, 99:21, 100:4, 100:12, 101:7, 107:18, 107:23, 107:25, 113:2, 113:13, 115:7, 115:25, 117:13, 119:15, 119:20, 119:24, 120:22, 122:3
**stopped** [18] - 77:6, 85:25, 86:4, 92:14, 94:11, 100:1, 100:7, 100:8, 100:12, 101:3, 101:6, 113:8, 113:16, 114:9, 114:19, 114:23, 118:20, 123:24
**stopping** [3] - 91:21, 98:13, 98:14
**stops** [2] - 109:21, 109:22
**story** [6] - 41:6, 44:6, 44:16, 47:14, 49:3, 49:6
**strange** [2] - 102:14, 103:13
**strap** [3] - 126:9, 126:11, 126:15
**Strawn** [1] - 5:4
**Street** [3] - 2:5, 2:17, 2:20
**streets** [1] - 62:24
**stressful** [2] - 76:5, 129:24
**strictly** [1] - 75:19
**striking** [1] - 83:23
**struck** [1] - 84:4
**structure** [2] - 117:12, 119:14
**stuff** [1] - 79:10
**subject** [2] - 112:7, 116:8
**subjective** [1] - 35:15
**submit** [1] - 21:9
**submitted** [1] - 94:1
**submitting** [1] - 21:9
**subsequently** [1] - 132:19
**substance** [3] - 72:18, 72:21, 120:19
**substances** [3] - 73:14, 74:14, 75:19
**substantial** [6] - 21:5, 23:17, 24:21, 24:25, 25:3, 65:19
**Suburban** [1] - 37:4
**suburban** [1] - 118:17
**succession** [1] - 111:20
**suffered** [1] - 65:19
**suggest** [1] - 126:2

**suicide** [4] - 50:19, 97:22, 98:2, 130:8
**Suite** [3] - 2:13, 2:17, 2:20
**Sullivan** [1] - 5:5
**summarizing** [1] - 71:10
**summer** [1] - 4:16
**supervised** [1] - 17:20
**support** [5] - 30:10, 32:5, 35:16, 44:16, 138:22
**supported** [1] - 31:7
**supposedly** [1] - 43:7
**surrendered** [1] - 12:12
**surveillance** [1] - 80:12
**suspect** [1] - 68:2
**suspected** [2] - 10:15, 51:23
**sustained** [3] - 6:6, 30:14, 36:1
**switch** [2] - 70:19, 84:20
**swiveled** [1] - 84:15
**swiveling** [2] - 128:4, 130:13
**sworn** [5] - 48:8, 48:11, 89:4, 93:12, 94:1
**system** [1] - 14:6

---

# T

**table** [1] - 29:7
**tactical** [1] - 49:23
**talks** [2] - 16:18, 75:10
**tanks** [4] - 69:6, 69:10, 69:14, 69:24
**target** [2] - 14:19, 67:23
**targets** [7] - 7:6, 7:11, 7:18, 8:9, 29:25, 123:10
**team** [29] - 49:16, 49:20, 61:22, 62:3, 62:5, 62:13, 62:19, 63:7, 63:10, 66:5, 66:6, 66:13, 67:6, 67:21, 67:24, 68:3, 68:12, 68:21, 78:10, 79:4, 79:8, 79:12, 81:8, 96:23, 96:25, 128:16, 137:21, 138:9
**team's** [2] - 68:15, 79:17
**teammates** [4] - 8:23, 9:12, 9:22, 10:5
**teams** [4] - 49:23, 49:25, 50:1, 50:5
**tear** [3] - 43:14, 44:1, 45:5
**technical** [2] - 11:6, 11:8
**ten** [5] - 17:17, 24:1, 24:3, 24:6, 24:7
**tenure** [2] - 49:21, 50:21
**term** [7] - 17:20, 20:6, 54:6, 54:10, 54:22, 54:23, 83:16
**terms** [6] - 30:16, 80:20, 84:3, 109:20, 130:18, 139:5
**terrorist** [1] - 53:14
**testified** [36] - 24:7, 25:13, 36:17, 37:4, 38:7, 42:22,

43:17, 43:22, 54:6, 67:3, 67:9, 76:19, 81:13, 87:14, 87:24, 100:11, 100:18, 101:12, 102:16, 104:19, 106:20, 108:16, 111:10, 111:25, 112:3, 115:6, 121:21, 122:8, 123:3, 123:13, 124:1, 125:2, 129:20, 130:23, 134:11, 135:19
**testifies** [1] - 138:10
**testify** [6] - 20:22, 42:13, 69:24, 111:2, 138:11, 138:17
**testifying** [5] - 20:25, 42:3, 77:24, 104:5, 138:24
**testimony** [42] - 21:7, 21:8, 24:9, 24:16, 40:5, 40:9, 40:14, 40:16, 42:24, 43:4, 43:15, 45:1, 46:24, 47:6, 47:24, 48:3, 64:25, 65:25, 69:22, 70:2, 77:7, 77:16, 77:21, 87:17, 88:18, 89:5, 89:14, 91:4, 96:15, 97:6, 100:3, 100:13, 101:5, 102:8, 104:2, 106:1, 107:13, 109:10, 110:25, 111:23, 115:15, 131:15
**testing** [1] - 138:4
**text** [1] - 58:11
**THE** [44] - 1:1, 1:1, 1:10, 1:18, 4:2, 4:11, 6:6, 11:17, 13:18, 14:9, 30:14, 32:10, 33:21, 33:25, 34:2, 34:15, 34:16, 36:1, 39:17, 55:20, 57:13, 58:19, 70:9, 74:25, 75:2, 89:2, 96:13, 103:6, 104:16, 109:16, 114:3, 136:9, 136:20, 136:23, 137:2, 137:4, 137:8, 138:6, 139:10, 139:22, 140:4, 140:7, 140:12, 141:2
**themselves** [2] - 53:21, 125:7
**thereafter** [2] - 49:18, 49:20
**therefore** [1] - 91:16
**thereto** [1] - 50:15
**they've** [2] - 21:21, 138:16
**third** [1] - 124:19
**Thomas** [1] - 2:19
**thoughts** [1] - 102:20
**threat** [30] - 4:23, 50:18, 50:22, 50:23, 50:25, 52:4, 53:8, 87:10, 91:9, 91:11, 91:15, 91:23, 92:2, 93:12, 94:23, 95:6, 95:16, 95:21, 96:16, 96:21, 97:9, 97:13, 97:22, 98:2, 98:7, 99:13, 99:19, 107:18, 107:24, 107:25

**threatened** [1] - 4:20
**threatening** [2] - 60:3, 92:14
**threats** [5] - 7:12, 52:22, 119:3, 127:21, 128:13
**three** [13] - 7:18, 58:6, 60:6, 67:10, 67:14, 85:11, 107:5, 112:1, 112:2, 117:21, 117:22, 118:7, 118:8
**threw** [1] - 110:24
**throughout** [1] - 40:9
**throw** [1] - 51:6
**Thursday** [1] - 136:20
**Timothy** [1] - 138:1
**to/from** [1] - 55:24
**today** [18] - 17:4, 20:25, 24:9, 26:14, 38:1, 76:20, 78:2, 91:2, 95:2, 95:16, 106:9, 106:13, 108:16, 111:4, 111:23, 112:3, 119:24, 121:13
**together** [3] - 15:2, 18:1, 97:2
**Tom** [1] - 138:1
**took** [17] - 6:13, 9:14, 70:23, 71:1, 71:3, 71:18, 71:24, 72:1, 72:5, 77:10, 77:13, 77:15, 77:17, 77:25, 79:20
**top** [9] - 17:13, 18:4, 18:16, 26:19, 32:3, 52:5, 55:16, 56:8, 57:4
**topic** [4] - 37:14, 50:14, 86:10, 95:19
**tore** [2] - 46:12, 46:16
**tow** [10] - 123:19, 124:7, 125:4, 125:11, 125:16, 126:9, 126:11, 126:15, 126:18, 126:23
**tow-out** [1] - 125:4
**toward** [8] - 53:25, 59:5, 83:20, 94:10, 94:20, 102:9, 102:12, 135:3
**towards** [8] - 54:14, 90:8, 90:9, 94:10, 94:11, 130:16, 139:16
**towed** [3] - 123:14, 126:19, 127:1
**towing** [2] - 126:4, 131:4
**town** [1] - 139:4
**traditional** [1] - 101:23
**traffic** [28] - 8:1, 8:5, 81:18, 82:6, 85:25, 92:12, 94:9, 100:18, 101:17, 106:15, 111:11, 116:25, 117:7, 118:23, 123:14, 126:20, 127:4, 127:15, 127:16, 127:22, 128:15, 128:17, 129:7, 129:15, 129:18, 129:20, 130:24, 131:3
**trained** [5] - 50:17, 97:20, 107:16, 107:19, 107:20

**training** [6] - 51:22, 52:1, 94:22, 97:25, 118:11, 125:11
**transcript** [7] - 39:4, 43:10, 88:18, 96:2, 104:10, 141:9, 141:10
**TRANSCRIPT** [1] - 1:17
**transitioned** [1] - 117:15
**transpired** [1] - 9:23
**transport** [2] - 63:18, 63:25
**transported** [2] - 12:10, 66:17
**traveled** [7] - 113:11, 113:16, 115:24, 116:14, 127:15, 129:15, 136:4
**traveling** [13] - 89:17, 89:20, 90:12, 90:13, 90:19, 90:21, 91:13, 91:17, 128:1, 128:23, 130:4, 130:10
**treat** [2] - 73:3, 73:9
**tremendous** [1] - 63:8
**trial** [4] - 23:10, 23:14, 24:11, 83:14
**TRIAL** [1] - 1:17
**tried** [4] - 23:16, 53:17, 53:20, 134:14
**trip** [1] - 80:8
**trouble** [1] - 97:4
**true** [24] - 11:5, 30:9, 39:23, 56:14, 56:21, 62:22, 63:22, 67:21, 68:1, 68:18, 87:21, 87:25, 92:21, 92:25, 93:5, 94:5, 94:13, 94:15, 94:16, 95:8, 123:9, 131:19, 141:8, 141:9
**truth** [19] - 23:18, 25:14, 26:16, 43:12, 44:9, 44:18, 48:5, 48:8, 48:11, 48:15, 48:19, 48:23, 49:2, 49:5, 49:8, 103:18, 105:23, 105:24, 115:20
**truthful** [2] - 21:7, 115:15
**truthfully** [3] - 25:25, 26:3, 42:13
**try** [2] - 60:4, 93:17
**trying** [7] - 24:4, 59:10, 97:4, 100:9, 107:8, 110:16, 139:2
**tuned** [1] - 81:5
**turn** [6] - 75:4, 78:4, 84:21, 88:20, 96:3, 109:11
**turned** [6] - 83:2, 83:19, 84:7, 84:23, 85:24, 97:3
**turns** [1] - 22:19
**turret** [10] - 78:12, 79:21, 80:22, 124:12, 124:21, 124:22, 127:24, 128:8, 128:11, 130:19
**tweet** [1] - 136:12
**Twitter** [1] - 136:11

**two** [42] - 15:17, 16:5, 16:11, 16:12, 28:7, 29:18, 30:3, 31:13, 33:14, 34:8, 34:25, 35:20, 36:4, 36:7, 45:16, 67:10, 67:14, 73:10, 85:2, 85:6, 89:21, 89:22, 89:25, 90:3, 90:5, 90:19, 91:3, 97:1, 101:9, 106:8, 112:13, 112:16, 118:7, 120:14, 122:17, 124:2, 124:8, 127:19, 131:8, 132:9, 132:11, 133:2
**Tyler** [1] - 137:12
**type** [4] - 61:10, 80:15, 101:23, 114:18
**typical** [1] - 50:4
**typically** [4] - 50:7, 65:11, 65:12, 128:14

## U

**U.S** [2] - 1:23, 14:18
**ultimately** [1] - 10:18
**unambiguously** [1] - 5:22
**uncomfortable** [1] - 91:14
**under** [26] - 11:10, 12:6, 26:16, 27:13, 27:20, 28:25, 29:4, 33:7, 52:4, 62:16, 63:7, 74:22, 87:19, 87:24, 89:11, 90:15, 90:21, 94:4, 100:11, 102:16, 104:5, 104:19, 106:2, 111:2, 111:6, 115:7
**understandably** [1] - 30:8
**understood** [19] - 26:14, 28:3, 28:18, 31:9, 35:4, 35:8, 43:21, 45:12, 46:7, 46:12, 46:16, 47:19, 66:20, 87:5, 101:1, 122:1, 123:2, 131:15
**undoing** [1] - 126:11
**uniform** [2] - 101:13, 101:16
**uniformed** [1] - 101:17
**uniforms** [2] - 53:14, 53:21
**United** [10] - 16:21, 18:10, 18:13, 18:17, 18:24, 27:9, 29:4, 72:23, 72:24, 141:15
**UNITED** [6] - 1:1, 1:3, 1:10, 1:18, 2:4, 141:1
**unless** [1] - 125:21
**unpack** [1] - 27:19
**unredacted** [1] - 5:14
**unrelated** [1] - 59:4
**unsafe** [2] - 97:21, 98:1
**unusual** [1] - 63:2
**unwilling** [1] - 111:4
**up** [56] - 4:14, 13:21, 17:13, 18:15, 29:9, 31:2, 31:25, 32:3, 36:25, 39:9, 43:14, 44:1, 45:5, 46:12, 46:16,

49:12, 55:3, 55:7, 55:15, 56:17, 57:3, 58:3, 58:15, 61:1, 64:10, 66:9, 67:4, 71:7, 76:12, 77:10, 78:25, 81:3, 81:17, 81:20, 81:22, 82:3, 85:20, 93:20, 100:18, 104:12, 106:25, 117:3, 123:19, 124:7, 125:3, 125:8, 126:9, 126:10, 126:15, 126:18, 127:3, 128:20, 134:14, 134:18, 138:16, 139:10
**Urbina** [2] - 15:11, 15:12
**utterly** [1] - 125:24

## V

**valid** [2] - 70:24, 73:15
**Valium** [4] - 71:1, 72:17, 74:9, 76:16
**variety** [1] - 76:20
**various** [3] - 50:24, 68:22, 80:15
**VBIED** [4] - 50:19, 50:25, 51:23, 130:8
**VBIEDs** [3] - 50:21, 52:1, 53:2
**vehicle** [89] - 50:12, 51:14, 52:2, 78:13, 79:20, 83:11, 83:13, 83:24, 84:1, 84:2, 84:4, 87:3, 87:4, 87:8, 87:9, 87:11, 87:22, 91:16, 91:18, 91:20, 94:11, 94:18, 96:24, 97:20, 98:1, 98:12, 98:13, 98:17, 99:15, 100:8, 100:10, 100:12, 100:17, 102:3, 102:20, 103:13, 103:23, 104:20, 104:21, 104:24, 105:8, 105:10, 105:14, 106:4, 107:10, 109:21, 109:22, 112:21, 114:14, 114:16, 114:18, 117:6, 118:15, 123:13, 123:14, 124:12, 124:15, 124:18, 124:19, 124:22, 124:23, 125:12, 125:15, 125:16, 125:19, 125:24, 126:3, 126:12, 126:15, 126:19, 126:20, 126:22, 126:25, 127:1, 127:8, 127:9, 127:18, 127:25, 128:6, 128:11, 131:4, 132:19, 136:1, 136:2, 137:17
**vehicle's** [1] - 87:2
**vehicles** [23] - 63:25, 64:19, 66:17, 79:10, 79:15, 81:17, 86:4, 87:6, 91:16, 92:15, 94:10, 94:19, 118:22, 125:3, 125:7, 125:11,

16

126:4, 126:9, 126:22, 127:19, 130:1, 130:5, 136:5
**venue** [1] - 79:5
**verbal** [1] - 51:4
**version** [2] - 47:16, 47:19
**vest** [1] - 80:17
**vicinity** [3] - 22:25, 120:1, 122:6
**Vicki** [1] - 1:22
**VICKI** [1] - 141:7
**view** [5] - 91:15, 124:23, 124:24, 125:1, 127:7
**violate** [1] - 75:22
**violated** [2] - 73:23, 74:6
**visited** [1] - 72:14
**voluntarily** [2] - 13:10, 13:22
**voluntary** [3] - 15:20, 17:16, 19:11
**vs** [2] - 1:5, 1:12
**vu** [1] - 139:8

## W

**wagon** [1] - 135:13
**wake** [1] - 78:25
**wall** [2] - 125:8, 135:3
**wants** [2] - 140:3, 140:12
**warning** [2] - 51:4, 107:21
**warnings** [1] - 92:15
**warrant** [1] - 12:13
**warranted** [1] - 52:6
**Washington** [12] - 1:24, 2:6, 2:10, 2:14, 2:17, 2:21, 11:12, 11:14, 11:19, 12:4, 132:5, 141:16
**water** [4] - 6:23, 31:2, 31:3, 51:6
**Watson** [2] - 112:7, 112:10
**weapon** [17] - 67:22, 67:23, 68:2, 68:9, 68:12, 68:19, 83:6, 83:25, 85:5, 117:18, 122:9, 122:11, 130:24, 134:15, 134:18, 134:24
**weapons** [4] - 7:3, 65:17, 80:20, 124:6
**wear** [2] - 53:14, 80:13
**wearing** [2] - 53:21, 101:21
**Wednesday** [1] - 57:17
**week** [16] - 56:4, 58:15, 60:7, 61:22, 66:9, 136:21, 138:5, 139:1, 139:9, 139:12, 139:13, 139:16
**weekend** [1] - 136:14
**weeks** [6] - 10:18, 10:20, 10:22, 15:5, 30:2, 58:7
**weird** [1] - 102:21
**Wellbutrin** [7] - 76:22, 77:4, 77:11, 77:16, 77:17, 77:18, 77:25

**west** [4] - 128:17, 128:18, 129:2, 133:21
**westerly** [1] - 133:15
**whatsoever** [2] - 45:16, 46:3
**white** [66] - 7:23, 8:4, 15:23, 16:2, 29:20, 29:21, 32:16, 32:23, 33:4, 33:5, 83:11, 83:14, 83:19, 84:8, 84:9, 84:12, 85:2, 85:8, 85:18, 85:21, 86:3, 86:6, 86:9, 86:24, 87:15, 89:20, 91:6, 91:9, 91:10, 91:23, 92:2, 92:13, 93:11, 94:8, 94:18, 95:21, 96:18, 98:6, 99:1, 99:4, 100:1, 100:3, 101:7, 102:9, 102:12, 103:9, 106:9, 106:12, 107:2, 108:5, 108:8, 108:24, 109:21, 110:15, 111:21, 112:23, 113:15, 115:24, 116:22, 123:22, 131:14, 131:16, 131:21, 132:20, 135:13
**whole** [4] - 22:19, 22:20, 55:24, 116:8
**whoop** [1] - 128:23
**whoops** [1] - 129:5
**William** [2] - 2:12, 5:5
**willing** [1] - 6:2
**WILTSHIRE** [1] - 2:20
**window** [4] - 95:5, 95:10, 103:24, 112:22
**windshield** [1] - 85:18
**Winston** [1] - 5:4
**wire** [1] - 80:11
**wise** [2] - 94:17, 110:1
**withdraw** [2] - 27:16, 28:5
**withheld** [5] - 36:21, 36:24, 37:9, 41:15, 41:19
**withhold** [1] - 26:7
**WITNESS** [1] - 34:15
**witness** [14] - 4:14, 8:17, 8:23, 32:1, 39:2, 55:16, 58:9, 71:7, 74:20, 88:17, 96:2, 109:9, 131:24, 138:11
**witnesses** [4] - 137:15, 139:3, 139:6, 139:18
**word** [6] - 54:17, 60:10, 99:5, 123:7, 123:8
**words** [4] - 37:17, 110:7, 128:19, 128:22
**wore** [1] - 80:18
**world** [1] - 90:12
**worse** [3] - 55:5, 55:9, 56:10
**worst** [1] - 17:24
**wounding** [1] - 16:2
**write** [1] - 57:18
**written** [1] - 14:21
**wrongdoing** [1] - 29:14

**wrote** [8] - 4:23, 5:17, 56:8, 58:1, 59:3, 59:9, 59:20, 92:11

## X

**Xanax** [5] - 76:24, 77:4, 77:11, 77:12, 78:1
**XIV** [1] - 75:8

## Y

**y'all** [1] - 136:13
**year** [6] - 38:10, 42:19, 89:5, 104:6, 106:1, 114:6
**Year's** [1] - 61:19
**years** [7] - 17:17, 17:22, 18:1, 19:21, 22:21, 132:25, 133:1
**yesterday** [27] - 36:17, 43:5, 43:15, 43:18, 43:20, 43:23, 53:24, 61:3, 61:9, 63:15, 64:16, 67:19, 74:17, 74:23, 75:5, 76:19, 77:7, 77:17, 77:21, 77:23, 86:11, 86:17, 86:19, 98:15, 100:6, 101:5, 107:13
**yesterday's** [1] - 77:16
**yesterdays** [1] - 43:10
**yourself** [5] - 12:17, 35:12, 40:24, 131:14, 132:11

## Z

**Zone** [15] - 50:2, 52:10, 52:15, 52:22, 53:9, 62:7, 63:19, 64:8, 66:22, 80:2, 80:18, 125:23, 126:3, 130:5
**zoomed** [1] - 120:21
**zoomed-in** [1] - 120:21