IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA


THE UNITED STATES OF AMERICA,)
                             )
               Plaintiff,    )
                             )
vs.                          )          File No:  CR 08-360
                             )
Paul Alvin Slough,           )
Evan Shawn Liberty,          )
Dustin Laurent Heard,        )
                             )
               Defendants.   )          Date:  August 4, 2014
                                        Time:  2:04 p.m.

-----------------------------          DAY 32 - P.M. Session

THE UNITED STATES OF AMERICA,)
                             )
               Plaintiff,    )
                             )          File No:  CR 14-107
Vs.                          )
                             )
Nicholas Abram Slatten,      )
                             )
               Defendant.    )

_____


                      TRANSCRIPT OF JURY TRIAL
                           HELD BEFORE
                 THE HONORABLE ROYCE C. LAMBERTH
                   UNITED STATES DISTRICT JUDGE

_____




Court Reporter:              Vicki Eastvold, RMR, CRR
                             Official Court Reporter
                             U.S. Courthouse, Room 6722
                             333 Constitution Avenue, NW
                             Washington, DC  20001
                             202-354-3242

```
 1      APPEARANCES:

 2
        For the Plaintiff:      Mr. Anthony Asuncion
 3                              Mr. John Crabb, Jr.
                                Mr. T. Patrick Martin
 4                              Mr. Christopher R. Kavanaugh
                                UNITED STATES ATTORNEY'S OFFICE
 5                              Criminal Division
                                555 Fourth Street, NW
 6                              Washington, DC   20530

 7
        For Defendant Slough:   Mr. Brian M. Heberlig
 8                              Ms. Linda C. Bailey
                                Mr. Michael J. Baratz
 9                              Mr. Scott P. Armstrong
                                STEPTOE & JOHNSON, LLP
10                              1330 Connecticut Avenue, NW
                                Washington, DC   20036
11

12      For Defendant Liberty:  Mr. William F. Coffield, IV
                                COFFIELD LAW GROUP, LLP
13                              1330 Connecticut Avenue, NW
                                Suite 220
14                              Washington, DC   20036

15
        For Defendant Heard:    Mr. David Schertler
16                              Ms. Janet Foster
                                SCHERTLER & ONORATO, LLP
17                              575 7th Street, NW, Suite 300 South
                                Washington, DC   20004
18

19      For Defendant Slatten:  Mr. Thomas G. Connolly
                                Mr. Steven A. Fredley
20                              HARRIS, WILTSHIRE & GRANNIS, LLP
                                1200 18th Street, NW, Suite 1200
21                              Washington, DC   20036

22

23

24

25
```

1

                              I N D E X

2

3

4     JEREMY RIDGEWAY

           (*Continuing*) Cross-Examination by Mr. Schertler.....   4
5           Cross-Examination by Mr. Connolly...................  55
           Redirect Examination by Mr. Asuncion...............  82
6
      JEREMY KRUEGER
7           Direct Examination by Mr. Martin................... 114

8     Record Made.......................................... 137

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Upon resuming at 2:03 p.m., out of the presence

2       of the jury.)

3              MR. SCHERTLER:  Your Honor, I apologize.  I think

4       my cross was a little longer than I had predicted last week.

5              MR. ASUNCION:  Your Honor, if I may, I will note

6       that Jessica Moffett (sp), a paralegal with our office, is

7       now sitting at counsel table to assist.

8              THE COURT:  All right.

9

10             (NOTE:  The jury entering the courtroom at

11      2:05 p.m.)

12             THE COURT:  All right.  Mr. Schertler, you may

13      proceed with your cross-examination.

14             MR. SCHERTLER:  Thank you, Your Honor.  Could I

15      ask the clerk -- have we switched to the Elmo?  And this is

16      for the witness only, please.

17             And Your Honor, this is Defense Exhibit 2270 which

18      I have given a copy to Mr. Asuncion.

19      BY MR. SCHERTLER:

20      Q.  Mr. Ridgeway, good afternoon.

21      A.  Good afternoon, sir.

22      Q.  I want to just pick up where we left off and recap some

23      of the things we were talking about.  We were talking about

24      that meeting you had with the prosecutors on October 30 of

25      2008, correct?

1   A.   Yes, sir.

2   Q.   And we've also discussed the fact that 19 days later,

3   November 18 of 2008, you signed a guilty plea, correct?

4   A.   Yes, sir.

5   Q.   Okay.  If you'll work with me, do you see -- do you have

6   this exhibit in front of you?

7   A.   Yes, sir.

8   Q.   And at the top of it, it's got August 14, 2008.  That's

9   the date that Mr. Sullivan sent a letter to the prosecutors,

10  correct?

11  A.   I believe that's the date.

12  Q.   And that's the letter that said you acted honorably and

13  did nothing wrong, correct?

14  A.   Yes, sir.

15  Q.   Then October 30, 2008, this is the meeting we've been

16  talking about, one of the first meetings you had with

17  prosecutors, correct?

18  A.   I believe so.

19  Q.   Just to summarize, it's the meeting where you go in and

20  you tell them that you committed no crime and you did

21  nothing wrong, correct?

22  A.   That's right.

23  Q.   And before we broke, you said that as of October 30 you

24  felt remorse, correct?

25  A.   Yes.

1    Q.  And you felt guilt.  And in fact, the remorse and guilt

2    started the same day as the incident on September 16, right?

3    A.  Yes.

4    Q.  And you also had always been thinking about your family

5    from day one, correct?

6    A.  Yes.

7    Q.  And then you said close to that day, but before it, you

8    had the need to tell your story.  Correct?

9    A.  Yes.

10   Q.  So those four things existed on October 30 of 2008,

11   correct?

12   A.  Yes, sir.

13   Q.  And those, according to your testimony from last

14   Wednesday, those are the reasons that you pled guilty,

15   correct?

16   A.  Yes, sir.

17   Q.  So if I go here to November 18, the date of your guilty

18   plea, you have remorse, correct?  You have guilt, correct?

19   A.  Yes, sir.

20   Q.  Family's still a consideration, correct?

21   A.  Yes, sir.

22   Q.  And still need to tell your story.  Right?

23   A.  Yes, sir.

24          MR. SCHERTLER:  Your Honor, I'd like to

25   introduce --

1    BY MR. SCHERTLER:

2    Q.  And this is an accurate -- have I depicted this

3    accurately in terms of what you were feeling at different

4    times?

5    A.  Yes, sir.

6              MR. SCHERTLER:  Your Honor, I'd like to introduce

7    Defense Exhibit 2270 into evidence.

8              MR. ASUNCION:  No objection, Your Honor.

9              MR. SCHERTLER:  And publish it to the jury.

10             THE COURT:  Received.

11             (Exhibit 2270 received into evidence.)

12   BY MR. SCHERTLER:

13   Q.  All four of those things exist on October 30, 2008,

14   correct?

15   A.  Yes, sir.

16   Q.  All the reasons why you wanted to plead guilty.

17   A.  Yes, sir.

18   Q.  But on October 30, 2008, instead of pleading guilty you

19   go in and say, You don't charge me, I didn't do anything

20   wrong, I'm innocent.  All my shots were justified.  Correct?

21   A.  Yes, sir.

22   Q.  And nothing changes in terms of the reasons you plead

23   guilty between October 30 and November 18, in those 19 days,

24   right?

25   A.  Correct.

1    Q.   They all exist.

2    A.   Correct.

3    Q.   So if we go -- if we look at those 19 days between

4    October 30 and November 18, less than three weeks, there's

5    only one thing that really changes in that time period,

6    correct?

7    A.   Pardon me?

8    Q.   Okay.  Let me ask you this:  After October 30 when you,

9    Mr. Sullivan, went in and told prosecutors that you were

10   justified in your shooting and you had committed no crimes

11   and you shouldn't be charged, but you would be happy to be a

12   witness for the government, right?

13   A.   I don't remember saying that we were -- be happy to be a

14   witness.

15   Q.   Oh, wasn't that part of the deal?  That you were going

16   to go in and if they needed you as a witness you'd be a

17   witness for them?

18   A.   I think whatever -- it depended on what was worked out

19   that day.

20   Q.   Okay.  But the idea is on that day you tell them:  Don't

21   charge me.  I did nothing wrong.  Correct?

22   A.   Yes, sir.

23   Q.   Now, that's October 30.  Let's say October 31,

24   Halloween, they -- Mr. Kohl, the prosecutor, got on the line

25   to you and your lawyer and said, You know what, Mr. Ridgeway

1      Mr. Sullivan?  We think that Mr. Ridgeway was telling the

2      truth.  We don't think he did anything wrong and we're not

3      going to charge him.

4                You'd have been thrilled.  Right?

5      A.  Yes, sir.

6      Q.  And you wouldn't have pled guilty, would you?

7      A.  No, sir.

8      Q.  If they had come back and said, We believe you and we're

9      not going to charge you, you would have been -- that would

10     have been a great result, right?

11     A.  Yes, sir.

12     Q.  And you would have gone happily on with your life,

13     correct?

14     A.  No, sir.

15     Q.  The remorse -- but none of that remorse, none of that

16     guilt, none of that need to tell your story, and your

17     family, that wouldn't have caused you, if the prosecutors

18     weren't going to prosecute you and thought you were -- your

19     lies were the truth, that wasn't going to cause you to go in

20     there and say, You know, fellas, I know you're not going to

21     prosecute me but I want to plead guilty anyway.

22                You weren't going to do that.

23     A.  At the time I probably wasn't, sir.  A lot's transpired

24     since then.  I've changed as a person.  So, yeah.

25     Q.  You weren't -- if the prosecutors bought your story,

1    there's no way you would have ever pled guilty in this case,

2    correct?

3    A.  I couldn't say, sir.

4    Q.  Are you serious?

5    A.  Yes, sir, I am.

6    Q.  If the prosecutors told you within days of your meeting

7    on October 30 that we believe you and we won't charge you,

8    you're telling us that you would have walked in sometime

9    later and pled guilty?

10   A.  I don't know, sir.  I have a lot of guilt for what I

11   did.  I feel terrible about what I did.  I feel terrible

12   about what happened that day, what others did, and I -- and

13   I've changed as a person.

14   Q.  You would have lived with that guilt --

15           MR. ASUNCION:  We would ask counsel to allow the

16   witness not only to finish the question, but continuing on

17   to provide his complete response before going on.

18   BY MR. SCHERTLER:

19   Q.  Okay.  The truth is that what happens in those 19 days

20   is that the prosecutors don't call you and say, We believe

21   you, do they?

22   A.  No, sir, they don't.

23   Q.  In fact, they do the exact opposite, don't they?

24   A.  Yes, sir.

25   Q.  They call you and they say that, We don't buy what

1    you're telling us when you say you're innocent.  Right?

2    A.  Pretty much, sir.

3    Q.  They said, No matter what you've told us, Mr. Ridgeway,

4    no matter how you have tried to justify how you shot, we

5    just don't buy it.  Right?

6    A.  Yes, sir.

7    Q.  And if you continue to say that you're innocent and that

8    you committed no crimes in Nisur Square, what's going to

9    happen is that you're going to be indicted along with these

10   other men and charged with all kinds of crimes.  Correct?

11   A.  I don't remember them saying it, but that was my

12   understanding.

13   Q.  That was your understanding, right?

14   A.  Yes, sir.

15   Q.  So the one thing that changes -- you got remorse, guilt,

16   family, need to tell the story, none of that changed.  One

17   thing that changed is between October 30 and November 18 is

18   the prosecutors tell you they are not buying your story and

19   you will be indicted.  Correct?

20   A.  Yes, sir.

21   Q.  Now, that's why you pled guilty.

22   A.  Pardon me, sir?

23   Q.  That's why you pled guilty.

24   A.  I pled guilty because I am guilty.

25   Q.  None of those things between October 30 and November 18

1    changed, right?

2    A.  I felt remorse, I felt guilt, I love my family.

3    Q.  Yup, you felt that on October 30 when you lied and said

4    you were innocent.  You felt that on November 18 when you

5    pled guilty.  The only thing that changed is that you're

6    looking at some serious charges if you don't change,

7    correct?

8    A.  If I don't tell the truth.  That's right, sir.

9    Q.  Oh, tell the truth.  Okay.  Well, we'll talk about that

10   in a minute, too.

11              MR. ASUNCION:  Objection, Your Honor.

12              THE COURT:  Sustained.

13   BY MR. SCHERTLER:

14   Q.  You knew -- this is for the witness only, Defense

15   Exhibit 2271.  This is just another chart to kind of help

16   us.  I think Mr. Asuncion has a copy of this.

17              So, sir, let me just walk you through this chart.

18   Before you entered your plea agreement with the government,

19   you knew that the government could charge you with up to 14

20   counts of voluntary manslaughter, just like they've charged

21   these men in this case, correct?

22   A.  Yes, sir.

23   Q.  And each count of that voluntary manslaughter carries up

24   to ten years of incarceration.  Correct?

25   A.  That is my understanding.

1    Q.  And the result you had, third column, your plea

2    agreement with cooperation, is they agreed not to charge you

3    with 13 counts of voluntary manslaughter.  You only need to

4    plead guilty to one, correct?

5    A.  That's correct, sir.

6    Q.  You also knew that they could charge you with 18 counts

7    of attempt to commit manslaughter, correct?  For all the

8    people wounded at Nisur Square.

9    A.  Yes, sir.

10   Q.  And each of those counts carries up to seven years of

11   incarceration, correct?

12   A.  Yes, sir.

13   Q.  And they dropped -- or agreed not to charge you with the

14   17 counts if you pled guilty to just one, correct?

15   A.  They wanted me to plead -- I pled guilty to what I was

16   guilty of.

17   Q.  Oh, we'll talk about that.

18           The government dropped -- agreed not to charge you

19   with 17 counts of attempt to commit manslaughter and only

20   made you plead guilty to one, correct?

21   A.  Yes, sir.

22   Q.  And you -- and if you'll look at this chart with me, the

23   government also agreed that they would not charge you with

24   that mandatory 30-year sentence for using a firearm during

25   the crime of violence.  Do you see that?

```
 1    A.   Yes, sir.

 2    Q.   And they didn't charge you with that, correct?

 3    A.   That's correct.

 4    Q.   So you walked away from that 30-year mandatory.  Based

 5    on your plea.

 6    A.   Is that a question, sir?  I mean, it's a statement.

 7    Q.   It's a question.

 8    A.   Yes, it is.

 9    Q.   You were able to walk away from the 30-year mandatory

10    because you agreed to plead guilty and cooperate, correct?

11    A.   Yes, sir.

12    Q.   So if you look at this chart, Defense Exhibit 2271 which

13    I've just walked through with you, is it an accurate

14    description of the benefits that you obtained as a result of

15    your plea agreement?

16    A.   It seems fairly accurate.

17    Q.   Okay.  And in fact, it recites exactly what I've just

18    told you, correct?

19    A.   Yes, sir.

20              MR. SCHERTLER:  Your Honor, I'd like to introduce

21    Defense Exhibit 2271, publish to the jury just briefly.

22              MR. ASUNCION:  If I could have a moment,

23    Your Honor.

24              (Pause.)

25              MR. ASUNCION:  May we approach, Your Honor?  We're
```

1     going to object.

2                    THE COURT:  Okay.

3

4                    (Discussion at the bench on the record:)

5                    MR. ASUNCION:  Your Honor, we don't believe

6     there's any evidentiary basis for Mr. Schertler to be

7     introducing this chart.  He's already crossed on it.

8                    THE COURT:  It's a demonstrative exhibit, it's not

9     evidence itself.  The objection's sustained.

10                    MR. SCHERTLER:  Yes, sir.

11                    (End of discussion at the bench.)

12

13                    MR. SCHERTLER:  Your Honor, I understand the

14    Court's ruling.  May we just publish it to the jury as a

15    demonstrative exhibit as to what the witness just adopted

16    and testified to?

17                    THE COURT:  You may.  It's demonstrative only.

18                    MR. SCHERTLER:  Yes, sir.

19                    THE COURT:  It's not independent evidence.

20    BY MR. SCHERTLER:

21    Q.  So just to recap, Mr. Ridgeway.  On the left column

22    those are the potential charges you face, correct?  The left

23    column?

24    A.  Yes, sir, I'm just reading them.

25    Q.  Take your time.

1    A.   Thank you.

2              I see them, sir.

3    Q.   The middle column is the maximum sentences that you

4    could face for each of those charges, correct?

5    A.   That's what it says, yes, sir.

6    Q.   And then the right column is the benefit that you

7    obtained as a result of the plea agreement that you entered

8    on November 18, 2008, to plead guilty to two crimes and

9    cooperate with the government, correct?

10   A.   Yes, sir.

11   Q.   Okay.  Thank you.  Now, I just -- I'm not going to try

12   to retrace some of the things that Mr. Heberlig asked you

13   last week.  But, you know, we're talking about -- you talked

14   to Mr. Asuncion about these various charges.  And you

15   understand that you pled -- you pled guilty to two counts,

16   correct?

17   A.   Yes, sir.

18   Q.   One count of voluntary manslaughter, correct?

19   A.   Yes, sir.

20   Q.   And you understand that while there's a ten-year maximum

21   on that voluntary manslaughter charge, the judge also has

22   the discretion to give you probation.  You understand that?

23   He can give you anything from zero to ten?

24   A.   Yes, I understand that.

25   Q.   And the same thing is true with the other count, the

1    second count you pled guilty to of attempt to commit

2    manslaughter.  That even though there's a maximum sentence

3    of seven years, the judge has the discretion to give you

4    probation for that charge, correct?

5    A.  I believe so.

6    Q.  He can give you anywhere from zero to seven on that

7    count, correct?

8    A.  Yes, sir.

9    Q.  And it's not the same case with the third count, the

10   weapons charge, is it?

11   A.  No, sir.

12   Q.  That's a mandatory 30-year jail sentence if you're

13   convicted of using that firearm, correct?

14   A.  Yes, sir.

15   Q.  And the judge has no discretion.  He can't -- no letter,

16   no motion from the government, no pleadings that

17   Mr. Sullivan could file could help you get out from under

18   that 30-year mandatory, right?

19   A.  I believe that's correct.

20   Q.  So -- and did you -- when your -- was the 30-year

21   mandatory -- you said it was a factor, but was that an

22   important thing on your mind when you're trying to decide

23   what to do?

24   A.  Yes, sir.

25   Q.  And did you -- when you thought about it, did you think

1    about what 30 years in jail would be like?

2    A.  Of course.

3    Q.  And did you understand that if you get a 30-year jail

4    sentence in the federal system, that you go to a maximum

5    security jail, not one of those low, medium security

6    prisons?  Do you understand that?

7    A.  No, I didn't know that.

8    Q.  But you knew it wouldn't be a good place, right?

9    A.  Of course.

10   Q.  You're going to spend 30 years possibly in a federal

11   prison.  Correct?

12   A.  Yes, sir.

13   Q.  And that's what you're looking at between October 30 and

14   November 18, right?

15   A.  Yes, sir.

16   Q.  And that -- you were 37 at the time?

17   A.  Yes, sir.

18   Q.  So you wouldn't get out until you were 67?

19   A.  Correct.

20   Q.  Never would have seen your kids.  Correct?

21   A.  Correct.

22   Q.  Probably -- your marriage wouldn't have lasted, would

23   it?

24   A.  Probably not.

25   Q.  I mean, am I understating it if I say that that 30-year

1    mandatory minimum, the possibility of doing that, would

2    destroy -- would do nothing less than destroy your entire

3    life?

4              MR. ASUNCION:  Your Honor, one, it's

5    argumentative.  Two, it's been asked and answered.

6              THE COURT:  Sustained.

7    BY MR. SCHERTLER:

8    Q.  It must have been -- it must have been a horrifying

9    prospect to you, wasn't it?

10             MR. ASUNCION:  I'll make the same objection.

11             THE COURT:  Sustained.

12   BY MR. SCHERTLER:

13   Q.  Have you ever been faced with anything more frightening

14   than looking at a 30-year jail sentence in federal prison?

15   A.  Probably not, sir.

16   Q.  So just, you know, one question.  Prosecutors come in.

17   You go in and you say on October 30, I'm innocent, I'm

18   trying to convince you or persuade you I didn't commit any

19   crimes and I don't want you to charge me with any crimes.

20   Correct?

21   A.  Yes, sir.

22   Q.  And I know I'm repeating a little bit --

23   A.  Yes.

24   Q.  -- and I apologize for that to everybody.  But then they

25   tell you they're going to indict you and it's going to

 1    include this mandatory 30-year charge if you don't enter

 2    into an agreement to plead guilty and cooperate, right?

 3                MR. ASUNCION:  Objection.  Your Honor, I think

 4    that mischaracterizes the prior testimony.

 5                THE COURT:  Sustained.

 6    BY MR. SCHERTLER:

 7    Q.  So -- well, let's do it this way.  You have two options

 8    after the October 30, 2008, meeting.  Would you agree with

 9    me on that?

10    A.  Yes, sir.

11    Q.  The first option would be that you say, Mr. Prosecutors,

12    Mr. FBI Agents, I'm innocent.  I believe I was justified in

13    terms of what I did.  And if you take that option, that's

14    one option you could take, right?  I'm going to maintain my

15    innocence no matter what you prosecutors say.  You could

16    have said that, right?

17    A.  I could have, yes, sir.

18    Q.  And if you do that, their response to your lawyer and

19    you is, Well, that's fine if you want to do that.  But if

20    you do it, we're going to indict you on those 18 counts of

21    attempt to commit manslaughter, 14 counts of voluntary

22    manslaughter, and the 30-year mandatory minimum charge,

23    right?

24                MR. ASUNCION:  Same objection, Your Honor.

25                THE COURT:  Sustained.

1    BY MR. SCHERTLER:

2    Q.  My question is, if you knew that if you maintained your

3    innocence, once the prosecutors told you they didn't buy

4    your story, you were going to face the indictment that we

5    just looked at, correct?

6    A.  Yes.

7    Q.  You would have faced those charges, right?

8    A.  Yes, I suspected.

9    Q.  Okay.  Suspected.  You knew it was coming down.  They

10   told you that they were preparing an indictment, right?

11   A.  I suspected.

12   Q.  So that's option number one.  Right?

13   A.  Yes.

14   Q.  Maintain your innocence, get indicted on all these

15   charges we just talked about, correct?

16   A.  I could have claimed innocence, yes.

17   Q.  And you would have gotten indicted with all the charges

18   that we talked about, correct?

19   A.  More than likely, yes.

20   Q.  Second option.  What did they want you to do?

21   A.  They wanted me to tell the truth.

22   Q.  They wanted you to plead guilty to two counts and they

23   wanted you to cooperate, right?

24   A.  They wanted me to tell the truth.

25   Q.  They wanted you -- okay.  Well, they wanted you to tell

1    the truth.  Whose truth?  Whose truth were you telling?

2              MR. ASUNCION:  Objection, Your Honor.

3              THE COURT:  Sustained.

4    BY MR. SCHERTLER:

5    Q.  They wanted you to tell them what they wanted to hear.

6    They had their version of the truth, and if you didn't buy

7    into it they were going to --

8              MR. ASUNCION:  Objection.

9              THE COURT:  Sustained.  Save it for your argument.

10   Ask questions factually now.

11   BY MR. SCHERTLER:

12   Q.  You opted to enter, 19 days after you said you were

13   innocent --

14             THE COURT:  Asked and answered.  What's your next

15   question?

16   BY MR. SCHERTLER:

17   Q.  You opted to enter a plea agreement.

18             THE COURT:  Asked and answered.  What's your next

19   question?

20   BY MR. SCHERTLER:

21   Q.  Okay.  Let me -- what I'd like to do is go through your

22   plea agreement with you.  Exhibit 2292 -- Defense Exhibit

23   2292-R.

24             Your Honor, I think this has been introduced into

25   evidence already.  And I think we can publish this to the

```
 1    jury.  Could we change to the defense?
 2              Okay.  We've seen this.
 3              Correct, Mr. Ridgeway?
 4    A.  Yes.
 5    Q.  I'd like to talk to you about a couple parts of your
 6    plea agreement.  If we could go to page 6 of the agreement,
 7    paragraph 12.  And if you could highlight that for us,
 8    Andrej.
 9              This paragraph is entitled Substantial Assistance.
10    Do you see that?
11    A.  Yes, sir.
12    Q.  And do you understand what substantial assistance is?
13    A.  Yes, sir.
14    Q.  Okay.  In this paragraph it says:  Following the
15    completion of your client's cooperation, we will inform the
16    departure committee of the United States Attorney's Office
17    for the District of Columbia of the nature and extent of
18    your client's cooperation, or lack thereof.
19              Do you see that?
20    A.  Yes, sir.
21    Q.  And you expect that if they're advised of the nature and
22    extent of your cooperation in connection with this case
23    against these defendants, your hope is that the Department
24    of Justice, the U.S. Attorney's Office, the prosecutors
25    here, will file a letter or a motion with Judge Lamberth,
```

1    correct?

2    A.   That's my understanding.

3    Q.   And that under that motion or letter talking about your

4    cooperation, it gives Judge Lamberth -- it can provide the

5    Court with a reason to give you a lower sentence, correct?

6    A.   That's my understanding.

7    Q.   Than you would have gotten if you didn't cooperate,

8    correct?

9    A.   Yes, sir.

10   Q.   Okay.  So the next sentence is:  If the departure

11   committee of the United States Attorney's Office for the

12   District of Columbia, after evaluating the full nature and

13   extent of your client's cooperation, or lack thereof,

14   determines that your client has provided substantial

15   assistance --

16            And Andrej, if you could highlight from here to

17   here.

18            It says, Substantial assistance in the

19   investigation or prosecution of another person.

20            Do you see that?

21   A.   Yes, sir.

22   Q.   So are we on the same page?  That substantial assistance

23   means you have to help them in making a case against other

24   people?

25   A.   Sir, I've just told them -- I told them what I saw and I

1    know.  I told them the truth.

2    Q.  Look.  Provided substantial assistance in the

3    investigation or prosecution of another person.  I'm not

4    asking what you told them.  I'm asking that -- you

5    understand that substantial assistance in the investigation

6    or prosecution of another person who has committed any

7    offense.

8    A.  Yes, that's what it says.

9    Q.  Can you read the plain words there?

10   A.  Yes, that's what it says, sir.

11   Q.  So it means that substantial assistance, if you're going

12   to get credit for it and get a more lenient sentence, it's

13   got to give them assistance in the investigation or

14   prosecution of another person, right?

15   A.  Yes, sir.

16   Q.  So if you go in and you say I don't have any information

17   on anybody, you're not going to get substantial assistance,

18   right?

19   A.  I wouldn't know, sir.

20   Q.  And if you don't have any -- well, if you read what

21   substantial assistance is defined as, if you don't have any

22   information that helps them investigate or prosecute another

23   person, you don't qualify.

24   A.  I understand.  I understand.  Yes, sir.

25   Q.  And so you're providing substantial assistance in the

```
 1    investigation and prosecution of these four gentlemen,
 2    correct?
 3    A.  Yes, sir.
 4    Q.  And that's why you hope to get a letter from the
 5    prosecutors that will result in a lower sentence.  Right?
 6    A.  Yes, sir.
 7    Q.  You know, you made a comment, an interesting comment, on
 8    direct examination with Mr. Asuncion.  He asked you whether
 9    you were prepared to go to jail.  Do you recall that?
10    A.  Yes, sir.
11    Q.  And do you recall what your answer was?
12    A.  I believe I said I was mentally preparing.
13    Q.  You were mentally prepared to go to jail.
14    A.  Yes, sir.
15    Q.  As a possibility.
16    A.  I know it's a possibility, sir.
17    Q.  It's a possibility, correct?
18    A.  Yes, sir.
19    Q.  But you believe, and you expect, that based on your
20    substantial assistance in this case that when your lawyers
21    come to sentencing they are going to ask Judge Lamberth to
22    give you probation, correct?
23    A.  My lawyers will -- my lawyers will work hard on my
24    behalf to get a lesser sentence.
25    Q.  They are going to -- you expect and want them to ask for
```

1   a sentence of probation, correct?

2   A.  Sir, I put myself at the mercy of the Court.

3   Q.  You have the opportunity when you come to sentencing to

4   tell this judge, and your lawyers can tell this judge on

5   your behalf, what they think you should get.  Right?

6   A.  Yes, sir.

7   Q.  And you expect them to come in and ask Judge Lamberth to

8   give you a sentence of probation, don't you?

9   A.  I expect them to work hard on my behalf.

10  Q.  To work hard on your behalf to try to get you a

11  probationary sentence.  Can you answer that question?

12  A.  Sir, I don't expect that.  I just came here to tell the

13  truth, that's what I'm here to do.

14  Q.  You know what --

15  A.  And that's up to the judge, I believe.

16              MR. ASUNCION:  Your Honor --

17              THE COURT:  Sustained.

18  BY MR. SCHERTLER:

19  Q.  It has nothing to do --

20              THE COURT:  Let him finish his answer.

21  BY MR. SCHERTLER:

22  Q.  Are you finished?

23  A.  Yes, sir.

24  Q.  The question is, you expect your attorneys -- I don't

25  care about working hard on your behalf or doing anything,

1    you expect them when you come to sentencing, whenever that

2    is, to ask for probation.  "Yes" or "no"?

3    A.  Yes, sir.  They will ask.

4    Q.  Thank you.  Could we go to paragraph -- page 7 of the

5    agreement.  And, Andrej, could you highlight this portion of

6    paragraph 13?

7            Are you familiar with this -- I mean, you've

8    reviewed this carefully in the past, correct?

9    A.  Yes, sir.

10   Q.  This talks about a breach of agreement, do you see that?

11   A.  Yes, sir.

12   Q.  And your client -- it states your client --

13           And we may publish this to the jury?

14           Your client understands and agrees if that after

15   entering this plea agreement if your client specifically --

16   fails specifically to perform or fulfill completely each and

17   every one -- each and every one -- of your client's

18   obligations of this agreement, or engages in any criminal

19   activity prior to sentencing, your client will have breached

20   the agreement.

21           Do you know what that means?  "Breach the

22   agreement"?

23   A.  Yes, sir.

24   Q.  Means violate the agreement, correct?

25   A.  Yes, sir.

1    Q.  And then it goes on to talk about all the bad things

2    that could happen to you if you do breach the agreement.  Do

3    you see that?

4    A.  Yes, sir.

5    Q.  First, the United States will be free from its

6    obligations under the agreement.  Do you see that?

7    A.  Yes, sir.

8    Q.  They could charge you with all of those counts that they

9    didn't charge you with, right?

10   A.  That's my understanding, sir.

11   Q.  Including the 30-year jail mandatory minimum, right?

12   A.  That's my understanding, sir.

13   Q.  Your client will not have the right to withdraw his

14   guilty plea.  You're still stuck with the fact that you pled

15   guilty, correct?

16   A.  That's my understanding.

17   Q.  Your client shall be fully subject to criminal

18   prosecution for any other crimes, including perjury or

19   obstruction of justice.  Do you see that?

20   A.  Yes, sir.

21   Q.  So for instance, if you lie to them after you enter the

22   plea agreement, you could be charged with these additional

23   crimes in addition to all this other stuff that you got

24   hanging over your head.

25   A.  Yes, sir.

1    Q.  The United States will be free to use against your

2    client, directly and indirectly, in any criminal or civil

3    proceeding all statements made by your client and any

4    information or materials provided by your client, including

5    such statements, information and materials provided pursuant

6    to this agreement or during the course of any debriefings

7    conducted in anticipation of or after entry of -- very long

8    sentence -- this agreement, including your client's

9    statements made during proceedings before the Court pursuant

10   to the Federal Rule of Criminal Procedure, Rule 11.

11             Do you see that?

12   A.  Yes, sir.

13   Q.  Do you know what that means?

14   A.  Yes, sir.

15   Q.  That means that all the stuff that you had told them

16   about what you did, if you breach the agreement, they could

17   use against you.  They could put you on trial and they could

18   use all the statements you made against you.  Do you

19   understand that?

20   A.  Yes, sir.

21   Q.  And then it says and, (e), the United States will be

22   relieved of its obligation to file a departure motion

23   pursuant to 5(k)(1) of the sentencing guidelines.  Do you

24   see that?

25   A.  Yes, sir.

```
 1    Q.  That means that if you breach the agreement, they don't

 2    have to file that letter with Judge Lamberth talking about

 3    your cooperation, right?

 4    A.  Yes, sir.

 5    Q.  And if they don't file that letter, no chance for a

 6    lenient sentence based on cooperation.  That goes down the

 7    tubes.  Correct?

 8    A.  Yes, sir.

 9    Q.  The truth is that you breached this agreement, didn't

10    you?

11    A.  Yes, sir.

12    Q.  In fact, Mr. Asuncion --

13            If we could go to --

14            Mr. Asuncion showed you certain portions of this

15    in your direct examination.  If I could go to section 11, I

16    believe it's page 5.  Thank you, Andrej.  If I could go to

17    the third -- just this paragraph right here.

18            This is what Mr. Asuncion showed you.  He showed

19    you the paragraph of the cooperation.  Your client shall

20    testify fully and truthfully before any grand jury in the

21    District of Columbia and elsewhere, and at all trials and

22    cases and other court proceedings in the District of

23    Columbia and elsewhere at which your client's testimony may

24    be deemed relevant by the United States.

25            Do you see that?
```

1    A.   Yes, sir.

2    Q.   Then he said, Did you testify truthfully in the grand

3    jury?  And you said, Yes.  And you're here to testify

4    truthfully in front of these ladies and gentlemen of the

5    jury at trial.  You said, Yes.

6    A.   Yes.

7    Q.   Now, if we could go to what Mr. Asuncion didn't show

8    you, the first paragraph of that section.  Thank you,

9    Andrej.

10               This is also one of the conditions of your

11   agreement, correct?

12   A.   Yes, sir.

13   Q.   And would you read that for us?

14   A.   Your client agrees to cooperate fully, completely and

15   truthfully with all investigators and attorneys of the

16   United States, by truthfully providing all information in

17   your client's possession relating directly to or indirectly

18   to all criminal activity and related matters which concern

19   the subject matter of this investigation and of which he has

20   knowledge, or relating to other matters deemed relevant by

21   the United States.

22   Q.   That says nothing about testifying in a grand jury or

23   testifying at trial, does it?

24   A.   I don't see it in here.

25   Q.   What that means is that put aside testifying in a grand

1    jury, put aside testifying at trial, what that means is that

2    when you meet with the prosecutors and the agents, after you

3    sign the agreement you've got to tell them the truth,

4    correct?

5    A.  Yes, sir.

6    Q.  And if you don't tell them the truth at all those

7    meetings that you had with them, you've breached one of the

8    most important parts of your agreement, correct?

9    A.  Yes, sir.

10   Q.  And you've already testified I believe on direct -- I

11   mean, it says -- that sentence has "truthfully" twice in

12   that sentence, do you see that?

13   A.  Yes, sir.

14   Q.  And is the idea that in this plea agreement if the

15   prosecutors use the word "truthfully" enough that we're

16   supposed to believe that it's all truthful?

17          MR. ASUNCION:  Objection, Your Honor.

18          THE COURT:  Sustained.

19          MR. SCHERTLER:  Withdraw the question.  Sorry,

20   Your Honor.

21   BY MR. SCHERTLER:

22   Q.  You've already testified -- and I don't want to beat a

23   dead horse.  But you've testified that even after signing

24   this agreement where you said, I will tell the truth in all

25   meetings and all interviews and in testimony, grand jury,

1    trial, whatever; even after signing this agreement, you

2    continued to lie about important things to the FBI and the

3    prosecutors, right?

4              MR. ASUNCION:  That's been covered *ad nauseam*,

5    Your Honor.  Asked and answered.

6              THE COURT:  Sustained.

7    BY MR. SCHERTLER:

8    Q.  You agree that you've breached your agreement.

9    A.  Yes, sir.

10   Q.  And after you breached your agreement by lying to the

11   prosecutors for almost a year after you signed the agreement

12   saying you'd be truthful, did anybody ever say, We're going

13   to rip up your plea agreement?

14   A.  No, sir.

15   Q.  Did anybody say, We're going to charge you now with all

16   these other crimes?

17   A.  No, sir.

18   Q.  Did anybody say, You know what?  You lied to us in

19   repeated meetings, so you committed false statements and you

20   know you've got to take a hit for that.  We're going to

21   charge you with false statements.  Did anybody ever say

22   that?

23   A.  No, sir.

24   Q.  Did anybody ever say, You know, you breached the

25   agreement because you lied to us repeatedly about important

1   things in connection with this investigation, and because of

2   that we're not going to file that letter of leniency.

3   A.  No, sir.

4   Q.  So you still expect to get that, right?

5   A.  Yes, sir.

6   Q.  I'm going to switch gears and in front of you, you

7   should have what I believe is Defense Exhibit 2288.  Would

8   you see if you have that?

9   A.  Yes, sir.

10  Q.  And that's what Mr. Heberlig showed you.  Those are the

11  agent's notes of that meeting on October 30 of 2008,

12  correct?

13  A.  (No response.)

14  Q.  Take a look through it.  See if that appears to be the

15  notes.

16  A.  October 30, 2008, it says it on here.

17  Q.  Is that correct?

18  A.  That's what it says on here, yes, sir.

19  Q.  Those appear to be the notes of the interview that was

20  conducted on October 30 of 2008?

21  A.  They appear to be.  I don't have -- I didn't have a

22  chance to review the notes when the agent was writing them

23  so --

24  Q.  Of course.

25  A.  But that's what it says on here.

1    Q.   Let me ask you this:   We already talked about this

2    meeting on October 30 of 2008.   And we've already talked

3    about the fact that you were asked questions about what you

4    did at Nisur Square, correct?

5    A.   Yes, sir.

6    Q.   Then you were asked about things that your teammates on

7    Raven 23 did at Nisur Square, correct?

8    A.   I believe so.

9    Q.   And what I'd like you to do is if we could go to page 13

10   of the -- and what I'd like to do is --

11             Now, let me just step back, okay?   You have page

12   13 of the exhibit in front of you?   I think it's page 11 of

13   the notes.

14   A.   Yes, sir.

15   Q.   Okay.   Now, during this trial, at some point you

16   testified that when you got back to the Green Zone you had a

17   short conversation with my client, Mr. Heard, correct?

18   A.   I did, yes.

19   Q.   And you testified that in that conversation you made a

20   comment to him about the man with the *dishdasha* dress, or

21   the *dishdasha* clothing.

22   A.   Yes.

23   Q.   And you asked him if he had seen that man, correct?

24   A.   Yes.

25   Q.   And this is the man that you also described to -- that

1    was kind of zigzagging back and forth down the street, in

2    and out, is that fair to say?

3    A.  Yes.

4    Q.  And your comment was, Yes, Dustin Heard told me he

5    smoked that guy.  Do you remember that?

6    A.  Yes, that's what he said.

7    Q.  Now, do you recall on October 30 of 2008 -- and, you

8    know, you were trying to claim your own innocence on October

9    30 of 2008, but there was no reason to lie about anybody

10   else, right?

11   A.  No, sir.

12   Q.  You were more than happy to tell the truth about what

13   anybody else did or said, correct?

14   A.  Sir, there was a point where I was still trying to --

15   where I was still trying to defend not only my actions but

16   also some of the actions of my teammates.

17   Q.  You were trying to cover for yourself on October 30,

18   right?

19   A.  Not just myself, sir.

20   Q.  Well, let's go to this.  No reason for you not to be

21   truthful with them about what other people did, is there?

22   A.  Pardon me?

23   Q.  There's no reason for you not to be truthful.

24   A.  I wasn't truthful about what other people did.

25   Q.  You -- if we could highlight this portion.  I'm sorry,

```
 1      Andrej.  Could I go this far?

 2              Do you see this?

 3      A.  Yes, sir.

 4      Q.  So isn't it true that on October 30 of 2008 when they're

 5      asking you questions about what other of the Raven 23

 6      members said after you got back to the Green Zone, they

 7      asked you, Did Tommy address the group?  Do you see that?

 8      A.  Yes, sir.

 9      Q.  And that refers to Tommy Vargas, correct?

10      A.  Yes, sir.

11      Q.  A member of Raven 23.

12      A.  Yes, sir.

13      Q.  And you -- the answer here is:  Doesn't remember.

14      A.  That's what it says, sir.

15      Q.  You told them that you didn't remember any conversation

16      with Tommy.

17      A.  That's what it says, sir.

18      Q.  And then it says, Talk amongst -- you told them that the

19      team members talked amongst themselves about who did and who

20      didn't shoot.  Do you see that?

21      A.  Yes, sir.

22      Q.  And it says walking back towards the chow hall,

23      something about Liberty.  Do you see that?

24      A.  Yes, sir.

25      Q.  And then it has a specific question that you were asked
```

```
 1    that day, Did Heard talk about it.  Do you see that?

 2    A.  Yes, sir.

 3    Q.  And your answer is, you told them on October 30 of 2008,

 4    Nothing comes to mind.

 5    A.  That's what it says, sir.

 6    Q.  And isn't that true?  On October 30 of 2008 when they

 7    said, Did Dustin Heard say to you anything after you got

 8    back to the Green Zone?  You said, Nothing comes to mind.

 9    A.  I don't know what the context of that conversation was,

10    sir.  I mean, it's not -- it's not completely accurate.  I

11    mean, we did -- I told the government early on about what

12    happened.

13    Q.  Sir, you were asked a specific question and you're

14    talking in the context of this -- look at the context of it.

15    They're asking you about what people did and said once you

16    got back to the Green Zone.  Do you see that?

17    A.  Yes, sir.

18    Q.  Do you have any doubt about that?

19    A.  Sir, I don't remember the conversation.  I mean, I

20    wasn't completely honest throughout this time --

21    Q.  What I --

22    A.  -- and I did come clean.

23    Q.  What I want to know --

24            MR. ASUNCION:  I'm going to ask that he be allowed

25    to finish his answer.
```

1            THE COURT:  Sustained.

2            MR. ASUNCION:  We would like Mr. Ridgeway to be

3    allowed to provide his complete answer to counsel's last

4    question.

5            THE COURT:  Go ahead.

6            THE WITNESS:  I wasn't completely honest, and

7    there was a point where I came clean.  It was a long

8    struggle, it was hard, it was hard to admit what I did, it

9    was hard to admit what I saw other people doing, it was not

10   an easy process.  So, yes, it took time.  I was dishonest.

11   I admit that, I own that.

12   BY MR. SCHERTLER:

13   Q.  I'm just asking you this question:  Do you recall on

14   October 30 of 2008 when you met with the prosecutors and the

15   FBI agent, them asking you, Did Heard talk about it?  And

16   you said, Nothing comes to mind.

17   A.  I don't remember the conversation.  We had a lot of

18   interviews, sir.

19   Q.  I'd like to publish this to the jury, please, and

20   introduce it.

21            THE COURT:  Denied.

22   BY MR. SCHERTLER:

23   Q.  Would the agents be lying if they said that you --

24            MR. ASUNCION:  Your Honor?

25            THE COURT:  Sustained.

```
1    BY MR. SCHERTLER:

2    Q.  Are you saying you didn't say this?

3    A.  Pardon me?

4            MR. ASUNCION:  Your Honor?

5            THE COURT:  Sustained.

6    BY MR. SCHERTLER:

7    Q.  October 30, 2008, you were still maintaining your

8    innocence, correct?

9    A.  There were points in October, yes, where I was

10   maintaining my innocence and then as well as some of my

11   teammates.

12   Q.  That's the meeting where we have this, Did Heard talk

13   about it?  And you said, Nothing comes to mind.

14   A.  We just went over that.  I said I didn't remember it.

15   Q.  And what happens is less than three weeks later you

16   enter the guilty plea.  You signed the plea agreement.

17   A.  Yes.

18   Q.  And we talked about the substantial assistance part of

19   the plea agreement, right?

20   A.  Yes, sir.

21   Q.  And that's the part that requires you to provide

22   information that will help the prosecutors investigate and

23   prosecute other individuals in connection with the crime.

24   Correct?

25   A.  Yes, sir.
```

1    Q.  And that's when we first hear this *dishdasha* comment by

2    Mr. Heard.  You didn't tell them before that.  You tell them

3    after you have to provide substantial assistance, Oh, yes,

4    Mr. Heard told me he smoked that guy.  Correct?

5    A.  Yes, he said that.

6    Q.  You didn't tell them until after you entered your plea

7    agreement.

8    A.  I don't remember when I told them, sir, but I did tell

9    them.

10   Q.  You don't remember what you told them?

11   A.  I don't remember when I told them that.

12   Q.  Okay.  I want to be clear about your testimony regarding

13   Mr. Heard on September 16 of 2007.  I believe that you

14   testified that shortly -- first time that you fired at the

15   white Kia, that you saw shortly -- at the same time or

16   shortly thereafter you observed Mr. Heard firing at the

17   white Kia as well, correct?

18   A.  Yes, sir.

19   Q.  And the second thing you talked about is that at some

20   point after that, you see Mr. Heard shooting -- I believe

21   you said in a southeast direction towards the bus stop.  Do

22   you remember that?

23   A.  In the -- the bus stop is in that area.  Yes, I saw him

24   firing in that direction.

25   Q.  That's the direction that you believe he was firing

1   toward that bus stop.

2   A.  He was firing at the southeast.

3   Q.  Where the bus stop was.

4   A.  The bus stop is there, yes.

5   Q.  These have already been introduced into evidence.  Can I

6   ask you to come down for just a moment?  And when we talked

7   about the bus stop -- you've seen these photographs,

8   correct?

9   A.  Yes, sir.

10  Q.  And this is the bus stop we're talking about, correct?

11  A.  I believe so, sir.

12  Q.  And that's to the southeast of the circle, correct?

13  A.  Yes, sir.

14  Q.  Where you saw Mr. Heard shooting.

15  A.  Yes, sir, I saw him fire to the southeast.

16  Q.  And you said you saw this photograph, as well.

17  Prosecutors had showed it to you just a few days ago?

18  A.  Yes, sir.

19  Q.  And do you understand these to be, at least counting

20  them right here, eight AK-47 shell casings, correct?

21  A.  Yes, sir.

22  Q.  And you understand that those shell casings -- see the

23  blue cap?

24  A.  Yes, sir.

25  Q.  Those shell casings were found right here behind the bus

```
 1    stop?
 2    A.  That is my understanding, sir.
 3    Q.  Did they tell you that this photograph was taken within
 4    an hour of the incident in Nisur Square?
 5    A.  I don't recall when they -- they told me it was taken
 6    after the fact.  I think the same day.  I don't exactly
 7    remember what time they said.
 8    Q.  Okay.
 9    A.  It was my understanding the same day.
10    Q.  Same day.  Eight AK-47 shell casings.
11    A.  Yes, sir.
12    Q.  You can resume the stand.
13             And those were the only two times you saw
14    Mr. Heard firing that day, correct?
15    A.  Pardon me?
16    Q.  Those are the only two times that you saw Mr. Heard
17    firing that day.
18    A.  The --
19    Q.  The white Kia --
20    A.  Yes, sir.
21    Q.  -- and the bus stop.
22    A.  Yes, sir.
23    Q.  He wasn't shooting as you did the tow-out, correct?  You
24    said everything went quiet.
25    A.  That's correct.
```

```
 1    Q.  Then as you tow-out -- you're in the same truck with

 2    him, right?

 3    A.  That's correct.

 4    Q.  Two, three feet away, I believe.

 5    A.  Yes, sir.

 6    Q.  Mr. Heard's not shooting anybody as you're going on the

 7    westerly side of the circle north, correct?

 8    A.  I don't think so.

 9    Q.  Well, you didn't see --

10    A.  I didn't see or hear him shooting, so --

11    Q.  You're two feet away from him.

12    A.  That's correct.

13    Q.  If he was shooting, you'd have heard him.

14    A.  That's right, sir.

15    Q.  And when you get north of the circle, he's not shooting,

16    correct?

17    A.  That's correct.

18    Q.  In fact, didn't you testify that at some point when you

19    shot that man with the cell phone, that Mr. Heard saw that

20    but he didn't shoot.

21    A.  That's correct.

22    Q.  You talked -- and I only have a few more areas.  But you

23    talked last week about a pen flare.  Do you remember that?

24    A.  Yes, sir.

25    Q.  And you believed you saw what you thought was a pen
```

1   flare go off?

2   A.  Yes, sir.

3   Q.  I think you said you -- smelled like a pen flare, it

4   looked like a pen flare?

5   A.  Yes, sir.

6   Q.  But it was moving around, correct?

7   A.  Yes, sir.

8   Q.  I think you said this pen flare hit your turret then

9   bounced off somewhere?

10  A.  It hit somewhere within the turret, a piece of the

11  metal.

12  Q.  In your turret?

13  A.  Yes, sir.  Not within -- not within the actual circle of

14  the turret.  Somewhere within my area.

15  Q.  And you said you caught a glimpse of it, is that fair to

16  say?

17  A.  I saw a bright flash.

18  Q.  And you said you saw a bright red flash, correct?

19  A.  It's more of a bright -- reddish, yeah.

20  Reddish-greenish flash.

21  Q.  It was a red pen flare, is that what you're saying?

22  A.  That's what I said, yes, sir.

23  Q.  Not a green one.  Red pen flare, not a green one.

24  A.  It appeared to be red.

25  Q.  Well, pretty different -- I mean, you can tell red from

1    green, right?  You're not color --

2    A.  Yes, sir.

3    Q.  And you had a conversation with Mr. Heard about this

4    that you related to us after you got back to the Green Zone,

5    correct?

6    A.  Yes, sir.

7    Q.  And it was his belief that he had been hit by a tracer

8    round, correct?

9    A.  Yes, sir.

10          MR. ASUNCION:  Objection to the form of the --

11   BY MR. SCHERTLER:

12   Q.  It was his statement to you.

13   A.  Yes, that's what he said.

14   Q.  And he said it sincerely, correct?

15          MR. ASUNCION:  Objection.

16          THE COURT:  Sustained.

17   BY MR. SCHERTLER:

18   Q.  Okay.  Just one final area, Mr. Ridgeway.  You have told

19   both Mr. Asuncion and Mr. Heberlig that I believe you --

20   that everybody's referring you to the come-clean meeting in

21   the fall of 2009.  Do you remember that?

22   A.  Yes, sir.

23   Q.  And this is the meeting at which you decide to come

24   clean and tell the prosecutors about everything that you had

25   done, correct?

1    A.  Yes, sir.

2    Q.  And among those things you tell them is that you didn't

3    see muzzle flashes.

4    A.  That's correct.

5    Q.  Even though for almost two years before this you'd been

6    saying you saw muzzle flashes, correct?

7    A.  Yes, sir.

8    Q.  And you also told the prosecutors what you fired at.  Do

9    you remember that?

10   A.  Yes, sir.

11   Q.  And if -- you told the prosecutors that you'd -- you

12   told them that you fired at the white Kia, correct?

13   A.  Yes, sir.

14   Q.  Next fired at the *dishdasha* man behind the white Kia,

15   correct?

16   A.  Yes, sir.

17   Q.  Fired at the white Kia passenger a second time, correct?

18   A.  Yes, sir.

19   Q.  Then you fired your M-240 to the south, correct?

20   A.  Yes, sir.

21   Q.  And isn't it true that on that come-clean meeting

22   September 1 of 2009, you told the prosecutors that you made

23   the transition from your M-4 to your M-240 and fired south

24   toward the bus stop, correct?

25   A.  I may have said that.

1    Q.  May have said that?  Would it refresh your recollection

2    to look at something?

3    A.  Sure.

4    Q.  Could we bring up Defense Exhibit 2304?  And this would

5    be page 3, Andrej.  And, Andrej, if you could -- bear with

6    me just a moment.  If you could start here, please.  Can you

7    start here?  Right here.  That's it.  And if you could go

8    down the entire paragraph.  I apologize.

9            Would you take a look at that?  And this is for

10   the witness only.  Why don't you read that entire paragraph.

11   A.  I see it, sir.

12   Q.  Have you?

13   A.  Yes.

14   Q.  What you told the prosecutors and the agents at the

15   come-clean meeting on September 1 of 2009 is you made the

16   transition from your M-4 to your M-240 and you fired south

17   toward the bus stop.  Do you see that?

18   A.  Yes, I do.

19   Q.  And you told them that?

20   A.  I believe I did.

21   Q.  Then it says, Ridgeway said he fired two or three

22   automatic bursts toward the bus stop and the people near the

23   bus stop.  Do you see that?

24   A.  That's what it says.

25   Q.  And that's what you told them?

1    A.  I don't remember saying the people near the bus stop,

2    but I did say I fired in that direction.

3    Q.  And you say that you don't -- you didn't tell them that

4    you fired at the bus stop and the people near the bus stop?

5    A.  I remember telling them that I had -- I hit a vehicle,

6    the back -- appeared to be the back of a dark Suburban.

7    That's what I remember telling them.

8    Q.  Okay.  Well, how about this:  Ridgeway observed his

9    rounds hitting cars that were stopped in the traffic.  Do

10   you remember that?

11   A.  Yes, sir.

12   Q.  Did you tell them that?

13   A.  Yes, I told them that I hit the black Suburban.

14   Q.  Well, let's go -- so you told them that you hit the

15   black Suburban.  But let's go to page 5, please, and see if

16   this refreshes your recollection.

17        And Andrej, if we could start right about here,

18   this sentence here.  And that paragraph.

19        So did you tell them at your come-clean meeting on

20   September 1 of 2009 that you used -- Ridgeway used his M-240

21   machine gun when he shot at the black Suburban and other

22   vehicles south of the square?

23   A.  I had told them that I had hit the black Suburban.

24   Q.  Did you tell them that you shot at other vehicles south

25   of the square?

1    A.  I've always maintained that I may have hit other

2    vehicles when I -- but the black -- when I stopped is when I

3    noticed that I hit the black Suburban.

4    Q.  Not just maintained.  The next sentence is:  He is

5    certain he hit the Suburban and pretty certain hit other

6    vehicles.  Do you see that?

7    A.  Yes, I see that.

8    Q.  You were pretty certain that you hit other vehicles in

9    addition to the Suburban, correct?

10   A.  I was certain that I hit other vehicles -- that I hit

11   the Suburban and, yes, I always assumed that I hit other

12   vehicles.

13   Q.  And you tell them on this day you're pretty certain you

14   hit other vehicles, correct?

15   A.  Yes, sir, I said that.

16   Q.  And then, Andrej, if we could take that down and go to

17   the sentence that begins "when."

18           Do you recall telling them that when Ridgeway shot

19   long south, he knew there was an Iraqi army (IA) bunker down

20   the road and fired in that direction with the intent of

21   putting -- of hitting the bunker.  Do you see that?

22   A.  Yes, sir, I see that.

23   Q.  You told them at your come-clean meeting about all

24   things you had done.  That you knew there was an Iraqi army

25   bunker down the road, and you fired at that Iraqi army

```
 1    bunker with the idea of hitting it.  Correct?
 2    A.  That's what I said, yes, sir.
 3    Q.  And then you told them:  Ridgeway stated that he was
 4    putting down suppressive fire.  Do you see that?
 5    A.  Yes, sir.
 6    Q.  You told them on September 16, 2007, in Nisur Square
 7    when you were firing south you were putting down suppressive
 8    fire, correct?
 9    A.  Yes, sir.
10    Q.  But you weren't really suppressing anything, correct?
11    A.  That's correct.
12    Q.  And you define "suppressive fire" earlier in your direct
13    examination as being what you called area fire.
14    A.  Yes, sir.
15    Q.  And you're firing with your M-240 machine gun, correct?
16    A.  Yes, sir.
17    Q.  So you're firing area fire down that road to the south
18    without aiming.
19    A.  Yes, sir.
20    Q.  And you're just firing away at whatever is there because
21    that's how you define suppressive fire.
22    A.  You're taking it out of context, sir.
23    Q.  Define -- what's suppressive fire?
24    A.  Okay.  What I -- when I was -- when I was telling
25    them -- I made three short bursts down that area.  I may
```

1    have said suppressive fire, but I wasn't saying that I was

2    firing, you know, thousands of rounds down that area.

3    Q.  You used the term suppressive fire.

4    A.  I did use it.

5    Q.  And you used it to describe what you were doing,

6    correct?

7    A.  That's correct, I said that.

8    Q.  So let's go -- just finally if we could go down to the

9    final paragraph.

10           It says:  Ridgeway acknowledged that although he

11   earlier used the term suppressive fire, he wasn't

12   suppressing anyone as they were not being fired upon.

13           You're using suppressive fire, but there's nothing

14   to suppress, correct?

15   A.  I'm sorry.  I don't really understand.

16   Q.  Okay.  He described suppressive fire as area fire, not

17   well-aimed fire.  Do you see that?

18   A.  Are you --

19   Q.  I'm on the second sentence.  He described suppressive

20   fire as area fire, not well-aimed.

21   A.  That's correct.

22   Q.  And that's what you were doing with your 678 M-240 to

23   the south, correct?

24   A.  But it was three small bursts, I was not putting a large

25   volume of fire.

```
1    Q.  But you described it as suppressive fire.

2    A.  Yes, I did.

3    Q.  Okay.  Now, is it -- I just want to clear up one thing.

4    What's a combat reload?

5    A.  It's where you drop your magazine if you have rounds

6    still in it and you put in a new magazine.

7    Q.  So what you can do is with your M-4 you can take the

8    cartridge out, you can put it in your pack, and then put a

9    new one in, correct?

10   A.  You could do that, yes.

11   Q.  But a combat reload you just flip it out, it falls to

12   the ground, and then you put in a new cartridge, right?

13   A.  Yes, sir.

14   Q.  That's a combat reload.

15   A.  That's my understanding.

16   Q.  And you performed a combat reload in Nisur Square with

17   your M-4 on September 16, 2007, correct?

18   A.  Yes, I did.

19          MR. SCHERTLER:  Your Honor, may I have the Court's

20   indulgence for just one moment?

21          (Pause.)

22          MR. SCHERTLER:  Thank you.  I have no further

23   questions.  Mr. Ridgeway, thank you.

24          MR. COFFIELD:  Nothing from me, Your Honor.

25          THE COURT:  All right.  Mr. Connolly?
```

```
 1              MR. CONNOLLY:  May I, Your Honor?
 2                      CROSS-EXAMINATION
 3      BY MR. CONNOLLY:
 4      Q.  Mr. Ridgeway, September 16, 2007, just past noon in
 5      Nisur Square.  All right?
 6      A.  Pardon me?
 7      Q.  It's September 16, 2007, just past noon and we're in
 8      Nisur Square, okay?
 9      A.  Okay.
10      Q.  You are the front gunner on the rear vehicle, correct?
11      A.  Yes, sir.
12      Q.  Now you're oriented to the north, northwest, correct?
13      A.  At what point are you --
14      Q.  The very beginning --
15      A.  As we're rolling in?
16      Q.  As you're rolling in.
17      A.  Yes, sir.
18      Q.  You hear automatic gunfire, correct?
19      A.  Yes, sir.
20      Q.  That automatic gunfire came from an M-4, correct?
21      A.  That's my understanding.
22      Q.  You heard the automatic gunfire, and in one fluid motion
23      you shot three to five rounds at the driver of the white
24      Kia, correct?
25      A.  I wouldn't say it's one fluid motion.  I was fluidly
```

1  moving and I fired.  I don't know if you're trying to twist

2  my words around.  I mean, I turned and I fired.

3  Q.  From the time that you heard the automatic gunfire until

4  you shot three to five rounds into the driver's windshield,

5  it was a matter of a second or two, correct?

6  A.  That's about right.

7  Q.  Okay.  And when you heard the automatic gunfire and

8  turned to shoot at the white car, that white car was coming

9  out of traffic, correct?

10  A.  Yes, sir.

11  Q.  Towards the convoy.

12  A.  Yes, sir.

13  Q.  And it was you, sir, who put three to five group of

14  rounds right in the driver's windshield, correct?

15  A.  I don't know if they all went in the windshield.  I

16  thought some of them hit the hood -- the hood of the car.

17  Q.  Do you deny putting rounds in the driver's windshield

18  right where the driver's head would be?

19  A.  I aimed there, sir, yes.

20  Q.  That's where you aimed.

21  A.  Yes, sir.

22  Q.  And that's where you shot.

23  A.  Yes, sir.

24  Q.  Now, I'd like to ask you some questions about

25  Mr. Asuncion's direct examination of you, okay?

1    A.  Yes, sir.

2    Q.  Mr. Asuncion did not ask you where you shot in the white

3    Kia, correct?

4    A.  I don't recall.

5    Q.  Okay.  Let me read the direct examination that occurred

6    last week.  This is from -- it's the Defense Exhibit 9055

7    from July 30, page 88.  Question from Mr. Asuncion.

8            MR. ASUNCION:  We're going to object, Your Honor.

9            THE COURT:  Overruled.

10   BY MR. CONNOLLY:

11   Q.  Question from Mr. Asuncion:  What did you do when you

12   saw that?  Answer:  When I saw Mr. Slough firing, I

13   immediately turned.  As I was turning, I switched my weapon

14   to fire and I fired on the white vehicle, sir.  Question:

15   Why?  Answer:  Solely based on the fact that I saw

16   Mr. Slough firing, sir.  Question:  Did you take any time to

17   assess -- further assess the situation?  Answer:  No, sir, I

18   did not.  Question:  Which weapon were you using?  Answer:

19   I was using my M-4 carbine, sir.  Question:  You mentioned

20   that your weapon -- did it have a scope that day?  Answer:

21   It did, sir.  Question:  Was that an ACOG?  Answer:  Yes,

22   sir, it did.  Question:  Did you use your scope when you

23   fired at it at this time?  Answer:  I don't recall, sir.

24   Question:  How many rounds do you recall firing at that

25   point?  Answer:  I believe somewhere between three and five,

```
1    sir.  Question:  After three to five shots that you fired,

2    what did you do?  Answer:  The vehicle had come to a stop

3    and I observed a gentleman, a uniformed Iraqi official, I

4    thought he was a traffic officer.  Question:  Let me stop

5    you right there.  So you fired your three to five and then

6    you stopped.  Answer:  Yes, sir.

7              That was your testimony, correct?

8    A.  Yes.

9    Q.  Mr. Asuncion never, in your direct examination --

10             MR. ASUNCION:  Objection, Your Honor.

11   BY MR. CONNOLLY:

12   Q.  -- asked you what you shot at, correct?

13             MR. ASUNCION:  He's responding to questions he's

14   asked.

15             THE COURT:  Sustained.

16   BY MR. CONNOLLY:

17   Q.  It's not until Mr. Heberlig cross-examined you that the

18   jury learned for the first time it was you who shot three to

19   five rounds at the driver, correct?

20             MR. ASUNCION:  Objection.  That's argumentative.

21             THE COURT:  Sustained.

22   BY MR. CONNOLLY:

23   Q.  Do you remember Mr. Heberlig asking you questions about

24   what you did, sir?

25             MR. ASUNCION:  Objection to relevance at this
```

 1    point.

 2              THE COURT:  Sustained.

 3    BY MR. CONNOLLY:

 4    Q.  You shot three to five rounds right in the windshield

 5    where the driver was, correct?

 6    A.  That's where I was focusing my firearm, yes, sir.

 7    Q.  And sir, you talked about your testimony in the grand

 8    jury, correct?

 9    A.  Yes, sir.

10    Q.  That grand jury testimony was in May of last year,

11    correct?

12    A.  Yes, sir.

13    Q.  And in that grand jury testimony of May of last year,

14    you acknowledged under oath that you shot three to five

15    rounds in the windshield where the driver was, correct?

16    A.  I believe -- I don't have the testimony in front of me.

17    Q.  I may be able to help you with that.  Grand jury

18    testimony pages 67, line 10.  Question:  All right.  So you

19    see Slough firing in that direction.  Did you see bullets

20    impacting on that vehicle?  I don't recall.  Question:  What

21    did you do?  Answer:  I fired on the vehicle.  Question:

22    Why?  Answer:  Because Slough -- well, Slough was firing.

23    My initial when I turned I saw Slough firing, the vehicle

24    was still coming at us.  I immediately began to fire on that

25    vehicle based on the assumption that my teammate was firing

 1    on that vehicle.  Question:  You say coming at you.  What do

 2    you mean by that?  The vehicle was coming at you?  Answer:

 3    Other vehicles on the side of the road were stopped and that

 4    vehicle had passed other vehicles.  My automatic response

 5    was to shoot at that vehicle based on seeing Slough fire.

 6    Question:  What part of the vehicle did you aim for?

 7    Answer:  The driver.  Question:  How many shots did you

 8    fire?  Answer:  I'm not sure.  Approximately four, maybe

 9    five.  Were you in automatic or semiautomatic mode?

10    Semiautomatic.

11         Was that your grand jury testimony, sir?

12    A.  It sounds like it.

13    Q.  Was that the truth?

14    A.  Yes.

15    Q.  In May of last year you sat for a grand jury and you

16    testified in front of the grand jury, correct?

17    A.  Pardon me?

18    Q.  You testified May of last year in front of a grand jury,

19    correct?

20    A.  I did.

21    Q.  Let's talk about the grand jury process for a moment.

22    In the grand jury there's no judge, correct?

23    A.  That's correct.

24    Q.  And there's no defense lawyers asking you questions,

25    correct?

1    A.   That's correct.

2    Q.   It's just the prosecutors asking you questions in front

3    of citizens just like this jury, correct?

4    A.   That's my understanding, yes.

5    Q.   I didn't get to ask you any questions in the grand jury,

6    correct?

7    A.   No, sir.

8    Q.   The people who were asking you questions in the grand

9    jury were Mr. Asuncion and Mr. Martin, correct?

10   A.   Yes, sir.

11   Q.   So in the grand jury last May, you testified under oath

12   in which you admitted you were the person who shot three to

13   five rounds at the driver of the white Kia, correct?

14   A.   Yes, I said I shot at the driver.

15   Q.   So before any prosecutor got up in opening statements in

16   this case, they were well aware that you, Mr. Ridgeway, had

17   testified under oath that you were the one who shot --

18            MR. ASUNCION:   We're going to object, Your Honor.

19            THE COURT:   Sustained.

20   BY MR. CONNOLLY:

21   Q.   You mentioned in response to a question from

22   Mr. Heberlig multiple practice sessions you had with the

23   prosecutor before you testified at this trial, correct?

24   A.   Yeah, we had some, yes, sir.

25   Q.   And in those practice sessions, they would ask you the

1    questions they expected to ask you in front of this jury,

2    correct?

3    A.  I'm sorry.  Could you repeat that?

4    Q.  In those practice sessions, the prosecutor would ask you

5    questions, the questions they expected to ask you at trial

6    in front of this jury, correct?

7    A.  They had -- they asked me lot of questions.  I'm not

8    sure if they were all -- they asked the exact same questions

9    or not.  We had gone through a lot of prep.

10   Q.  And they asked you questions that you might expect from

11   the defense lawyers in this case, correct?

12   A.  Yes.

13   Q.  So when you practiced with Mr. Asuncion for your trial

14   testimony, did you practice what you would say if you were

15   asked:  What did you shoot when you shot at the white Kia?

16   A.  I don't -- I don't recall if we did or not.

17   Q.  The three to five M-4 rounds that you shot at the

18   driver, those occurred before the person dressed as an Iraqi

19   police officer ran to the driver's side door, correct?

20   A.  Pardon me?  Could you say that again?

21   Q.  You testified that after you shot the three to five

22   rounds at the driver, correct?

23   A.  Yes.

24   Q.  After that occurred, someone who was dressed as an Iraqi

25   police officer ran to the driver's side door, correct?

1    A.   He was a uniformed traffic official or a police officer,

2    yeah.   I had said that.

3    Q.   I'm not trying to quibble about what he was.   He was

4    somebody in uniform, correct?

5    A.   Yes.

6    Q.   Ran to the driver's side door.

7    A.   Yes, sir.

8    Q.   And this was after you shot the three to five rounds in

9    the driver's windshield, correct?

10   A.   Yes, sir.

11   Q.   So if that person in the uniform saw three to five

12   rounds in the windshield of the white Kia, those are rounds

13   from your perspective that would have come from you,

14   correct?

15             MR. ASUNCION:   Objection.

16             THE COURT:   Sustained.

17   BY MR. CONNOLLY:

18   Q.   The person in the Iraqi police uniform, if he saw rounds

19   in the windshield, from your perspective that would have

20   come from you?

21             MR. ASUNCION:   Same objection.

22             THE COURT:   Sustained.

23   BY MR. CONNOLLY:

24   Q.   You testified that you don't know -- although Mr. Slough

25   was firing, you don't know where Mr. Slough's bullets

1    impacted the car, correct?

2    A.  I didn't see them impacting.

3    Q.  Okay.  So Mr. Slough's bullets or rounds could have been

4    impacting the grille of the white Kia, correct?

5    A.  I don't know.  I didn't see where they were impacting.

6    Q.  You didn't see them hit the windshield, correct?

7    A.  No, I didn't.

8    Q.  So Mr. Slough's rounds you didn't see hit the

9    windshield.  You saw your rounds hit the windshield.

10    Correct?

11    A.  Yes.

12    Q.  Okay.  Mr. Ridgeway, isn't it a fact that after this

13    incident you believed that you, Mr. Ridgeway, shot and

14    killed the driver of the white Kia?

15    A.  No, sir.

16    Q.  You know a gentleman named Vance McGee?

17    A.  Yes, I do.

18    Q.  Vance McGee is a friend of yours, correct?

19    A.  Yes.

20    Q.  He was with Blackwater, correct?

21    A.  Yes.

22    Q.  But on a different team.

23    A.  Yes.

24    Q.  And after this incident, you had a conversation with

25    Vance McGee about what happened at Nisur Square, correct?

```
1    A.  I believe we had -- yeah.  Yes, sir.

2    Q.  You were friends with him?

3    A.  Yes, sir.

4    Q.  You told Mr. McGee in the conversation after this

5    incident that you shot the driver of the white Kia, didn't

6    you?

7    A.  I had told him I shot at the driver.  I don't remember

8    how -- it was a long time ago, that conversation I had with

9    him.

10   Q.  You told Mr. McGee that you believed you killed the

11   driver of the white car, didn't you?

12   A.  That doesn't sound right.

13   Q.  You told Mr. McGee that you believe you shot the driver

14   of the white Kia in the head, didn't you?

15   A.  I don't remember telling him that.

16   Q.  Don't remember?

17   A.  No, sir.

18   Q.  The fact that you don't remember doesn't mean that that

19   conversation did not occur, correct?

20             MR. ASUNCION:  Objection, Your Honor.

21             THE COURT:  Sustained.

22   BY MR. CONNOLLY:

23   Q.  I'm just trying to get a sense of not remembering or it

24   didn't happen, the distinction between that.

25   A.  Sir, I don't know if I hit the driver at all.
```

1              MR. CONNOLLY:  Your Honor, would this be a good

2       time to take a break.

3              THE COURT:  We'll take a break.

4              (NOTE:  The jury exiting the courtroom at

5       3:17 p.m.)

6

7              (Upon resuming at 3:32 p.m.)

8              THE COURT:  Mr. Connolly, you may proceed.

9              MR. CONNOLLY:  Thank you.

10      BY MR. CONNOLLY:

11      Q.  Mr. Ridgeway, during the incident in Nisur Square, you

12      were in the follow vehicle, correct?

13      A.  Yes, sir.

14      Q.  Mr. Slatten was inside the command vehicle?

15      A.  Yes, sir.

16      Q.  Was not within your line of sight, correct?

17      A.  Yes, sir.

18      Q.  You didn't see him do anything at Nisur Square?

19      A.  No, sir.

20      Q.  You didn't hear him do anything at Nisur Square.

21      A.  No.

22      Q.  You never heard his sniper weapon fire during Nisur

23      Square.

24      A.  No, sir.

25      Q.  What you have to say, if at all about Mr. Slatten in

```
 1    Nisur Square, is about a conversation you had with him after
 2    the incident, correct?
 3    A.  Yes, sir.
 4    Q.  Okay.  You've told the jury that this conversation
 5    occurred once you came back to the man camp, correct?
 6    A.  Yes, sir.
 7    Q.  And what Mr. Slatten told you was that he engaged an
 8    active shooter, correct?
 9    A.  Yes, sir.
10    Q.  Which means he shot at someone who was actively shooting
11    at the convoy, correct?
12    A.  Yes.  That's what he said.
13    Q.  And he said that that person was to the south or
14    southwest, correct?
15    A.  Yes, sir.
16    Q.  This was someone that Mr. Slatten perceived to be
17    threatening the convoy, correct?
18              MR. ASUNCION:  Objection.
19    BY MR. CONNOLLY:
20    Q.  That's what he told you.
21              MR. ASUNCION:  Perception.
22              THE COURT:  Just rephrase it.
23    BY MR. CONNOLLY:
24    Q.  So he told you words to the effect this is someone who's
25    threatening the convoy.  Correct?
```

1    A.  Yes, sir.

2    Q.  Threatening people like you, up gunners, who were not

3    protected from small arms fire, correct?

4    A.  Yes, sir.

5    Q.  And just to be clear, if he sees -- Mr. Slatten sees

6    somebody shooting at the convoy, as the designated defensive

7    marksman, it's his duty to engage that threat, correct?

8    A.  Yes, sir.

9    Q.  Let's be crystal clear.  At no time did Mr. Slatten ever

10   say to you he shot at a white car, correct?

11   A.  I don't recall him telling me that.

12   Q.  He said nothing about shooting at a car, correct?

13   A.  I don't remember him saying that, no, sir.  He didn't.

14   Q.  He told you he was shooting at someone who was shooting

15   at the convoy, correct?

16   A.  Yes, sir.

17   Q.  Switching topics for a moment.  I believe you told the

18   ladies and gentlemen of this jury -- but I want to make sure

19   I understand that -- that early in your cooperation with the

20   United States government you told them that Jimmy Watson had

21   acknowledged to you that Mr. Watson fired during the Nisur

22   Square incident.  Correct?

23   A.  Pardon me?  Can you repeat that?

24   Q.  I'm moving now to Jimmy Watson.

25   A.  Right.

1    Q.  Is it your testimony that early in your cooperation with

2    the United States you told prosecutors that you had a

3    conversation with Jimmy Watson, and Jimmy Watson

4    acknowledged in that conversation that he fired during the

5    incident in Nisur Square.

6    A.  He did tell me that.

7    Q.  And you told the prosecutors this early in your

8    cooperation.

9    A.  I'm not sure when I told them.  But he told me that.

10   Q.  Now, we've spoken about substantial assistance and what

11   that means for you and your life, correct?

12   A.  Yes, sir.

13   Q.  And would you agree with me that you have a better

14   chance of receiving a motion for substantial assistance if

15   you can cover all four defendants as opposed to just one?

16   Correct?

17              MR. ASUNCION:  Objection, Your Honor.

18              THE COURT:  Sustained.

19   BY MR. CONNOLLY:

20   Q.  Well, do you have any sense that your odds of getting a

21   letter from the government for leniency for substantial

22   assistance increase if you can help their case against not

23   just one, but four defendants?

24              MR. ASUNCION:  Same objection.

25              THE COURT:  You can answer that.

1          THE WITNESS:  If you could rephrase that, please.

2     BY MR. CONNOLLY:

3     Q.  You're desperate to get a substantial assistance letter,

4     correct?

5     A.  I'm asking for a letter of cooperation, yes.

6     Q.  And would you agree with me that your odds increase to

7     get substantial assistance leniency if you can have

8     information as to four defendants rather than one?

9     A.  Sir, I wouldn't know that.

10    Q.  You don't think your odds increase four times?

11    A.  I wouldn't know.

12    Q.  So, Mr. Slatten wasn't in your vehicle.  You don't have

13    any idea what he did at Nisur Square, correct?

14    A.  That's correct.

15    Q.  And that's true of Mr. Liberty, also, correct?

16    A.  Other than what they told me.

17    Q.  And so in order to get substantial assistance as to

18    Mr. Liberty and Mr. Slatten you have to come up with things

19    that they've done in the past that might be helpful to the

20    government's case.  Correct?

21          MR. ASUNCION:  That's not factually accurate,

22    Your Honor.  We're objecting.

23          THE COURT:  Sustained.

24    BY MR. CONNOLLY:

25    Q.  Well, in the course of your multiple times of

1    cooperating with the United States Attorney's Office and the

2    FBI, were you asked multiple times to provide information

3    about Mr. Slatten, something he may have done in the past

4    unconnected to Nisur Square?

5    A.  They had asked me a lot of questions about some of the

6    defendants.  I answered what I knew.

7    Q.  And that's true of Mr. Liberty, also, correct?

8    A.  Yes, sir.

9    Q.  Because there's nothing you saw them doing during the

10   incident at Nisur Square, correct?

11   A.  That's correct.

12   Q.  So if you're going to get substantial assistance as to

13   Mr. Slatten you have to come up with issues --

14            MR. ASUNCION:  Objection, Your Honor, to that line

15   of questioning.

16            THE COURT:  Sustained.

17   BY MR. CONNOLLY:

18   Q.  Mr. Ridgeway, you understood that you couldn't credibly

19   come in front of this jury and testify to what Mr. Slatten

20   did at Nisur Square, because there's no way you would have

21   seen what he did.  Correct?

22            MR. ASUNCION:  Objection, Your Honor.

23            THE COURT:  Sustained.

24   BY MR. CONNOLLY:

25   Q.  Let's talk, Mr. Ridgeway, about your relationship with

```
 1    the truth.  Okay?

 2    A.  Yes, sir.

 3    Q.  So, it's been kind of a rocky relationship, hasn't it?

 4    A.  Yes, sir.

 5    Q.  Your relationship with the truth as it relates to

 6    Blackwater began on a lie, correct?

 7    A.  Yes, sir.

 8    Q.  The application form that you filled out to get this job

 9    you lied multiple times, correct?

10    A.  Yes, sir.

11    Q.  Lied about your military experience, correct?

12    A.  Yes, sir.

13    Q.  You lied about your experience on personal security

14    details, correct?

15    A.  Yes, sir.

16    Q.  You lied because you understood that if you didn't lie

17    you wouldn't get that job, correct?

18    A.  Yes, sir.

19    Q.  So you had an incentive to lie, and you actually lied

20    because of that incentive, correct?

21    A.  I did lie, yes, sir.

22    Q.  You had PTSD, according to your testimony, when you

23    applied for the position as the Blackwater contractor,

24    correct?

25    A.  Yes, sir.
```

1    Q.  And in the form you were asked if you had any mental

2    health issues, correct?

3    A.  Yes, sir.

4    Q.  And you understand that if you said that you had PTSD

5    you would not get that job, correct?

6    A.  Yes, sir.

7    Q.  You understood that if you acknowledged the truth that

8    you had received mental health treatment the period of the

9    last three years you would not get that job, correct?

10   A.  Yes, sir.

11   Q.  So you had an incentive to lie, correct?

12   A.  Yes, sir.

13   Q.  And when you had an incentive to lie, you lied, correct?

14   A.  I did.

15   Q.  But for those lies, you would have never been employed

16   by Blackwater, would you?

17   A.  That's correct, sir.

18   Q.  All right.  So then we get to the incident.  Immediately

19   after the incident you meet with federal agents from the

20   Department of State, correct?

21   A.  Yes, sir.

22   Q.  And at this point you told the ladies and gentlemen of

23   the grand jury:  I want to minimize my own conduct and

24   justify what I did.  Correct?

25   A.  I'm sorry.  Can you repeat that?

1    Q.  At this point when you're meeting with the Department of

2    State officials immediately after the Nisur Square incident,

3    you wanted to minimize your own behavior out there, correct?

4    A.  No, I just was trying to justify my behavior.

5    Q.  Trying to justify your behavior, correct?

6    A.  Yes, sir.

7    Q.  So your incentive there was to justify your behavior,

8    right?

9    A.  Yes, sir.

10   Q.  And given that incentive, that's exactly what you did.

11   You lied, correct?

12   A.  Yes, sir.

13   Q.  When you had an incentive to lie to the DSS, you lied,

14   correct?

15   A.  I did lie, yes, sir.

16   Q.  You looked the officers -- according to your own

17   testimony -- you looked them in the eye and lied to them in

18   response to questions, correct?

19   A.  I looked them in the eye?  I don't remember saying that.

20   But I lied to them.

21   Q.  You had a face-to-face interaction with them.

22   A.  Yes, sir.

23   Q.  So whether you averted your gaze or looked in their

24   eyes, you lied to them when you had an incentive to lie.

25   Correct?

1    A.  I lied to them, yes, sir.

2    Q.  That was the first time with you met with DSS.  You met

3    with them, correct?

4    A.  Yes.

5    Q.  And, again, you had an incentive to justify your

6    actions, according to you, correct?

7    A.  Incentive?  I just said I lied.  I lied to them.

8    Q.  The incentive to lie was to justify your actions,

9    correct?

10   A.  Yes, sir.

11   Q.  And having that incentive to lie, you lied, right?

12   A.  Yes, sir.

13   Q.  You met with the FBI agents and prosecutors in October

14   of 2008, correct?

15   A.  Yes, sir.

16   Q.  And there the incentive was again you wanted to justify

17   your behavior and not get charged in this case.  Correct?

18   A.  Yes, sir.

19   Q.  So the incentive was to lie, correct?

20   A.  I did lie, yes, sir.

21   Q.  And you lied because it was -- you thought it was in

22   your best interests to lie, correct?

23   A.  I lied, sir.

24   Q.  And you met with them multiple -- the agents and

25   prosecutors -- multiple times over the course of years.  And

1   on multiple occasions you thought it was in your best

2   interests to lie to them, didn't you?

3   A.   I did lie, yes, sir.

4   Q.   And then you did lie, correct?

5   A.   I had lied, yes.

6   Q.   When you -- after the incident at Nisur Square when you

7   decided you needed to get home but you needed disability

8   insurance, you had an incentive to lie, correct?

9   A.   Sir, you're taking it out of context.  Yes, I put down

10  that incident as the last incident.  I did have anxiety, I

11  did have trouble.  I wasn't completely honest on that form,

12  but I did have PTSD from that event.  From that event and

13  from previous events.

14  Q.   Mr. Ridgeway, I truly am sensitive to mental health

15  issues.  I'm not in any way criticizing this.  But what I'm

16  asking you is did you understand that you would have a

17  better chance to get disability insurance if you wrote on

18  the form that it was a two-way fire fight?

19  A.   Sir, I don't know what I was thinking when I wrote that.

20  Q.   Nonetheless you lied, correct?

21  A.   I did, yes, when I said it was a two-way fire fight.

22  Q.   And you have lied during the course of this case when

23  you had an incentive to lie and you believed it was in your

24  best interests you have in fact lied.  Correct?

25  A.   Sir, I did lie in this case.

1    Q.  Lied multiple times.

2    A.  I did, yes.

3    Q.  So now you have an incentive to get a substantial

4    assistance, correct?

5    A.  I'm asking -- I would hope that my lawyers will work on

6    my behalf for that, yes, sir.

7    Q.  You have an incentive for substantial assistance,

8    correct?

9    A.  Sir, I don't understand what you're trying to get at.  I

10   just came -- I wanted to come clean.  I did come clean.  I

11   owned what I did.  And if they -- and if I get the

12   substantial agreement -- if I get it I get it.

13   Q.  My question was much more simpler than that,

14   Mr. Ridgeway.  You now have an incentive to get substantial

15   assistance, correct?

16   A.  It's not an incentive, sir.

17   Q.  So you shared with the ladies and gentlemen of this jury

18   an alleged conversation you had Mr. Slatten having to do

19   with payback for 9/11, correct?

20   A.  Yes, sir.

21   Q.  And you told them that this occurred fairly early in

22   your tenure, correct?

23   A.  Yes, sir.

24   Q.  You arrived in Baghdad approximately January 1, January

25   2, 2007, correct?

1    A.  Approximately.

2    Q.  And you relayed to these ladies and gentlemen of the

3    jury a really dangerous mission that occurred on January 23

4    of that year, correct?

5    A.  Yes, sir.

6    Q.  That was about three weeks after you arrived in Baghdad,

7    correct?

8    A.  Yes, sir.

9    Q.  Insurgents had shot an RPG and downed a helicopter for

10   Blackwater, correct?

11   A.  I'm not sure what they shot it down with.

12   Q.  It was shot down.

13   A.  Yes, sir.

14   Q.  And another Blackwater helicopter went to its rescue and

15   it also went down, correct?

16   A.  I believe.  I'm not sure what happened to the other one,

17   sir.  Because someone wasn't killed on it.

18   Q.  And on this January 23 incident Mr. Slatten was on this

19   mission with you, correct?

20   A.  Yes, sir.

21   Q.  And this was a day of infamy for Blackwater, correct?

22   A.  Yes, sir.

23   Q.  Five Blackwater people were executed by insurgents,

24   correct?

25   A.  Yes, sir.

1    Q.  Their bodies were dragged through the streets?  Correct?

2    A.  I don't know if they were or not, sir.

3    Q.  Part of your mission was to recover the bodies, correct?

4    A.  Yes, sir.

5    Q.  And every time you went around a corner on that mission

6    to try to recover body you were ambushed by insurgents,

7    correct?

8    A.  I don't -- I don't recall that, sir.  When I was

9    carrying one of the bodies back with other gentlemen, we

10   were taking -- it appeared to be fired upon.

11   Q.  This was a four and-a-half hour fire fight, wasn't it?

12   A.  Four and-a-half hours?

13   Q.  Yeah.

14   A.  You're talking about while we were there at the crash

15   site?  Or getting around -- yeah, it lasted quite a bit.

16   Q.  And every time you went to a new place you got fired on

17   by insurgents.

18   A.  Yes, sir.

19   Q.  And the army was out there, correct?

20   A.  They were.

21   Q.  And they had their Bradley tanks and their Stryker

22   vehicles, correct?

23   A.  Yes, sir.

24   Q.  And they had Apache helicopters, correct?

25   A.  Yes.

1    Q.  And the army was into the fight with these insurgents

2    weren't they?

3    A.  I believe so.

4    Q.  This was a four and-a-half hour fire fight, correct?

5    A.  I don't know how long it lasted, sir.

6    Q.  And a day in which you lost five Blackwater personnel

7    from being executed by insurgents, is that correct?

8    A.  That's my understanding, yes, sir.

9    Q.  And it was after this mission on that day that

10   Mr. Slatten said to you:  I want to get payback for 9/11

11   because of these *hajjis*.  Correct?

12   A.  I'm not sure if it was that day.

13   Q.  You're not sure if it was that day?

14   A.  No, sir.  I didn't say when it happened.  I just said

15   that had said it.

16   Q.  But you can't say with any certainty that it didn't

17   occurred immediately after this mission when five Blackwater

18   people had been killed, correct?

19   A.  No, I couldn't say.

20   Q.  You testified about an incident where you say that

21   Mr. Slatten shot into an empty corrugated shed, correct?

22   A.  Yes, sir.

23   Q.  There wasn't anyone inside that shed, correct?

24   A.  That I know of, no.

25   Q.  Wasn't shooting at any person, was he?

1   A.  Pardon me?

2   Q.  He wasn't shooting at any person, correct?

3   A.  I don't think anyone was in there.

4   Q.  No one was there, correct?

5   A.  I don't think anyone was in there.

6   Q.  Now, testimony about Amanant city hall, correct?

7   A.  Yes, sir.

8   Q.  That was also known as Gray 55?

9   A.  That's my understanding.

10  Q.  You weren't present for Gray 55, the Amanant city hall,

11  were you?

12  A.  No, sir.

13  Q.  So you don't know, for example, what Mr. Liberty did or

14  didn't do that day, correct?

15  A.  Other than what he told me, no, sir.

16  Q.  You didn't observe him do anything at Amanant city hall,

17  did you?

18  A.  No, sir.

19  Q.  And you say -- you told us -- that Mr. Liberty told you

20  he stuck his weapon outside and shot, correct?

21  A.  Yes, sir.

22  Q.  And we can believe that because we have your word on

23  that, correct?

24  A.  He said that, sir.

25  Q.  We can take that to the bank because we have your word,

1     correct?

2     A.  He said that, sir.

3     Q.  So after Nisur Square you said that you had a

4     conversation with Mr. Liberty in which Mr. Liberty said he

5     pulled a Gray 55, correct?

6     A.  Yes, sir.

7     Q.  And again we can take that to the bank because we have

8     your word on that, correct?

9             MR. ASUNCION:  Your Honor, objection.

10            THE COURT:  Sustained.

11            MR. CONNOLLY:  May I have the Court's brief

12    indulgence?

13            (Pause.)

14            MR. CONNOLLY:  Your Honor, I'm done.  Thanks.

15            THE COURT:  Redirect?

16                      REDIRECT EXAMINATION

17    BY MR. ASUNCION:

18    Q.  Let's begin where Mr. Connolly left off, Mr. Ridgeway.

19    Do you remember the line of questioning from Mr. Connolly

20    just a few moments ago talking about incentives and

21    incentives to lie?

22    A.  Yes, sir.

23    Q.  Do you have -- as you sit here today, do you have any,

24    in your mind, do you have any incentive to lie about

25    anything that you've testified over the last few days?

1    A.  I have an incentive -- no, I don't have an incentive to

2    lie.

3    Q.  In your mind you have incentive to do what?

4    A.  To tell the truth.

5    Q.  And remind us.  Do you know the name of the judge who's

6    going to be sentencing you?

7    A.  Yes, sir.

8    Q.  And who is that?

9    A.  Judge Lamberth.

10   Q.  Judge Lamberth seated a few feet from you, Mr. Ridgeway?

11   A.  Yes, he is.

12   Q.  And what, if anything -- how do you think your sentence

13   would be affected if -- well, first of all, the judge

14   obviously gets to see you testify.  He's seen you throughout

15   these proceedings, right?

16   A.  Yes, sir.

17   Q.  I'm just asking what you're thinking.  In your mind, if

18   you were to tell the ladies and gentlemen of this jury

19   something less than the complete truth, how do you think

20   that will affect how the judge views you at sentencing?

21   A.  Not in a good way, sir.

22   Q.  And when you mean -- "not in a good way," what do you

23   think is going to happen to you?

24   A.  I'll go away for a long time.

25   Q.  Mr. Connolly asked you about this statement that you

1   testified to about -- what Mr. Slatten said about payback

2   for 9/11.  Do you remember that line of questions?

3   A.  Yes, sir.

4   Q.  And he asked you a bunch of questions about the timing

5   of when you may have heard that statement.  Do you remember

6   that?

7   A.  Yes, sir.

8   Q.  Just so we're absolutely clear, Mr. Ridgeway.  Do you

9   have a sense at all when that statement may have occurred?

10  A.  Not particularly, no, sir.

11  Q.  But just so we're clear, is it your memory that Slatten

12  said he wanted payback for what happened to Blackwater?  Or

13  payback -- or, did he say that?  Did he say:  I want payback

14  for what happened to Blackwater on this day?  Or anything

15  like that?

16  A.  No, sir.

17  Q.  Is there any question in your mind that he was referring

18  specifically to 9/11?

19  A.  I'm sorry.  Can you repeat that?

20  Q.  Why don't I ask it this way:  To the best of your

21  recollection with respect to that comment that you testified

22  about, both today and the other day, what is it that you

23  remember Slatten saying?

24  A.  That he was trying to get pay pack for 9/11, and he was

25  well on his way.

1    Q.  Now, the other day we had you mark on the screen an

2    exhibit, which I printed out and we've now marked it as

3    Government Exhibit 497-J.

4              MR. CONNOLLY:  No objection, Your Honor.

5              MR. ASUNCION:  Ma'am clerk, if we could move over

6    to the Elmo, please.

7              And, Your Honor, we're going to move that into

8    evidence.

9              THE COURT:  Received.

10             (Exhibit 497-J received into evidence.)

11   BY MR. ASUNCION:

12   Q.  And just so we're clear, Mr. Ridgeway, because it's now

13   an exhibit, 497-J, you had made a number of markings.  Do

14   you remember that?  You see it in blue?

15             Oh, I'm sorry.  If we could have that published to

16   the jury?

17             And Mr. Ridgeway, I just want to make sure we're

18   clear on what you -- what this reflects.  It reflects three

19   vehicles in blue?  Do you see that?

20   A.  It's hard to see, but -- I see four.  Appears to be

21   four.

22   Q.  Let me go ahead -- why don't I go ahead and do it this

23   way.

24             May I do this, Your Honor?

25             Because it's been a couple days.  First of all, do

1    you remember making those marks?

2    A.   Oh.  It was the arrow.  Yes, sir.

3    Q.   Okay.  And what is it that you meant to mark on that

4    exhibit?

5              Well, let me ask you this way:  Was there a point

6    that I asked you -- at the point before you shot at the Kia,

7    where were the vehicles located?  Do you remember that

8    series of questions?

9    A.   I do.

10   Q.   Just so we're clear there, I believe your testimony was

11   that you obviously knew where your vehicle was, you knew

12   where the command vehicle was, and you believed you

13   remembered where the first vehicle was.  Is that right?

14   A.   Yeah, approximately.  Within there.

15   Q.   And the second vehicle, at that point did you know where

16   it was?

17   A.   The ERV?

18   Q.   ERV, yes.

19   A.   I was a little unsure of the positioning of it.

20   Q.   Okay.  Which is why you didn't mark it on that

21   particular exhibit?

22   A.   I believe so.

23   Q.   Okay.  You've been asked a lot of questions about the

24   time between when you first shot in the direction of the

25   driver of the white Kia and when you shot at the passenger.

1    Do you remember this line of questioning --

2    A.  Yes, sir.

3    Q.  -- over the last few days?

4    A.  Yes, sir.

5    Q.  And just so we're clear -- I'm not asking you for

6    specific time -- but from the moment that you shot into the

7    driver's area of that white Kia, tell us what happened, and

8    between then and the time that you actually fired at the

9    passenger.

10   A.  The Iraqi traffic officer had run up to it, the man in

11   the *dishdasha* had run up to it, and then they disbursed, and

12   then the man in the *dishdasha* went behind the vehicle.  Then

13   from there after I fired at his feet then he went over to

14   the east side of the south of the circle.  And then he had

15   come back over to the passenger side of the Kia and that's

16   when I had fired.

17   Q.  All right.  And again, I'm not asking for a time

18   estimate.  But is it fair to say that that's more than a

19   split second?

20   A.  Yes, sir.

21   Q.  And when you first shot -- the very first time you shot

22   at the white Kia, describe what you remember about the

23   movements of the Kia.

24   A.  After I -- after I fired -- I'm sorry.  Can you --

25   Q.  Sure.  When you first fired at the Kia, could you tell

```
1    whether the Kia was moving or not?

2    A.   When I first fired on it?

3    Q.   Yes, sir.

4    A.   Yes.  I could tell it was moving.

5    Q.   Okay.  And how would you describe that movement?

6    A.   It was moving forward.

7    Q.   Now, I just want to make sure I understand your

8    testimony, sir.  Is it your view that when you shot at the

9    passenger in the white car, that was wrong?

10   A.   Yes, sir.

11   Q.   Is it your view that if someone else had shot at that

12   person before you or after you, that that would also be

13   wrong?

14   A.   Yes, sir.

15   Q.   And the same series of questions with respect to the

16   driver.  When you shot in the direction of the driver of

17   that Kia, do you believe that was wrong?

18              MR. CONNOLLY:  Objection as is to his opinion,

19   Your Honor.

20              THE COURT:  Overruled.

21   BY MR. ASUNCION:

22   Q.   You can answer that, Mr. Ridgeway.

23   A.   Would you repeat it?

24   Q.   Sure.  When you shot in the direction of the driver of

25   the Kia, do you believe that was wrong?
```

1    A.  Yes, sir.

2    Q.  If someone had shot before you in the same direction, do

3    you believe that would have been wrong?

4    A.  I'm not necessarily comfortable answering that because I

5    couldn't see what they were seeing.  I don't know what they

6    were -- so I'm not comfortable answering that.

7    Q.  When you shot in the direction of the driver of the

8    white Kia, is there anything about what you were able to

9    see, if anything, that suggested to you the driver by

10   himself was a threat to you?

11   A.  No.

12   Q.  When you saw the movement of the hands of the passenger

13   before you shot at that person, was there anything about

14   this alone -- the waving of the hands -- that suggested to

15   you that she was a threat to you?

16   A.  No, sir.

17   Q.  You've been asked a lot of questions about where it was

18   that you actually saw Dustin Heard firing and the volume of

19   fire.  Do you remember that series of questions?

20   A.  Yes, sir.

21   Q.  And just -- Mr. Schertler had asked you a number -- he

22   referred you to an FBI report, a 302, from 2009.  Do you

23   remember that?  And he pointed you to certain portions where

24   you talk about what Dustin Heard was doing?

25   A.  I do.

```
 1                    MR. SCHERTLER:  Objection, Your Honor.  I didn't
 2     do that.  I talked -- may we approach?
 3                    MR. ASUNCION:  I can rephrase the question,
 4     Your Honor, but that's my recollection.
 5     BY MR. ASUNCION:
 6     Q.  Let me ask it in this way:
 7                    THE COURT:  All right.
 8     BY MR. ASUNCION:
 9     Q.  Just so we're all clear, when is it -- just describe for
10     us when it was that you saw Dustin Heard firing, and in
11     which directions.
12     A.  When it was that he was firing and which directions?
13     Q.  Yes.
14     A.  It was after I fired on the driver of the Kia.  And he
15     was firing -- I could hear him firing.  So I look over and I
16     see him firing to the southeast of the circle.
17     Q.  Did you see him firing at any other point?
18     A.  Throughout the day?
19     Q.  Yes.
20     A.  Yes.
21     Q.  Okay.  Describe that for us.
22     A.  I saw him firing at the white Kia.
23     Q.  And apart from the white Kia, were you able to tell
24     where he was firing?  After he stopped firing at the white
25     Kia, where was he firing?
```

1   A.  I couldn't tell.  I mean, I know it wasn't -- it wasn't

2   in front of me, so --

3   Q.  Okay.  Well, you've talked a fair amount about this bus

4   stop.  Okay?  Did you perceive Dustin Heard to be firing

5   directly at the bus stop?  Or in the general vicinity of the

6   bus stop?

7   A.  It would be more in the general vicinity.  I couldn't

8   say if it was directly at that bus stop or not.

9   Q.  And in terms of -- I believe you were asked about how

10  you were firing your weapon suppressively.  I think there

11  was that line of questioning.  Do you remember that?

12  A.  Yes.  I had stated that.  Or, it was in the -- in a

13  conversation.  And I guess the 302's had said that I was

14  suppressively firing.

15  Q.  And how would you characterize how you perceived

16  Mr. Heard to be firing?

17  A.  It was a much higher volume of fire.

18  Q.  And in terms of -- let me ask you this:  When you were

19  firing in the direction that he was, were you yourself able

20  to personally identify a legitimate target?

21  A.  No, sir.

22  Q.  And in that general area at or around the bus stop, did

23  you ever see any muzzle flashes?

24  A.  No, sir.

25  Q.  You were asked about a photograph of -- taken near that

1    bus stop.  Do you remember that?

2    A.  Yes, sir.

3    Q.  And you remember that there were a handful of random

4    casings around that bus stop?

5    A.  Yes, sir.

6    Q.  Does the fact that that picture depicts a number of

7    random shell casings change the fact that you committed

8    crimes on September 16, 2007?  In your mind.

9    A.  No, sir.

10   Q.  If we could bring up Government Exhibit 9820, please?

11   Which is in evidence.  If we could have the laptop, please.

12           THE COURT:  Is it in evidence?

13           MR. ASUNCION:  I believe so.

14           THE COURT:  All right.

15   BY MR. ASUNCION:

16   Q.  And if we could, please, turn to the fourth page of that

17   document.  Woops.  Sorry.  Go back one, please.  If we could

18   just highlight that section, please.

19           And you remember talking about this both on direct

20   and cross-examination, Mr. Ridgeway?

21   A.  Yes, sir.

22   Q.  Okay.  First of all, do you understand that this is a

23   Department of State document?  This mission's firearms

24   policy?

25   A.  That's my understanding, sir.

1    Q.  Do you understand that this is not a statement of the

2    law that applies in this case?

3    A.  I don't know, sir.

4    Q.  Well, let me direct your attention to Government Exhibit

5    4971, which is your plea agreement.  If we could just

6    highlight that, please?

7              THE DEPUTY CLERK:  Is that in evidence?

8              MR. ASUNCION:  It's in evidence.  Sorry.

9    BY MR. ASUNCION:

10   Q.  And this is your plea agreement, and this reflects the

11   charges to which you pled guilty.  Is that right?

12   A.  Yes, sir.

13   Q.  Okay.  And do you see anywhere in here that -- I mean,

14   is it fair to say you're not pleading guilty to violating

15   the missions firearms statement of the Department of State.

16   Is that fair?

17   A.  Yes, sir.

18   Q.  In fact, the United States Code sections that support

19   the charges that relate to the charges of which you're

20   pleading guilty to, are enumerated in this paragraph.  Do

21   you see that?

22   A.  Yes, sir.

23   Q.  When you pled guilty in this case you accepted

24   responsibility for this crime?

25   A.  Yes, I did.

 1    Q.  Did you rely on that paragraph of the mission firearm

 2    statement as an excuse for committing this crime?

 3    A.  I'm not sure if I understand the question.

 4    Q.  When you appear before the judge, your plea was accepted

 5    by the judge?

 6    A.  Yes, sir.

 7    Q.  Let's talk a little bit about your perception about the

 8    white Kia.  And you described at various points your

 9    understanding at one point or perception that it was being

10    pushed.

11    A.  It's not that simple.

12    Q.  Okay.  Well --

13    A.  I used that word "pushed," but it -- clearly the guy

14    wasn't pushing.  I mean, he had his hand on the window.  And

15    it just -- I mean, the vehicle just rolled not even -- maybe

16    like a foot or so.  It barely rolled.

17    Q.  You talked about this person in -- was it a *dishdasha* --

18    that was kind of moving back and forth behind -- at various

19    points including behind the white Kia?

20    A.  Yes, sir.

21    Q.  And I believe you might have used words like "strange"

22    or "odd" or something like that to describe that?

23    A.  Yes, sir.

24    Q.  Did that odd or strange perception give you the right to

25    shoot at him?

1    A.  No, sir.

2    Q.  If we could go back to the plea agreement for a moment,

3    please.  If we could have it on the laptop, please.

4         You were -- there's a lot of discussion about what

5    will be considered for your actual sentence when you are

6    actually sentenced.  Do you remember that line of questions,

7    Mr. Ridgeway?

8    A.  Yes, sir.

9    Q.  And if we could refer to a Government's Exhibit

10   497-I0005, please.

11        THE DEPUTY CLERK:  In evidence?

12        MR. ASUNCION:  It's part of this exhibit.

13   BY MR. ASUNCION:

14   Q.  And if we could just highlight paragraph 9, please.

15        And this is entitled Court Not Bound By the

16   Non-Mandatory Sentencing Guidelines.  Do you see that?

17   A.  Yes, sir.

18   Q.  And is this something that you have reviewed before you

19   pled guilty?

20   A.  Yes, sir.

21   Q.  As part of your plea agreement, obviously?

22   A.  Yes, sir.

23   Q.  I'll just quickly read it.  You understand that the

24   sentence to be imposed upon -- is determined solely by the

25   Court.  And we've already talked about that.  That's going

1    to be Judge Lamberth, is that right?

2    A.  Yes, sir.

3    Q.  You understand that the sentencing guidelines are not

4    binding on the Court.  Do you see that?

5    A.  Yes, sir.

6    Q.  Okay.  What does that mean to you?

7    A.  The Court does not have to -- he could do -- the judge

8    could do whatever he wants.

9    Q.  So the sentencing guidelines calculations that are

10   spelled out in your plea agreement, the judge has the

11   discretion not to apply those.  Do you understand that?

12   A.  Yes, I do.

13   Q.  You, Mr. Ridgeway, acknowledge that your entry of guilty

14   pleas to the charged offenses authorizes the Court -- that

15   is Judge Lamberth in this case -- to impose any sentence up

16   to and including the statutory maximum sentence which may be

17   greater than the applicable guidelines range.

18           What does that mean to you?

19   A.  It means exactly what it said, sir.

20   Q.  And we've already talked about your cooperation which

21   is, again, another part of what will be weighed when going

22   to your sentencing, right?

23   A.  Yes, sir.

24   Q.  And that's also spelled out in this plea agreement?

25   A.  Yes, sir.

1    Q.  And we've already -- you've already talked about whether

2    you believe it will help or hurt to you lie before this

3    jury.  Right?

4    A.  That's correct, sir.

5    Q.  And we talked about this a little bit before, paragraph

6    7 of this agreement, which says that the United States

7    reserves its full rate of allocution for purposes of

8    sentencing in this matter.

9            That's spelled out here.  Do you see that?

10   A.  Yes, sir.

11   Q.  And to you, what does that mean?

12   A.  That's kind of hard to explain.  My understanding is

13   that you may or may not -- I'm sorry.  You'd have to -- it's

14   kind of hard for me to --

15   Q.  Do you believe that -- when you say "United States," in

16   your mind who are you -- who do you think is being referred

17   to?

18   A.  The -- you, the prosecution.

19   Q.  The prosecutors from the Department of Justice?

20   A.  Yes, sir.

21   Q.  And do you read this to mean that we can say what we

22   want to at sentencing?

23   A.  That's my understanding.

24   Q.  Now, is it fair to say that you've met with a number of

25   prosecutors over the course of this matter, this

1    investigation, up to this point, is that right?

2    A.  Yes, sir.

3    Q.  Did any single one of those prosecutors ever tell you

4    that they wanted to say -- they wanted you to say anything

5    that was other than the truth?

6    A.  No, sir.

7    Q.  And as you sit here today, Mr. Ridgeway, do you have any

8    idea what the government will be asking for at your

9    sentencing hearing?

10   A.  I have no idea, sir.

11   Q.  As you sit here today, Mr. Ridgeway, do you have any

12   idea what Judge Lamberth will do to you at sentencing?

13   A.  I have no idea, sir.

14   Q.  Now, we talked about the two charges that you pled

15   guilty to.  We've also talked about the criminal information

16   that relates to that.  Do you remember that?

17   A.  Yes, sir.

18   Q.  Do you understand that Judge Lamberth can weigh your

19   entire conduct, everything you did on September 16, 2007, in

20   deciding a fair and appropriate sentence in your case?

21   A.  That's my understanding.

22   Q.  If we could move on to Government Exhibit 497-L, which

23   is Factual Proffer in Support of Guilty Plea.  It's not yet

24   in evidence.  We're moving it into evidence.

25              MR. HEBERLIG:  No objection.

```
1              THE COURT:  Received.

2              (Exhibit 497-L received into evidence.)

3    BY MR. ASUNCION:

4    Q.  497-L.  We can just move over to the Elmo, if we could.

5    Thank you.

6              Sir, you've testified about this and obviously

7    you've seen this document before?

8    A.  Yes, sir.

9    Q.  Okay.  And that's the factual proffer in support of your

10   guilty plea?

11   A.  Yes, sir.

12   Q.  Do you understand that this is a legal document?

13   A.  Yes, sir.

14   Q.  Do you understand that it is part of the packet that's

15   filed -- or, was filed at the time of your plea hearing?

16   A.  I'm not sure I understand what you mean, sir.

17   Q.  Was it filed in court as part of the plea process, do

18   you know?

19   A.  That is my understanding, sir.

20   Q.  And is it right that when you strip away the signature

21   pages -- well, you'll see there are essentially 15

22   paragraphs to this document.  Do you see that?

23   A.  Yes, sir.

24   Q.  Is it your understanding that these 15 paragraphs

25   include every single detail about what you do know about the
```

1    facts of this case?

2    A.  Every single detail?

3    Q.  Yeah.

4    A.  I don't think it does, every single detail.

5    Q.  And as far as you know do these 15 paragraphs include

6    every single detail about your mindset, what was going

7    through your mind on that day, September 16 of 2007?

8    A.  No, sir.

9    Q.  Sir, as you sit here today, when you shot at the

10   passenger in the white Kia, did you subjectively believe

11   that you were acting in self-defense?

12   A.  No, sir.

13   Q.  Sir, as you sit here today, when you shot at Abdul

14   Wahab, the driver of that white Celebrity, did you

15   subjectively believe that you were acting in self-defense?

16   A.  No, sir.

17   Q.  And it's been covered quite a bit about you lying to a

18   number of people quite a bit about what occurred on

19   September 16, 2007.  Right?  Do you remember that line of

20   questions?

21   A.  Yes, sir.

22   Q.  And that includes people like your father and people

23   very close to you.  Do you remember that?

24   A.  Yes, sir.

25   Q.  Why is it that you would lie to your father about what

1    you actually did on September 16, 2007?

2    A.  I was embarrassed.  I didn't want him to know that my

3    actions were not anything other than appropriate or

4    honorable.

5    Q.  Switch gears for a moment.  As you were exiting the

6    south of the circle, when you were leaving the south of the

7    circle and heading north -- first of all, what would Heard,

8    as the rear turret gunner, typically what would his sector

9    of responsibility be?

10   A.  Typically?

11   Q.  Yes.

12   A.  To the rear of the convoy.

13   Q.  All right.  And do you know that to the rear of the

14   convoy --

15          Well, actually, if we could pull up Government

16   Exhibit 323.  We could do it this way.  It's in evidence.

17   Laptop, please.

18          Let me ask it this way.  Do you recognize where

19   FOB -- are you FOB Prosperity?

20   A.  Somewhat, yes, sir.

21   Q.  And do you see it generally on the map where it would be

22   located?

23   A.  I believe I do.

24   Q.  Okay.  And why don't you just point to the general area

25   where Prosperity is.

1    A.  This is my understanding, sir.  That it's -- I believe

2    it goes that way.

3    Q.  Just so we're clear, is Prosperity within the Red Zone

4    or the Green Zone?

5    A.  It's in the Green Zone, sir.

6    Q.  So as you are exiting from the south part of the circle,

7    is FOB Prosperity to the rear of your vehicle?

8    A.  Yes, sir.

9    Q.  Okay.  And is there any reason to believe that there

10   would be any threats or incoming fire coming from FOB

11   Prosperity?

12   A.  Coming from Prosperity?

13   Q.  Right.

14   A.  I wouldn't think so, sir.

15   Q.  And just so we're all clear, when you are leaving the

16   circle, where is your focus?  What sector are you looking

17   at?

18   A.  Sir, I'm not quite -- I don't quite remember.  I know I

19   was somewhat forward.  I could have been either this way or

20   that way looking -- as we get into the counter flow, I start

21   looking to the -- to the easterly side of the street.

22   Q.  So I just want to be clear.  Is your testimony today --

23   at what point do you believe -- well, actually, let me move

24   forward.  When you felt contact to the north of the circle

25   between your vehicle and what was the white Celebrity, in

1    which direction were you facing?

2    A.  I was facing east -- or, towards the -- towards oncoming

3    traffic just trying to move the traffic.

4    Q.  What is it that made you turn around?

5    A.  The impact of the vehicles.

6    Q.  And before -- and so is it when you swung around and

7    turned west?

8    A.  Yes, sir.

9    Q.  And before then, do you recall whether you were facing

10   west at all?

11   A.  Before then?

12   Q.  Yeah.  After you exited the south of the circle.

13   A.  I'm not sure I understand.

14   Q.  Just so we're clear.  When you're leaving this area,

15   where do you believe you're facing?

16   A.  I'm not sure.  I could have been looking either way.  I

17   just don't remember which way I was looking it could have

18   been back and forth.

19   Q.  But it sounds like what you've described is when you're

20   north of the circle you're clearly facing east?

21   A.  When I'm north?

22   Q.  Yes.  Before the impact.

23   A.  I was facing forward, but it's -- it's my -- my view,

24   I'm looking to the east because we're trying to move the

25   traffic past our vehicles.

1   Q.  Okay.  You remember the series of questions about the

2   State Department issued weapons that you described.  Do you

3   remember that?

4   A.  Yes, sir.

5   Q.  And these were State Department weapons issued to do

6   your job, is that right?

7   A.  Yes, sir.

8   Q.  Mr. Ridgeway, was it your job to shoot unarmed civilians

9   who posed no threat to you?

10   A.  No, it was not.

11   Q.  You were asked about an email and several questions

12   along the line that six months or so leading up to September

13   16, 2007, things were getting progressively worse.  Do you

14   remember that?

15   A.  Yes, sir.

16   Q.  And when you wrote that, were you referring specifically

17   to Nisur Square?

18   A.  No, sir.

19   Q.  Before September 16, 2007, had you had any shoot-outs at

20   Nisur Square that you were involved with?

21   A.  No, sir.

22   Q.  Before September 16, 2007, do you know whether Raven 23

23   was ever ambushed at Nisur Square?

24   A.  I don't know, sir.

25   Q.  Were you ever ambushed at Nisur Square?

1    A.  No, sir.

2    Q.  You were asked about the statement that you made on that

3    form where you indicate lack of sleep and extreme stress and

4    anxiety.  Do you remember that line of questions?

5    A.  Yes, sir.

6    Q.  What were you stressed out about?

7    A.  A lot of things.  I mean, incoming rockets.  Just

8    leaving -- being in Baghdad in and of itself.

9    Q.  Did the events that occurred -- did the events that

10   occurred on September 16, 2007, weigh on you at all?  Did

11   that cause any anxiety on your end?

12   A.  Yes, it did.

13   Q.  You were asked a lot about this first meeting with the

14   Department of Justice attorneys.  Do you remember that?

15   A.  Yes, sir.

16   Q.  First of all, did you know going in before that meeting

17   that you were already a target of their investigation?

18   A.  I'm not sure of the timing, sir.  There was -- I know I

19   did get a target letter, but I'm not sure of the timing.

20           (Pause.)

21   Q.  Just going to put on the Elmo what is in evidence as a

22   defense exhibit.  First of all, you were asked a series of

23   questions about that, Mr. Ridgeway, the other day, right?

24   A.  Yes, sir.

25   Q.  And that was described to you as a target better.  Do

1    you remember that?

2    A.  Yes, sir.

3    Q.  What is the date of that letter?

4    A.  June 2, 2008.

5    Q.  So -- and did -- I assume your lawyer shared that

6    information with you soon thereafter?

7    A.  Yes, sir.

8    Q.  And this is Mr. Schertler's exhibit.  Do you remember

9    talking about this?  Defense exhibit 2270.  You remember

10   your testimony regarding this, right?

11   A.  Yes, sir.

12   Q.  So just so we're clear on the timing, even before August

13   14 of 2008, did you understand yourself to be a target of

14   the government's investigation?

15   A.  Yes.

16   Q.  And we'll talk about this letter in a moment.  But let's

17   talk a little bit about this October 30 of 2008 meeting.

18   Your first meeting with prosecutors.

19          I believe your testimony was, and you correct me

20   if I'm wrong -- that your goal was to essentially convince

21   prosecutors that you had done nothing wrong.  Is that a fair

22   statement?

23   A.  Not entirely.

24   Q.  Okay.  Well, tell me what your goal was on October 30 of

25   2008.

1   A.  We were -- our goal was, not just for myself, but also

2   for all the defendants, to justify our actions as a whole.

3   Q.  Mr. Ridgeway, do you play poker?

4   A.  I haven't in awhile, sir.

5   Q.  Do you know what it means to bluff?

6   A.  Yes, sir.

7   Q.  You were bluffing at that meeting, weren't you?

8   A.  Yes, sir.

9   Q.  So to be entirely accurate, we talked a little bit about

10  what was going through your mind.  But the fact of the

11  matter is on that day you were bluffing.

12  A.  Yes, sir.

13  Q.  And hoping that the Department of Justice would do what?

14  A.  We wouldn't -- I wouldn't be investigated.

15  Q.  Much has been made of the fact that -- is it 18?  Or, I

16  guess 19 days between October 30 and November 18 before you

17  signed your plea agreement.  Do you remember that line of

18  questions?

19  A.  Yes, sir.

20  Q.  Did you know on October 30 of 2008 that you were telling

21  lies to the prosecutors?

22  A.  Yes, sir.

23  Q.  So how long did it take for you to decide that you

24  wanted a Plan B and tell the truth?

25  A.  19 days, it says.

1    Q.  Well, I mean, you knew on this day that you had told

2    lies, is that right?

3    A.  Yes, I did.

4    Q.  And there has been a lot of discussion about what you

5    told agents and when throughout this whole process.  Do you

6    remember that line of questions?

7    A.  Yes, sir.

8    Q.  Are you able to provide your best estimate of how many

9    times you met with FBI agents throughout the course of this

10   entire matter?

11   A.  No.  No, sir.

12   Q.  Are you able to provide your best guess, your best

13   estimate?

14   A.  It was quite a few.

15   Q.  When you say "quite a few," are we talking about a dozen

16   or more?

17   A.  I would say a dozen or more.

18   Q.  At these meetings with FBI agents, did they ask you to

19   recount ever single thing you know every time they sit down

20   with you?

21   A.  No, sir.

22   Q.  Are there times they focus on one part or one area

23   rather than other areas?

24   A.  Yes, sir.

25   Q.  At these meetings do they ask you to recount everything

1    you know about what others said to you?

2    A.  I'm sorry.  Would you repeat the question?

3    Q.  At these meetings with FBI agents, do they ask you to

4    recount -- do they always ask you to recount everything you

5    possibly know about what other people, including the

6    defendants, may have said to you?

7    A.  Not every time, sir.

8    Q.  And so, for example -- and you were asked about this

9    quite a bit on cross-examination.  Are you able to tell us

10   when it was that Watson said something along the lines of

11   get your story straight, or keep your story straight?

12   A.  When he said it?

13   Q.  Yeah.

14   A.  He said it the evening of September 16.

15   Q.  But when is it that you -- are you able to say when it

16   was that you told the FBI about that?

17   A.  No, I couldn't say when it was.

18   Q.  But is it fair to say that your testimony today is not

19   the first time you've ever told anyone that this occurred

20   with respect to the Watson statement?

21   A.  I'm sorry.  Could you --

22   Q.  Sure.  As I understand your testimony, you're not able

23   to tell us with precision when it was that Watson made that

24   statement.  Is that right?

25   A.  I mean, I can estimate it back.  It was with the old

1    trial team, so it was years ago.

2    Q.  Just so we're clear, you've admitted that even after

3    your plea you continued to tell lies about what you observed

4    on September 16, 2007, right?

5    A.  Yes, sir.

6    Q.  And in particular, what is it that you continued to lie

7    about?

8    A.  It was the muzzle flashes to the south, southwest.

9    Q.  If we could pull up Government's Exhibit 497-L for the

10   witness at this point.

11              Going to have to put on the Elmo.  I'm sorry.

12              And you testified quite a bit on cross-examination

13   about this letter.  Do you remember that series of

14   questions, Mr. Ridgeway?

15   A.  Yes.

16   Q.  And so we know that this is a letter authored by your

17   attorney, Mr. William Sullivan, right?

18   A.  That's correct.

19   Q.  And he's a partner at a large DC law firm here in town?

20   A.  Yes, sir.

21   Q.  Is it fair to say that your understanding of his role is

22   to look after your best interests?

23   A.  That is my understanding.

24   Q.  He represented you from 2007 through today?

25   A.  Yes, sir.

1    Q.  So that would include the plea process?

2    A.  Yes, sir.

3    Q.  Is it your expectation that he's going to be there at

4    sentencing advocating on your behalf?

5    A.  Yes, sir.

6    Q.  Now, this letter that you've talked quite a bit about,

7    is it your understanding that he was doing his job writing

8    this letter to the Department of Justice?

9    A.  That is my understanding, sir.

10   Q.  And his job, at least at that point, was to try to get

11   you off.  Is that a fair statement?

12   A.  Yes, sir.

13   Q.  Is that what you believed?

14   A.  Yes, sir.

15   Q.  And if we could -- we'll turn to the next page.  And so

16   you see that reference to -- on that next page your lawyer

17   writes you conducted yourself honorably, courageously and

18   responsibly at every point during the incident and that you

19   did nothing wrong.  Do you see that?

20   A.  Yes, sir.

21   Q.  That wasn't true, was it?

22   A.  No, it was not, sir.

23   Q.  He was advocating on your behalf.  Is that a fair

24   statement?

25   A.  Yes, sir.

1   Q.  If I could direct your attention -- we've talked quite a

2   bit about this, or you talked quite a bit about this on

3   cross-examination.  That paragraph that's there on that

4   government exhibit, second page of that letter.  Do you see

5   that?

6   A.  Yes, sir.

7   Q.  And essentially, among other things, what it says is it

8   portrays the white Kia as a threat.  Do you see that?

9   A.  Yes, sir.

10  Q.  And that's not true, is it?  Did you perceive that white

11  Kia as a threat?

12  A.  No, it was not.  It was not, sir.

13  Q.  This letter also alleges that you were receiving gunfire

14  from multiple directions.  Do you see that?

15  A.  I actually don't see it on here.  Maybe you could point

16  it --

17  Q.  At approximately the same time or within seconds

18  thereafter, members of Raven 23 began receiving machine

19  gunfire from multiple directions.

20  A.  I see it, sir.

21  Q.  And is that information that you provided to your

22  lawyer?

23  A.  Yes, sir.

24  Q.  Was that true or false?

25  A.  It was false, sir.

1    Q.  At the time that your lawyer in representing your

2    interests wrote this letter, was this the story that you

3    were asking the Department of Justice to believe?

4    A.  Yes, sir.

5    Q.  If you had been unable to work out a plea agreement with

6    the Department of Justice in this case is this the story

7    that you would be sticking by?

8              MR. SCHERTLER:  Objection.

9              THE COURT:  Sustained.

10   BY MR. ASUNCION:

11   Q.  If you had not accepted responsibility and you,

12   Mr. Ridgeway, went to trial, what do you believe your

13   attorney would be saying?

14             MR. SCHERTLER:  Objection.

15             THE COURT:  Sustained.

16             MR. ASUNCION:  Court's indulgence.

17             (Pause.)

18             MR. ASUNCION:  We have nothing further,

19   Your Honor.

20             THE COURT:  All right.  You can step down.

21             (Witness excused.)

22             THE COURT:  Do you have a witness here?

23             MR. MARTIN:  Yes, Your Honor, we do.  The

24   government calls Jeremy Krueger.

25                          JEREMY KRUEGER,

```
 1                    after having been first duly

 2                  sworn upon oath, was examined

 3                    and testified as follows:

 4                      DIRECT EXAMINATION

 5    BY MR. MARTIN:

 6    Q.  Sir, good afternoon.

 7    A.  Hello.

 8    Q.  Would you please take a moment, introduce yourself to

 9    the members of the jury and spell your full name?

10    A.  My name's Jeremy Krueger.  J-E-R-E-M-Y, K-R-U-E-G-E-R.

11    Q.  And Mr. Krueger --

12              MR. MARTIN:  I'm moving at this time Exhibit 500.

13    I think without objection, Your Honor.

14              MR. HEBERLIG:  That's correct, Your Honor.

15              THE COURT:  Received.

16              (Exhibit 500 received into evidence.)

17    BY MR. MARTIN:

18    Q.  May we put the Elmo on the big screen, please?

19              Do you recognize that man, sir?

20    A.  Yes.

21    Q.  And who is that?

22    A.  That's me.

23    Q.  Several years ago, correct?

24    A.  Yes.

25    Q.  Mr. Krueger, how old are you?
```

```
1    A.   41.

2    Q.   And what do you do for a living?

3    A.   I'm in the sanitation business.

4    Q.   Where do you live?

5    A.   Pensacola, Florida.

6    Q.   How long have you lived in Pensacola?

7    A.   Approximately 15 years.

8    Q.   Are you married, sir?

9    A.   I am.

10   Q.   Do you have kids?

11   A.   I do.

12   Q.   And what level of education do you have, sir?

13   A.   I have a bachelor's.

14   Q.   In what?

15   A.   Sociology.

16   Q.   Criminal justice, as well?

17   A.   Yeah.  It was kind of a double major.

18   Q.   Where did you get your degree?

19   A.   West Virginia University.

20   Q.   And when you graduated from college, what did you do?

21   A.   I spun my wheels for awhile and I moved to Pensacola,

22   Florida.

23   Q.   For the weather?

24   A.   Family and weather, yeah.

25   Q.   And then did there come a time after you graduated that
```

1    you joined the Army?

2    A.  Yes.

3    Q.  Can you tell us a little bit about that?

4    A.  What do you want to know exactly?

5    Q.  When did you join the Army?

6    A.  2002.  I think it was February or March.

7    Q.  When did you graduate from college?

8    A.  December 1996.

9    Q.  And when you joined the Army in 2002, was it as an

10   enlisted man, an officer?  How did you do that?

11   A.  I went in as an officer.

12   Q.  Did you go to the officer basic course or officer

13   candidate school as it's sometimes called?

14   A.  Yes.  Officer Candidate School.

15   Q.  And am I correct that's something where just like being

16   enlisted guy, you have to volunteer to go to that school?

17   A.  I'm not really sure, but I can explain.  I had a college

18   degree, I wanted to join the Army.  Because of that degree I

19   was able to apply for Officer Candidate School.

20   Q.  You went there in 2002.  And where was that physically

21   located?  The school.

22   A.  Fort Benning, Georgia.

23   Q.  What was the particular branch of the Army you were

24   going into?

25   A.  Infantry.

1    Q.   Infantry?

2    A.   Uh-huh.

3    Q.   How long did you spend at Fort Benning at Officer

4    Candidate School?

5    A.   Officer Candidate School I think lasts about three

6    months.

7    Q.   After that you became an officer in the Army?

8    A.   Correct.

9    Q.   And do you recall what your rank was at that time?

10   A.   Second lieutenant.

11   Q.   That's where you got to start, correct?

12   A.   Yes.

13   Q.   Then you went to a unit, I take it, at some point?

14   A.   I did, yes.

15   Q.   Where were you assigned?

16   A.   Fort Benning, Georgia.

17   Q.   What was the name of the division or unit you were in?

18   A.   The 3rd Battalion, 3rd Infantry Division.

19   Q.   Do you have a sense of how many infantry divisions were

20   in the Army at the time?

21   A.   No.

22   Q.   But the 3rd Infantry Division, is that a fairly large

23   unit, if you will?

24   A.   Sure.

25   Q.   How many men?

```
 1    A.  The division?

 2    Q.  Yes.

 3    A.  I wouldn't know.  Several thousand.

 4    Q.  And as part of the division, what was your role?  What

 5    was your assignment?

 6    A.  I had several assignments.  Just I was an infantry

 7    officer in that division.

 8    Q.  Did you start off with a platoon?

 9    A.  I did.

10    Q.  How many men in your platoon?

11    A.  About 30.

12    Q.  What did you do over the course of the next several

13    years with the Army?

14    A.  I remained as an infantry officer until I got out of the

15    Army.

16    Q.  Were you ever deployed?

17    A.  I was.

18    Q.  Okay.  What time frame?

19    A.  All of 2005.

20    Q.  Where were you deployed, sir?

21    A.  Iraq.

22    Q.  Was that in support of our efforts in Iraq from 2003

23    through about year and-a-half ago?

24    A.  Yes.

25    Q.  What was your responsibility when you were deployed to
```

1    Iraq?

2    A.   I was still infantry officer at the time.  And when I

3    deployed I had a platoon.

4    Q.   Again, right around 30 men?

5    A.   Correct.

6    Q.   And what type of missions did you conduct on a daily

7    basis in Iraq in 2005?

8    A.   Mainly security missions, convoy, different types of

9    infantry missions.  The whole spectrum.

10   Q.   Did that include things like combat patrols?

11   A.   Yes, it did.

12   Q.   And did that include taking your element out into some

13   of the more dangerous areas of Iraq?

14   A.   Yes.

15   Q.   During your time in Iraq in 2005 did you ever encounter

16   enemy fire?

17   A.   Yes.

18   Q.   Did you yourself have to engage the enemy from time to

19   time?

20   A.   Not myself, no.

21   Q.   Did members of your unit have to engage?

22   A.   Yes.

23   Q.   Did you lose men?

24   A.   No.

25   Q.   And how many engagements with the enemy did your unit

1     have -- your platoon -- over the time you were in Iraq

2     during that deployment?

3     A.   A half dozen, approximately.

4     Q.   Would that include small arms fire?

5     A.   Yes.

6     Q.   Did you yourself come under fire at times?

7     A.   Myself?

8     Q.   Yes.

9     A.   My unit did, yeah.  Or whatever my -- I guess my unit or

10    team at the time, yes.

11    Q.   Okay.  And as being part of the Army, did you become

12    proficient, if you will, in use of the basic infantryman's

13    rifle?

14    A.   Yes.

15    Q.   What type of rifle was the Army using at the time?

16    A.   Either an M-4 or an M-16.

17    Q.   Did you become familiar with the M-203 grenade launcher?

18    A.   Yes.

19    Q.   Did you yourself have one of those?

20    A.   No.

21    Q.   Did members of your unit?

22    A.   Yes.

23    Q.   Did you about become familiar with the M-240 Bravo or

24    Gulf machine gun?

25    A.   Yes.

1    Q.  And did you feel like over the course of your time with

2    the Army you had some level of proficiency with all those

3    weapons?

4    A.  Yes.

5    Q.  Now, how long did you stay with the military?

6    A.  Approximately four and-a-half years.

7    Q.  Why did you get out, sir?

8    A.  My initial obligation was through shortly after my

9    deployment, and I wanted to do other things.

10   Q.  When you got out, sir, what was your rank?

11   A.  Captain.

12   Q.  And to be clear there's second lieutenant, first

13   lieutenant, and then captain, correct?

14   A.  Yes.

15   Q.  Were you honorably discharged?

16   A.  Yes.

17   Q.  Did you receive any awards or accommodations as parts of

18   your deployment to Iraq?

19   A.  Yes.

20   Q.  Let me ask you just a few more questions about the

21   military.  In the military itself, you were in charge of 30

22   men, is that correct?

23   A.  Yes.

24   Q.  And were you also in charge of ensuring that they had

25   good morale and welfare?

1   A.  Yes.

2   Q.  Was unit morale important to you as a leader of that

3   platoon?

4   A.  Yes.

5   Q.  And how did you foster that type of morale?

6   A.  There's lots of ways.  Just generally making sure that

7   the soldiers under me had everything that they needed,

8   allowing them plenty of recreational time, things of that

9   nature.

10  Q.  When you were in training with those men, did you train

11  them to do their part of the missions and allow others to do

12  their part of the mission?

13  A.  I'm not sure I understand that question.

14  Q.  You got 30 men out there at any given time, is that

15  correct?

16  A.  Yes.

17  Q.  And if -- are you familiar with 360 security?

18  A.  Yes.

19  Q.  And 360 security is you put people around in a circle,

20  you've got something you're trying to protect in the middle

21  -- maybe you as a platoon leader -- and you're relying all

22  those men on the perimeter to do their job, is that correct?

23  A.  Correct.

24  Q.  Was there a fair amount of training with your platoon

25  encouraging them to trust -- trust -- their team members and

1    their other military members?

2    A.  Yes.

3    Q.  And was that important to you in order to ensure that

4    you could accomplish your mission?

5    A.  Yes.

6    Q.  Did you foster that?

7    A.  Yes.

8    Q.  And did you believe at the time when you were in the

9    military that was important to any functioning unit, that

10   they at least start with the assumption of trust in terms of

11   their other military members?

12   A.  Yes.

13   Q.  Now when you got out of the military what did you do?

14   A.  Shortly after I got out I gained employment with

15   Blackwater.

16   Q.  About how long did it take, do you know?  In terms of

17   months or years?

18   A.  I don't recall.  Maybe three to four months.

19   Q.  Why did you apply for Blackwater?

20   A.  The money, for one.  Also just the opportunity to stay

21   in a field that was interesting to me.

22   Q.  Was part of that service towards your country?

23   A.  Yes.

24   Q.  And did you have some unique skills that you thought you

25   could lend to Blackwater?

1    A.  Yes.

2    Q.  In terms of the pay you mentioned it was pretty good.

3    You were in the military as an officer, though, is that

4    correct?

5    A.  Correct.

6    Q.  Were you still going to be getting paid more with

7    Blackwater than you could ever get paid as a captain, for

8    example?

9    A.  Yes.

10   Q.  About how much more?

11   A.  How much more?

12   Q.  Two times more, three times more?  Or do you know?

13   A.  Two to three times more.

14   Q.  And when you applied for the position with Blackwater

15   were you accepted?

16   A.  Excuse me?

17   Q.  Were you accepted?

18   A.  Yes.

19   Q.  The first time?

20   A.  As far as I know.

21   Q.  And then in terms of where you were going, did you know

22   you'd be deployed to Iraq or some other place?

23   A.  I think I was fairly certain it was going to be Iraq at

24   the time.

25   Q.  Did you know at the time you applied it was a dangerous

1    place to go?

2    A.  Yes.

3    Q.  You were still willing to go?

4    A.  Yes.

5    Q.  Did you know at the time you applied that you may

6    encounter actual enemy at some time?

7    A.  Yes.

8    Q.  But you were prepared to do that?

9    A.  Yes.

10   Q.  When you were selected did you go to Moyock to go

11   through their vetting course of sorts?

12   A.  I did.

13   Q.  Did you learn a little bit about providing defensive

14   protective services as part of the Blackwater mission?

15   A.  Yes.

16   Q.  You know what I mean by that?  Defensive protective

17   services?

18   A.  Yes.

19   Q.  Just describe for the ladies and gentlemen of the jury

20   what you believe that meant in terms of that mission that

21   Blackwater was undertaking in Iraq at the time.

22   A.  Basically, to me it meant that we would be protecting

23   certain individuals or groups, small groups, that worked for

24   the United States, in either the government or in support of

25   the mission over there.

1    Q.  Was that different than the military mission that you

2    had performed in Iraq in 2005?

3    A.  There was differences, sure.

4    Q.  Did you have an offensive mission when you were in Iraq

5    in 2005?

6    A.  We had offensive missions and defensive missions.

7    Q.  And if you were to describe the Blackwater mission that

8    you were going to support when you went to Iraq as part of

9    Blackwater, would you describe it as offensive or defensive?

10   A.  Defensive.

11   Q.  Was there any doubt in your mind?

12   A.  No.

13   Q.  Now, when you were -- when were you initially deployed

14   to Iraq, do you recall, roughly?

15   A.  Sometime in the summer of 2007.

16   Q.  Was that your first deployment as part of Blackwater?

17   A.  Yes.

18   Q.  What happened when you got on the ground?  Were you

19   assigned to a particular unit?

20   A.  I was.

21   Q.  What unit?

22   A.  I was assigned to Raven 23.

23   Q.  The same unit you were in on September 16, 2007?

24   A.  Yes.

25   Q.  And if I can show you 330.  Sir, this is already in

1    evidence as Government's Exhibit 330.

2           Are you able to see that for the most part?

3    A.  I can.

4    Q.  Do you see yourself right up here?

5    A.  Yes.

6    Q.  Same picture we showed you earlier correct?

7    A.  Correct.

8    Q.  When you got to Raven 23 in the summer 2007, who on that

9    board was already there, if you remember?

10   A.  I can point out each one that I'm pretty certain were

11   there.

12   Q.  Why don't you just say their names out loud.

13   A.  Okay.  Fairly certain Mark Mealy, Donald Ball, Matthew

14   Murphy, Adam Frost, Paul Slough, Nick Slatten, Jeremy

15   Ridgeway, Dustin Heard, Daniel Childers, Cory Wainscott,

16   Jeremy Skinner, Kevin Rhodes, Jim Watson, Evan Liberty,

17   Edward Randall, Thomas Vargas and Dean Wagler were already

18   there.

19   Q.  So it sounds like most of the gentlemen on 330 were

20   already there when you got there.

21   A.  Yes.

22   Q.  And let me just ask you about a few of these individuals

23   here.

24           Paul Slough on -- in the upper row appears to be

25   assigned to the turret gun in the Bearcat.  When you first

1   got to Raven 23, was that your first interaction with

2   Mr. Slough?

3   A.  I don't recall what his position was when I first got

4   there.

5   Q.  Do you recall whether you knew Mr. Slough before you got

6   to Raven 23, though?

7   A.  Yes, I do recall.

8   Q.  Did you know him before that?

9   A.  I did not.

10  Q.  Do you see him here in the courtroom?

11  A.  Yes.

12  Q.  And he just stood up, is that correct?

13  A.  That's correct.

14  Q.  Now if we could move on to Mr. Nick Slatten.  Do you

15  recall whether you knew Mr. Nick Slatten before you got to

16  Raven 23 in summer of 2007?

17  A.  Yes.  I recall.  I didn't know him.

18  Q.  Do you see him in the courtroom?

19  A.  That's him.

20  Q.  Standing up?

21  A.  Yes, that's him.

22  Q.  Thank you.  Mr. Jeremy Ridgeway.  Did you know him

23  before summer of 2007?

24  A.  I did not.

25  Q.  Mr. Dustin Heard.  Did you know Mr. Dustin Heard before

1    summer 2007?

2    A.  I did not.

3    Q.  Is he standing up behind me?

4    A.  Standing right there, yes.

5    Q.  Thank you.  And then Mr. Evan Liberty on the bottom side

6    there.  Do you see him in the courtroom?

7    A.  I see him, yes, standing up.

8    Q.  And did you know Mr. Liberty before summer of 2007?

9    A.  I did not.

10   Q.  Mr. Jim Watson.  Did you know him before summer 2007?

11   A.  I did not.

12   Q.  Did you know any of those individuals on that board

13   prior to the summer of 2007?

14   A.  No, I didn't.

15           MR. MARTIN:  And, Your Honor, for the record, may

16   it reflect the witness has identified the defendants?

17           THE COURT:  It will.

18   BY MR. MARTIN:

19   Q.  Let me ask you about Mr. Slough, Mr. Slatten, Mr. Heard

20   and Mr. Liberty as a group.  Did you have any problems with

21   any of those individuals prior to September 16, 2007?

22   A.  What do you mean by problems?

23   Q.  Did you have any personality conflicts with them?

24   A.  No, I didn't have anything that -- I didn't really have

25   any personal issues with them personally, no.

1    Q.   Did you have an ax to grind against any of them?

2    A.   No.

3    Q.   And did you yourself serve in Raven 23 from summer 2007

4    to September 16, 2007, with those men without incident?

5    A.   Yes.

6    Q.   Now, let me ask you about a few other gentlemen.

7    Mr. Mealy.  Did you know -- you did not know him before

8    summer of 2007, is that correct?

9    A.   Correct.

10   Q.   Did you have an opinion as to whether he was a

11   professional during the time you served with him?

12   A.   Yes.

13   Q.   Was he?

14   A.   Yes.  That was my opinion.

15   Q.   With respect to Mr. Murphy -- Matthew Murphy -- did you

16   know him prior to summer of 2007?

17   A.   No.

18   Q.   And over the course of the months you were able to serve

19   with Mr. Murphy did you consider him a professional?

20   A.   I did.

21   Q.   Mr. Adam Frost, same question.  Over the course of the

22   time you were able to serve with that man as a member of

23   Raven 23 up to September 16, 2007, did you consider him a

24   professional?

25   A.   I did.

1    Q.  And did you consider those men above average in terms of

2    their competence?

3    A.  Yes.

4    Q.  Let me ask you just a few follow-up questions on

5    Mr. Liberty.

6           Were you aware of any instances where Mr. Liberty

7    was over aggressive with water bottles?

8    A.  Yes.

9    Q.  And can you tell us about the incidents you're aware of?

10   A.  There was some incidents with escalation of force using

11   water bottles.

12   Q.  Do you recall an instance in which Mr. Liberty smashed

13   the window on a car?

14   A.  I do.

15   Q.  And did you see that yourself?

16   A.  I did see one incident, yes.

17   Q.  Was it necessary?

18   A.  I didn't believe so.

19   Q.  Now, with that information did you tell anybody about

20   that?

21   A.  I don't know that I told anybody.  I think other people

22   witnessed it.

23   Q.  Did you approve of that use of a water bottle?

24   A.  I didn't personally, know.

25   Q.  And did you also see from time to time Mr. Jeremy

1    Ridgeway using water bottles in an overly aggressive manner?

2    A.  Yes.

3    Q.  Do you recall any specific instances as you sit here

4    today?

5    A.  No.

6    Q.  But generally recall him using those in an overly

7    aggressive manner?

8    A.  I have, yeah.  I recollect that.

9    Q.  Let me ask you, then, a few questions about Mr. Jimmy

10   Watson there.  It says Jim Watson down there.  But do you

11   recall when he arrived at the team?

12   A.  I recall him not being on the team, and then arriving.

13   I don't remember the date.

14   Q.  Do you recall how long before September 16, 2007, he got

15   there?

16   A.  Approximately a month.

17   Q.  And did you have any issues with Mr. Watson?

18   A.  No.

19   Q.  Let me move you to September 16, 2007.  There was a

20   shooting incident in Nisur Square that day.  Do you recall

21   that?

22   A.  Yes.

23   Q.  Did you fire your weapon that day?

24   A.  No.

25   Q.  Did you yourself see any threats to the convoy that day?

1    A.  I didn't see any.

2    Q.  And did you yourself see any individuals firing weapons

3    at Raven 23 that day?

4    A.  I did not.

5    Q.  Now, what vehicle were you occupying on September 16,

6    2007?

7    A.  I was occupying the ERV.

8    Q.  What was your position that day?

9    A.  I was a fire team member inside the vehicle.

10   Q.  What did that mean that day?  What were your

11   responsibilities?

12   A.  My responsibilities?  Given any situation we were in, I

13   would have a designated sector to provide security on, and

14   then take orders from the chain of command.

15   Q.  As a member of the fire team in the ERV, would you be

16   required to deploy on the orders of your shift leader from

17   time to time?

18   A.  That would be -- that could be a possibility, yes.

19   Q.  And did you -- you mentioned sectors of responsibility.

20   But did you have defined sectors?  Or were you more of a

21   I'll-look-where-I-need-to-look in order to provide security

22   to the convoy?

23   A.  It would be situationally dependent.

24   Q.  Do you recall what did you that morning?

25   A.  At what time?

1    Q.  Did you wake up?

2    A.  Yeah.

3    Q.  What did you do after you woke up?

4    A.  Are you asking for a list of events that led up --

5    Q.  Just the basics, yeah.  What was the first thing you did

6    after you got up?  You ate breakfast.  And then did you have

7    a requirement to go to the convoy vehicles at some point?

8    A.  I don't remember our exact schedule that day.  If my

9    memory serves me accurately, we were on a break.  The team.

10   Raven 2-3 was on a break or they were on a support shift

11   where we weren't actually deployed into our vehicles.

12   Q.  And by being on a break or a support shift, do you

13   recall there being like, basically, three different

14   assignments?  Either primary, secondary, or tertiary or off?

15   A.  Yes.

16   Q.  Do you recall whether you were primary, secondary, or

17   tertiary that day?

18   A.  I don't recall.

19   Q.  Let me ask you if I can -- if I can refer you to your

20   grand jury transcript.  And this is marked as 500-T.

21             MR. MARTIN:  May I approach, Your Honor?

22             THE COURT:  Yes.

23   BY MR. MARTIN:

24   Q.  We'll see if we can refresh your recollection.  Let me

25   just ask you some basic questions about that.  Do you see

1    the date of that particular grand jury transcript, sir, is

2    that December 18, 2007?

3    A.   Yes.

4    Q.   And is that consistent with your memory as to when you

5    appeared in front of the grand jury in this matter?

6    A.   Yes.

7    Q.   So we're talking approximately three months after the

8    September 16, 2007, event?

9    A.   Correct.

10   Q.   Let me direct your attention to page 23, line 24.  And

11   if you could just read it to yourself first and we'll see if

12   that refreshes your recollection.  If you go 24, 25, and

13   then over to the next page 1 and 2.

14   A.   Okay.

15   Q.   Does that refresh your recollection as to whether you

16   were primary, secondary or something else?

17   A.   Yeah.  It refreshes my memory that we were on secondary

18   or primary that day.

19   Q.   Okay.  And as the secondary, not the primary TST, what

20   was your responsibility that day?

21   A.   We may have had a mission that day and returned to it

22   and been on a break.  We may not have been assigned that

23   mission today and were just awaiting possible assignment.

24   Q.   Being on the secondary team at least that day, did you

25   still have to get your vehicles ready to go in the morning?

```
1    A.  Yes.

2    Q.  And did you do that, to your recollection?

3    A.  To my recollection, yes.

4    Q.  Once you were kind of all ready to go if you had to on a

5    moment's notice, were you allowed to then leave the vehicles

6    and go do some other things?

7    A.  Yes.

8    Q.  Do you recall if you ever called back to the vehicles to

9    go out into the Red Zone to provide support?

10   A.  Yes.

11   Q.  About what time, if you recall.

12   A.  I don't recall.

13   Q.  Do you recall what you were doing at the time?

14   A.  I think I was in my room.

15   Q.  And do you recall knowing anything about the reason for

16   you, Raven 23, being called to your vehicles to go out?

17   A.  Not before I got to the vehicle.

18   Q.  When you got to the vehicle do you learn from someone

19   why you were going out?

20   A.  I think so, yes.

21   Q.  What's your best recollection as to why you were needed

22   to go out?

23   A.  There was a threat or a possible threat, attack or

24   possible attack, on one of the PSD teams.

25   Q.  And when you responded to the ERV, do you recall the
```

1   other members of your particular vehicle being there or not

2   being there at the time you first responded?

3   A.  I'm fairly certain they were all there.

4   Q.  Mr. Murphy, Mr. Frost, Mr. Skinner, Mr. Rhodes to the

5   best of your recollection were they in your vehicle that

6   day?

7   A.  Yes.

8   Q.  And I'm not going to ask about the other vehicles.  But

9   you're certain they were in your vehicle that day.

10  A.  Yes.

11  Q.  What did Raven 23 do once everybody was ready to go?

12              THE COURT:  We'll cover that at 10:00 tomorrow.

13              Have a nice evening.  Don't talk about the case,

14  don't Twitter, tweet, don't read anything about the case.

15  I'll see you all tomorrow.

16              (NOTE:  The jury exiting the courtroom at

17  5:00 p.m.)

18

19              (NOTE:  The following proceedings were held

20  outside the presence of the jury.)

21              THE COURT:  You can step down.

22              (Witness stepping down.)

23              THE COURT:  All right.  I'm prepared to take

24  argument on the defendants' motion for sanctions against the

25  government for the *Brady* violation.  I have the government's

1    papers.  Let me ask the government if they'll go through

2    their factual scenario first.

3              MR. HEBERLIG:  You want to hear from the

4    government first?

5              MR. CRABB:  I'm sorry, Your Honor.  I didn't hear

6    what you want from the government.

7              THE COURT:  Start with the facts.  Start with fact

8    number one, why did these two pictures get separated out?

9              MR. CRABB:  That I can't say explicitly,

10   Your Honor.

11             THE COURT:  Why can't you?

12             MR. CRABB:  Because when -- the people we've

13   talked to don't have a specific recollection.

14             THE COURT:  Who separated them?

15             MR. CRABB:  If I could go back a step.  To my

16   knowledge, they weren't separated.  What we understand

17   happened is that Captain Decareau gave a disk --

18             THE COURT:  They were separated when they went to

19   the defendant.

20             MR. CRABB:  Well, it was two different sets of

21   photographs, Your Honor.  It's our understanding that when

22   Captain Decareau met with the FBI in October 2007, he gave a

23   disk to the FBI agent that had photographs on it.

24             THE COURT:  Had all of them.

25             MR. CRABB:  Yes.

1          THE COURT:  That's what he would say.

2          MR. CRABB:  Yes, Your Honor.  That disk was taken

3    by the FBI.

4          THE COURT:  Who?

5          MR. CRABB:  I'm sorry?

6          THE COURT:  Who?  Name.

7          MR. CRABB:  I would have to look, Your Honor.  I

8    apologize.  Off the top of my head I don't know which agent

9    did the 302.  I certainly can supply that information.  It

10   was most likely Agent Patarini or Murphy.  They were the

11   agents early on.  But I can find that the out.  I just don't

12   know off the top of my head.

13         THE COURT:  What did that person do with them?  I

14   want you to walk me through step by step.

15         MR. CRABB:  Yes, Your Honor.  That agent took the

16   disk and a couple of other items from Captain Decareau.

17   There was a statement that Captain Decareau had prepared for

18   the Army, a written statement of his own, and what's been

19   described as a story board.  It's like a PowerPoint printout

20   of some photographs and some verbiage.

21         THE COURT:  Who prepared that?

22         MR. CRABB:  I think that Captain Decareau was

23   involved in the preparation of it.  I think it was a joint

24   effort in his command, but it was something that he worked

25   on.  But I don't think he was the exclusive author of that

1     item is the way I understand it.  But he certainly

2     participated in its production.

3               THE COURT:  What was his assignment?

4               MR. CRABB:  He was a platoon leader.  He was in

5     the battalion commanded by Colonel Tarsa who the Court's

6     heard from previously.

7               THE COURT:  And his assignment was to go over

8     there that day and take pictures?

9               MR. CRABB:  In general, yes.  Captain Decareau, as

10    I said, was a platoon leader.  His platoon was getting ready

11    to go out on their normal daily duties, which were generally

12    patrolling that area.  Prior to them actually going out at

13    their assigned time, they heard the explosion of the Kia in

14    Nisur Square.

15              At approximately the same time, word was getting

16    back to Colonel Tarsa about an issue in Nisur Square.  So

17    the way I understand it, Colonel Tarsa contacted Captain

18    Decareau and told him that he needed to leave immediately

19    and go to Nisur Square to investigate what was happening.

20              I don't believe he was given a specific assignment

21    about photographs.  He was just generally told to go there,

22    find out what was happening.  By the time he arrived, the

23    shooting was over, the car was still burning, so he didn't

24    have any -- he didn't get involved in actual action, so he

25    did begin to try to see what had happened.  And one of the

1     things he did was take photographs.

2               THE COURT:  And Colonel Tarsa was still there?

3               MR. CRABB:  Colonel Tarsa arrived after Captain

4     Decareau.  I believe that Captain Decareau and the men in

5     his platoon were the first Americans on the scene.  So they

6     were there sometime later.  I think it's approximately a

7     half an hour.  I don't know precisely how long.  But

8     sometime in the approximate time frame after Captain

9     Decareau and his platoon arrived on the scene, Colonel Tarsa

10    with a detachment of his additional men arrived on the

11    screen.  And then sometime thereafter -- I think

12    approximately an hour after the incident ended -- Colonel

13    Boslego arrived on the scene.  So Colonel Tarsa and Captain

14    Decareau overlapped on the scene, but Captain Decareau

15    preceded him.

16              THE COURT:  And then Decareau's testimony is that

17    he took these photos.  And did what with them?

18              MR. CRABB:  He took them and had a disk.  And I

19    was handed a 302 while I was talking, Your Honor.  He turned

20    this disk over to Agent Sean Joyce and Agent Aubrey Farrar,

21    F-A-R-R-A-R, were the two agents who interviewed Captain

22    Decareau.  And this happened on October 12 of 2007.

23              THE COURT:  And they prepared a 302?

24              MR. CRABB:  Yes, Your Honor.

25              THE COURT:  And what do they say about the photos

1       in it?

2                   MR. CRABB:  May I have just a moment?

3                   (Pause.)

4                   MR. CRABB:  Your Honor, I believe one of the 302's

5       attached.  I certainly can provide another copy to the

6       Court.  On page 2 of the 302 it says, quote:  Decareau

7       provided the interviewing agents a CD of photographs taken

8       at the scene.

9                   May I have just a moment, Your Honor?

10                  (Pause.)

11                  MR. CRABB:  And, Your Honor, I don't believe that

12      in the 302 there's any notation of Captain Decareau

13      describing actually what was on the disk.  He does talk

14      about interviewing people there and things that he observed.

15      I don't believe he gave -- at least it's not accounted here

16      -- any particular inventory or description of what the

17      photos were on the disk.  It's our understanding that --

18                  THE COURT:  Once they took the disk, is that an

19      item of evidence they put in the evidence chain?  Or not?

20                  MR. CRABB:  Yes and no.  Although this piece of

21      evidence wasn't handled like, for example, shell casings or

22      weapons where it's actually put in the FBI's evidence room.

23      This item of evidence was put in what the FBI calls a 1-A,

24      which is an envelope with one of those string attachments.

25      And the disk of photographs, Decareau's written statement,

1    and his so-called story board were put into one of those FBI

2    envelopes which were called 1-A.

3            THE COURT:  Oh.  He gave them the story board at

4    the same time.

5            MR. CRABB:  Yes, Your Honor.

6            THE COURT:  What was that date?

7            MR. CRABB:  That was on October 12, 2007.

8            THE COURT:  And then what happened to it?

9            MR. CRABB:  Those items were brought back to the

10   United States, put into the 1-A, and maintained at the FBI.

11   Subsequently -- well, I should mention two things.  One,

12   there were a lot of photographs produced by the U.S.

13   military of the scene and worked its way through the system,

14   came to the FBI, came to the U.S. Attorney's Office, and

15   were produced in discovery.

16            I've spoken to both of the prosecutors who were

17   handling the case at that time and it was their

18   understanding they had all of the photographs taken by the

19   U.S. military, and that's what they produced in discovery.

20            In -- I believe it's April, but sometime in the

21   spring of 2008, Captain Decareau came to Washington and

22   testified before the grand jury in this case.  At that point

23   his 1-A was not reviewed.  It was what we've called a

24   montage.  There were several photographs.  I believe it's

25   four.  A subset of Captain Decareau's photographs, but four

1     that were on a single sheet.

2              In talking to the prosecutors who had the case at

3     that time, it's not clear, no one has a memory now,

4     precisely where they obtained that montage, whether it was

5     Captain Decareau gave it to them or one of the military

6     officers who had previously testified.  Because by that

7     point both Colonels Boslego and Tarsa had come and testified

8     before the grand jury.

9              At this point no one is sure from whom

10    specifically they received that montage.  But they had it.

11    And that's what was used when Captain Decareau testified in

12    the grand jury in the spring of 2008.

13             THE COURT:  What's the date of that?

14             MR. CRABB:  Of his grand jury testimony?  May I

15    have one moment, Your Honor?

16             THE COURT:  Yeah.

17             MR. CRABB:  Your Honor, he testified on April 15

18    of 2008.

19             THE COURT:  All right.  The montage only had four.

20             MR. CRABB:  Correct.

21             THE COURT:  Not including these two.

22             MR. CRABB:  Correct.  And I think there were some

23    other photographs that came from various sources that were

24    used with Captain Decareau at that time.  But as I say,

25    there was -- the disk which had been received the previous

1      October and placed in the 1-A was not reviewed or used as

2      part of the grand jury process.  I want to emphasize that.

3      It wasn't reviewed at that point.  There was no decision at

4      that point made about any photographs and the disk to use or

5      not use with the grand jury.  It just wasn't reviewed at

6      that point.  And photographs coming from other sources, some

7      of which overlap with the disk, were used when Captain

8      Decareau testified.

9           And when Captain Decareau testified before the

10     grand jury, he said that he didn't see any AK-47 shell

11     casings.  And specifically referred to the area of the bus

12     stop not having seen AK-47s.  So there was no reason at that

13     point for anyone to think differently and to think that they

14     were missing something because he affirmatively said before

15     the grand jury that he went down by the bus stop and he

16     didn't see AK-47s in that area.

17          And, in fact, that was what the government

18     understood through the first incarnation of this case,

19     through subsequent meetings with Captain Decareau which

20     happened in approximately May of 2013 is when the filter

21     team met with him.  Just to be clear, the filter team talked

22     to him more about his official exposure.  We didn't quiz him

23     in great detail about the substance, but we certainly met

24     with him and were aware of his 302 and aware of the

25     materials.

1          Subsequently, he met with the trial team.  I guess

2     in I think early this year and of course again to prepare

3     for trial.  And prior to July 23, Captain Decareau never

4     said anything to any representative of the government about

5     seeing AK-47 shell casings, and certainly not specifically

6     about seeing and photographing AK-47 shell casings near the

7     bus stop, as I said a moment ago.  In fact, he said to the

8     contrary.  He said to the grand jury that he didn't see

9     something like that.

10          So without question it's an oversight and a

11     mistake which we should not have made, but it was nothing

12     intentional and no one was putting their head in the sand

13     and trying to avoid uncomfortable evidence.

14          Captain Decareau had given a different

15     explanation.  Based on the montage of photographs everyone

16     assumed that the photographs that he took were the ones that

17     we had and had no reason to go back and check the disk

18     because his testimony was he hadn't seen AK-47 shell casings

19     or such casings near the bus stop.

20          He did -- for whatever reason, on the evening of

21     July 23 something clicked in his mind and he mentioned for

22     the first time to either the agents or the prosecutors that

23     he had a recollection of having seen some AK-47 shell

24     casings and thought he might have photographed them.

25          At that point, clearly, we didn't have such a

1   photograph and that was the spark that alerted us that

2   perhaps we were missing something which we had mistakenly

3   assumed we had.

4           THE COURT:  What was the story board and what was

5   the reason for creating a story board?

6           MR. CRABB:  The story board is --

7           THE COURT:  And who created it?

8           MR. CRABB:  The story board looked -- I think the

9   best way to describe it is like a PowerPoint slide.  It has

10  both photographs and verbiage.  I believe it's two pages, is

11  my recollection.  I think it went through several

12  iterations.  What I understand from Captain Decareau is he

13  created some type of a product which has been referred to as

14  a story board shortly after the incident based on his time

15  on the scene, what he and his men saw, photographs they

16  took, interviews they took.  Because there was -- I

17  apologize I can't tell you precisely within the military

18  chain of command what the requirements were.  But since they

19  were on the scene and this happened in the area they were

20  responsible for, there was some type of a reporting

21  requirement.

22          THE COURT:  So the theory was the story board was

23  to help tell the story of what happened.

24          MR. CRABB:  That's my understanding.

25          THE COURT:  And Decareau created it?

 1          MR. CRABB:  He at least created an iteration of

 2     it.  What I understand from him is he created a product.  It

 3     went up through the chain of command, and it was amended and

 4     revised at several levels as it worked its way through.  But

 5     he certainly began the project.

 6          THE COURT:  Now, I thought I read -- let me see if

 7     I can -- give me just a moment to see.  I thought I read

 8     something about --

 9          He would say he never knew those two were

10     separated out.  That's your proffer?  Or not?

11          MR. CRABB:  Right.  My understanding from Captain

12     Decareau is he took these photographs on September 16, he

13     handed a disk containing those two and other photographs to

14     the FBI on I believe it was October 12.  But October 2007.

15     And he didn't really think about it one way or the other

16     again.  Some six months later he came to Washington to

17     testify in the grand jury.  He was shown certain photographs

18     which he recognized as being consistent with what he had

19     seen at Nisur Square.  But he didn't do an inventory or

20     cross reference the photographs he had taken on September 16

21     as compared to what he was shown on April 15 of 2008 when he

22     came to Washington to testify in the grand jury.

23          And as I've said before, he in fact said at that

24     point that he hadn't seen AK-47 shell casings near the bus

25     stop, so it doesn't appear as though that was something that

1    was foremost in his mind at the time.

2            What he's told us is that at the time of September

3    16 and today he doesn't think there was any connection

4    between those shell casings and the incident based on the

5    circumstances, based on the location being so close to the

6    wall, based on the array of the casings.  He didn't think

7    had anything to do with the shooting then.  He still doesn't

8    think it had anything to do with the shooting.  And so

9    somehow it wasn't foremost in his mind.

10           THE COURT:  Now, in your responsive memo you say

11   the story board was classified.  Why was it classified?

12           MR. CRABB:  Your Honor, I apologize for smiling.

13           THE COURT:  And by who?

14           MR. CRABB:  The military tends to classify things.

15   Apply a very low threshold to classification.  I can't -- I

16   don't mean to be facetious at all.  I can't answer why.

17           THE COURT:  Who?

18           MR. CRABB:  I'm sorry?

19           THE COURT:  Tell me who.

20           MR. CRABB:  Who classified it?  I believe in the

21   first instance it was Captain Decareau in preparing it.  It

22   has just basic information what people perceive to have

23   happened there that day.  There's not any intel about prior

24   incidents or intel about other information about what might

25   have transpired that day.  It's basic information that was

 1     gathered through witness interviews and observations.  And

 2     for whatever reason -- perhaps based on the situation and

 3     the military circumstances at the time -- Captain Decareau

 4     classified it.  I can certainly look into it further.  I

 5     don't know what requirements they had.

 6               THE COURT:  The board itself is stamped "secret"?

 7               MR. CRABB:  "Secret."  Yes, Your Honor.

 8               THE COURT:  The photos themselves were never

 9     classified.

10               MR. CRABB:  Correct.  I don't mean to be

11     presumptuous.  But if the Court is getting at the point --

12     the photos on the disk, the story board which was marked

13     "secret," and Captain Decareau's statement; when they were

14     collected by the FBI they were all put into a single

15     envelope.  That envelope was marked "secret."  I believe the

16     reason was that since any item in there was secret, the

17     entire package was marked "secret," I believe is what the

18     rationale was behind that.  But as the Court pointed out,

19     neither the disk of photographs, nor Captain Decareau's

20     actual statement, were themselves secret.

21               THE COURT:  But in terms of the FBI disclosing

22     anything in that envelope, they would have to know some of

23     it was secret and some of it wasn't.

24               MR. CRABB:  I'm sorry, I don't quite understand.

25               THE COURT:  Well, if they made a disclosure, they

1    would have thought the envelope was classified "secret."

2    The envelope's marked "secret," right?

3              MR. CRABB:  Yes.  The outside of the envelope

4    containing the entire contents was marked "secret."

5              THE COURT:  Even the Army wouldn't try to defend

6    classifying that today, I take it.

7              MR. CRABB:  No, Your Honor.

8              THE COURT:  But the FBI treated it as classified.

9              MR. CRABB:  Your Honor, it was placed in a 1-A

10   that was stamped "secret."  Precisely where that envelope

11   was maintained over the course of the past seven years I

12   can't speak to right now.  I can try to look into it

13   further.

14             THE COURT:  Who could speak to that?

15             MR. CRABB:  I'm not sure, but I just want to be --

16   when you say did the FBI treat it that way, as the Court's

17   well aware there are very specific requirements as to how

18   secret documents be maintained.  And precisely where this

19   item was housed from October 2007 forward I can't answer

20   right now, but I can try to find out.

21             THE COURT:  Well, how did the two photographs

22   suddenly appear, then, in 2014?

23             MR. CRABB:  When -- on the evening of July 23

24   Captain Decareau's at the U.S. Attorney's Office meeting

25   with the trial team to prepare for his trial testimony.  And

1    I was present for some of this, not all of it.  But what I

2    understand is -- I mean, at some point there were some

3    questions about whether or not he saw anything at Nisur

4    Square that would suggest insurgents or any fire at the

5    convoy.  Now, previously, for a long time, his answer had

6    been no.  In fact, that's what he said in the grand jury.

7    For whatever reason, that evening something clicked in his

8    mind and he remembered.  It's my understanding he said he

9    thought he remembered having seen some AK-47 shell casings

10   on the ground and he thought he had taken a picture of it.

11          People knew that they'd never seen such a picture

12   and began to put two and two together that we had pictures

13   which didn't show what he just mentioned.  And that the

14   assumption that people have been --

15          THE COURT:  These are pictures now more than the

16   story board.

17          MR. CRABB:  Yes.  These are on the disk.  In

18   addition to the story board -- I'm probably just not being

19   clear.

20          When Captain Decareau met with the FBI at the very

21   beginning, October 2007, there's a story board.  But a

22   completely separate item is a disk that contains

23   photographs.  I think approximately 30.

24          MR. HEBERLIG:  44.

25          MR. CRABB:  Okay.  44.  Those are separate items,

1    Your Honor.  There's a story board, and then there's a disk

2    of photographs.

3              THE COURT:  And they went in this 1-A envelope the

4    FBI took.

5              MR. CRABB:  Yes.  The three items that Captain

6    Decareau gave to the FBI in October of '07, which was the

7    disk of photographs, the story board which had been stamped

8    "secret," and Agent Decareau had written a statement,

9    military statement.  All three of those items were turned

10   over by Captain Decareau to the FBI in October of 2007.  All

11   three items were maintained together in the same 1-A

12   envelope.  Because one of the three items had been marked

13   "secret," the entire envelope was then marked "secret."

14             THE COURT:  Well, when were the pictures on the

15   disk then made available to the defendant and the trial

16   team?

17             MR. CRABB:  That evening when Captain Decareau

18   mentioned --

19             THE COURT:  You mean, not until July 23.

20             MR. CRABB:  Correct.

21             THE COURT:  So all of those pictures were

22   concealed until July 23.

23             MR. CRABB:  Yes.  No one -- correct.  No one --

24   that is correct.  No one from the government had looked at

25   that disk until the evening of July 23, to our knowledge.

1    We know no one on the prior trial team, the current trial

2    team, the current filter team.

3              THE COURT:  Had the disk been turned over?

4              MR. CRABB:  To the defense?  No.

5              THE COURT:  A copy of the disk.

6              MR. CRABB:  No, Your Honor.

7              THE COURT:  How did they get the pictures, then?

8              MR. CRABB:  We gave them to the defense that

9    evening.

10             THE COURT:  But they had other pictures.

11             MR. HEBERLIG:  Can I respond to the facts?  I

12   think we're operating under a misconception here.

13             THE COURT:  Yes.

14             MR. HEBERLIG:  Your Honor, we laid this out in

15   attachment 11 to our motion.

16             The disk was 44 photos.  Okay?  That's what

17   Decareau turned over to the FBI.  We never got the disk and

18   we never got those photos produced individually as part of

19   discovery.  What we did get -- although we didn't know they

20   were Decareau's photos at the time -- are grand jury

21   exhibits that were used with the first grand jury.

22             Mr. Crabb has referred to a montage of

23   photographs.  And he said there was just one that had four

24   of Decareau's photos.  Well, there actually were five.  And

25   attachment 11 to our motion has all of them.  They were

1    different grand jury exhibits.  But 22 of Decareau's 44

2    photographs were put in these collages, all right?  And I

3    can hand them up if the Court wants it.  But fully half of

4    Decareau's photos were put in the prior grand jury in this

5    form.  Not the two that we've highlighted here.

6         I don't believe there's a chance in the world that

7    Captain Decareau created these story boards, or whatever you

8    call them, collages.  And that would be simple enough for

9    the prosecutors to ask.

10        There is a virtual certainty that someone within

11   the government created these.  We've heard a representation

12   that Mr. Kohl and Mr. Malis don't recall creating them.  I

13   have to take that at face value.  But if it wasn't them,

14   then it had to have been the FBI.

15        And whoever went through the 44 photographs to

16   cull out the 22 that they used with the grand jury either

17   saw those two photographs or was grossly negligent in not

18   doing so.  But there are more than just four.  It's 22 of

19   44.

20        And I'd like to address the legal issues, but

21   that's --

22        THE COURT:  I understand.  I just want to get the

23   facts straight first.

24        MR. CRABB:  Your Honor, we agree that someone from

25   the government created those montages, but it's most likely

1    --

2              THE COURT:  That's different than the story board.

3              MR. CRABB:  Correct.

4              THE COURT:  What are montages?

5              MR. CRABB:  As Mr. Heberlig pointed out, there are

6    five of them.  There are single pages with multiple

7    photographs on the page.  And --

8              THE COURT:  Those are created for that 2008 grand

9    jury.

10             MR. CRABB:  That's what I want to address,

11   Your Honor.  Those were received by the government.  As

12   Mr. Heberlig says, there's no doubt they were created by the

13   government.  But I think he's mistaken as to which part of

14   the government.  It's our understanding the United States

15   military created those.  It's our understanding no one from

16   the Department of Justice went through that disk.  No one

17   from the Department of Justice created these what we're

18   calling montages.

19             Captain Decareau, as we talked about, was on the

20   scene at the order of his commander, Colonel Tarsa.  Captain

21   Decareau had a reporting requirement up through his

22   hierarchy.  He created these story boards.  It's our

23   understanding that he passed photographs, other things he

24   did, went up through the hierarchy.  Somehow a -- his

25   photographs went on two different tracts.

1          Some subset of his photographs, someone in the

2    military made judgments as to what was important and what

3    they were interested in, were put on what we're calling

4    montages.  At some point those montages were turned over to

5    the United States government.  They are a subset of all of

6    the photos Captain Decareau took.

7          On a completely separate track, Captain Decareau

8    gave his disk of all his photos to the FBI agents in October

9    2007.  It was that disk that was put into a 1-A file and not

10   reviewed by the Department of Justice until July 23 of 2014.

11         These subset of his photos which were used in the

12   grand jury came to the government on a completely separate

13   track.  They weren't by the Department of Justice extracted

14   from this disk.  Someone else -- we believe it was the

15   military -- did that.  As I say, both Colonel Boslego and

16   Colonel Tarsa testified to the grand jury prior to Captain

17   Decareau having come.

18              THE COURT:  Were they displayed to the grand jury?

19              MR. CRABB:  What I'm calling montages?

20              THE COURT:  No -- yes.

21              MR. CRABB:  Yes.

22              THE COURT:  Who displayed them?

23              MR. CRABB:  Well --

24              THE COURT:  During whose testimony?

25              MR. CRABB:  Oh, Captain Decareau.

1          THE COURT:  And they're displayed by either Kohl

2     or Malis.

3          MR. CRABB:  Yes.  Mr. Kohl is the one who

4     presented that witness.  And he presented these photographs

5     and I believe some other items or other photographs.  I'm

6     not positive.  And asked Captain Decareau about them.  And

7     he identified them as, you know, being consistent with what

8     he saw in Nisur Square that afternoon.  And as I've said

9     several times --

10          THE COURT:  And did he proffer, when you talked to

11     him last week, did he proffer how the montages came to be

12     created?

13          MR. CRABB:  He said that he didn't do them and no

14     one did them at his direction.  What he could not remember

15     is precisely from whom he received them.  Whether it was

16     Colonel Tarsa or Colonel Boslego.

17          Could I have one moment, please?

18          (Pause.)

19          MR. CRABB:  And to clarify, some of these -- some

20     of the photographs that I keep referring to as a montage

21     were used in previous grand jury sessions.  For example,

22     when Colonel Tarsa testified, some of those same

23     photographs.  That's why we think that -- something along

24     those lines is when they came into the system.

25          But as I said before, there were two separate

1   tracks here.  There was the disk that had all the photos

2   which was put in the 1-A and not reviewed until about two

3   weeks ago.  And then some subset of those photographs came

4   to the government on a different track.  And that's what was

5   actually used in the grand jury.

6          But what Mr. Heberlig is suggesting that someone

7   from the U.S. Attorney's Office, someone from the FBI, went

8   through Captain Decareau's disk, decided to use certain

9   photographs and decided to ignore these photographs showing

10  the casings, is unsupported by any information we have.

11  There's no reason to think that.  In fact, what appears to

12  have happened is what I've laid out.  That there were two

13  separate tracks by which the government received photographs

14  taken by Captain Decareau.

15          THE COURT:  All right.  Any other factual

16  representations you want to make?

17          MR. CRABB:  May I have just a moment?

18          (Pause.)

19          MR. CRABB:  No, Your Honor.

20          THE COURT:  All right.  Let me take your factual

21  representations first, and then I may take a short break

22  before I get to the legal argument.

23          MR. HEBERLIG:  The only other factual

24  representation I would make, Your Honor, is there was a copy

25  of this story board that was made available to us as part of

1    the classified CIPA discovery.  We all -- at least one

2    representative from every team had a security clearance.  We

3    went through that material in a SCIF.  And, you know, either

4    that story board was retrieved from the 1-A file so that a

5    copy was made and it was put with the materials in the SCIF,

6    or it was obtained elsewhere.  But we all had seen the story

7    board before as part of that classified discovery.  What

8    wasn't --

9              THE COURT:  But you didn't get the disk.

10             MR. HEBERLIG:  We never got the disk.

11             THE COURT:  That was in the 1-A.

12             MR. HEBERLIG:  That was in the 1-A.  And to the

13   extent the 1-A file as a whole it was marked "secret," that

14   was made not available to us in the SCIF.  So this was not a

15   situation where we had the file folder and didn't go through

16   it ourselves.

17             You know, just in terms of the facts, we requested

18   and understood we were getting all photographs.  I don't

19   have any other factual representations to make, although I

20   do think it should be relatively straight forward for the

21   government to be able to figure out if it wasn't FBI or U.S.

22   Attorney's Office representative who made those story boards

23   -- excuse me -- those montages, who did?  And I'm not sure

24   what inquiry has been done with that.  Seemed like a fair

25   amount of speculation that the Army did it.  But I think

1  inquiry is warranted.  Although ultimately, when we get to

2  the legal piece, I don't think it matters.  That may be an

3  issue for OPR some day, but not for us right here and now.

4          I don't have any other facts.

5          THE COURT:  All right.  Let's take a short recess.

6  Then I'll come back and hear your legal arguments.

7          MR. COFFIELD:  Your Honor, may the defense be

8  excused?

9          THE COURT:  Yes.

10          (Break in the proceedings at 5:31 p.m.)

11

12          (Upon resuming at 5:39 p.m.)

13          MR. HEBERLIG:  Your Honor, I'll be brief.  We made

14  our argument in our papers.  And at this stage as we laid

15  out with great care, the good or bad faith of these current

16  prosecutors before you is not the issue.  You know, we made

17  clear to represent in our papers that we don't have cause to

18  question their good or bad faith.

19          But the bottom line is this is critical

20  exculpatory evidence.  And it would have changed in a

21  significant way the way we would have done things both in

22  opening statements and in examining witnesses.

23          I obviously argued in my opening statement that

24  there was incoming fire from three directions from the south

25  of the traffic circle, and one of those areas I highlighted

1    was the bus stop, which is certainly where we believe and do

2    believe there was incoming gunfire coming from.

3            But all I could point to from that area -- and

4    frankly I didn't highlight the specifics in my opening -- is

5    the State Department's recovery of three AK-47 shells at the

6    bus stop four days later.

7            Had I had this photograph -- or these two

8    photographs -- that show 30 minutes after the event the

9    eight AK shells right there -- I didn't use exhibits during

10   my opening, but I certainly would have.  You know, we've

11   racked our brains to think about is there another piece of

12   physical evidence in this case that's more exculpatory?  And

13   the only one that I think even comes close is the actual

14   side of the Bearcat vehicle and the impact marks that have

15   hit it.

16           But this photograph is clear, it's clean.  And not

17   only does it give us extremely strong exculpatory evidence

18   on the issue of incoming gunfire, it also bolsters another

19   argument we made in opening statements and we pursued in the

20   case.  And that is, it significantly impeaches the Iraqi

21   investigation.

22           Among the photographs that we've admitted in this

23   case are right in that very spot where the shells were found

24   right after the incident were a group of Iraqi security and

25   police forces.  And, you know, number one, Lord only knows

1    what else was out there that wasn't photographed that day

2    and what else was taken away by the Iraqi security forces.

3    And, you know, we have a strong and reasonable argument to

4    make from this photograph.

5            So the relief we've requested -- and it was

6    tailored to the specific issues here -- we've not asked for

7    a mistrial.  None of us wants one.  I think logistically I

8    can't even conceive of starting over here and bringing over

9    Iraqis again.

10           That's not what we're asking for.  We just want to

11   be put back on level ground.  Had we had this stuff in

12   opening, we would have used it.  And, you know, the

13   government says, well, we can re-call witnesses.  That alone

14   is not enough.  You know, cross-examination the way it's

15   been working in this trial and the way it's worked in my

16   experience, it's effective when you do it right on the spot.

17   When, you know, Colonel Tarsa testified that he walked the

18   circle and didn't see any evidence of incoming gunfire; had

19   we had those photographs, we would have gone right there.

20   But to call him back now cold and to give them an

21   opportunity to prepare him just doesn't cut it.

22           So what we've asked for I believe is narrow and

23   specifically tailored relief.  It's a 15-minute supplemental

24   opening statement by one defense counsel.  I think that

25   person would be me.  I would get right to the point.  I'm

1    not going to talk about anything else but the implication of

2    these photographs.  And I'm prepared to do it at any time,

3    ideally with a little bit of notice.

4          And then we've proposed a specific curative

5    instruction that highlights a couple of things.  First and

6    foremost, it highlights the fact that the reason why the

7    jury has only seen these photographs mid trial is because we

8    didn't have them.  And, you know, I have to believe -- and I

9    did take note when Agent Farrington was on the stand some of

10   the expressions on the jurors' faces when they saw these

11   photographs.  And I saw outward signs of surprise.  Where

12   have these been?

13         And I believe they deserve to have an explanation.

14   And the explanation isn't just that, you know, they were

15   just produced to us.  I think there has to be some element

16   in the instruction the government was obligated to turn them

17   over and didn't.  And we've proposed some other language

18   about the fact that we would have questioned witnesses about

19   them when they were here on the stand.

20         And, you know, the ultimate paragraph about while

21   they don't necessarily directly bear on guilt or innocence,

22   they may take them into account.  They may take into account

23   the possible harm to the defendants caused by the late

24   disclosures.

25         So we would respectfully ask that the Court grant

1    us that relief, and ideally as quickly as possible, so that

2    this doesn't linger and the jury can be told promptly the

3    story here.

4          And then the final thing I would add, Your Honor,

5    in light of what Mr. Crabb mentioned in his argument and now

6    that I understand apparently the FBI did not create this

7    montage, I believe inquiry should be made of the Army as to

8    who did.

9          And there is a remaining Army witness who is yet

10    to testify, Colonel Boslego.  To the extent he was the

11    person who created the montage, that is certainly something

12    we should know before he takes the stand because someone had

13    to go through this disk and pick out the ones they thought

14    were useful but gloss over these ones that are certainly

15    very useful to the defense.

16          So that is the relief we are requesting.

17          THE COURT:  The only question I have on legal

18    grounds for you is, in terms of another opening statement I

19    have not seen any case where that's ever been authorized.

20    And it would be extremely unusual.  Because we instruct the

21    jury that opening statements aren't evidence, it's just

22    intended to help you find the evidence.  And when evidence

23    does come to light later, we normally would never consider

24    giving a new opening statement.

25          When it comes to light later because of the fault

 1      of the government, I think you probably are entitled to some

 2      sort of instruction.  The contours of the instruction I've

 3      still got to decide.  But I don't think, unless you know

 4      some law that I haven't found, my clerk hasn't found, I

 5      don't think I've seen a case where a reopening was ever

 6      authorized.  Am I right?

 7              MR. HEBERLIG:  You know, we cited a treatise to

 8      that effect.  I'm not sure the authors are the most credible

 9      source for pro-government authority.  They are partners at

10      Williams and Conley.  But, you know, I think it's a

11      practical solution to --

12              THE COURT:  They're trying to write all the law on

13      *Brady* now, so I understand.

14              MR. HEBERLIG:  I do understand.  I had some

15      involvement in that investigation, actually representing a

16      government party.

17              But you're absolutely right.  We have not cited a

18      specific case where this relief has been authorized.  But,

19      you know, we also looked high and low for a situation

20      precisely like this where such a core piece of exculpatory

21      evidence --

22              THE COURT:  I understand.

23              MR. HEBERLIG:  -- not just late discovered through

24      inadvertence, but was suppressed.  And that's not too strong

25      a word.  You know, this was suppressed.  The FBI when they

1    got this disk in 2007 didn't look at it.  Apparently, at

2    best, for them.  And --

3              THE COURT:  That's the best of all worlds.

4              MR. HEBERLIG:  That's the best of all worlds.  And

5    that's giving them every benefit of the doubt.  And that's

6    suppression under the *Brady* law.

7              THE COURT:  Wait till you've been around the

8    government very long --

9              MR. HEBERLIG:  You know, I haven't been on that

10   side, Your Honor.

11             THE COURT:  Incompetent is more often than venal

12   for government actors, I have to say.

13             MR. HEBERLIG:  You know, I haven't been on that

14   side and I can imagine --

15             THE COURT:  It's a sad commentary.

16             MR. HEBERLIG:  This is a large case and there's a

17   lot of evidence.  But particularly in light of what happened

18   the first time around, we certainly would have thought that

19   every nook and cranny of the government file would have been

20   reviewed when new material was being filtered -- or old

21   material for that matter -- was being filtered for these

22   prosecutors.  Not just limiting the review to what had been

23   presented to the prior grand jury.  But given Judge Urbina's

24   concerns as expressed in the opinion that the former trial

25   team had, you know, suppressed exculpatory evidence from

1    being presented to the grand jury, that --

2          You know, there are control mechanisms.  There are

3    these 1-A's and one 1-B's.  There is a method to pull every

4    single document and piece of paper and envelope and

5    everything else related to the case.  And given the

6    significance of this case and the resources the government's

7    put towards convicting the defendants, you would think that

8    they would have gone to that trouble on our behalf.

9          And I think extraordinary relief is warranted

10   under these circumstances.

11         THE COURT:  Thank you.

12         MR. HEBERLIG:  Thank you.

13         MR. CRABB:  Your Honor, first of all, I'd like to

14   reiterate what we have said previously.  These photographs

15   should have been produced sooner.  We are not in any way

16   disputing that.  It was a lapse.  They should have been

17   produced back in '08 sometime shortly after the indictment.

18   And we are saying nothing to the contrary.

19         We do believe that the record shows this was an

20   innocent oversight.  That doesn't change the fact that it

21   should have been produced.  But I think any of the rhetoric

22   suggesting that these photographs were intentionally

23   suppressed is unfounded.  But we do understand that they

24   should have been produced previously.

25         Your Honor, if I may address two points in

1       particular.  Being first the nature of these photographs

2       and, second, what prejudice, if any, the late disclosure has

3       caused the defendants.

4              As I mentioned before, Your Honor, the person who

5       actually took the photographs was there that day and saw

6       them has no reason to believe they're related to the

7       shooting.  We believe the evidence will show that based on

8       the circumstances, based on how close they were to the wall,

9       and based on the array in which they fell, that it's quite

10      unlikely that someone who would have had their left side

11      against the wall shooting north toward Nisur Square would

12      have left those casings.  So we don't believe that they have

13      nearly the exculpatory value that the defense says and we

14      believe the evidence will show that.

15             But we acknowledge that they are arguably

16      exculpatory.  And as I said before, we understand that they

17      should have been produced sooner.

18             As the Supreme Court has said, there are three

19      components to a *Brady* violation.  The material has to be

20      exculpatory; it should have been disclosed; but third, there

21      has to be prejudice.

22             And here, Your Honor, the defense has not shown

23      much, if any, prejudice.  And in assessing that point,

24      Your Honor, we ask the Court to consider the *Andrews* case

25      which we did cite in our brief.  And we ask the Court to

1    consider several other DC Circuit cases dealing with the

2    same situation where *Brady* material is turned over during

3    trial.

4         And in addition to the *Andrews* case which we

5    cited, there's the *Bailey* case from this circuit which is

6    622 F.3d 1 from 2010 where the DC Circuit found there's no

7    *Brady* violation where exculpatory evidence was produced

8    during the trial because the defense had an opportunity to

9    use evidence.

10        Also from this circuit there's *United States*

11   *versus Wilson*, 160 F.3d 732 from 1998 where again the DC

12   Circuit said that when exculpatory evidence was produced

13   during trial, there's no *Brady* violation because the defense

14   had an opportunity to use it.

15        There's also *United States versus Dean* from this

16   circuit, 55 F.3d 640 from 1995.  The same situation.

17   Exculpatory evidence produced during trial.  The Circuit

18   found no *Brady* violation because the defense had an

19   opportunity to use it.

20        Here the defense has claimed prejudice in two

21   respects.  With respect to their opening and with respect to

22   witnesses.  First of all, as Mr. Heberlig just said, in

23   opening the defense said that Raven 23 sustained incoming

24   fire.  Specifically, Mr. Heberlig told the jury that one of

25   the places the fire originated from was the bus stop and

1    said that they would find that there was actually fire from

2    the bus stop for several reasons, one of which was

3    enumerated was the fact that shell casings were found there.

4    So this issue has been presented to the jury.

5            And with respect to Mr. Heberlig's argument that

6    somehow the jury is surprised by hearing about this evidence

7    now or that somehow their impressions are already set, we

8    ask the Court to consider two things.  First, with respect

9    to whether or not the jury's impressions are set we ask the

10   Court to consider a case we've cited in our brief, which is

11   the *Mathur* case, M-A-T-H-U-R, 624 F.3d 498, where the Court

12   specifically rejected that reasoning.  And it said, quote:

13   In an effort to blunt the force of this reasoning, the

14   defendant asserts that the customary remedy was insufficient

15   in the case at hand because the jury has already formed

16   first impressions.  Other courts have rejected conclusory

17   arguments along these same lines.  And they cite cases from

18   the Sixth Circuit, the Ninth Circuit and the Tenth Circuit.

19           Also with respect to the timing of this evidence,

20   Your Honor, what the defense seems to be skipping is that

21   the only person who can authenticate these photographs is

22   Captain Decareau.  So this evidence could not come -- these

23   photographs could not come into evidence until Captain

24   Decareau testified.

25           Whether or not these photographs were disclosed to

1    defense before trial would make no difference as to when the

2    jury would have learned about them, because it was always a

3    function when Captain Decareau, the only witness who could

4    authenticate them, testified.

5           With respect to the defendants' claims of

6    prejudice on cross-examination of witnesses, Your Honor, we

7    also believe there they haven't established prejudice.  They

8    named four witnesses that they would have dealt with

9    differently had they had these photographs.

10          First, they mention Mr. Murphy who was a member of

11   Raven 23 who said that he heard AK-47 gunfire during the

12   incident.  And the defense suggests they would have asked

13   him an improper question calling for speculation.  Namely,

14   they would have asked him if it's possible that the AK-47

15   sounds he heard were caused by those casings.  That is utter

16   speculation.  There's no way he could know that.  That

17   doesn't advance the ball.

18          Second, they said they would have liked to ask

19   Colonel Tarsa about these photographs.  But Colonel Tarsa

20   testified, quote, that -- well, first, that he didn't see

21   AK-47 casings.  And, quote:  Not that I saw.  Not that was

22   reported to me.

23          So the defense has the record.  He didn't see

24   AK-47 casings, they weren't reported to him.  Whether he

25   overlooked them, whether someone moved them, no one knows.

1     But the point is already in the record.

2             They also mention Mr. Wisam, an Iraqi who was shot

3     in the circle and ran and hid behind the bus stop.

4     Mr. Wisam's testified there was no shooter back there.

5     Whether or not he noticed litter or other materials on the

6     ground would not impeach him one way or the other.

7             And then last they say it's affected their

8     cross-examination of Agent O'Connor who was one of the FBI

9     agents who conducted a search of the scene several weeks

10    after the shooting.

11            As I mentioned before, Agent O'Connor can't

12    authenticate those photographs.  Only Captain Decareau can.

13    The timing hasn't affected the defense.  Confronting Agent

14    O'Connor with those photographs would be most appropriate in

15    the defense case.  They can call Agent O'Connor and ask him

16    what, if anything, he knows about those photographs.  But

17    the timing of the disclosure hasn't in any way materially

18    affected their cross-examination of Agent O'Connor,

19    Mr. Wisam, Colonel Tarsa, or Mr. Murphy.

20            Your Honor, if I could wrap up.  As I said before,

21    we understand that these should have been produced

22    previously.  We don't believe there's been the prejudice the

23    defense claims by their late disclosure.  As the Court's

24    pointed out, there don't seem to be any cases that support

25    the proposition of a mid-trial opening.  As the Court's

 1    pointed out, openings are not evidence.  This point was made

 2    in the defenses opening.  Any of the points they say they

 3    would have liked to make with witnesses either have been

 4    made or would be inappropriate.

 5            Therefore, Your Honor, we ask that the Court

 6    reject the defense request to have an additional opening

 7    statement and their request for the curative instruction

 8    that they've requested.

 9            We have in the alternative proposed a curative

10    instruction that we ask the Court to consider to give to the

11    jury under these circumstances.

12            THE COURT:  All right.

13            MR. CRABB:  Unless the Court has questions, I have

14    nothing else.

15            THE COURT:  I don't.  Anything else you want to

16    say?

17            MR. HEBERLIG:  Only if you want to hear response,

18    Your Honor.

19            THE COURT:  I'm going to read the additional cases

20    and then work on the wording of what I'm going to say.

21            I take it an appropriate time to do this would be

22    when Decareau takes the stand.

23            What's the scheduling now after Krueger?

24            MR. KAVANAUGH:  Sorry, Your Honor?

25            THE COURT:  After Krueger.

```
1              MR. KAVANAUGH:  After Krueger.  We don't
2     anticipate Decareau will testify this week, unless for some
3     reason we get through our witnesses and have some
4     availability on Thursday.  He is one of our more cooperative
5     witnesses as far as being able to get down here to DC.  So
6     whenever we call him.
7              THE COURT:  I may have to talk to the defendants
8     about the timing.  Who do you have after Krueger, then?
9              MR. KAVANAUGH:  It would be Doc Rhodes.  Kevin
10    Rhodes.
11             THE COURT:  Are we looking at Krueger as a long
12    witness, or not?
13             MR. KAVANAUGH:  Mr. Martin has estimated his
14    direct at two to three hours, approximately.
15             THE COURT:  Less than that for the defendants?
16             MR. HEBERLIG:  Less than that.
17             THE COURT:  Then Rhodes is how long?
18             MR. KAVANAUGH:  I don't know, Your Honor.
19             Hour and-a-half direct, Your Honor.
20             THE COURT:  So could get through both of those
21    tomorrow.
22             MR. KAVANAUGH:  I don't think we'll get through
23    Rhodes, Your Honor.  To the extent I have any credibility
24    with respect to scheduling.
25             THE COURT:  I'm resisting.
```

1          MR. CRABB:  Would Court like copies of those

2     cases?

3          THE COURT:  Yes.

4          MR. HEBERLIG:  Can I say one things about those

5     cases?

6          THE COURT:  Yeah.

7          MR. HEBERLIG:  Yeah.  Without having read all of

8     them.  But, you know, I have gone through.  They're

9     obviously post-conviction cases.

10         THE COURT:  I know.

11         MR. HEBERLIG:  And that is a fundamentally

12    different scenario from where we are.  So whether something

13    --

14         THE COURT:  And *Brady* is a little different post

15    conviction.

16         MR. HEBERLIG:  I think so.  It's sort of apples

17    and oranges.  And unfortunately, because this stuff is often

18    not figured out during trial, we don't have enough cases of

19    mid-trial relief.

20         THE COURT:  In truth, you're lucky you have some

21    current, at least, government prosecutors that are honest.

22         MR. HEBERLIG:  Agreed.  Look, although we're

23    certainly upset we haven't received it sooner, at least we

24    can make some use of it here.

25         THE COURT:  I agree.  I'll see you all tomorrow at

1       10.

2                  (Court adjourned at 5:58 p.m.)

3

4

5       UNITED STATES DISTRICT COURT.)
                                      ) ss.
6       FOR THE DISTRICT OF COLUMBIA )

7

8

9                  **CERTIFICATE OF OFFICIAL COURT REPORTER**

10

11               I, VICKI EASTVOLD, do hereby certify that the

12      above and foregoing constitutes a true and accurate

13      transcript of my stenographic notes and is a full, true and

14      complete transcript of the proceedings to the best of my

15      ability.

16          Dated this 5th day of August, 2012.

17

18                              _____s/Vicki Eastvold_____
                                Official Court Reporter
19                              United States Courthouse
                                Room 6722
20                              333 Constitution Avenue, NW
                                Washington, DC   20001
21                              202-354-3242

22

23

24

25

**'**

**'07** [1] - 153:6
**'08** [1] - 168:17

**0**

**08-360** [1] - 1:5

**1**

**1** [6] - 48:22, 49:15, 50:20, 77:24, 135:13, 170:6
**1-A** [14] - 142:23, 143:2, 143:10, 143:23, 145:1, 151:9, 153:3, 153:11, 157:9, 159:2, 160:4, 160:11, 160:12, 160:13
**1-A's** [1] - 168:3
**1-B's** [1] - 168:3
**10** [2] - 59:18, 177:1
**10:00** [1] - 137:12
**11** [5] - 30:10, 31:15, 36:12, 154:15, 154:25
**114** [1] - 3:7
**12** [4] - 23:7, 141:22, 143:7, 148:14
**1200** [2] - 2:20
**13** [4] - 13:3, 28:6, 36:9, 36:12
**1330** [2] - 2:10, 2:13
**137** [1] - 3:8
**14** [4] - 5:8, 12:19, 20:21, 106:13
**14-107** [1] - 1:12
**15** [6] - 99:21, 99:24, 100:5, 115:7, 144:17, 148:21
**15-minute** [1] - 163:23
**16** [28] - 6:2, 42:13, 52:6, 54:17, 55:4, 55:7, 92:8, 98:19, 100:7, 100:19, 101:1, 104:13, 104:19, 104:22, 105:10, 109:14, 110:4, 126:23, 129:21, 130:4, 130:23, 132:14, 132:19, 133:5, 135:8, 148:12, 148:20, 149:3
**160** [1] - 170:11
**17** [2] - 13:14, 13:19
**18** [14] - 5:3, 6:17, 7:23, 8:4, 11:17, 11:25, 12:4, 13:6, 16:8, 18:14, 20:20, 107:15, 107:16, 135:2
**18th** [1] - 2:20
**19** [7] - 5:2, 7:23, 8:3, 10:19, 22:12, 107:16, 107:25
**1995** [1] - 170:16
**1996** [1] - 116:8
**1998** [1] - 170:11

**2**

**2** [4] - 77:25, 106:4, 135:13, 142:6
**2-3** [1] - 134:10
**20001** [2] - 1:24, 177:20
**20004** [1] - 2:17
**2002** [3] - 116:6, 116:9, 116:20
**2003** [1] - 118:22
**20036** [3] - 2:10, 2:14, 2:21
**2005** [5] - 118:19, 119:7, 119:15, 126:2, 126:5
**2007** [46] - 42:13, 52:6, 54:17, 55:4, 55:7, 77:25, 92:8, 98:19, 100:7, 100:19, 101:1, 104:13, 104:19, 104:22, 105:10, 110:4, 110:24, 126:15, 126:23, 127:8, 128:16, 128:23, 129:1, 129:8, 129:10, 129:13, 129:21, 130:3, 130:4, 130:8, 130:16, 130:23, 132:14, 132:19, 133:6, 135:2, 135:8, 138:22, 141:22, 143:7, 148:14, 151:19, 152:21, 153:10, 157:9, 167:1
**2008** [31] - 4:25, 5:3, 5:8, 5:15, 6:10, 7:13, 7:18, 16:8, 20:8, 35:11, 35:16, 35:20, 36:2, 37:7, 37:9, 38:4, 39:3, 39:6, 40:14, 41:7, 75:14, 106:4, 106:13, 106:17, 106:25, 107:20, 143:21, 144:12, 144:18, 148:21, 156:8
**2009** [5] - 47:21, 48:22, 49:15, 50:20, 89:22
**2010** [1] - 170:6
**2012** [1] - 177:16
**2013** [1] - 145:20
**2014** [3] - 1:8, 151:22, 157:10
**202-354-3242** [2] - 1:25, 177:21
**20530** [1] - 2:6
**22** [3] - 155:1, 155:16, 155:18
**220** [1] - 2:13
**2270** [4] - 4:17, 7:7, 7:11, 106:9
**2271** [3] - 12:15, 14:12, 14:21
**2288** [1] - 35:7
**2292** [1] - 22:22
**2292-R** [1] - 22:23
**23** [27] - 36:7, 38:5, 38:11, 78:3, 78:18, 104:22, 112:18, 126:22, 127:8, 128:1, 128:6, 128:16, 130:3, 130:23, 133:3, 135:10, 136:16, 137:11,

146:3, 146:21, 151:23, 153:19, 153:22, 153:25, 157:10, 170:23, 172:11
**2304** [1] - 49:4
**24** [2] - 135:10, 135:12
**25** [1] - 135:12
**2:03** [1] - 4:1
**2:04** [1] - 1:8
**2:05** [1] - 4:11

**3**

**3** [1] - 49:5
**30** [42] - 4:24, 5:15, 5:23, 6:10, 7:13, 7:18, 7:23, 8:4, 8:8, 8:23, 10:7, 11:17, 11:25, 12:3, 18:1, 18:10, 18:13, 19:17, 20:8, 35:11, 35:16, 35:20, 36:2, 37:7, 37:9, 37:17, 38:4, 39:3, 39:6, 40:14, 41:7, 57:7, 106:17, 106:24, 107:16, 107:20, 118:11, 119:4, 121:21, 122:14, 152:23, 162:8
**30-year** [12] - 13:24, 14:4, 14:9, 17:12, 17:18, 17:20, 18:3, 18:25, 19:14, 20:1, 20:22, 29:11
**300** [1] - 2:17
**302** [7] - 89:22, 139:9, 141:19, 141:23, 142:6, 142:12, 145:24
**302's** [2] - 91:13, 142:4
**31** [1] - 8:23
**32** [1] - 1:9
**323** [1] - 101:16
**330** [3] - 126:25, 127:1, 127:19
**333** [2] - 1:24, 177:20
**360** [2] - 122:17, 122:19
**37** [1] - 18:16
**3:17** [1] - 66:5
**3:32** [1] - 66:7
**3rd** [3] - 117:18, 117:22

**4**

**4** [2] - 1:8, 3:4
**41** [1] - 115:1
**44** [6] - 152:24, 152:25, 154:16, 155:1, 155:15, 155:19
**497-I0005** [1] - 95:10
**497-J** [3] - 85:3, 85:10, 85:13
**497-L** [4] - 98:22, 99:2, 99:4, 110:9
**4971** [1] - 93:5
**498** [1] - 171:11

**5**

**5** [2] - 31:16, 50:15
**5(k)(1** [1] - 30:23
**500** [2] - 114:12, 114:16
**500-T** [1] - 134:20
**55** [5] - 3:5, 81:8, 81:10, 82:5, 170:16
**555** [1] - 2:5
**575** [1] - 2:17
**5:00** [1] - 137:17
**5:31** [1] - 161:10
**5:39** [1] - 161:12
**5:58** [1] - 177:2
**5th** [1] - 177:16

**6**

**6** [1] - 23:6
**622** [1] - 170:6
**624** [1] - 171:11
**640** [1] - 170:16
**67** [2] - 18:18, 59:18
**6722** [2] - 1:23, 177:19
**678** [1] - 53:22

**7**

**7** [2] - 28:4, 97:6
**732** [1] - 170:11
**7th** [1] - 2:17

**8**

**82** [1] - 3:5
**88** [1] - 57:7

**9**

**9** [1] - 95:14
**9/11** [5] - 77:19, 80:10, 84:2, 84:18, 84:24
**9055** [1] - 57:6
**9820** [1] - 92:10

**A**

**Abdul** [1] - 100:13
**ability** [1] - 177:15
**able** [16] - 14:9, 59:17, 89:8, 90:23, 91:19, 108:8, 108:12, 109:9, 109:15, 109:22, 116:19, 127:2, 130:18, 130:22, 160:21, 175:5
**Abram** [1] - 1:13
**absolutely** [2] - 84:8, 166:17
**accepted** [5] - 93:23, 94:4, 113:11, 124:15, 124:17
**accommodations** [1] - 121:17

**accomplish** [1] - 123:4
**according** [4] - 6:13, 72:22, 74:16, 75:6
**account** [2] - 164:22
**accounted** [1] - 142:15
**accurate** [7] - 7:2, 14:13, 14:16, 39:10, 70:21, 107:9, 177:12
**accurately** [2] - 7:3, 134:9
**acknowledge** [2] - 96:13, 169:15
**acknowledged** [5] - 53:10, 59:14, 68:21, 69:4, 73:7
**ACOG** [1] - 57:21
**acted** [1] - 5:12
**acting** [2] - 100:11, 100:15
**action** [1] - 140:24
**actions** [6] - 37:15, 37:16, 75:6, 75:8, 101:3, 107:2
**active** [1] - 67:8
**actively** [1] - 67:10
**activity** [2] - 28:19, 32:18
**actors** [1] - 167:12
**actual** [6] - 46:13, 95:5, 125:6, 140:24, 150:20, 162:13
**ad** [1] - 34:4
**Adam** [2] - 127:14, 130:21
**add** [1] - 165:4
**addition** [4] - 29:23, 51:9, 152:18, 170:4
**additional** [4] - 29:22, 141:10, 174:6, 174:19
**address** [4] - 38:7, 155:20, 156:10, 168:25
**adjourned** [1] - 177:2
**admit** [3] - 40:8, 40:9, 40:11
**admitted** [3] - 61:12, 110:2, 162:22
**adopted** [1] - 15:15
**advance** [1] - 172:17
**advised** [1] - 23:21
**advocating** [2] - 111:4, 111:23
**affect** [1] - 83:20
**affected** [4] - 83:13, 173:7, 173:13, 173:18
**affirmatively** [1] - 145:14
**afternoon** [4] - 4:20, 4:21, 114:6, 158:8
**agent** [5] - 35:22, 40:15, 138:23, 139:8, 139:15
**Agent** [10] - 139:10, 141:20, 153:8, 164:9, 173:8, 173:11, 173:13, 173:15, 173:18
**agent's** [1] - 35:11
**agents** [16] - 33:2, 40:23, 49:14, 73:19, 75:13, 75:24, 108:5, 108:9, 108:18,

109:3, 139:11, 141:21, 142:7, 146:22, 157:8, 173:9
**Agents** [1] - 20:12
**aggressive** [3] - 131:7, 132:1, 132:7
**ago** [8] - 43:17, 65:8, 82:20, 110:1, 114:23, 118:23, 146:7, 159:3
**agree** [6] - 20:8, 34:8, 69:13, 70:6, 155:24, 176:25
**agreed** [6] - 13:2, 13:13, 13:18, 13:23, 14:10, 176:22
**agreement** [48] - 12:18, 13:2, 14:15, 16:7, 20:2, 22:17, 22:22, 23:6, 28:5, 28:10, 28:15, 28:18, 28:20, 28:22, 28:24, 29:2, 29:6, 29:22, 30:6, 30:8, 30:16, 31:1, 31:9, 32:11, 33:3, 33:8, 33:14, 33:24, 34:1, 34:8, 34:10, 34:11, 34:13, 34:25, 41:16, 41:19, 42:7, 77:12, 93:5, 93:10, 95:2, 95:21, 96:10, 96:24, 97:6, 107:17, 113:5
**agrees** [2] - 28:14, 32:14
**ahead** [3] - 40:5, 85:22
**aim** [1] - 60:6
**aimed** [4] - 53:17, 53:20, 56:19, 56:20
**aiming** [1] - 52:18
**AK** [1] - 162:9
**AK-47** [14] - 43:20, 44:10, 145:10, 146:5, 146:6, 146:18, 146:23, 148:24, 152:9, 162:5, 172:11, 172:14, 172:21, 172:24
**AK-47s** [2] - 145:12, 145:16
**alerted** [1] - 147:1
**alleged** [1] - 77:18
**alleges** [1] - 112:13
**allocution** [1] - 97:7
**allow** [2] - 10:15, 122:11
**allowed** [3] - 39:24, 40:3, 136:5
**allowing** [1] - 122:8
**almost** [2] - 34:11, 48:5
**alone** [2] - 89:14, 163:13
**alternative** [1] - 174:9
**Alvin** [1] - 1:6
**Amanant** [3] - 81:6, 81:10, 81:16
**ambushed** [3] - 79:6, 104:23, 104:25
**amended** [1] - 148:3
**AMERICA** [2] - 1:3, 1:10
**Americans** [1] - 141:5
**amount** [3] - 91:3, 122:24,

160:25
**and-a-half** [6] - 79:11, 79:12, 80:4, 118:23, 121:6, 175:19
**Andrej** [10] - 23:8, 24:16, 28:5, 31:16, 32:9, 38:1, 49:5, 50:17, 51:16
**Andrews** [2] - 169:24, 170:4
**answer** [27] - 26:11, 27:11, 27:20, 38:13, 39:3, 39:25, 40:3, 57:12, 57:15, 57:17, 57:18, 57:20, 57:21, 57:23, 57:25, 58:2, 58:6, 59:21, 59:22, 60:2, 60:7, 60:8, 69:25, 88:22, 149:16, 151:19, 152:5
**answered** [5] - 19:5, 22:14, 22:18, 34:5, 71:6
**answering** [2] - 89:4, 89:6
**Anthony** [1] - 2:2
**anticipate** [1] - 175:2
**anticipation** [1] - 30:7
**anxiety** [3] - 76:10, 105:4, 105:11
**anyway** [1] - 9:21
**Apache** [1] - 79:24
**apart** [1] - 90:23
**apologize** [6] - 4:3, 19:24, 49:8, 139:8, 147:17, 149:12
**appear** [5] - 35:19, 35:21, 94:4, 148:25, 151:22
**aPPEARANCES** [1] - 2:1
**appeared** [4] - 46:24, 50:6, 79:10, 135:5
**apples** [1] - 176:16
**applicable** [1] - 96:17
**application** [1] - 72:8
**applied** [4] - 72:23, 124:14, 124:25, 125:5
**applies** [1] - 93:2
**apply** [4] - 96:11, 116:19, 123:19, 149:15
**approach** [3] - 14:25, 90:2, 134:21
**appropriate** [4] - 98:20, 101:3, 173:14, 174:21
**approve** [1] - 131:23
**approximate** [1] - 141:8
**April** [3] - 143:20, 144:17, 148:21
**area** [19] - 42:23, 46:14, 47:18, 52:13, 52:17, 52:25, 53:2, 53:16, 53:20, 87:7, 91:22, 101:24, 103:14, 108:22, 140:12, 145:11, 145:16, 147:19, 162:3
**areas** [4] - 45:22, 108:23, 119:13, 161:25
**arguably** [1] - 169:15

**argued** [1] - 161:23
**argument** [8] - 22:9, 137:24, 159:22, 161:14, 162:19, 163:3, 165:5, 171:5
**argumentative** [2] - 19:5, 58:20
**arguments** [2] - 161:6, 171:17
**arms** [2] - 68:3, 120:4
**Armstrong** [1] - 2:9
**Army** [17] - 116:1, 116:5, 116:9, 116:18, 116:23, 117:7, 117:20, 118:13, 118:15, 120:11, 120:15, 121:2, 139:18, 151:5, 160:25, 165:7, 165:9
**army** [5] - 51:19, 51:24, 51:25, 79:19, 80:1
**array** [1] - 149:6, 169:9
**arrived** [8] - 77:24, 78:6, 132:11, 140:22, 141:3, 141:9, 141:10, 141:13
**arriving** [1] - 132:12
**arrow** [1] - 86:2
**aside** [2] - 32:25, 33:1
**asserts** [1] - 171:14
**assess** [2] - 57:17
**assessing** [1] - 169:23
**assigned** [5] - 117:15, 126:19, 126:22, 127:25, 135:22, 140:13
**assignment** [5] - 118:5, 135:23, 140:3, 140:7, 140:20
**assignments** [2] - 118:6, 134:14
**assist** [1] - 4:7
**Assistance** [1] - 23:9
**assistance** [24] - 23:12, 24:15, 24:18, 24:22, 25:2, 25:5, 25:11, 25:13, 25:17, 25:21, 25:25, 26:20, 41:18, 42:3, 69:10, 69:14, 69:22, 70:3, 70:7, 70:17, 71:12, 77:4, 77:7, 77:15
**assume** [1] - 106:5
**assumed** [3] - 51:11, 146:16, 147:3
**assumption** [3] - 59:25, 123:10, 152:14
**Asuncion** [16] - 2:2, 4:18, 12:16, 16:14, 26:8, 31:12, 31:14, 31:18, 32:7, 47:19, 57:2, 57:7, 57:11, 58:9, 61:9, 62:13
**ASUNCION** [56] - 4:5, 7:8, 10:15, 12:11, 14:22, 14:25, 15:5, 19:4, 19:10, 20:3, 20:24, 22:2, 22:8, 27:16, 33:17, 34:4, 39:24, 40:2,

40:24, 41:4, 47:10, 47:15, 57:8, 58:10, 58:13, 58:20, 58:25, 61:18, 63:15, 63:21, 65:20, 67:18, 67:21, 69:17, 69:24, 70:21, 71:14, 71:22, 82:9, 82:17, 85:5, 85:11, 88:21, 90:3, 90:5, 90:8, 92:13, 92:15, 93:8, 93:9, 95:12, 95:13, 99:3, 113:10, 113:16, 113:18
**Asuncion's** - 56:25
**Asuncion** ............... [1] - 3:5
**ate** - 134:6
**attached** [1] - 142:5
**attachment** [2] - 154:15, 154:25
**attachments** [1] - 142:24
**attack** [2] - 136:23, 136:24
**attempt** [4] - 13:7, 13:19, 17:1, 20:21
**attention** [3] - 93:4, 112:1, 135:10
**attorney** [2] - 110:17, 113:13
**ATTORNEY'S** [1] - 2:4
**Attorney's** [8] - 23:16, 23:24, 24:11, 71:1, 143:14, 151:24, 159:7, 160:22
**attorneys** [3] - 27:24, 32:15, 105:14
**Aubrey** [1] - 141:20
**August** [4] - 1:8, 5:8, 106:12, 177:16
**authenticate** [3] - 171:21, 172:4, 173:12
**author** [1] - 139:25
**authored** [1] - 110:16
**authority** [1] - 166:9
**authorized** [3] - 165:19, 166:6, 166:18
**authorizes** [1] - 96:14
**authors** [1] - 166:8
**automatic** [8] - 49:22, 55:18, 55:20, 55:22, 56:3, 56:7, 60:4, 60:9
**availability** [1] - 175:4
**available** [3] - 153:15, 159:25, 160:14
**Avenue** [4] - 1:24, 2:10, 2:13, 177:20
**average** [1] - 131:1
**averted** [1] - 74:23
**avoid** [1] - 146:13
**awaiting** [1] - 135:23
**awards** [1] - 121:17
**aware** [6] - 61:16, 131:6, 131:9, 145:24, 151:17
**awhile** [2] - 107:4, 115:21
**ax** [1] - 130:1

## B

**bachelor's** [1] - 115:13
**bad** [3] - 29:1, 161:15, 161:18
**Baghdad** [3] - 77:24, 78:6, 105:8
**Bailey** [2] - 2:8, 170:5
**Ball** [1] - 127:13
**ball** [1] - 172:17
**bank** [2] - 81:25, 82:7
**Baratz** [1] - 2:8
**barely** [1] - 94:16
**based** [15] - 14:4, 26:19, 31:6, 57:15, 59:25, 60:5, 146:15, 147:14, 149:4, 149:5, 149:6, 150:2, 169:7, 169:8, 169:9
**basic** [5] - 116:12, 120:12, 134:25, 149:22, 149:25
**basics** [1] - 134:5
**basis** [2] - 15:6, 119:7
**battalion** [1] - 140:5
**Battalion** [1] - 117:18
**bear** [2] - 49:5, 164:21
**Bearcat** [2] - 127:25, 162:14
**beat** [1] - 33:22
**became** [1] - 117:7
**become** [3] - 120:11, 120:17, 120:23
**BEFORE** [1] - 1:17
**began** [5] - 59:24, 72:6, 112:18, 148:5, 152:12
**begin** [2] - 82:18, 140:25
**beginning** [2] - 55:14, 152:21
**begins** [1] - 51:17
**behalf** [9] - 26:24, 27:5, 27:9, 27:10, 27:25, 77:6, 111:4, 111:23, 168:8
**behavior** [5] - 74:3, 74:4, 74:5, 74:7, 75:17
**behind** [6] - 43:25, 48:14, 87:12, 94:18, 94:19, 129:3, 150:18, 173:3
**belief** [1] - 47:7
**bench** [2] - 15:4, 15:11
**benefit** [2] - 16:6, 167:5
**benefits** [1] - 14:14
**Benning** [3] - 116:22, 117:3, 117:16
**best** [15] - 75:22, 76:1, 76:24, 84:20, 108:8, 108:12, 110:22, 136:21, 137:5, 147:9, 167:2, 167:3, 167:4, 177:14
**better** [3] - 69:13, 76:17, 105:25
**between** [12] - 7:23, 8:3, 11:17, 11:25, 18:13, 57:25,

65:24, 86:24, 87:8, 102:25, 107:16, 149:4
**big** [1] - 114:18
**binding** [1] - 96:4
**bit** [16] - 19:22, 79:15, 94:7, 97:5, 100:17, 100:18, 106:17, 107:9, 109:9, 110:12, 111:6, 112:2, 116:3, 125:13, 164:3
**black** [6] - 50:13, 50:15, 50:21, 50:23, 51:2, 51:3
**Blackwater** [22] - 64:20, 72:6, 72:23, 73:16, 78:10, 78:14, 78:21, 78:23, 80:6, 80:17, 84:12, 84:14, 123:15, 123:19, 123:25, 124:7, 124:14, 125:14, 125:21, 126:7, 126:9, 126:16
**blue** [3] - 43:23, 85:14, 85:19
**bluff** [1] - 107:5
**bluffing** [2] - 107:7, 107:11
**blunt** [1] - 171:13
**board** [23] - 127:9, 129:12, 139:19, 143:1, 143:3, 147:4, 147:5, 147:6, 147:8, 147:14, 147:22, 149:11, 150:6, 150:12, 152:16, 152:18, 152:21, 153:1, 153:7, 156:2, 159:25, 160:4, 160:7
**boards** [3] - 155:7, 156:22, 160:22
**bodies** [3] - 79:1, 79:3, 79:9
**body** [1] - 79:6
**bolsters** [1] - 162:18
**Boslego** [5] - 141:13, 144:7, 157:15, 158:16, 165:10
**bottle** [1] - 131:23
**bottles** [3] - 131:7, 131:11, 132:1
**bottom** [2] - 129:5, 161:19
**bought** [1] - 9:25
**bounced** [1] - 46:9
**Bound** [1] - 95:15
**Bradley** [1] - 79:21
**Brady** [9] - 137:25, 166:13, 167:6, 169:19, 170:2, 170:7, 170:13, 170:18, 176:14
**brains** [1] - 162:11
**branch** [1] - 116:23
**Bravo** [1] - 120:23
**breach** [5] - 28:10, 28:21, 29:2, 30:16, 31:1
**breached** [6] - 28:19, 31:9, 33:7, 34:8, 34:10, 34:24
**break** [7] - 66:2, 66:3, 134:9, 134:10, 134:12, 135:22, 159:21

**Break** [1] - 161:10
**breakfast** [1] - 134:6
**Brian** [1] - 2:7
**brief** [4] - 82:11, 161:13, 169:25, 171:10
**briefly** [1] - 14:21
**bright** [3] - 46:17, 46:18, 46:19
**bring** [2] - 49:4, 92:10
**bringing** [1] - 163:8
**broke** [1] - 5:23
**brought** [1] - 143:9
**bullets** [3] - 59:19, 63:25, 64:3
**bunch** [1] - 84:4
**bunker** [4] - 51:19, 51:21, 51:25, 52:1
**burning** [1] - 140:23
**bursts** [3] - 49:22, 52:25, 53:24
**bus** [33] - 42:21, 42:23, 43:1, 43:3, 43:4, 43:7, 43:10, 43:25, 44:21, 48:24, 49:17, 49:22, 49:23, 50:1, 50:4, 91:3, 91:5, 91:6, 91:8, 91:22, 92:1, 92:4, 145:11, 145:15, 146:7, 146:19, 148:24, 162:1, 162:6, 170:25, 171:2, 173:3
**business** [1] - 115:3
**buy** [4] - 10:25, 11:5, 21:3, 22:6
**buying** [1] - 11:18
**BY** [55] - 4:19, 7:1, 7:12, 10:18, 12:13, 15:20, 19:7, 19:12, 20:6, 21:1, 22:4, 22:11, 22:16, 22:20, 27:18, 27:21, 33:21, 34:7, 40:12, 40:22, 41:1, 41:6, 47:11, 47:17, 55:3, 57:10, 58:11, 58:16, 58:22, 59:3, 61:20, 63:17, 63:23, 65:22, 66:10, 67:23, 69:19, 70:2, 70:24, 71:17, 71:24, 82:17, 85:11, 88:21, 90:5, 90:8, 92:15, 93:9, 95:13, 99:3, 113:10, 114:5, 114:17, 129:18, 134:23

## C

**calculations** [1] - 96:9
**camp** [1] - 67:5
**candidate** [1] - 116:13
**Candidate** [4] - 116:14, 116:19, 117:4, 117:5
**cap** [1] - 43:23
**Captain** [49] - 138:17, 138:22, 139:16, 139:17, 139:22, 140:9, 140:17,

4

141:3, 141:4, 141:8,
141:13, 141:14, 141:21,
142:12, 143:21, 143:25,
144:5, 144:11, 144:24,
145:7, 145:9, 145:19,
146:3, 146:14, 147:12,
148:11, 149:21, 150:3,
150:13, 150:19, 151:24,
152:20, 153:5, 153:10,
153:17, 155:7, 156:19,
156:20, 157:6, 157:7,
157:16, 157:25, 158:6,
159:8, 159:14, 171:22,
171:23, 172:3, 173:12
**captain** [3] - 121:11, 121:13,
124:7
**car** [10] - 56:8, 56:16, 64:1,
65:11, 68:10, 68:12, 88:9,
131:13, 140:23
**carbine** [1] - 57:19
**care** [2] - 27:25, 161:15
**carefully** [1] - 28:8
**carries** [2] - 12:23, 13:10
**carrying** [1] - 79:9
**cars** [1] - 50:9
**cartridge** [2] - 54:8, 54:12
**case** [41] - 10:1, 12:21, 17:9,
23:22, 24:23, 26:20, 61:16,
62:11, 69:22, 70:20, 75:17,
76:22, 76:25, 93:2, 93:23,
96:15, 98:20, 100:1, 113:6,
137:13, 137:14, 143:17,
143:22, 144:2, 145:18,
162:12, 162:20, 162:23,
165:19, 166:5, 166:18,
167:16, 168:5, 168:6,
169:24, 170:4, 170:5,
171:10, 171:11, 171:15,
173:15
**cases** [9] - 31:22, 170:1,
171:17, 173:24, 174:19,
176:2, 176:5, 176:9,
176:18
**casings** [23] - 43:20, 43:22,
43:25, 44:10, 92:4, 92:7,
142:21, 145:11, 146:5,
146:6, 146:18, 146:19,
146:24, 148:24, 149:4,
149:6, 152:9, 159:10,
169:12, 171:3, 172:15,
172:21, 172:24
**caught** [1] - 46:15
**caused** [4] - 9:17, 164:23,
169:3, 172:15
**CD** [1] - 142:7
**Celebrity** [2] - 100:14,
102:25
**cell** [1] - 45:19
**certain** [15] - 31:14, 51:5,
51:8, 51:10, 51:13, 89:23,

124:23, 125:23, 127:10,
127:13, 137:3, 137:9,
148:17, 159:8
**certainly** [13] - 139:9, 140:1,
142:5, 145:23, 146:5,
148:5, 150:4, 162:1,
162:10, 165:11, 165:14,
167:18, 176:23
**certainty** [2] - 80:16, 155:10
**CERTIFICATE** [1] - 177:9
**certify** [1] - 177:11
**chain** [4] - 133:14, 142:19,
147:18, 148:3
**chance** [5] - 31:5, 35:22,
69:14, 76:17, 155:6
**change** [4] - 12:6, 23:1, 92:7,
168:20
**changed** [7] - 9:24, 10:13,
11:16, 11:17, 12:1, 12:5,
161:20
**changes** [3] - 7:22, 8:5,
11:15
**characterize** [1] - 91:15
**charge** [24] - 7:19, 8:21, 9:3,
9:9, 10:7, 12:19, 13:2,
13:6, 13:13, 13:18, 13:23,
14:2, 16:21, 17:4, 17:10,
19:19, 20:1, 20:22, 29:8,
29:9, 34:15, 34:21, 121:21,
121:24
**charged** [6] - 8:11, 11:10,
12:20, 29:22, 75:17, 96:14
**charges** [11] - 12:6, 15:22,
16:4, 16:14, 21:7, 21:15,
21:17, 93:11, 93:19, 98:14
**chart** [5] - 12:15, 12:17,
13:22, 14:12, 15:7
**check** [1] - 146:17
**Childers** [1] - 127:15
**chow** [1] - 38:22
**Christopher** [1] - 2:4
**CIPA** [1] - 160:1
**circle** [17] - 43:12, 45:7,
45:15, 46:13, 87:14, 90:16,
101:6, 101:7, 102:6,
102:16, 102:24, 103:12,
103:20, 122:19, 161:25,
163:18, 173:3
**Circuit** [7] - 170:1, 170:6,
170:12, 170:17, 171:18
**circuit** [3] - 170:5, 170:10,
170:16
**circumstances** [5] - 149:5,
150:3, 168:10, 169:8,
174:11
**cite** [2] - 169:25, 171:17
**cited** [4] - 166:7, 166:17,
170:5, 171:10
**citizens** [1] - 61:3
**city** [3] - 81:6, 81:10, 81:16

**civil** [1] - 30:2
**civilians** [1] - 104:8
**claim** [1] - 37:8
**claimed** [2] - 21:16, 170:20
**claims** [2] - 172:5, 173:23
**clarify** [1] - 158:19
**classification** [1] - 149:15
**classified** [9] - 149:11,
149:20, 150:4, 150:9,
151:1, 151:8, 160:1, 160:7
**classify** [1] - 149:14
**classifying** [1] - 151:6
**clean** [11] - 39:22, 40:7,
47:20, 47:24, 48:21, 49:15,
50:19, 51:23, 77:10,
162:16
**clear** [23] - 42:12, 54:3, 68:5,
68:9, 84:8, 84:11, 85:12,
85:18, 86:10, 87:5, 90:9,
102:3, 102:15, 102:22,
103:14, 106:12, 110:2,
121:12, 144:3, 145:21,
152:19, 161:17, 162:16
**clearance** [1] - 160:2
**clearly** [3] - 94:13, 103:20,
146:25
**clerk** [3] - 4:15, 85:5, 166:4
**CLERK** [2] - 93:7, 95:11
**clicked** [2] - 146:21, 152:7
**client** [14] - 24:14, 28:12,
28:14, 28:15, 28:19, 29:13,
29:17, 30:2, 30:3, 30:4,
31:19, 32:14, 36:17
**client's** [7] - 23:15, 23:18,
24:13, 28:17, 30:8, 31:23,
32:17
**close** [5] - 6:7, 100:23,
149:5, 162:13, 169:8
**clothing** [1] - 36:21
**Code** [1] - 93:18
**Coffield** [1] - 2:12
**COFFIELD** [3] - 2:12, 54:24,
161:7
**cold** [1] - 163:20
**collages** [2] - 155:2, 155:8
**collected** [1] - 146:24
**college** [3] - 115:20, 116:7,
116:17
**Colonel** [19] - 140:5, 140:16,
140:17, 141:2, 141:3,
141:9, 141:12, 141:13,
156:20, 157:15, 157:16,
158:16, 158:22, 163:17,
165:10, 172:19, 173:19
**Colonels** [1] - 144:7
**color** [1] - 47:1
**COLUMBIA** [2] - 1:1, 177:6
**Columbia** [4] - 23:17, 24:12,
31:21, 31:23
**column** [5] - 13:1, 15:21,

15:23, 16:3, 16:6
**combat** [5] - 54:4, 54:11,
54:14, 54:16, 119:10
**come-clean** [5] - 47:20,
48:21, 49:15, 50:19, 51:23
**comfortable** [2] - 89:4, 89:6
**coming** [9] - 21:9, 56:8,
59:24, 60:1, 60:2, 102:10,
102:12, 145:6, 162:2
**command** [6] - 66:14, 86:12,
133:14, 139:24, 147:18,
148:3
**commanded** [1] - 140:5
**commander** [1] - 156:20
**comment** [6] - 26:7, 36:20,
37:4, 42:1, 84:21
**commentary** [1] - 167:15
**commit** [5] - 13:7, 13:19,
17:1, 19:18, 20:21
**committed** [6] - 5:20, 8:10,
11:8, 25:6, 34:19, 92:7
**committee** [2] - 23:16, 24:11
**committing** [1] - 94:2
**compared** [1] - 148:21
**competence** [1] - 131:2
**complete** [4] - 10:17, 40:3,
83:19, 177:14
**completely** [6] - 28:16,
32:14, 39:10, 39:20, 40:6,
76:11, 152:22, 157:7,
157:12
**completion** [1] - 23:15
**components** [1] - 169:19
**concealed** [1] - 153:22
**conceive** [1] - 163:8
**concern** [1] - 32:18
**concerns** [1] - 167:24
**conclusory** [1] - 171:16
**conditions** [1] - 32:10
**conduct** [3] - 73:23, 98:19,
119:6
**conducted** [4] - 30:7, 35:20,
111:17, 173:9
**conflicts** [1] - 129:23
**confronting** [1] - 173:13
**Conley** [1] - 166:10
**Connecticut** [2] - 2:10, 2:13
**connection** [4] - 23:22, 35:1,
41:23, 149:3
**CONNOLLY** [25] - 55:1, 55:3,
57:10, 58:11, 58:16, 58:22,
59:3, 61:20, 63:17, 63:23,
65:22, 66:1, 66:9, 66:10,
67:19, 67:23, 69:19, 70:2,
70:24, 71:17, 71:24, 82:11,
82:14, 85:4, 88:18
**Connolly** [6] - 2:19, 54:25,
66:8, 82:18, 82:19, 83:25
**Connolly**.................. [1] - 3:5
**consider** [9] - 130:19,

130:23, 131:1, 165:23, 169:24, 170:1, 171:8, 171:10, 174:10
**consideration** [1] - 6:20
**considered** [1] - 95:5
**consistent** [3] - 135:4, 148:18, 158:7
**constitutes** [1] - 177:12
**Constitution** [2] - 1:24, 177:20
**contact** [1] - 102:24
**contacted** [1] - 140:17
**containing** [2] - 148:13, 151:4
**contains** [1] - 152:22
**contents** [1] - 151:4
**context** [5] - 39:9, 39:14, 52:22, 76:9
**continue** [1] - 11:7
**continued** [3] - 34:2, 110:3, 110:6
**continuing** [2] - 3:4, 10:16
**contours** [1] - 166:2
**contractor** [1] - 72:23
**contrary** [2] - 146:8, 168:18
**control** [1] - 168:2
**conversation** [18] - 36:17, 36:19, 38:15, 39:9, 39:19, 40:17, 47:3, 64:24, 65:4, 65:8, 65:19, 67:1, 67:4, 69:3, 69:4, 77:18, 82:4, 91:13
**convicted** [1] - 17:13
**convicting** [1] - 168:7
**conviction** [2] - 176:9, 176:15
**convince** [2] - 19:18, 106:20
**convoy** [13] - 56:11, 67:11, 67:17, 67:25, 68:6, 68:15, 101:12, 101:14, 119:8, 132:25, 133:22, 134:7, 152:5
**cooperate** [6] - 14:10, 16:9, 20:2, 21:23, 24:7, 32:14
**cooperating** [1] - 71:1
**cooperation** [14] - 13:2, 23:15, 23:18, 23:22, 24:4, 24:13, 31:3, 31:6, 31:19, 68:19, 69:1, 69:8, 70:5, 96:20
**cooperative** [1] - 175:4
**copies** [1] - 176:1
**copy** [6] - 4:18, 12:16, 142:5, 154:5, 159:24, 160:5
**core** [1] - 166:20
**corner** [1] - 79:5
**correct** [287] - 4:25, 5:3, 5:10, 5:13, 5:17, 5:21, 5:24, 6:5, 6:8, 6:11, 6:15, 6:18, 6:20, 7:14, 7:20,

7:25, 8:2, 8:6, 8:21, 9:13, 10:2, 11:10, 11:19, 12:7, 12:21, 12:24, 13:4, 13:5, 13:7, 13:11, 13:14, 13:20, 14:2, 14:3, 14:10, 14:18, 15:22, 16:4, 16:9, 16:16, 16:18, 17:4, 17:7, 17:13, 17:19, 18:11, 18:19, 18:20, 18:21, 19:20, 21:5, 21:15, 21:18, 23:3, 24:1, 24:5, 24:8, 26:2, 26:17, 26:22, 27:1, 28:8, 28:24, 29:15, 31:7, 32:11, 33:4, 33:8, 35:12, 35:17, 36:4, 36:7, 36:17, 36:23, 37:13, 38:9, 41:8, 41:24, 42:4, 42:17, 43:8, 43:10, 43:12, 43:20, 44:14, 44:23, 44:25, 45:3, 45:7, 45:12, 45:16, 45:17, 45:21, 46:6, 46:18, 47:5, 47:8, 47:14, 47:25, 48:4, 48:6, 48:12, 48:15, 48:17, 48:19, 48:24, 51:9, 51:14, 52:1, 52:8, 52:10, 52:11, 52:15, 53:6, 53:7, 53:14, 53:21, 53:23, 54:9, 54:17, 55:10, 55:12, 55:18, 55:20, 55:24, 56:5, 56:9, 56:14, 57:3, 58:7, 58:12, 58:19, 59:5, 59:8, 59:11, 59:15, 60:16, 60:19, 60:22, 60:23, 60:25, 61:1, 61:3, 61:6, 61:9, 61:13, 61:23, 62:2, 62:6, 62:11, 62:19, 62:22, 62:25, 63:4, 63:9, 63:14, 64:1, 64:4, 64:6, 64:10, 64:18, 64:20, 64:25, 65:19, 66:12, 66:16, 67:2, 67:5, 67:8, 67:11, 67:14, 67:17, 67:25, 68:3, 68:7, 68:10, 68:12, 68:15, 68:22, 69:11, 69:16, 70:4, 70:13, 70:14, 70:15, 70:20, 71:7, 71:10, 71:11, 71:21, 72:6, 72:9, 72:11, 72:14, 72:17, 72:20, 72:24, 73:2, 73:5, 73:9, 73:11, 73:13, 73:17, 73:20, 73:24, 74:3, 74:5, 74:11, 74:14, 74:18, 74:25, 75:3, 75:6, 75:9, 75:14, 75:17, 75:19, 75:22, 76:4, 76:8, 76:20, 76:24, 77:4, 77:8, 77:15, 77:19, 77:22, 77:25, 78:4, 78:7, 78:10, 78:15, 78:19, 78:21, 78:24, 79:1, 79:3, 79:7, 79:19, 79:22, 79:24, 80:4, 80:7, 80:11, 80:18, 80:21, 80:23, 81:2, 81:4, 81:6, 81:14, 81:20, 81:23, 82:1, 82:5, 82:8, 97:4, 106:19, 110:18,

114:14, 114:23, 116:15, 117:8, 117:11, 119:5, 121:13, 121:22, 122:15, 122:22, 122:23, 124:4, 124:5, 127:6, 127:7, 128:12, 128:13, 130:8, 130:9, 135:9, 144:20, 144:22, 150:10, 153:20, 153:23, 153:24, 156:3
**corrugated** [1] - 80:21
**Cory** [1] - 127:15
**counsel** [3] - 4:7, 10:15, 163:24
**counsel's** [1] - 40:3
**count** [6] - 12:23, 16:18, 16:25, 17:1, 17:7, 17:9
**counter** [1] - 102:20
**counting** [1] - 43:19
**country** [1] - 123:22
**counts** [11] - 12:20, 13:3, 13:6, 13:10, 13:14, 13:19, 16:15, 20:20, 20:21, 21:22, 29:8
**couple** [4] - 23:5, 85:25, 139:16, 164:5
**courageously** [1] - 111:17
**course** [17] - 18:2, 18:9, 30:6, 35:24, 70:25, 75:25, 76:22, 97:25, 108:9, 116:12, 118:12, 121:1, 125:11, 130:18, 130:21, 146:2, 151:11
**COURT** [155] - 1:1, 4:8, 4:12, 7:10, 12:12, 15:2, 15:8, 15:17, 15:19, 19:6, 19:11, 20:5, 20:25, 22:3, 22:9, 22:14, 22:18, 27:17, 27:20, 33:18, 34:6, 40:1, 40:5, 40:21, 40:25, 41:5, 47:16, 54:25, 57:9, 58:15, 58:21, 59:2, 61:19, 63:16, 63:22, 65:21, 66:3, 66:8, 67:22, 69:18, 69:25, 70:23, 71:16, 71:23, 82:10, 82:15, 85:9, 88:20, 90:7, 92:12, 92:14, 99:1, 113:9, 113:15, 113:20, 113:22, 114:15, 129:17, 134:22, 137:12, 137:21, 137:23, 138:7, 138:11, 138:14, 138:18, 138:24, 139:1, 139:4, 139:6, 139:13, 139:21, 140:3, 140:7, 141:2, 141:16, 141:23, 141:25, 142:18, 143:3, 143:6, 143:8, 144:13, 144:16, 144:19, 144:21, 147:4, 147:7, 147:22, 147:25, 148:6, 149:10, 149:13, 149:17, 149:19, 150:6,

150:8, 150:21, 150:25, 151:5, 151:8, 151:14, 151:21, 152:15, 153:3, 153:14, 153:19, 153:21, 154:3, 154:5, 154:7, 154:10, 154:13, 155:22, 156:2, 156:4, 156:8, 157:18, 157:20, 157:22, 157:24, 158:1, 158:10, 159:15, 159:20, 160:9, 160:11, 161:5, 161:9, 165:17, 166:12, 166:22, 167:3, 167:7, 167:11, 167:15, 168:11, 174:12, 174:15, 174:19, 174:25, 175:7, 175:11, 175:15, 175:17, 175:20, 175:25, 176:3, 176:6, 176:10, 176:14, 176:20, 176:25, 177:5, 177:9
**court** [2] - 31:22, 99:17
**Court** [27] - 1:22, 1:23, 24:5, 27:2, 30:9, 95:15, 95:25, 96:4, 96:7, 96:14, 142:6, 150:11, 150:18, 155:3, 164:25, 169:18, 169:24, 169:25, 171:8, 171:10, 171:11, 174:5, 174:10, 174:13, 176:1, 177:2, 177:18
**Court's** [8] - 15:14, 54:19, 82:11, 113:16, 140:5, 151:16, 173:23, 173:25
**Courthouse** [2] - 1:23, 177:19
**courtroom** [6] - 4:10, 66:4, 128:10, 128:18, 129:6, 137:16
**courts** [1] - 171:16
**cover** [3] - 37:17, 69:15, 137:12
**covered** [2] - 34:4, 100:17
**CR** [2] - 1:5, 1:12
**Crabb** [3] - 2:3, 154:22, 155:3
**CRABB** [69] - 138:5, 138:9, 138:12, 138:15, 138:20, 138:25, 139:2, 139:5, 139:7, 139:15, 139:22, 140:4, 140:9, 141:3, 141:18, 141:24, 142:2, 142:4, 142:11, 142:20, 143:5, 143:7, 143:9, 144:14, 144:17, 144:20, 144:22, 147:6, 147:8, 147:24, 148:1, 148:11, 149:12, 149:14, 149:18, 149:20, 150:7, 150:10, 150:24, 151:3, 151:7, 151:9, 151:15, 151:23,

6

152:17, 152:25, 153:5,
153:17, 153:20, 153:23,
154:4, 154:6, 154:8,
155:24, 156:3, 156:5,
156:10, 157:19, 157:21,
157:23, 157:25, 158:3,
158:13, 158:19, 159:17,
159:19, 168:13, 174:13,
176:1
**cranny** [1] - 167:19
**crash** [1] - 79:14
**create** [1] - 165:6
**created** [15] - 147:7, 147:13,
147:25, 148:1, 148:2,
155:7, 155:11, 155:25,
156:8, 156:12, 156:15,
156:17, 156:22, 158:12,
165:11
**creating** [2] - 147:5, 155:12
**credibility** [1] - 175:23
**credible** [1] - 166:8
**credibly** [1] - 71:18
**credit** [1] - 25:12
**crime** [5] - 5:20, 13:25,
41:23, 93:24, 94:2
**crimes** [10] - 8:10, 11:18,
11:10, 16:8, 19:19, 29:18,
29:23, 34:16, 92:8
**Criminal** [2] - 2:5, 30:10
**criminal** [6] - 28:18, 29:17,
30:2, 32:18, 98:15, 115:16
**critical** [1] - 161:19
**criticizing** [1] - 76:15
**CROSS** [1] - 55:2
**Cross** [2] - 3:4, 3:5
**cross** [12] - 4:4, 4:13, 58:17,
92:20, 109:9, 110:12,
112:3, 148:20, 163:14,
172:6, 173:8, 173:18
**CROSS-EXAMINATION** [1] -
55:2
**Cross-Examination** [2] - 3:4,
3:5
**cross-examination** [9] -
4:13, 92:20, 109:9, 110:12,
112:3, 163:14, 172:6,
173:8, 173:18
**cross-examined** [1] - 58:17
**crossed** [1] - 15:7
**CRR** [1] - 1:22
**crystal** [1] - 68:9
**cull** [1] - 155:16
**curative** [3] - 164:4, 174:7,
174:9
**current** [4] - 154:1, 154:2,
161:15, 176:21
**customary** [1] - 171:14
**cut** [1] - 163:21

# D

**daily** [2] - 119:6, 140:11
**dangerous** [3] - 78:3,
119:13, 124:25
**Daniel** [1] - 127:15
**dark** [1] - 50:6
**Date** [1] - 1:8
**date** [8] - 5:9, 5:11, 6:17,
106:3, 132:13, 135:1,
143:6, 144:13
**Dated** [1] - 177:16
**David** [1] - 2:15
**DAY** [1] - 1:9
**days** [13] - 5:2, 7:23, 8:3,
10:6, 10:19, 22:12, 43:17,
82:25, 85:25, 87:3, 107:16,
107:25, 162:6
**DC** [12] - 1:24, 2:6, 2:10,
2:14, 2:17, 2:21, 110:19,
170:1, 170:6, 170:11,
175:5, 177:20
**dead** [1] - 33:23
**deal** [1] - 8:15
**dealing** [1] - 170:1
**dealt** [1] - 172:8
**Dean** [2] - 127:17, 170:15
**debriefings** [1] - 30:6
**Decareau** [50] - 138:17,
138:22, 139:16, 139:17,
139:22, 140:9, 140:18,
141:4, 141:9, 141:14,
141:22, 142:6, 142:12,
143:21, 144:5, 144:11,
144:24, 145:8, 145:9,
145:19, 146:3, 146:14,
147:12, 147:25, 148:12,
149:21, 150:3, 152:20,
153:6, 153:8, 153:10,
153:17, 154:17, 155:7,
156:19, 156:21, 157:6,
157:7, 157:17, 157:25,
158:6, 159:14, 171:22,
171:24, 172:3, 173:12,
174:22, 175:2
**Decareau's** [11] - 141:16,
142:25, 143:25, 150:13,
150:19, 151:24, 154:20,
154:24, 155:1, 155:4,
159:8
**December** [2] - 116:8, 135:2
**decide** [4] - 17:22, 47:23,
107:23, 166:3
**decided** [3] - 76:7, 159:8,
159:9
**deciding** [1] - 98:20
**decision** [1] - 145:3
**deemed** [2] - 31:24, 32:20
**defend** [2] - 37:15, 151:5
**defendant** [3] - 138:19,

153:15, 171:14
**Defendant** [5] - 1:14, 2:7,
2:12, 2:15, 2:19
**defendants** [13] - 23:23,
69:15, 69:23, 70:8, 71:6,
107:2, 109:6, 129:16,
164:23, 168:7, 169:3,
175:7, 175:15
**Defendants** [1] - 1:8
**defendants'** [2] - 137:24,
172:5
**defense** [27] - 23:1, 60:24,
62:11, 100:11, 100:15,
105:22, 106:9, 154:4,
154:8, 161:7, 163:24,
165:15, 169:13, 169:22,
170:8, 170:13, 170:18,
170:20, 170:23, 171:20,
172:1, 172:12, 172:23,
173:13, 173:15, 173:23,
174:6
**Defense** [9] - 4:17, 7:7,
12:14, 14:12, 14:21, 22:22,
35:7, 49:4, 57:6
**defenses** [1] - 174:2
**defensive** [6] - 68:6, 125:13,
125:16, 126:6, 126:9,
126:10
**define** [3] - 52:12, 52:21,
52:23
**defined** [2] - 25:21, 133:20
**degree** [3] - 115:18, 116:18
**demonstrative** [3] - 15:8,
15:15, 15:17
**denied** [1] - 40:21
**deny** [1] - 56:17
**Department** [17] - 23:23,
73:20, 74:1, 92:23, 93:15,
97:19, 104:2, 104:5,
105:14, 107:13, 111:8,
113:3, 113:6, 156:16,
156:17, 157:10, 157:13
**Department's** [1] - 162:5
**departure** [3] - 23:16, 24:10,
30:22
**depended** [1] - 8:18
**dependent** [1] - 133:23
**depicted** [1] - 7:2
**depicts** [1] - 92:6
**deploy** [1] - 133:16
**deployed** [7] - 118:16,
118:20, 118:25, 119:3,
124:22, 126:13, 134:11
**deployment** [4] - 120:2,
121:9, 121:18, 126:16
**DEPUTY** [2] - 93:7, 95:11
**describe** [10] - 53:5, 87:22,
88:5, 90:9, 90:21, 94:22,
125:19, 126:7, 126:9,
147:9

**described** [9] - 36:25, 53:16,
53:19, 54:1, 94:8, 103:19,
104:2, 105:25, 139:19
**describing** [1] - 142:13
**description** [2] - 14:14,
142:16
**deserve** [1] - 164:13
**designated** [2] - 68:6, 133:13
**desperate** [1] - 70:3
**destroy** [2] - 19:2
**detachment** [1] - 141:10
**detail** [5] - 99:25, 100:2,
100:4, 100:6, 145:23
**details** [1] - 72:14
**determined** [1] - 95:24
**determines** [1] - 24:14
**difference** [1] - 172:1
**differences** [1] - 126:3
**different** [14] - 7:3, 46:25,
64:22, 119:8, 126:1,
134:13, 138:20, 146:14,
155:1, 156:2, 156:25,
159:4, 176:12, 176:14
**differently** [2] - 145:13,
172:9
**DIRECT** [1] - 114:4
**Direct** [1] - 3:7
**direct** [13] - 26:8, 31:15,
33:10, 52:12, 56:25, 57:5,
58:9, 92:19, 93:4, 112:1,
135:10, 175:14, 175:19
**direction** [14] - 42:21, 42:24,
42:25, 50:2, 51:20, 59:19,
86:24, 88:16, 88:24, 89:2,
89:7, 91:19, 103:1, 158:14
**directions** [5] - 90:11, 90:12,
112:14, 112:19, 161:24
**directly** [5] - 30:2, 32:17,
91:5, 91:8, 164:21
**disability** [2] - 76:7, 76:17
**disbursed** [1] - 87:11
**discharged** [1] - 121:15
**disclosed** [2] - 169:20,
171:25
**disclosing** [1] - 150:21
**disclosure** [4] - 150:25,
169:2, 173:17, 173:23
**disclosures** [1] - 164:24
**discovered** [1] - 166:23
**discovery** [5] - 143:15,
143:19, 154:19, 160:1,
160:7
**discretion** [4] - 16:22, 17:3,
17:15, 96:11
**discussed** [1] - 5:2
**Discussion** [1] - 15:4
**discussion** [3] - 15:11, 95:4,
108:4
**dishdasha** [7] - 36:20, 36:21,
42:1, 48:14, 87:11, 87:12,

94:17
**dishonest** [1] - 40:10
**disk** [37] - 138:17, 138:23, 139:2, 139:16, 141:18, 141:20, 142:13, 142:17, 142:18, 142:25, 144:25, 145:4, 145:7, 146:17, 148:13, 150:12, 150:19, 152:17, 152:22, 153:1, 153:7, 153:15, 153:25, 154:3, 154:5, 154:16, 154:17, 156:16, 157:8, 157:9, 157:14, 159:1, 159:8, 160:9, 160:10, 165:13, 167:1
**displayed** [3] - 157:18, 157:22, 158:1
**disputing** [1] - 168:16
**distinction** [1] - 65:24
**DISTRICT** [5] - 1:1, 1:1, 1:18, 177:5, 177:6
**District** [4] - 23:17, 24:12, 31:21, 31:22
**Division** [3] - 2:5, 117:18, 117:22
**division** [4] - 117:17, 118:1, 118:4, 118:7
**divisions** [1] - 117:19
**Doc** [1] - 175:9
**document** [6] - 92:17, 92:23, 99:7, 99:12, 99:22, 168:4
**documents** [1] - 151:18
**Donald** [1] - 127:13
**done** [8] - 47:25, 51:24, 70:19, 71:3, 82:14, 106:21, 160:24, 161:21
**door** [3] - 62:19, 62:25, 63:6
**double** [1] - 115:17
**doubt** [4] - 39:18, 126:11, 156:12, 167:5
**down** [25] - 21:9, 31:6, 37:1, 43:6, 49:8, 51:16, 51:19, 51:25, 52:4, 52:7, 52:17, 52:25, 53:2, 53:8, 76:9, 78:11, 78:12, 78:15, 108:19, 113:20, 132:10, 137:21, 137:22, 145:15, 175:5
**downed** [1] - 78:9
**dozen** [3] - 108:15, 108:17, 120:3
**dragged** [1] - 79:1
**dress** [1] - 36:20
**dressed** [2] - 62:18, 62:24
**driver** [23] - 55:23, 58:19, 59:5, 59:15, 60:7, 61:13, 61:14, 62:18, 62:22, 64:14, 65:5, 65:7, 65:11, 65:13, 65:25, 86:25, 88:16, 88:24, 89:7, 89:9, 90:14, 100:14

**driver's** [9] - 56:4, 56:14, 56:17, 56:18, 62:19, 62:25, 63:6, 63:9, 87:7
**drop** [1] - 54:5
**dropped** [2] - 13:13, 13:18
**DSS** [2] - 74:13, 75:2
**duly** [1] - 114:1
**during** [22] - 13:24, 30:6, 30:9, 36:15, 66:11, 66:22, 68:21, 69:4, 71:9, 76:22, 111:18, 119:15, 120:2, 130:11, 157:24, 162:9, 170:2, 170:8, 170:13, 170:17, 172:11, 176:18
**Dustin** [10] - 1:7, 37:4, 39:7, 89:18, 89:24, 90:10, 91:4, 127:15, 128:25
**duties** [1] - 140:11
**duty** [1] - 68:7

**E**

**early** [7] - 39:11, 68:19, 69:1, 69:7, 77:21, 139:11, 146:2
**east** [4] - 87:14, 103:2, 103:20, 103:24
**easterly** [1] - 102:21
**EASTVOLD** [1] - 177:11
**Eastvold** [2] - 1:22, 177:18
**easy** [1] - 40:10
**education** [1] - 115:12
**Edward** [1] - 127:17
**effect** [2] - 67:24, 166:8
**effective** [1] - 163:16
**effort** [2] - 139:24, 171:13
**efforts** [1] - 118:22
**eight** [3] - 43:20, 44:10, 162:9
**either** [10] - 102:19, 103:16, 120:16, 125:24, 134:14, 146:22, 155:16, 158:1, 160:3, 174:3
**element** [2] - 119:12, 164:15
**Elmo** [6] - 4:15, 85:6, 99:4, 105:21, 110:11, 114:18
**elsewhere** [3] - 31:21, 31:23, 160:6
**email** [1] - 104:11
**embarrassed** [1] - 101:2
**emphasize** [1] - 145:2
**employed** [1] - 73:15
**employment** [1] - 123:14
**empty** [1] - 80:21
**encounter** [2] - 119:15, 125:6
**end** [1] - 105:11
**End** [1] - 15:11
**ended** [1] - 141:12
**enemy** [4] - 119:16, 119:18,

119:25, 125:6
**engage** [3] - 68:7, 119:18, 119:21
**engaged** [1] - 67:7
**engagements** [1] - 119:25
**engages** [1] - 28:18
**enlisted** [2] - 116:10, 116:16
**ensure** [1] - 123:3
**ensuring** [1] - 121:24
**enter** [5] - 20:1, 22:12, 22:17, 29:21, 41:16
**entered** [2] - 12:18, 16:7, 42:6
**entering** [2] - 4:10, 28:15
**entire** [8] - 19:2, 49:8, 49:10, 98:19, 108:10, 150:17, 151:4, 153:13
**entirely** [2] - 106:23, 107:9
**entitled** [3] - 23:9, 95:15, 166:1
**entry** [2] - 30:7, 96:13
**enumerated** [2] - 93:20, 171:3
**envelope** [11] - 142:24, 150:15, 150:22, 151:1, 151:3, 151:10, 153:3, 153:12, 153:13, 168:4
**envelope's** [1] - 151:2
**envelopes** [1] - 143:2
**ERV** [5] - 86:17, 86:18, 133:7, 133:15, 136:25
**escalation** [1] - 131:10
**essentially** [2] - 99:21, 106:20, 112:7
**established** [1] - 172:7
**estimate** [4] - 87:18, 108:8, 108:13, 109:25
**estimated** [1] - 175:13
**evaluating** [1] - 24:12
**Evan** [3] - 1:6, 127:16, 129:5
**evening** [8] - 109:14, 137:13, 146:20, 151:23, 152:7, 153:17, 153:25, 154:9
**event** [4] - 76:12, 135:8, 162:8
**events** [4] - 76:13, 105:9, 134:4
**evidence** [47] - 7:7, 7:11, 15:9, 15:19, 22:25, 43:5, 85:8, 85:10, 92:11, 92:12, 93:7, 93:8, 95:11, 98:24, 99:2, 101:16, 105:21, 114:16, 127:1, 142:19, 142:21, 142:22, 142:23, 146:13, 161:20, 162:12, 162:17, 163:18, 165:21, 165:22, 166:21, 167:17, 167:25, 169:7, 169:14, 170:7, 170:9, 170:12, 170:17, 171:6, 171:19,

171:22, 171:23, 174:1
**evidentiary** [1] - 15:6
**exact** [3] - 10:23, 62:8, 134:8
**exactly** [5] - 14:17, 44:6, 74:10, 96:19, 116:4
**EXAMINATION** [3] - 55:2, 82:16, 114:4
**Examination** [4] - 3:4, 3:5, 3:5, 3:7
**examination** [15] - 4:13, 26:8, 31:15, 52:13, 56:25, 57:5, 58:9, 92:20, 109:9, 110:12, 112:3, 163:14, 172:6, 173:8, 173:18
**examined** [2] - 58:17, 114:2
**examining** [1] - 161:22
**example** [5] - 81:13, 109:8, 124:8, 142:21, 158:21
**exclusive** [1] - 139:25
**exculpatory** [11] - 161:20, 162:12, 162:17, 166:20, 167:25, 169:13, 169:16, 169:20, 170:7, 170:12, 170:17
**excuse** [3] - 94:2, 124:16, 160:23
**excused** [2] - 113:21, 161:8
**executed** [2] - 78:23, 80:7
**exhibit** [14] - 5:6, 15:8, 15:15, 22:22, 36:12, 85:2, 85:13, 86:4, 86:21, 95:12, 105:22, 106:8, 106:9, 112:4
**Exhibit** [22] - 4:17, 7:7, 7:11, 12:15, 14:12, 14:21, 22:22, 35:7, 49:4, 57:6, 85:3, 85:10, 92:10, 93:4, 95:9, 98:22, 99:2, 101:16, 110:9, 114:12, 114:16, 127:1
**exhibits** [3] - 154:21, 155:1, 162:9
**exist** [2] - 7:13, 8:1
**existed** [1] - 6:10
**exited** [1] - 103:12
**exiting** [4] - 66:4, 101:5, 102:6, 137:16
**expect** [10] - 23:21, 26:19, 26:25, 27:7, 27:9, 27:12, 27:24, 28:1, 35:4, 62:10
**expectation** [1] - 111:3
**expected** [2] - 62:1, 62:5
**experience** [3] - 72:11, 72:13, 163:16
**explain** [2] - 97:12, 116:17
**explanation** [3] - 146:15, 164:13, 164:14
**explicitly** [1] - 138:9
**explosion** [1] - 140:13
**exposure** [1] - 145:22
**expressed** [1] - 167:24

**expressions** [1] - 164:10
**extent** [6] - 23:17, 23:22, 24:13, 160:13, 165:10, 175:23
**extracted** [1] - 157:13
**extraordinary** [1] - 168:9
**extreme** [1] - 105:3
**extremely** [2] - 162:17, 165:20
**eye** [2] - 74:17, 74:19
**eyes** [1] - 74:24

## F

**F.3d** [4] - 170:6, 170:11, 170:16, 171:11
**face** [6] - 15:22, 16:4, 21:4, 74:21, 155:13
**face-to-face** [1] - 74:21
**faced** [2] - 19:13, 21:7
**faces** [1] - 164:10
**facetious** [1] - 149:16
**facing** [6] - 103:1, 103:2, 103:9, 103:15, 103:20, 103:23
**fact** [28] - 5:2, 6:1, 10:23, 14:17, 29:14, 31:12, 36:3, 44:6, 45:18, 57:15, 64:12, 65:18, 76:24, 92:6, 92:7, 93:18, 107:10, 107:15, 138:7, 145:17, 146:7, 148:23, 152:6, 159:11, 164:6, 164:18, 168:20, 171:3
**factor** [1] - 17:21
**facts** [6] - 100:1, 138:7, 154:11, 155:23, 160:17, 161:4
**Factual** [1] - 98:23
**factual** [6] - 99:9, 138:2, 159:15, 159:20, 159:23, 160:19
**factually** [2] - 22:10, 70:21
**fails** [1] - 28:16
**fair** [15] - 37:2, 46:15, 87:18, 91:3, 93:14, 93:16, 97:24, 98:20, 106:21, 109:18, 110:21, 111:11, 111:23, 122:24, 160:24
**fairly** [6] - 14:16, 77:21, 117:22, 124:23, 127:13, 137:3
**faith** [2] - 161:15, 161:18
**fall** [1] - 47:21
**falls** [1] - 54:11
**false** [4] - 34:19, 34:21, 112:24, 112:25
**familiar** [4] - 28:7, 120:17, 120:23, 122:17
**family** [5] - 6:4, 9:17, 11:16,

12:2, 115:24
**family's** [1] - 6:20
**far** [4] - 38:1, 100:5, 124:20, 175:5
**Farrar** [1] - 141:20
**FARRAR** [1] - 141:21
**Farrington** [1] - 164:9
**father** [2] - 100:22, 100:25
**fault** [1] - 165:25
**FBI** [34] - 20:12, 34:2, 40:15, 71:2, 75:13, 89:22, 108:9, 108:18, 109:3, 109:16, 138:22, 138:23, 139:3, 142:23, 143:1, 143:10, 143:14, 148:14, 150:14, 150:21, 151:8, 151:16, 152:20, 153:4, 153:6, 153:10, 154:17, 155:14, 157:8, 159:7, 160:21, 165:6, 166:25, 173:8
**FBI's** [1] - 142:22
**February** [1] - 116:6
**federal** [4] - 18:4, 18:10, 19:14, 73:19
**Federal** [1] - 30:10
**feet** [4] - 45:4, 45:11, 83:10, 87:13
**fell** [1] - 169:9
**fellas** [1] - 9:20
**felt** [7] - 5:24, 6:1, 12:2, 12:3, 12:4, 102:24
**few** [13] - 43:17, 45:22, 82:20, 82:25, 83:10, 87:3, 108:14, 108:15, 121:20, 127:22, 130:6, 131:4, 132:9
**field** [1] - 123:21
**fight** [5] - 76:18, 76:21, 79:11, 80:1, 80:4
**figure** [1] - 160:21
**figured** [1] - 176:18
**File** [1] - 1:5, 1:12
**file** [11] - 17:17, 23:25, 30:22, 31:2, 31:5, 35:2, 157:9, 160:4, 160:13, 160:15, 167:19
**filed** [3] - 99:15, 99:17
**filled** [1] - 72:8
**filter** [3] - 145:20, 145:21, 154:2
**filtered** [2] - 167:20, 167:21
**final** [3] - 47:18, 53:9, 165:4
**finally** [1] - 53:8
**fine** [1] - 20:19
**finish** [3] - 10:16, 27:20, 39:25
**finished** [1] - 27:22
**fire** [43] - 43:15, 52:4, 52:8, 52:12, 52:13, 52:17, 52:21, 52:23, 53:1, 53:3, 53:11,

53:13, 53:16, 53:17, 53:20, 53:25, 54:1, 57:14, 59:24, 60:5, 60:8, 66:22, 68:3, 76:18, 76:21, 79:11, 80:4, 89:19, 91:17, 102:10, 119:16, 120:4, 120:6, 132:23, 133:9, 133:15, 152:4, 161:24, 170:24, 170:25, 171:1
**firearm** [4] - 13:24, 17:13, 59:6, 94:1
**firearms** [2] - 92:23, 93:15
**fired** [32] - 42:14, 48:8, 48:12, 48:14, 48:17, 48:19, 48:23, 49:16, 49:21, 50:2, 50:4, 51:20, 51:25, 53:12, 56:1, 56:2, 57:14, 57:23, 58:1, 58:5, 59:21, 68:21, 69:4, 79:10, 79:16, 87:8, 87:13, 87:16, 87:24, 87:25, 88:2, 90:14
**firing** [36] - 42:16, 42:24, 42:25, 43:2, 44:14, 44:17, 52:7, 52:15, 52:17, 52:20, 53:2, 57:12, 57:16, 57:24, 59:19, 59:22, 59:23, 59:25, 63:25, 89:18, 90:10, 90:12, 90:15, 90:16, 90:17, 90:22, 90:24, 90:25, 91:4, 91:10, 91:14, 91:16, 91:19, 133:2
**firm** [1] - 110:19
**first** [51] - 5:16, 20:11, 29:5, 32:8, 42:1, 42:14, 58:18, 75:2, 83:13, 85:25, 86:13, 86:24, 87:21, 87:25, 88:2, 92:22, 101:7, 105:13, 105:16, 105:22, 106:18, 109:19, 114:1, 121:12, 124:19, 126:16, 127:25, 128:1, 128:3, 134:5, 135:11, 137:2, 138:2, 138:4, 141:5, 145:18, 146:22, 149:21, 154:21, 155:23, 159:21, 164:5, 167:18, 168:13, 169:1, 170:22, 171:8, 171:16, 172:10, 172:20
**five** [20] - 55:23, 56:4, 56:13, 57:25, 58:1, 58:5, 58:19, 59:4, 59:14, 60:9, 61:13, 62:17, 62:21, 63:8, 63:11, 78:23, 80:6, 80:17, 154:24, 156:6
**flare** [7] - 45:23, 46:1, 46:3, 46:4, 46:8, 46:21, 46:23
**flash** [3] - 46:17, 46:18, 46:20
**flashes** [4] - 48:3, 48:6, 91:23, 110:8
**flip** [1] - 54:11

**Florida** [2] - 115:5, 115:22
**flow** [1] - 102:20
**fluid** [2] - 55:22, 55:25
**fluidly** [1] - 55:25
**FOB** [4] - 101:19, 102:7, 102:10
**focus** [2] - 102:16, 108:22
**focusing** [1] - 59:6
**folder** [1] - 160:15
**follow** [2] - 66:12, 131:4
**follow-up** [1] - 131:4
**following** [2] - 23:14, 137:19
**follows** [1] - 114:3
**foot** [1] - 94:16
**FOR** [1] - 1:1
**force** [2] - 131:10, 171:13
**forces** [2] - 162:25, 163:2
**foregoing** [1] - 177:12
**foremost** [7] - 149:1, 149:9, 164:6
**form** [7] - 47:10, 72:8, 73:1, 76:11, 76:18, 105:3, 155:5
**formed** [1] - 171:15
**former** [1] - 167:24
**Fort** [3] - 116:22, 117:3, 117:16
**forth** [3] - 37:1, 94:18, 103:18
**forward** [6] - 88:6, 102:19, 102:24, 103:23, 151:19, 160:20
**Foster** [1] - 2:16
**foster** [2] - 122:5, 123:6
**four** [22] - 6:10, 7:13, 26:1, 60:8, 69:15, 69:23, 70:8, 70:10, 79:11, 79:12, 80:4, 85:20, 85:21, 121:6, 123:18, 143:25, 144:19, 154:23, 155:18, 162:6, 172:8
**fourth** [1] - 92:16
**Fourth** [1] - 2:5
**frame** [2] - 118:18, 141:8
**frankly** [1] - 162:4
**Fredley** [1] - 2:19
**free** [2] - 29:5, 30:1
**friend** [1] - 64:18
**friends** [1] - 65:2
**frightening** [1] - 19:13
**front** [14] - 5:6, 32:4, 35:6, 36:12, 55:10, 59:16, 60:16, 60:18, 61:2, 62:1, 62:6, 71:19, 91:2, 135:5
**Frost** [3] - 127:14, 130:21, 137:4
**fulfill** [1] - 28:16
**full** [4] - 24:12, 97:7, 114:9, 177:13
**fully** [4] - 29:17, 31:20,

32:14, 155:3
**function** [1] - 172:3
**functioning** [1] - 123:9
**fundamentally** [1] - 176:11

## G

**gained** [1] - 123:14
**gathered** [1] - 150:1
**gaze** [1] - 74:23
**gears** [2] - 35:6, 101:5
**general** [5] - 91:5, 91:7, 91:22, 101:24, 140:9
**generally** [5] - 101:21, 122:6, 132:6, 140:11, 140:21
**gentleman** [2] - 58:3, 64:16
**gentlemen** [11] - 26:1, 32:4, 68:18, 73:22, 77:17, 78:2, 79:9, 83:18, 125:19, 127:19, 130:6
**Georgia** [2] - 116:22, 117:16
**given** [8] - 4:18, 74:10, 122:14, 133:12, 140:20, 146:14, 167:23, 168:5
**glimpse** [1] - 46:15
**gloss** [1] - 165:14
**goal** [3] - 106:20, 106:24, 107:1
**Government** [5] - 85:3, 92:10, 93:4, 98:22, 101:15
**government** [40] - 8:12, 12:18, 12:19, 13:18, 13:23, 16:9, 17:16, 39:11, 68:20, 69:21, 98:8, 112:4, 113:24, 125:24, 137:25, 138:1, 138:4, 138:6, 145:17, 146:4, 153:24, 155:11, 155:25, 156:11, 156:13, 156:14, 157:5, 157:12, 159:4, 159:13, 160:21, 163:13, 164:16, 166:1, 166:9, 166:16, 167:8, 167:12, 167:19, 176:21
**government's** [4] - 70:20, 106:14, 137:25, 168:6
**Government's** [3] - 95:9, 110:9, 127:1
**graduate** [1] - 116:7
**graduated** [2] - 115:20, 115:25
**grand** [47] - 31:20, 32:2, 32:22, 32:25, 33:25, 59:7, 59:10, 59:13, 59:17, 60:11, 60:15, 60:16, 60:18, 60:21, 60:22, 61:5, 61:8, 61:11, 73:23, 134:20, 135:1, 135:5, 143:22, 144:8, 144:12, 144:14, 145:2, 145:5, 145:10, 145:15, 146:8, 148:17, 148:22,

152:6, 154:20, 154:21, 155:1, 155:4, 155:16, 156:8, 157:12, 157:16, 157:18, 158:21, 159:5, 167:23, 168:1
**GRANNIS** [1] - 2:20
**grant** [1] - 164:25
**Gray** [3] - 81:8, 81:10, 82:5
**great** [3] - 9:10, 145:23, 161:15
**greater** [1] - 96:17
**green** [3] - 46:23, 47:1
**Green** [7] - 36:16, 38:6, 39:8, 39:16, 47:4, 102:4, 102:5
**greenish** [1] - 46:20
**grenade** [1] - 120:17
**grille** [1] - 64:4
**grind** [1] - 130:1
**grossly** [1] - 155:17
**ground** [5] - 54:12, 126:18, 152:10, 163:11, 173:6
**grounds** [1] - 165:18
**GROUP** [1] - 2:12
**group** [4] - 38:7, 56:13, 129:20, 162:24
**groups** [2] - 125:23
**guess** [5] - 91:13, 107:16, 108:12, 120:9, 146:1
**Guidelines** [1] - 95:16
**guidelines** [4] - 30:23, 96:3, 96:9, 96:17
**guilt** [6] - 6:1, 6:18, 9:16, 10:10, 10:14, 11:15, 12:2, 164:21
**Guilty** [1] - 98:23
**guilty** [37] - 5:3, 6:14, 6:17, 7:16, 7:18, 7:23, 9:6, 9:21, 10:1, 10:9, 11:21, 11:23, 11:24, 12:5, 13:4, 13:14, 13:15, 13:16, 13:20, 14:10, 16:8, 16:15, 17:1, 20:2, 21:22, 29:14, 29:15, 41:16, 93:11, 93:14, 93:20, 93:23, 95:19, 96:13, 98:15, 99:10
**Gulf** [1] - 120:24
**gun** [4] - 50:21, 52:15, 120:24, 127:25
**gunfire** [11] - 55:18, 55:20, 55:22, 56:3, 56:7, 112:13, 112:19, 162:2, 162:18, 163:18, 172:11
**gunner** [2] - 55:10, 101:8
**gunners** [1] - 68:2
**guy** [4] - 37:5, 42:4, 94:13, 116:16

## H

**hajjis** [1] - 80:11
**half** [9] - 79:11, 79:12, 80:4,

118:23, 120:3, 121:6, 141:7, 155:3, 175:19
**hall** [4] - 38:22, 81:6, 81:10, 81:16
**Halloween** [1] - 8:24
**hand** [3] - 94:14, 155:3, 171:15
**handed** [2] - 141:19, 148:13
**handful** [1] - 92:3
**handled** [1] - 142:21
**handling** [1] - 143:17
**hands** [2] - 89:12, 89:14
**hanging** [1] - 29:24
**happily** [1] - 9:12
**happy** [3] - 8:11, 8:13, 37:12
**hard** [10] - 26:23, 27:9, 27:10, 27:25, 40:8, 40:9, 85:20, 97:12, 97:14
**harm** [1] - 164:23
**HARRIS** [1] - 2:20
**head** [6] - 29:24, 56:18, 65:14, 139:8, 139:12, 146:12
**heading** [1] - 101:7
**health** [3] - 73:2, 73:8, 76:14
**hear** [10] - 22:5, 42:1, 45:10, 55:18, 66:20, 90:15, 138:3, 138:5, 161:6, 174:17
**heard** [16] - 42:20, 43:14, 44:14, 45:13, 45:19, 47:3, 55:22, 56:3, 56:7, 66:22, 84:5, 140:6, 140:13, 155:11, 172:11, 172:15
**Heard** [23] - 1:7, 2:15, 36:17, 37:4, 39:1, 39:7, 40:15, 41:12, 42:2, 42:4, 42:13, 42:16, 44:16, 89:18, 89:24, 90:10, 91:4, 91:16, 101:7, 127:15, 128:25, 129:19
**heard's** [1] - 45:6
**hearing** [3] - 98:9, 99:15, 171:6
**Heberlig** [12] - 2:7, 16:12, 35:10, 47:19, 58:17, 58:23, 61:22, 156:5, 156:12, 159:6, 170:22, 170:24
**HEBERLIG** [25] - 98:25, 114:14, 138:3, 152:24, 154:11, 154:14, 159:23, 160:10, 160:12, 161:13, 166:7, 166:14, 166:23, 167:4, 167:9, 167:13, 167:16, 168:12, 174:17, 175:16, 176:4, 176:7, 176:11, 176:16, 176:22
**Heberlig's** [1] - 171:5
**HELD** [1] - 1:17
**held** [1] - 137:19
**helicopter** [2] - 78:9, 78:14
**helicopters** [1] - 79:24

**hello** [1] - 114:7
**help** [9] - 12:15, 17:17, 24:23, 41:22, 59:17, 69:22, 97:2, 147:23, 165:22
**helpful** [1] - 70:19
**helps** [1] - 25:22
**hereby** [1] - 177:11
**hid** [1] - 173:3
**hierarchy** [2] - 156:22, 156:24
**high** [1] - 166:19
**higher** [1] - 91:17
**highlight** [8] - 23:7, 24:16, 28:5, 37:25, 92:18, 93:6, 95:14, 162:4
**highlighted** [2] - 155:5, 161:25
**highlights** [2] - 164:5, 164:6
**himself** [1] - 89:10
**hit** [23] - 34:20, 46:8, 46:10, 47:7, 50:5, 50:13, 50:14, 50:23, 51:1, 51:3, 51:5, 51:8, 51:10, 51:11, 51:14, 56:16, 64:6, 64:8, 64:9, 65:25, 162:15
**hitting** [3] - 50:9, 51:21, 52:1
**home** [1] - 76:7
**honest** [4] - 39:20, 40:6, 76:11, 176:21
**Honor** [93] - 4:3, 4:5, 4:14, 4:17, 6:24, 7:6, 7:8, 12:11, 14:20, 14:23, 14:25, 15:5, 15:13, 19:4, 20:3, 20:24, 22:2, 22:24, 27:16, 33:17, 33:20, 34:5, 40:24, 41:4, 54:19, 54:24, 55:1, 57:8, 58:10, 61:18, 65:20, 66:1, 69:17, 70:22, 71:14, 71:22, 82:9, 82:14, 85:4, 85:7, 85:24, 88:19, 90:1, 90:4, 113:19, 113:23, 114:13, 114:14, 129:15, 134:21, 138:5, 138:10, 138:21, 139:2, 139:7, 139:15, 141:19, 141:24, 142:4, 142:9, 142:11, 143:5, 144:15, 144:17, 149:12, 150:7, 151:7, 151:9, 153:1, 154:6, 154:14, 155:24, 156:11, 159:19, 159:24, 161:7, 161:13, 165:4, 167:10, 168:13, 168:25, 169:4, 169:22, 169:24, 171:20, 172:6, 173:20, 174:5, 174:18, 174:24, 175:18, 175:19, 175:23
**honorable** [1] - 101:4
**HONORABLE** [1] - 1:18
**honorably** [3] - 5:12, 111:17, 121:15

**hood** [2] - 56:16
**hope** [3] - 23:23, 26:4, 77:5
**hoping** [1] - 107:13
**horrifying** [1] - 19:8
**horse** [1] - 33:23
**hour** [6] - 44:4, 79:11, 80:4, 141:7, 141:12, 175:19
**hours** [2] - 79:12, 175:14
**housed** [1] - 151:19
**hurt** [1] - 97:2

## I

**I'll-look-where-I-need-to-look** [1] - 133:21
**IA** [1] - 51:19
**idea** [8] - 8:20, 33:14, 52:1, 70:13, 98:8, 98:10, 98:12, 98:13
**ideally** [2] - 164:3, 165:1
**identified** [2] - 129:16, 158:7
**identify** [1] - 91:20
**ignore** [1] - 159:9
**imagine** [1] - 167:14
**immediately** [6] - 57:13, 59:24, 73:18, 74:2, 80:17, 140:18
**impact** [3] - 103:5, 103:22, 162:14
**impacted** [1] - 64:1
**impacting** [4] - 59:20, 64:2, 64:4, 64:5
**impeach** [1] - 173:6
**impeaches** [1] - 162:20
**implication** [1] - 164:1
**important** [8] - 17:22, 33:8, 34:2, 34:25, 122:2, 123:3, 123:9, 157:2
**impose** [1] - 96:15
**imposed** [1] - 95:24
**impressions** [3] - 171:7, 171:9, 171:16
**improper** [1] - 172:13
**IN** [1] - 1:1
**inadvertence** [1] - 166:24
**inappropriate** [1] - 174:4
**incarceration** [2] - 12:24, 13:11
**incarnation** [1] - 145:18
**incentive** [23] - 72:19, 72:20, 73:11, 73:13, 74:7, 74:10, 74:13, 74:24, 75:5, 75:8, 75:11, 75:16, 75:19, 76:8, 76:23, 77:3, 77:7, 77:14, 77:16, 82:24, 83:1, 83:3
**Incentive** [1] - 75:7
**incentives** [2] - 82:20, 82:21
**incident** [27] - 6:2, 44:4, 64:13, 64:24, 65:5, 66:11, 67:2, 68:22, 69:5, 71:10,

73:18, 73:19, 74:2, 76:6, 76:10, 78:18, 80:20, 111:18, 130:4, 131:16, 132:20, 141:12, 147:14, 149:4, 162:24, 172:12
**incidents** [3] - 131:9, 131:10, 149:24
**include** [7] - 20:1, 99:25, 100:5, 111:1, 119:10, 119:12, 120:4
**includes** [1] - 100:22
**including** [6] - 29:11, 29:18, 30:4, 30:8, 94:19, 96:16, 109:5, 144:21
**incoming** [7] - 102:10, 105:7, 161:24, 162:2, 162:18, 163:18, 170:23
**Incompetent** [1] - 167:11
**increase** [3] - 69:22, 70:6, 70:10
**independent** [1] - 15:19
**indicate** [1] - 105:3
**indict** [2] - 19:25, 20:20
**indicted** [4] - 11:9, 11:19, 21:14, 21:17
**indictment** [3] - 21:4, 21:10, 168:17
**indirectly** [2] - 30:2, 32:17
**individually** [1] - 154:18
**individuals** [6] - 41:23, 125:23, 127:22, 129:12, 129:21, 133:2
**indulgence** [1] - 54:20, 82:12, 113:16
**infamy** [1] - 78:21
**infantry** [7] - 116:25, 117:1, 117:19, 118:6, 118:14, 119:2, 119:9
**Infantry** [2] - 117:18, 117:22
**infantryman's** [1] - 120:12
**inform** [1] - 23:15
**information** [17] - 25:16, 25:22, 30:4, 30:5, 32:16, 41:22, 70:8, 71:2, 98:15, 106:6, 112:21, 131:19, 139:9, 149:22, 149:24, 149:25, 159:10
**initial** [2] - 59:23, 121:8
**innocence** [6] - 20:15, 21:3, 21:14, 21:16, 37:8, 41:8, 41:10, 164:21
**innocent** [8] - 7:20, 11:1, 11:7, 12:4, 19:17, 20:12, 22:13, 168:20
**inquiry** [3] - 160:24, 161:1, 165:7
**inside** [3] - 66:14, 80:23, 133:9
**instance** [3] - 29:21, 131:12, 149:21

**instances** [2] - 131:6, 132:3
**instead** [1] - 7:18
**instruct** [1] - 165:20
**instruction** [6] - 164:5, 164:16, 166:2, 174:7, 174:10
**insufficient** [1] - 171:14
**insurance** [2] - 76:8, 76:17
**insurgents** [7] - 78:9, 78:23, 79:6, 79:17, 80:1, 80:7, 152:4
**intel** [2] - 149:23, 149:24
**intended** [1] - 165:22
**intent** [1] - 51:20
**intentional** [1] - 146:12
**intentionally** [1] - 168:22
**interaction** [2] - 74:21, 128:1
**interested** [1] - 157:3
**interesting** [2] - 26:7, 123:21
**interests** [5] - 75:22, 76:2, 76:24, 110:22, 113:2
**interview** [1] - 35:19
**interviewed** [1] - 141:21
**interviewing** [2] - 142:7, 142:14
**interviews** [4] - 33:25, 40:18, 147:16, 150:1
**introduce** [5] - 6:25, 7:6, 14:20, 40:20, 114:8
**introduced** [2] - 22:24, 43:5
**introducing** [1] - 15:7
**inventory** [2] - 142:16, 148:19
**investigate** [3] - 25:22, 41:22, 140:19
**investigated** [1] - 107:14
**investigation** [12] - 24:19, 25:3, 25:5, 25:13, 26:1, 32:19, 35:1, 98:1, 105:17, 106:14, 162:21, 166:15
**investigators** [1] - 32:15
**involved** [3] - 104:20, 139:23, 140:24
**involvement** [1] - 166:15
**Iraq** [15] - 118:21, 118:22, 119:1, 119:7, 119:13, 119:15, 120:1, 121:18, 124:22, 124:23, 125:21, 126:2, 126:4, 126:8, 126:14
**Iraqi** [12] - 51:19, 51:24, 51:25, 58:3, 62:18, 62:24, 63:18, 87:10, 162:20, 162:24, 163:2, 173:2
**Iraqis** [1] - 163:9
**issue** [5] - 140:16, 161:3, 161:16, 162:18, 171:4
**issued** [2] - 104:2, 104:5
**issues** [7] - 71:13, 73:2, 76:15, 129:25, 132:17,

155:20, 163:6
**item** [6] - 140:1, 142:19, 142:23, 150:16, 151:19, 152:22
**items** [8] - 139:16, 143:9, 152:25, 153:5, 153:9, 153:11, 153:12, 158:5
**iteration** [1] - 148:1
**iterations** [1] - 147:12
**itself** [4] - 15:9, 105:8, 121:21, 150:6
**IV** [1] - 2:12

## J

**jail** [8] - 17:12, 18:1, 18:3, 18:5, 19:14, 26:9, 26:13, 29:11
**Janet** [1] - 2:16
**January** [4] - 77:24, 78:3, 78:18
**jEREMY** [1] - 3:4
**Jeremy** [6] - 113:24, 114:10, 127:14, 127:16, 128:22, 131:25
**JEREMY** [3] - 3:6, 113:25, 114:10
**Jessica** [1] - 4:6
**Jim** [3] - 127:16, 129:10, 132:10
**Jimmy** [5] - 68:20, 68:24, 69:3, 132:9
**job** [9] - 72:8, 72:17, 73:5, 73:9, 104:6, 104:8, 111:7, 111:10, 122:22
**John** [1] - 2:3
**JOHNSON** [1] - 2:9
**join** [2] - 116:5, 116:18
**joined** [2] - 116:1, 116:9
**joint** [1] - 139:23
**Joyce** [1] - 141:20
**Jr** [1] - 2:3
**judge** [14] - 16:21, 17:3, 17:15, 27:4, 27:15, 60:22, 83:5, 83:13, 83:20, 94:4, 94:5, 96:7, 96:10
**Judge** [12] - 23:25, 24:4, 26:21, 27:7, 31:2, 83:9, 83:10, 96:1, 96:15, 98:12, 98:18, 167:23
**JUDGE** [1] - 1:18
**judgments** [1] - 157:2
**July** [8] - 57:7, 146:3, 146:21, 151:23, 153:19, 153:22, 153:25, 157:10
**June** [1] - 106:4
**jurors'** [1] - 164:10
**JURY** [1] - 1:17
**jury** [82] - 4:2, 4:10, 7:9, 14:21, 15:14, 23:1, 28:13,

31:20, 32:3, 32:5, 32:22,
33:1, 33:25, 40:19, 58:18,
59:8, 59:10, 59:13, 59:17,
60:11, 60:15, 60:16, 60:18,
60:21, 60:22, 61:3, 61:5,
61:9, 61:11, 62:1, 62:6,
66:4, 67:4, 68:18, 71:19,
73:23, 77:17, 78:3, 83:18,
85:16, 97:3, 114:9, 125:19,
134:20, 135:1, 135:5,
137:16, 137:20, 143:22,
144:8, 144:12, 144:14,
145:2, 145:5, 145:10,
145:15, 146:8, 148:17,
148:22, 152:6, 154:20,
154:21, 155:1, 155:4,
155:16, 156:9, 157:12,
157:16, 157:18, 158:21,
159:5, 164:7, 165:2,
165:21, 167:23, 168:1,
170:24, 171:4, 171:6,
171:15, 172:2, 174:11
**jury's** [1] - 171:9
**justice** [2] - 29:19, 115:16
**Justice** [11] - 23:24, 97:19,
105:14, 107:13, 111:8,
113:3, 113:6, 156:16,
156:17, 157:10, 157:13
**justified** [3] - 7:20, 8:10,
20:12
**justify** [9] - 11:4, 73:24, 74:4,
74:5, 74:7, 75:5, 75:8,
75:16, 107:2

## K

**K-R-U-E-G-E-R** [1] - 114:10
**Kavanaugh** [1] - 2:4
**KAVANAUGH** [6] - 174:24,
175:1, 175:9, 175:13,
175:18, 175:22
**keep** [2] - 109:11, 158:20
**Kevin** [2] - 127:16, 175:9
**Kia** [36] - 42:15, 42:17, 44:19,
48:12, 48:14, 48:17, 55:24,
57:3, 61:13, 62:15, 63:12,
64:4, 64:14, 65:5, 65:14,
86:6, 86:25, 87:7, 87:15,
87:22, 87:23, 87:25, 88:1,
88:17, 88:25, 89:8, 90:14,
90:22, 90:23, 90:25, 94:8,
94:19, 100:10, 112:8,
112:11, 140:13
**kids** [2] - 18:20, 115:10
**killed** [4] - 64:14, 65:10,
78:17, 80:18
**kind** [8] - 12:15, 37:1, 72:3,
94:18, 97:12, 97:14,
115:17, 136:4
**kinds** [1] - 11:10

**knowing** [1] - 136:15
**knowledge** [3] - 32:20,
138:16, 153:25
**known** [1] - 81:8
**knows** [3] - 162:25, 172:25,
173:16
**Kohl** [4] - 8:24, 155:12,
158:1, 158:3
**Krueger** [9] - 113:24, 114:10,
114:11, 114:25, 174:23,
174:25, 175:1, 175:8,
175:11
**KRUEGER** [2] - 3:6, 113:25

## L

**lack** [3] - 23:18, 24:13, 105:3
**ladies** [7] - 32:4, 68:18,
73:22, 77:17, 78:2, 83:18,
125:19
**laid** [3] - 154:14, 159:12,
161:14
**Lamberth** [11] - 23:25, 24:4,
26:21, 27:7, 31:2, 83:9,
83:10, 96:1, 96:15, 98:12,
98:18
**LAMBERTH** [1] - 1:18
**language** [1] - 164:17
**lapse** [1] - 168:16
**laptop** [3] - 92:11, 95:3,
101:17
**large** [4] - 53:24, 110:19,
117:22, 167:16
**last** [17] - 4:4, 6:13, 16:13,
40:3, 45:23, 57:6, 59:10,
59:13, 60:15, 60:18, 61:11,
73:9, 76:10, 82:25, 87:3,
158:11, 173:7
**lasted** [3] - 18:22, 79:15,
80:5
**lasts** [1] - 117:5
**late** [4] - 164:23, 166:23,
169:2, 173:23
**launcher** [1] - 120:17
**Laurent** [1] - 1:7
**LAW** [1] - 2:12
**law** [5] - 93:2, 110:19, 166:4,
166:12, 167:6
**lawyer** [6] - 8:25, 20:18,
106:5, 111:16, 112:22,
113:1
**lawyers** [7] - 26:20, 26:23,
27:4, 60:24, 62:11, 77:5
**leader** [5] - 122:2, 122:21,
133:16, 140:4, 140:10
**leading** [1] - 104:12
**learn** [2] - 125:13, 136:18
**learned** [2] - 58:18, 172:2
**least** [9] - 43:19, 111:10,
123:10, 135:24, 142:15,

148:1, 160:1, 176:21,
176:23
**leave** [2] - 136:5, 140:18
**leaving** [4] - 101:6, 102:15,
103:14, 105:8
**led** [1] - 134:4
**left** [6] - 4:22, 15:21, 15:22,
82:18, 169:10, 169:12
**legal** [6] - 99:12, 155:20,
159:22, 161:2, 161:6,
165:17
**legitimate** [1] - 91:20
**lend** [1] - 123:25
**leniency** [3] - 35:2, 69:21,
70:7
**lenient** [2] - 25:12, 31:6
**less** [6] - 8:4, 19:2, 41:15,
83:19, 175:15, 175:16
**lesser** [1] - 26:24
**letter** [22] - 5:9, 5:12, 17:15,
23:25, 24:3, 26:4, 31:2,
31:5, 35:2, 69:21, 70:3,
70:5, 105:19, 106:3,
106:16, 110:13, 110:16,
111:6, 111:8, 112:4,
112:13, 113:2
**level** [3] - 115:12, 121:2,
163:11
**levels** [1] - 148:4
**Liberty** [17] - 1:6, 2:12,
38:23, 70:15, 70:18, 71:7,
81:13, 81:19, 82:4, 127:16,
129:5, 129:8, 129:20,
131:5, 131:6, 131:12
**lie** [29] - 29:21, 34:2, 37:9,
72:6, 72:16, 72:19, 72:21,
73:11, 73:13, 74:13, 74:15,
74:24, 75:8, 75:11, 75:19,
75:20, 75:22, 76:2, 76:3,
76:4, 76:8, 76:23, 76:25,
82:21, 82:24, 83:2, 97:2,
100:25, 110:6
**lied** [25] - 12:3, 34:18, 34:25,
72:9, 72:11, 72:13, 72:16,
72:19, 73:13, 74:11, 74:13,
74:17, 74:20, 74:24, 75:1,
75:7, 75:11, 75:21, 75:23,
76:5, 76:20, 76:22, 76:24,
77:1
**lies** [5] - 9:19, 73:15, 107:21,
108:2, 110:3
**lieutenant** [3] - 117:10,
121:12, 121:13
**life** [3] - 9:12, 19:3, 69:11
**light** [4] - 165:5, 165:23,
165:25, 167:17
**likely** [3] - 21:19, 139:10,
155:25
**limiting** [1] - 167:22
**Linda** [1] - 2:8

**line** [16] - 8:24, 59:18, 66:16,
71:14, 82:19, 84:2, 87:1,
91:11, 95:6, 100:19,
104:12, 105:4, 107:17,
108:6, 135:10, 161:19
**lines** [3] - 109:10, 158:24,
171:17
**linger** [1] - 165:2
**list** [1] - 134:4
**litter** [1] - 173:5
**live** [1] - 115:4
**lived** [2] - 10:14, 115:6
**living** [1] - 115:2
**LLP** [4] - 2:9, 2:12, 2:16, 2:20
**located** [3] - 86:7, 101:22,
116:21
**location** [1] - 149:5
**logistically** [1] - 163:7
**look** [17] - 8:3, 13:22, 14:12,
25:2, 35:14, 39:14, 49:2,
49:9, 90:15, 110:22,
133:21, 139:7, 150:4,
151:12, 167:1, 176:22
**looked** [9] - 21:5, 46:4,
74:16, 74:17, 74:19, 74:23,
147:8, 153:24, 166:19
**looking** [10] - 12:6, 18:13,
19:14, 102:16, 102:20,
102:21, 103:16, 103:17,
103:24, 175:11
**Lord** [1] - 162:25
**lose** [1] - 119:23
**lost** [1] - 80:6
**lot's** [1] - 9:23
**loud** [1] - 127:12
**love** [1] - 12:2
**low** [3] - 18:5, 149:15, 166:19
**lower** [2] - 24:5, 26:5
**lucky** [1] - 176:20
**lying** [3] - 34:10, 40:23,
100:17

## M

**M-16** [1] - 120:16
**M-203** [1] - 120:17
**M-240** [7] - 48:19, 48:23,
49:16, 50:20, 52:15, 53:22,
120:23
**M-4** [8] - 48:23, 49:16, 54:7,
54:17, 55:20, 57:19, 62:17,
120:16
**ma'am** [1] - 85:5
**machine** [4] - 50:21, 52:15,
112:18, 120:24
**Made..................................**
**........** [1] - 3:8
**magazine** [2] - 54:5, 54:6
**maintain** [2] - 20:14, 21:14
**maintained** [7] - 21:2, 51:1,

51:4, 143:10, 151:11, 151:18, 153:11
**maintaining** [2] - 41:7, 41:10
**major** [1] - 115:17
**Malis** [2] - 155:12, 158:2
**man** [11] - 36:20, 36:23, 36:25, 45:19, 48:14, 67:5, 87:10, 87:12, 114:19, 116:10, 130:22
**Mandatory** [1] - 95:16
**mandatory** [10] - 13:24, 14:4, 14:9, 17:12, 17:18, 17:21, 19:1, 20:1, 20:22, 29:11
**manner** [2] - 132:1, 132:7
**manslaughter** [10] - 12:20, 12:23, 13:3, 13:7, 13:19, 16:18, 16:21, 17:2, 20:21, 20:22
**map** [1] - 101:21
**March** [1] - 116:6
**mark** [3] - 85:1, 86:3, 86:20
**Mark** [1] - 127:13
**marked** [10] - 85:2, 134:20, 150:12, 150:15, 150:17, 151:2, 151:4, 153:12, 153:13, 160:13
**markings** [1] - 85:13
**marks** [2] - 86:1, 162:14
**marksman** [1] - 68:7
**marriage** [1] - 18:22
**married** [1] - 115:8
**Martin** [2] - 2:3, 61:9, 175:13
**MARTIN** [7] - 113:23, 114:5, 114:17, 129:15, 129:18, 134:21, 134:23
**mARTIN** [1] - 114:12
**Martin**.................. [1] - 3:7
**material** [5] - 160:3, 167:20, 167:21, 169:19, 170:2
**materially** [1] - 173:17
**materials** [5] - 30:4, 30:5, 145:25, 160:5, 173:5
**Mathur** [1] - 171:11
**MATHUR** [1] - 171:11
**matter** [11] - 11:3, 11:4, 20:15, 32:19, 56:5, 97:8, 97:25, 107:11, 108:10, 135:5, 167:21
**matters** [3] - 32:18, 32:20, 161:2
**Matthew** [2] - 127:13, 130:15
**maximum** [5] - 16:3, 16:20, 17:2, 18:4, 96:16
**McGee** [6] - 64:16, 64:18, 64:25, 65:4, 65:10, 65:13
**Mealy** [2] - 127:13, 130:7
**mean** [31] - 14:6, 18:25, 28:7, 33:11, 39:10, 39:11, 39:19, 46:25, 56:2, 60:2, 65:18, 83:22, 91:1, 93:13, 94:14,

94:15, 96:6, 96:18, 97:11, 97:21, 99:16, 105:7, 108:1, 109:25, 125:16, 129:22, 133:10, 149:16, 150:10, 152:2, 153:19
**means** [13] - 24:23, 25:11, 28:21, 28:24, 30:13, 30:15, 31:1, 32:25, 33:1, 67:10, 69:11, 96:19, 107:5
**meant** [3] - 86:3, 125:20, 125:22
**mechanisms** [1] - 168:2
**medium** [1] - 18:5
**meet** [2] - 33:2, 73:19
**meeting** [21] - 4:24, 5:15, 5:19, 10:6, 20:8, 35:11, 36:2, 41:12, 47:20, 47:23, 48:21, 49:15, 50:19, 51:23, 74:1, 105:13, 105:16, 106:17, 106:18, 107:7, 151:24
**meetings** [8] - 5:16, 33:7, 33:25, 34:19, 108:18, 108:25, 109:3, 145:19
**member** [5] - 38:11, 130:22, 133:9, 133:15, 172:10
**members** [10] - 38:6, 38:19, 112:18, 114:9, 119:21, 120:21, 122:25, 123:1, 123:11, 137:1
**memo** [1] - 149:10
**memory** [5] - 84:11, 134:9, 135:4, 135:17, 144:3
**men** [15] - 11:10, 12:21, 117:25, 118:10, 119:4, 119:23, 121:22, 122:10, 122:14, 122:22, 130:4, 131:1, 141:4, 141:10, 147:15
**mental** [3] - 73:1, 73:8, 76:14
**mentally** [2] - 26:12, 26:13
**mention** [3] - 143:11, 172:10, 173:2
**mentioned** [10] - 57:19, 61:21, 124:2, 133:19, 146:21, 152:13, 153:18, 165:5, 169:4, 173:11
**mercy** [1] - 27:2
**met** [12] - 40:14, 75:2, 75:13, 75:24, 97:24, 108:9, 138:22, 145:21, 145:23, 146:1, 152:20
**metal** [1] - 46:11
**method** [1] - 168:3
**Michael** [1] - 2:8
**mid** [3] - 164:7, 173:25, 176:19
**mid-trial** [2] - 173:25, 176:19
**middle** [2] - 16:3, 122:20
**might** [5] - 62:10, 70:19,

94:21, 146:24, 149:24
**military** [20] - 72:11, 121:5, 121:21, 123:1, 123:9, 123:11, 123:13, 124:3, 126:1, 143:13, 143:19, 144:5, 147:17, 149:14, 150:3, 153:9, 156:15, 157:2, 157:15
**mind** [18] - 17:22, 39:4, 39:8, 40:16, 41:13, 82:24, 83:3, 83:17, 84:17, 92:8, 97:16, 100:7, 107:10, 126:11, 146:21, 149:1, 149:9, 152:8
**mindset** [1] - 100:6
**minimize** [2] - 73:23, 74:3
**minimum** [3] - 19:1, 20:22, 29:11
**minute** [1] - 12:10
**minutes** [1] - 162:8
**mischaracterizes** [1] - 20:4
**misconception** [1] - 154:12
**missing** [2] - 145:14, 147:2
**mission** [17] - 78:3, 78:19, 79:3, 79:5, 80:9, 80:17, 94:1, 122:12, 123:4, 125:14, 125:20, 125:25, 126:1, 126:4, 126:7, 135:21, 135:23
**mission's** [1] - 92:23
**missions** [7] - 93:15, 119:6, 119:8, 119:9, 122:11, 126:6
**mistake** [1] - 146:11
**mistaken** [1] - 156:13
**mistakenly** [1] - 147:2
**mistrial** [1] - 163:7
**mode** [1] - 60:9
**Moffett** [1] - 4:6
**moment** [18] - 14:22, 43:6, 49:6, 54:20, 60:21, 68:17, 87:6, 95:2, 101:5, 106:16, 114:8, 142:2, 142:9, 144:15, 146:7, 148:7, 158:17, 159:17
**moment's** [1] - 136:5
**moments** [1] - 82:20
**money** [1] - 123:20
**montage** [9] - 143:24, 144:4, 144:10, 144:19, 146:15, 154:22, 158:20, 165:7, 165:11
**montages** [8] - 155:25, 156:4, 156:18, 157:4, 157:19, 158:11, 160:23
**month** [1] - 132:16
**months** [7] - 104:12, 117:6, 123:17, 123:18, 130:18, 135:7, 148:16
**morale** [3] - 121:25, 122:2,

122:5
**morning** [2] - 133:24, 135:25
**most** [7] - 33:8, 127:2, 127:19, 139:10, 155:25, 166:8, 173:14
**motion** [10] - 17:16, 23:25, 24:3, 30:22, 55:22, 55:25, 69:14, 137:24, 154:15, 154:25
**move** [9] - 85:5, 85:7, 98:22, 99:4, 102:23, 103:3, 103:24, 128:14, 132:19
**moved** [2] - 115:21, 172:25
**movement** [2] - 88:5, 89:12
**movements** [1] - 87:23
**moving** [9] - 46:6, 56:1, 68:24, 88:1, 88:4, 88:6, 94:18, 98:24, 114:12
**Moyock** [1] - 125:10
**MR** [227] - 4:3, 4:5, 4:14, 4:19, 6:24, 7:1, 7:6, 7:8, 7:9, 7:12, 10:15, 10:18, 12:11, 12:13, 14:22, 14:25, 15:5, 15:10, 15:13, 15:18, 15:20, 19:4, 19:7, 19:10, 19:12, 20:3, 20:6, 20:24, 21:1, 22:2, 22:4, 22:8, 22:11, 22:16, 22:20, 27:16, 27:18, 27:21, 33:17, 33:19, 33:21, 34:4, 34:7, 39:24, 40:2, 40:12, 40:22, 40:24, 41:1, 41:4, 41:6, 47:10, 47:11, 47:15, 47:17, 54:19, 54:22, 54:24, 55:1, 55:3, 57:8, 57:10, 58:10, 58:11, 58:13, 58:16, 58:20, 58:22, 58:25, 59:3, 61:18, 61:20, 63:15, 63:17, 63:21, 63:23, 65:20, 65:22, 66:1, 66:9, 66:10, 67:18, 67:19, 67:21, 67:23, 69:17, 69:19, 69:24, 70:2, 70:21, 70:24, 71:14, 71:17, 71:22, 71:24, 82:9, 82:11, 82:14, 82:17, 85:4, 85:5, 85:11, 88:18, 88:21, 90:1, 90:3, 90:5, 90:8, 92:13, 92:15, 93:9, 95:12, 95:13, 98:25, 99:3, 113:8, 113:10, 113:14, 113:16, 113:18, 113:23, 114:5, 114:12, 114:14, 114:17, 129:15, 129:18, 134:21, 134:23, 138:3, 138:5, 138:9, 138:12, 138:15, 138:20, 139:2, 139:5, 139:7, 139:15, 139:22, 140:4, 140:9, 141:3, 141:18, 141:24, 142:2, 142:4, 142:11, 142:20, 143:5, 143:7, 143:9,

**never** [12] - 18:20, 58:9, 66:22, 73:15, 146:3, 148:9, 150:8, 152:11, 154:17, 154:18, 160:10, 165:23
**new** [6] - 54:6, 54:9, 54:12, 79:16, 165:24, 167:20
**next** [9] - 22:14, 22:18, 24:10, 48:14, 51:4, 111:15, 111:16, 118:12, 135:13
**nice** [1] - 137:13
**Nicholas** [1] - 1:13
**Nick** [3] - 127:14, 128:14, 128:15
**Ninth** [1] - 171:18
**Nisur** [36] - 11:8, 13:8, 36:4, 36:7, 44:4, 52:6, 54:16, 55:5, 55:8, 64:25, 66:11, 66:18, 66:20, 66:22, 67:1, 68:21, 69:5, 70:13, 71:4, 71:10, 71:20, 74:2, 76:6, 82:3, 104:17, 104:20, 104:23, 104:25, 132:20, 140:14, 140:16, 140:19, 148:19, 152:3, 158:8, 169:11
**Non** [1] - 95:16
**Non-Mandatory** [1] - 95:16
**none** [6] - 9:15, 9:16, 11:16, 11:25, 163:7
**nonetheless** [1] - 76:20
**nook** [1] - 167:19
**noon** [2] - 55:4, 55:7
**normal** [1] - 140:11
**normally** [1] - 165:23
**north** [8] - 45:7, 45:15, 55:12, 101:7, 102:24, 103:20, 103:21, 169:11
**northwest** [1] - 55:12
**notation** [1] - 142:12
**note** [2] - 4:5, 164:9
**NOTE** [4] - 4:10, 66:4, 137:16, 137:19
**notes** [6] - 35:11, 35:15, 35:19, 35:22, 36:13, 177:13
**nothing** [17] - 5:13, 5:21, 7:22, 8:21, 19:2, 27:19, 32:22, 53:13, 54:24, 68:12, 71:9, 106:21, 111:19, 113:18, 146:11, 168:18, 174:14
**Nothing** [4] - 39:4, 39:8, 40:16, 41:13
**notice** [2] - 136:5, 164:3
**noticed** [2] - 51:3, 173:5
**November** [10] - 5:3, 6:17, 7:23, 8:4, 11:17, 11:25, 12:4, 16:8, 18:14, 107:16
**number** [8] - 21:12, 85:13, 89:21, 92:6, 97:24, 100:18,

**name** [4] - 83:5, 114:9, 117:17, 139:6
**name's** [1] - 114:10
**named** [2] - 64:16, 172:8
**namely** [1] - 172:13
**names** [1] - 127:12
**narrow** [1] - 163:22
**nature** [5] - 23:17, 23:21, 24:12, 122:9, 169:1
**nauseam** [1] - 34:4
**near** [7] - 49:22, 50:1, 50:4, 91:25, 146:6, 146:19, 148:24
**nearly** [1] - 169:13
**necessarily** [2] - 89:4, 164:21
**necessary** [1] - 131:17
**need** [6] - 6:8, 6:22, 9:16, 11:16, 13:3, 133:21
**needed** [6] - 8:16, 76:7, 122:7, 136:21, 140:18
**negligent** [1] - 155:17

**144:14**, 144:17, 144:20, 144:22, 147:6, 147:8, 147:24, 148:1, 148:11, 149:12, 149:14, 149:18, 149:20, 150:7, 150:10, 150:24, 151:3, 151:7, 151:9, 151:15, 151:23, 152:17, 152:24, 152:25, 153:5, 153:17, 153:20, 153:23, 154:4, 154:6, 154:8, 154:11, 154:14, 155:24, 156:3, 156:5, 156:10, 157:19, 157:21, 157:23, 157:25, 158:3, 158:13, 158:19, 159:17, 159:19, 159:23, 160:10, 160:12, 161:7, 161:13, 166:7, 166:14, 166:23, 167:4, 167:9, 167:13, 167:16, 168:12, 168:13, 174:13, 174:17, 174:24, 175:1, 175:9, 175:13, 175:16, 175:18, 175:22, 176:1, 176:4, 176:7, 176:11, 176:16, 176:22
**multiple** [11] - 61:22, 70:25, 71:2, 72:9, 75:24, 75:25, 76:1, 77:1, 112:14, 112:19, 156:6
**Murphy** [8] - 127:14, 130:15, 130:19, 137:4, 139:10, 172:10, 173:19
**must** [2] - 19:8
**muzzle** [4] - 48:3, 48:6, 91:23, 110:8

## N

## O

**138:8**, 162:25
**NW** [7] - 1:24, 2:5, 2:10, 2:13, 2:17, 2:20, 177:20

**O'Connor** [5] - 173:8, 173:11, 173:14, 173:15, 173:18
**oath** [4] - 59:14, 61:11, 61:17, 114:2
**object** [3] - 15:1, 57:8, 61:18
**objecting** [1] - 70:22
**objection** [29] - 7:8, 12:11, 19:10, 20:3, 20:24, 22:2, 22:8, 33:17, 47:10, 47:15, 58:10, 58:20, 58:25, 63:15, 63:21, 65:20, 67:18, 69:17, 69:24, 71:14, 71:22, 82:9, 85:4, 88:18, 90:1, 98:25, 113:8, 113:14, 114:13
**objection's** [1] - 15:9
**obligated** [1] - 164:16
**obligation** [2] - 30:22, 121:8
**obligations** [2] - 28:18, 29:6
**observations** [1] - 150:1
**observe** [1] - 81:16
**observed** [5] - 42:16, 50:8, 58:3, 110:3, 142:14
**obstruction** [1] - 29:19
**obtained** [4] - 14:14, 16:7, 144:4, 160:6
**obviously** [6] - 83:14, 86:11, 95:21, 99:6, 161:23, 176:9
**occasions** [1] - 76:1
**occupying** [2] - 133:5, 133:7
**occur** [1] - 65:19
**occurred** [12] - 57:5, 62:18, 62:24, 67:5, 77:21, 78:3, 80:17, 84:9, 100:18, 105:9, 105:10, 109:19
**October** [47] - 4:24, 5:15, 5:23, 6:10, 7:13, 7:18, 7:23, 8:4, 8:8, 8:23, 10:7, 11:17, 11:25, 12:3, 18:13, 19:17, 20:8, 35:11, 35:16, 35:20, 36:2, 37:7, 37:8, 37:17, 38:4, 39:3, 39:6, 40:14, 41:7, 41:9, 75:13, 106:17, 106:24, 107:16, 107:20, 138:22, 141:22, 143:7, 145:1, 148:14, 151:19, 152:21, 153:6, 153:10, 157:8
**odd** [2] - 94:22, 94:24
**odds** [3] - 69:20, 70:6, 70:10
**OF** [6] - 1:1, 1:3, 1:10, 1:17, 177:6, 177:9
**offense** [1] - 25:7
**offenses** [1] - 96:14

**offensive** [3] - 126:4, 126:6, 126:9
**OFFICE** [1] - 2:4
**office** [1] - 4:6
**Office** [8] - 23:16, 23:24, 24:11, 71:1, 143:14, 151:24, 159:7, 160:22
**Officer** [3] - 116:14, 116:19, 117:3
**officer** [15] - 58:4, 62:19, 62:25, 63:1, 87:10, 116:10, 116:11, 116:12, 117:5, 117:7, 118:7, 118:14, 119:2, 124:3
**officers** [2] - 74:16, 144:6
**OFFICIAL** [1] - 177:9
**official** [4] - 58:3, 63:1, 145:22, 177:18
**Official** [1] - 1:23
**officials** [1] - 74:2
**often** [2] - 167:1, 176:17
**old** [3] - 109:25, 114:25, 167:20
**once** [6] - 21:3, 39:15, 67:5, 136:4, 137:11, 142:18
**oncoming** [1] - 103:2
**one** [80] - 5:16, 6:5, 8:5, 11:15, 11:16, 13:4, 13:14, 13:20, 16:18, 18:5, 19:4, 19:16, 20:14, 21:12, 28:17, 32:10, 33:7, 46:23, 47:18, 54:3, 54:9, 54:20, 55:22, 55:25, 61:17, 69:15, 69:23, 70:8, 78:16, 79:9, 81:4, 92:17, 94:9, 98:3, 108:22, 120:19, 123:20, 127:10, 131:16, 136:24, 138:8, 140:25, 142:4, 142:24, 143:1, 143:11, 144:3, 144:5, 144:9, 144:15, 146:12, 148:15, 153:12, 153:23, 153:24, 154:1, 154:23, 156:15, 156:16, 158:3, 158:14, 158:17, 160:1, 161:25, 162:13, 162:25, 163:7, 163:24, 168:3, 170:24, 171:2, 172:25, 173:6, 173:8, 175:4, 176:4
**ones** [3] - 146:16, 165:13, 165:14
**ONORATO** [1] - 2:16
**opening** [16] - 61:15, 161:22, 161:23, 162:4, 162:10, 162:19, 163:12, 163:24, 165:18, 165:21, 165:24, 170:21, 170:23, 173:25, 174:2, 174:6
**openings** [1] - 174:1
**operating** [1] - 154:12

**opinion** [4] - 88:18, 130:10, 130:14, 167:24
**opportunity** [6] - 27:3, 123:20, 163:21, 170:8, 170:14, 170:19
**opposed** [1] - 69:15
**opposite** [1] - 10:23
**OPR** [1] - 161:3
**opted** [2] - 22:12, 22:17
**option** [5] - 20:11, 20:13, 20:14, 21:12, 21:20
**options** [1] - 20:7
**oranges** [1] - 176:17
**order** [4] - 70:17, 123:3, 133:21, 156:20
**orders** [2] - 133:14, 133:16
**oriented** [1] - 55:12
**originated** [1] - 170:25
**ourselves** [1] - 160:16
**outs** [1] - 104:19
**outside** [3] - 81:20, 137:20, 151:3
**outward** [1] - 164:11
**overlap** [1] - 145:7
**overlapped** [1] - 141:14
**overlooked** [1] - 172:25
**overly** [1] - 132:1, 132:6
**overruled** [2] - 57:9, 88:20
**oversight** [2] - 146:10, 168:20
**own** [6] - 37:8, 40:11, 73:23, 74:3, 74:16, 139:18
**owned** [1] - 77:11

**P**

**p.m** [9] - 1:8, 4:1, 4:11, 66:5, 66:7, 137:17, 161:10, 161:12, 177:2
**P.M** [1] - 1:9
**pack** [2] - 54:8, 84:24
**package** [1] - 150:17
**packet** [1] - 99:14
**page** [18] - 23:6, 24:22, 28:4, 31:16, 36:9, 36:11, 36:12, 49:5, 50:15, 57:7, 92:16, 111:15, 111:16, 112:4, 135:10, 135:13, 142:6, 156:7
**pages** [4] - 59:18, 99:21, 147:10, 156:6
**paid** [2] - 124:6, 124:7
**paper** [1] - 168:4
**papers** [3] - 138:1, 161:14, 161:17
**paragraph** [18] - 23:7, 23:9, 23:14, 28:4, 28:6, 31:17, 31:19, 32:8, 49:8, 49:10, 50:18, 53:9, 93:20, 94:1, 95:14, 97:5, 112:3, 164:20

**paragraphs** [3] - 99:22, 99:24, 100:5
**paralegal** [1] - 4:6
**pardon** [10] - 8:7, 11:22, 37:22, 41:3, 44:15, 55:6, 60:17, 62:20, 68:23, 81:1
**part** [26] - 8:15, 41:18, 41:21, 60:6, 79:3, 95:12, 95:21, 96:21, 99:14, 99:17, 102:6, 108:22, 118:4, 120:11, 122:11, 122:12, 123:22, 125:14, 126:8, 126:16, 127:2, 145:2, 154:18, 156:13, 159:25, 160:7
**participated** [1] - 140:2
**particular** [8] - 86:21, 110:6, 116:23, 126:19, 135:1, 137:1, 142:16, 169:1
**particularly** [2] - 84:10, 167:17
**partner** [1] - 110:19
**partners** [1] - 166:9
**parts** [3] - 23:5, 33:8, 121:17
**party** [1] - 166:16
**passed** [2] - 60:4, 156:23
**passenger** [7] - 48:17, 86:25, 87:9, 87:15, 88:9, 89:12, 100:10
**past** [7] - 28:8, 55:4, 55:7, 70:19, 71:3, 103:25, 151:11
**Patarini** [1] - 139:10
**Patrick** [1] - 2:3
**patrolling** [1] - 140:12
**patrols** [1] - 119:10
**Paul** [3] - 1:6, 127:14, 127:24
**Pause** [9] - 14:24, 54:21, 82:13, 105:20, 113:17, 142:3, 142:10, 158:18, 159:18
**pay** [2] - 84:24, 124:2
**payback** [6] - 77:19, 80:10, 84:1, 84:12, 84:13
**pen** [5] - 45:23, 45:25, 46:3, 46:4, 46:8, 46:21, 46:23
**Pensacola** [3] - 115:5, 115:6, 115:21
**people** [24] - 13:8, 24:24, 37:21, 37:24, 39:15, 40:9, 49:22, 50:1, 50:4, 61:8, 68:2, 78:23, 80:18, 100:18, 100:22, 109:5, 122:19, 131:21, 138:12, 142:14, 149:22, 152:11, 152:14
**perceive** [3] - 91:4, 112:10, 149:22
**perceived** [2] - 67:16, 91:15
**perception** [4] - 67:21, 94:7, 94:9, 94:24
**perform** [1] - 28:16

**performed** [2] - 54:16, 126:2
**perhaps** [2] - 147:2, 150:2
**perimeter** [1] - 122:22
**period** [2] - 8:5, 73:8
**perjury** [1] - 29:18
**person** [22] - 9:24, 10:13, 24:19, 25:3, 25:6, 25:14, 25:23, 61:12, 62:18, 63:11, 63:18, 67:13, 80:25, 81:2, 88:12, 89:13, 94:17, 139:13, 163:25, 165:11, 169:4, 171:21
**personal** [2] - 72:13, 129:25
**personality** [1] - 129:23
**personally** [3] - 91:20, 129:25, 131:24
**personnel** [1] - 80:6
**perspective** [2] - 63:13, 63:19
**persuade** [1] - 19:18
**phone** [1] - 45:19
**photograph** [7] - 43:16, 44:3, 91:25, 147:1, 162:7, 162:16, 163:4
**photographed** [2] - 146:24, 163:1
**photographing** [1] - 146:6
**photographs** [63] - 43:7, 138:21, 138:23, 139:20, 140:21, 141:1, 142:7, 142:25, 143:12, 143:18, 143:24, 143:25, 144:23, 145:4, 145:6, 146:15, 146:16, 147:10, 147:15, 148:12, 148:13, 148:17, 148:20, 150:19, 151:21, 152:23, 153:2, 153:7, 154:23, 155:2, 155:15, 155:17, 156:7, 156:23, 156:25, 157:1, 158:4, 158:5, 158:20, 158:23, 159:3, 159:9, 159:13, 160:18, 162:8, 162:22, 163:19, 164:2, 164:7, 164:11, 168:14, 168:22, 169:1, 169:5, 171:21, 171:23, 171:25, 172:9, 172:19, 173:12, 173:14, 173:16
**photos** [14] - 141:17, 141:25, 142:17, 150:8, 150:12, 154:16, 154:18, 154:20, 154:24, 155:4, 157:6, 157:8, 157:11, 159:1
**physical** [1] - 162:12
**physically** [1] - 116:20
**pick** [2] - 4:22, 165:13
**picture** [4] - 92:6, 127:6, 152:10, 152:11
**pictures** [8] - 138:8, 140:8,

152:12, 152:15, 153:14, 153:21, 154:7, 154:10
**piece** [6] - 46:10, 142:20, 161:2, 162:11, 166:20, 168:4
**place** [4] - 18:8, 79:16, 124:22, 125:1
**placed** [2] - 145:1, 151:9
**places** [1] - 170:25
**plain** [1] - 25:9
**Plaintiff** [3] - 1:4, 1:11, 2:2
**Plan** [1] - 107:24
**platoon** [12] - 118:8, 118:10, 119:3, 120:1, 122:3, 122:21, 122:24, 140:4, 140:10, 141:5, 141:9
**play** [1] - 107:3
**plea** [33] - 5:3, 6:18, 12:18, 13:1, 14:5, 14:15, 16:7, 22:17, 22:22, 23:6, 28:15, 29:14, 29:22, 33:14, 34:13, 41:16, 41:19, 42:6, 93:5, 93:10, 94:4, 95:2, 95:21, 96:10, 96:24, 99:10, 99:15, 99:17, 107:17, 110:3, 111:1, 113:5
**Plea** [1] - 98:23
**plead** [10] - 7:16, 7:22, 9:21, 13:4, 13:15, 13:20, 14:10, 16:8, 20:2, 21:22
**pleading** [2] - 7:18, 93:14, 93:20
**pleadings** [1] - 17:16
**pleas** [1] - 96:14
**pled** [18] - 6:14, 9:6, 10:1, 10:9, 11:21, 11:23, 11:24, 12:5, 13:14, 13:15, 16:15, 17:1, 29:14, 93:11, 93:23, 95:19, 98:14
**plenty** [1] - 122:8
**point** [42] - 36:15, 37:14, 40:7, 42:20, 45:18, 55:13, 57:25, 59:1, 73:22, 74:1, 86:5, 86:6, 86:15, 90:17, 94:9, 98:1, 101:24, 102:23, 110:10, 111:10, 111:18, 112:15, 117:13, 127:10, 134:7, 143:22, 144:7, 144:9, 145:3, 145:4, 145:6, 145:13, 146:25, 148:24, 150:11, 152:2, 157:4, 162:3, 163:25, 169:23, 173:1, 174:1
**pointed** [5] - 89:23, 150:18, 156:5, 173:24, 174:1
**points** [5] - 41:9, 94:8, 94:19, 168:25, 174:2
**poker** [1] - 107:3
**police** [5] - 62:19, 62:25, 63:1, 63:18, 162:25

15

**policy** [1] - 92:24
**portion** [2] - 28:5, 37:25
**portions** [2] - 31:14, 89:23
**portrays** [1] - 112:8
**posed** [1] - 104:9
**position** [4] - 72:23, 124:14, 128:3, 133:8
**positioning** [1] - 86:19
**positive** [1] - 158:6
**possession** [1] - 32:17
**possibility** [5] - 19:1, 26:15, 26:16, 26:17, 133:18
**possible** [6] - 135:23, 136:23, 136:24, 164:23, 165:1, 172:14
**possibly** [2] - 18:10, 109:5
**post** [2] - 176:9, 176:14
**post-conviction** [1] - 176:9
**potential** [1] - 15:22
**PowerPoint** [2] - 139:19, 147:9
**practical** [1] - 166:11
**practice** [4] - 61:22, 61:25, 62:4, 62:14
**practiced** [1] - 62:13
**preceded** [1] - 141:15
**precisely** [7] - 141:7, 144:4, 147:17, 151:10, 151:18, 158:15, 166:20
**precision** [1] - 109:23
**predicted** [1] - 4:4
**prejudice** [7] - 169:2, 169:21, 169:23, 170:20, 172:6, 172:7, 173:22
**prep** [1] - 62:9
**preparation** [1] - 139:23
**prepare** [3] - 146:2, 151:25, 163:21
**prepared** [8] - 26:9, 26:13, 125:8, 137:23, 139:17, 139:21, 141:23, 164:2
**preparing** [3] - 21:10, 26:12, 149:21
**presence** [2] - 4:1, 137:20
**present** [2] - 81:10, 152:1
**presented** [5] - 158:4, 167:23, 168:1, 171:4
**presumptuous** [1] - 150:11
**pretty** [7] - 11:2, 46:25, 51:5, 51:8, 51:13, 124:2, 127:10
**previous** [3] - 76:13, 144:25, 158:21
**previously** [6] - 140:6, 144:6, 152:5, 168:14, 168:24, 173:22
**primary** [5] - 134:14, 134:16, 135:16, 135:18, 135:19
**printed** [1] - 85:2
**printout** [1] - 139:19
**prison** [2] - 18:11, 19:14

**prisons** [1] - 18:6
**pro** [1] - 166:9
**pro-government** [1] - 166:9
**probation** [6] - 16:22, 17:4, 26:22, 27:1, 27:8, 28:2
**probationary** [1] - 27:11
**problems** [2] - 129:20, 129:22
**Procedure** [1] - 30:10
**proceed** [2] - 4:13, 66:8
**proceeding** [1] - 30:3
**proceedings** [6] - 30:9, 31:22, 83:15, 137:19, 161:10, 177:14
**process** [6] - 40:10, 60:21, 99:17, 108:5, 111:1, 145:2
**produced** [14] - 143:12, 143:15, 143:19, 154:18, 164:15, 168:15, 168:17, 168:21, 168:24, 169:17, 170:7, 170:12, 170:17, 173:21
**product** [2] - 147:13, 148:2
**production** [1] - 140:2
**professional** [3] - 130:11, 130:19, 130:24
**Proffer** [1] - 98:23
**proffer** [4] - 99:9, 148:10, 158:10, 158:11
**proficiency** [1] - 121:2
**proficient** [1] - 120:12
**progressively** [1] - 104:13
**project** [1] - 148:5
**promptly** [1] - 165:2
**proposed** [3] - 164:4, 164:17, 174:9
**proposition** [1] - 173:25
**prosecute** [4] - 9:18, 9:21, 25:22, 41:23
**prosecution** [7] - 24:19, 25:3, 25:6, 25:14, 26:1, 29:18, 97:18
**prosecutor** [4] - 8:24, 61:15, 61:23, 62:4
**prosecutors** [45] - 4:24, 5:9, 5:17, 8:9, 9:17, 9:25, 10:6, 10:20, 11:18, 19:16, 20:11, 20:15, 21:3, 23:24, 26:5, 33:2, 33:15, 34:3, 34:11, 40:14, 41:22, 43:17, 47:24, 48:8, 48:11, 48:22, 49:14, 61:2, 69:2, 69:7, 75:13, 75:25, 97:19, 97:25, 98:3, 106:18, 106:21, 107:21, 143:16, 144:2, 146:22, 155:9, 161:16, 167:22, 176:21
**prospect** [1] - 19:9
**Prosperity** [6] - 101:19, 101:25, 102:3, 102:7,

102:11, 102:12
**protect** [1] - 122:20
**protected** [1] - 68:3
**protecting** [1] - 125:22
**protective** [2] - 125:14, 125:16
**provide** [12] - 10:17, 24:4, 40:3, 41:21, 42:3, 71:2, 108:8, 108:12, 133:13, 133:21, 136:9, 142:5
**provided** [6] - 24:14, 25:2, 30:4, 30:5, 112:21, 142:7
**providing** [3] - 25:25, 32:16, 125:13
**PSD** [1] - 136:24
**PTSD** [5] - 72:22, 73:4, 76:12
**publish** [6] - 7:9, 14:21, 15:14, 22:25, 28:13, 40:19
**published** [1] - 85:15
**pull** [3] - 101:15, 110:9, 168:3
**pulled** [1] - 82:5
**purposes** [1] - 97:7
**pursuant** [3] - 30:5, 30:9, 30:23
**pursued** [1] - 162:19
**pushed** [2] - 94:10, 94:13
**pushing** [1] - 94:14
**put** [29] - 27:2, 30:17, 32:25, 33:1, 54:6, 54:8, 54:12, 56:13, 76:9, 105:21, 110:11, 114:18, 122:19, 142:19, 142:22, 142:23, 143:1, 143:10, 150:14, 152:12, 155:2, 155:4, 157:3, 157:9, 159:2, 160:5, 163:11, 168:7
**putting** [6] - 51:21, 52:4, 52:7, 53:24, 56:17, 146:12

**Q**

**qualify** [1] - 25:23
**questioned** [1] - 164:18
**questioning** [4] - 71:15, 82:19, 87:1, 91:11
**questions** [41] - 22:10, 36:3, 38:5, 54:23, 56:24, 58:13, 58:23, 60:24, 61:2, 61:5, 61:8, 62:1, 62:5, 62:7, 62:8, 62:10, 71:5, 74:18, 84:2, 84:4, 86:8, 86:23, 88:15, 89:17, 89:19, 95:6, 100:20, 104:1, 104:11, 105:4, 105:23, 107:18, 108:6, 110:14, 121:20, 131:4, 132:9, 134:25, 152:3, 174:13
**quibble** [1] - 63:3
**quickly** [2] - 95:23, 165:1

**quiet** [1] - 44:24
**quite** [14] - 79:15, 100:17, 100:18, 102:18, 108:14, 108:15, 109:9, 110:12, 111:6, 112:1, 112:2, 150:24, 169:9
**quiz** [1] - 145:22
**quote** [4] - 142:6, 171:12, 172:20, 172:21

**R**

**racked** [1] - 162:11
**ran** [4] - 62:19, 62:25, 63:6, 173:3
**Randall** [1] - 127:17
**random** [2] - 92:3, 92:7
**range** [1] - 96:17
**rank** [2] - 117:9, 121:10
**rate** [1] - 97:7
**rather** [2] - 70:8, 108:23
**rationale** [1] - 150:18
**Raven** [18] - 36:7, 38:5, 38:11, 104:22, 112:18, 126:22, 127:8, 128:1, 128:6, 128:16, 130:3, 130:23, 133:3, 134:10, 136:16, 137:11, 170:23, 172:11
**re** [1] - 163:13
**re-call** [1] - 163:13
**read** [13] - 25:9, 25:20, 32:13, 49:10, 57:5, 95:23, 97:21, 135:11, 137:14, 148:6, 148:7, 174:19, 176:7
**reading** [1] - 15:24
**ready** [4] - 135:25, 136:4, 137:11, 140:10
**really** [7] - 8:5, 52:10, 53:15, 78:3, 116:17, 129:24, 148:15
**rear** [4] - 55:10, 101:8, 101:12, 101:13, 102:7
**reason** [17] - 24:5, 37:9, 37:20, 37:23, 102:9, 136:15, 145:12, 146:17, 146:20, 147:5, 150:2, 150:16, 152:7, 159:11, 164:6, 169:6, 175:3
**reasonable** [1] - 163:3
**reasoning** [2] - 171:12, 171:13
**reasons** [4] - 6:14, 7:16, 7:22, 171:2
**recap** [2] - 4:22, 15:21
**receive** [1] - 121:17
**received** [15] - 7:10, 7:11, 73:8, 85:9, 85:10, 99:1, 99:2, 114:15, 114:16, 144:10, 144:25, 156:11,

158:15, 159:13, 176:23
**receiving** [3] - 69:14, 112:13, 112:18
**recess** [1] - 161:5
**recites** [1] - 14:17
**recognize** [2] - 101:18, 114:19
**recognized** [1] - 148:18
**recollect** [1] - 132:8
**recollection** [14] - 49:1, 50:16, 84:21, 90:4, 134:24, 135:12, 135:15, 136:2, 136:3, 136:21, 137:5, 138:13, 146:23, 147:11
**record** [5] - 15:4, 129:15, 168:19, 172:23, 173:1
**Record** [1] - 3:8
**recount** [4] - 108:19, 108:25, 109:4
**recover** [2] - 79:3, 79:6
**recovery** [1] - 162:5
**recreational** [1] - 122:8
**Red** [2] - 102:3, 136:9
**red** [5] - 46:18, 46:21, 46:23, 46:24, 46:25
**reddish** [1] - 46:19
**Reddish** [1] - 46:20
**Reddish-greenish** [1] - 46:20
**Redirect** [1] - 3:5
**redirect** [1] - 82:15
**REDIRECT** [1] - 82:16
**refer** [2] - 95:9, 134:19
**reference** [2] - 111:16, 148:20
**referred** [5] - 89:22, 97:16, 145:11, 147:13, 154:22
**referring** [4] - 47:20, 84:17, 104:16, 158:20
**refers** [1] - 38:9
**reflect** [1] - 129:16
**reflects** [3] - 85:18, 93:10
**refresh** [3] - 49:1, 134:24, 135:15
**refreshes** [3] - 50:16, 135:12, 135:17
**regarding** [2] - 42:12, 106:10
**reiterate** [1] - 168:14
**reject** [1] - 174:6
**rejected** [2] - 171:12, 171:16
**relate** [1] - 93:19
**related** [4] - 32:18, 47:4, 168:5, 169:6
**relates** [2] - 72:5, 98:16
**relating** [2] - 32:17, 32:20
**relationship** [3] - 71:25, 72:3, 72:5
**relatively** [1] - 160:20
**relayed** [1] - 78:2

**relevance** [1] - 58:25
**relevant** [2] - 31:24, 32:20
**relief** [7] - 163:5, 163:23, 165:1, 165:16, 166:18, 168:9, 176:19
**relieved** [1] - 30:22
**reload** [4] - 54:4, 54:11, 54:14, 54:16
**rely** [1] - 94:1
**relying** [1] - 122:21
**remained** [1] - 118:14
**remaining** [1] - 165:9
**remedy** [1] - 171:14
**remember** [63] - 8:13, 11:11, 37:5, 38:13, 38:15, 39:19, 40:17, 41:14, 42:8, 42:10, 42:11, 42:22, 44:7, 45:23, 47:21, 48:9, 50:1, 50:5, 50:7, 50:10, 58:23, 65:7, 65:15, 65:16, 65:18, 68:13, 74:19, 82:19, 84:2, 84:5, 84:23, 85:14, 86:1, 86:7, 87:1, 87:22, 89:19, 89:23, 91:11, 92:1, 92:3, 92:19, 95:6, 98:16, 100:19, 100:23, 102:18, 103:17, 104:1, 104:3, 104:14, 105:4, 105:14, 106:1, 106:8, 106:9, 107:17, 108:6, 110:13, 127:9, 132:13, 134:8, 158:14
**remembered** [3] - 86:13, 152:8, 152:9
**remembering** [1] - 65:23
**remind** [1] - 83:5
**remorse** [7] - 5:24, 6:1, 6:18, 9:15, 11:15, 12:2
**reopening** [1] - 166:5
**repeat** [6] - 62:3, 68:23, 73:25, 84:19, 88:23, 109:2
**repeated** [1] - 34:19
**repeatedly** [1] - 34:25
**repeating** [1] - 19:22
**rephrase** [3] - 67:22, 70:1, 90:3
**report** [1] - 89:22
**reported** [2] - 172:22, 172:24
**REPORTER** [1] - 177:9
**Reporter** [3] - 1:22, 1:23, 177:18
**reporting** [2] - 147:20, 156:21
**represent** [1] - 161:17
**representation** [2] - 155:11, 159:24
**representations** [3] - 159:16, 159:21, 160:19
**representative** [3] - 146:4, 160:2, 160:22
**represented** [1] - 110:24

**representing** [2] - 113:1, 166:15
**request** [2] - 174:6, 174:7
**requested** [3] - 160:17, 163:5, 174:8
**requesting** [1] - 165:16
**required** [1] - 133:16
**requirement** [3] - 134:7, 147:21, 156:21
**requirements** [3] - 147:18, 150:5, 151:17
**requires** [1] - 41:21
**rescue** [1] - 78:14
**reserves** [1] - 97:7
**resisting** [1] - 175:25
**resources** [1] - 168:6
**respect** [11] - 84:21, 88:15, 109:20, 130:15, 170:21, 171:5, 171:8, 171:19, 172:5, 175:24
**respectfully** [1] - 164:25
**respects** [1] - 170:21
**respond** [1] - 154:11
**responded** [2] - 136:25, 137:2
**responding** [1] - 58:13
**response** [7] - 10:17, 20:18, 35:13, 60:4, 61:21, 74:18, 174:17
**responsibilities** [2] - 133:11, 133:12
**responsibility** [6] - 93:24, 101:9, 113:11, 118:25, 133:19, 135:20
**responsible** [1] - 147:20
**responsibly** [1] - 111:18
**responsive** [1] - 149:10
**result** [5] - 9:10, 13:1, 14:14, 16:7, 26:5
**resume** [1] - 44:12
**resuming** [3] - 4:1, 66:7, 161:12
**retrace** [1] - 16:12
**retrieved** [1] - 160:4
**returned** [1] - 135:21
**review** [2] - 35:22, 167:22
**reviewed** [9] - 28:8, 95:18, 143:23, 145:1, 145:3, 145:5, 157:10, 159:2, 167:20
**revised** [1] - 148:4
**rhetoric** [1] - 168:21
**Rhodes** [6] - 127:16, 137:4, 175:9, 175:10, 175:17, 175:23
**RIDGEWAY** [1] - 3:4
**Ridgway** [43] - 4:20, 8:25, 9:1, 11:3, 15:21, 23:3, 40:2, 47:18, 49:21, 50:8, 50:20, 51:18, 52:3, 53:10,

54:23, 55:4, 61:16, 64:12, 64:13, 66:11, 71:18, 71:25, 76:14, 77:14, 82:18, 83:10, 84:8, 85:12, 85:17, 88:22, 92:20, 95:7, 96:13, 98:7, 98:11, 104:8, 105:23, 107:3, 110:14, 113:12, 127:15, 128:22, 132:1
**rifle** [2] - 120:13, 120:15
**rip** [1] - 34:13
**RMR** [1] - 1:22
**road** [4] - 51:20, 51:25, 52:17, 60:3
**rockets** [1] - 105:7
**rocky** [1] - 72:3
**role** [2] - 110:21, 118:4
**rolled** [2] - 94:15, 94:16
**rolling** [2] - 55:15, 55:16
**Room** [1] - 1:23, 177:19
**room** [2] - 136:14, 142:22
**roughly** [1] - 126:14
**round** [1] - 47:8
**rounds** [21] - 50:9, 53:2, 54:5, 55:23, 56:4, 56:14, 56:17, 57:24, 58:19, 59:4, 59:15, 61:13, 62:17, 62:22, 63:8, 63:12, 63:18, 64:3, 64:8, 64:9
**row** [1] - 127:24
**ROYCE** [1] - 1:18
**RPG** [1] - 78:9
**Rule** [2] - 30:10
**ruling** [1] - 15:14
**run** [2] - 87:10, 87:11

**S**

**s/Vicki** [1] - 177:18
**sad** [1] - 167:15
**sanctions** [1] - 137:24
**sand** [1] - 146:12
**sanitation** [1] - 115:3
**sat** [1] - 60:15
**save** [1] - 22:9
**saw** [34] - 24:25, 40:9, 42:15, 42:23, 43:14, 43:15, 43:16, 44:13, 44:16, 45:19, 45:25, 46:17, 46:18, 48:6, 57:12, 57:15, 59:23, 63:11, 63:18, 64:9, 71:9, 89:12, 89:18, 90:10, 90:22, 147:15, 152:3, 155:17, 158:8, 164:10, 164:11, 169:5, 172:21
**scenario** [2] - 138:2, 176:12
**scene** [10] - 141:5, 141:9, 141:13, 141:14, 142:8, 143:13, 147:15, 147:19, 156:20, 173:9
**schedule** [1] - 134:8

**scheduling** [2] - 174:23, 175:24
**Schertler** [4] - 2:15, 4:12, 15:6, 89:21
**sCHERTLER** [2] - 12:13, 33:19
**SCHERTLER** [38] - 2:16, 4:3, 4:14, 4:19, 6:24, 7:1, 7:6, 7:9, 7:12, 10:18, 14:20, 15:10, 15:13, 15:18, 15:20, 19:7, 19:12, 20:6, 21:1, 22:4, 22:11, 22:16, 22:20, 27:18, 27:21, 33:21, 34:7, 40:12, 40:22, 41:1, 41:6, 47:11, 47:17, 54:19, 54:22, 90:1, 113:8, 113:14
**Schertler's** [1] - 106:8
**schertler....** [1] - 3:4
**school** [3] - 116:13, 116:16, 116:21
**School** [4] - 116:14, 116:19, 117:4, 117:5
**SCIF** [3] - 160:3, 160:5, 160:14
**scope** [2] - 57:20, 57:22
**Scott** [1] - 2:9
**screen** [3] - 85:1, 114:18, 141:11
**Sean** [1] - 141:20
**search** [1] - 173:9
**seated** [1] - 83:10
**second** [13] - 17:1, 21:20, 42:19, 48:17, 53:19, 56:5, 86:15, 87:19, 112:4, 117:10, 121:12, 169:2, 172:18
**secondary** [6] - 134:14, 134:16, 135:16, 135:17, 135:19, 135:24
**seconds** [1] - 112:17
**secret** [16] - 150:6, 150:13, 150:15, 150:16, 150:17, 150:20, 150:23, 151:1, 151:2, 151:4, 151:10, 151:18, 153:8, 153:13, 160:13
**Secret** [1] - 150:7
**section** [3] - 31:15, 32:8, 92:18
**sections** [1] - 93:18
**sector** [3] - 101:8, 102:16, 133:13
**sectors** [2] - 133:19, 133:20
**security** [11] - 18:5, 72:13, 119:8, 122:17, 122:19, 133:13, 133:21, 160:2, 162:24, 163:2
**see** [96] - 5:5, 13:25, 16:2, 23:10, 23:19, 24:20, 28:10, 29:3, 29:6, 29:19, 30:11,

30:24, 31:25, 32:24, 33:12, 35:8, 35:14, 38:2, 38:7, 38:20, 38:23, 39:1, 39:16, 42:20, 43:22, 45:9, 45:10, 48:3, 49:11, 49:17, 49:23, 50:15, 51:6, 51:7, 51:21, 51:22, 52:4, 53:17, 59:19, 64:2, 64:5, 64:6, 64:8, 66:18, 83:14, 85:14, 85:19, 85:20, 89:5, 89:9, 90:16, 90:17, 91:23, 93:13, 93:21, 95:16, 96:4, 97:9, 99:21, 99:22, 101:21, 111:16, 111:19, 112:4, 112:8, 112:14, 112:15, 112:20, 127:2, 127:4, 128:10, 128:18, 129:6, 129:7, 131:15, 131:16, 131:25, 132:25, 133:1, 133:2, 134:24, 134:25, 135:11, 137:15, 140:25, 145:10, 145:16, 146:8, 148:6, 148:7, 163:18, 172:20, 172:23, 176:25
**seeing** [4] - 60:5, 89:5, 146:5, 146:6
**seem** [1] - 173:24
**sees** [2] - 68:5
**selected** [1] - 125:10
**self** [2] - 100:11, 100:15
**self-defense** [2] - 100:11, 100:15
**semiautomatic** [2] - 60:9, 60:10
**sense** [4] - 65:23, 69:20, 84:9, 117:19
**sensitive** [1] - 76:14
**sent** [1] - 5:9
**sentence** [27] - 13:24, 17:2, 17:12, 18:4, 19:14, 24:5, 24:10, 25:12, 26:5, 26:24, 27:1, 27:8, 27:11, 30:8, 31:6, 33:11, 33:12, 50:18, 51:4, 51:17, 53:19, 83:12, 95:5, 95:24, 96:15, 96:16, 98:20
**sentenced** [1] - 95:6
**sentences** [1] - 16:3
**sentencing** [15] - 26:21, 27:3, 28:1, 28:19, 30:23, 83:6, 83:20, 96:3, 96:9, 96:22, 97:8, 97:22, 98:9, 98:12, 111:4
**Sentencing** [1] - 95:16
**separate** [6] - 152:22, 152:25, 157:7, 157:12, 158:25, 159:13
**separated** [5] - 138:8, 138:14, 138:16, 138:18, 148:10

**September** [31] - 6:2, 42:13, 48:22, 49:15, 50:20, 52:6, 54:17, 55:4, 55:7, 92:8, 98:19, 100:7, 100:19, 101:1, 104:12, 104:19, 104:22, 105:10, 109:14, 110:4, 126:23, 129:21, 130:4, 130:23, 132:14, 132:19, 133:5, 135:8, 148:12, 148:20, 149:2
**series** [6] - 86:8, 88:15, 89:19, 104:1, 105:22, 110:13
**serious** [2] - 10:4, 12:6
**serve** [3] - 130:3, 130:18, 130:22
**served** [1] - 130:11
**serves** [1] - 134:9
**service** [1] - 123:22
**services** [2] - 125:14, 125:17
**Session** [1] - 1:9
**sessions** [4] - 61:22, 61:25, 62:4, 158:21
**set** [2] - 171:7, 171:9
**sets** [1] - 138:20
**seven** [4] - 13:10, 17:3, 17:6, 151:11
**several** [12] - 104:11, 114:23, 118:3, 118:6, 118:12, 143:24, 147:11, 148:4, 158:9, 170:1, 171:2, 173:9
**shall** [2] - 29:17, 31:19
**shared** [2] - 77:17, 106:5
**Shawn** [1] - 1:6
**shed** [2] - 80:21, 80:23
**sheet** [1] - 144:1
**shell** [15] - 43:20, 43:22, 43:25, 44:10, 92:7, 142:21, 145:10, 146:5, 146:6, 146:18, 146:23, 148:24, 149:4, 152:9, 171:3
**shells** [3] - 162:5, 162:9, 162:23
**shift** [3] - 133:16, 134:10, 134:12
**shoot** [8] - 38:20, 45:20, 56:8, 60:5, 62:15, 94:25, 104:8, 104:19
**shoot-outs** [1] - 104:19
**shooter** [2] - 67:8, 173:4
**shooting** [22] - 8:10, 42:20, 43:14, 44:23, 45:6, 45:10, 45:13, 45:15, 67:10, 68:6, 68:12, 68:14, 80:25, 81:2, 132:20, 140:23, 149:7, 149:8, 169:7, 169:11, 173:10
**short** [4] - 36:17, 52:25, 159:21, 161:5
**shortly** [7] - 42:14, 42:15,

42:16, 121:8, 123:14, 147:14, 168:17
**shot** [47] - 11:4, 45:19, 50:21, 50:24, 51:18, 55:23, 56:4, 56:22, 57:2, 58:12, 58:18, 59:4, 59:14, 61:12, 61:14, 61:17, 62:15, 62:17, 62:21, 63:8, 64:13, 65:5, 65:7, 65:13, 67:10, 68:10, 78:9, 78:11, 78:12, 80:21, 81:20, 86:6, 86:24, 86:25, 87:6, 87:21, 88:8, 88:11, 88:16, 88:24, 89:2, 89:7, 89:13, 100:9, 100:13, 173:2
**shots** [3] - 7:20, 58:1, 60:7
**show** [6] - 32:7, 126:25, 152:13, 162:8, 169:7, 169:14
**showed** [6] - 31:14, 31:18, 35:10, 43:17, 127:6
**showing** [1] - 159:9
**shown** [3] - 148:17, 148:21, 169:22
**shows** [1] - 168:19
**side** [13] - 45:7, 60:3, 62:19, 62:25, 63:6, 87:14, 87:15, 102:21, 129:5, 162:14, 167:10, 167:14, 169:10
**sight** [1] - 66:16
**sign** [1] - 33:3
**signature** [1] - 99:20
**signed** [4] - 5:3, 34:11, 41:16, 107:17
**significance** [1] - 168:6
**significant** [1] - 161:21
**significantly** [1] - 162:20
**signing** [2] - 33:23, 34:1
**signs** [1] - 164:11
**simple** [2] - 94:11, 155:8
**simpler** [1] - 77:13
**sincerely** [1] - 47:14
**single** [10] - 98:3, 99:25, 100:2, 100:4, 100:6, 108:19, 144:1, 150:14, 156:6, 168:4
**sit** [7] - 82:23, 98:7, 98:11, 100:9, 100:13, 108:19, 132:3
**site** [1] - 79:15
**sitting** [1] - 4:7
**situation** [7] - 57:17, 133:12, 150:2, 160:15, 166:19, 170:2, 170:16
**situationally** [1] - 133:23
**six** [2] - 104:12, 148:16
**Sixth** [1] - 171:18
**skills** [1] - 123:24
**Skinner** [2] - 127:16, 137:4
**skipping** [1] - 171:20
**Slatten** [24] - 1:13, 2:19,

66:14, 66:25, 67:7, 67:16, 68:5, 68:9, 70:12, 70:18, 71:3, 71:13, 71:19, 77:18, 78:18, 80:10, 80:21, 84:1, 84:11, 84:23, 127:14, 128:14, 128:15, 129:19
**sleep** [1] - 105:3
**slide** [1] - 147:9
**Slough** [15] - 1:6, 2:7, 57:12, 57:16, 59:19, 59:22, 59:23, 60:5, 63:24, 127:14, 127:24, 128:2, 128:5, 129:19
**Slough's** [3] - 63:25, 64:3, 64:8
**small** [4] - 53:24, 68:3, 120:4, 125:23
**smashed** [1] - 131:12
**smelled** [1] - 46:3
**smiling** [1] - 149:12
**smoked** [2] - 37:5, 42:4
**sniper** [1] - 66:22
**so-called** [1] - 143:1
**sociology** [1] - 115:15
**soldiers** [1] - 122:7
**solely** [2] - 57:15, 95:24
**solution** [1] - 166:11
**someone** [18] - 62:24, 67:10, 67:16, 67:24, 68:14, 78:17, 88:11, 89:2, 136:18, 155:10, 155:24, 157:1, 157:14, 159:6, 159:7, 165:12, 169:10, 172:25
**sometime** [7] - 10:8, 126:15, 141:6, 141:8, 141:11, 143:20, 168:17
**sometimes** [1] - 116:13
**somewhat** [2] - 101:20, 102:19
**somewhere** [4] - 46:9, 46:10, 46:14, 57:25
**soon** [1] - 106:6
**sooner** [3] - 168:15, 169:17, 176:23
**Sorry** [1] - 93:8
**sorry** [18] - 33:19, 37:25, 53:15, 62:3, 73:25, 84:19, 85:15, 87:24, 92:17, 97:13, 109:2, 109:21, 110:11, 138:5, 139:5, 149:18, 150:24, 174:24
**sort** [2] - 166:2, 176:16
**sorts** [1] - 125:11
**sound** [1] - 65:12
**sounds** [4] - 60:12, 103:19, 127:19, 172:15
**source** [1] - 166:9
**sources** [2] - 144:23, 145:6
**south** [17] - 48:19, 48:23, 49:16, 50:22, 50:24, 51:19,

52:7, 52:17, 53:23, 67:13, 87:14, 101:6, 102:6, 103:12, 110:8, 161:24
**South** [1] - 2:17
**southeast** [5] - 42:21, 43:2, 43:12, 43:15, 90:16
**southwest** [2] - 67:14, 110:8
**sp** [1] - 4:6
**spark** [1] - 147:1
**specific** [10] - 38:25, 39:13, 87:6, 132:3, 138:13, 140:20, 151:17, 163:6, 164:4, 166:18
**specifically** [10] - 28:15, 28:16, 84:18, 104:16, 144:10, 145:11, 146:5, 163:23, 170:24, 171:12
**specifics** [1] - 162:4
**spectrum** [1] - 119:9
**speculation** [3] - 160:25, 172:13, 172:16
**spell** [1] - 114:9
**spelled** [3] - 96:10, 96:24, 97:9
**spend** [2] - 18:10, 117:3
**split** [1] - 87:19
**spoken** [2] - 69:10, 143:16
**spot** [2] - 162:23, 163:16
**spring** [2] - 143:21, 144:12
**spun** [1] - 115:21
**Square** [36] - 11:8, 13:8, 36:4, 36:7, 44:4, 52:6, 54:16, 55:5, 55:8, 64:25, 66:11, 66:18, 66:20, 66:23, 67:1, 68:22, 69:5, 70:13, 71:4, 71:10, 71:20, 74:2, 76:6, 82:3, 104:17, 104:20, 104:23, 104:25, 132:20, 140:14, 140:16, 140:19, 148:19, 152:4, 158:8, 169:11
**square** [2] - 50:22, 50:25
**ss** [1] - 177:5
**stage** [1] - 161:14
**stamped** [3] - 150:6, 151:10, 153:7
**stand** [5] - 44:12, 164:9, 164:19, 165:12, 174:22
**standing** [4] - 128:20, 129:3, 129:4, 129:7
**start** [9] - 49:6, 49:7, 50:17, 102:20, 117:11, 118:8, 123:10, 138:7
**started** [1] - 6:2
**starting** [1] - 163:8
**State** [7] - 73:20, 74:2, 92:23, 93:15, 104:2, 104:5, 162:5
**statement** [26] - 14:6, 47:12, 83:25, 84:5, 84:9, 93:1, 93:15, 94:2, 105:2, 106:22,

109:20, 109:24, 111:11, 111:24, 139:17, 139:18, 142:25, 150:13, 150:20, 153:8, 153:9, 161:23, 163:24, 165:18, 165:24, 174:7
**statements** [10] - 30:3, 30:5, 30:9, 30:18, 34:19, 34:21, 61:15, 161:22, 162:19, 165:21
**States** [21] - 23:16, 24:11, 29:5, 30:1, 30:21, 31:24, 32:16, 32:21, 68:20, 69:2, 71:1, 93:18, 97:6, 97:15, 125:24, 143:10, 156:14, 157:5, 170:10, 170:15, 177:19
**STATES** [6] - 1:1, 1:3, 1:10, 1:18, 2:4, 177:5
**states** [1] - 28:12
**statutory** [1] - 96:16
**stay** [2] - 121:5, 123:20
**stenographic** [1] - 177:13
**step** [6] - 36:11, 113:20, 137:21, 138:15, 139:14
**stepping** [1] - 137:22
**STEPTOE** [1] - 2:9
**Steven** [1] - 2:19
**sticking** [1] - 113:7
**still** [17] - 6:20, 6:22, 29:14, 35:4, 37:14, 37:15, 41:7, 54:6, 59:24, 119:2, 124:6, 125:3, 135:25, 140:23, 141:2, 149:7, 166:3
**stood** [1] - 128:12
**stop** [35] - 42:21, 42:23, 43:1, 43:3, 43:4, 43:7, 43:10, 44:1, 44:21, 48:24, 49:17, 49:22, 49:23, 50:1, 50:4, 58:2, 58:4, 91:4, 91:5, 91:6, 91:8, 91:22, 92:1, 92:4, 145:12, 145:15, 146:7, 146:19, 148:25, 162:1, 162:6, 170:25, 171:2, 173:3
**stopped** [5] - 50:9, 51:2, 58:6, 60:3, 90:24
**story** [36] - 6:8, 6:22, 9:16, 9:25, 11:16, 11:18, 21:4, 109:11, 113:2, 113:6, 139:19, 143:1, 143:3, 147:4, 147:5, 147:6, 147:8, 147:14, 147:22, 147:23, 149:11, 150:12, 152:16, 152:18, 152:21, 153:1, 153:7, 155:7, 156:2, 156:22, 159:25, 160:4, 160:6, 160:22, 165:3
**straight** [4] - 109:11, 155:23, 160:20

**strange** [2] - 94:21, 94:24
**Street** [3] - 2:5, 2:17, 2:20
**street** [2] - 37:1, 102:21
**streets** [1] - 79:1
**stress** [1] - 105:3
**stressed** [1] - 105:6
**string** [1] - 142:24
**strip** [1] - 99:20
**strong** [3] - 162:17, 163:3, 166:24
**struggle** [1] - 40:8
**Stryker** [1] - 79:21
**stuck** [2] - 29:14, 81:20
**stuff** [4] - 29:23, 30:15, 163:11, 176:17
**subject** [2] - 29:17, 32:19
**subjectively** [2] - 100:10, 100:15
**subsequent** [1] - 145:19
**subsequently** [2] - 143:11, 146:1
**subset** [5] - 143:25, 157:1, 157:5, 157:11, 159:3
**substance** [1] - 145:23
**Substantial** [2] - 23:9, 24:18
**substantial** [23] - 23:12, 24:14, 24:22, 25:2, 25:5, 25:11, 25:17, 25:21, 25:25, 26:20, 41:18, 42:3, 69:10, 69:14, 69:21, 70:3, 70:7, 70:17, 71:12, 77:3, 77:7, 77:12, 77:14
**Suburban** [9] - 50:6, 50:13, 50:15, 50:21, 50:23, 51:3, 51:5, 51:9, 51:11
**suddenly** [1] - 151:22
**suggest** [1] - 152:4
**suggested** [2] - 89:9, 89:14
**suggesting** [2] - 159:6, 168:22
**suggests** [1] - 172:12
**Suite** [3] - 2:13, 2:17, 2:20
**Sullivan** [5] - 5:9, 8:9, 9:1, 17:17, 110:17
**summarize** [1] - 5:19
**summer** [11] - 126:15, 127:8, 128:16, 128:23, 129:1, 129:8, 129:10, 129:13, 130:3, 130:8, 130:16
**supplemental** [1] - 163:23
**supply** [1] - 139:9
**support** [9] - 93:18, 99:9, 118:22, 125:24, 126:8, 134:10, 134:12, 136:9, 173:24
**Support** [1] - 98:23
**supposed** [1] - 33:16
**suppress** [1] - 53:14
**suppressed** [4] - 166:24, 166:25, 167:25, 168:23

**suppressing** [2] - 52:10, 53:12
**suppression** [1] - 167:6
**suppressive** [12] - 52:4, 52:7, 52:12, 52:21, 52:23, 53:1, 53:3, 53:11, 53:13, 53:16, 53:19, 54:1
**suppressively** [2] - 91:10, 91:14
**Supreme** [1] - 169:18
**surprise** [1] - 164:11
**surprised** [1] - 171:6
**suspected** [3] - 21:8, 21:9, 21:11
**sustained** [30] - 12:12, 15:9, 19:6, 19:11, 20:5, 20:25, 22:3, 22:9, 27:17, 33:18, 34:6, 40:1, 40:25, 41:5, 47:16, 58:15, 58:21, 59:2, 61:19, 63:16, 63:22, 65:21, 69:18, 70:23, 71:16, 71:23, 82:10, 113:9, 113:15, 170:23
**switch** [2] - 35:6, 101:5
**switched** [2] - 4:15, 57:13
**switching** [1] - 68:17
**sworn** [1] - 114:2
**swung** [1] - 103:6
**system** [3] - 18:4, 143:13, 158:24

### T

**table** [1] - 4:7
**tailored** [2] - 163:6, 163:23
**talks** [1] - 28:10
**tanks** [1] - 79:21
**target** [5] - 91:20, 105:17, 105:19, 105:25, 106:13
**Tarsa** [16] - 140:5, 140:16, 140:17, 141:2, 141:3, 141:9, 141:13, 144:7, 156:20, 157:16, 158:16, 158:22, 163:17, 172:19, 173:19
**team** [21] - 38:19, 64:22, 110:1, 120:10, 122:25, 132:11, 132:12, 133:9, 133:15, 134:9, 135:24, 145:21, 146:1, 151:25, 153:16, 154:1, 154:2, 160:2, 167:25
**teammate** [1] - 59:25
**teammates** [2] - 36:6, 37:16, 41:11
**teams** [1] - 136:24
**ten** [3] - 12:24, 16:20, 16:23
**ten-year** [1] - 16:20
**tends** [1] - 149:14
**Tenth** [1] - 171:18

**tenure** [1] - 77:22
**term** [2] - 53:3, 53:11
**terms** [14] - 7:3, 7:22, 20:13, 91:9, 91:18, 123:10, 123:16, 124:2, 124:21, 125:20, 131:1, 150:21, 160:17, 165:18
**terrible** [2] - 10:11
**tertiary** [2] - 134:14, 134:17
**testified** [35] - 15:16, 33:10, 33:22, 33:23, 36:16, 36:19, 42:14, 60:16, 60:18, 61:11, 61:17, 61:23, 62:21, 63:24, 80:20, 82:25, 84:1, 84:21, 99:6, 110:12, 114:3, 143:22, 144:6, 144:7, 144:11, 144:17, 145:8, 145:9, 157:16, 158:22, 163:17, 171:24, 172:4, 172:20, 173:4
**testify** [10] - 31:20, 32:2, 32:3, 45:18, 71:19, 83:14, 148:17, 148:22, 165:10, 175:2
**testifying** [4] - 32:22, 32:23, 32:25, 33:1
**testimony** [29] - 6:13, 20:4, 31:23, 33:25, 42:12, 58:7, 59:7, 59:10, 59:13, 59:16, 59:18, 60:11, 62:14, 69:1, 72:22, 74:17, 81:6, 86:10, 88:8, 102:22, 106:10, 106:19, 109:18, 109:22, 141:16, 144:14, 146:18, 151:25, 157:24
**THE** [161] - 1:1, 1:1, 1:10, 1:18, 4:8, 4:12, 7:10, 12:12, 15:2, 15:8, 15:17, 15:19, 19:6, 19:11, 20:5, 20:25, 22:3, 22:9, 22:14, 22:18, 27:17, 27:20, 33:18, 34:6, 40:1, 40:5, 40:6, 40:21, 40:25, 41:5, 47:16, 54:25, 57:9, 58:15, 58:21, 59:2, 61:19, 63:16, 63:22, 65:21, 66:3, 66:8, 67:22, 69:18, 69:25, 70:1, 70:23, 71:16, 71:23, 82:10, 82:15, 85:9, 88:20, 90:7, 92:12, 92:14, 93:7, 95:11, 99:1, 113:9, 113:15, 113:20, 113:22, 114:15, 129:17, 134:22, 137:12, 137:21, 137:23, 138:7, 138:11, 138:14, 138:18, 138:24, 139:1, 139:4, 139:6, 139:13, 139:21, 140:3, 140:7, 141:2, 141:16, 141:23, 141:25, 142:18, 143:3, 143:6, 143:8,

144:13, 144:16, 144:19, 144:21, 147:4, 147:7, 147:22, 147:25, 148:6, 149:10, 149:13, 149:17, 149:19, 150:6, 150:8, 150:21, 150:25, 151:5, 151:8, 151:14, 151:21, 152:15, 153:3, 153:14, 153:19, 153:21, 154:3, 154:5, 154:7, 154:10, 154:13, 155:22, 156:2, 156:4, 156:8, 157:18, 157:20, 157:22, 157:24, 158:1, 158:10, 159:15, 159:20, 160:9, 160:11, 161:5, 161:9, 165:17, 166:12, 166:22, 167:3, 167:7, 167:11, 167:15, 168:11, 174:12, 174:15, 174:19, 174:25, 175:7, 175:11, 175:15, 175:17, 175:20, 175:25, 176:3, 176:6, 176:10, 176:14, 176:20, 176:25, 177:6
**themselves** [3] - 38:19, 150:8, 150:20
**theory** [1] - 147:22
**thereafter** [4] - 42:16, 106:6, 112:18, 141:11
**therefore** [1] - 174:5
**thereof** [2] - 23:18, 24:13
**they've** [3] - 12:20, 70:19, 174:8
**thinking** [3] - 6:4, 76:19, 83:17
**third** [4] - 13:1, 17:9, 31:17, 169:20
**Thomas** [2] - 2:19, 127:17
**thousand** [1] - 118:3
**thousands** [1] - 53:2
**threat** [8] - 68:7, 89:10, 89:15, 104:9, 112:8, 112:11, 136:23
**threatening** [3] - 67:17, 67:25, 68:2
**threats** [2] - 102:10, 132:25
**three** [37] - 8:4, 41:15, 45:4, 49:21, 52:25, 53:24, 55:23, 56:4, 56:13, 57:25, 58:1, 58:5, 58:18, 59:4, 59:14, 61:12, 62:17, 62:21, 63:8, 63:11, 73:9, 78:6, 85:18, 117:5, 123:18, 124:12, 124:13, 134:13, 135:7, 153:5, 153:9, 153:11, 153:12, 161:24, 162:5, 169:18, 175:14
**threshold** [1] - 149:15
**thrilled** [1] - 9:4
**throughout** [5] - 39:20,

83:14, 90:18, 108:5, 108:9
**Thursday** [1] - 175:4
**timing** [8] - 84:4, 105:18, 105:19, 106:12, 171:19, 173:13, 173:17, 175:8
**today** [13] - 82:23, 84:22, 98:7, 98:11, 100:9, 100:13, 102:22, 109:18, 110:24, 132:4, 135:23, 149:3, 151:6
**together** [2] - 152:12, 153:11
**Tommy** [3] - 38:7, 38:9, 38:16
**tomorrow** [4] - 137:12, 137:15, 175:21, 176:25
**took** [12] - 40:10, 139:15, 141:17, 141:18, 142:18, 146:16, 147:16, 148:12, 153:4, 157:6, 169:5
**top** [3] - 5:8, 139:8, 139:12
**topics** [1] - 68:17
**tow** [2] - 44:23, 45:1
**tow-out** [2] - 44:23, 45:1
**toward** [5] - 43:1, 48:24, 49:17, 49:22, 169:11
**towards** [7] - 38:22, 42:21, 56:11, 103:2, 123:22, 168:7
**town** [1] - 110:19
**tracer** [1] - 47:7
**track** [3] - 157:7, 157:13, 159:4
**tracks** [2] - 159:1, 159:13
**tracts** [1] - 156:25
**traffic** [9] - 50:9, 56:9, 58:4, 63:1, 87:10, 103:3, 103:25, 161:25
**train** [1] - 122:10
**training** [2] - 122:10, 122:24
**TRANSCRIPT** [1] - 1:17
**transcript** [4] - 134:20, 135:1, 177:13, 177:14
**transition** [2] - 48:23, 49:16
**transpired** [2] - 9:23, 149:25
**treat** [1] - 151:16
**treated** [1] - 151:8
**treatise** [1] - 166:7
**treatment** [1] - 73:8
**trial** [29] - 30:17, 32:5, 32:23, 33:1, 34:1, 36:15, 61:23, 62:5, 62:13, 110:1, 113:12, 146:1, 146:3, 151:25, 153:15, 154:1, 163:15, 164:7, 167:24, 170:3, 170:8, 170:13, 170:17, 172:1, 173:25, 176:18, 176:19
**TRIAL** [1] - 1:17
**trials** [1] - 31:21
**tried** [1] - 11:4

**trouble** [2] - 76:11, 168:8
**truck** [1] - 45:1
**true** [11] - 16:25, 38:4, 39:6, 48:21, 70:15, 71:7, 111:21, 112:10, 112:24, 177:12, 177:13
**truly** [1] - 76:14
**trust** [3] - 122:25, 123:10
**truth** [27] - 9:2, 9:19, 10:19, 12:8, 12:9, 21:21, 21:24, 22:1, 22:6, 25:1, 27:13, 31:9, 33:3, 33:6, 33:24, 37:12, 60:13, 72:1, 72:5, 73:7, 83:4, 83:19, 98:5, 107:24, 176:20
**truthful** [5] - 33:16, 34:12, 37:21, 37:23, 37:24
**truthfully** [7] - 31:20, 32:2, 32:4, 32:15, 32:16, 33:11, 33:15
**try** [8] - 16:11, 27:10, 79:6, 111:10, 140:25, 151:5, 151:12, 151:20
**trying** [18] - 17:22, 19:18, 37:8, 37:14, 37:15, 37:17, 56:1, 63:3, 65:23, 74:4, 74:5, 77:9, 84:24, 103:3, 103:24, 122:20, 146:13, 166:12
**TST** [1] - 135:19
**tubes** [1] - 31:7
**turn** [4] - 92:16, 103:4, 111:15, 164:16
**turned** [11] - 56:2, 56:8, 57:13, 59:23, 103:7, 141:19, 153:9, 154:3, 154:17, 157:4, 170:2
**turning** [1] - 57:13
**turret** [6] - 46:8, 46:10, 46:12, 46:14, 101:8, 127:25
**tweet** [1] - 137:14
**twice** [1] - 33:11
**twist** [1] - 56:1
**Twitter** [1] - 137:14
**two** [39] - 16:8, 16:15, 19:5, 20:7, 21:22, 44:13, 44:16, 45:4, 45:11, 48:5, 49:21, 56:5, 76:18, 76:21, 98:14, 124:12, 124:13, 138:8, 138:20, 141:21, 143:11, 144:21, 147:10, 148:9, 148:13, 151:21, 152:12, 155:5, 155:17, 156:25, 158:25, 159:12, 159:12, 162:7, 168:25, 170:20, 171:8, 175:14
**two-way** [2] - 76:18, 76:21
**type** [5] - 119:6, 120:15, 122:5, 147:13, 147:20

**types** [1] - 119:8
**typically** [2] - 101:8, 101:10

## U

**U.S** [8] - 1:23, 23:24, 143:12, 143:14, 143:19, 151:24, 159:7, 160:21
**ultimate** [1] - 164:20
**ultimately** [1] - 161:1
**unable** [1] - 113:5
**unarmed** [1] - 104:8
**uncomfortable** [1] - 146:13
**unconnected** [1] - 71:4
**under** [12] - 17:17, 24:3, 29:6, 59:14, 61:11, 61:17, 120:6, 122:7, 154:12, 167:6, 168:10, 174:11
**understating** [1] - 18:25
**understood** [5] - 71:18, 72:16, 73:7, 145:18, 160:18
**undertaking** [1] - 125:21
**unfortunately** [1] - 176:17
**unfounded** [1] - 168:23
**uniform** [3] - 63:4, 63:11, 63:18
**uniformed** [2] - 58:3, 63:1
**unique** [1] - 123:24
**unit** [13] - 117:13, 117:17, 117:23, 119:21, 119:25, 120:9, 120:21, 122:2, 123:9, 126:19, 126:21, 126:23
**United** [21] - 23:16, 24:11, 29:5, 30:1, 30:21, 31:24, 32:16, 32:21, 68:20, 69:2, 71:1, 93:18, 97:6, 97:15, 125:24, 143:10, 156:14, 157:5, 170:10, 170:15, 177:19
**UNITED** [6] - 1:1, 1:3, 1:10, 1:18, 2:4, 177:5
**University** [1] - 115:19
**unless** [3] - 166:3, 174:13, 175:2
**unlikely** [1] - 169:10
**unsupported** [1] - 159:10
**unsure** [1] - 86:19
**unusual** [1] - 165:20
**up** [36] - 4:22, 12:19, 12:23, 13:10, 27:15, 34:13, 49:4, 54:3, 61:15, 68:2, 70:18, 71:13, 87:10, 87:11, 92:10, 96:15, 98:1, 101:15, 104:12, 110:9, 127:4, 128:12, 128:20, 129:3, 129:7, 130:23, 131:4, 134:1, 134:3, 134:4, 134:6, 148:3, 155:3, 156:21,

156:24, 173:20
**upper** [1] - 127:24
**upset** [1] - 176:23
**Urbina's** [1] - 167:23
**useful** [2] - 165:14, 165:15
**utter** [1] - 172:15

## V

**value** [2] - 155:13, 169:13
**Vance** [3] - 64:16, 64:18, 64:25
**Vargas** [2] - 38:9, 127:17
**various** [4] - 16:14, 94:8, 94:18, 144:23
**vehicle** [32] - 50:5, 55:10, 57:14, 58:2, 59:20, 59:21, 59:23, 59:25, 60:1, 60:2, 60:4, 60:5, 60:6, 66:12, 66:14, 70:12, 86:11, 86:12, 86:13, 86:15, 87:12, 94:15, 102:7, 102:25, 133:5, 133:9, 136:17, 136:18, 137:1, 137:5, 137:9, 162:14
**vehicles** [22] - 50:22, 50:24, 51:2, 51:6, 51:8, 51:10, 51:12, 51:14, 60:3, 60:4, 79:22, 85:19, 86:7, 103:5, 103:25, 134:7, 134:11, 135:25, 136:5, 136:8, 136:16, 137:8
**venal** [1] - 167:11
**verbiage** [2] - 139:20, 147:10
**version** [1] - 22:6
**versus** [2] - 170:11, 170:15
**vetting** [1] - 125:11
**vicinity** [2] - 91:5, 91:7
**VICKI** [1] - 177:11
**Vicki** [1] - 1:22
**view** [3] - 88:8, 88:11, 103:23
**views** [1] - 83:20
**violate** [1] - 28:24
**violating** [1] - 93:14
**violation** [2] - 137:25, 169:19, 170:7, 170:13, 170:18
**violence** [1] - 13:25
**Virginia** [1] - 115:19
**virtual** [1] - 155:10
**volume** [3] - 53:25, 89:18, 91:17
**voluntary** [6] - 12:20, 12:23, 13:3, 16:18, 16:21, 20:21
**volunteer** [1] - 116:16
**vs** [2] - 1:5, 1:12

## W

**Wagler** [1] - 127:17

**Wahab** [1] - 100:14
**Wainscott** [1] - 127:15
**Wait** [1] - 167:7
**wake** [1] - 134:1
**walk** [3] - 12:17, 14:9, 139:14
**walked** [4] - 10:8, 14:4, 14:13, 163:17
**walking** [1] - 38:22
**wall** [3] - 149:6, 169:8, 169:11
**wants** [3] - 96:8, 155:3, 163:7
**warranted** [2] - 161:1, 168:9
**Washington** [10] - 1:24, 2:6, 2:10, 2:14, 2:17, 2:21, 143:21, 148:16, 148:22, 177:20
**water** [4] - 131:7, 131:11, 131:23, 132:1
**Watson** [13] - 68:20, 68:21, 68:24, 69:3, 109:10, 109:20, 109:23, 127:16, 129:10, 132:10, 132:17
**waving** [1] - 89:14
**ways** [1] - 122:6
**weapon** [7] - 57:13, 57:18, 57:20, 66:22, 81:20, 91:10, 132:23
**weapons** [6] - 17:10, 104:2, 104:5, 121:3, 133:2, 142:22
**weather** [2] - 115:23, 115:24
**Wednesday** [1] - 6:14
**week** [6] - 4:4, 16:13, 45:23, 57:6, 158:11, 175:2
**weeks** [5] - 8:4, 41:15, 78:6, 159:3, 173:9
**weigh** [2] - 98:18, 105:10
**weighed** [1] - 96:21
**welfare** [1] - 121:25
**well-aimed** [2] - 53:17, 53:20
**West** [1] - 115:19
**west** [2] - 103:7, 103:10
**westerly** [1] - 45:7
**wheels** [1] - 115:21
**white** [35] - 42:15, 42:17, 44:19, 48:12, 48:14, 48:17, 55:23, 56:8, 57:2, 57:14, 61:13, 62:15, 63:12, 64:4, 64:14, 65:5, 65:11, 65:14, 68:10, 86:25, 87:7, 87:22, 88:9, 89:8, 90:22, 90:23, 90:24, 94:8, 94:19, 100:10, 100:14, 102:25, 112:8, 112:10
**whole** [4] - 107:2, 108:5, 119:9, 160:13
**William** [2] - 2:12, 110:17
**Williams** [1] - 166:10
**willing** [1] - 125:3

**Wilson** [1] - 170:11
**WILTSHIRE** [1] - 2:20
**window** [2] - 94:14, 131:13
**windshield** [12] - 56:4,
    56:14, 56:15, 56:17, 59:4,
    59:15, 63:9, 63:12, 63:19,
    64:6, 64:9
**Wisam** [2] - 173:2, 173:19
**Wisam's** [1] - 173:4
**withdraw** [2] - 29:13, 33:19
**WITNESS** [2] - 40:6, 70:1
**witness** [17] - 4:16, 8:12,
    8:14, 8:16, 8:17, 10:16,
    12:14, 15:15, 49:10,
    110:10, 113:22, 129:16,
    150:1, 158:4, 165:9, 172:3,
    175:12
**Witness** [2] - 113:21, 137:22
**witnessed** [1] - 131:22
**witnesses** [9] - 161:22,
    163:13, 164:18, 170:22,
    172:6, 172:8, 174:3, 175:3,
    175:5
**woke** [1] - 134:3
**woops** [1] - 92:17
**word** [7] - 33:15, 81:22,
    81:25, 82:8, 94:13, 140:15,
    166:25
**wording** [1] - 174:20
**words** [4] - 25:9, 56:2, 67:24,
    94:21
**world** [1] - 155:6
**worlds** [2] - 167:3, 167:4
**worse** [1] - 104:13
**wounded** [1] - 13:8
**wrap** [1] - 173:20
**write** [1] - 166:12
**writes** [1] - 111:17
**writing** [2] - 35:22, 111:7
**written** [3] - 139:18, 142:25,
    153:8
**wrote** [4] - 76:17, 76:19,
    104:16, 113:2

## Y

**year** [9] - 16:20, 34:11,
    59:10, 59:13, 60:15, 60:18,
    78:4, 118:23, 146:2
**years** [15] - 12:24, 13:10,
    17:3, 18:1, 18:10, 48:5,
    73:9, 75:25, 110:1, 114:23,
    115:7, 118:13, 121:6,
    123:17, 151:11
**yourself** [14] - 37:17, 91:19,
    106:13, 111:17, 114:8,
    119:18, 120:6, 120:19,
    127:4, 130:3, 131:15,
    132:25, 133:2, 135:11
**yup** [1] - 12:3

## Z

**zero** [2] - 16:23, 17:6
**zigzagging** [1] - 37:1
**Zone** [9] - 36:16, 38:6, 39:8,
    39:16, 47:4, 102:3, 102:4,
    102:5, 136:9