## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Cr. No. 08-360 (RCL)**[1] |
| | : | |
| **v.** | : | |
| | : | |
| **PAUL ALVIN SLOUGH,** | : | |
| **EVAN SHAWN LIBERTY, and** | : | |
| **DUSTIN LAURENT HEARD,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Cr. No. 14-107 (RCL)** |
| | : | |
| **v.** | : | |
| | : | |
| **NICHOLAS SLATTEN,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

**"That day changed my life forever.   That day destroyed me completely."**

6/18/14 PM Tr. 36:1-4 (Mohammad Kinani, father to slain 9-year old Ali)

**"How do you feel when you are going to see your love[d] ones face to face in the morgue and find them decapitated and totally charred, and one can hardly identify their features."**

(Victim Impact Statement of Dr. Haithem Al Rubia'y, husband and father to slain victims Dr. Mahassin Al-Khazali and Ahmed Al Rubia'y, occupying the white Kia south of the circle)

**"At that moment a large number of shots started hitting him. . . .   His body was shaking violently as the bullets were hitting him, piercing the body, and**

---

[1]    On May 12, 2014, the Court granted the government's motion to join this case with *United States v. Nicholas Abram Slatten*, Crim. No, 14-107 (RCL) [Dkt #434].  This memorandum is intended to be filed in the two joined cases, and the government is filing a notice to that effect in Crim. No. 14-107.

hitting the sidewalk."

> 6/24/14 AM Tr. 54:14-18 (Majed Salman Abdel Kareem Al-Gharbawi, injured victim and friend to slain victim Osama Fadhil Abbas)

**"We couldn't do very much, the children were lowering their bodies and heads down.    We lowered our heads and bodies down, and we assumed that we were all going to be killed."**

> 8/19/14 AM Tr. 77:4-6 (Jennan Hafidh Abid Al-Razzaq, injured victim and aunt to slain 9-year old Ali)

**"He pointed his weapon at me.   I raised my hands out of the steering, I was looking at him.   I was trying to communicate to him that I have nothing and I am being surrendering.   He started shooting at me."**

> 7/2/14 PM Tr. 67:12-15 (Bara Sadoon Ismael Al-Ani, injured victim)

**"I went to the morgue, to the refrigerators of the morgue. . . .   I saw my brother, the father, laid down, and they had placed his son on top of him."**

> 8/13/14 PM Tr. 104:1-10 (Ali Abbas Mahmoud, brother and uncle to slain victims Mohamed Abbas Mahmoud and 11-year old Qasim)

**"I was really hurt, really hurt. . . .   Now I can't get in a car, I can't bathe myself, I cannot see, I am so tired, I'm so, so tired. . . .   I was trying to raise a family . . . .   I can't do anything now."**

> 7/21/14 AM Tr. 15:2-10 (Adel Jaber Sham'ma Al-Jadiri, injured victim west of circle)

**"I'm completely – my memory is lost, and I'm completely destroyed."**

> 6/30/14 AM Tr. 15:3-4 (Jassim Hashim, shot in the forehead)

**"Their families, their brothers.   They went to Yarmouk Hospital and they found them in the refrigerators of the morgue. . . .   it's a catastrophe, they have families."**

> 7/9/14 AM Tr. 63:22-64:3 (Talib Mutluk Diwan, injured victim and cousin to slain victims Hamoud Sa'eed and Uday Ismail Ibrahiem)

**"I saw the people running in this direction towards this – there's a depression down in there.   And I saw rounds, machine gun rounds, skipping off the ground as they were running."**

**"Well, there was an Iraqi man standing up here [indicating northeast] on the circle . . . [a]nd he had his hands up in the air.  And at some point when I heard a shot coming from the individual who was pointing in that direction, I looked over my shoulder and looked up and I saw . . . what appear[ed] he was shot in the stomach and then he just fell over backwards."**

> 7/15/14 PM Tr. 114:1-4 and 7/15/14 PM Tr. 120:22-121:5 (Mark Mealy, Raven 23 team member)

**"I've seen people completely unarmed, people doing nothing wrong get shot, you know . . . . it's the most horrible botched thing I've ever seen in my life."**

> 7/1/14 AM Tr. 58:15-59:5 (Matthew Murphy, Raven 23 team member)

**"I have pictures in my mind of the cars that I saw as we drove past them. There were scared civilians cowering in their vehicles, fathers and mothers shielding their children against the bullets that could destroy them.  I felt hollow inside.  I knew that what I was seeing was wrong. . . .  My thought kept returning to what I had seen.  Men that 10 minutes prior to that event had been my good friends were now distasteful to me.  I had seen them lose their cool and over react to a tense situation.  They could turn on the fight switch, but did not know how to control the throttle on it.  They were caught up in the moment and didn't stop to differentiate what was a genuine threat, and what was a scared innocent just trying to make it through the next few minutes without dying."**

> Journal of Adam Frost, Raven 23 team member, dated September 21, 2007, at p. 5, attached at Tab A.

**"Sir, it was grossly excessive use of force. . . .   the apparent firing into vehicles that were retreating – all of those factors appeared to me to be grossly inappropriate for an entity whose only job was to provide personal protection to somebody in an armored vehicle."**

**"Sir, it had a negative effect on our mission, adverse affect . . . it made our relationship with the Iraqis in general more strained."**

> 8/13/14 PM Tr. 44:22-45:8 and AM Tr. 69:2-6 (COL (Ret.) David Boslego, U.S. Army)

*       *       *

I.      **Introduction.**

On September 16, 2007, the defendants perpetrated a mass killing and injuring of at least 31 innocent men, woman, and children in Baghdad, Iraq.   The Iraqi victims — 14 killed and at least 17 maimed — and their extended families suffered immeasurably that day and in the weeks and years to follow.   Their devastating loss can never be restored and their grief never assuaged. On October 22, 2014, the jury offered the victims and their families some measure of solace after seven long years by finding the defendants guilty of their crimes.   This Court, by sentencing the defendants to substantial prison terms, would appropriately validate the jury's considered verdicts. By imposing substantial sentences, this Court would hold the defendants accountable for their callous, wanton, and deadly conduct, and deter others wielding the awesome power over life or death from perpetrating similar atrocities in the future.

This is far from the ordinary case.   The crimes here were so horrendous – the massacre and maiming of innocents so heinous – that they outweigh any factors that the defendants may argue form a basis for leniency under 18 U.S.C. § 3553(a).   This is especially true here, where the defendants have shown no remorse for their actions.   Indeed, the defendants have not accepted responsibility for their criminal actions whatsoever and, to this day, have denied any wrongdoing.

As set forth below, the drafters of the Guidelines failed to account for defendants who took so many lives and injured so many others.   Nor could anyone have expected them to do so.   Thus, for defendants Slough, Liberty, and Heard, the government is seeking upward departures from the recommended guidelines sentences for the manslaughter and attempted manslaughter convictions, which sentences will run consecutively to the 30-year mandatory minimum sentence for their convictions on the 18 U.S.C. § 924(c) count.   For the reasons set forth below, the government is

asking the Court to sentence defendant Slough to a total of 57 years (684 months) in prison, defendant Liberty to a total of 51 years (612 months) in prison, and defendant Heard to a total of 47 years (564 months) in prison.   As mandated by Congress, the Court must impose a sentence of life without parole on defendant Slatten for his conviction of first-degree murder.

## II.      The Nisur Square Shooting.

Consistent with the jury's guilty verdicts, the following facts were established at trial:[2]

In September 2007, defendants Slatten, Slough, Liberty, and Heard worked as independent contractors and employees of Blackwater Worldwide, a contractor of the United States Department of State ("DOS").   In that capacity, they provided personal security services for DOS diplomats and other United States government personnel in Baghdad, Iraq. The defendants' employment as Blackwater contractors related to supporting the mission of the Department of Defense in Iraq.

### The Shooting

Shortly before noon on September 16, 2007, the defendants' Blackwater tactical support team, called "Raven 23," learned that a car bomb had detonated in central Baghdad near a location where a U.S. official was under the protection of another Blackwater team.   Raven 23 team members, including the defendants, promptly reported to their convoy of four heavily-armored vehicles in "Patriots" parking lot near the U.S. Embassy.   After team members donned their body

---

[2]        *See, e.g., S.E.C. v. Jasper*, 678 F.3d 1116, 1120 (9th Cir. 2012) ("We relate the facts here in the way most favorable to the jury verdict.").   Even if the Court does not believe it is bound, at this stage, to view the evidence in the light most favorable to the government, the government has easily satisfied its burden of establishing these facts by a preponderance of the evidence. *United States v. Bras*, 483 F.3d 103, 108 (D.C. Cir. 2007) (appropriate for sentencing court to apply a preponderance of the evidence standard when making factual findings); *United States v. Edwards*, 496 F.3d 677, 681 (D.C. Cir. 2007) (same); *see also* U.S.S.G. § 6A1.3 Commentary ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.").

armor and readied their weapons systems (*e.g.*, mounting and loading the M-240 machine guns), the convoy left the lot and headed toward "Checkpoint 12" — a guarded egress point between the Green Zone and Red Zone.[3]   Once there, the convoy encountered a number of other vehicles waiting to exit the checkpoint.   In contravention of a direct order from his chain of command, shift leader Jimmy Watson directed the convoy to depart Checkpoint 12 and proceed to Nisur Square, a busy traffic circle in central Baghdad immediately adjacent to the Green Zone.   While en route to Nisur Square, Watson informed the Raven 23 team members over their internal radio communications that the team would be occupying and "locking down" the circle.   Watson's claimed purpose for locking down the circle was to provide the other Blackwater team a safe route back into the Green Zone.

The four-vehicle convoy formed a semi-circle at the south end of the Nisur Square circle. At trial, the vehicles were referred to as the Lead Vehicle (first in line), the Emergency Response Vehicle (ERV) (second in line), the Command Vehicle (third in line), and the Follow Vehicle (fourth in line).   The Lead Vehicle, the ERV, and the Follow Vehicle each had two gunners inside turrets at the top of the vehicles.   The Command Vehicle only had one turret gunner, defendant Slough.

Raven 23 occupied the traffic circle for approximately 10 – 15 minutes, during which time the defendants, cooperating witness Jeremy Ridgeway, and Watson trained heavy fire on unarmed civilians to the south, northeast, and west of the circle.   Near the end of their time in the circle, members of the second vehicle in the convoy (*i.e.*, the ERV) attached a tow strap to the third vehicle in the convoy (*i.e.*, the Command Vehicle), which had become disabled, when its radiator

---

[3]       The "Green Zone" was a fortified enclave in Baghdad that was occupied and controlled by U.S. and Coalition Forces, other international forces in Baghdad, and the Iraqi government.   The "Red Zone" consisted of all areas within Baghdad other than the Green Zone.

was punctured by fragments from a grenade launched by Raven 23, which exploded too close to the vehicle.   While the convoy was travelling around and north of Nisur Square, defendant Slough and Ridgeway shot at and injured several more victims to the west, northwest, and much further north of the circle.

In sum, the defendants were convicted of killing least 14 innocent civilians and wounded at least 17 others.   *See* Govt. Trial Exh. 390, attached at Tab B.   None of the victims was an insurgent or posed any threat to the Raven 23 convoy.   Many of the victims were shot while occupying their civilian vehicles and either taking shelter from Raven 23's deadly gunfire and grenades or attempting to flee the circle.   Four of the seven Raven 23 members occupying machine gun turrets in the armored vehicles fired their weapons during the shooting — defendants Slough and Heard, cooperating witness Ridgeway, and Donald Ball.   Defendants Slough (occupying the Command Vehicle turret) and Heard (occupying one of the Follow Vehicle's turrets) each fired rounds from their M-4 rifles, their mounted M-240 machine guns, and their M-203 grenade launchers.   Defendant Slatten, Raven 23's designated sniper, fired his high powered sniper rifle at least twice from a gun porthole on the left side of the Command Vehicle at the very outset of the incident.   Defendant Liberty, the driver of the Command Vehicle, fired his M-4 rifle from inside and outside that vehicle.

A summary of key aspects of the shooting and its aftermath follows:

## The White Kia

After the Raven 23 vehicles entered and took up their initial positions in the southern portion of Nisur Square, all civilian traffic within or seeking to enter the circle was stopped.   The approximate positioning of each of the four convoy vehicles is accurately depicted in

Government's Exhibit 496B.   *See* Govt. Trial Exh. 496B, attached at Tab C.   Before any gunfire occurred, defendants Slough and Slatten, occupying the Command Vehicle along with defendant Liberty, were generally oriented southbound toward the northbound lanes of traffic. Nineteen-year-old Ahmed Al Rubia'y (Ct. 1), a third-year medical student, and his mother, Dr. Mahassin Al-Khazali (Ct. 2), were stopped in their white Kia sedan among the other vehicles stopped in the northbound lanes directly south of the circle.   Al Rubia'y was driving, and Dr. Al-Khazali was seated in the front right passenger seat.

From his concealed sniper position within the Command Vehicle, defendant Slatten, without any provocation or legal justification, fired two well-aimed shots at Al Rubia'y, striking the young man in the forehead and killing him.   By doing so, defendant Slatten's shots also caused the white Kia, which had an automatic transmission, to begin rolling slowly forward on its own "drive" power.   Several seconds passed, and then defendants Slough and Heard, as well as Ridgeway, Watson, and Ball, began firing shots at the driver of the white Kia, as the car slowly crept toward the circle and the rear two convoy vehicles.[4]   The intense gunfire brought the white Kia to an abrupt stop within moments.   Thereafter, defendants Slough and Heard, Ridgeway, Watson, and then defendant Liberty trained heavy M-4 rifle and M-240 gunfire, as well as multiple M-203 grenade rounds, at the already incapacitated vehicle.   The combined firepower caused the white Kia to explode into flames.   During this time, Dr. Al-Khazali, the passenger of the white Kia, was also shot and killed.

### Further South and Northeast of the Circle

After eviscerating the white Kia and its two occupants, defendants Slough, Liberty, and Heard, as well as Ridgeway and Watson, directed more heavy gunfire and M-203 grenades at other

---

[4]   Ball fired a few shots at the driver's side of the white Kia and then stopped and did not fire again.

civilian vehicles and pedestrians south of the circle and in the northeast portion of the traffic circle. This sustained barrage of gunfire resulted in the deaths of nine more civilians and maiming of another twelve.   *See* Govt. Exh. 392, attached at Tab D.

### The Tow Hook-up and West/Northwest of the Circle

After defendants Slough, Liberty, and Heard, as well as Ridgeway and Watson, fired indiscriminately to the south for several minutes, Watson ordered the convoy to depart the circle. The Command Vehicle, however, had become disabled, when its radiator was punctured by fragments from a grenade launched by Raven 23, and it had to be hooked up and towed out by the ERV.   While the tow line was being attached, defendant Liberty got out of the command vehicle and shot Ali Khalil Abdul Hussein (Ct. 14), who was standing in the northeast portion of the circle with his empty hands raised in the air.   Raven 23 moved out of the traffic circle in a counter-clockwise direction.   For unknown reasons, the Lead Vehicle pushed through some Jersey barriers blocking the southbound lanes of traffic just north of the circle and drove against the flow of backed-up civilian traffic coming from the north.   Around this time, defendant Slough again fired his mounted M-240 machine gun at civilian cars and individuals on the west and northwest sides of the circle.   This gunfire resulted in the deaths of five more civilians and the injuring of another three.   *See* Govt. Exh. 392.

### Further North of the Circle

After leaving the circle, the convoy slowly made its way northbound against heavy oncoming traffic coming from that direction.   Approximately 200 to 300 meters north of the circle, Ridgeway opened fire on and seriously injured the driver of a white Chevrolet Celebrity stopped in traffic there.   Shortly thereafter, defendant Slough and Ridgeway fired at the drivers of

two other civilian vehicles heading southbound — a red Hyundai sedan being driven by Bara Sadoon Ismail Al-Ani (Ct. 31) and a white Opel station wagon being driven by Sami Hawa Hamud Al-Sabahin (Ct. 32).   Both drivers were shot and seriously injured.   *See* Govt. Exh. 392.   Raven 23 team member Matthew Murphy, who was one of the turret gunners in the Lead Vehicle and witnessed defendant Slough's final, unprovoked shots, waved furiously at him and screamed out, "Cease fire.   Cease fucking fire."   Only then did the gunfire stop.

### The Aftermath

Upon returning to Patriots parking lot, several of the shooters, including defendant Liberty, exchanged "high fives" and congratulatory praise.   Meanwhile, the Blackwater leadership took possession of Watson's weapons and relieved him of his command in front of his team.   Shortly thereafter, Raven 23 team members left the parking lot.   While walking away, defendant Liberty pulled Ridgeway to the side and told him that he (Liberty) had "pulled a Grey 55" — referencing a previous incident when he had fired his M-4 rifle on fully automatic through his driver's porthole while in another Baghdad traffic circle.   Separately, Ridgeway asked defendant Heard whether he had seen a man in a dishdasha (a local type of apparel) standing near the white Kia, and defendant Heard replied, "Yeah, I smoked that guy."   Defendant Slatten bragged to Ridgeway that he had shot a man and "popped his grape," causing him to slump forward.   This was in reference to defendant Slatten's shots at Al-Rubai'y with his sniper rifle.

### Some of the Conduct Attributable to Each Defendant

The evidence at trial also established the following conduct attributable to each of the defendants in Nisur Square on September 16, 2007, as well as other related conduct before then.

### Defendant Slough

-10-

- Multiple eyewitnesses observed defendant Slough firing his weapons systems at the white Kia while it was crawling forward and after it had stopped moving. Murphy saw Slough fire his M-240 and two to three M-203 rounds into the car after it stopped.  Murphy described the tens of seconds defendant Slough spent firing each M-203 round, removing the spent cartridge, loading another round, and then firing the grenade launcher again.

- Multiple eyewitnesses saw defendant Slough repeatedly fire 6-8 round bursts from his M-240 machine gun at vehicles and individuals south of the circle.  Watson described defendant Slough as firing with such frequency that the hot shell casings were falling into the Command Vehicle and hitting Watson's neck.

- Around the same time, Murphy perceived that the turret gunners in either the Command Vehicle (defendant Slough) or Follow Vehicle (Ridgeway and defendant Heard) were firing west and northwest of the circle and saw rounds strike a red Tata bus west of the circle and strike three men hiding behind a car.

- North of the circle, Murphy and Frost heard and perceived M-240 machine gunfire coming from the Command Vehicle.  They turned and saw defendant Slough behind his M-240.   Murphy signaled and yelled at him to cease fire.

- On a prior occasion, Murphy observed defendant Slough fire his M-203 grenade launcher so close to Murphy's convoy vehicle that Murphy feared the fragmenting grenade may cause damage or injury to the convoy.[5]

- On two separate prior occasions, Murphy observed defendant Slough initiate fire with his M-240 machine gun at buildings and streets where Murphy did not observe any threats to the convoy.

### Defendant Liberty

- While Watson was firing into the white Kia, he saw defendant Liberty shooting his M-4 rifle to the left and south of the Kia.

- Jeremy Krueger and Edward Randall saw defendant Liberty's driver's door open during and after the Kia was being fired upon.  Krueger saw defendant Liberty,

---

[5]        The trial evidence established that is what happened on September 16, 2007.  FBI Explosives Unit Expert Mark Whitworth testified to the 15-meter casualty radius of an M-203 grenade and the type of fragmentation damage caused by the high-explosive, dual-purpose warhead.  He also explained that the antipersonnel fragmentation cup is seated in the back of the round and designed to explode to the rear upon impact.  FBI Metallurgist Sue Marvin testified that shrapnel pieces consistent with M-203 fragmentation were found in the left-side tires of the Command Vehicle, indicating that such fragmentation had, in fact, blown back against the left side of the Command Vehicle on September 16, 2007.   Finally, the government introduced evidence of a test where the FBI shot an AK-47 at a Bearcat exactly like the Command Vehicle in this case, and the damage left by the AK-47 rounds was clearly more substantial than and distinct in appearance from the small "dings" that the defendants continue to claim were caused by "incoming fire."

while occupying the driver's seat of the Command Vehicle, fire approximately 20 - 30 rounds in the direction of the Kia.   Randall saw automatic fire coming out the driver's door of the Command Vehicle after the Kia was stopped.

- Mark Mealy saw defendant Liberty's door open during the tow hook-up of the disabled Command Vehicle, even though there would have been no reason for defendant Liberty to leave the vehicle during that time.   Mealy also saw a Raven 23 team member (*i.e.*, defendant Liberty) at the rear of the Command Vehicle during the tow hook-up take a knee and shoot an unarmed man by a tanker truck to the northeast (*i.e.* Ali Khalil Abdul Hussein (Ct. 14)).

- As the convoy drove out of and north of the circle, defendant Liberty did not fire any of his weapons.

- After the shooting, two empty M-4 rifle magazines were recovered at the scene — one bearing the name "Liberty" and the other the name "Libo," a nickname for defendant Liberty.   Combined, these magazines could carry up to 60 rounds of ammunition.

- After the shooting, defendant Liberty told Ridgeway that he had pulled a "Grey 55" at the circle, which Ridgeway understood to be an allusion to an earlier incident in which defendant Liberty said he fired his M-4 rifle on automatic out a gun porthole in the driver's door.

- On a prior occasion, defendant Liberty was manning an M-240 machine gun in a turret position and fired hundreds of rounds from the gun over the course of several hours.   When a teammate later questioned the wisdom and necessity of firing so many rounds, defendant Liberty responded indignantly, "Just shoot at something, man."

- On prior occasions in the Red Zone, defendant Liberty threw water bottles in an overly aggressive and malicious manner.   On one occasion, defendant Liberty broke a civilian's windshield without justification.   On another, defendant Liberty threw a water bottle so hard at an Iraqi woman begging for water that the cap exploded off the bottle when it struck her in the chest.

## Defendant Heard

- Multiple eyewitnesses saw or perceived defendant Heard shoot the white Kia.

- Around the time Ridgeway shot at Dr. Al- Khalazi in the white Kia, he heard and saw defendant Heard firing his M-240 machine gun at targets other than the white Kia south of the circle.   Mealy also saw defendant Heard firing further south of the circle.

-12-

- According to Ridgeway, he and defendants Slough and Heard were all firing to the south of the circle, but defendant Heard fired the most of the three.

- Murphy saw two unarmed men standing in the street south of the circle shot.   One of the men may have been wearing a dishdasha.   Murphy perceived that someone in the Follow Vehicle, namely Ridgeway, shot the men based on the locations of the Follow Vehicle and the men at the time they were shot.   Ridgeway, however, testified that he did not shoot the men.   And, after returning to base, Ridgeway asked defendant Heard about seeing a man in a dishdasha run to and from the white Kia, and defendant Heard replied, "Yeah.   I smoked that guy."

- As the convoy drove out of and north of the circle, defendant Heard did not fire any of his weapons.

- After the incident, defendant Heard told Murphy that he had fired an M-203 round at an Iraqi police officer south of the circle that defendant Heard claimed was a threat to the convoy.

### Defendant Slatten

- Watson heard defendant Slatten fire his sniper rifle twice at the outset of the incident and saw that defendant Slatten was aiming in the direction of the white Kia.

- Several Raven 23 witnesses recount that while the convoy was occupying the circle, the first sounds they heard were successive "pops" akin to semiautomatic gunfire or pen flares coming from the rear portion of the convoy — either the Command or Follow Vehicles — but did not see pen flares.   In particular, Randall (the driver of the Follow Vehicle) heard the first gunshots fired coming from the Command Vehicle in front of him.   Randall testified that whoever fired at the white Kia started the shooting incident as those were the first shots he heard that day.

- As indicated above, shortly after the incident, defendant Slatten bragged to Ridgeway that he had shot a man and "popped his grape," causing him to slump forward, which was an allusion to defendant Slatten's first shots at Al Rubai'y, the driver of the white Kia.

- After the incident, defendant Slatten told Raven 23 team members that he fired at multiple individuals while in the circle.

- Prior to September 16, 2007, defendant Slatten stated that he wanted to kill as many Iraqis as he could as "payback for 9/11."   He repeatedly boasted about the number of Iraqis he had shot and killed.   He regularly referred to the Iraqi people as animals and "less than human."

- Defendant Slatten told Murphy that when defendant Slatten was in the U.S. Army, he had shot and killed an older Iraqi lady holding a kitchen knife while inside her home.

- On two instances before September 16, 2007, Ridgeway witnessed defendant Slatten attempt to start gunfights with Iraqi authorities by firing his sniper rifle first at the Iraqi targets.   The Iraqi targets were not threats to the convoy.

- On a prior occasion, defendant Slatten told Mealy to shoot a random man who was holding what appeared to be a broom on a rooftop.   The man was not a threat to the convoy.

## III.    The Jury's Verdicts.

On October 22, the jury returned a verdict of guilty of Murder in the First Degree on Count 1 as to defendant Slatten in 14-CR-107.

The jury also returned the following verdicts as to defendants Slough, Liberty, and Heard in 08-CR-360:

Defendant Slough:    Guilty on Counts 2-14 (Voluntary Manslaughter)
Guilty on Counts 15-24, 26-32 (Attempt to Commit Manslaughter)
Guilty on Count 33 (Using and Discharging a Machinegun or Destructive Device During and in Relation to a Crime of Violence)

Defendant Liberty:    Guilty on Counts 2-8, 14 (Voluntary Manslaughter)
Guilty on Counts 15-22, 26-29 (Attempt to Commit Manslaughter)
Guilty on Count 33 (Using and Discharging a Machinegun or Destructive Device During and in Relation to a Crime of Violence)

Defendant Heard:    Guilty on Counts 3-8 (Voluntary Manslaughter)
Guilty on Counts 15-22, 27-29 (Attempt to Commit Manslaughter)
Guilty on Count 33 (Using and Discharging a Machinegun or Destructive Device During and in Relation to a Crime of Violence)
No Verdict on Counts 2, 14, 26[6]

---

[6]    After the jury failed to return a verdict as to defendant Heard on Counts 2, 14, and 26, the government moved to dismiss these counts without prejudice.   The Court then declared a mistrial as to defendant Heard on these three counts.

-14-

In summary, the jury found defendant Slatten guilty of the premeditated murder of Ahmed Al Rubai'y.   The jury found defendant Slough guilty of killing 13 Iraqi civilians and attempting to kill another 17 Iraqi civilians, while using and discharging a machine gun and a destructive device (*i.e.*, a grenade launcher) in the commission of these offenses.   The jury found defendant Liberty guilty of killing eight Iraqi civilians and attempting to kill another 12 Iraqi civilians, while using and discharging a machine gun and a destructive device in the commission of these offenses.   And finally, the jury found defendant Heard guilty of killing six Iraqi civilians and attempting to kill another 11 Iraqi civilians, while using and discharging a machine gun and a destructive device (*i.e.*, grenade launcher) in the commission of these offenses.

## IV.    Statutory Penalties.

As set forth above, the jury found defendant Slatten guilty of one count of First Degree Murder, in violation of 18 U.S.C. §§ 3261(a)(1) and 1111 (ed. 2007), and defendants Slough, Liberty, and Heard guilty of multiple counts of Voluntary Manslaughter and Attempt to Commit Manslaughter, in violation of 18 U.S.C. §§ 3261(a)(1), 1112, and 1113 (ed. 2007), and one count of Using and Discharging a Firearm During and in Relation to a Crime of Violence (the "Firearms Count"), in violation 18 U.S.C. §§ 3261(a)(1) and 924(c) (ed. 2007).

As to defendant Slatten, the crime of First Degree Murder carries a sentence of death or imprisonment for life, 18 U.S.C. § 1111, as well as mandatory restitution under 18 U.S.C. § 3663A.   The government did not seek a sentence of death.   Accordingly, federal law requires a sentence of life imprisonment for defendant Slatten.

As to defendants Slough, Liberty, and Heard, the crimes of Voluntary Manslaughter and Attempt to Commit Manslaughter carry maximum sentences of 10 years and 7 years of

imprisonment, respectively, 18 U.S.C. §§ 1112 and 1113, as well as mandatory restitution under 18 U.S.C. § 3663A.  This Court may impose consecutive prison terms of up to the relevant maximum sentence for each independent count of Voluntary Manslaughter and Attempt to Commit Manslaughter because, among other things, each count relates to an independent victim. *See* 18 U.S.C § 3584(a) ("[m]ultiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively"); *United States v. Fight*, 625 F.3d 523, 525-26 (8th Cir. 2010) (sentencing court reasonably imposed consecutive sentences on multiple counts of voluntary manslaughter involving three separate victims).  However, in determining whether the sentences on the independent counts of Voluntary Manslaughter and Attempt to Commit Manslaughter should run consecutively or concurrently, the district court "shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)."   18 U.S.C. § 3584(b).

As to defendants Slough, Liberty, and Heard, the Firearms Count carries a mandatory minimum sentence of 30 years' imprisonment.[7]   The 30-year mandatory minimum sentence on this count must run consecutive to any sentence the Court imposes on any of the underlying crime-of-violence counts.   *See* 18 U.S.C. § 924(c)(1)(A) and (B)(ii) ("[A]ny person who, during

---

[7]      The defendants claim that, since their weapons were issued by the government, it was improper to charge them with violating 18 U.S.C. § 924(c).   Their claim is unfounded.   In fact, Congress specifically amended 18 U.S.C. § 924(c) to cover situations, such as this, where individuals commit crimes with government-issued weapons.   *See* S. Rep. No. 225, 98th Cong. 2d Sess., 314 n. 10 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3492 n. 819 ("The committee has concluded that persons who are licensed to carry firearms and abuse that privilege by committing a crime with the weapon, *as in the extremely rare case of the armed police officer who commits a crime*, are as deserving of punishment as a person whose possession of the gun violates a state or local ordinance.) (emphasis added); *see also United States v. Gonzalez*, 528 F.3d 1207, 1212 (9th Cir. 2008) ("Congress intended § 924(c) to apply when police officers, or in this case, Border Patrol agents abuse the privilege of carrying a firearm by committing a crime with the weapon."); *United States v. Patterson*, 348 F.3d 218, 227 (7th Cir. 2003) (same); *United States v. Contreras*, 950 F.2d 232, 241 (5th Cir. 1991) ("Congress intended section 924(c) to apply to police officers who 'abuse that privilege [of being licensed to carry a firearm] by committing a crime with the weapon.'"); *United States v. Rivera*, 889 F.2d 1029, 1031 (11th Cir. 1989) (As part of the Comprehensive Crime Control Act of 1984, Congress amended 18 U.S.C. § 924 specifically to expand the law's scope to include wrongs committed by law enforcement officials); *United States v. Ramos*, 537 F.3d 439, 458 n.15 (5th Cir. 2008) (explaining that "the amendment to the statute was specifically intended to bring police officers within the statute's reach.").

and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime . . .   (B) [I]f the firearm possessed by a person convicted of a violation of this subsection . . . (ii) is a machinegun or a destructive device . . . , the person shall be sentenced to a term of imprisonment of not less than 30 years."); *see also* U.S.S.G. § 5G1.2.(a) and Commentary n.2.(A).

## V.      Defendant Slatten.

The trial evidence compellingly established that defendant Slatten committed first degree, premeditated murder, when he shot and killed Al Rubia'y.   That murder, even viewed in isolation, is worthy of severe punishment.   It cannot, however, be viewed in isolation.   By shooting and killing the driver of the white Kia, causing that car to inch forward, defendant Slatten set off a chain of horrific events that resulted in the Nisur Square massacre.

The evidence showed that the white Kia had come to a stop along with the other traffic south of the circle.   Randall, who was occupying the Follow Vehicle directly behind the Command Vehicle, testified that he heard the first shots fired that day come from the Command Vehicle.   Similarly, Majed Al-Gharbawi, who was seated in a stopped civilian vehicle in the first row of traffic facing the Raven 23 convoy, testified to hearing a single gunshot come from one of the two convoy vehicles in front of his vehicle.   Al-Gharbawi then felt the white Kia gently bump into the rear of his vehicle, at which time he looked back and saw a single hole in the front windshield of the white Kia and the bloodied head of Al Rubia'y.   Moments later, he heard the agonizing screams of Al Rubia'y's mother, Mahassin, who was seated right next to his now lifeless and slumping body.

Watson, who was inside the command vehicle with defendant Slatten, testified that while the Command Vehicle was stopped in the southern portion of the traffic circle, defendant Slatten had his sniper rifle pointed out the left side of the vehicle and was oriented to the south of the circle.   Watson identified defendant Slatten as the Raven 23 team member who fired first that day and in the direction of the white Kia sedan that Al Rubia'y was driving.   Watson also stated that after defendant Slatten fired two shots, he yelled, "white car, white car coming in."   7/29/14 AM Tr. 49.   Ridgeway testified that shortly after the incident, defendant Slatten bragged to Ridgeway that he had shot a man in the head ("popped his grape") and described how the man had slumped over after being shot.

Additionally, the evidence established that defendant Slatten held a deep seated animus toward Iraqis, blaming them for 9/11.   Defendant Slatten also had a history of shooting at Iraqis in order to instigate a fight, as he did on September 16, 2007.

Pursuant to 18 U.S.C. § 1111(b), Congress has provided that defendant Slatten must be sentenced to life imprisonment.   Accordingly, he is not included in the ensuing discussions of either the United States Sentencing Guidelines or the § 3553(a) factors.

## VI.   Determining the Sentences to be Imposed.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the United States Sentencing Guidelines are no longer mandatory.   However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining the defendant's sentence.   *Gall v. United States*, 552 U.S. 38, 49 (2007).   While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an

appropriate sentence," *Kimbrough v. United States*, 552 U.S. 85, 90 (2007), it remains the case that "the Commission fills an important institutional role:    It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'"    *Id.* at 574 (*quoting United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)).    The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"    *Kimbrough*, 552 U.S. at 89 (*quoting Rita v. United States*, 551 U.S. 338, 350 (2007)).    As one member of this Court has held, "*Booker* requires judges to engage in a two-step analysis to determine a reasonable sentence."    *United States v. Doe*, 412 F. Supp.2d 87, 90 (D.D.C. 2006) (Bates, J.).

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines.    Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing sentence.

*United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

When weighing the § 3553(a) factors as part of its determination of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives — that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care.    *See* 18 U.S.C. § 3553(a)(1) and (2).    In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    18 U.S.C. § 3553(a)(6).

The entire sentence imposed should be based on these factors.  *See, e.g., United States v. Townsend*, 178 F.3d 558, 567 (D.C. Cir. 1999) ("sentences on multiple counts may comprise a 'sentencing package'"); *Greenlaw v. United States*, 554 U.S. 237, 253 (2008) (recognizing the practice of "sentencing packag[ing]" in cases with multiple counts of conviction).  Here, as discussed above, the Firearms Count carries a 30-year mandatory minimum sentence that must run consecutive to the sentence the Court imposes on any of the underlying crime-of-violence counts.  There is no Guidelines range for the Firearms Count.  Accordingly, this Court should start by calculating the appropriate Guidelines range for defendants Slough, Liberty, and Heard for their crimes of violence (*i.e.,* the Manslaughter and Attempt to Commit Manslaughter offenses) and then apply the § 3553(a) factors to determine an appropriate total sentencing package for each defendant.

**VII.    Guidelines Analysis.**

As set forth below, defendants Slough, Liberty, and Heard have an Offense Level of 34 for their crimes of violence, which corresponds to a sentencing range of 151-188 months.  Also, as set forth below, the government requests that the Court depart upward from that sentencing range for each defendant to appropriately account for each victim of their crimes.

**A.    Guidelines Calculation.**

Defendants Slough, Liberty, and Heard were each found guilty of multiple counts of Voluntary Manslaughter and Attempt to Commit Manslaughter.   The U.S. Sentencing Guidelines provide that a "combined" offense level should be calculated for each defendant based on the guilty counts as to each.   Pursuant to U.S.S.G. § 3D1.2(a), the offenses should not be "grouped" as "closely related counts" because although the counts all occurred during the same shooting,

each count relates to a distinct victim.   *See* U.S.S.G. § 3D1.2(a), Commentary n.8. ("Cases involving injury to distinct victims are sufficiently comparable, whether or not the injuries are inflicted in distinct transactions, so that each such count should be treated separately rather than grouped together.")   Therefore, each count for each victim represents its own "group."

Pursuant to U.S.S.G. § 3D1.4(a), the first count of Voluntary Manslaughter as to defendants Slough, Liberty, and Heard has the highest offense level of 29 and constitutes the first unit.   For each additional count of Voluntary Manslaughter involving an independent victim, that count constitutes its own "group" and qualifies as one additional unit.   For each count of Attempt to Commit Manslaughter involving an independent victim, that count also constitutes its own "group" and may qualify as an additional one-half unit depending on the extent of the injury.[8] Where additional counts of Voluntary Manslaughter and Attempt to Commit Manslaughter involving different victims result in a combined total in excess of 5 units, section 3D1.4(a) provides that the most that can be added to the initial offense level of 29 is 5 levels, or a combined offense level of 34.   Because defendants Slough, Liberty, and Heard were each convicted of at least 5 additional counts of Voluntary Manslaughter involving different victims, each has a combined offense level of 34.[9]   Each has a Criminal History Score of zero.

---

[8]       Pursuant to U.S.S.G. § 2A2.2(a), the base offense level for Attempted Manslaughter begins at 14.   *See* Commentary, n.4 ("This guideline also covers attempted manslaughter and assault with intent to commit manslaughter.")   However, pursuant to §§ 2A2.2(b)(2) and 2A2.2(b)(3)(B), the base offense level is increased by another 3-7 levels depending on the degree of bodily injury sustained by the victim.   *See* "Victims Chart" attached a Tab E (describing the severity of each victim's injuries and the corresponding level increase).   As to a number of victims, the level could be increased by 7 points because the victim suffered "permanent or life-threatening bodily injury."   *See* § 2A2.2(b)(3)(C).   The adjusted offense level for each such Attempted Manslaughter count is 21 and qualifies as one-half unit under section 3D1.4(b) because it is its own group and is 5 to 8 levels less than the highest offense level for the lead count of Voluntary Manslaughter, or 29.

[9]       None of the defendants receive any reduction in their combined offense level for acceptance of responsibility.

B.     **In light of the gravity of the crimes committed by defendants Slough, Liberty, and Heard, and the adverse impact of those crimes on our national security, the government requests that the Court depart upward from the calculated Guidelines sentencing range.**

The Guidelines for the Voluntary Manslaughter and Attempt to Commit Manslaughter counts do not adequately address the enormity and scope of the defendants' criminal conduct. We, therefore, ask that the Court depart upward from the otherwise applicable Guidelines sentence for defendants Slough, Liberty, and Heard.[10]   Our request is based on two factors.  First, the Guidelines fail to account for the extraordinary number of homicides and attempted homicides committed by the defendants.   Second, the defendants' actions significantly endangered our national security.

1.     **An upward departure is necessary because the Guidelines' calculation does not adequately account for the extent of the harm caused by the defendants.**

The Guidelines provide for an upward departure where, as here, the case involves an aggravating factor "to a degree, not adequately taken into consideration" by the Guidelines. U.S.S.G. § 5K2.0(a).   As the Guidelines explain further:

> Departures Based on Circumstances Present to a Degree not Adequately Taken into Consideration. – A departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense.

U.S.S.G. § 5K2.0(a)(3).   While the number of victims is "taken into consideration" by the applicable Guideline (U.S.S.G. § 3D1.4), in this case, the number of victims killed and wounded by the defendants "is present in the offense to a degree substantially in excess of . . . that which ordinarily is involved in [this] kind of offense."   U.S.S.G. § 5K2.0(a)(3).   The criminal conduct

---

[10]     Because federal law requires defendant Slatten to be sentenced to life imprisonment, this request does not apply to him.

committed by the defendants is so exceptional that the Guidelines fail to account for the number of the defendants' victims in two ways.

First, because each count of conviction relates to a separate victim, the counts do not group under Chapter 3 of the Guidelines.  The applicable guideline for determining the increase to a defendant's offense level to account for non-grouping counts is U.S.S.G. § 3D1.4.  Pursuant to § 3D1.4, the defendants have the following total number of units for the victims attributable to them: defendant Slough – 15.5, defendant Liberty – 9.5, and defendant Heard – 7.5.  The applicable guideline, however, provides for a maximum of 5 units and a corresponding 5-level increase to the defendants' offense level.  Accordingly, the Guidelines do not adequately reflect the gravity of the defendants' crimes.

The Guidelines commentary recognizes this:  "Inasmuch as the maximum increase provided in the guideline is 5 levels, departure would be warranted in the unusual case where the additional offenses resulted in a total of significantly more than 5 units."  U.S.S.G. § 3D1.4, Background; *see also* Manslaughter Working Group Report to the Sentencing Commission, Dec. 15, 1997, at 11 ("'[o]ffenses resulting in multiple deaths appear to raise a concern vis-`a-vis the Guidelines' multiple count rules'"); *United States v. Lente*, 759 F3d 1149, 1154 (10th Cir. 2014) (affirming upward departure in an involuntary manslaughter case where, "the district court concluded that the Guidelines did not adequately account for the multiple fatalities involved in the crash, describing this as perhaps the most important factor in its decision to vary upward."). Additionally, upward departures based on the number of victims have also been imposed in a number of other contexts.  *See, e.g., United States v. Menzer*, 29 F.3d 1223, 1234-35 (7th Cir. 1994) (affirming upward departure in arson case, where "the Guidelines base level of thirty-three

failed to take into consideration multiple deaths"); *United States v. Calloway*, 116 F.3d 1129, 1136 (6th Cir. 1997) (aircraft piracy case); *United States v. Munoz-Tello*, 531 F.3d 1174, 1188 (10th Cir. 2008) (alien smuggling case); *United States v. Fei*, 225 F.3d 167, 172 (2nd Cir. 2000) (alien smuggling case).

Second, the defendants' offense level does not account for many of their victims because a number of the attempted manslaughter groups are 9 or more levels less than the group with the highest offense level, which is manslaughter with an offense level of 29.  *See* U.S.S.G. § 3D1.4(c).  Specifically, pursuant to U.S.S.G. § 3D1.4(c), defendant Slough's offense level does not account for 12 attempted manslaughter victims (or 6 units); defendant Liberty's offense level does not account for 9 attempted manslaughter victims (or 4.5 units); and defendant Heard's offense level does not account for 8 attempted manslaughter victims (or 4 units).   If these victims were each accounted for with half a unit, defendant Slough would have 21.5 units, defendant Liberty would have 14 units, and defendant Heard would have 11.5 units.  The defendants' adjusted base offense level, therefore, does not adequately reflect the gravity of their crimes – the true level of carnage that they visited upon the unarmed civilians of Nisur Square.

The Guidelines commentary recognizes this as well:

> In unusual circumstances, the approach adopted in this section could produce adjustments for the additional counts that are inadequate or excessive. If there are several groups and the most serious offense is considerably more serious than all of the others, there will be no increase in the offense level resulting from the additional counts.  Ordinarily, the court will have latitude to impose added punishment by sentencing toward the upper end of the range authorized for the most serious offense.  Situations in which there will be inadequate scope for ensuring appropriate additional punishment for the additional crimes are likely to be unusual and can be handled by departure from the guidelines.

U.S.S.G. § 3D1.4 Background.   The court addressed this situation in *United States v. Brown*, 287 F.3d 684 (8th Cir. 2002).

In *Brown*, the defendant was convicted of one count of assault resulting in serious bodily injury and three counts of assault resulting in serious bodily injury to a child.   *Id.* at 684. Pursuant to U.S.S.G. § 3D1.4(c), the latter three convictions were disregarded from the calculation of his offense level.   *Id.* at 688.   Accordingly, the district court departed upward, and the Eighth Circuit upheld the departure:   "We could not agree more with the sentiment of the district court. The operation of guideline § 3D1.4 entirely withdrew from the combined offense level computation three separate counts of assault to a defenseless toddler."   *Id.* at 689.   As opposed to withdrawing three separate counts from the calculation, here the operation of § 3D1.4, ignores defendant Slough's convictions for 12 counts, defendant Liberty's convictions for 9 counts, and defendant Heard's convictions for 8 counts.   All of these counts involved the wounding of defenseless Iraqi civilians.   Significantly, these were not minor wounds inflicted with fists or clubs.   Instead, the vast majority were major wounds inflicted by large-caliber, high-velocity, military-grade rifles, machine guns and explosives.[11]

## 2.   The Court should also depart upward because the defendants' actions significantly endangered our national security.

The Guidelines also provide for an upward departure where, as here, "national security, public health, or safety was significantly endangered" by the offense. U.S.S.G. § 5K2.14. "Generally, the conduct must have posed a threat 'substantially in excess of that ordinarily

---

[11]        Furthermore, we note that U.S.S.G. § 3D1.4 does not adequately reflect the gravity of the defendants' crimes, notwithstanding their convictions for violating 18 U.S.C. § 924(c)(1)(B)(ii).   Our departure request is aimed to address the inadequacy of § 3D1.4 in addressing mass casualty crimes such as the Nisur Square shooting, and the § 924(c) convictions are not relevant to this.   Here, defendants Slough, Liberty, and Heard violated § 924(c) once they fired machine guns and launched grenades at the white Kia, killing Dr. Al-Khazali – before they had caused mass causalities.   If the drafters of the guidelines had intended to make upward departures unavailable when there is a 30-year mandatory minimum for a § 924(c) conviction, that would have been made clear in the application notes.

involved in the offense.' [citation omitted] In determining whether it did so, the district court may consider 'all pertinent facts and circumstances. [citation omitted].'"   *United States v. Romero*, 239 Fed. Appx. 547, 549 (11th Cir. 2007).

Here, the defendants' massacre of unarmed Iraqis in broad daylight on a busy street in Baghdad inflamed anti-American passions in Iraq.[12]   Their actions were particularly harmful to the safety and well-being of our armed forces in Iraq.   As Col. (Ret.) David Boslego, one of the first Americans to arrive at the scene of the massacre, explained, "[I]t made our relationship with the Iraqis in general more strained . . . in general *the populous viewed us as an enemy more so than they had done before the incident*."   8/13/14 AM 69 (emphasis added).   Other American military leaders have echoed Col. Boslego's assessment of the negative impact of the Nisur Square shooting:

> "The military is very sensitive to its relationship that they've built with the Iraqis being altered or even severely degraded by actions such as this event, [Nisur Square shooting]" the official said.   "This is a nightmare," said a senior U.S. military official.   "We had guys who saw the aftermath, and it was very bad.   *This is going to hurt us badly.   It may be worse than Abu Ghraib*, and it comes at a time when we're trying to have an impact for the long term."

S. Raghavan & T. Ricks, *Private Security Puts Diplomats, Military at Odds*, Washington Post, September 26, 2007 (emphasis added).[13]

> "It was absolutely tragic," said Maj. Gen. Joseph Fil, commander of the 1st Cavalry Division and the Army's top commander for Baghdad.   "In the aftermath of this, everybody looks and says, "It's the Americans.' And that's us.   It's horrible timing.   It's yet another challenge, another setback," he said.

---

[12]      *See, e.g.*, "The bloody incident at Baghdad's Nisoor Square sparked widespread outrage in Iraq over what many considered trigger-happy American security guards who shot at civilians with impunity and no fear of consequences."   (http:// abcnews.go.com/ Blotter/FedCrimes/story?id=6396208); "A new jury indictment charges the men in a shooting that inflamed anti-American sentiment in Iraq and heightened diplomatic sensitivities amid an ongoing war." (http://www.usatoday. com/story/news/nation/2013/10/17/blackwater/3004319/).

[13]      http://www.washingtonpost.com/wp-dyn/content/article/2007/09/25/AR2007092502675.

S. Raghavan & J. White, *Blackwater Guards Fired at Fleeing Cars, Soldiers Say*, Washington Post, Oct. 12, 2007.[14]   One commentator summed it up this way:   "There are American men and women in uniform that were sent home in body bags because of the anger and hatred this created."[15]

In sum, the Nisur Square shooting substantially endangered our national security.   It fanned the flames of anti-American sentiment in Iraq and increased the risks to our armed forces stationed there.   Accordingly, the Court should apply an upward departure to the Guidelines range for each defendant.

**3.      Requested Upward Departure.**

As set forth above, the defendants' crimes have adversely affected our national security (U.S.S.G. § 5K2.14), their adjusted offense levels do not reflect all of the units for which they are responsible (U.S.S.G. § 3D1.4), and a number of the defendants' victims are not even included in the Guidelines calculation (U.S.S.G. § 3D1.4(c)).   In order to calculate the amount of an appropriate departure, we propose that the Court start with the last factor.   Namely, if each of the defendants' victims were properly accounted for, defendant Slough would have 21.5 units (or 16.5 units over the maximum number of units that is considered by the Guidelines); defendant Liberty would have 14 units (or 9 units over the maximum number of units that is considered by the Guidelines); and defendant Heard would have 11.5 units (or 6.5 units over the maximum number of units that is considered by U.S.S.G. § 3D1.4).

---

[14]      http://www.washingtonpost.com/wp-dyn/content/article/2007/10/11/AR2007101101030.

[15]      Anthony H. Cordesman, Arleigh A. Burke Chair in Strategy, Center for Strategic and International Studies (http://abcnews.go.com/WN/vice-president-joe-biden-us-appeal-blackwater-ruling/story?id=9645950studies).

Section 3D1.4 provides for a one-level increase in the base offense level for each unit to a maximum of 5 units.   Recognizing that an upward departure accounting for units in excess of 5 should not necessarily be a direct extrapolation, we recommend increasing the base offense level by approximately one-third of each defendant's total excess units, as set forth in the table below.

| Defendant | Estimated Range | Excess Units | Levels of Departure/ New Offense Level | Recommended Range |
|-----------|-----------------|--------------|----------------------------------------|-------------------|
| Slough | 151-188 | 16.5 | 5/39 | 262-327 |
| Liberty | 151-188 | 9 | 3/37 | 210-262 |
| Heard | 151-188 | 6.5 | 2/36 | 188-235 |

Specifically, we request the following upward departures (all to be applied consecutive to the mandatory 30-year sentences on the Firearms Count):   (1) defendant Slough – an upward departure of 136 months, from 188 months to 324 months; (2) defendant Liberty – an upward departure of 64 months, from 188 to 252 months; and (3) defendant Heard – an upward departure of 16 months, from 188 months to 204 months.    These requests are based on the following factors. First, with respect to defendant Slough, we ask that the Court depart upward to 324 months, near the top of his recommended Guidelines range, to account for the sheer number of individuals that he killed and maimed in Nisur Square and because he continued shooting innocent victims in virtually every sector of the circle – south, west, and north.   Second, with respect to defendant Liberty, we ask that the Court depart upward to 252 months, near the top of his recommended Guidelines range, to account for the large number of individuals that he killed and maimed and also to address his history of reckless indifference to Iraqi lives.[16]   Last, with respect to defendant

---

[16]        As to defendants Slough and Liberty at least, the evidence at trial also established that even before September 16, 2007, they fired their deadly weapons recklessly and in a manner exhibiting an extreme indifference to the severe damage they could cause, including the loss of human life.

Heard, we ask that the Court depart upward to 204 months, in the middle of his recommended Guidelines range.   This request balances the gravity of defendant Heard's crime with the fact that he ceased shooting when the convoy left Nisur Square and has no history of prior misconduct.

**VII.    An Analysis of the Factors Enunciated in 18 U.S.C. § 3553(a) Demands the Imposition of Substantial Prison Terms for Each of the Defendants.**

The § 3553(a) factors are addressed below.   Analyzing these factors demonstrates that the requested sentencing packages are reasonable and appropriate:   (1) defendant Slough – 57 years (684 months); (2) defendant Liberty – 51 years (612 months); and (3) defendant Heard – 47 years (564 months).   Because of the great number of victims, these requested sentencing packages amount to a sentence of between 23 and 32 months per victim for each defendant.[17]

**A.    The nature and circumstances of the offenses.**

On September 16, 2007, the defendants indiscriminately shed the blood of 31 innocent civilians.   Fourteen of those civilians died; many more were seriously injured.   Those civilians who managed to avoid the barrage of bullets and grenades entirely were just lucky to escape death or injury.   None of the survivors, however, escaped the terror of the event or, in many cases, the devastation of losing a father, mother, brother, sister, close relative, or friend.   In combination, the sheer amount of unnecessary human loss and suffering attributable to the defendants' criminal conduct on September 16, 2007, is staggering.   This factor alone – the enormity of the defendants' crimes – outweighs the other § 3553(a) factors.

In killing and maiming unarmed civilians, the defendants acted unreasonably and without justification.   Nisur Square, while located in a dangerous city and country, did not pose an

---

[17]        Collectively, excluding the effect of the mandatory minimum sentence on the Firearms Count, even with these upward departures, due to the large number of victims in this case, the defendants would be sentenced on the manslaughter and attempted manslaughter counts to approximately 12 months per victim.

imminent danger to the defendants around noon on September 16, 2007.   None of the members of Raven 23 team members were in actual danger while there that day, and the defendants did not reasonably believe that they were.   Nonetheless, the defendants ignored their training and unleashed their deadly weapons on unsuspecting and non-threatening civilians simply going about their daily lives.

Despite the substantial trial evidence of their wrongdoing and the jury's resulting guilty verdicts, the defendants do not accept responsibility for their actions.   Instead, they defiantly maintain to this day that they did nothing wrong on September 16, 2007.   Multiple "insurgents" were shooting at us, they say.   Our convoy was "under attack" from all directions, they say.   We just "did our jobs," they say.   In finding defendant Slatten guilty of the first degree, premeditated murder of Ahmed Al Rubia'y and in returning guilty verdicts on all counts against defendants Slough and Liberty and nearly all counts against defendant Heard, however, the jury clearly rejected the defendants' self-serving version of events.[18]   Consistent with the jury's verdicts, this Court should reject that false narrative as well.

At trial and in their victim impact statements, the victims describe the absolute horror of

---

[18]      Publically, and in their court filings since the inception of this case, the defendants have routinely overstated and mischaracterized the purported "evidence" they claim establishes that the Raven 23 convoy received incoming gunfire.   In doing so, they conveniently ignore the overall evidence presented at trial and its import in light of the jury's verdicts.   Significantly, not a single trial witness testified that he or she saw anyone shooting at the convoy.   At trial, eight members of Raven 23, five Blackwater helicopter personnel, and 22 Iraqi witnesses who were in or above Nisur Square during the shooting testified.   No one testified to seeing anyone shooting at the convoy.   While two Raven 23 team members testified to hearing what they believed to be AK-47 gunfire – unsurprising since an Iraqi soldier admitted firing his AK-47 into the air to warn others not to enter the scene of mayhem – and several Raven 23 team members later observed what they believed to be bullet strike marks on the Command Vehicle and the Follow Vehicle, this evidence failed to establish that the Raven 23 convoy received incoming gunfire that day.   Indeed, the trial evidence proved that the damage to the Command Vehicle that day was caused by shrapnel from one or more of the defendants' or Watson's own M-203 grenade rounds detonating too close to the vehicle.   *See supra* note 5.   In any event, even had the jury found, as a factual matter, that Raven 23 received some incoming fire, it would not have mattered.   By returning its guilty verdicts, the jury concluded that the defendants acted unreasonably under all the circumstances and were criminally responsible for indiscriminately firing their deadly weapons and killing and maiming numerous innocent Iraqi civilians.

September 16, 2007, and the unending loss and pain it has caused them.  *See* Victim Impact

Statements (VISs), attached at Tab F.   In their words:

> How do you feel when you are approaching the site of your burned vehicle where your love[d] ones spent their last ominous moments breathing smoke and blood? How do you feel when you are going to see your love[d] ones face to face in the morgue and find them decapitated and totally charred, and one can hardly identify their features.
>
>> (VIS of Dr. Haithem Al Rubia'y, husband and father to slain victims Dr. Mahassin Al-Khazali (Ct. 2) and Ahmed Al Rubia'y (Ct. 1), occupying white Kia south of the circle)
>
> How would you feel when you know your mother was meant to face her son's death alone, watching her son being slaughtered so crudely so brutally, seeing her little baby dead in her arms??  How would you feel when you know your mom was slaughtered the same Barbaric way???  What would you like the murderers to be judged when you know they didn't have enough by killing your mom and brother, the murderers burned the bodies!!  Exploded their car!!  How would you feel when you can't identify your own mom and brother['s] bodies????
>
>> (VIS of Ms. Haithem Ahmed, daughter and sister to slain victims Dr. Mahassin Al-Khazali (Ct. 2) and Ahmed Al Rubia'y (Ct. 1), occupying white Kia south of the circle)
>
> I was shot by the American Blackwater company in Iraq on September, 17th, [*sic*] 2007.  I had injuries all over my body because of this criminal incident (attack), and it has affected my health and made me feel helpless, fearful and frightened, lost trust in others, frustrated, and unsecured.   It also has affected my family, especially after this incident (attack), where many innocent people were killed and attacked.
>
>> (VIS of Hassan Jaber Salman (Ct. 19), injured victim fleeing in car south of circle)
>
> This incident had a negative impact on me, psychologically more than financially. If the judge wants to know what was the cost of this incident to compensate us, unfortunately the damages were psychological ones and they are priceless (uncompensatable).   Can you help me keep these nightmares away from me? Can you help me stop hearing the voice of victims, who I've helped?   Whenever I ride my motorcycle, I still fear that something is going to happen again. I still remember it as if it has happened now.   I became almost crazy and my family has suggested for me to see a psychiatrist.
>
>> (VIS of Husam Abdul Rahman Khadim, motorcycle police officer

and friend of slain victim Mahdi Sahib Nasir (Ct. 13) west of the circle)

I was not cross-examined by the defense attorney but seeing the criminals, the killers, was the most difficult period in my life.

(VIS of Afrah Sattar Ghafil Al-Kaabi, daughter of slain victim Ghaniyah Hassan Ali (Ct. 9), occupying red Tata bus west of the circle)

After the incident (attack), I've stayed at home for more than a year and haven't gone to work.   I have spent all the money that I have on my medical treatment and my family that consists of my wife, two children, and my elderly mother.   I have a psychological complex of going outside to the street because it was proved that it's not safe. I still have a fragment in my right foot, suffer from nightmares about the incident, which I can't forget, and feeling of uselessness for not being ability to get a job to help my family.

(VIS of Majed Salman Abdel Kareem Al-Gharbawi (Ct. 15), injured victim and friend to slain victim Osama Fadhil Abbas (Ct. 3), driver of white VW truck south of the circle)

I was injured in an incident (attack) by Blackwater in Nisur square in Baghdad on September 16th, 2007.   I was shot in my head and severely injured, which caused a damage in the skull, on the right side of my forehead.   A surgery had been done to the brain, skull was opened and the membranes (meningitis) in my brain were replaced.   This has led to the current complications that I am having now, which are the continuous epileptic seizures, the continuous headaches, and dizziness. According to the medical reports, more complications might happen in the future.

(VIS of Jassim Mohammad Hashim (Ct. 30), injured victim walking west of circle)

At the time when this crime and the shooting by members of this company happened, I went through a period of panic and fear because I have never been in such a situation in my whole life before, and I have not seen such an ugly crime like this one where innocent people are shot randomly and killed. I have lived very difficult moments during that time, and until now whenever I pass by that area, I remember that ugly crime and I don't think that I will ever forget that scene in my life.

(VIS of Haydar Ahmad Rabie Hussain Al-Khafaji (Ct. 10), injured victim occupying Black Concorde taxi south of circle)

This incident has affected me and my family especially directly, and there was

feelings of helplessness, anger, disappointment, fear, frustration, and loss of confidence.   Psychologically, I've become sick with chronic high blood pressure. As for my family, they have been directly affected, especially on my youngest son. He has become sick with chronic diabetes, because of his fears when he saw me in front him unconscious with injuries and blood covering my body in the hospital. Also, my mother when she witnessed the event, she was scared and frightened. Due to that, she was hospitalized, and after short time from that, she passed away as a reason for seeing that incident.

> (VIS of Sami Hawa Hamud Al-Sabahin (Ct. 32), injured victim occupying white Opel Omega north of circle)

Beyond question, the nature and circumstances of the offenses establish the depravity of each of the defendants' conduct and the dire consequences of that conduct.   Consistent with the jury's verdicts, each defendant must be held accountable for each of the victims the jury attributed to his criminal conduct.   In light of this, the Court should sentence defendant Slough to a longer prison term than defendants Liberty and Heard because the jury decided that he was responsible for more deaths and injuries.   By their verdicts, the jury found that even after Raven 23 had begun departing the traffic circle (and defendants Liberty and Heard had stopped firing their weapons), defendant Slough continued to fire his M-240 machine gun at unarmed civilians.   In doing so, defendant Slough caused the deaths and injury of nine additional victims to the west of the circle and injury of two additional victims well north of the circle.   His sentence should therefore reflect the more expansive scope of his criminal conduct and these independent victims.   In observance of the jury's partial verdicts as to defendant Heard, the government also submits that the Court should sentence him to a lesser prison term than defendant Liberty.

**B.   The History and Characteristics of the Offenders.**

The defendants' personal histories and family situations do not present unique circumstances such that they should significantly impact their sentences.

1.      **Slough.**      Defendant Slough appears to be capable and industrious.   His educational background and pursuits, as well as his vocational training and work history, exhibit a strong work ethic.   Since September 16, 2007, he has apparently maintained meaningful employment as a ranch hand and developed his own business.   Prior to committing the crimes in this matter, he served in the United States Army and Texas National Guard and was honorably discharged.   He served overseas and has a relatively distinguished service record.   After serving in the military, he joined Blackwater as a security contractor in 2005.   The government is unaware at this time, however, of anything in his background that suggests that his contributions in the military or to his community once discharged from the military were extraordinary.

Defendant Slough is married and has a young child.   His incarceration will no doubt be a hardship to his family.   The government has sympathy for them.   There is, however, nothing that indicates that the burden on defendant Slough's family will be any different from the burden that the families of other incarcerated violent crime offenders must bear.

2.      **Liberty.**   Defendant Liberty's educational background indicates that he is an intelligent individual.   Other than his prior military service, his work history is unremarkable. After serving in the United States Marine Corps from July 2000 through November 2004, he was honorably discharged.   He served overseas, albeit not in combat, and has a notable service record. After serving in the military, he joined Blackwater as a security contractor in 2004.   The government is unaware at this time, however, of anything in his background that suggests that his contributions in the military or to his community once discharged from the military were extraordinary.

Defendant Liberty is married.   His incarceration will no doubt be difficult for his wife and

his family.   The government has sympathy for them.   There is, however, nothing that indicates that the burden on defendant Liberty's family will be any different from the burden that the families of other incarcerated violent crime offenders must bear.

        **3.**      **Heard.**   Defendant Heard graduated from high school and joined the United States Marine Corps approximately a year later.   Other than his prior military service and work with Blackwater, his work history is unremarkable.   After serving in the United States Marine Corps from October 2000 through October 2004, he was honorably discharged.   He deployed overseas on multiple occasions, and has a noteworthy service record.   After serving in the military, he joined Blackwater as a security contractor in 2004.   The government is unaware at this time, however, of anything in his background that suggests that his contributions in the military or to his community once discharged from the military were extraordinary.

        Defendant Heard is married and has two young children.   His incarceration will adversely impact his family both emotionally and financially.   The government has sympathy for them. There is, however, nothing that indicates that the burden on defendant Heard's family will be significantly different from the burden that the families of other incarcerated violent crime offenders must bear.

        **4.**      **The Defendants' Post Traumatic Stress Disorder ("PTSD").**   Each of the defendants served in the military prior to September 16, 2007.   Each now claims to be suffering from PTSD.   However, it was only after the Nisur Square shooting that any of the defendants sought and obtained a diagnosis for PTSD.   In fact, in their applications to become Blackwater contractors, none of the defendants indicated that they suffered from PTSD.

        Defendant Heard was diagnosed with PTSD in late 2008, but he reports that he exhibited

symptoms of a "mental health condition" while serving in the USMC and after being discharged. After being diagnosed with PTSD, defendant Heard reports that he sought and obtained regular counseling through the military.

Defendant Slough was diagnosed with PTSD in 2008 and reports that his diagnosis was related to his experiences in the military and as a contractor with Blackwater.   He did not report a particular treatment regimen for his PTSD.

Defendant Liberty was diagnosed with PTSD in 2013.   He reports that while his PTSD is not a product of his prior military service because he did not experience combat while serving, this PTSD does relate to his experiences in Iraq as a contractor, including the shooting incident on September 16, 2007.   He reports that he participated in a few therapy sessions for his PTSD, but otherwise reports no notable treatment.

The defendants' PTSD does not, however, provide a basis for a downward departure. Such a departure may be appropriate if the defendant (1) was suffering from the mental condition when he committed the offense, and (2) the mental condition "contributed substantially to the commission of the offense."   U.S.S.G. §5K2.13.   Here, there is no evidence that any of the defendants suffered from PTSD at the time they committed offenses for which they have been convicted.   More importantly, the defendants do not claim that PTSD "contributed substantially" to their commission of the offense.   On the contrary, they insist that they committed no crime at all.[19]

---

[19]      The government acknowledges that many military service members deploy overseas to dangerous locations in service of their country and experience PTSD symptoms while deployed or after returning home, or both.   PTSD is a serious mental health issue for our military veterans and demands appropriate attention and treatment. Accordingly, we request that the Court order that the defendants be accorded proper treatment for their PTSD, while incarcerated.

**C.     The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public.**

Imposing substantial prison terms in this case is absolutely necessary to promote respect for the law, provide just punishment, and afford adequate deterrence.  Standing alone, the violence the defendants wrought was reprehensible and warrants significant prison terms. Additionally, by imposing substantial prison sentences, the Court will also send the appropriate message to others who are entrusted with the appropriate use of deadly weapons in furtherance of their employment:   namely, fire them only when necessary and always with due regard for the fatal and injurious consequences that will likely result.

Moreover, the Court's sentences in this case, unlike in many other cases, will send the appropriate signal to the international community.   Since September 16, 2007, the world has been watching.  It has been watching to see if the United States would honestly and aggressively pursue "justice for all" in this mater or simply allow the matter to fade away for the benefit of the Americans accused of perpetrating the shooting of innocent Iraqis in Iraq.   Utilizing the American criminal justice system and all the due process that it entails, the United States showed the world that it was committed to finding and exposing the truth of what occurred in Nisur Square on September 16, 2007.   The United States showed that it was dedicated to that truth, even if it meant holding its own citizens accountable for criminal conduct committed far beyond its borders against citizens of a foreign land.   As one of the victims of the shooting so aptly declared:   "The position that the prosecutor took along with the others [who worked with him] showed that justice knows no nationality.   The proof is the criminal was American and the person defending our rights was American also."   (VIS of Haydar Sattar Ghafel Al Kaabi, son of slain victim Ghaniyah Hassan Ali (Ct. 9).)

-37-

Another victim expressed his gratitude for our criminal justice system this way: "I would like to thank the jurors, who were regular people from public for their reaction with us when testimony was given in your decent court, and for their opinions and inputs.  Additionally, I would like to thank his Excellent, Judge Royce C. Lamberth for achieving justice in the United States of America, the land of justice and freedom."   (VIS of Abdulwahab Abdulkader Abdulwahab, victim injured by Ridgeway north of circle.)   This Court, by recognizing the jury's considered verdicts and sentencing the defendants accordingly, would further illustrate this Nation's unwavering dedication to the rule of law, even as applied to American citizens, and thereby promote respect for the law, provide just punishment, and afford adequate deterrence.

**D.      The Need to Provide the Defendant with Educational or**
**         Vocational Training.**

The defendants do not appear to need such training.   In any event, the other factors bearing on the seriousness of the offenses and the need for strong deterrence outweigh this element in fashioning a just sentence.

**E.      The Need to Avoid Unwarranted Sentence Disparities Among Defendants with**
**         Similar Records Who Have Been Found Guilty of Similar Conduct.**

This is a unique case.   The government has been unable to identify any prior cases that are even somewhat comparable in terms of the defendants' overall criminal conduct and the sheer quantity of killed or injured victims.  *But cf*. Jack Healy, *New York Times*, Aug. 23, 2013 (U.S. Army sergeant sentenced to life imprisonment after pleading guilty to killing 16 Afghan civilians). The vast majority of reported federal voluntary and involuntary manslaughter cases involve the death of a single victim.   In those cases, sentencing courts have generally imposed prison terms ranging from several years to 15 years.   *See, e.g., United States v. Lozoya*, 623 F.3d 624, 627 (8th

Cir. 2010) (180-month sentence for voluntary manslaughter conviction arising from prisoners' jail cell beating death of new inmate); *United States v. Tolen*, 372 Fed. Appx. 658, 660-61 (7th Cir. 2010) (180-month sentence for voluntary manslaughter conviction with 2-level obstruction of justice sentencing enhancement arising from inmate's pummeling death of another inmate); *United States v. Cherry*, 572 F.3d 829, 831-32 (10th Cir. 2009) (in context of 18 U.S.C. § 922(g) conviction involving possession of firearm by a prior felon during a gunfight resulting in a death, applying voluntary manslaughter guidelines and imposing 94-month sentence); *United States v. Teeple*, 252 Fed. Appx. 726, 730-31 (6th Cir. 2007) (96-month sentence for voluntary manslaughter conviction arising from stabbing death); *United States v. Chase*, 451 F.3d 474, 484-85 (8th Cir. 2006) (96-month sentence for voluntary manslaughter conviction arising from stabbing death); *United States v. Kupfer*, 68 Fed.Appx. 927 (10th Cir. 2003) (in context of 26 U.S.C. § 5861(d) conviction for possession of unregistered firearm that was used in homicide, applying voluntary manslaughter guideline and imposing 46-month sentence); *United States v. Iron Cloud*, 312 F.3d 379, 381-82 (8th Cir. 2002) (110-month sentence for voluntary manslaughter conviction arising from drowning); *see also, e.g., United States v. Branch*, 91 F.3d 699 (5th Cir. 1996) (10-year sentences for each of several defendants convicted of aiding and abetting voluntary manslaughter in causing the deaths of four federal agents during standoff at compound); *United States v. Crowe*, 563 F.3d 969, 977-78 (9th Cir. 2009) (30-month sentence for involuntary manslaughter conviction arising from defendant's single stab death blow to assaulting husband); *United States v. Cliatt*, 338 F.3d 1089 (9th Cir. 2003) (41-month sentence for attempted manslaughter conviction arising from defendant's stabbing of wife with kitchen knife).[20]

---

[20]        The incidents cited by defendant Slough [Dkt. #735 at 46-47] are inapposite.  In the first example, he explains that "[m]ilitary authorities determined that the Marines acted appropriately," while in this case the jury determined that the defendants acted *criminally*.  In his second example, the Haditha matter, there was an acquittal

The sheer volume of dead and injured victims in this case sets it apart from the rest. Each of the defendants was found responsible for killing and injuring numerous victims. Consistent with the jury's verdicts, the Court can and should impose a sentence on each defendant that will properly account for and acknowledge every single victim attributed to the defendants' criminal conduct.

## IX.    Restitution.

Under the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, a crime victim has the "right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6). The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, requires the sentencing court to order restitution to the victims of defendants who are convicted of certain enumerated crimes. *See* 18 U.S.C. § 3663A(a)(1). In particular, the MVRA makes restitution a mandatory part of the sentence for a defendant convicted of a crime of violence as defined in 18 U.S.C. § 16, in which an identifiable victim or victims has suffered a physical injury or pecuniary loss. 18 U.S.C. § 3663A(c)(1)(A).

Here, the crimes of First Degree Murder, Voluntary Manslaughter, and Attempt to Commit Manslaughter are "crimes of violence," as defined by 18 U.S.C. § 16. *Compare* 18 U.S.C. § 16(a) (providing that a "crime of violence" means "an offense that has as an element the use, attempted use, or threatened use of physical force against the person . . .") *with* 18 U.S.C. §§ 1111 and 1112 (setting forth statutory language of offenses and elements). In addition, each of the First Degree Murder, Voluntary Manslaughter, and Attempt to Commit Manslaughter counts on which the defendants were convicted relates to an identifiable victim who suffered death or physical injury, and many such victims also suffered pecuniary loss as well.

---

and several dismissals on procedural grounds; that case does not in any way undercut the enormity of the defendants' crimes here.

The MVRA requires that "[i]n each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."   18 U.S.C. § 3664(f)(1)(A). In addition, "[i]n no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution."   18 U.S.C. § 3664(f)(1)(B).   Under the MVRA, a district court considers the defendant's financial circumstances only in specifying the manner and schedule of payments.   *See* 18 U.S.C. § 3664(f)(2).   The purpose of the MVRA is, "to the extent possible, to make victims whole, to fully compensate victims for their losses, and to restore victims to their original state of well-being."   *United States v. Smith*, 297 F. Supp. 69, 72 (D.D.C. 2003) (citing *United States v. Simmonds*, 235 F.3d 826, 831 (3d Cir. 2000)).   Moreover, the MVRA instructs the district court to assess the victim's restitution based on the amount of actual loss that the defendant has caused to the victim.   *Id.* (citations omitted).   In calculating the amount, a sentencing court is not held to a standard of absolute precision.   *United States v. Innarelli*, 524 F.3d 286, 294 (1st Cir. 2008).   A "modicum of reliable evidence" will suffice. *United States v. Vaknin*, 112 F.3d 579, 587 (1st Cir. 1997).

Here, counts 1 through 24 and 26 through 32 each identify a particular victim.   Of the injured victims, Majed Salman Abdel Kareem Al-Gharbawi (Ct. 15), Haydar Ahmad Rabie Hussain Al-Khafaji (Ct. 18), Hassan Jaber Salman (Ct. 19), Jassim Mohammad Hashim (Ct. 30), and Sami Hawa Hamud Al-Sabahin (Ct. 32) have submitted victim impact statements.   In addition, family members for deceased victims Ahmed Haithem Ahmed Al Rubia'y (Ct. 1), Mahassin Mohssen Kadlum Al-Khazali (Ct. 2), Ali Mohammed Hafedh Abdul Razzaq (Ct. 4),

and Ghaniyah Hassan Ali (Ct. 9) have submitted victim impact statements.   Many of these victim impact statements contain claims for restitution.   Moreover, the government may continue to receive victim impact statements containing claims for restitution beyond the sentencing date.

As to all the named victims, pursuant to 18 U.S.C. § 3664(d)(5), the government is hereby informing the Court that it does not expect the losses to be ascertainable by the sentencing date and asks it to set a date for the final determination of the victims' losses and corresponding restitution amount, if any, by July 10, 2015 (i.e., within the 90-day statutory period after sentencing).   To the extent that the Court wishes any of the victims to provide additional corroboration for their restitution claims, the government can communicate any such requests to the victims as directed by the Court.

## X.      Conclusion.

For the foregoing reasons, the Court should sentence the defendants  as follows:  (1) defendant Slatten – life imprisonment, as required by federal law; (2) defendant Slough – 57 years (*i.e.,* 360 months on the Firearms Count plus 324 months on the crimes of violence for a total of 684 months); (3) defendant Liberty – 51 years (*i.e.,* 360 months on the Firearms Count plus 252 months on the crimes of violence for a total of 612 months); and (4) defendant Heard – 47 years

(*i.e.,* 360 months on the Firearms Count plus 204 months on the crimes of violence for a total of 564 months).

Respectfully submitted,

_____/s/_____

Gregg A. Maisel
Chief, National Security Section
D.C. Bar Number 447902
Gregg.Maisel@usdoj.gov

Jay I. Bratt
Deputy Chief, National Security Section
Illinois Bar Number 6187361
Jay.Bratt2@usdoj.gov

T. Patrick Martin
Special Assistant United States Attorney
D.C. Bar Number 471965
Thomas.Martin@usdoj.gov

Anthony Asuncion
Special Assistant United States Attorney
D.C. Bar Number 420822
Anthony.Asuncion@usdoj.gov

Christopher Kavanaugh
Special Assistant United States Attorney
VA Bar Number 73093
Christopher.Kavanaugh@usdoj.gov

John Crabb Jr.
Assistant United States Attorney
N.Y. Bar No. 2367670
John.D.Crabb@usdoj.gov

David Mudd
Assistant United States Attorney
D.C. Bar No. 995154
David.Mudd2@usdoj.gov

United States Attorney's Office
National Security Section
555 4th Street, N.W., 11th Floor
Washington, D.C. 20530
