UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>PAUL A. SLOUGH, )<br>EVAN S. LIBERTY, and )<br>DUSTIN L. HEARD, )<br>)<br>Defendants. )<br>) | Criminal No. 08-360 (RCL) |
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>NICHOLAS A. SLATTEN, )<br>)<br>Defendant. )<br>) | Criminal No. 14-107 (RCL) |

### MEMORANDUM OPINION

Before the Court are defendants' motions [765 (08-360), 659 (14-107)] for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. Upon consideration of the defendants' and the government's filings, the entire record in this case, and the applicable law, defendants' motions are DENIED.

### I. BACKGROUND

As this case has been summarized previously, *see United States v. Slough*, 677 F. Supp. 2d 112, 116–29 (D.D.C. 2009) ("*Slough I*"), *vacated*, 641 F.3d 544, 555 (D.C. Cir. 2011) ("*Slough II*"), the Court will offer only a brief outline of its factual and procedural background. Defendants were security contractors for Blackwater Worldwide ("Blackwater") in 2007, during which time Blackwater provided security services for U.S. government personnel in Iraq. *Slough I*, 677 F.

1

Supp. 2d. at 116. Defendants belonged to a Blackwater Tactical Support team—"Raven 23"—that supported other Blackwater security teams in Baghdad. *Id.* Raven 23 comprised four vehicles, with defendants Liberty, Slough, and Slatten stationed in the third vehicle as "the driver, turret gunner, and designated defensive marksman (or sniper) respectively," and defendant Heard as "the rear turret gunner in the fourth vehicle." *Id.* On September 16, 2007, defendants were called upon to establish an evacuation route for a U.S. diplomat who was being evacuated to the Green Zone; to that end, they "took up positions in Nisur Square, a traffic circle located just outside the [Green] Zone in downtown Baghdad" and attempted to stop traffic. *Slough II*, 641 F.3d at 547; *Slough I*, 667 F. Supp. 2d. at 116. In doing so, members of Raven 23 shot and killed fourteen Iraqi civilians and wounded twenty others. *Slough I*, 667 F. Supp. 2d. at 116. The government then brought this case against defendants.

At trial, the government presented the following theory: Slatten provoked the ensuing massacre by firing the first shots. Trial Tr. 8/27/14 a.m. 48–49. At least one of his bullets pierced the windshield of a white Kia sedan and struck its driver, Ahmed Haithem Ahmed Al Rubia'y, in the head, killing him instantly. *See id.*; *see also* Trial Tr. 8/27/14 a.m. 8–9. With Al Rubia'y slain, the Kia began to roll forward slowly. *See* Trial Tr. 8/27/14 a.m. 48–49. Two traffic policeman posted at the traffic circle—Sarhan Deab Abdull Monem and Ali Ghalaf Salman Mansur Al-Hamidi—approached the Kia to try to help its occupants (Al-Rubia'y and his mother, Mahassin Mohssen Kadhum Al-Khazali), with one or both of the officers gesturing to the convoy gunners to stop shooting. *See* Trial Tr. 8/27/14 a.m. 50; *see also* Trial Tr. 7/2/14 a.m. 94. Defendants ignored their pleas and continued to assail the Kia while Monem and Al-Hamidi fled, eventually destroying the car and killing Al-Khazali. *See* Trial Tr. 7/2/14 a.m. 97; *see also* Trial Tr. 8/27/14

a.m. 10. Defendants then continued to fire upon the crowded square. *See* Trial Tr. 8/27/14 a.m. 11–18.

Monem testified for the government in support of this version of events. On April 8, 2015, the government submitted Monem's Victim Impact Statement ("VIS") to defendants and this Court. Mem. Opp'n. 3, ECF No. 773 (08-360). The VIS appears to materially contradict a crucial aspect of Monem's trial testimony. On April 10, 2015, the government telephoned Monem to interview him, with the aid of a translator, about his VIS. Mem. Opp'n 10, ECF No. 773 (08-360). The only records of that interview appear to be handwritten notes taken by FBI Special Agent Marc Daniel Hess, *see* Def.'s Reply Ex. A, ECF No. 667 (14-107), which were later typed into an official FBI record, *see* Mem. Opp'n. Ex. P, ECF No. 773 (08-360). For ease of reference, the relevant text of Monem's VIS (which the government translated from Monem's handwritten statement) is as follows:

> When I saw my friends get killed and it was a foggy day, I was scared and remained in my traffic cabin unable to move nor think. I saw so much that day, I saw a mother weeping for her son, the doctor, because she felt he was going to be killed and she too was unable to move. Her son wanted to get her out of the damned car and I was not able to move to help him and I just remained looking. The mother wept and hugged her son as if to say to him no, don't go, we will be killed. The son tells her to get out of the car, that we will be killed and she hugs him and begs him not to go, and the son was killed by you and the mother was weeping confused and she was killed too. And the damned car exploded and those inside it were turned to ashes and I was watching without making a move. And on that day I learnt that life is zero and I was going to be killed without a doubt. I hid in that cabin and until this day I still hear the cries of the mother and her son. And until now I hear myself telling me that I am a coward and I am the cause of what happened. Why I did not help them, because I was helpless . . . .

Mem. Opp'n Ex. A, ECF 773 (08-360). The FBI's notes on the government's April 10, 2015 phone call with Monem discussing the VIS are also reproduced below:

3

> When asked to recount his actions involving the white Kia on September 16, 2007, [Monem] provided the following information:
>
> [Monem] approached the white Kia. When he got to the car he saw a man in the driver's seat with blood on his face and a hole in his forehead. The man was being held in a woman's arms. The woman was in the front passenger seat;
>
> The driver of the white Kia died immediately after being shot;
>
> [Monem] did not, at any time, hear the driver talking or see him moving after he was shot;
>
> [Monem] tried to help the woman get out of the car. Her window was rolled up so he signaled to her to unlock the car door;
>
> [Monem]'s colleague [Al-Hamidi] was at the driver's side door of the vehicle.
>
> [Monem] said he understood the victim impact statement to be an "expression" and not an investigative or factual statement. He explained that when he was writing his victim impact statement he was imagining what it would be like to be the driver of the vehicle.

Mem. Opp'n Ex. P, ECF 773 (08-360).

## II. LEGAL STANDARDS

A defendant who demands a new trial because of newly discovered evidence must generally satisfy five requirements:

> 1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) [it must be] of such nature that in a new trial it would probably produce an acquittal.

*United States v. Johnson*, 519 F.3d 478, 487 (D.C. Cir. 2008) (citing *Thompson v. United States*, 188 F.2d 652 (D.C. Cir. 1951)). Under *Napue v. People of State of Ill.*, 360 U.S. 264 (1959), however, due process is violated (and a new trial required) when the prosecution offers or solicits, and fails to timely correct, actually false material evidence or testimony at trial that it knew or

4

should have known was false. *See United States v. Iverson*, 637 F.2d 799, 801 (D.C. Cir. 1980) (*Iverson I*), *modified*, 648 F.2d 737 (D.C. Cir. 1981) (*Iverson II*); *see also Jackson v. Brown*, 513 F.3d 1057, 1071–72 (9th Cir. 2008). Though *Iverson I* held that a prosecutor had to correct the record "when a principal prosecution witness falsely claims that no promises of leniency were made," 637 F.2d at 801, the court did subsequently modify its decision—which dealt with a prosecutor who failed to alert the trial court and the jury to the truth when a cooperating witness falsely testified that she had not yet been sentenced—to clarify that, "absent unusual circumstances, the right of the defendant to disclosure by the prosecutor is deemed waived if defense counsel with actual knowledge of the plea agreement or sentencing status information chooses not to present such information to the jury." *See Iverson II*, 648 F.2d at 738–39; *but see United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000) ("But the government's duty to correct perjury by its witnesses is not discharged merely because defense counsel knows, and the jury may figure out, that the testimony is false.").

Some circuits have held that a witness's recantation of trial testimony cannot be the sole basis for a new trial if that witness has repudiated it, because that repudiated recantation would not itself be substantive evidence and could be used only to impeach the witness at a new trial. *See, e.g, Awon v. United States*, 308 F.3d 133, 141 (1st Cir. 2002); *United States v. Diaz*, 190 F.3d 1247, 1255 (11th Cir. 1999); *Lindsey v. United States*, 368 F.2d 633, 636 (9th Cir. 1966); *but see United States v. Lespier*, 266 F. App'x 5, 7 (2d Cir. 2008) ("[A] district court should give little evidentiary weight to a recantation affidavit that has since been repudiated."). Even where this is the rule, however, exceptions are made when the impeachment evidence is powerful enough to nullify the effect of an essential incriminating witness. *See, e.g., United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992); *see also Gordon v. United States*, 383 F.2d 936, 938 (D.C. Cir. 1967)

(noting that new trial was granted upon learning that the sole government witness at the first trial had been convicted of larceny, a fact relevant to his credibility but unknown at the time of trial).

## III. ANALYSIS

According to defendants, Monem's VIS proves he perjured himself at trial in two relevant ways:

1. At trial Monem said that the first shot fired at Nisur Square killed Al-Rubia'y instantly. But from his VIS we can infer that Al-Rubia'y was alive after shooting had broken out, given that his mother, Al-Khazali, "felt he was going to be killed," and Al-Rubia'y was trying to get her out of their car—presumably to escape the slaughter—when he was killed.

2. At trial Monem said that he left his traffic kiosk after Al-Rubia'y was killed; he tried to help Al-Rubia'y and Al-Khazali by, among other things, waving at the Blackwater convoy to indicate that they should stop firing. Defendants say that according to his VIS, Monem did not leave his traffic kiosk throughout the massacre.

Defendants insist that Monem's statements in his April 10 interview did not rob the VIS of its persuasive power and offer two arguments for a new trial based on this so-called proof of perjury.

First, they argue that the VIS proves the government knew or should have known Monem's trial testimony was false, and they are therefore entitled to a new trial so long as there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury" (which, they say, there was), a standard considerably easier to satisfy than *Thompson*. *Iverson I*, 637 F.2d at 805 (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976)), *modified*, 648 F.2d 737 (D.C. Cir. 1981). While this correctly states the law, defendants also argue that the *Thompson* standard is inappropriate because the Court must apply "the *Iverson* or *Williams* standards specifically applicable to new evidence showing perjury at trial." Defs.' Reply 8, ECF No. 776 (08-360). Such language risks conflating the doctrine governing newly discovered evidence with the doctrine governing revelations that the government knew or should have known about false or misleading testimony. The cases are quite explicit about this distinction; *Williams* itself says that "[a]nother

6

reason for adhering to the *Thompson* standard is that newly discovered evidence of perjury is not distinguishable from other newly discovered evidence." 233 F.3d 592, 595 (D.C. Cir. 2000). Perjury alone may suffice for a new trial, but must do so under *Thompson*; perjury the government knew or should have known about falls under *Napue* and *Iverson*.

Second, defendants claim these contradictions prove Slatten did not kill Al-Rubia'y, and suggest that Al-Rubia'y in fact provoked the ensuing gunfire when he "tragically advanced his vehicle towards the convoy"; failing that, defendants posit the contradictions at least create reasonable doubt that defendants acted with conscious disregard for human life and without a reasonable basis to believe that they had to defend themselves. So even if the Court disagrees that the government knew or should have known that Monem perjured himself at trial, defendants claim the VIS satisfies *Thompson* because it would probably lead to acquittal if introduced at a new trial.

As the saying goes, defendants' motion is both good and original, but what is good is not original, and what is original is not good. They rehash evidence they had at trial—none of it sufficiently convincing—to show the government knew or should have known Monem perjured himself there. As this evidence is not new and was known to defendants, *Brady* objections to it were waived. *See Iverson II*, 648 F.2d at 738–39. Defendants, perhaps sensing this pitfall, claim not to have made a *Brady* argument; "[i]nstead, they move for a new trial under Rule 33 because new evidence (Monem's VIS) shows his trial testimony was false. The standard for granting a new trial, however, depends on whether the government should have known it was false." But "undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury" is a classic *Brady* argument, and by definition unavailable to them on this record. *Agurs*, 427 U.S. at 103, *modified*, *United States v. Bagley*, 473 U.S. 667 (1985). Defendants' one new piece of evidence, Monem's VIS, did not

7

exist until after the trial had ended, so *Iverson I*, a case about conviction obtained by the use of testimony the prosecution knew or should have known was perjured when it was solicited at trial, does not apply to it. 637 F.2d at 802–03.

To the extent that *Napue* comprises some claims not encompassed by *Brady*, it is defendants' only hope of avoiding *Thompson*'s more exacting standard. For reasons that remain unclear, however, some of the defendants deny having raised *Napue* claims ("the government charges at the straw man of an asserted *Brady* or *Napue* violation"). Their argument so neatly fits the mold, however, that the Court will analyze it as such. *Compare United States v. Quinn*, 537 F. Supp. 2d 99, 120 (D.D.C. 2008) (holding that, under *Napue*, "[a] defendant need only show that false testimony was presented at trial, that the government knew, or should have known, that the testimony was false, and that there is a reasonable likelihood that the false testimony could have affected the judgment of the jury"), *with* Defs.' Reply 11, ECF No. 776 (08-360) ("The Court Should Grant A New Trial Under *Iverson*, Because The Government Should Have Known Mr. Monem's Testimony Was False").

Defendants' *Napue* claims seem, under *Iverson II*, undone by disclosure; apart from the VIS, they had all the evidence cited in their briefs available to them at trial. But out of an abundance of caution, and because the Court has not found controlling authority extending *Iverson II*'s principle—that defense counsel's actual knowledge will waive a *Napue* violation—to cover false or misleading testimony going to the gravamen of a case, the Court has treated their *Napue* claims as unwaived.

A *Napue* violation, however, requires some material trial testimony to have been false, and defendants have not shown to the Court's satisfaction that Monem's was. *Jackson v. Brown*, 513 F.3d 1057, 1071 (9th Cir. 2008). First of all, Monem's VIS largely ratifies his trial testimony,

8

unless one imposes a highly strained reading of his statements that is belied by the record. Second, Monem also unequivocally repudiated his VIS in his April 10 conversation with the government. Third, the evidence adduced at trial tends to contradict the VIS, even as defendants interpret it, and to support Monem's trial testimony; for example, though one of defendants' two pivotal claims is that Monem's VIS reveals that Al-Rubia'y was alive when the shooting started, they cite no other evidence supporting this proposition, and indeed seem to have forgotten the point when they repeatedly imply that Jeremy Ridgeway fired the first shots and killed Al-Rubia'y. *See* Def.'s Reply 6, ECF No. 664 (14-107); *see also* Defs.' Reply 24, ECF No. 776 (08-360). Fourth, and finally, defendant's cited impeachment evidence from trial fails to do more than cast doubt on Monem's account. The following analysis explains why the VIS and the impeachment evidence offered at trial both fail to justify a new trial under either *Thompson* or *Napue*.

**A. The VIS**

The government argues that Monem's VIS is a "repudiated recantation" and therefore insufficient to sustain a motion for a new trial. Defendants counter that (a) the VIS is not a recantation; (b) even if it is, Monem did not (or did not fully) repudiate it; and (c) even if he did fully repudiate it, Monem is sufficiently important to the government's case, and would be sufficiently discredited by the VIS, that a new trial is justified.

*i. The VIS Is a Recantation*

Defendants argue that Monem's VIS—which significantly contradicts his trial testimony—demonstrates that he perjured himself at trial. They also insist, however, that the VIS is not a recantation because "recantations occur when a prosecution witness later claims he or she falsely testified at trial." Defs.' Reply 1, ECF No. 776 (08-360). "Instead," defendants say, "[Monem] has advanced two narratives that conflict: his VIS reveals the untruth of his previous well-

rehearsed testimony." *Id.* at 3. So: A "recantation" only occurs if a witness *actually says* that he or she lied at trial, but this witness has merely *conclusively demonstrated* (according to defendants) that he lied at trial. Which means that, by defendants' logic, had Monem mailed the court a signed confession and video proof that he personally murdered Al-Rubia'y, it would not "count" as recantation without such a proviso.

Such a result would be absurd, and though a witness's claim that he or she testified falsely may suffice for recantation, it is not required. In *United States v. Glantz*, for example, a government witness identified certain relevant payments as "kickbacks" (to the defendants' detriment) but then filed a post-trial tax court petition labeling the payments as deductible "legal fees." 884 F.2d 1483, 1484–85 (1st Cir. 1989). The First Circuit did not hesitate to consider the possibility that the later-filed petition was a recantation, but still rejected defendants' motion for a new trial on the ground that the petition, even if it had been a recantation, had been repudiated. *Id.* at 1486.

Defendants seek to distinguish precedents which presumed recantations unreliable on the ground that those examples offered greater reason for suspicion than Monem's recantation does. So, to be clear, the Court adopted no such presumption, and its assessment of Monem's recantation (and subsequent repudiation) does not turn on a knife's edge determination of the neat conceptual categories into which his two post-trial statements fall. The Court has instead looked to the specific facts of this case to determine the probative value and reliability of each set of statements.

To that end, it pays to be specific about precisely which parts of Monem's testimony his VIS contradicted. The government concedes, and the Court agrees, that Monem's VIS contradicted his testimony as to when Al-Rubia'y died and whether Monem heard him speak after the shooting had begun. Defendants also contend, however, that Monem's VIS says that Monem

10

did not at any point during the shooting leave his kiosk. The relevant language from his VIS is as follows: "I feel guilt because I was not able to help the poor doctor and his mother, I could not do anything"; "When I saw my friends get killed . . . I was scared and remained in my traffic cabin unable to move nor think"; "I was not able to move to help [Al-Rubia'y] and I just remained looking"; "and the damned car exploded and those inside it were turned to ashes and I was watching it without making a move"; "I hid in that cabin"; "[w]hy I did not help them because I was helpless . . . ." Mem. Opp'n Ex. A, ECF 773 (08-360).

If Monem's VIS were our sole source of information about his conduct and observations on the day of the Nisur Square massacre, defendants' position would be understandable, as the VIS can, when read in isolation, be reasonably understood both ways. But the Court also has the benefit of a multimonth trial during which these questions of fact were amply tested by counsel on both sides through cross-examination. Consequently, what defendants portray as a shocking revelation is more sensibly read as a reiteration of what Monem has attested to many times before: He hid in his police kiosk while defendants (and others) destroyed the Kia. *See, e.g.*, Trial Tr. 6/23/14 a.m. 24 ("Q. What did you do when the second set of gunfire hit the [Kia]? A. [Al-Hamidi] and I move away. Q. Where did you go? A. I went to the right to the other sidewalk."); *id.* at 25 ("Q. What did you do next? A. I went back to my kiosk, and I hid behind it because there was so much gunfire."). The VIS itself supports this reading, and says not that Monem hid in the kiosk the entire time, but rather that he did so "when I saw my friends get killed," and when "the damned car exploded." That Monem repudiated defendants' reading of his VIS does not show he ever intended his VIS to read that way; the Court interprets it, rather, as an effort to dispel any ambiguity.

    *ii.*    ***Monem Repudiated His VIS***

11

Defendants offer three arguments in support of the proposition that Monem did not repudiate his VIS in his April 10, 2015 phone call with the government.

First, they assert that Monem's April 10, 2015 statements "did not address the factual content of the VIS, including its core admission that he 'was scared and remained in [his] traffic cabin unable to move or think.'" This is simply wrong. *See* Mem. Opp'n Ex. P, ECF 773 (08-360) (stating that "[Monem] approached the white Kia" and "tried to help the woman get out of the car").

Second, they argue that because Monem actually wrote the VIS from his perspective, describing what Al-Rubia'y and his mother said and did as though he had witnessed it, his April 10 assertion—that the VIS sought to imagine how Al-Rubia'y and his mother felt—makes no sense. But Monem did not say in his April 10 conversation that every word of the VIS was written from the perspective of the murdered victims. The more sensible interpretation is that Monem tried to imagine what Al-Rubia'y and his mother experienced for those portions of the VIS dealing with what they experienced. Works of fiction routinely adopt third-person omniscient narration, and that Monem did so in part of his VIS rather than throughout is hardly proof his VIS is true.

Third, defendants contend that though Monem stated on April 10 that Al-Rubia'y was dead immediately after being shot, he did not deny or retract one of the most crucial implications of his VIS: That Al-Rubia'y was alive after the shooting began. The Court disagrees. Not that the notes taken on Monem's April 10 interview are a model of clarity—one wonders, for example, what questions the government asked him; what a witness doesn't say can be as telling as what he does, and if a man says "I love my son," that may mean one thing if you asked whether he loves his son, but quite another if you asked whether he loves his family. Nevertheless, Monem's April 10 statements are more reasonably interpreted to mean that he denied the VIS's implication that Al-

12

Rubia'y survived the initial burst of gunfire. Defendants note that Monem said on April 10 that he at no point heard Al-Rubia'y move or talk after being shot, but assert that Monem "said nothing to the government . . . about what he witnessed of Al-Rubia'y before he was shot." Def.'s Reply 2, ECF No. 667 (14-107). The flaw in this argument is that it presumes that Monem's VIS describes events that precede Al-Rubia'y being shot. Nothing in the VIS, however, contradicts Monem's testimony (and the testimony of other witnesses) that the first shots fired struck the white Kia. The VIS's observations about what Al-Rubia'y said and did are, therefore, just as sensibly read to describe a time *after* he was shot—and injured—but before he died, and before the final fusillade that destroyed the Kia, and Al-Rubia'y and his mother with it. This reading still contradicts Monem's trial testimony, of course, but not in a way that his April 10 repudiation fails to address, and unlike defendants' interpretation has ample support in the record. *See* Trial Tr. 7/2/14 a.m. 92 ("Q: And so the record is entirely clear, where was the blood coming from? A: It was coming from the head, and [Al-Rubia'y's] whole face was full of blood."); *see also* Trial Tr. 6/24/14 a.m. 49 ("I saw a white vehicle that was with a hole in it, and there is blood splattered on it . . . ." If the Court's and defendants' readings of the VIS both seem implausible in light of the trial evidence, that is because the VIS itself is implausible in light of the trial evidence. The Court therefore concludes that the less implausible reading of the two—its own—is correct, as it is most corroborated by the evidence in the record.

Recall that Monem told the government on April 10 that his VIS was "not an investigative or factual statement." Defendants wave this away, insisting Monem meant only that he had embellished minor details, and that the thrust of his VIS still trustworthy. They are being opportunistically charitable. Had Monem's VIS stated that his entire trial testimony was "not an

13

investigative or factual statement," defendants would no doubt brandish that (justifiably) as proof he had lied at trial.

The Court concludes that Monem fully repudiated his VIS, rendering the VIS pure impeachment evidence. Defendants argue that this is irrelevant because Monem would be unlikely to testify at a new trial for several reasons—he has been so thoroughly discredited that the government would likely not call him; he would invoke the Fifth Amendment to avoid admitting that he has previously perjured himself; he might simply decline to return to the U.S.—and his VIS would therefore be admissible as either a statement against interest or, in the event that he did testify and deny recollection, a past recollection recorded.

The Court is not persuaded that Monem will not testify. If he is as essential as defendants claim, it is hard to credit the assertion that the government would decline to call him; the government has also stated to this Court that it would not hesitate to call him. As explained throughout this opinion, the Court does not deem Monem thoroughly discredited by his VIS, and he has already faced much more persuasive impeaching evidence at trial. Insofar as willingness to cooperate is in question, Monem was apparently willing to testify at the original trial even as his wife endured a difficult pregnancy. The Court therefore has little trouble concluding that he would do so once again.

### iii. *Monem Was Not Essential Because His Testimony Was Corroborated*

Newly discovered pure impeachment evidence justifies granting a new trial, if at all, only where the conviction rests on one witness's uncorroborated testimony. *See, e.g., United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992). Defendants argue that Monem was the only witness to attest that (1) Al-Rubia'y had a head injury consistent with a gunshot wound; (2) the Kia's windshield had one bullet hole in it (consistent with gunfire originating from Slatten's sniper rifle)

14

rather than three or four (arguably more consistent with gunfire originating from a turret gunner); or (3) Slatten fired the first shots of the massacre, and in doing so killed Al-Rubia'y. Defendants also argue that he was critical to the government's theory that the Blackwater guards knew or should have known the Kia presented no threat.

Defendants are wrong on all points. Al-Hamidi testified that he saw Al-Rubia'y's bloodied head, and though defendants insist that Al-Hamidi did not testify that the wound was fatal, he clearly stated that Al-Rubia'y was dead. *Compare* Trial Tr. 7/2/14 a.m. 93 ("So the car started moving slowly because the young man was killed."), *with id.* at 94 ("I was holding the driver because I wanted to save him, and I thought that because I thought that he was injured. I didn't think that he died."). Al-Hamidi's testimony that at the time he hoped Al-Rubia'y was merely gravely injured—as opposed to already dead—does not support the conclusion that Al-Rubia'y survived his gunshot wound for any meaningful time. Nor was Monem the only person whose testimony supported a conclusion that the first shot came from Slatten's rifle; Majeed Salman Abdel Kareem Al-Gharbawi, the passenger in a Volkswagen box truck mired in traffic at the square, reported both hearing a single shot and seeing a single bullet hole. *See* Trial Tr. 6/24/14 a.m. 48–49 ("Q: Okay. The hole you referred to, where did you see that hole? A. It was on the front windshield right in front of the driver."). Further in this vein, Jeremy Ridgeway testified that Slatten boasted about having killed a man with a headshot ("popped his grape") at Nisur Square, a man who then slumped forward—as though at the wheel of a car, the government later argued. Trial Tr. 7/31/14 a.m. 49.

On the last point, defendants respond that Slatten could not have been alluding to Al-Rubia'y because Slatten called his victim an "active shooter," a conclusion which ignores the fact that the jury had ample support in the record to find that Slatten was lying or unreasonably

15

mistaken when he told Ridgeway that his victim had been shooting at the convoy. It is especially compelling that Slatten's counsel declined to cross-examine Monem and even cited Monem in his closing argument in support of the proposition that a turret gunner, and not Slatten, had killed Al-Rubia'y. Trial Tr. 8/28/14 p.m. 13–16. This fact seriously undermines any attempt to recast Monem as the pivotal witness against Slatten. Finally, Monem was not the only witness to testify to having waved at the convoy in an attempt to halt their fire; Al-Hamidi testified similarly. *See* Trial Tr. 7/2/14 a.m. 94 ("Q: All right. And so you're holding up your left hand, and who are you trying to communicate with at that point? A: Yeah, I was trying to communicate with the person that is on that—in that car and also a Blackwater car, to tell him to stop shooting."). Defendants attempt to rebut this by (1) noting that several Blackwater witnesses testified that they interpreted Al-Hamidi's movements next to the Kia as efforts to push the Kia toward the convoy, and (2) seizing upon the fact that, in its closing, the government cited Monem rather than Al-Hamidi as the officer who waved at the convoy. But a jury may credit witness A even if witnesses B, C, and D attempt to undermine him, just as a jury may credit witness A's testimony on a subject even if the prosecution chooses in its closing to instead cite witness E's testimony on that subject.

Defendants' last line of defense is that Monem was an essential witness because he was the only one to attest to all of the above; other witnesses may have corroborated him in part, but each of those witnesses also contradicted him in part. They offer no support for this argument that a conviction cannot stand unless a single witness attests to every element of the government's case, and unsurprisingly that is not how testimony works. Barring extraordinary circumstance not operative here, factfinders may believe multiple witnesses in whole, in part, or not at all, and may properly piece together a factual picture by crediting different portions of testimony from different

witnesses. Consequently, the Court concludes that Monem was not so essential to the convictions that pure impeachment evidence against him offers a basis for a new trial.

### iv. *Monem's VIS Would Not Probably Result in Acquittal*

Even in the unlikely event Monem were deemed a sufficiently crucial witness that impeachment evidence against him could suffice to justify a new trial, defendants' motion would still fail because the addition of Monem's VIS at a new trial would not, for the reasons explained above, probably result in acquittal at a new trial.

### B. Defendants' Non-VIS Evidence

Eyewitness testimony rarely reveals itself as conclusively true or false; in general, it resides in the valley of the shadow of doubt. The evidence defendants offer to discredit Monem—apart from his VIS—casts some doubt on Monem's testimony. It nevertheless fails to establish a *Napue* violation. Defendants offer the following:

1. Portions of Monem and Al-Hamidi's statements to the Iraqi police the day after the killings appear to be identical.

2. Monem, in interviews with *Der Spiegel* and CNN, offered descriptions of the massacre that partly contradicted his later trial testimony. To CNN, he described the Blackwater guards as having "fired five or six shots in an apparent attempt to scare people away." *See* Defs.' Mot. for New Trial Ex. D, ECF No. 765 (08-360). To *Der Spiegel*, he said "The driver of a white car was anxious to drive off[.] I signaled him to drive, since the distance to the convoy was around 60 meters, far enough to get traffic rolling again." *See id.* at Ex. C.

3. There is no sign the government scrutinized his claim that he was the second officer who approached the Kia. Defendants note that Gharbawi specifically testified that he did not see a second Iraqi police officer approach the Kia on its passenger side, Trial Tr. 6/24/14 p.m. 30, and assert that Al-Hamidi did not mention Monem approaching the Kia at all.

The first point raises the sheer possibility of coordination, but leaves quite a leap from there to the conclusion that Monem's testimony at trial seven years later was false, let alone that the government knew or should have known it. Iraqi investigators orally interviewed Monem and Al-Hamidi and then committed those statements to writing. *See, e.g.*, Trial Tr. 7/2/14 p.m. 27. It may

17

well be that the Iraqi investigators introduced verbatim language from their report on Al-Hamidi into their report on Monem; if so, it suggests shoddy police work or maybe even outright corruption, but not on either Al-Hamidi's or Monem's part. Nor would this prove Monem's account false, as the investigators could have sought to coordinate the stories of two witnesses who truly did see the same thing. To be clear, the fact that (relatively) innocent explanations exist for this oddity does not mean that the government should have simply brushed it off. Fortunately, that is not what the government did; instead, they investigated the possibility of tainted testimony as appropriate under *Kastigar v. United States*, 406 U.S. 441 (1972). *See Kastigar* Hearing Tr. 12/4/13 p.m.

As to the second point, the Court has previously made its view of newspaper articles as evidence clear. *See id.* at 53. If anything these articles largely corroborate Monem's testimony, and in none of them does he describe Al-Rubia'y surviving the first volley or speaking to his mother, Al-Khazali. That Monem on two occasions described the initial gunfire as "warning shots" is not persuasive—given that the "warning shots" killed a man, it is not clear how Monem would have been able to discern their intended effect, and Monem's understanding of what he observed may simply have genuinely changed over time. Nor is the Court swayed by defendants' insistence that Monem lied at trial about ever speaking to the media; as he stated at trial, he believed the interviewers he spoke to were affiliated with U.S. armed forces. *See* Trial Tr. 6/23/14 p.m. 46–49. Defendants have not offered to explain the significance of Monem's aforementioned statement to *Der Spiegel*, and without more the Court is not convinced that minor factual variations in a story retold over many years prove Monem a liar.

With respect to their last point, defendants cross-examined Al-Hamidi on this very subject. *See* Trial Tr. 7/2/14 a.m. 34 ("Q. Okay. And were you also with your partner, [Monem]? Was he

18

out next to you? A. Yes."). It is true that some witnesses to this chaotic event failed to recall seeing Monem. In light of human perception's limited capacity for absorption and retention, however—especially during events as chaotic and traumatic as those which transpired at Nisur Square—this does not show that Monem lied at trial, let alone that the government knew or should have known he did.

### C. No Hearing is Required

The Court had the opportunity to observe Monem's demeanor and assess his credibility at trial. Having considered that experience, and the record, it finds that Monem's recantation is not credible and that no hearing is necessary. *See, e.g., United States v. Pearson*, 203 F.3d 1243, 1274–75 (10th Cir. 2000).

**CONCLUSION**

This Court, having spent several months immersed in the evidence and testimony presented at one trial, is unpersuaded that another would vindicate any recognized legal right. Yes, a new trial with a new jury might conceivably yield a different result; that is nature of a process which incorporates elements of randomness. But the weight of the evidence is heavily against defendants, and, in the Court's view, the VIS—an implausible and quickly rescinded recantation that is powerfully contradicted by the record—would offer little chance of an acquittal at a new trial, let alone make acquittal probable. The Court will therefore DENY defendants' Motions for a new trial. A separate ORDER consistent with this Memorandum Opinion shall issue this date, November 10, 2015.

ROYCE C. LAMBERTH
United States District Judge