```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA

    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,          )  Criminal Action
                                   )  No. 14-107
vs.                                )
                                   )  Washington, D.C.
NICHOLAS ABRAM SLATTEN,            )
                                   )  December 7, 2018
            Defendant.             )  2:30 p.m.
                                   )  Motions
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF MOTIONS**
**DECEMBER 7, 2018**
**BEFORE THE HONORABLE ROYCE C. LAMBERTH,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

**APPEARANCES:**

```
FOR THE GOVERNMENT: T. PATRICK MARTIN
                    FERNANDO CAMPOAMOR-SANCHEZ
                    KAREN SEIFERT
                    ALEXANDRA HUGHES
                    U.S. Attorney's Office
                    555 Fourth Street, NW
                    Washington, DC 20530
                    (202) 252-7732
                    Email:  Thomas.martin5@usdoj.gov


FOR THE DEFENDANT:  AMY MASON SAHARIA
                    DANE BUTSWINKAS
                    Williams & Connolly LLP
                    725 12th St. NW
                    Washington, DC 20005
                    (202) 434-5847
                    Email:  Asaharia@wc.com


Court Reporter:     Janice Dickman, RMR, CRR
                    Official Court Reporter
                    Washington, D.C.  20001
                    (202) 354-3267
```

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  Your Honor, we're now on the record for criminal case 14-107, United States of America versus Nicholas Slatten.

Counsel, please approach and identify yourselves for the record.

MS. SEIFERT:  Good afternoon, Your Honor.  Karen Seifert for the United States.  With me at counsel table are AUSAs Martin and Campoamor-Sanchez and Special AUSA Hughes.

MS. SAHARIA:  Good afternoon, Your Honor.  Amy Saharia and Dane Butswinkas for the defense.  Mr. Slatten waives his presence.

THE COURT:  Let's start on the motions in limine on the experts, so we can try to get straight.  What experts are going to be testifying?  I guess we have Carter, Colvert, Green and Mireles.

MS. HUGHES:  Correct, Your Honor.  Good afternoon. And I'm Miss Hughes.  Good afternoon.  So I will be addressing, first, Mr. Green.  Miss Seifert will be addressing the pending sealed motion.

With respect to our other objections, those are now moot based on defense's representations regarding who they intend to call.  So we'll just be focusing on the two.

First, in regards to Mr. Green, in May -- on May 21st, 2018 defendant first gave notice for Mr. Green.  And just

1    so the record is clear, in that initial notice the defendant

2    indicated that Mr. Green would offer two opinions and both of

3    those opinions regarded auditory perceptions.

4           And just so our objections are clear on the record,

5    we would object to any auditory perception testimony that would

6    be elicited.  As we understand it, that is no longer the

7    intention of defendant, but we just want to be clear about our

8    maintained objection to that line of questioning, regarding his

9    perception of how auditory sounds compare to each other.

10          The basis for our objection to the supplemental

11   notice that was given in relation to this trial, however, is

12   primarily regarding their disclosure obligations.  Defendant

13   has resisted disclosing whether or not there are any additional

14   diagrams, any additional documentation regarding the tests.

15   You can see in Attachment C to our motion, which is 1080, ECF

16   1080, the very terse summary that was given regarding the

17   nature of the test performed, there's no visual diagram

18   included.

19          The government has a hard time believing there isn't

20   additional information, given that defendant, in their

21   opposition, noted that the BearCat was 15 degree angle from the

22   car.  Now, unless this is -- at the memory of all the attorneys

23   and Mr. Green himself, it is our belief that there is

24   additional information, and this information is directly

25   relevant to whether or not the test themselves are relevant,

1    whether or not they're prejudicial.

2         We still don't have a clear understanding where the

3    recording device was positioned on the car, the exact

4    positioning between the car and the listener.  We've asked for

5    piecemeal information regarding the tests, but we're shooting

6    in the dark.

7         And so our request is in compliance with Rule 16,

8    that they just provide what they have regarding the set up of

9    the test.

10         MS. SAHARIA:  Your Honor, Miss Hughes is correct that

11    we are not seeking to present any testimony from Mr. Green

12    about his own you auditory perceptions.  We simply seek to have

13    him come, introduce the recordings of tests that he made.

14    There is no diagram.  We don't have a diagram.  Rule 16

15    requires only that we disclose the basis and reasons for his

16    opinions.  We have done that.  We have provided the recordings

17    that were made.  We have indicated where they were -- where

18    that recording device was located:  It was located to the front

19    of the vehicle that was in front of the BearCat.  That was

20    intended to be approximately where someone who was a front

21    turret gunner would have been located in that vehicle.  But

22    that's an approximation, and that's what we have disclosed.

23         The disclosure regarding the angle was based on the

24    memory of the people who were there.  There simply is no

25    diagram.  Rule 16 does not require disclosure of every single

1  piece of information that may exist out there.  It requires

2  disclosure of the basis and reasons for the expert's opinions,

3  as well as the results of a test.  And those results have been

4  produced, those are the videotapes -- excuse me, audiotapes

5  that were taken using Peltors in the location that I just

6  described.  So we've produced everything that Rule 16 requires.

7       MS. HUGHES:  And listening closely to defense's

8  representations, the government is still not clear whether or

9  not there's any visual capturing of this test, whether or not

10  it's auditorily transcribed.  And if it is such that it is --

11  literally the only documentation is the recording, then that

12  should be stated explicitly.  But as it stands, the government

13  maintains that it is entitled to whatever documentation there

14  has been of these tests.

15       And one particular part of this is what kind of

16  recording equipment was used?  How was it recorded?  Who

17  recorded it?  All of this is certainly relevant as the entire

18  purpose of this test is to put before the jury that these two

19  types of sounds, both the SR25 fired from inside the BearCat

20  and the SR25 fired from outside the BearCat and M4 fired on

21  semiautomatic mode are all similar.  And the entire relevancy

22  of that testimony depends -- of this demonstration, rather,

23  depends on how this was recorded and captured.  And that is

24  just very unclear from just the very short description

25  provided.

```
 1              THE COURT:  I don't -- I guess I don't get it.  I

 2    don't have -- maybe it was attached, but I haven't seen what

 3    was the description that was provided.  All I have is the

 4    briefs.

 5              MS. HUGHES:  The description that was provided is in

 6    defense's disclosure and it's at -- it should be Attachment C

 7    on ECF 1080.

 8              THE COURT:  I don't have that.  Do you have a copy?

 9              MS. HUGHES:  I don't have a copy of the attachment.

10    You know what may have happened, Your Honor, this may have been

11    the attachment that was removed.  If I may have one moment,

12    please.

13              (Pause.)

14              THE COURT:  So you have a clip?

15              MS. HUGHES:  Apologies, Your Honor.  Miss Seifert --

16              THE COURT:  You have the clip?

17              MS. HUGHES:  We have the audio clip, but that's all

18    we have.

19              THE COURT:  And that's what they're proposing to

20    play.

21              MS. HUGHES:  That's what they're proposing to play.

22              THE COURT:  And you don't know what it was recorded

23    on?

24              MS. HUGHES:  We don't know what it was record on, we

25    don't know precise distances.  Initially they maintained that
```

1   we had everything, and then when we asked for more information,

2   they said it was at a 15 degree angle, which, understandably,

3   made us question how they were able to remember that.  And

4   perhaps, you know, their memory is just better than all of ours

5   and they can remember things like 15 degree angles.

6          But the government simply maintains that if there's

7   any documentation -- broadly speaking and not parsing there are

8   no notes or diagrams -- but broadly speaking, if there's any

9   documentation, the government is entitled to that to be able to

10  assess the relevancy of these tests, as well as to be able to

11  cross-examine effectively.

12         THE COURT:  Okay.  I guess I don't understand your

13  argument then.

14         MS. SAHARIA:  So, Your Honor, this is the first time

15  that they've even asked for the recording device or who

16  actually made the recording.  They've never asked for that

17  before.  I don't personally have that information in front of

18  me.  If they had asked that through the back and forth, we

19  would have answered that question.

20         Our position is simply that we have complied with

21  Rule 16.  Rule 16 requires disclosing the basis and reasons for

22  the opinion.  And frankly, it's questionable whether Mr. Green

23  is actually providing an expert opinion, as I would submit he's

24  coming to authenticate recordings, sound recordings that were

25  made.

1          THE COURT:  I understand, but if you want to put the

2     recordings in, they're entitled to know how it was recorded,

3     where it was recorded, who recorded it.  I mean, obviously --

4          MS. SAHARIA:  Sure.  They haven't even asked us.

5     This is the first time they've asked us for that information,

6     Your Honor.

7          THE COURT:  Well, give them that information and I

8     don't have any other problems with Green testifying.  I mean,

9     they put in the same kind of recording, obviously you can, too.

10          MS. SAHARIA:  Okay.

11          THE COURT:  I had the same problem I originally had,

12     but you've already satisfied that, that he's not going to tell

13     what he listened to --

14          MS. SAHARIA:  Correct.

15          THE COURT:  -- or heard.

16          MS. SAHARIA:  He's just going to say that he's going

17     to authenticate --

18          THE COURT:  He's going to just show the recording.

19          MS. SAHARIA:  Correct, Your Honor.

20          THE COURT:  But they're entitled to see what

21     happened, how it was recorded or whatever --

22          MS. SAHARIA:  So the type of --

23          THE COURT:  -- and what he thinks --

24          MS. SAHARIA:  -- recording device and who actually

25     made the audio recording.

1          THE COURT:  Yeah, and what the equipment was.  If

2     they want to say you can't -- you know, whatever they want to

3     try to impeach that --

4          MS. SAHARIA:  Understood, Your Honor.  We can provide

5     that information.

6          THE COURT:  Okay.  Okay.

7          MS. HUGHES:  And, pardon me, Your Honor, but if there

8     are any videotapes or photographs, the government would also

9     just note that we believe that we are also entitled to those.

10          And with regarding our recordings, we disclosed

11     everything there was with regard to those recordings.  We made

12     our experts available.  We went above and beyond, in our

13     estimation.  And we're just entitled to the basic documentation

14     of this test, we maintain, if there is any.

15          THE COURT:  Okay.  Who's the next one?

16          MS. SEIFERT:  Good afternoon, Your Honor.  With

17     respect to Mr. Colvert, he is the polygraph examiner.

18          THE COURT:  We'll take that with the polygraph

19     motion.

20          MS. SEIFERT:  That is the only other portion of the

21     government's expert motion that is still for your

22     consideration.

23          THE COURT:  We don't have to deal with Carter or

24     Mireles?

25          MS. SAHARIA:  That's correct, Your Honor.

```
1              MS. SEIFERT:  No, Your Honor.

2              MS. SAHARIA:  We have decided not to call Dr. Carter

3    and Mr. Mireles.

4              THE COURT:  Okay.  Okay.  So Green I've dealt with.

5    All right.  Then polygraph we need to deal with.  Okay.

6              Here, I can hand these back to you.

7              MS. SEIFERT:  Thank you, Your Honor.

8              THE COURTROOM DEPUTY:  What motion is it, Judge?

9              THE COURT:  This will be --

10             MS. SEIFERT:  It's partially contained in the motion

11   we were just referring to.  There is an objection to --

12             THE COURT:  And also in 1031.

13             MS. SEIFERT:  So, it is partially responsive to --

14   the argument is partially incorporating 1080, and then it is

15   also the Government's sealed filing, which was filed on October

16   30th.

17             THE COURT:  All right.  Go ahead.

18             MS. SEIFERT:  So I will be brief, Your Honor.  With

19   respect to Mr. Colvert, the objection that is raised in

20   government 1080 is that --

21             THE COURT:  Before we get to -- this is on the

22   polygraph?

23             MS. SEIFERT:  Yes.

24             THE COURT:  All right.  I don't -- maybe I

25   misunderstand.  How do you get a polygraph in if the defendant
```

1    doesn't testify?

2              MS. SAHARIA:  Well, Your Honor, he may.  He may

3    testify.

4              THE COURT:  So I'm supposed to rule before he decides

5    whether he testifies?

6              MS. SAHARIA:  We would be --

7              THE COURTROOM DEPUTY:  Counsel, approach.

8              MS. SAHARIA:  Your Honor, we actually said, in

9    opposition to their motion, that we thought the motion was

10   premature.  If Your Honor wants to wait until after Mr. Slatten

11   decides for sure whether to testify, we could raise it at that

12   time.

13             THE COURT:  Okay.

14             MS. SAHARIA:  That would be fine with us, Your Honor.

15             THE COURT:  Okay.  You don't even think you could get

16   it in if he doesn't testify.  I'm assuming --

17             MS. SAHARIA:  I think it would be a very strong

18   uphill battle, Your Honor.

19             THE COURT:  Okay.

20             MR. BUTSWINKAS:  It's at least harder, Your Honor.

21             THE COURT:  Maybe impossible.  Okay.

22             MS. SEIFERT:  With respect to --

23             THE COURT:  You can go ahead and present it, because

24   obviously I don't want to have the jury sitting around.

25             MS. SEIFERT:  Certainly.  So, the government submits

1    that it's not admissible, even if the defendant does testify.

2    So, first I'll discuss the discovery issue, which is what is

3    raised in 1080.

4           The disclosure of Mr. Colvert's test is simply a

5    two-page, very short filing.  It doesn't include any of the

6    source data, any of the testing material, all of which the

7    government is entitled to and should have been provided.

8           The substantive objections to Mr. Colvert's testimony

9    and to the polygraph examiner made in the government's sealed

10   filing, which basically boils down to a few main points:

11   First, the government submits that polygraph examinations are

12   not scientifically reliable under *Daubert*, they do not involve

13   standardized questions, they also have an undue impact on the

14   jury, as numerous Courts have found.  I believe this particular

15   Court has found polygraph examinations not to be admissible in

16   the *Laureys* case, which is 103 F.Supp.3d at 69.

17           THE COURT:  Did *Laureys* go up?  I think it did.

18           MS. SEIFERT:  I believe it was affirmed, Your Honor,

19   yes.

20           THE COURT:  Was that affirmed?  Or is it still

21   pending?  Or -- I don't remember now.

22           MS. SEIFERT:  I will check, but I -- oh, I'm sorry.

23   Forgive me.  It was reversed on other grounds, but not on the

24   ground with respect to the polygraph.  So it has been decided

25   on appeal.

1    Numerous courts, though, have found that it is not

2    admissible evidence.  I think I would point the Court to --

3    THE COURT:  There's no recent D.C. Circuit case,

4    right?

5    MS. SEIFERT:  There is not a recent D.C. Circuit

6    case.  The most recent D.C. Circuit case is the *Elmer Feddi*

7    *versus Obama* (ph.) case, the 2011 case in which there's just a

8    concurrence about -- from Judge Rogers about the reliability of

9    polygraphs being in question, but no cases specifically on

10   point.  Although I do note that several other federal circuits

11   have a per se ban on polygraphs; the Eight Circuit, the Second

12   Circuit, the Fourth Circuit.

13   Now, there are other circuits that allow them in

14   special circumstances, specifically when the parties, like,

15   agree to their admissibility, or if it's relevant to show why

16   the investigation took a certain turn, because the officer did

17   a polygraph and then went on a certain investigative path.  The

18   government submits none of those circumstances are relevant or

19   at issue here.

20   The second reason it's not admissible, even if the

21   defendant testifies, is it is inadmissible hearsay.  The

22   government submits that the very purpose of the polygraph --

23   it's essentially to bootstrap around the hearsay rules.  And

24   703 does allow an expert to testify to hearsay, but it does

25   have limitations on that testimony, basically incorporating

1   Rule 403.  And the Second Circuit addressed this explicitly and

2   said the jury would rely on hearsay testimony for the truth and

3   the expert is just enabling the defendant to circumvent the

4   rules of hearsay.  So --

5              THE COURT:  The defendant testifies first, then --

6              MS. SEIFERT:  As a prior consistent statement, is

7   that in the theory it would be coming in as?  I mean, it would

8   depend on what, you know, what the impeachment is.  I think the

9   concern is then it's just the statement that comes in, it's not

10  his opinion that he's telling the truth.  So those are two

11  different things, that the defendant previously said to Mr.

12  Colvert, you know, I did or did not do X, Y and Z on September

13  16th of 2007 can be a prior inconsistent statement.  Mr.

14  Colvert's opinion that the defendant, when he made that

15  statement was being truthful, should not come in under 703.

16             And, moreover, it should not come in under 403

17  because Mr. Colvert is substituting his judgment for whether or

18  not the defendant is telling the truth for that of the jury.

19  And it is the jury's job to decide who tells the truth, not Mr.

20  Colvert.  It's unduly prejudicial.

21             The Courts have found that across the board in

22  multiple circuits, and I think -- I would submit the rest of

23  the arguments in our brief to the Court -- for the Court's

24  consideration.

25             MS. SAHARIA:  Your Honor, we're content to rest on

1    our papers on this motion.  But I do want to raise one

2    recordkeeping matter with respect to this motion, which is that

3    the government had filed a motion to -- filed its motion under

4    seal together with a motion to seal.  It's our position that

5    there is no basis to seal the motion.

6              Because we were awaiting the Court's guidance on that

7    motion to seal, we emailed or opposition brief to Mr. Kohl

8    pending a ruling on the motion to seal.  And so right now our

9    brief is not actually a matter of the record, the formal ECF

10   record.  So we do need a ruling on the motion to seal so that

11   we know how to record and file our opposition brief.

12             THE COURT:  What was the basis for sealing?  Miss

13   Seifert?

14             MS. SAHARIA:  I'll let them address that, Your Honor.

15             MS. SEIFERT:  The government submitted the polygraph

16   under seal because the nature of the polygraph examination and

17   what it purports to show is such a powerful piece of testimony

18   that without additional, kind of, understanding of how it's

19   viewed legally, the government was concerned that if that was

20   in a public filing, it might make it into news reports or other

21   media that the jury might hear, and if they weren't allowed to

22   hear that, not understanding when a polygraph test is and why

23   it may not be admissible, it could impact their view of the

24   case.

25             THE COURT:  I probably would keep it sealed until the

1    conclusion of the trial.

2              MS. SAHARIA:  Okay.  Understood, Your Honor.  Thank

3    you.

4              THE COURT:  Then I'll just -- I'll do an order to

5    that, and your opposition can be lodged or filed when I do that

6    order.  I'll put it all on the same order then.

7              MS. SAHARIA:  Perfect.  Thank you, Your Honor.

8              THE COURT:  Then I won't rule on that until I see

9    whether the defendant takes the stand.

10             MS. SAHARIA:  Thank you.

11             THE COURT:  All right.  All right.  Then the next

12   motion is this liberty motion, I take it?

13             (Off-the-record discussion between courtroom deputy

14   and the Court.)

15             THE COURT:  Give me a minute to talk to this one

16   first.  Let me go off-the-record for a minute.

17             (Off-the-record discussion between the U.S. Marshal

18   and the Court.)

19             THE COURT:  Okay.  Let's start with that motion then.

20             MS. SAHARIA:  Sure.  Thank you, Your Honor.  I would

21   also point out, there are a number of pending motions, but some

22   of them I think are moot.  So I don't know if it would be

23   helpful for the Court for me to, at some point, walk through

24   what is pending and indicate what I think is moot, and you can

25   kind of just --

1          THE COURT:  Sure.

2          MS. SAHARIA:  Should I do that now?

3          THE COURT:  You can do that now, if you want to.

4          MS. SAHARIA:  Okay.  So I'll just list the motions

5     that I believe to still be pending.  The first is ECF 949,

6     which is our motion to compel audio recordings.

7          THE COURT:  Right.

8          MS. SAHARIA:  That one I don't believe is moot.  It's

9     unclear whether the government has audio recordings made of the

10    SR25 or M4.  If they don't have any, then obviously there's

11    nothing to compel.  But that one I think we would like a ruling

12    on.

13         THE COURT:  Okay.

14         MS. SAHARIA:  The second one is ECF 1032, this is our

15    motion to compel disclosure of information regarding expert

16    review of GX-2130.  I think in light of the Court's ruling

17    about the Kia video, that motion is moot.

18         THE COURT:  Is moot?

19         MS. SAHARIA:  Yes, it is moot, assuming the

20    government continues to comply with that ruling, which I assume

21    they will.

22         We've already discussed ECF 1080, which is the

23    Government's motion to preclude defense experts, and the sealed

24    motion that we just discussed.

25         THE COURT:  Right.

1      MS. SAHARIA:  The next one is ECF 1155, this is our

2  motion to compel production of *Brady/Giglio* materials related

3  to the government's experts.  I think, in light of the fact

4  that their experts have now testified and we don't intend to

5  recall them, that motion is moot.  That doesn't mean that I

6  agree with everything they said in their opposition brief, but

7  I think we don't need a ruling on that.

8      There was one expert, a new expert they disclosed,

9  Mr. Boone, who they didn't call.  If they were to try to call

10  him in a rebuttal case, then that motion would again be live.

11      THE COURT:  Okay.

12      MS. SAHARIA:  The next one is ECF 1157.  This is our

13  renewed motion to compel production of intelligence files and

14  revised summaries.  We would like a ruling on that, but we

15  don't need to argue it, Your Honor.

16      THE COURT:  All right.

17      MS. SAHARIA:  Next is 1163.  This is our motion for

18  access to the court report's audio recordings of the trial

19  testimony of Mr. Moniem.  And I'm happy to address that one

20  today.

21      And then the last one is the one that Your Honor just

22  mentioned, which is the one related to Mr. Liberty, and that's

23  ECF 1170.

24      THE COURT:  Okay.  Okay.

25      MS. SAHARIA:  So let me turn to that one, if that's

1   okay with Your Honor.

2          So, as you're aware, we would like to call

3   Mr. Liberty as a witness.  We have --

4          THE COURT:  Why so late?

5          MS. SAHARIA:  Well, we just received the declaration

6   from his lawyer on November 28th.  I understand it took

7   Mr. Coffield some amount of time to get comfortable with the

8   idea of providing a declaration.  He provided that declaration

9   to us on November 28th, and we moved as promptly as we could to

10  file this motion.

11         THE COURT:  Does his declaration mean that his client

12  is willing?  Is that how I --

13         MS. SAHARIA:  Yes, if his client is granted immunity

14  for his testimony, he is willing to testify here at trial.

15         Now, to -- let me briefly address what the government

16  just filed before this hearing and then I'll move to, kind of,

17  the substance of our motion.

18         We had understood -- now, perhaps this was a mistaken

19  assumption, but we had understood the government had decided

20  not to grant Mr. Liberty immunity because we understood from

21  its disclosures before the last trial that they went to

22  Mr. Liberty's lawyer and asked whether he would testify and, if

23  so, what he would say.  And the response, apparently, was not

24  one that they liked.  He, through his lawyer, his lawyer said

25  he would testify that Mr. Slough fired first.  But we

1     understood that at that time the government had considered

2     whether it would grant immunity for him to testify and had

3     decided not to.  And that was the premise of our motion, that

4     we were asking for Court-ordered immunity or, in the

5     alternative, for dismissal or alternative remedies.

6            So we had understood, perhaps mistakenly, that the

7     government had made that decision, given that they had that

8     interaction with Mr. Liberty's lawyer.

9            As I indicated, we did reach out to Mr. Coffield.  It

10    took him some time to decide to give us a declaration.  We just

11    received that declaration last week and we moved as promptly as

12    we could to file our motion.

13           In response to the Government's opposition filed

14    today, yes, we do request that they consider providing

15    Mr. Liberty with immunity.  He is an essential witness in this

16    case.  The government has made much of the fact that Mr. Watson

17    was the only witness available to the jury who was there in the

18    BearCat who can know what happened.  Well, of course

19    Mr. Liberty is the other such person.  He was seated right next

20    to Mr. Watson.  And if he were granted immunity, he would

21    testify to the opposite of Mr. Watson's grand jury testimony.

22    He would testify that he heard Mr. Slough fire first.

23           This is highly exculpatory testimony.  It is critical

24    for Mr. Slatten to present the jury with this exculpatory

25    testimony, particularly when the government has used its powers

1      under the Immunity Act to grant Mr. Watson immunity.  And the

2      cases recognize that although -- I recognize we face a very

3      high uphill battle in convincing the Court that it has the

4      power to grant immunity.  Although some Courts have --

5                  THE COURT:  It's not just uphill, I'll tell you right

6      now, the motion is denied on whether I have the power to do it.

7                  MS. SAHARIA:  Right.  I understand that that is -- I

8      understood that would likely be Your Honor's position, given

9      the language of the statute.

10                 Now, that said, the Courts have recognized that the

11     government's statutory power to grant immunity is subject to

12     the restrictions of the due process clause, which obviously

13     trumps -- the Constitution trumps statutes.  And that there

14     might be circumstances in which the government's choice to give

15     immunity to one witness and not another can implicate a

16     defendant's due process rights.

17                 And if I may, I just wanted to point the Court in

18     particular to three case that I think are particularly helpful

19     and relevant.  One is *Earl versus United States*, it's a

20     decision of the D.C. Circuit from 1965 written by then Judge

21     Burger.  And Judge Burger indicated in that opinion, admittedly

22     dicta, but this is language that's quite relevant to this

23     particular situation, where he said:  We might have quite

24     different and more difficult problems if the government in this

25     case secured testimony from one eye witness by granting him

1   immunity while declining to seek an immunity grant for Scott --

2   the person for whom the defendant wanted immunity -- to free

3   him from possible incrimination to testify for Earl, the

4   defendant.  That situation would vividly dramatize an argument

5   on behalf of Earl that the statute as applied denied his due

6   process.

7            So just the same situation here, where we have two

8   people seated in front of the BearCat, one of whom received

9   immunity, one of whom does not have immunity, and Mr. Slatten

10  would like to call that witness to provide exculpatory

11  testimony.

12           The second opinion that I would urge the Court to

13  look at is the Third Circuit's opinion in *United States versus*

14  *Quinn*, it's an en banc decision from 2013.  This was the

15  decision in which the Third Circuit reversed itself and held

16  that Courts do not have the power to grant immunity themselves,

17  bringing it in line with the other circuits.

18           But it went on to survey the case law from the other

19  circuits to recognize that there are due process implications

20  from the government's selective use of immunity and that in

21  situations where the selective use of immunity would deprive a

22  defendant of the right to call highly exculpatory testimony, it

23  can give rise to due process violation and require dismissal of

24  the indictment.  Now, the Court acknowledged there might be

25  alternative remedies, but didn't go into what those alternative

1      remedies might be.

2              The final opinion I would urge the Court to consider

3      is Judge Kozinski's opinion, admittedly a dissenting opinion

4      from the *Paris* case in the Ninth Circuit from 1987, where Judge

5      Kozinski also recognized the premise that the due process

6      clause can be implicated when the government chooses to give

7      only selective immunity to some witnesses and not others.

8              And he says -- acknowledging that the Court can't

9      grant immunity itself, he wrote:  The Court does have the

10     immunity -- excuse me, the authority, indeed, the

11     responsibility to ensure that the accused is given a fair

12     trial.  When the prosecutor's refusal to grant immunity results

13     in such unfairness to the accused that it amounts to a denial

14     of due process, the Court must exercise the considerable powers

15     it does have to even the balance.  And in this case Judge

16     Kozinski said in that case what he would have done was to

17     strike the testimony that was -- that the government provided,

18     that would have been rebutted by the testimony that it refused

19     to grant the immunity for.

20             So, given the unique situation in this case, where we

21     have these two witnesses, they're in the same place, both of

22     whom are evenly capable of knowing whether it was Mr. Slough or

23     Mr. Slatten who fired first, and given what we have learned

24     from Mr. Coffield about what Mr. Liberty would say, we do ask

25     the government to grant Mr. Liberty immunity.  They have said

1   they're willing to consider asking Main Justice to grant him

2   immunity.  I'm not really sure what that means.  But if the

3   Court -- if they're willing to do that and if they decide to

4   grant him immunity, then the rest of our motion would be moot.

5   But, if they decide not to, then I would come back to the Court

6   next week and renew the alternative measures that we've asked

7   for.

8           THE COURT:  Okay.

9           MR. MARTIN:  Your Honor, good afternoon.  Miss

10  Saharia is right in one respect and probably only one respect,

11  which is now that she's asked, we are willing to consider it.

12  It's been an express request as of today.  Two days ago was the

13  first time they even suggested it through their filing.  I

14  believe she has conceded -- or, essentially conceded that the

15  Court does not have that authority.  That continues to be our

16  position.

17          Factually, Your Honor, I think, for the record, it is

18  worth stretching out just a little bit.  In February we made

19  this disclosure, shortly after finding this out from

20  Mr. Coffield, who did provide counsel with essentially the

21  information provided in the disclosure to defense counsel.  I

22  went back to Mr. Coffield and asked if we could talk to his

23  client.  And at that time there was some delay in his getting

24  back to me, which I understood because he would have to go talk

25  to his client, see if his client was interested.  Through

1    Mr. Coffield Mr. Liberty said no, I have no interest in talking

2    to you.

3            So, again, in terms of the record, we at no time

4    asked him to testify or contemplated him testifying.  We

5    received this information from Mr. Coffield.

6            THE COURT:  The information you received at that time

7    was that Mr. Coffield was saying that Liberty said that Slough

8    was the shooter?

9            MR. MARTIN:  It was even a step back from that.  It

10   was that according to Mr. Liberty, that Mr. Coffield was

11   representing that Mr. Liberty would say that others before

12   Mr. Slatten fired, based upon Mr. Liberty's recollection of the

13   timing of events, and that Mr. Slatten did fire, but not at the

14   white Kia, he fired at other targets, words to that effect.

15           So didn't specifically identify Mr. Slough, but

16   nevertheless, that was the basics of it.  So when we had asked

17   to sit down with Mr. Liberty to flesh that out, there was a no.

18   We did disclose what we had at the time and provided

19   Mr. Coffield's name and number.  And, of course, defense

20   counsel is well aware of who Mr. Coffield is, and received a

21   response that Mr. Liberty did not want to talk to us.  Of

22   course, we had -- that was well before the last trial; no

23   request from the defendant to -- for us to seek authority from

24   the Department of Justice and then seek an application for a

25   court-ordered immunity.  At that time no request for that in

1     the run-up for this trial or throughout trial.

2          And then, finally, we were here two days ago and

3     there's a claim that the government somehow has violated their

4     client's due process, which is, frankly, laughable because it

5     can't be that when they've never expressly asked about it and

6     they had never done that until two days ago.

7          So, what I want to make clear and is not clear from

8     the filing by the defense, and the Court is well aware of this,

9     but for the record, we can't just, as an office with the U.S.

10    Attorney's Office, just decide that we are going to seek a

11    court order for immunity.  We do need to go to the Department

12    of Justice, that's required by the statute.  And the Department

13    of Justice, a high-level official has to take any number of

14    considerations into account before they grant us that

15    authority, has to make a determination.

16         So what we are promising to do is now that there has

17    been an express request, we're going to go parallel paths,

18    which is, one, we have to -- the Court already asked that the

19    body be moved, if you will, through a forthwith order.  Because

20    regardless how the Court ultimately resolves the issue, whether

21    we are in fact going to ask and we receive Court-ordered

22    immunity and so there is no issue, we would need him here.  But

23    if we go to the Department of Justice for other reasons, decide

24    we are not going to seek that, we will let -- seek Court-

25    ordered immunity, we will let the Court know that ASAP so then

1    the Court can deal with the other, if you will, relief sought

2    by the defendant.  Until then it's premature.

3           And Miss Seifert would very much like to respond to

4    all of Mrs. Saharia's legal arguments, but to save the Court at

5    least some time today, we don't think that's necessary.

6           THE COURT:  What is the timeframe for when the

7    Department would determine that the -- the U.S. Attorney would

8    make a recommendation, first?

9           MR. MARTIN:  Yes.

10          THE COURT:  Is that going to be today?

11          MR. MARTIN:  That should be today, Your Honor.  And

12   then what would happen is -- assuming we can get all of the

13   paperwork together, it's a formal application, we would forward

14   that to a point of contact in the Department of Justice, who we

15   have talked to already.

16          THE COURT:  Is that delegated by the assistant

17   attorney general for criminal to one of his deputies?

18          MR. MARTIN:  It is.  Deputy assistant attorney

19   general.  And we've been in contact with that person, who is

20   aware of the request and is aware there may -- or, aware of the

21   potential request, and it may be coming as early as today.

22          THE COURT:  Conceivably it could be decided Monday?

23          MR. MARTIN:  Conceivably, yes.  We have provided that

24   information in terms of the timing considerations to the

25   Department and let them know where we are in the case, we would

1    like prompt action.  Fortunately -- or unfortunately, depending

2    how you look at it -- in this case there have been requests for

3    immunity orders, three different instances.  So they're

4    familiar with the facts at least and they're at least primed,

5    the same people are in place, if you will, that have seen prior

6    requests.

7            THE COURT:  But the deputy who approved it for Watson

8    would be long gone, I assume.

9            MR. MARTIN:  That's correct.  But the deputy -- the

10   person who holds that position right now actually has a lot of

11   familiarity with the case and the prior immunity orders.  So

12   we're probably in good stead that way, and I've talked

13   personally to that person.

14           THE COURT:  Okay.  You could notify me this afternoon

15   whether the U.S. Attorney has recommended it, and that would

16   make a difference in whether I want to order the marshal to go

17   up this weekend.

18           MR. MARTIN:  Your Honor, I think the earliest I could

19   get back to you with a firm answer, because although we have

20   greased the skids, if you will, up the chain, in my current

21   position there are some people, many people ahead of us.

22           THE COURT:  I understand.

23           MR. MARTIN:  So, criminal chief, principal, and then,

24   obviously, U.S. attorney.  We have let those individuals know

25   it should be coming, but they would want to review the packet,

1    I'm sure, before a formal request went over to the Office of

2    Enforcement Operations, which is Department of Justice.

3              THE COURT:  I'm just trying to assess whether or not

4    to impose a burden on the marshals for transport.

5              MR. MARTIN:  Your Honor, without speaking for the

6    U.S. Attorney --

7              THE COURT:  Four and a half hours each way, so --

8              MR. MARTIN:  Without speaking for the U.S.

9    Attorney -- before I had spoken for the Solicitor General at

10   one time.  But without speaking for the U.S. Attorney, I think

11   I can say there is a high percent chance that she will

12   authorize us to seek authority.

13             THE COURT:  Seek authority?

14             MR. MARTIN:  Seek authority.  I can't say

15   definitively because she hasn't seen the packet.  But, yes, I

16   think there's a high percentage chance she will allow us to

17   seek authority.  And that's as much as I think I can say right

18   now.

19             THE COURT:  Okay.  All right.  Let me see counsel at

20   the bench off the record.

21             (Whereupon an off-the-record discussion was had at

22   the bench.)

23             MR. MARTIN:  Your Honor, you dimed me out, didn't

24   you?

25             THE COURT:  Do you all have the ASR and the other

1    information to do a forthwith subpoena?

2              MR. MARTIN:  Your Honor, I believe we provided what

3    we have needed to provide.  But we will -- if you want, I can

4    step away right now --

5              THE COURT:  Why don't you step away right now because

6    they're going to need to get a team together to send people up

7    there.  I'll take a minute now and let's see if we can get --

8    because they're going to need to get a team on their way.

9              MR. MARTIN:  Will do, Your Honor.

10             THE COURT:  They can't do anything without an ASR and

11   all that kind of stuff, and a forthwith subpoena.

12             MS. SAHARIA:  Thank you, Your Honor.

13             THE COURT:  Let's wait until he gets that done.

14             MS. SAHARIA:  Sure.  Fine.

15             THE COURT:  Off-the-record.

16             (Pause.)

17             THE COURT:  All right.  You had some other issues you

18   wanted to raise.  Back on the record.

19             MS. SAHARIA:  The only other motion that's pending is

20   the motion relating to the audio recordings of Mr. Moniem.

21             THE COURT:  Oh, yes.

22             MS. SAHARIA:  I'll be very brief, Your Honor.

23             THE COURT:  I have not talked to the chief of the

24   court reporters about that.  So, I don't know if you've talked

25   to him or not.

```
 1          MS. SAHARIA:  We have not talked --
 2          THE COURT:  I know they're very reluctant to ever do
 3   anything like that, but I have not discussed it with them.
 4          MS. SAHARIA:  Sure.  Let me give a little background
 5   with resect to the recordings, which is that we have learned
 6   that the interpreters are not court-appointed interpreters, but
 7   actually were retained and paid by the government.  And just to
 8   be clear, that's not improper, that's actually how the Court
 9   Interpreters Act works in a criminal case.  For government
10   witnesses, it's the government that retains and pays the
11   interpreters.
12          THE COURT:  Statute says that?
13          MS. SAHARIA:  It does.  I believe the government will
14   agree with me on that.
15          MR. CAMPOAMOR-SANCHEZ:  Yes.
16          THE COURT:  I didn't know that.
17          MS. SAHARIA:  We didn't know that either, Your Honor.
18   And actually, I think at one point in the trial you told the
19   jury that they were neutral Court-appointed interpreters.  It
20   turns out they're not, and we just didn't know that either.
21          And so, in light of -- when we learned that, we asked
22   the government whether they had been participating in witness
23   prep sessions.  And they have disclosed to us that in many
24   cases they use the same interpreters both to translate at trial
25   and to do witness prep.
```

1          And last night Mr. Martin disclosed to us that two of

2     the interpreters who interpreted Mr. Moniem's testimony here at

3     trial did participate in his witness prep sessions.  And so in

4     light of that and in light of the fact that when we raised our

5     concern about Mr. Moniem's change in testimony to use the word

6     "assuming" with the Court, Mr. Moniem -- excuse me, Mr. Martin

7     responded that perhaps it was a translation issue.

8          Our concern is that perhaps the interpretation could

9     have been shaped by the fact that they were also participating

10    in witness prep sessions.  And I don't want to accuse them of

11    any sort of improper conduct, because I'm not -- I have no

12    reason to believe that is the case.  But interpretation, as we

13    know, is an art, not a science, and there are choices that are

14    made and it is -- in choosing what the appropriate word is and

15    it's possible that subconsciously, because they were involved

16    in witness prep, they interpreted the word "believed," for

17    stance, as "assuming."

18          And so, if those tapes exist, we request access to

19    them, to check those very brief portions of Mr. Moniem's

20    testimony.  The Court does have authority under the Court

21    Interpreter's Act to order in advance the audio recordings

22    being made of interpreted witnesses testimony.  Now, because we

23    didn't know before his testimony that these were not court-

24    appointed experts, we didn't ask for that in advance.  But to

25    the extent these do exist, we request access to them for these

1    reasons.

2              MR. CAMPOAMOR-SANCHEZ:  Your Honor, just very

3    briefly.  First of all, I want to be clear that although the

4    Act requires that the government pay for them and retain them,

5    they still are neutral and they do take an oath.  So I think

6    that I want to be very clear that we do consider it to be

7    neutral.  And so this -- the other part that concerns me is --

8    obviously, the court reporters have their recording, if the

9    Court wants to order, we're not going to oppose.

10             The concern I want to raise for the Court is I don't

11   want all of these cases, but in particularly this one, to turn

12   into a battle then as to some other expert from the first is

13   going to come in and say, well, I do not agree with the

14   translation that was done, then we can have another expert that

15   says, well, no, I think I do, and I think the Iraqi dialect is

16   different from the dialect elsewhere.  And so we are

17   potentially opening up a can of worms in terms of different

18   interpretations as to what an interpreter says.  And now, of

19   course, it's very difficult to go back and try to get Mr. Sayid

20   again.

21             But in any event, if the Court is inclined to do so,

22   we do not have a concern.  Our main request would be that it be

23   limited to just the area, as opposed to us having to -- both

24   sides review, you know, hours of testimony and then come up

25   with dueling experts as to how the translation was conducted

1      and have a mini trial as to whether the interpreters are

2      properly interpreting.  And so that's our main concern in all

3      of this.  Thank you.

4           MR. MARTIN:  Your Honor, sorry to tag team.  I just

5      want to supplement, just so the Court is well aware of what we

6      did provide last night.

7           There were three interpreters who interpreted for

8      Mr. Moniem when he took the stand on two different dates, one

9      was on November 16th and then one was on November 19th.  On

10     November 16th the two interpreters who provided court-

11     appointed, under oath translation services, interpretation

12     services, those two were present and retained by the government

13     to provide interpretation services during witness conferences.

14          Of course, when they provide these interpretation

15     services in court, per their oath, they are neutral and they

16     provide those interpretation services.  On that date, according

17     to the interpretation, Mr. Moniem did use at one time the word

18     "assume."

19          On Monday, that following day, that following court

20     appearance by Mr. Moniem, there were two other interpreters.

21     One was an interpreter who had been in on the witness

22     conferences, one was an interpreter who had not been in on any

23     witness conferences with the witness.  And it's still unclear

24     to us exactly whether that interpreter who provided the court

25     interpretation services and was not part of the witness

1    conferences was the one who interpreted the word "assume,"

2    because on that date Mr. Moniem again, a second time, used the

3    word "assume" in reference to the issue.

4              And so, it's not entirely clear exactly which

5    interpreters interpreted what.  But there is a possibility, at

6    least, that some of the interpreters that were in on the

7    witness conferences were certainly the ones that were there for

8    the first use of the word "assume," but one of the interpreters

9    who was not part of that was here interpreting for that second

10   time.  And I just thought it would be helpful to the Court to

11   understand that that was the full disclosure that the

12   government made.

13             THE COURT:  All right.  Any other issues?

14             MS. SAHARIA:  The only other issues I have on my list

15   are -- I think we were going to address the issue with the

16   jurors today.

17             THE COURT:  Yes.

18             MS. SAHARIA:  Your Honor asked for argument on the

19   motion for acquittal today instead of Monday, even though the

20   government hasn't closed yet.  If Your Honor still wants

21   argument today on that, I will do that.

22             THE COURT:  I think it would be useful.

23             MS. SAHARIA:  And then there's the jury instructions,

24   which we just have a few proposed tweaks to the jury

25   instructions.  Which order would you like?

1          THE COURT:  Either way.

2          MS. SAHARIA:  Okay.  Okay.  Let me turn to the Rule

3     29 motion then, Your Honor.  And I'll try to be brief because

4     you've heard this argument before.  But I do want to make our

5     record.

6          Your Honor, Mr. Slatten is innocent.  He did not

7     shoot the driver of that white Kia, let alone murder the driver

8     of the white Kia.  We move for judgment of acquittal on each

9     and every element of the indictment.  Excuse me.

10          The standard is not the civil standard for judgment

11     as a matter of law.  As Your Honor is aware, in the civil

12     context the question is whether there's any modicum of evidence

13     in the record that supports the claim.  That's not the standard

14     here, and that's because the government's burden in a criminal

15     case is much higher.  The question is whether a reasonable

16     juror must necessarily have a reasonable doubt.  And we submit

17     that fundamentally in this case any reasonable juror must have

18     a reasonable doubt as to whether Mr. Slatten shot the driver of

19     the white Kia.

20          As the jury instruction that the Court gave at the

21     last trial says, a reasonable doubt necessarily exists when

22     there is a fair possibility that the defendant is innocent.

23     And in this case any reasonable juror would have to conclude on

24     this record that there is at least a fair possibility that

25     Mr. Slatten is innocent.  We move as to each and every element

 1    of the indictment.  I'm going to focus on three of them, but we

 2    move as to all of them.

 3          And because of the unusual posture where we have put

 4    in some of the evidence in the defense case out of turn, I'm

 5    going to focus just on the evidence that was presented in the

 6    government's case, and that does not include Mr. Slough's

 7    statements because we put them in the defense case this time.

 8          With respect to the first question, whether

 9    Mr. Slough caused the death of the white Kia driver.  Your

10    Honor is well aware of our arguments and so I'll be very brief.

11    There are three eyewitnesses who identify Mr. Slough as the

12    person who shot the driver:  Mr. Moniem, Mr. Khalif, and

13    Mr. Ridgeway.  This evidence must necessarily create a

14    reasonable doubt in a rational juror.

15          What does the government have in response?  Well, it

16    has conjecture that those eyewitnesses could be wrong or that

17    they were now merely assuming that they saw Mr. Slough shoot

18    the white Kia driver.  They have the grand jury testimony of

19    Jimmy Watson, which, by the way, is not even consistent with

20    the government's theory of what happened.  He claims he heard

21    pops outside the vehicle, he heard people calling out

22    "contact," and then at some -- and then after then is when he

23    heard Mr. Slatten supposedly shoot.  That's not even consistent

24    with the government's theory of what happened in this case.

25    They have just plucked one tiny piece out of his grand jury

1    testimony and held that up and asked the jury to ignore the

2    rest, even with the grand jury testimony.

3          And finally, they have Mr. Murphy's speculation that

4    something he had never heard before matched something else he

5    had never heard before.  And if Your Honor needs any further

6    proof that Mr. Murphy is speculating, I would submit that what

7    happened with his testimony about the suppressor is proof

8    positive that he's just making up these theories as he goes

9    along to come up to his desired conclusion.

10         You have these two pieces of ear-witness testimony

11   that are completely unreliable compared to the substantial

12   weight of eyewitness testimony, all of whom saw Mr. Slough

13   shoot the driver.  On this record any reasonable juror would at

14   least have a reasonable doubt about whether Mr. Slatten shot

15   that white Kia driver.

16         Second, there is insufficient evidence that

17   Mr. Slatten acted with the requisite mental state.  I'm not

18   going to belabor the standard, but to prove first degree murder

19   the government must show that the defendant acted with malice

20   aforethought and after premeditation.  There's no evidence

21   whatsoever that Mr. Slatten deliberated over killing the white

22   Kia driver; there's no testimony regarding his actions before

23   the alleged shots that day; there's no testimony establishing

24   his mental state before the alleged shots that day; no

25   testimony whatsoever about what he was doing before those

 1    alleged shots.

 2            And we respectfully reiterate, as we've indicated

 3    before, that the government's Rule 404(b) evidence does not

 4    demonstrate that he had an intent to murder an innocent Iraqi

 5    civilian.

 6            With respect to the element of mitigating

 7    circumstances, even an unreasonable belief in the need to use

 8    force defeats the government's claim.  They cannot prove that

 9    that white Kia was stopped when the first shots occurred.  The

10    only person who saw the white Kia -- what it was doing when

11    those first shots occurred was Mr. Ridgeway, who said that when

12    he heard the first shots and turned immediately, he saw

13    Mr. Slough firing on the white Kia as it was moving.  All of

14    the other eyewitnesses were not looking at the white Kia when

15    it was shot.  Mr. Moniem and Mr. Khalif had their backs to the

16    white Kia, they were looking at the convoy.  And the other

17    Iraqi eyewitnesses -- or, witnesses who were in the area,

18    Mr. Majed and Mr. Hayder, likewise, said nothing about what the

19    white Kia was doing when it was first shot.

20            Beyond those core elements, we reiterate our position

21    that the government has failed to prove jurisdiction under

22    MEJA, as well as the fact that they cannot establish that venue

23    is proper in D.C.  And we acknowledge the D.C. Circuit has

24    ruled on those two issues and we just made those objections to

25    preserve our record.  Thank you.

1        THE COURT:  All right.

2        MR. CAMPOAMOR-SANCHEZ:  Your Honor, again, I'll try

3   to be very brief.  And frankly, we just obviously have a

4   disagreement.  We do not believe he's innocent.  We do believe

5   he murdered Mr. Ahmed.  And I'll try to address very quickly

6   the points raised by Ms. Saharia.

7        According to the defense -- and I understand the

8   arguments they're going to make, but in the light most

9   favorable to the government, actually, the testimony of

10  Mr. Watson -- well, first of all, there's actually no dispute

11  that the first shots are the ones that killed Mr. Ahmed.  Even

12  Mr. Ali and Mr. Sarhan, as soon as they hear they shot, they

13  look, they see the hole in the windshield and, indeed, he had

14  been shot in the middle of the head and he is dead at that

15  point.

16       So the question is who fired those first shots?  And

17  for that the Court has heard and the jury has heard the

18  testimony of Mr. Watson, has heard the testimony of Mr. Murphy.

19  And I'm jumping to the end of Miss Saharia's argument, but she

20  claims that the only person that sees the car is Mr. Ridgeway.

21  Well, that's, unfortunately, not true.

22       We have and the jury heard from Sabah, who was in

23  that elevated position, who hears the scream and looks, and can

24  say and tell the jury that that car was stopped.  We have the

25  testimony of Brian Chase, who talks about how the impact is so

1   slow, that really it could not have been moving as -- before

2   those shots, as the defense would like the jurors to believe.

3          In terms of the mental state and deliberation, I will

4   not belabor the 404(b) evidence, but there is clearly that

5   animus that Mr. Slatten had and that the government has proved.

6   And there is certainly evidence that everything had stopped so

7   Mr. Slatten had the time to deliberate and think before

8   anything happened, what he was going to do and the shot that

9   was taken that day.

10          And there was certainly no mitigating circumstances

11   because, as the government has proved repeatedly, there was no

12   attack, there was nothing that threatened the convoy at that

13   point.

14          So in light of the Rule 29 standard, we believe the

15   motion should be denied.

16          And I would also like to address briefly on the venue

17   after this motion, which is we would request once again, as the

18   Court did the first trial and the last trial, based upon

19   Mr. Ridgeway's testimony, have the Court find that venue has

20   been established and that that is not an issue for the jury to

21   decide in this case.  Thank you, Your Honor.

22          THE COURT:  I'll reserve on the Rule 29 motion until

23   the conclusion of the government's case then.

24          MS. SAHARIA:  Thank you.  If I can turn to the jury

25   instructions.

```
 1                 THE COURT:  Yes.
 2                 MS. SAHARIA:  We had a very lengthy charge conference
 3      at the last trial and so I don't need to reargue our
 4      objections.  We've set them forth in ECF 1171.  Now, under the
 5      rules we are obligated to make our objections after you've
 6      instructed the jury but before they retire.  And I very much
 7      appreciated how the Court did it the last time, where you said
 8      you needed to make sure you read them correctly and you called
 9      us up.  And so I would ask that Your Honor do that again and we
10      will make our very brief objections.
11                 So we have just a very few proposed tweaks to the
12      objections in light of what has transpired in this case and --
13      in this trial.  And I'll just walk through them very briefly
14      and we can take them one by one, if you would like?
15                 MR. MARTIN:  Do you mind if I interrupt you for a
16      second?
17                 MS. SAHARIA:  Yeah.
18                 MR. MARTIN:  Your Honor, I apologize.  These were
19      filed Wednesday night, like late in the evening.  We've been
20      dealing with other motions.  We're not prepared to address
21      them.  We would characterize them as much more than tweaks, and
22      we're going to have substantive objections to a lot of them.
23      We just haven't had the chance to look at them and we didn't
24      think that that --
25                 THE COURT:  We can do it at the end of the dayMonday.
```

```
1              MS. SAHARIA:  That's fine, Your Honor.  So I think

2       the only issue left is the juror issue.

3              MR. BUTSWINKAS:  May we approach?

4              THE COURT:  Yes.  And this we'll do under seal.

5              (Sealed bench conference:)
```







10          (Open court:)

11          THE COURT:  I'll see you all Monday.

12          MS. SAHARIA:  Thank you, Your Honor.

13          MR. MARTIN:  Thank you, Your Honor.

14                         *   *   *

CERTIFICATE OF OFFICIAL COURT REPORTER

        I, JANICE DICKMAN, do hereby certify that the above
and foregoing constitutes a true and accurate transcript of my
stenograph notes and is a full, true and complete transcript of
the proceedings to the best of my ability.

                    Dated this 11th day of December, 2018.




                    /s/_____

                    Janice E. Dickman, CRR, RMR
                    Official Court Reporter
                    Room 6523
                    333 Constitution Avenue NW
                    Washington, D.C. 20001