**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 14-107 (RCL)** |
| | : | |
| **v.** | : | |
| | : | |
| **NICHOLAS ABRAM SLATTEN** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the defendant's Motion for Judgment of Acquittal (ECF. No. 1217). On December 19, 2018, the defendant was once again convicted of first-degree murder in the death of Ahmed Haithem Ahmed Al-Rubia'y. The government's evidence was sufficient for a rational juror to conclude that the defendant fired first on September 16, 2007, killing Al-Rubia'y, and setting into motion that day's horrific events. Indeed, the sufficiency of the evidence against the defendant has been affirmed in the last three trials. When considering a similar record, the D.C. Circuit held "that it would have been reasonable for the jury to find that Slatten killed Al-Rubia'y." *United States v. Slatten*, 865 F.3d 767, 797 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 1990 (2018). Likewise, in October 2018, with an almost identical record, this Court found that "a reasonable jury could find Mr. Slatten guilty of first-degree murder." ECF No. 1030 at 3. And, in the most recent trial, the Court once again denied the defendant's motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. *See* 12/10/18 AM Tr. at 4039-40.

Ignoring this precedent, the defendant insists Paul Slough "confessed" to the shooting, and

that "every eyewitness to the shooting corroborated Mr. Slough's confessions." Motion at 1. As detailed below, this characterization is contrary to the majority of the record evidence before the Court. Instead, a rational juror could conclude beyond a reasonable doubt that the defendant, acting with malice aforethought and premeditation, killed Al-Rubia'y. The defendant's instant motion advances no new arguments, relying instead on the same assertions this Court and the D.C. Circuit have now rejected numerous times. The defendant's renewed Motion for Judgment of Acquittal should once again be denied.

## FACTUAL BACKGROUND

At approximately noon on September 16, 2007, Raven 23, a 19-person response team for Blackwater Worldwide, departed the green zone and entered Nisur Square in Baghdad, Iraq. The Raven 23 convoy was comprised of four armored vehicles, with the defendant in a Bearcat, the command vehicle. The four vehicles stopped in the southern end of Nisur Square, a traffic circle. Once in the circle, multiple witnesses testified that all the cars in and around the circle, including the victim's white Kia, came to a complete stop. 11/5/18 PM Tr. at 625 (Al-Gharbawi); 11/7/18 PM Tr. at 1013 (Murphy); 11/13/18 PM Tr. at 1277, 1282 (Abdulrahman); 11/14/18 PM Tr. at 1469 (Watson); 11/16/18 PM Tr. at 1976-77 (Moniem); 11/19/18 PM Tr. at 2165-66 (Al-Hamidi); 11/26/18 PM Tr. at 2391 (Mealy); 11/29/18 PM Tr. at 3105 (Randall); 12/6/18 PM Tr. at 3873-74 (Al-Khafaji).

The defendant baselessly claims that Paul Slough, a turret gunner on top of the command vehicle, was the "only witness" to observe what happened next. Motion at 2. Yet, numerous witnesses, Iraqi civilians and Blackwater personnel alike, testified to the following sequence. First,

the sound of single gunshots broke the stillness that had fallen on the circle. 11/5/18 PM Tr. at 624-25 (Al-Gharbawi) (one shot from an American-style weapon); 11/7/18 PM Tr. at 1017 (Murphy) (two loud pops); 11/14/18 PM Tr. at 1492-93 (Watson) (defendant fired two shots using his SR-25); 11/16/18 PM Tr. at 1981 (Moniem) (between one and ten, but less than ten shots); 11/19/18 PM Tr. at 2166 (Al-Hamidi) (three to four shots); 11/26/18 PM Tr. at 2395 (Mealy) (some pen flares); 11/29/18 PM Tr. at 3114-15 (Randall) (few single shots, not automatic-style fire); 12/6/18 PM Tr. at 3874 (Al-Khafaji) (a shot). These single shots were followed by a woman screaming "my son, my son," coming from the direction of the victim's white Kia. 11/5/18 PM Tr. at 626 (Al-Gharbawi); 11/13/18 PM Tr. at 1277 (Abdulrahman); 11/16/18 PM Tr. at 1981-82 (Moniem); 11/19/18 PM Tr. at 2168 (Al-Hamidi); 12/6/18 PM Tr. at 3874-75 (Al-Khafaji).

After the initial shots, multiple witnesses observed holes in the windshield of the white Kia and saw that the driver, Al-Rubia'y, had been shot in the head. 11/5/18 PM Tr. at 626 (Al-Gharbawi) ("I saw a hole in the windshield of that car from the side of the driver, and the windshield was splattered with blood"); 11/16/18 PM Tr. at 1983-84 (Moniem) (observed a "hole in the front windshield" of the white Kia and that the driver had a hole between his eyebrows); 11/19/18 PM Tr. at 2168-69 (Al-Hamidi) (saw "three to four shots" on the front windshield and the driver's "whole face was full of blood"). Multiple Iraqi and Raven 23 witnesses testified that the initial shots originated from the same direction as the command vehicle, the vehicle in which the defendant lay prone, hidden from view. 11/7/18 PM Tr. at 1017 (Murphy); 11/14/18 PM Tr. at 1492-93 (Watson); 11/19/18 PM Tr. at 2167 (Al-Hamidi); 11/26/18 PM Tr. at 2395 (Mealy); 11/29/18 PM Tr. at 3110 (Randall).

3

Two witnesses identified the defendant as the first Raven 23 member to fire in Nisur Square. Jimmy Watson, the Raven 23 shift leader on September 16, 2007, heard the defendant fire his SR-25 rifle before anyone else in Raven 23 at the onset of the shooting. As in the past two trials, the jury learned that Watson testified before the grand jury on March 13 and 14, 2013. Over those two days, Watson reaffirmed, no less than six times, that the defendant was the first to fire. *See, e.g.*, 11/14/18 PM at 1493 (Q. "So your recollection of the first person who shot from vehicle number three, your command vehicle, was who?" A. "My recollection was Nick Slatten yelled out contact, contact, and fired twice . . . then right after the second shot, the turret guns opened up . . . ."). Watson explained that he was in the front passenger's seat of the Bearcat, within close proximity of the defendant. *Id.* at 1474. Prior to the first shots, the defendant was positioned behind Watson, looking out the portholes on left side of the vehicle towards the south—the same direction as the white Kia. *Id*. at 1475, 1502. Watson could distinguish the defendant's SR-25 from other weapons. *Id.* at 1498-99 (Q. "[C]ould you distinguish Mr. Slatten's SR-25, the sniper rifle, from other weapons?" A. "Yes." Q. "No doubt in your mind?" A. "Yes."). Watson had heard the other weapons fired previously, including the defendant's SR-25. *Id.* at 1477. And, although Watson could not recall portions of his 2013 grand jury testimony, he affirmed that there was "no doubt in [his] mind" that he can tell the difference between an SR-25 and an M-4 rifle, and that if he had described the first shots as "two booms" in 2013, "then it was that SR gun," the defendant's SR-25. *Id.* at 1504.

Matthew Murphy, a turret gunner in the vehicle directly in front of the command vehicle, was in an opportune observation position when he heard the initial "two loud hollow popping

sounds," 11/7/18 PM Tr. at 1017 (Murphy), thereby corroborating Watson's testimony. Like Watson, Murphy was familiar with the various weapons carried by the other convoy members and had heard each weapon fired previously. *Id.* at 1018. Based on this familiarity, he was able to determine that the two hollow pops were distinct from an M-4 rifle or the burst of an M240. *Id.* at 1018. Murphy had heard the defendant's SR-25 rifle, but had not heard the SR-25 fired while the shooter was inside a vehicle. *Id.* at 1022. Ultimately, based on a combination of factors, including where the pops originated, Murphy concluded that the initial sounds were attributable to the defendant's SR-25. *Id.* at 1023.

It was only after these initial shots that the white Kia began to roll forward slowly. 11/5/18 PM Tr. at 626 (Al-Gharbawi); 11/13/18 PM Tr. at 1283 (Abdulrahman); 11/16/18 PM Tr. at 1994 (Moniem); 11/19/18 PM Tr. at 2173 (Al-Hamidi). As the white Kia began to creep forward, the car was engulfed in heavy gunfire. 11/13/18 PM Tr. at 1283 (Abdulrahman); 11/16/18 PM Tr. at 1992 (Moniem); 11/19/18 PM Tr. at 2173 (Al-Hamidi). And after the initial shots, when the white Kia was moving slowly, multiple Raven 23 members observed Paul Slough fire his M240 machine gun at the Kia. 11/14/18 PM Tr. at 1493 (Watson); 11/26/18 PM Tr. at 2404 (Mealy); 11/29/18 PM Tr. at 3119 (Randall). Slough was also seen firing his M230 grenade launcher, which is attached to the M-4 rifle. 11/13/18 AM Tr. at 1206 (Murphy).

In the immediate aftermath of the shooting, the defendant was described as defiant and celebratory, high-fiving other Raven 23 members. 11/7/18 PM Tr. at 1057 (Murphy); 11/26/18 PM Tr. at 2430 (Mealy). The defendant also bragged that he had "popped [a man's] grape," who then

"slumped forward," 11/27/18 PM Tr. at 2689 (Ridgeway), aptly describing what would happen if someone was shot in the head while sitting behind the wheel of a car. The defendant added that the man had been taking aim at the convoy, *id.*, but none of the trial evidence supports this claim. After the massacre, the defendant also confided that he thought there was something wrong with him because of how he felt/did not feel after he killed people. 11/7/18 PM Tr. at 1057 (Murphy).

## LEGAL BACKGROUND

Pursuant to Federal Rule of Criminal Procedure 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In determining the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983) ("[J]udgment of acquittal is appropriate only when there is *no* evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt.") (emphasis in original). The jury is "entitled to draw a vast range of reasonable inferences from evidence, but may not base a verdict on mere speculation." *United States v. Harrison*, 103 F.3d 986, 991 (D.C. Cir. 1997) (quoting *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990)). A court must, "drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Battle*, 613 F.3d 258, 264 (D.C. Cir. 2010) (quoting *United States v. Andrews*, 532 F.3d 900, 903 n. 1 (D.C. Cir. 2008)); *see also United States*

*v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983) (affirming a court "must presume that the jury properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences").

When reviewing a post-verdict motion for judgment of acquittal under Rule 29, a court "must view the evidence in the light most favorable to the verdict." *Campbell*, 702 F.2d at 264. "Typically, the jury's determination will stand unless no reasonable juror could have found a defendant guilty beyond a reasonable doubt." *United States v. Ring*, 768 F. Supp. 2d 302, 304 (D.C. Cir. 2011) (citing *United States v. Cook*, 526 F. Supp. 2d 10, 18 (D.D.C. 2007)).

## ARGUMENT

I.    **The Record Evidence Again Supports the Defendant's First-Degree Murder Conviction.**

The record evidence clearly establishes that a rational juror could once again conclude beyond a reasonable doubt that the defendant murdered Al-Rubia'y on September 16, 2007. Specifically, the evidence shows that when the Raven 23 convoy entered and "locked down" the traffic circle, no cars, including the victim's white Kia, were moving. After the first shots, Ali Al-Hamidi, an Iraqi police officer, ran to the Kia and saw the driver Al-Rubia'y had been shot in the head, causing the Kia to slowly roll forward. Sarhan Moniem, another officer, observed the driver with a wound in the middle of his forehead. Watson and Murphy both identified the defendant as the first member of Raven 23 to shoot. From this, a rational juror could conclude that the initial, single shots from the convoy killed Al-Rubia'y, and that the defendant, the first Raven 23 member to shoot, was the one who killed him.

Dismissing this record, the defense blithely asserts there has "never been a weaker prosecution." Motion at 1. In addition to ignoring the evidence of what transpired on September 16, 2007, the defendant disregards all evidence of the defendant's opportunity, motive, and intent to shoot Al-Rubia'y without provocation, in the absence of a threat to either himself or the Raven 23 convoy. The defendant occupied a unique role on Raven 23. As the defensive designated marksman, the defendant alone carried the SR-25 rifle, 11/7/18 PM Tr. at 994 (Murphy), and utilized a high-powered Leopold scope, 11/14/18 PM Tr. at 1478 (Watson). Additionally, the defendant's SR-25 had been improperly modified to be on a hair trigger. 11/29/18 PM Tr. at 3184-85 (Martin). Concealed within the command vehicle with the Leopold scope, the defendant was more able to see his surroundings in greater detail than a turret gunner like Paul Slough, who was exposed to the sun and without the same high-powered scope. *See, e.g.*, Ex. 9425 (view from Leopold scope at 10 magnification); Ex. 9402 (view from turret with no magnification).

The defendant was also distinctive in his animus toward the Iraqi people. 11/7/18 PM Tr. at 985-87 (Murphy); 11/26/18 PM Tr. at 2371 (Mealy); 11/27/18 PM Tr. at 2638 (Ridgeway). Referring to the Iraqi people, the defendant said, "Those people's lives are not worth anything, they are not even humans, they are animals." 11/26/18 PM Tr. at 2371 (Mealy). Multiple Raven 23 members explained that the defendant would make such comments regarding the Iraqi people in general, not towards insurgents specifically. 11/07/18 PM Tr. at 987 (Murphy); 11/26/18 PM Tr. at 2372 (Mealy). The defendant was not alone in his animus toward the Iraqi people. Other Raven 23 members, including Slough, likewise made derogatory comments and failed to distinguish between innocent civilians and insurgents. *See* 11/28/18 AM Tr. at 2750 (Ridgeway).

However, the defendant's hatred was notable even among those who harbored animosity. 11/07/18 PM Tr. at 985-86 (Murphy) ("[T]here was a general prevailing view that the Iraqis are the enemy, and everyone was on some end of that spectrum . . . I would say Nick was to the far end of that opinion . . . .").

In addition to a general disdain towards the Iraqi people, the defendant was motivated by a desire to get "payback for 9/11," something the defendant claimed he was "well on his way" to achieving. 11/27/18 PM Tr. at 2639 (Ridgeway). Indeed, several Raven 23 members testified to prior incidents when the defendant preemptively fired his weapon or encouraged others to shoot innocuous targets to "draw out fire." *See* 11/7/18 PM Tr. at 999-1004 (Murphy); 11/26/18 PM Tr. at 2378-81 (Mealy); 11/27/18 PM Tr. at 2641-46 (Ridgeway). Taken together, this evidence once again provides sufficient basis for a rational juror to conclude the defendant acted with premeditation and malice aforethought. *See United States v. Seale*, 600 F.3d 473, 495 (5th Cir. 2010) (evidence of racial animus was relevant to show motive and intent); *United States v. Long*, 328 F.3d 655, 661-62 (D.C. Cir. 2003) (evidence shows "a pattern of operation that would suggest intent") (citations and quotations omitted); *United States v. Russell*, 971 F.2d 1098, 1106-07 (4th Cir. 1992) ("Hostility is a paradigmatic motive for committing a crime.").

Likewise, the record evidence again "provided a basis for finding that Slatten had fired first, in the absence of any insurgent fire or other threat to the heavily armed convoy." *Slatten*, 865 F.3d at 767. The defendant emphasizes that Baghdad was an "extremely dangerous place." Motion at 22. However, the record is devoid of any evidence that the Raven 23 convoy was in danger on September 16, 2007, in Nisur Square. *See, e.g.*, 11/7/18 PM Tr. at 1035 (Murphy) (Q. "When you

9

looked back here and saw the shots at the white car, did you see any threats in this area?" A. "I never saw any threats." Q. "That whole day?" A. "At all."); 11/26/18 PM Tr. at 2417 (Mealy) (Q. "Do you recall seeing any threats, armed threats to the convoy?" A. "No."). The defendant's insistence that "multiple witnesses testified that the Kia *could have been perceived as a threat*" is likewise of no import. Motion at 23 (emphasis added). The testimony cited relates to the Kia's perception as a threat *after* the car was set in motion, following the convoy's (defendant's) first initial shots. *See, e.g.*, 11/13/18 AM Tr. at 1215 (Murphy) (Q. "And the white Kia was out in front of all the other traffic?" A. "Yeah . . . that's a fair thing to say." Q. "And it would be fair to say, from what you saw that day, the white Kia could have been perceived as a threat?" A. "[T]hat's a very broad question . . . I can't give a yes-or-no answer to a question that broad."); 11/15/18 PM Tr. at 1776 (Gehsitz) (Q. "[T]hat [the white Kia] was ahead of the line of traffic would have been typical to what you would perceive as a VBIED; correct?" A. "Yes."); 11/15/18 PM Tr. at 1726 (Gosiewski) (Q. "And because [the white Kia] was far enough ahead of the rest of the traffic, you believed that it was a threat . . . ?" A. "Yes, sir."); 11/26/18 PM Tr. at 2385 (Mealy) (Q. "[D]id you yourself perceive the *moving Kia* as a threat to the convoy?" A. "I think it could have been interpreted as a threat for sure") (emphasis added). As detailed above, the Kia was stationary when the defendant fired the first fatal shots. None of the testimony cited supports the contention that the Kia or Al-Rubia'y, who was sitting in traffic with his mother in the passenger's seat, posed a threat to the convoy prior to those first shots.

The defendant counters that it was physically impossible for the defendant to fire upon the white Kia. First, the defendant claims "it was physically impossible for Mr. Slatten to shoot the

driver while laying prone on the bench." Motion at 11. The defendant cites the government's demonstrative test in which Special Agent Brian Cramer used "soft pads" to support his gun while firing outside of a Bearcat's porthole. 12/10/18 AM Tr. 4014-16 (Cramer). Cramer never testified, as the defendant alleges, "it was not physically possible" to shoot out of the porthole *without* the pads. Motion at 11. Yet, inexplicably, the defendant claims it was impossible for the defendant to have fired while laying prone on the bench. *Id.* Second, the defendant asserts that it was "not physically possible to orient a rifle out of the front porthole" at the angle necessary for the defendant to have shot at the white Kia. *Id.* This claim is likewise without merit. Indeed, the defendant's assertion that the white Kia was 20 to 40 degrees from the command vehicle is unsupported by the record evidence. This angle range, which originates from defense counsel's own use of a protractor, was undercut at trial and is based on pure conjecture regarding the potential location of the white Kia and the Bearcat. 12/10/18 AM Tr. at 4019 (Cramer) ("I don't know what the angle of the BearCat was, as in the angle. That would change things."); 12/10/18 AM Tr. at 4026-27 (Cramer) (explaining that he could not account for the precise orientation of the command vehicle within Nisur Square, where the white Kia was when it was first shot, or the exact angle between the Bearcat and the white Kia).[1] When Cramer was asked what such an angle would mean in terms of his position within the Bearcat, Cramer responded, "[i]t's hard to answer a question like that" without being inside the vehicle. 12/10/18 AM Tr. at 4023.

---

[1]    Tellingly, defense expert Carlo Rosati, a scene reconstruction expert, was not asked to recreate the scene in Nisur Square or provide any assessment regarding the angles between the various vehicles. 12/10/2018 AM Tr. at 4066 (Rosati).

Citing defense counsel's own unsubstantiated trajectory analysis, the defendant claims the government can only speculate that "it was even physically possible" for the defendant to have made the shot. Motion at 12. However, "no premium is placed upon direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction." *United States v. Hernández*, 218 F.3d 58, 64 (1st Cir. 2000) (citations and quotations omitted). Watson testified that the direction in which the defendant fired was the same direction as the white Kia. 11/14/18 PM Tr. at 1502-03 (Watson). Watson himself admitted to firing upon the white Kia and was therefore aware of its position relative to the convoy. *Id.* at 1502. Moreover, after firing his first shots, the defendant called out, "White car, white car coming in," thereby demonstrating he was in a position to see the car. *Id.* at 1501-02. Considering this testimony in conjunction with evidence that the defendant fired the initial fatal shots, a rational juror had ample evidence to support a conclusion that the defendant was able to make those first shots, and that those shots killed Al-Rubia'y.

The defendant further argues that there is "no physical or scientific evidence" tying the defendant to the shooting. Motion at 13. The absence of shell casings associated with the defendant's SR-25 is, however, to be expected. As the defense's own expert Brandon Giroux explained, if an individual fired inside a vehicle, as the defendant did, the cartridge casings would remain within the vehicle and would not expel into the circle. 11/26/18 AM Tr. at 2313-14. Moreover, the steering wheel of the white Kia displayed five areas of damage. 11/26/18 AM Tr. at 2308-09 (Giroux). Each of the five areas tested positive for copper and lead, consistent with a bullet or bullet fragment impact. *Id.* However, Giroux was unable to determine which weapon or

ammunition caused each area of damage from these impact marks alone. *Id.* The ballistics evidence (or lack thereof) is neither unusual under the circumstances nor determinative of who fired upon the white Kia.

Moreover, juries are granted latitude "to draw reasonable inferences from basic facts to ultimate facts." *United States v. Torres*, 894 F.3d 305, 312 (D.C. Cir. 2018) (citations and quotations omitted). Direct evidence of which bullet killed Al-Rubia'y is not required. When reviewing substantially the same record, the D.C. Circuit affirmed, "it would have been reasonable for the jury to find that Slatten killed [Ahmed Haithem Ahmed] Al-Rubia'y." *Slatten*, 865 F.3d at 797. Specifically, the D.C. Circuit noted that a reasonable juror could conclude that the first shots were fatal, *id.*, a fact that remains undisputed. And, as with the record before the D.C. Circuit, "[w]ithout other plausible target for [the defendant's] first shots, and given the proximity of the Kia, it would have been reasonable for the jury to find that [the defendant] killed Al-Rubia'y." *Id.*

The D.C. Circuit likewise rejected many of the same arguments the defendant now advances. The defendant, ignoring the entirety of the above record, inexplicably claims that "every single eyewitness" corroborates that Slough fired first. Motion at 7. In support of this claim, the defendant points to the testimony of police officers Al-Hamidi, who testified that he is "100 perfect certain" that the turret gunner was the shooter, 11/19/18 PM Tr. at 2206, and Moniem, who testified that the turret gunners fired first, 11/19/18 AM Tr. at 2044. However, Al-Hamidi's testimony "does not disprove the government's theory of [the defendant's] guilt[,] . . . [i]t simply creates a dispute of fact, and it was the jury's responsibility to weigh the officers' conflicting testimony against that of Watson to resolve that dispute." *Slatten*, 865 F.3d 767 at 797. Moniem's testimony raises even

less a factual dispute. When asked whether he in fact saw the turret gunners fire the first single shots, he replied, "I did not see them fire, but I am assuming that to be, from what I heard, that the gunfire was coming from [the turret gunners]." 11/16/18 PM Tr. at 1979. From his testimony, a rational juror would conclude that Moniem made a reasonable, yet incorrect, assumption, not a direct observation. Similarly, there was evidence from which a juror could find Al-Hamidi made an assumption as well.

Jeremy Ridgeway's testimony that the first gunfire he heard was automatic gunfire was also a disputed fact for the jury to resolve. Ridgeway testified that he "saw Paul Slough firing his M4" on "automatic." 11/27/18 PM Tr. at 2703. Every other witness testified that there was no automatic gunfire until after the Iraqi officers were near the white Kia. Similarly, every other Raven 23 member testified that Slough fired his M240, not his M-4. In light of this countervailing evidence, a reasonable juror could conclude Ridgeway was simply mistaken. Ridgeway did, however, testify that he observed Slough fire at the white Kia when it was moving. 11/27/18 PM Tr. at 2665. In this respect, Ridgeway's testimony is consistent with the balance of evidence that Slough engaged the white Kia *after* the initial shots, once the white Kia was rolling slowly forward. 11/26/18 PM Tr. at 2404-05 (Mealy); 11/29/18 PM Tr. at 3119 (Randall).

## II.     Slough's Statements Do Not Diminish the Sufficiency of the Evidence against the Defendant.

Although Slough's statements were not included in the record before the D.C. Circuit, as this Court has already found, his hearsay statements do not diminish the sufficiency of the evidence supporting the defendant's conviction beyond a reasonable doubt. *See* ECF No. 1030 at 2. First, when reviewed side-by-side, the statements are simply not credible. *See* Gov't Closing Argument

Slide (attached hereto as Exhibit A). As this Court is aware, within eight days of the shooting, Slough gave statements to State Department investigators on five separate occasions. In his September 18, 2007 statement, Slough described the Kia driving at the convoy "as [the] motorcade pulled into the intersection." DX-1115 at 2. On September 23, 2007, Slough told investigators he "monitored his sector for 10-15 seconds without incident." DX-1117 at 1. On September 20, 2007, Slough claimed he "did not fire his M203," DX-1116 at 2, but on September 24, 2007, Slough told investigators he fired an M203 round, DX-2010 at 2. Slough's account of the white Kia also acquired more detail over the course of his statements. On September 16, 2007, he described the white Kia as already in motion, but provided no additional detail about the driver. DX-1114 at 1. On September 23, 2007, however, he described the driver of the white Kia as in his late 20s with a beard. DX-1117 at 1.

More significantly, Slough's statements were materially contradicted by the record evidence. That evidence includes, but is not limited to, testimonial and physical evidence establishing that Al-Rubia'y's white Kia was stopped before any shots were fired. As noted, Watson and Murphy identified the defendant, not Slough, as the first to shoot. After these initial shots, multiple witnesses described Al-Rubia'y's white Kia moving forward at a slow speed. Slough instead described a white sedan traveling northbound at 40 miles per hour. DX-1117 at 1. Slough further stated that "some occupants" of the surrounding vehicles exited their vehicles and began "waving and yelling at the white sedan to stop." *Id.* This assertion is belied by *any* corroborative testimony.

Slough additionally described a Nisur Square teaming with insurgents who attacked the

15

convoy from various concealed positions. On September 23, 2007, Slough stated that immediately after firing shots at the white sedan, his "vehicle began receiving automatic small arms fire from a small shack-like structure . . . ." DX-1117 at 2. Slough additionally claimed he observed "muzzle flashes coming from two separate positions in the same general area." *Id.* Slough later described seeing an adult male "pointing an AK-47 at the rear turret gunner of Vehicle #4." *Id.* Multiple Iraqi witnesses and Raven 23 members denied seeing any threats that day—let alone an omnipresent insurgent force. The government credibly demonstrated the self-serving nature of Slough's statements, which depict Slough as a conquering hero in a swarm of enemy combatants. And the government explained why Slough, a turret gunner who was observed firing multiple times that day at innocent and unarmed civilians, would have a compelling motivation to fabricate such a threat.[2]

---

[2] The cases cited by the defendant regarding an alternative culprit are inapposite to the present matter. Two of the cases consider the sufficiency of evidence for the constructive possession of child pornography where the computer containing pornographic images was either in the joint custody of multiple individuals or found in the common area of a multi-member household. *See United States v. Lowe*, 795 F.3d 519, 524 (6th Cir. 2015); *United States v. Moreland*, 665 F.3d 137, 150-51 (5th Cir. 2011). The other cases cited concern records fundamentally distinct from the record before the Court now. In *United States v. Houlihan*, Houlihan was charged with, among other offenses, conspiring to murder in aid of racketeering, abetting that murder, and hiring another to perform that murder. 92 F.3d 1271, 1293 (1st Cir. 1996). The only evidence linking the defendant to the murder was the defendant's uncorroborated hearsay statement that "he could have somebody kill anybody he wants." *Id.* at 1294. When considering this statement, the court noted that "Houlihan could have been charged and convicted of *any* murder." *Id.* at 1295 (emphasis in original). In *Ex parte Brown*, the Supreme Court of Alabama found the evidence insufficient to support a murder conviction when "the sum total of evidence against the defendant" was that the defendant "was in possession of various items which had belonged to the victim, and that the defendant was staying a few blocks from where the victim's stolen car was recovered." 499 So. 2d. 787, 788 (Ala. 1986). The record evidence in the instant case, which includes testimony from two Raven 23 members identifying the defendant as the first to shoot, stands in stark contrast to both cases.

Furthermore, the government does not dispute that Slough fired his weapon. Rather, as established by the record evidence, Slough fired his weapon at the white Kia *after* the defendant fired the initial shots, killing Al-Rubia'y. At trial, the defense's experts testified that although there was evidence consistent with an M-4 having been fired at the white Kia, the experts could not determine when or from where these rounds were fired. *See* 11/26/18 AM Tr. at 2310 (Giroux) (Q. "You cannot . . . provide us, just based on your examination, any information about where that round was fired from that . . . little steel penetrator, correct?" A. "Yes that's correct." Q. "And similarly . . . you cannot tell us when that round was fired?" A. "Right."); 12/10/18 AM Tr. at 4056 (Rosati) (Q. "[C]an your analysis here today tell us anything about the timing of when a projectile penetrated that headrest?" A. "No, I can't."). Moreover, Slough uniformly stated that he fired on the white Kia when the car was already in motion. The evidence cited by the defendant is therefore entirely consistent with the government's theory that the defendant killed Al Rubia'y when the white Kia was stationary, before Slough fired at the moving car.

Presented with an almost identical record, this Court "determine[d] whether [Slough's] statements, taken together with the rest of the evidence in this case, make the evidence insufficient to support a conviction of Mr. Slatten beyond a reasonable doubt." ECF No. 1030 at 2. The Court found that it did not. *Id.* The government once again "presented evidence attacking the credibility of these statements," including that "the white Kia was stopped and posed no threat to the convoy"

and of Slough's "motivation to fabricate his statements." *Id.* As before, "a rational jury could accept the government's counterevidence and reject Mr. Slough's statements." *Id.*[3]

### III.   The Weight of the Evidence Supports the Defendant's Conviction.

Rule 33 of the Federal Rules of Criminal Procedure permits a court to grant a new trial "if the interests of justice so require." When a new trial motion is made on the ground that the verdict is contrary to the weight of the evidence, courts are granted "greater discretion to make its own judgment about whether the verdict is just in light of the evidence at trial." *United States v. Wilkerson*, 656 F. Supp. 2d 22, 28 (D.C. Cir. 2009). "This second-guessing discretion should be exercised sparingly, however, limited to situations presenting a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* (citations and quotations omitted); *see also United States v. Wilson*, 178 F. Supp. 881, 884 (D.C. Cir. 1959) (The authority to grant a new trial "should be exercised sparingly and with caution. It should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.") (citations and quotations omitted). Courts must likewise balance "weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (citations and quotations omitted).[4]

---

[3]      The defendant additionally argues the evidence is insufficient to establish jurisdiction and venue. Motion at 23-24. As the defendant acknowledges, the D.C. Circuit affirmed that venue was proper in the District of Columbia and that jurisdiction was conferred under the Military Extraterritorial Jurisdiction Act, 18 U.S.C. §3261 *et seq. Id.* This Court has likewise repeatedly denied the defendant's motions challenging venue and jurisdiction. *See* ECF Nos. 723, 1042, 1043. The government hereby adopts and incorporates by reference its prior oppositions and any arguments made at hearings. *See United States v. Slatten*, 14-cr-107, 4/10/18 Tr. at 8.

[4]      The defendant filed a separate Motion for a New Trial based on alleged trial errors. *See* ECF No. 1219. The government will respond separately to the arguments made therein.

The aforementioned record evidence clearly supports the verdict. This Court previously considered the weight of the evidence in the context of determining the defendant's detention status. There, the Court found the weight of the evidence against the defendant was "strong," noting, "There are many reasons to doubt Mr. Slough's statements, including that Mr. Slough himself made inconsistent statements." ECF No. 700 at 10. Before the Court is a similar record. None of the defendant's unsubstantiated assertions undermine the weight of the evidence described. Moreover, the defendant's invocation of evidence not admitted is perplexing. Although courts are afforded greater discretion when evaluating a verdict under Rule 33, courts are not thereby invited to consider evidence outside the record. Indeed, to do so would transform courts from a "thirteenth juror," *Tibbs v. Florida*, 457 U.S. at 31, 42 (1982), to a juror on a different trial.

## CONCLUSION

The government's evidence has once again established that a rational juror could conclude beyond a reasonable doubt that the defendant, acting with malice aforethought and premeditation, killed Al-Rubia'y. The weight of the evidence likewise supports the defendant's conviction. For the foregoing reasons, the government respectfully requests that the Court deny the defendant's renewed Motion for Judgment of Acquittal.


Respectfully submitted,


JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845

By: _____/s/_____
    T. PATRICK MARTIN
    D.C. Bar Number 471965
    FERNANDO CAMPOAMOR-SANCHEZ
    D.C. Bar Number 451210
    KAREN P. SEIFERT
    N.Y. Bar Number 4742342
    Assistant United States Attorneys
    National Security Section
    United States Attorney's Office
    555 4th Street NW, 11th Floor
    Washington, D.C. 20530
    202-252-7698
    fernando.campoamor-sanchez@usdoj.gov

    ALEXANDRA HUGHES
    VA Bar Number 91593
    Special Assistant United States Attorney
    National Security Division
    U.S. Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, D.C. 20530

20

**<u>Certificate of Service</u>**

     I certify that, by virtue of the Court's ECF system, a copy of the foregoing government's Opposition to the Defendant's Motion for Judgment of Acquittal and New Trial has been sent to counsel for the defendant on March 19, 2019.


/s/ _____ __
Alexandra Hughes
Special Assistant United States Attorney