# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA )
)
)
v. )
) **Criminal Case No. 14-107**
NICHOLAS A. SLATTEN, )
)
Defendant. )
_____)

## <u>MEMORANDUM OPINION</u>

**I. Slatten's Motion for Judgment of Acquittal** ..................................................**5**

    A. The record establishes Slatten committed each element
of first-degree murder. ..................................................5

        1. The record adequately establishes Slatten unlawfully killed
Al-Rubia'y. ..................................................7

        2. The record establishes Slatten acted with malice
aforethought. ..................................................23

        3. The record establishes Slatten acted with premeditation. ..............25

    B. The jury's verdict accords with the weight of the evidence. .....................28

    C. Jurisdiction and venue are proper. ..............................................29

**II. Slatten's Motion for a New Trial** ..................................................**30**

    A. Matthew Murphy's testimony does not require a new trial because
any error was harmless. ..................................................30

        1. Rules 602 and 701 permit Murphy's testimony. ...........................32

        2. ███████████████████████████ ..................................34

        3. The government's failure to stop Murphy from speculating
about whether Slatten used a suppressor was egregious but
harmless. ..................................................39

    B. The government properly relied on Jimmy Watson's testimony. ..............45

        1. *Johnson* did not preclude Watson's testimony. ...........................45

        2. Any misuse of Watson's grand jury testimony was harmless. .......49

    C. Neither the government nor the Court prevented Slatten from
corroborating Paul Slough's statements. ..................................53

    D. The government did not mislead the jury regarding witness
availability. ..................................................56

    E.  The government's re-direct examination of Sarhan Moniem did not mislead the jury. ...................................................................60

    F.  No legal error resulted from Scott Patterson's testimony. ..........63

        1.  The government's closing argument properly referenced Patterson's comparison of SR-25 and M-4 rounds. ......................64

        2.  Patterson properly testified about AK-47 impact marks on steel armor. .................................................................65

    G.  The government properly presented evidence under Rule 404(b). ...........68

        1.  The Court properly received evidence of Slatten's contempt for Iraqis, of his prior preemptive shootings, and of his SR-25's modified trigger mechanism. ............................................69

        2.  The government accurately represented this evidence during its summation ...............................................71

        3.  The Court properly instructed the jury about this evidence. ...........73

    H.  Slatten's groundless witness tampering claim merits neither an evidentiary hearing nor a new trial. .........................................75

    I.  The government's garbled presumption-of-innocence argument did not affect Slatten. ...................................................77

    J.  Slatten cannot cut the jury off from evidence necessary to contextualize Slatten's post-shooting conduct, Slough's post-shooting statements, and evidence suggesting mitigating circumstances. ...............80

    K.  To the extent the Court erroneously rebuked defense counsel, it was harmless. .................................................................83

    L.  To the extent the government's summation hit below the belt, it was harmless. .................................................................87

    M.  The Court properly instructed the jury. ....................................91

    N.  Slatten's juror misconduct allegation does not justify an evidentiary hearing. ..................................................................94

    O.  The government adequately disclosed classified information. .................97

**III.  Conclusion ................................................................98**

The law seeks justice when soldiers attack civilians. On a snowy night in March 1770, British soldiers occupying Boston fired on a crowd of American colonists, wounding six and killing five—one as he ran away. Though King George III initially moved to pardon the soldiers, the Crown-backed governor assured his outraged city "that a due inquiry [w]ould be made, and

justice done, so far as was in [his] power."[1] "The law shall have its course," he promised.[2] And so it did. Undertaking what he would later describe as "one of the best Pieces of Service I ever rendered my Country,"[3] future president John Adams persuaded a colonial jury to find the hundreds-strong mob provoked the shooting by hurling ice and oyster shells at the soldiers, and by bludgeoning them with cudgels. Though eight soldiers were charged with murder, the jury acquitted six and convicted two others of the lesser charge of manslaughter. The latter group included the young private who fired the first shot when a colonist's thrown club knocked him to the ground.[4]

History will not be so kind to Nicholas Slatten. One of thousands of military contractors the United States government retained to secure Baghdad in the wake of the Iraq War, Slatten was part of an armored motorcade in a busy traffic circle known as Nisour Square when he shot and killed Iraqi medical student Ahmed Haithem Ahmed Al-Rubia'y, prompting the rest of his convoy to "indiscriminate[ly]" fire machine guns and launch grenades into the crowded intersection. *United States v. Slatten*, 865 F.3d 767, 777-78 (D.C. Cir. 2017). Their twenty-minute barrage of "death and destruction" killed fourteen civilians and wounded seventeen others—many attempting to flee, and at least one with his hands up. *Id.* at 820. And unlike the British soldiers two centuries and half-a-world apart, Slatten and his teammates shot without any provocation.

---

[1] Letter from Thomas Hutchinson to Lord Hillsborough (Mar. 1770), *in* 6 Proc. Mass. Hist. Soc'y 484, 484 (1863), https://www.jstor.org/stable/25079299.

[2] Bernard Bailyn, The Ordeal of Thomas Hutchinson 158 (1974).

[3] 2 Diary & Autobiography of John Adams 79 (L.H. Butterfield ed., 1961), *available at* https://founders.archives.gov/documents/Adams/01-02-02-0003-0002-0002.

[4] *See generally* William Emmons, The Trial of the British Soldiers (1824), https://lccn.loc.gov/08037489; Hiller B. Zobel, The Boston Massacre (1970).

The grand jury invoked the Military Extraterritorial Jurisdiction Act, 18 U.S.C. §§ 3261–3267 (MEJA), to indict Slatten for his role in this "human carnage." *Slatten*, 865 F.3d at 824 (Rogers, J., concurring-in-part and dissenting-in-part).[5] After deliberating for eight weeks, a jury found Slatten guilty of first-degree murder. But the Court of Appeals decided this Court should have admitted another convoy member's hearsay statements under the "extremely narrow" and "truly exceptional" residual exception. *Id.* at 806-11 (majority opinion) (internal quotation marks omitted). So although acknowledging "[w]hat happened in Nisour Square defie[d] civilized description," the panel vacated his conviction. *See id.* at 818-20.

The government retried Slatten in summer 2018. After seven weeks of trial and five weeks of deliberations, the jury deadlocked and the Court declared a mistrial. But after a third trial that fall, another jury returned a guilty verdict.

So all told, two different juries—twenty-four different people—considered weeks of evidence and unanimously concluded Slatten committed first-degree murder. Nevertheless, he now renews his motion for acquittal, adjudging the evidence insufficient and the verdict against the weight of the evidence. He also moves for a new trial, citing dozens of purported trial errors.

---

[5] This was the third indictment returned against Slatten for his role in the shooting. The government voluntarily dismissed the first indictment (for manslaughter, attempted manslaughter, and weapons charges) without prejudice after conceding the grand jury considered evidence stemming from a compelled statement Slatten gave to the State Department two days after the incident in violation of *Kastigar v. United States*, 406 U.S. 441 (1972). *See United States v. Slough*, 677 F. Supp. 2d 112, 115 n.2 (D.D.C. 2009), *vacated*, 641 F.3d 544 (D.C. Cir. 2011). A new prosecutorial team convened a new grand jury, which returned a second indictment for manslaughter, attempted manslaughter, and weapons charges. But because prosecutors had misinterpreted the Court of Appeals's mandate in an appeal stemming from the first prosecution (which included four other convoy members involved in the shooting), they neglected to convene the new grand jury before the five-year statute of limitations for manslaughter expired. So the Court of Appeals dismissed the second indictment as time-barred. *See In re Slatten*, No. 14-3007 (D.C. Cir. Apr. 7, 2014). Because the United States resolved to hold Slatten accountable for his conduct, and because Slatten refused to waive his limitations defense, the government obtained this indictment for first-degree murder, a charge without a limitations period. In a prior proceeding, the Court of Appeals confirmed the new indictment did not amount to vindictive prosecution since no lesser charge was available and since there was no evidence of actual vindictiveness. *See Slatten*, 865 F.3d at 798-801.

His motions raise many issues: some hard; others easy; a few already decided either by this Court or by the Court of Appeals. And in the end, none justify relief. Accordingly, the Court will deny Slatten's motion for acquittal and his motion for a new trial.

## I. Slatten's Motion for Judgment of Acquittal

Slatten starts with the "daunting" task of "overturning a jury verdict for insufficient evidence." *United States v. Teffera*, 985 F.2d 1082, 1085 (D.C. Cir. 1993). But his attempt misses the mark, since the record establishes Slatten committed each element of first-degree murder beyond a reasonable doubt. Next, Slatten asks the Court to sit as a "thirteenth juror" and nullify the verdict as a "serious miscarriage of justice." Mot. J. Acquittal 1, 25, ECF No. 1217. But Slatten fails to undermine the evidence proving he fired the initial—and fatal—shots. Finally, Slatten challenges this Court's jurisdiction and venue in the District of Columbia. But the D.C. Circuit's prior opinion forecloses his arguments. So the Court will deny his motion.

## A. The record establishes Slatten committed each element of first-degree murder.

Slatten argues the government failed to present evidence sufficient to convict him. Yet a defendant "challenging the sufficiency of the evidence on which he was convicted faces an uphill struggle." *United States v. Salamanca*, 900 F.2d 629, 635 (D.C. Cir. 1993). After all, "[a]lthough a jury 'may not base a verdict on mere speculation,' it may permissibly draw a vast range of inferences from evidence." *Id.* (quoting *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990)). Put differently, "the government's evidence need not exclude all reasonable hypotheses of innocence or lead inexorably to the conclusion that the defendant is guilty." *Teffera*, 985 F.2d at 1085.

A court cannot second-guess the jury's discretion if the government introduced enough admissible evidence—direct or circumstantial—on each element of the charged offense so that

"*any* rational trier of fact *could* have found" the element "beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (second emphasis added); *see United States v. Foster*, 783 F.2d 1087, 1088 (D.C. Cir. 1986) (noting courts must "draw[] no distinction between direct and circumstantial evidence, and 'giv[e] full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact'" when assessing sufficiency challenges (quoting *United States v. Davis*, 562 F.2d 681, 683 (D.C. Cir. 1977))); *see also Woodby v. INS*, 385 U.S. 276, 282 (1966) (noting a reviewing "court in a criminal case ordinarily does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt" (emphasis added)).

First-degree murder, 18 U.S.C. § 1111, has three elements: *First*, an unlawful killing. A killing is unlawful absent a justification like self-defense. *Second*, malice aforethought. Malice aforethought means the defendant either intended to kill or consciously disregarded an extreme risk of death or serious bodily injury. *See United States v. Williams*, 836 F.3d 1, 10 (D.C. Cir. 2016). Malice aforethought can be negated by a mitigating circumstance like a mistaken apprehension of the need to use self-defense. *Third*, premeditation. Premeditation requires the defendant to have deliberated—at least for a few seconds—before killing the victim. *See Hemphill v. United States*, 402 F.2d 187, 189 (D.C. Cir. 1968). At trial, both malice aforethought and premeditation can be proven through "[e]vidence of a similar act," even if "neither criminal nor unlawful," as long as the act "show[s] a pattern of operation that would suggest intent." *United States v. Long*, 328 F.3d 655, 661 (D.C. Cir. 2003) (internal quotation marks omitted).

Slatten rehashes the trial record in search of reasonable doubt, focusing his efforts on the first element: whether he killed Al-Rubia'y. Although arguments about conflicting evidence technically sound in "evidentiary weight, not evidentiary sufficiency," *Tibbs v. Florida*, 457 U.S.

31, 46 (1982), Slatten cherry-picks favorable pieces of evidence that, he argues, inevitably raise reasonable doubt and render the verdict legally insufficient. But as this Section explains, they do not. (And as Section I.B. explains, they don't create a weight problem, either.) At bottom, because a reasonable fact-finder could conclude beyond a reasonable doubt that Slatten committed each element of first-degree murder, his sufficiency challenge fails.

### 1. The record adequately establishes Slatten unlawfully killed Al-Rubia'y.

Sufficient evidence shows Slatten killed Al-Rubia'y while laying prone inside his armored vehicle and aiming his semi-automatic SR-25 sniper rifle through a six-inch porthole. Once Slatten's four-vehicle convoy arrived in Nisour Square, all other cars stopped—including the white Kia driven by Al-Rubia'y with his mother in the passenger seat.[6] Several loud bangs

---

[6] *See* 11/5/18 PM Tr. 625:20–626:6 ("The traffic was not moving at all, no movement at all, no activity in the circle."); 11/7/17 PM Tr. 1013:6-10 ("Q: Did you see any traffic moving into the Circle . . . ? A: I did not . . . ."); 11/13/18 PM Tr. 1277:4–1278:24 ("[T]here were no vehicles in motion at the time."), 1282:6-24 (placing a woman within the stopped Kia); 11/14/18 PM Tr. 1469:7-22 ("Q: . . . [D]id you succeed in your mission to lock down the Circle? A: Yes, sir."); 11/19/18 PM Tr. 2165:15–2166:15 ("Q: . . . You just stopped traffic? A: I stopped traffic."); 11/29/18 PM Tr. 3105:10-16 ("When we first got in the traffic circle, everything was stopped . . . ."); 12/6/18 PM Tr. 3873:13–3874:18 ("Q: . . . [I]n addition to yourself, did the cars around you also come to a stop? A: Yes, of course.").

rang out from Slatten's vehicle,[7] and Al-Rubia'y's mother screamed.[8] Rushing to the Kia,

multiple witnesses—including two Iraqi police officers—saw Al-Rubia'y had been shot in the

---

[7] *See* 11/5/18 PM Tr. 624:22–625:19 ("I head one shot being fired. . . . [F]rom the sound of it, it was an American [weapon]."); 11/7/18 PM Tr. 1017:4-23 ("Q: What was the first thing of significance that happened that day when you were out in the Circle . . . ? A: I heard two loud pops. Q: How would you describe those pops? A: Like two loud hollow popping sounds, like a firecracker in a 55-gallon drum or something like that. Q: Did you immediately recognize where those were coming from? A: I recognized the general direction. . . . [Slatten's] vehicle and all the traffic that way. . . ."); 11/14/18 PM Tr. 1493:3-15 ("Nick Slatten yelled out contact, contact, and fired twice. But the first one went off, and then right after the second shot, the turret guns opened up, all the turret guns. . . . [Slatten] yells out contact. And then he fires, boom. It's real loud, and then he fires again. I don't see him, but I know that he's firing, you know. And then all the turret guns go off."); 11/16/18 PM Tr. 1979:9–1981:24 ("Q: And when you turn around, what happens? A: I immediately heard some gunfire. Q: What did they sound like? A: It was single shots, one after the other. Q: Do you know how many? A: No. . . . Q: And how much time passed between you stopping the cars, turning to see the vehicles, and then hearing the single shots? A: As soon as I stopped the traffic and turned around and looked over at the vehicles of the convoy, I saw—and they had stopped, I heard them shooting. I heard the shots, and I asked myself—I was very surprised. I said—I told myself, the traffic has stopped, why are they firing? . . . I heard screaming behind me during the single rounds that were being fired. Q: Do you recall how many single rounds you heard at the very beginning? A: I don't know—I don't know precisely, one to ten. I think, you know, I cannot—one to ten. Q: One to ten? A: Maximum ten. I don't know the number. Q: And minimum one? A: It's more than one. Q: Okay. Do you have a firm recollection, as you sit here today, how many single shots you heard at first? A: I cannot really remember how many rounds they fired. I cannot keep track of rounds being fired, count them while they're being fired. It's hard. But as I said, it's ten or less."); 11/19/18 PM Tr. 2166:16–2167:2519 ("Q: What's the next thing that happened [after traffic stopped]? A: [Slatten's] car started throwing bottles of water and then shot three to four shots . . . . Q: . . . Tell us what you heard. A: I heard three to four shots. . . . Q: What is your best recollection of where those sounds came from, the gunshots? A: From [Slatten's] car."); 11/26/18 PM Tr. 2394:25–2396:6 ("Well, once we commandeered the circle . . . . I think the first thing that happened significantly was I heard what I thought were some pen flares being fired from behind me, and I remember looking over my shoulder [towards Slatten's car] and not seeing any pen flares being fired."); 11/29/18 PM Tr. 3114:12–3115:4 ("Q: . . . I just want to take you back just briefly to these initial shots. . . . Do you remember how many? A: I just remember there being a couple, couple to a few. I couldn't be exact. Q: And to be fair, your testimony regarding one, two, or three changed a little bit over the 11 years? A: Probably. Q: But you remember a couple to a few? A: I remember a couple to a few shots. In my recollection, it was a few shots. Q: And do you recall, as you sit here today, whether those shots were what I will call automatic fire or single semiautomatic? A: They weren't an automatic-style fire. It was more like single shots and not a burst."); 12/6/18 PM Tr. 3874:19-25 ("Q: What was the first thing of significance that happened when you were stopped in the Circle? A: I heard shooting, a shot, and after that, the screaming of a woman. And then I saw in my rearview mirror when I looked back, I saw a kind of shock in my surroundings. Q: Just to be clear, you heard one shot at the beginning? A: Yes, a shot and a scream of a lady.").

[8] *See* 11/5/18 PM Tr. 625:17–626:12 ("Q: Prior to hearing that shot from the American weapon, had you heard any gunshot? A: No, that was the first shot. Q: What happened next? A: . . . I kept hearing that screaming woman. She was screaming and using a term that only Arab women, Iraqi women use, which is [Arabic] when they ask for help. . . . Q: Could you tell us where the screaming was coming from? A: From that white car."); 11/13/18 PM Tr. 1277:4–1278:2 ("[A]ll of a sudden, everything just became quiet. . . . [T]here were no vehicles in motion at the time. . . . So it was like this silence, and then I heard a woman screaming. So when I heard the woman screaming, I looked, trying to see what's happening. So the screams were coming out of a white car that was—that had came to a complete stop."), 1278:22–1284:22 ("Q: So that you could see, no cars were moving at that point; correct? A: No, no vehicles, complete stop. Q: Then what's the first thing you actually hear? A: The woman screaming. Q: So you actually hear a woman screaming? A: Yes. Q: That's the first thing that happens after the silence and the traffic being stopped? A: Yes. Q: How do you know it was a woman? A: From her voice . . . Q: Could you tell what kind of car it was? A: Kia Credos. . . . Q: And the voice of the woman, do you know whether she was in the driver seat of the passenger seat, if you know? A: I don't know. Q: You just know she was inside of the car? A: Yes, inside the white car."); 11/16/18

PM Tr. 1981:25–1984:23 ("Q: Okay. So after the single shots— A: I heard a scream behind me. It was coming from one of the vehicles that was stopped behind me. . . . So I turned towards where the screaming was coming from. . . . Q: Do you find out where that scream is coming from? A: Yes. It was coming from one of the cars . . . . Q: Describe the car. A: It was a white Kia Credos. . . . And there was a woman inside of the car that was screaming. . . . Q: And could you see the woman? A: Yes. Q: Where was she? A: She was in the seat next to the driver."); 11/19/18 PM Tr. 2167:23–2176:15 ("Q: After you heard those gunshots, what's the next thing you remember hearing? A: I heard a woman screaming, My son, my son. I went toward them. I wanted to open the door of the car, and I saw the man. He was bloodied, and the woman hanging to her car, holding her son and screaming, My son, my son. . . . Q: And do you recall what the color of that car was? A: Yes . . . White Credos, Kia. Q: Do you recall which seat she was in? A: Yes. . . . the passenger seat. . . . Q: Now, the woman who was screaming, My son, my son, did you see whether she was touching him in any way, the driver? A: No, she was holding to him. . . . She was holding her son. She was screaming, My son, my son. And she was crying and screaming, My son, my son. . . ."); 12/6/18 PM Tr. 3874:24–3875:13 (" It was a clear scream of her even chanting and yelling Dear Father, Dear Father, Dear Father, which is something that is usually at a very catastrophic moment when someone hears of a death of someone close to them. Usually when you hear that kind of screaming, that wording, it's usually when something bad has happened.").

head through the windshield.[9] Two convoy members identify Slatten as the initial shooter:

Jimmy Watson,[10] the team leader stationed inside Slatten's vehicle, and Matthew Murphy,[11] a

---

[9] *See* 11/5/18 PM Tr. 625:20–626:6 ("I saw a white car, and I heard the screaming of a woman, and I saw a hole in the windshield of that car from the side of the driver, and the windshield was splattered with blood."); 11/16/18 PM Tr. 1983:9–1984:23 ("Q: And when you head toward the car, what do you see? A: So I found that there was someone injured, and I can see a hole in the front windshield, and there was a lady next to the driver, and she was screaming. Q: Of the two individuals in the car that you saw, which person was injured? A: The driver. Q: How was he injured? A: It was an injury in his forehead. Q: Can you point to where? . . . May the record reflect the forehead—in the middle of the forehead an inch above the eyebrows . . . . Q: What did it look like, the actual injury? A: It was a hole, and there was blood. Q: Where was the blood flowing? A: It was coming out of the hole. . . . Q: Where was the hole in the windshield in comparison to the driver? A: Right in front of the driver."); 11/19/18 PM Tr. 2168:22–2170:17 (Q: [T]ell us your observations regarding the person in the driver's seat. What did you see? A: Three to four shots, and then I saw he was bloodied on the face. Q: Okay. Just so we're clear, you say three to four shots. What are you referring to? A: I'm talking about the glass window. Q: Okay. So the windshield in front of the driver, is that what you're saying? A: Yes, exactly. Q: And with respect to the driver, did you actually get to see that person in the driver's seat? A: Yes, yes yes, . . . . He was all bloodied . . . . [the blood] was coming from the head, and his whole face was full of blood."), 2206:22-24 ("Q: And the white car had three or four holes in its windshield? A: Yes.").

Obviously, witnesses differ over how many times Al-Rubia'y was shot, and over whether those shots left a single-hole or a splatter in his skull. As Slatten points out, "multiple wounds in a splatter-like fashion" is more consistent with shots fired from an SR-25. *See* Mot. J. Acquittal 10 (collecting evidence).

[10] *See* 11/14/18 PM Tr. 1472:6–1478:24 (describing Slatten's position and equipment), 1493:1–1494:20 ("'Q: So your recollection of the first person who shot from . . . your command vehicle, was who? A: My recollection was Nick Slatten yelled out contact, contact, and fired twice. But the first one went off, and then right after the second shot, the turret guns opened up, all the turret guns.").

Watson is not a perfect witness. His time as a military contractor and subsequent service as a Navy Seal left him with significant mental and emotional injuries, some of which have affected his memory. *See* 11/14/18 PM Tr. 1529:8-14, 1531:5-7, 1533:24–1535:4, 1544:1–1553:9. In short, he could only recall certain details of the Nisour Square incident while on the stand, and he could not completely remember his testimony before the grand jury and in the first two trials. But as a prior sworn statement, the jury could consider Watson's 2013 grand jury testimony, when he recalled enough of the incident to recount Slatten's two shots preceding the turret gunners' automatic fire.

As Slatten points out, the government asked the jury to credit this chronology but to disregard other portions of Watson's grand-jury testimony, including the portion where he testified to hearing a series of distant pops before Slatten fired. *See* 11/15/18 AM Tr. 1607:11–1610:1 ("Q: You don't recall hearing fire from [the rear vehicle] prior to Mr. Slatten shooting? A: Really, the only memory that I have is hearing the distant pops and hearing contact from the rear, and then hearing . . . Nick Slatten fire his weapon. . . . Q: So the first thing you heard, according to your grand jury testimony, were pops that were outside your vehicle? A: That's right. Q: And that's what you testified to in 2013? A: Yes. Q: And you said that maybe [the rear vehicle] was shooting, but you didn't remember hearing that? A: That's right."); *see also* 12/11/18 PM Tr. 4403:11-20 ("[I]n Jimmy Watson's mind, he's the only one that says that, the sequence starts before that with the supposed distant shots. Nobody else testifies to that or something else. But he doesn't know the significance of that, but you do. . . . [Y]ou can piece it together, and you can rely upon the grand jury for that."). Slatten cites four-decade-old Sixth Circuit dicta for the proposition that "[o]ut of court inconsistent statements (particularly snippets pulled from the middle of a sequence claimed to be false when taken as a whole) do not generally 'suffice to support a conviction since it is unlikely that a reasonable juror could be convinced beyond a reasonable doubt by such evidence alone.'" Mot. J. Acquittal 18 (citing *United States v. Orrico*, 599 F.2d 113, 118 (6th Cir. 1979)).

But *Orrico* does not resemble this case. If anything, *Orrico* stands for the proposition that a person cannot be convicted solely on the basis of a single prior inconsistent statement. *Orrico* did not address a situation as here, where several other witnesses corroborated Watson's chronology. *See infra* notes 63–67 and accompanying text. So even if Slatten is right that a prosecution cannot rest solely on a truthful part plucked from an otherwise untruthful out-of-court whole, this case is different: Watson's chronology did not stand alone.

turret gunner atop the vehicle in front of Slatten's. Only Slatten had an SR-25[12] equipped with a high-powered scope.[13] This equipment—especially given his shielded environment—uniquely enabled him to aim a precision shot, relative to his teammates exposed to the midday sun and lacking the same scope.[14] Once those initial shots were fired, Al-Rubia'y slumped into his

---

Moreover, Slatten's *Orrico* discussion elided critical context. The Sixth Circuit recognized the potential for a "most unusual case" to challenge this presumption by persuading a reasonable juror "by such evidence alone." *Orrico*, 599 F.2d at 118 (emphasis added) (internal quotation marks omitted) (quoting 4 Weinstein's Evidence 801-74). To be sure, this is a most unusual case, and—for reasons already explained—Watson is a most unusual witness. And importantly, Watson's prior inconsistent statement (sworn grand jury testimony) lends much stronger indicia of reliability than the *Orrico* witness's prior inconsistent statement (past recollection recorded, *see id.* at 115-16). So if nothing else, the *Orrico* dicta poorly squares with the fact that whatever Watson's probative worth, two juries relied on his testimony to unanimously conclude beyond a reasonable doubt that Slatten killed Al-Rubia'y.

[11] *See* 11/7/18 PM Tr. 1023:2-12 ("Q: At some point later on, did you conclude that those first two hollow pops that you heard at the very beginning of the shooting incident were attributable to Mr. Slatten firing that weapon within the [his] vehicle? A: I did. Q: How did you arrive at that conclusion? A: Because it's the only sound that could emanate from within our team that makes sense. Q: What do you mean by that? A: Because nobody else has a weapon like that, has anything that would produce that noise. . . .").

[12] *E.g.*, 11/7/18 PM Tr. 994:12-18 ("Q: . . . [W]hat title did [Slatten] hold or role? A: He would have been the designated marksman on the team. Q: What is a designated marksman? A: A designated marksman carries a different sort of rifle with—well, the SR-25, with an actual good scope where you can get a much closer look at things, and it's more of an accurate rifle with a better scope.").

[13] *E.g.*, 11/14/18 PM Tr. 1477:20–1478:15 ("He had [a scope] on there, yep. . . . [I]t had to have been a high-powered one.").

[14] *See, e.g.*, Gov't's Ex. 9402 (documenting the turret gunner's view in direct sunlight).

mother's lap, and the Kia began slowly rolling forward.[15] As it did, the rest of the convoy hailed

bullets and grenades until the Kia exploded.[16]

[15] *See* 11/5/18 PM Tr. 625:17–628:14 ("Q: What happened [after that first shot]? A: After that, a car bumped us from the rear, a very light bump, I would say. . . . When I turned to see what is going on behind me, since the traffic was stopped, what is happening behind us, I saw a white car, and I heard the screaming of a woman, and I saw a hole in the windshield of that car from the side of the driver, and the windshield was splattered with blood. . . . After the car bumped us, I heard the screaming. The screaming started almost at the same time as the bump. . . . The car started moving slowly, really slowly. It was moving very slowly without, I believe, any gas, anyone pressing on the gas. I saw the traffic cop come toward that car and try to open the door. . . . Apparently, it was locked, and we continued on hearing the screaming of this woman and the car inching forward slowly. . . . There was no speed. It was almost going automatically on its own, on its own moving forward. . . . [I]t started to pass us. Q: What happens next? A: We heard a second shot fired. Q: Are you able to see the white car next to you. A: Yes, it was next to us, that white car. Q: Were you able to see at that time who was in the white car to your left? A: I was able to ascertain there was a woman sitting there. . . . Q: And does there come a time where additional gunshots—you hear additional gunshots? A: Yes. . . . I saw the machine gun on the military vehicle to my right training their guns toward the white car and firing in a continuous fashion. . . . [T]hey shelled it completely. They covered it until that woman stopped even talking or stopped her screaming."); 11/13/18 PM Tr. 1281:21–1284:15 ("Q: When the traffic cop approached the car [with the screaming woman inside], was the car stopped or moving? A: It was stopped. Q: Okay. So no movement, still? A: No, no movement at all. Q: After the traffic cop approached the driver side, did you see the white car move? . . . A: Once he approached it and spoke to the occupants, it started moving slowly. Q: So you did perceive it moving after the traffic cop approached the driver's side door? A: I mean, all of this happened within seconds, you know. Q: Right. And after the car starts moving slowly, as you said, what happens next? A: I cannot tell you really exactly how much it moved forward, maybe three meters. But as soon as it moved forward, heavy fire was—it was being hit by gunfire. Q: How could you tell that heavy gunfire started hitting the car? A: The car, you know, is white, and as I was looking at it, all of a sudden, I saw black holes, you know, being formed on it as a result. Q: In which part of the car do you see the holes being formed? A: On the front of the car, over the engine part. Q: Can you describe for us, when you say heavy gunfire, what does that mean to you? What exactly are you trying to convey by that? A: I can't describe it precise[ly], but there was a lot of sound, you know, a lot of heavy sound coming. Q: So not a single shot or two shots, like a lot of shots? A: Yes, of course. Q: Could you tell who was shooting? A: From the cars, but I don't know which one of their cars. Q: When you say 'cars,' are you talking about the convoy, or are you talking about all the cars? A: Yes, the convoy cars. . . . Q: And after the heavy gunfire had started on the white vehicle, what happened next. A: The gunfire started. People started getting out of their cars, taking cover in every direction. Q: But with the white car specifically, did something happen to the white car, in addition to getting the heavy gunshots in the hood, as you described? A: Yes. It started burning."); 11/16/18 PM Tr. 1991:3–1996:9 ("Q: . . . [Y]ou were describing the female passenger and how she was responding to the male passenger, who had an injury to his forehead. . . . A: She had her left arm behind the neck of the driver and pulling him towards her so that his head was on her shoulder. And she was screaming very loudly. . . . Q: And pulling the male's upper body into the chest, or what portion of the male's body? A: [Indicating] when I was saying, the upper part, I meant his head pulling him towards her, toward her lap. Q: Okay. And as you're at the car trying to help the woman, what happens? A: I tried to open the door of the car . . . . Q: What happens next? A: The car started moving to the front. The car was actually butting the car in front of it. . . . When it started moving, the Credos, Kia Credos started moving forward, moving forward toward the convoy. It started moving . . . [and] started receiving heavy gunfire from the convoy. . . . Q: How would you describe the pace? Was it your normal walking pace, faster, slower? A: A normal pace of walking. . . . Q: . . . So as that white Kia starts to move forward, what happens? A: At that time, heavy gunfire was directed to the car, . . . . Q: Directed at which car? A: The Kia Credos. It was receiving heavy gunfire, like heavy rain. . . . Q: . . . What happened to the Kia Credos? A: As a result of the heavy gunfire that it was subjected to it started burning. Q: And did it stop, or did it keep moving? A: It continued on crawling forward even during the heavy gunfire that it was receiving until it started burning, and then then an explosion occurred."); 11/19/18 PM Tr. 2170:10-17 ("So the car started moving slowly, because the young man was killed, and he did not have control of the car.), 2172:10–2174:11 ("Q: . . . [I]s the white car moving or stopped or do you remember? A: . . . [T]he car was moving slowly. Q: What happened next? A: So the same [convoy] car, [Slatten's] car, started shooting at the woman. . . . Then there were shooting coming from all the [convoy] cars."), 2206:25–2207:13

Sufficient evidence further shows Slatten did not act in self-defense.[17] To the extent other convoy members perceived the Kia as a threat, it was only after it began rolling towards the

("When the person inside [the car] was killed, the car started—it was still in gear. It started moving very slowly forward."); 11/28/18 AM Tr. 2745:24–2746:17 ("Q: . . . So after the Kia comes to a stop, an Iraqi police officer approaches the driver side of the White Kia, correct? A: Yes, sir. Q: The car begins to move again? A: Yes, sir. Q: A large volume of gunfire erupts from the convoy, correct? A: Yes, sir. Q: You hear some explosions? A: Yes, sir. Q: It fills up with smoke? A: Yes, sir. Q: And upon seeing the passenger's hands, you shoot and kill the passenger, correct? A: Yes, sir.").

[16] See 11/27/18 PM Tr. 2703:14–2706:18 ("Q: And the very first gunfire you heard that day was automatic gunfire; correct? . . . Q: . . . And then, sir, the next thing that happens is you immediately turn in the direction of that gunfire; correct? A: Yes, sir. Q: And you saw [the turret gunner atop Slatten's vehicle] firing his M4 [an assault rifle issued to convoy members capable of being fired either semi-automatically (i.e., single shots) or fully automatically (i.e., bursts of shots)]; correct? A: Yes, sir. Q: On automatic? A: Yes, sir. Q: At a white vehicle? A: Yes, sir. Q: Which we all now know is the white Kia; correct? A: That is correct. Q: And the white Kia was moving towards the convoy? A: Yes, sir, it was. . . . Q: And then, sir, when you saw Mr. Slough firing, you immediately began to fire at the white Kia, too; correct? A: Yes, sir. . . . Q: And then, sir, at about the same time that you fired at the White Kia or immediately thereafter, you saw [another turret gunner] fire his M4 at the white Kia as well; correct? A: Yes sir."); 11/29/18 PM Tr. 3118:25–3119:25 ("Q: How quickly is the car moving, if you will, toward the convoy? A: . . . It was not going fast. It was just rolling towards us. . . . Q: What happened then? Describe what you saw. A: It was a large volume of fire was directed towards the vehicle. As it started rolling towards us, as I recall, both [turret gunners] just unleashed a lot of rounds into the car. Q: Did you see where those rounds were hitting the car? A: The whole front end, the window, everywhere. It just looked like . . . massive automatic fire on the front end of a vehicle. . . . Hood, windshield, everything.").

[17] See 11/7/18 PM Tr. 1034:18–1035:11 ("Q: . . . [D]id you see any threats in this are? A: I never saw any threats. Q: That whole day? A: At all."); 11/16/18 AM Tr. 1868:19–1871:7 ("Q: And what was so concerning to you about vehicles facing south? A: It appeared to me that these vehicles were fleeing whatever they confronted . . . at the northern point of Nisur Square. So this alleged confrontation, they didn't appear to be exchanging fire. They appeared to be fleeing the scene of conflict . . . . Q: And these—and the vehicles that you were looking at were all civilian-type vehicles? A: They were. Q: When you are looking at these vehicles and walking down this road, did you see any evidence of, say, . . . cartridge casings [from weapons typically used by Iraqi insurgents]? A: I don't recall seeing anything like that. . . . We saw a huge volume of what appeared to be [American] casings north of that white vehicle that was engulfed in flames. We did not see shell casings south of that vehicle. And it seemed very strange that in what was reported to be a confrontation, we had evidence of a volume of fire coming from the north pointed south, but not from the south pointed north."); 11/26/18 PM Tr. 2417:3-10 ("Q: Do you recall seeing any threats, armed threats to the convoy? A: No.").

convoy[18]—which multiple witnesses say didn't happen until after Slatten shot Al-Rubia'y.[19] No other witness came close to corroborating Slatten's self-serving contention that Al-Rubia'y was taking aim at the convoy.[20] Although State Department investigators recovered spent shell casings from Iraqi weapons around the southwest quadrant of the traffic circle four days after the incident, the casings were far away from the Kia (in the southeast quadrant), and investigators could not determine if the shells resulted from shooting during the incident, the days following the incident, or the weeks and months preceding the incident.[21]

As Slatten points out, this evidence did not go uncontroverted over the six-week trial. Yet these evidentiary conflicts fail to undermine the record's legal sufficiency. For example, Iraqi police officers on the scene initially blamed the convoy members manning mounted turret guns

---

[18] 11/13/18 AM Tr. 1214:13–1217:8 ("Q: When you turned and first saw the white Kia, it was very close to [Slatten's vehicle]? A: It was within, I would say, 30, 40 feet or so . . . . Q: Okay. And, at least when you looked, it was moving but at that point very slowly? Q: Literally a walking pace. . . . Q: And the white Kia was out in front of all the other traffic? A: Yeah . . . . Q: . . . [W]ould it be generally fair to say that some members of the convoy could have perceived the white Kia as a threat? A: It would be generally fair to say that some people under the right circumstances could with [sic] perceive it as a threat, sure."); 11/15/18 PM Tr. 1726:18-21 ("Q: If one car has broken from the pack, if you will, and is ahead of the rest of the traffic, that looks like a [car bomb] threat; correct, sir? A: Yes, sir."), 1775:17–1778:2 ("Q: So when you flew over [Nisour Square in a helicopter after the shooting], it seemed pretty clear to you that there was a vehicle that failed to stop with the other traffic; correct? A: Yes. Q: It looked like a situation—it looked like the situation was a possible [car bomb]; correct? A: Yes. Q: And that the team perceived it as a threat and had engaged it; correct? A: Yes. Q: And then the vehicle had stopped; correct? A: Yes."); 11/26/18 PM Tr. 2384:22–2385:15 ("Q: . . . [D]id you perceive anyone out there in Nisur Square on [the day of the shooting] as a threat to the convoy? A: There was the issue with the white Kia, and, you know, if there was one thing that I saw that day that would have struck me as a threat, it would have been that vehicle that was moving towards our convoy. . . . Q: Now, turning to the white Kia, it is your testimony that—did you yourself perceive the moving Kia as a threat to the convoy? A: I think it could have been interpreted as a threat for sure.").

[19] See evidence cited *supra* note 15.

[20] See 11/27/18 PM Tr. 2689:7-24 ("Q: And what did Mr. Slatten tell you about the incident in Nisur Square? A: He had said that an armed insurgent was taking aim on our convoy, and he shot him. Q: And how did he describe shooting at that man that was allegedly taking aim at the convoy? A: He said he popped his grape. Q: Did he saw what happened to this man after he popped his grape? A: That he slumped forward. Q: What was Mr. Slatten's demeanor when he told you this? A: Just regular conversation. Q: Calm? A: Yes, sir. Q: Did he appear upset? A: No. Q: Remorseful? A: No, sir."); *cf., e.g.*, 11/26/18 PM Tr. 2385:4-10 ("Q: . . . [I]n terms of an individual with a rifle or other weapon trained at the convoy or firing at the convoy, did you observe that day any individual present a threat to the convoy? A: No, I didn't. Q: Did you perceive at any time incoming rounds? A: No.").

[21] See Gov't's Ex. 8006B; 11/27/18 AM Tr. 2551:9–2568:13; *cf.* 11/17/18 PM Tr. 1083:8–1084:16 (recalling someone firing at the convoy from the southwest of the circle sometime during the incident); 11/29/18 Tr. 3152:20–3153:4 (same).

for firing the first shots[22]—an unsurprising inference, since the turret gunners were the only convoy members visible from the ground, and since both turret gunners acknowledge training their guns on the Kia seconds later as it began rolling forward.[23] But the D.C. Circuit already rejected Slatten's argument that this daylight between the government's theory and the police officers' accounts causes a sufficiency issue: The officers' testimony "does not disprove the

---

[22] *See* 11/16/18 PM Tr. 1979:19–1980:5 ("Q: Did you see whether those men on top of the vehicles actually fired those first single shots or not? A: I did not see them fire, but I am assuming that to be, from what I heard, that the gunfire was coming from them. Q: Why are you assuming that? A: Because the sound was coming from the convoy."); 11/19/18 AM Tr. 2036:7-22 ("Q: And you have testified consistently for ten years that the turret gunners shot and killed the driver of the white Kia, correct? A: Yes. Q: And you testified consistently for ten years that the turret gunners shot and killed the passenger in the white Kia, correct? . . . A: He shot, but I don't know if he killed the passenger or not."), 2041:20–2043:11 ("Q: . . . And those initial shots that you saw were by the turret gunners? A: I believe so."), 2044:6–2046:21 ("Q: . . . And when you say you believe one of the individuals inside one of the cars shot, which armored vehicles are you talking about? A: In the beginning when I mentioned that there was firing, I meant it was coming from the turrets and not from the holes or the windows that are in the vehicles. . . . Q: And let me make sure I understand that. Did you actually see the explosion out of the end of the barrel? A: No. I did not see the explosion from the mouth of the rifle, but it was so close, I can tell it is from the sound. Q: You saw the men pointing their rifles? A: Yes. Q: And you heard the shot? A: Yes, sir. Q: What happened next? A: We heard the sound of the screaming of a person who was shot in the vehicle behind us. . . . Q: And then you heard gunshots? A: Yes, I heard. Q: From the men in the turrets? A: Yes. . . . Q: . . . You ultimately learned that that screaming was coming from a white Kia Credos? A: After I started moving towards it."); 11/19/18 PM Tr. 2204:8–2206:15 ("Q: So let me direct your attention, then, to the first shots that you say you heard. . . . You testified, I believe, that you heard four shots fired. A: From three to four shots. Q: And were those shots fired in rapid succession? . . . A: Pop, pop, intermittent, but fast. Q: Okay. But four shots? A: Three to four. Q: Sorry, three to four. When you heard those shots fired, were you facing the convoy, or were you facing the traffic? A: I was facing the convoy. Q: And did you see the man who pulled the trigger? A: Yes, on top of the armored turret. Q: He was a man who was on the turret on top of [Slatten's vehicle]; correct? A: Yes. Q: And those were the very first shots you heard? A: Yes. Q: You're 100 percent certain of that? A: Yes.").

[23] *See* 11/27/18 PM Tr. 2703:14–2707:3 ("Q: You were the front turret gunner in the [vehicle behind Slatten's] that day; correct, sir? A: Yes, sir. Q: And the very first gunfire you heard that day was automatic gunfire; correct? . . . Q: . . . And then, sir, the next thing that happens is you immediately turn in the direction of that gunfire; correct? A: Yes, sir. Q: And you saw Paul Slough [the turret gunner atop Slatten's vehicle] firing his M4; correct? A: Yes, sir. Q: On automatic? A: Yes, sir. Q: At a white vehicle? A: Yes, sir. Q: Which we all now know is the white Kia; correct? A: That is correct. Q: And the white Kia was moving towards the convoy? A: Yes, sir, it was. . . . Q: And then, sir, when you saw Mr. Slough firing, you immediately began to fire at the white Kia, too; correct? A: Yes, sir. Q: And you fired approximately three to five shots? A: Roughly. Q: Okay. With your M4 rifle? A: Yes, sir. Q: In semiautomatic mode? A: Yes, sir."); 11/28/18 AM Tr. 2780:19–2781:13 ("Q: So then as you're turning into the circle, that's when you hear the automatic gunfire, right? A: Yes, sir. Q: And it was automatic gunfire? A: Yes, sir. Q: And the white Kia was moving? A: Yes, sir.").
    This remains true despite evidence suggesting people on the ground could notice muzzle flashes from an SR-25 fired through a porthole. 11/19/18 AM Tr. 2046:17-21 ("Q: . . . And did you at some point later see some shots come from the porthole in [Slatten's] armored vehicle? A: Yes. Q: But that was later in the chronology [after the woman in the white Kia began screaming]? A: Yes."); 11/29/18 PM Tr. 3091:22–3093:7 ("Q: Did you actually visibly see the barrel outside the portholes? A: I did see a barrel. . . . Q: And when you saw that barrel, did you see something associated with it that suggested it was firing? A: White smoke . . . A quick puff of smoke coming out each time a round is fired. . . . You see a bit of the smoke just pop off of it. . . . That's not something you would see if you weren't looking at it. Q: Because its so quick and instantaneous? A: Correct, yeah.").

government's theory of Slatten's guilt. It simply creates a dispute of fact, and it was the jury's responsibility to weigh the officer[s'] conflicting testimony against that of Watson to resolve the dispute." *Slatten*, 865 F.3d at 797 (citation and internal quotation marks omitted).

Slatten's other arguments fare no better. True enough, one turret gunner doesn't recall hearing Slatten fire first.[24] But that gunner—and everyone else—agrees gunfire erupted as the Kia rolled forward, by which point Al-Rubia'y was already dead.[25] Nor is it inconsistent with Slatten's guilt that investigators found no SR-25 shell casings in the traffic circle after the incident[26]—Slatten shot from inside a vehicle, so any expended shell casings would have landed there.[27] And it is perfectly consistent that shell casings matched to the turret gunners' weapons riddled the traffic circle[28]—all agree the turret gunners indiscriminately fired their weapons into the crowd.[29] So too that the only bullet fragments investigators could identify from the Kia traced back to the turret gunners' weapons,[30] for two reasons. *First*, the government doesn't claim Slatten targeted the Kia generally—the government theorizes Slatten fired a precision shot into Al-Rubia'y's head. *Second*, everyone admits the turret gunners eventually bombarded the Kia, and the investigators acknowledged they could not determine if the recovered fragments

---

[24] *See* 11/27/18 PM Tr. 2704:1–2708:1 ("Q: Now, during this initial flurry of shots at the white Kia, you did not hear Mr. Slatten fire a sniper rifle, did you? A: No, sir.").

[25] *See* evidence cited *supra* notes 9, 15.

[26] *See* 11/16/18 AM Tr. 1871:1-3.

[27] *See* 11/26/18 AM Tr. 2313:20–2314:7 ("Q: And what would happen, however, if I'm firing this inside of a vehicle and only the muzzle is firing outside of the vehicle? What would happen to those cartridge casings? A: If you were firing inside the vehicle, the cartridge casings would be retained within the vehicle. Q: And if the vehicle drove away from the crime scene, you wouldn't have access to those cartridge casings, fair? . . . A: Those cartridge casings would be in the vehicle and they would not have been outside of the vehicle on the ground.").

[28] *See id.* at 2299:7–2303:7; Def.'s Exs. 6337, 7066 (cataloguing shell casings recovered from Nisour Square and matching them to convoy members' weapons).

[29] *See* evidence cited *supra* note 16.

[30] *See* 11/26/18 AM Tr. 2305:3–2307:21; Def.'s Ex. 5007.

came from the beginning or the end of the shooting.[31] And in any event, the fact "[t]hat a different jury might have resolved [an evidentiary] conflict differently is not tantamount to showing that *no* reasonable fact-finder could conclude that Slatten shot first." *Slatten*, 865 F.3d at 797.

Slatten similarly makes much of Paul Slough's—the turret gunner atop Slatten's vehicle—claim he shot the Kia first, and even more of the D.C. Circuit's conclusion "he was likely telling the truth." *Id.* at 808. Yet properly contextualized, Slough's statement actually supports Slatten's guilt. After all, Slough only admits shooting the Kia as it moved towards the convoy.[32] But the balance of evidence confirms the Kia began rolling toward the convoy only *after* Al-Rubia'y was shot.[33] So even if Slough honestly believed he shot the Kia first, he may have been mistaken. And a mistaken belief does not create a sufficiency problem.

Moreover, Slatten emphasizes (and characterizes as a "confession") Slough's related statement—expressed in four of his five interviews with State Department investigators in the

---

[31] *See* 11/26/18 AM Tr. 2310:18–2311:7 ("Q: . . . [M]ore to the point, you cannot tell us when [the M4 bullet fragment recovered from the top of the steering wheel] was fired? A: Right. Q: You don't know if it was at the beginning . . . of this incident, correct? A: Right. Q: And you don't know if it was in the middle of this incident, correct? A: Correct. Q: Or even at the end? A: Correct. Q: So all you can tell us is that at some point something, a bullet with a steel penetrator, hit the top of this steering wheel? Correct."); *see also* 11/26/18 AM Tr. 2308:19–2311:11 ("I believe you told us that your examination revealed five areas of damage [in the steering wheel]; is that correct? A: Yes. Q: And all those five areas of damage when you tested them tested positive for copper and lead? A: Yes, that's correct. Q: And that's consistent with them having been struck by a bullet or bullet fragment? A: Yes. . . . Q: . . . You cannot tell the ladies and gentlemen of the jury which weapons or bullets caused the other four—the other areas of damage around the steering wheel? A: That's correct. Q: You don't know if it was . . . a 7.62 round from an M240? A: Correct. Q: Or a similar round from an SR25? A: Correct. Q: Or any other type of weapon, for that matter? A: Right, yes. . . . Q: . . . [Y]ou cannot tell us about which of the other rounds or what the other rounds were that hit the rest of the steering wheel? A: That is correct."); 12/10/18 AM Tr. 4056:6-17 ("Q: . . . Now, can your analysis here today tell us anything about the timing of when a projectile penetrated that headrest? A: No, I can't. Q: Can you tell us anything about whether the projectile hit anything before it hit the headrest? A: No, sir, I cannot. Q: So you have no opinion to offer on whether it hit a windshield first? A: No, sir. Q: Or anything else? A: No, sir.").

[32] *E.g.*, Def.'s Ex. 1115 at 2 ("As our motorcade pulled into the intersection I noticed a white four door sedan driving directly at our motorcade . . . . I and others were yelling, and using hand signals for the car to stop and the driver looked directly at me and kept moving toward our motorcade. Fearing for my life and the lives of my teammates, I engaged the driver and stopped the threat.").

[33] *See* evidence cited *supra* notes 6–7, 9, 15.

eight days after the shooting[34]—that he killed the Kia's driver. But Slough's accounts fall short of exonerating Slatten, since multiple chinks erode their evidentiary force. The Court highlights just three: *First*, facing a mountain of evidence suggesting the Kia either sat stationary or rolled forward through bumper-to-bumper traffic at walking speed, Slough's remarkable contention that the Kia careened towards the convoy at forty miles-per-hour[35] beggars belief. *Second*, Slough's statements openly contradict each other. During his second interview, he described "notic[ing]" the Kia "driving directly" at the convoy "as [the] motorcade pulled into the intersection."[36] But in his fourth interview, he said he "monitored his sector for 10-15 seconds without incident" before seeing the Kia.[37] In his third interview, he claimed he did not launch grenades at the Kia.[38] But in his second and fifth interviews, he admitted he did.[39] *Third*, Slough's statement seems concocted to hoodwink investigators into believing the traffic circle

---

[34] Def.'s Exs. 1114 ("SLOUGH engaged and hit the driver."), 1115 at 2 ("[T]he driver looked directly at me and kept moving toward our motorcade. . . . I engaged the driver and stopped the threat."); 1116 at 2 ("The [white] car did not stop, and SLOUGH engaged it with his M4. SLOUGH is not sure whether he was the first one to fire during this incident. He is not aware of any shots being fired before his. The car kept moving straight toward the motorcade without braking. SLOUGH used one magazine of M4 ammunition to engage the white car."); 1117 at 1 ("Slough fired two rounds at the driver from his M-4 rifle. Slough believes these rounds impacted the driver's area of the windshield.").

[35] Def.'s Ex. 1117 at 1 ("He then noticed a white sedan traveling north bound toward the traffic circle at approximately 40 mph. The vehicle was approximately 40 meters south of Slough's position. . . . All of the other north bound vehicles between this white sedan and the motorcade had pulled over to the east cub line of the north bound traffic lanes, and had stopped. Some of the occupants of these vehicles had gotten out of their cars, and were waving and yelling at the white sedan to stop. Slough threw a water bottle at the white sedan, and yelled in both Arabic and English for the car to stop while signaling with hand and arm gestures. Slough made eye contact with the driver of the white sedan whom he described as being an Arabic male in his late 20's with a beard. The vehicle did not heed Slough's and the other pedestrian's warnings. Slough fired two rounds at the driver from his M-4 rifle. Slough believes these rounds impacted the driver's area of the windshield. The white sedan began slowing."). Indeed, almost nothing about this story fits with other witnesses' accounts. And crediting Slough's estimations of time and distance, this entire interaction took place over two seconds.

[36] Def.'s Ex. 1115 at 2.

[37] Def.'s Ex. 1117 at 1.

[38] Def.'s Ex. 1116 at 2 ("SLOUGH did not fire his M203 during this incident.").

[39] Def.'s Ex. 1117 at 2 ("Due to the vehicle continuing to roll toward the motorcade, and now being danger[ously] close, Slough fired [a] high explosive round from his M-203."); Def.'s Ex. 2010 at 2 ("SLOUGH was re-interviewed and maintained his previous statement that he fired one 203 round at the driver's side wheel well of the white vehicle approximately fifty meters away.").

was teeming with insurgents attacking the convoy from concealed positions.[40] Slough remains the only team member to offer that after-the-fact explanation for slaughtering fourteen Iraqi civilians. All in all, the jury reasonably disregarded his "confession."[41]

Slatten again misrepresents the record by baldly claiming "it was physically impossible for Mr. Slatten to shoot the driver while laying prone on the bench" inside his vehicle. Mot. J. Acquittal 11 (emphasis removed). Slatten bases this conclusion on the fact that the special agent who conducted the government's demonstrative shooting of an SR-25 through the vehicle's porthole used additional padding from the Federal Bureau of Investigation's (FBI) shooting range to support his chest and steady the rifle.[42] But the agent never testified he couldn't make the shot without supplemental pads, and the record does not reflect whether Slatten is physically bigger or smaller than the agent, or whether the agent was in exactly the same position as Slatten, or whether Slatten and the agent were wearing the same gear, or whether Slatten was a more or less capable marksman. Instead, Slatten extrapolates from the agent's testimony about the approximate view Slatten would have seen looking through his SR-25's scope to conjure a triple-

---

[40] *Compare, e.g.*, Def.'s Ex. 1117 at 2 ("Immediately after firing the two shots at the white sedan, Slough's vehicle began receiving automatic small arms fire from a small shack-like structure approximately 150 meters south . . . . Slough saw muzzle flashes coming from two separate positions in the same general area."), *with* evidence cited *supra* note 17.

[41] That's true despite the Court of Appeals's recognition of "several . . . circumstances . . . indicat[ing]" Slough's statements' "reliability." *See Slatten*, 865 F.3d at 808-09. To be sure, Slough was incentivized to speak truthfully, especially since he acknowledged he faced criminal liability for lying to investigators. Additionally, Slough did repeatedly say he killed the white Kia's driver—though he remained consistent about little else. And true enough, discrete details can be corroborated with the Iraqi police officers' testimony (like the throwing of water bottles, *see* evidence cited *supra* note 7, or the assumption that the turret gunners fired first, *see supra* note 22 and accompanying text), even though the two accounts remain fundamentally irreconcilable writ large. *Compare* Def.'s Ex. 1117 at 1 ("[Slough] then noticed a white sedan traveling . . . at approximately 40 mph."), *with, e.g.*, 11/16/18 PM Tr. 1979:9–1995:11 (testifying that the Kia was "standing in [a] line" of traffic when it was shot, before later rolling forward at "[a] normal pace of walking"). But simply put, the Court of Appeals merely held these indicia of reliability satisfied Rule 807's threshold "requirement that the . . . statements contain 'equivalent circumstantial guarantees of trustworthiness' to those ensured by the Rule 803 and Rule 804 hearsay exceptions." *Slatten*, 865 F.3d at 807. Yet that holding does not force a jury to believe the statements: juries remain free to weigh and disregard hearsay evidence whether its admitted under Rule 803, 804, or 807.

[42] *See* 12/10/18 AM Tr. 4015:21–4017:8.

bank-shot inference that because the agent used padding unavailable to Slatten to position the gun through the porthole, Slatten could not have shot his SR-25 through the porthole while laying prone on the bench. Yet this inference proves too much—by Slatten's own logic, not only would it be impossible for him to have shot the Kia, it would be impossible for him to have ever shot *anything* out of the porthole with his SR-25. But that cannot be true: as the convoy's designated defensive marksman, Slatten routinely surveilled targets through the vehicle's portholes.[43] And the inference overlooks evidence that Slatten looked out of his vehicle's portholes when he shot the Kia and called other convoy members' attention to its forward movement.[44] So Slatten's sham inference fails to render the verdict legally insufficient.

Slatten further disguises conjecture as evidence by claiming "it [wa]s not physically possible to orient a rifle out of the front porthole . . . from the bench" at the angle necessary to aim at the Kia. Mot. J. Acquittal 11 (emphasis removed). This conclusion rests on two premises: First, that the Kia lay twenty to forty degrees to Slatten's left as he looked through the porthole. And second, that the turret gunner's position inside the vehicle—standing immediately to Slatten's right on a raised platform—impeded Slatten's ability to aim his SR-25 at that angle:



Def.'s Ex. 7203                                      Def.'s Ex. 7202

---

[43] *See* 11/5/18 PM Tr. 565:14-17; 11/7/18 PM Tr. 994:7-18; 11/14/18 PM Tr. 1481:2-12; 11/26/18 PM Tr. 2368:2-20; 11/19/18 PM Tr. 3085:22–3086:18; *see also* 11/26/18 PM Tr. 2372:7-16 ("[A]t the City Hall complex a couple days before, he engaged some threats, and I know he shot some people that day out of [his] vehicle.").

[44] *See* 11/14/18 PM Tr. 1476:12-20; 1501:22–1503:18.

Both premises are flawed. The first—the angle between Slatten's vehicle and the Kia—comes from one of Slatten's lawyers, who used a protractor and a post-shooting aerial photograph of Nisour Square to approximate the locations of Slatten's vehicle and of the Kia based partly on wreckage and stains left in the road, and partly on other witnesses' crude sketches:[45]

 

Def.'s Ex. 7201 (Demonstrative)          Def.'s Ex. 7200 (Demonstrative)

But when they showed this hand-drawn analysis to the FBI agent who conducted the demonstrative shootings, the agent balked: "We do not know the exact angle. . . . I have no idea about the number, no."[46] When defense counsel marshalled evidence about the Kia's location, the agent repeatedly reminded them: "[B]ut I don't know what the angle of [Slatten's vehicle] was . . . . That would change things."[47] And though defense counsel characterized his in-court

---

[45] *See* 12/10/18 AM Tr. 3995:1–4006:12.

[46] *Id.* at 3995:18–3996:1.

[47] *Id.* at 4019:1-5; *accord id.* at 3996:23–3997:1 ("I don't know the angle that [Slatten's vehicle] would have been at, though."); *id.* at 3997:5-10 ("But, again, I couldn't say the angle of which [Slatten's vehicle] was exactly sitting and which way it was facing toward the Kia or any other direction"); *see also id.* at 4025:25–4027:14 ("Q: . . . [I]s it your understanding that this (indicating [on the aerial picture]) is the radiator stain from [Slatten's vehicle? A: Yes, ma'am. Q: And in your—as part of your investigation, do you have an understanding of where this radiator is positioned on [Slatten's vehicle]? A: It's at the very front . . . . Q: So the very front . . . ? A: Yes, ma'am. Q: And so, in terms of the orientation of [Slatten's] vehicle, do we know what the first—what the angle is between the—what would be the right side of [Slatten's] vehicle and the curb? A: No, I don't know what the angle would be. . . . Q: Aside from knowing that this would be the very front of [Slatten's] vehicle right here (indicating [the location of the stain]), . . . do you know how it is oriented in relation to the curb? A: No, I don't. Q: So do you know if it would

estimation as "conservative,"[48] it remains an estimation based solely on a stain in the road and rough shapes other witnesses drew on a courtroom touchscreen. Whatever probative value that estimation has, it doesn't necessarily foil the jury's verdict.[49]

The second premise cannot be verified. Maybe the turret gunner's position impeded Slatten's ability to aim his gun to the left. Or maybe it didn't. Maybe the turret gunner turned out of the way. Maybe he leaned back, or to the side. Maybe he stepped onto another surface inside the vehicle. Maybe Slatten pushed him. As the government acknowledged, "[w]e don't know."[50] But the record does establish—at least—that Slatten watched the Kia as it rolled forward,[51]

---

be—if it could be positioned like this [(indicating one way)]? A: It could be, yes. Q: Do you now if was positioned more like this (indicating [another way])? A: I don't know. Q: And I guess that goes to my larger point . . . . In terms of knowing where the gunport is in relation to this vehicle, that could be orientated a number of ways, do we know precisely where the gunport is in relation to the curb and then in relation to the White Kia? A: No.").

[48] *Id.* at 4019:10-13.

[49] In his reply brief (at 7), Slatten claims government exhibit 9210V supports concluding the Kia was roughly forty degrees to the left of Slatten's vehicle. That's wrong—and very misleading. Government exhibit 9201V depicts the FBI's post-incident trajectory analysis of shots that hit the Kia's hood. The analysis shows a dozen shots riddling the Kia's hood from both sides, some of which appear at roughly a forty-degree angle:



Gov't's Ex. 9210V

*See also* 12/10/18 AM Tr. 3999:14–4000:11. But this analysis considers shots fired into the Kia's hood from all four convoy vehicles as the Kia rolled forward and came to a stop. It proves nothing about the Kia's location vis-à-vis Slatten, who aimed at the Kia's driver (not its hood) out of the third convoy vehicle before the Kia began moving.

[50] 12/11/18 AM Tr. 4225:23–4226:2.

[51] *See* 11/14/18 PM Tr. 1476:12-20; 1501:22–1502:7 ("[H]e said, White car, white car coming in. He yelled that."). *But cf.* Def.'s Reply 7 (speculating Slatten watched the Kia through a larger window, not the gun porthole).

and—at most—that Slatten could and did shoot its driver.[52] So although a reasonable juror might surmise the turret gunner's position would generally prevent Slatten from aiming the SR-25 too far to the left, a reasonable juror could legitimately infer that—in the moment—it did not. The turret gunner's relative position in the vehicle fails to inevitably cast enough doubt to undermine the jury's verdict.

### 2. The record establishes Slatten acted with malice aforethought.

Sufficient evidence shows Slatten intended to kill Al-Rubia'y. Immediately after the shooting, Slatten gloated he "popped [a man's] grape" and watched him "slump[] forward."[53] Other witnesses characterized Slatten's reaction to the shooting as "defiant" and "chest-beating,"[54] and recalled him high-fiving and back-slapping other team members.[55] In private, Slatten mused something was wrong with him since he did not feel remorseful.[56]

Those comments echoed Slatten's history of animus toward Iraqi civilians. Slatten once declared "[Iraqi] lives are not worth anything, they are not even humans, they are animals."[57] A

---

[52] *See* 11/14/18 PM Tr. 1503:13-18; evidence cited *supra* notes 10–11.

[53] 11/27/18 PM Tr. 2689:11-24.

[54] 11/7/18 PM Tr. 1057:2-6.

[55] *See* 11/26/18 PM Tr. 2430:15–2432:8.

[56] *See* 11/7/18 PM Tr. 1057:13–1058:4.

[57] 11/26/18 PM Tr. 2371:11-15; *see also* 11/7/18 PM Tr. 985:17–988:1 ("[I]t was very common among the military and contractors to dislike Iraqis. . . . I would say Nick was to the far end of that opinion, where I believe he viewed them pretty much all as an enemy. . . . I remember Nick saying that everybody—basically everybody in Baghdad, like, Why are they still here if they're not against us? They should have, you know—they know after all these years—this is not a direct quote, obviously—by this time, they could have left."); *id.* at 988:11-13 ("Q: Did you know anyone else other than Mr. Slatten to have that similar mind-set at the at extreme level? A: To that extreme level, no."); 11/26/18 PM Tr. 2371:16-20 ("I didn't talk to [Slatten] much after the shooting, but after some engagements, I heard him make some pretty derogatory comments toward the Iraqi people."); *id.* at 2372:7–2374:1 ("Q: What was the context, though? . . . A: Yeah, it could be just sitting at a dinner table one night talking just referring to them. It's just slander toward the Iraqi people. Or it could be a situation where, like at the City Hall complex a couple days before, he engaged some threats, and I know he shot some people that day out of [his] vehicle. And then afterwards, he again was bragging about it. . . . I remember him talking about he turned one guy's head into a canoe, was his term for it. So really, no remorse and respect for those people or their lives. Q: I mean, do you perceive he is generalizing toward the Iraqi people, or is he specifically talking about insurgents? A: No, it's toward the Iraqi people in general. . . . Q: Do you, based on your experience or understanding of the word 'canoe' used in that context, have an understanding as to what Mr. Slatten meant? A: . . . [I]t would be in the context of

convoy member recounted Slatten firing without provocation on multiple instances, and openly

encouraging teammates to shoot innocuous targets.[58] Thanks to these efforts, Slatten boasted he

hollowing somebody's head out. Q: With a bullet? A: Could be, yeah, sure."); 11/27/18 PM Tr. 2647:12-15 ("Q: Did he in his comments, did he distinguish between people that were a threat and people that were just Iraqis out in the street? A: No, sir, he did not.").

Slatten does not deny hating Iraqis—he just points out that some other convoy members did too. *See* Mot. J. Acquittal 20 (citing 11/28/18 AM Tr. 2787:1-15). But that's beside the point. It matters only that Slatten's demonstrated animus towards Iraqi civilians tends to make it more likely that he acted with malice aforethought.

[58] 11/27/18 PM Tr. 2641:4–2646:17 ("Q: . . . [W]hat do you recall about that incident? A: There was a mechanic's shop that was across the street from a staging area that our vehicles would park in. . . . And Mr. Slatten had said to me, Do you see the mechanic's shop over there? There was a shed on top of it, almost like an outhouse. And he said, If I was an armed insurgent, that's where I would attack us from, because they had a clear view of our vehicles. And he had said that he was going to shoot at it when we were exiting the facility and try and draw out any fire if there was anyone in there. And he said, Fire along with me, and I said, Okay. . . . Q: Sir, this shed, can you give us an idea where it was located versus where you were parked or stationed in your vehicle? A: Maybe 100 meters across the street from us. Q: So it was literally across the street from where you were located? A: Yes. Q: When we are talking about a shed, what are we talking about? A: It looked like a mechanic's shop, I think it was, and the shed on top of it looked like just what an outhouse would. Q: And you initially agreed to also fire at the shed? A: I did. Q: So what happened after the convoy was leaving, then? A: Mr. Slatten fired on the shed. Q: Did you fire on the shed? A: No, I didn't. Q: And when Mr. Slatten fired on the shed, did you see if there was anybody in the shed at the time? A: No, I didn't. Q: So you don't know one way or another whether somebody was in there or was not in there? A: That's correct. Q: Did anybody fire back or act as a result of that shot being taken at the shed? A: No, sir. Q: Did you and Mr. Slatten have a discussion when you got back and returned? A: We did. Q: Tell us about that. A: He either asked if I did or why I didn't fire on the shed. Q: And what was your response? A: I think I said, I think, I forgot or something. Q: You made some kind of excuse? A: Yeah, I made some kind of excuse. Q: And why didn't you fire? A: I just didn't. . . . Q: Certainly there was no reason to fire on the shed? A: Correct. Q: Was there some [other] incident some weeks prior to [the Nisour Square incident] involving a helicopter crash? A: Yes. . . . Q: And what happened once you [responded to the crash site]? A: We formed a perimeter around the helicopter, or that area. . . . Q: Do you recall who you were next to? A: Mr. Slatten. Q: And as you're next to Mr. Slatten providing this perimeter security, do you have a conversation with Mr. Slatten? A: I do. Q: Tell us about that conversation. A: He had said that if he was the shooter that shot down the helicopter—I think it was those words—that he would have— he would be from that building. I think he even pointed out the window, but I'm not 100 percent sure. And he said he's going to fire on the building, and when he does, that I should fire along with him. Q: Kind of similar to the shed situation? A: Yes. Q: Okay. And then after you had this conversation with him, what happened? A: At some point Mr. Slatten did fire. Q: Did you fire after that? A: I did. Q: How about other members of Raven 23? Did they fire then after he did? A: Yes, several. Q: And did Mr. Slatten say something either before or after he fired to the group that you could hear? A: I know he said after that he saw someone taking aim at us through the window. Q: So he said that somebody was taking aim out the window and that's why he was firing? A: That's correct. Q: And this is after the conversation he had with you about him just suspecting that somebody—if there was a sniper, that it would be there? A: Yes, sir. Q: Was the military present when this was taking place? A: Yes, they were. Q: And did you see the military also open fire after Mr. Slatten had fired at that location? A: They did. . . . I believe there was a Bradley [tank], and I'm not sure if it was a Stryker armored vehicle. . . . [T]hey fired on that building, and also air assets. I think it was an Apache helicopter. Q: What happened to the building? A: It, for the most part, was destroyed."); *see* 11/7/18 PM Tr. 999:7–1004:19 (recounting the same incident involving the helicopter and recalling that Slatten suddenly shot at the building and persuaded not only the rest of the convoy to shoot and but also an Army helicopter to fire a Hellfire missile into one building and another Hellfire missile into an adjacent building because of "a guy in a window with a rifle," only to later admit he did not see if the man had a rifle); *see also* 11/26/18 PM Tr. 2377:12–2381:19 ("Q: Now, do you recall on that day, the week prior to [the Nisour Square] incident, what role [Slatten] was playing [in a different mission]? A: He was [out of the vehicle on foot directing traffic.] . . . Q: Do you recall an interaction with [Slatten] based on your observation of a man on a roof? A: Yes. Q: Can you, to the best of your recollection, describe for the ladies and gentlemen of the jury what you recall seeing

was "well on his way" to "getting payback for 9/11,"[59] a statement evincing Slatten's determination to kill Iraqis in a twisted hunt for revenge.

### 3. The record establishes Slatten acted with premeditation.

Much of the evidence establishing Slatten acted with malice aforethought—in particular, Slatten's anti-Iraqi animus and his history of firing without provocation—doubly suggests he acted with premeditation. *See generally Old Chief v. United States*, 519 U.S. 172, 187 (1997) ("[A] piece of evidence may address any number of separate elements, striking hard just because it shows so much at once; the account of a shooting that establishes capacity and causation may tell just as much about the triggerman's motive and intent."). In addition, the government introduced circumstantial evidence suggesting Slatten modified—or allowed someone else to modify—his gun before the shooting, changing it from a two-stage trigger (more accurate, but takes longer to fire) to a hair trigger (allowing for quicker and easier firing).[60] Because the

---

and conveying to [Slatten]. A: . . . I saw somebody on a rooftop. It was a pretty good distance from our location, but nonetheless, he was in a good vantage point watching over the convoy, and he was doing something like sweeping or working, doing something up on top of that building. He wasn't a threat at that time, but it was applicable to call out to other members of the team and let them know that there was somebody up on that rooftop, just so they could know and have that, because he could have changed from a nonaggressive posture to an aggressive posture, if that makes sense. Q: Is it accurate to say that that was fairly common practice, to identify individuals on rooftops as potential threats? A: Sure, yes. Q: Whether or not they had a weapon in their hands or not? A: Yes. Q: Now, when you did that, was it typical to just shoot the individual? A: No. Q: Would that have been an appropriate reaction? A: In this instance, no. . . . Q: . . . [W]hat did Mr. Slatten say to you after you had identified the man on the rooftop? . . . A: To the best of my recollection, it was, 'Shoot that [expletive].' Q: Did you shoot him? A: I did not. Q: Why not? A: I did not perceive him as a threat at that time. Q: Could you see his hands [while observing him through your magnified scope]? A: Yes. Q: What did he have in his hands, to your perception? A: It was either some sort of a hose or broom or something. Q: Did it look anything like a weapon? A: I don't remember it looking like a weapon, no.").

[59] 11/27/18 PM Tr. 2639:2-8.

[60] *See* 11/29/18 PM Tr. 3184:23–3207:8. As Slatten acknowledges, the Kia was so close to the convoy that any competent rifle shooter could have made the fatal shot. *See* Mot. J. Acquittal 20-21 (collecting evidence). So to the extent a hair trigger made his SR-25 less accurate, *see* 11/29/18 PM Tr. 3187:20–3189:15, the record suggests Slatten could still have made the shot.

modification had to occur before the incident,[61] it supports the conclusion Slatten acted with premeditation.

*   *   *

In the end, concluding the government presented sufficient evidence to support Slatten's conviction should be unremarkable. After all, the Court of Appeals already held the same thing after Slatten's first trial, which featured a largely identical record. *See Slatten*, 865 F.3d at 795-97. The panel unanimously accepted the government's theory that "Slatten was laying across a bench in the back of the third [convoy] vehicle, aiming his weapon south out of a driver's side porthole" and that "while traffic was at a standstill . . . Slatten fired two shots from a sniper rifle into the Kia windshield, killing Al-Rubia'y instantly and setting into motion the day's horrific events." *Id.* at 795.[62]

---

[61] *See id.* at 3202:7–3205:17.

[62] The records are strikingly parallel. Here's how the Court of Appeals summarized the evidence last time:

> The jury heard testimony that at the outset, while all traffic was stopped in Nisur Square, there were two distinct pops, after which the Kia started to roll slowly and a woman began to scream. Officer Al-Hamidi testified that he approached the car to see that Al-Rubia'y's "whole face was full of blood," that the woman in the passenger seat was holding him and screaming "My son, my son," and then the car "started moving slowly because the young man was killed, and he did not have control of the car." Officer Monem similarly testified that, on his approach, he saw that Al-Rubia'y had been shot in the middle of his forehead, while a nearby witness saw a hole in the blood-splattered driver's side windshield. From this, the jury could reasonably conclude that the first shots were fatal.
>
> The jury also heard testimony from Jimmy Watson, who was in the front passenger seat of Slatten's vehicle. Although unable to recall at trial, Watson had testified before the grand jury to his fairly strong recollection that Slatten fired twice and then the gunners began shooting, and this testimony was admitted into evidence at trial. Watson described Slatten's first shots as "very rhythmic . . . retort then retort," consistent with others' descriptions of the fatal shots as "two pops." Watson could not see Slatten's target, but testified that Slatten was aimed generally south, which was "the direction . . . where the [Kia] was." Similarly, Eddie Randall testified that he heard the first shots come from in front of him, where Slatten's vehicle was positioned. Slough was in Slatten's vehicle, and on direct examination Randall testified that nothing he saw in Slough's appearance indicated to him that Slough had taken the shots.
>
> The jury heard further testimony that Slatten was Raven 23's best marksman, who carried a sniper rifle that had been modified to be on a hair trigger, and that Slatten was known for his particular disdain for Iraqis, viewing himself as getting payback for 9/11. Indeed, Jeremy Ridgeway testified that Slatten later recounted shooting someone who was taking aim at the convoy, with Slatten saying matter-of-factly that he "popped his grape" and caused him to slump forward. From this evidence, a reasonable jury could understand this to describe Al-Rubia'y, after being shot in the middle of the forehead by Raven 23's best marksman. Slatten's bias against Iraqis, moreover, provided a basis for

Why does Slatten think this iteration should be different? Slough's statements? As noted, the jury reasonably disregarded them.

His new argument that he physically couldn't shoot at the Kia while laying prone on the vehicle's bench and aiming through the porthole? As explained, the jury had no obligation to tag-along with his logical leaps.

The government's decision to not call Adam Frost, another convoy member whose testimony at the first trial that he heard two pops, turned, and saw a white vehicle rolling forward meshed with Watson's recollection of two shots? No matter: numerous other witnesses in this trial testified to hearing several single shots, and even if they did not agree on the precise number—Murphy testified he heard "two loud hollow popping sounds";[63] a different convoy member described "a couple to a few";[64] one Iraqi policeman in Nisour Square remembered two to ten;[65] another policeman recollected three to four;[66] and two Iraqi civilians independently recalled one[67]—their consistent accounts sufficiently echo Watson's account.

The discrepancy between Slatten bragging about watching a man slump forward after he "popped his grape," and one police officer's testimony that Al-Rubia'y fell backwards?[68] As the

---

finding that Slatten had fired first, in the absence of any insurgent fire or other threat to the heavily armed convoy. Witnesses testified that Slatten had previously engaged in a pattern of preemptively shooting (or encouraging others to preemptively shoot) at targets in order to draw fire from potential adversaries.

865 F.3d at 795-96 (citations omitted).

[63] 11/7/18 PM Tr. 1017:4-10.

[64] 11/29/18 PM Tr. 3114:15–3115:4.

[65] 11/16/18 PM Tr. 1979:10–1981:24.

[66] 11/19/18 PM Tr. 2167:8-9.

[67] 11/5/18 PM Tr. 624:22–625:19; 12/6/18 PM Tr. 3874:19–3875:5.

[68] *Compare* 11/27/18 PM Tr. 2689:11-24 ("Q: And how did [Slatten] describe shooting at that man that was allegedly taking aim at the convoy? A: He said he popped his grape. Q: Did he saw what happened to this man after he popped his grape? A: That he slumped forward."), *with* 11/19/18 AM Tr. 2071:7-13 ("I saw him[] leaning backwards.").

D.C. Circuit said, "to the extent [there is a] conflict[] . . . , the jury was entitled to disregard such a minor discrepancy. Given the lack of evidence Slatten fired any other shots that day, the jury could reasonably understand his 'popped his grape' comment to describe Al-Rubia'y, who had been shot in the middle of his forehead." *Slatten*, 865 F.3d at 797. So too for Slatten's claim that he shot a man taking aim at the convoy: "The jury could reasonably find that Slatten's . . . claim . . . was self-serving and therefore not trustworthy." *Id.* at 796.

In the end, this trial—like its predecessor—included enough evidence for the jury to conclude beyond a reasonable doubt Slatten committed each element of first-degree murder: that he unlawfully killed Al-Rubia'y; that he acted with malice aforethought; and that he acted with premeditation. In other words, the record sufficiently supports the verdict.

## B.  The jury's verdict accords with the weight of the evidence.

With that background, the verdict's sound evidentiary footing should be obvious. Of course, a court may grant a new trial "despite the abstract sufficiency of the evidence to sustain the verdict" if it concludes "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." *Tibbs*, 457 U.S. at 38 n.11 (internal quotation marks omitted) (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). But this record does not sufficiently militate against Slatten's guilt.[69]

Put simply, Slatten fails to blunt the government's case. First, he points to Slough's "confessions"—but as subsection I.A.1 explains—those deserve particularly little weight. Next, he trots out the witnesses who testified the turret gunners fired first, but their recollections are even flimsier. After all, they're testifying about a few-second sequence from over a decade ago,

---

[69] Obviously, "[i]n considering a new trial motion based on the weight of the evidence" to "decide whether a serious miscarriage of justice may have occurred," a district judge can only "weigh[] . . . and evaluate[]" evidence the jury itself considered. *United States v. Dale*, 991 F.2d 819, 838 (D.C. Cir. 1993). So the four pieces of evidence "not admitted at trial" that Slatten offers for the Court's consideration, *see* Mot. J. Acquittal 29, are of no moment.

in which either the turret gunners or Slatten fired first, but they could only see the turret gunners. So their inference the turret gunners fired first (one witness admitted it was only an assumption) proves little. What's more, Slatten fumbles the significance of M-4 shells recovered from Nisour Square after the shooting, since they hardly shed light on who fired first, or on who shot Al-Rubia'y. Finally, despite swiping at Murphy and Watson's testimony, Slatten does nothing to undermine the broader evidentiary constellation supporting his guilt. Consequently, the jury's verdict accords with the weight of the evidence.

## C. Jurisdiction and venue are proper.

Slatten's renewed objections to this Court's jurisdiction and to venue in the District of Columbia fail from the start.

*First*, jurisdiction. MEJA empowers the government to prosecute civilians who commit crimes while employed abroad by the United States to support its military mission. As relevant here, the government must prove three elements to activate MEJA's jurisdictional grant: *First*, that the charged conduct would be punishable by more than one-year imprisonment if it occurred within the United States' special maritime and territorial jurisdiction. *Second*, that a contractor or subcontractor of a federal agency employed Slatten. *Third*, that Slatten's employment related to supporting the Defense Department's mission. *See Slatten*, 865 F.3d at 781 (citing 18 U.S.C. §§ 3261, 3267). In its prior opinion, the D.C. Circuit held evidence showing Slatten provided security for State Department diplomats in Baghdad satisfied the third prong. *See id.* at 781-82. And though Slatten quibbles with that approach, he concedes the government followed it here. *See* Mot. J. Acquittal 23-24. So unless and until the *en banc* Court of Appeals or Supreme Court decides otherwise, this Court properly exercised jurisdiction.

*Second*, venue. As the D.C. Circuit noted, "If an offense is committed outside the United States and involves charges against multiple people, Congress has declared venue to be proper in the district where any of the joint offenders are first arrested." *Slatten*, 865 F.3d at 786 (citing 18 U.S.C. § 3238). To determine where someone was arrested, this Circuit looks to "where the defendant is first restrained of his liberty *in connection with the offense charged*." *Id.* (emphasis in original) (internal quotation marks omitted) (quoting *United States v. Wharton*, 320 F.3d 526, 537 (5th Cir. 2003)). A joint offender includes "anyone who has joined others in participating in the same act or transaction constituting a crime or crimes." *Id.* at 787-88. On this basis, the D.C. Circuit held Jeremy Ridgeway (one of the turret gunners who fired at the Kia) was "clear[ly] . . . a joint offender" because by being "in Nisur Square as a member of the . . . convoy and . . . fir[ing] at civilians," he "participated in the 'same series of acts or transactions' that gave rise to the prosecution." *Id.* at 788 (quoting Fed. R. Crim. P. 8(b)). And since "Ridgeway was first arrested in the District of Columbia," the D.C. Circuit already concluded his "arrest established venue here." *Id.* at 787; *see also id.* at 789 n.5.

## II.  Slatten's Motion for a New Trial

After mining the six-week-long trial record for thirty-five distinct issues, Slatten's second motion demands (at most) a new trial or (at least) an evidentiary hearing. Each issue will be discussed in turn. But briefly: although some were errors, none merit relief. *See* Fed. R. Crim. P. 52(a). So the Court will deny his motion.

### A.  Matthew Murphy's testimony does not require a new trial because any error was harmless.

As subsection I.A.1 explains, convoy member Matthew Murphy identified Slatten as the initial shooter. Murphy testified the first significant sounds he heard in Nisour Square were "two loud hollow popping sounds, like a firecracker in a 55-gallon drum" coming "near" his location,

"sort of behind" him and "off to the left"—exactly where Slatten's vehicle was.[70] Murphy—wearing ear protection—couldn't precisely identify the sounds, but he knew they weren't pen flares, or shots from an M-4, or shots from a turret gunner's M-240, or shots from a Glock pistol, or grenades from an M-203.[71] With those sources ruled out, Murphy concluded "the only sound that could emanate from within our team that makes sense" was Slatten's SR-25: "Nobody else has a weapon or device that sounds like that in the entire team, and that sound came from within our team, from the area relative to me where [Slatten's] vehicle was."[72] That said, Murphy admitted the hollow pops sounded different from other times he heard Slatten fire his SR-25.[73] But Murphy knew Slatten fired his SR-25 at some point (Slatten told him so[74]), and Murphy thought of two reasons why it might have sounded differently: maybe Slatten used his team-issued suppressor, or maybe Slatten's gun sounded differently because it was fired inside a vehicle.[75] Murphy reiterated this account a few days later on cross-examination (describing "two loud muffled popping noises" that "w[ere] clearly not [] pen flare[s]" nor "a 240 . . . M4, et cetera," leading him to conclude after the fact through process of elimination they were an SR-25, and that "[t]he rational presumption is that it was [Slatten shooting] if somebody was shooting an SR-25 since he was the only one that had one"[76]) and on re-direct (recounting "two loud pops" from "more or less" Slatten's vehicle that "didn't sound like any of the typical

---

[70] 11/07/18 PM Tr. 1017:4-23.

[71] *See id.* at 1017:24–1019:5, 1026:6-10.

[72] *Id.* at 1022:7–14; 1024:14–1026:5.

[73] *See id* at 1022:7–14; 1024:14–1026:5.

[74] *See* 11/13/18 AM Tr. 1126:24–1127:16.

[75] *See* 11/07/18 PM Tr. 1022:7–14; 1024:14–1026:5.

[76] 11/13/18 AM Tr. 1184:9-1200:3.

weapons" he "was used to hearing" so "presumably it was [Slatten] shooting from inside his vehicle" since "[t]hat would distort the sound and make it sound different"[77]).

Slatten raises three concerns about this testimony. The first characterizes Murphy's account as impermissibly speculative. The second ███████████████ requires discussion under seal. The third upbraids prosecutors for flouting this Court's order directing them to tell Murphy not to theorize whether Slatten used a suppressor, a detail the government previously promised not to elicit. But consistent with its prior rulings on the first point, the Court holds Murphy's testimony was admissible under Federal Rules of Evidence 602 and 701. *Accord* ECF Nos. 858, 1072. And on the second issue, ██████████████████████ the Court finds no ██████████ problem. *Accord* ECF Nos. 858, 1076. Finally, though a breathtaking lapse in professional judgment, the government's failure to follow this Court's order was harmless. So in the end, nothing about Murphy's testimony requires a new trial.

**1. Rules 602 and 701 permit Murphy's testimony.**

Slatten argues Murphy's attribution of the initial pops to Slatten's SR-25 improperly rested on Murphy's inference that an SR-25 fired inside a vehicle sounds different from an SR-25 fired outside a vehicle. Slatten claims that Murphy wasn't qualified to make the inference, and that it is factually incorrect.

But Rule 602 invites anyone to testify about anything they have personal knowledge about, and Rule 701 allows them to rationally extrapolate from this knowledge to opine on matters "helpful to . . . determining a fact in issue" as long as the opinion does not rely on "scientific, technical, or otherwise specialized knowledge." Together, the rules "ensure that any opinions offered by a lay witness are based on personal, 'first-hand knowledge or observation,'

---

[77] *See id.* at 1217:23–1221:6, 1227:17–1229:17.

and 'a process of reasoning familiar in everyday life'" while still permitting witnesses to offer conclusions "'that cannot be described factually . . . apart from inferences.'" *United States v. Williams*, 827 F.3d 1134, 1155-56 (D.C. Cir. 2016) (citations omitted) (quoting Fed. R. Evid. 701 adv. comm. note (2000 amend.)). If a witness identifies the objective basis for their opinion, "thus ensur[ing] that the jury has the information it needs to conduct an independent assessment" of it, the Rules allow it. *United States v. Hampton*, 718 F.3d 978, 981 (D.C. Cir. 2013).

That's what Murphy did here. To help the jury determine who fired first, Murphy suggested it was Slatten, an opinion founded on sounds he personally perceived in Nisour Square compared to sounds he personally perceived previously when convoy members fired their weapons, and on his personal perception of the sound's direction. Courts routinely hold witnesses do not use scientific or technical knowledge when distinguishing between familiar sounds. *See, e.g.*, *United States v. Mendiola*, 707 F.3d 735, 741 (7th Cir. 2013); *United States v. Bush*, 405 F.3d 909, 916 (10th Cir. 2005); *see also Williams Enters. v. Sherman R. Smoot Co.*, 938 F.2d 230, 234 (D.C. Cir. 1991) ("As long as [the lay witness] had personal knowledge of the facts, he was entitled to draw conclusions and inferences from those facts—regardless of whether he applied any specialized expertise."). Now, Murphy's distinction isn't airtight—he can't precisely identify the sound he perceived in Nisour Square. But he revealed to the jury he identified Slatten's SR-25 through everyday reasoning and the common-sense recognition that the same noise sounds differently when it passes through a solid barrier from a confined space to the open air. Importantly, Murphy never hid the ball: he was transparent about his reasoning and made clear he had never heard an SR-25 fired from within a vehicle.[78] Besides, testimony identifying shooters is rarely airtight, yet courts commonly allow lay witnesses to infer identity

---

[78] *See* 11/07/18 PM Tr. 1022:7-14; 1024:14–1026:5.

from the sound and direction of fire. *See United States v. Pierson*, 503 F.2d 173, 176-77 (D.C. Cir. 1974); *see also Reed v. City of Modesto*, No. 11-1083, 2015 WL 1889048, at *8 (E.D. Cal. Apr. 24, 2015) (collecting cases); Gov't Mem. Opp'n. 7-8 (collecting cases), ECF No. 830. And importantly, Slatten had a full and fair opportunity to cross-examine Murphy on the basis for his opinion, empowering the jury to independently assess Murphy's premises and conclusion, and the extent to which either evolved over time. Rules 602 and 701 do not preclude Murphy's testimony.

Moreover, Slatten oversells audio recordings comparing an SR-25 fired inside an armored vehicle to an SR-25 fired in the open air. Slatten claims the "recordings sound nearly identical," thus "confirm[ing] that [Murphy's] opinion is impermissibly speculative." Mot. New Trial 8-9, ECF No. 1219. But the Court has noted the recordings do not capture what a "listener in Mr. Murphy's position at the scene of the shooting" would have heard. ECF No. 1072 at 2. So at least in this regard, Slatten is the one speculating. Murphy's testimony—rationally stemming from perceptions backed by his personal knowledge—stands in stark relief.

**2.** 





[REDACTED]

Neither judicial estoppel nor law-of-the-case doctrine precludes that conclusion. *First*, judicial estoppel: an equitable rule "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotation marks omitted) (quoting *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993)). Under this rule, a court may block a party from shifting its position if the positions clearly contradict, if the party successfully persuaded one court to adopt its first position so that flip-flopping creates the perception a court was misled, or if the party would derive an unfair advantage from the change. *Id.* at 750-51. But even if judicial estoppel can bind the government in a federal criminal prosecution, [80] it does not here. [REDACTED]

[REDACTED] [81] [REDACTED]

---

[80] *See Maine*, 532 U.S. at 755 (suggesting estoppel should not apply if it "would compromise a governmental interest in enforcing the law"); *Heckler v. Cmty. Health Servs. of Crawford City, Inc.*, 467 U.S. 51, 60 (1984) ("When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for the this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant."); *United States v. Cluff*, 857 F.3d 292, 301 (5th Cir. 2017) ("[J]udicial estoppel 'has apparently never been applied against the government in a criminal case.'" (quoting *Nichols v. Scott*, 69 F.3d 1255, 1272 (5th Cir. 1995))); *United States v. Kattar*, 840 F.2d 118, 129 n.7 (1st Cir. 1988) ("[A]s far as we can tell, this obscure doctrine has never been applied against the government in a criminal proceeding."); *Judicial Estoppel in Criminal Prosecution*, 121 A.L.R.5th 551 § 4 (2019) (collecting cases).

[81] [REDACTED]



■ So in light of the *Maine* factors, and consistent with its prior rulings, *see* ECF No. 766, the Court declines to apply judicial estoppel.

*Second*, law-of-the-case: the principle that "the *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc). ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

■ But law-of-the-case does not ossify erroneous decisions vacated by a higher court. *See Agostini v. Felton*, 521 U.S. 203, 236 (1997). ████████████████████████

██████████████████████████████████████

████████████████████████ *See also* ECF No. 766.

### 3. The government's failure to stop Murphy from speculating about whether Slatten used a suppressor was egregious but harmless.

A long time ago, this Court registered its "deep[] disappoint[ment] that any litigant would fail to obey orders . . . and then conceal and cover-up that disobedience with outright false statements." *Cobell v. Babbitt*, 37 F. Supp. 2d 6, 38 (D.D.C. 1999). "When that litigant is the federal government, the misconduct is even more troubling." *Id.* And when that litigant heads the Criminal Division of our nation's largest U.S. Attorney's office, it is more troubling yet. He is lucky his misstep was harmless.

Some background: During the second trial, Murphy wondered aloud whether Slatten's SR-25 sounded differently not only because Slatten fired from inside the vehicle, but also because he used a suppressor.[82] This testimony didn't totally lack an evidentiary foundation—the government can prove Slatten was issued a suppressor. *See* Gov't's Ex. 9865. But the government had never presented this information to the jury, partly because numerous witnesses (including Murphy himself) admitted they don't know if Slatten used the suppressor during the shooting. *See* Def.'s Mot. Lim. exs. C–F, ECF Nos. 956-3–956-6. Before the third trial, Slatten moved to exclude any testimony or evidence regarding a suppressor under Rule 403, arguing "the prejudicial nature of this evidence dwarfs any minimal probative value" by "invit[ing] jurors to associate Mr. Slatten with the criminal hit men and assassins whom they already associate

---

[82] *See* 7/10/18 AM Tr. 1817:5-10 ("An SR25 fired unsuppressed in open air sounds distinctly different from a suppressed SR25 fired from inside a vehicle."); 7/10/18 PM Tr. 1862:21–1863:10 ("Q: . . . You used the word, I believe, 'suppressed.' What do you mean by that? . . . A: Well, when we say suppressed, that's what—people think of the Hollywood term 'silencer,' which nothing—there's nothing that effectively really silences a round that large. But a suppressor is an attachment to muffle the noise and reduce the flash generally of a round fired from a rifle or pistol.").

with suppressors." *Id.* at 5, ECF No. 956. In response, the government swore off "elicit[ing] testimony or otherwise seek[ing] to introduce evidence about [Slatten's] suppressor." Gov't's Resp., ECF No. 999. That strategy surprised the Court, not least because Rule 403 "tilts . . . toward the admission of evidence." *United States v. Moore*, 732 F.2d 983, 989 (D.C. Cir. 1984). But regardless, the Court took the government's suggestion and denied Slatten's motion as moot. *See* ECF No. 1046. The Court included the following proviso: "Based on [the government's] representation, the Court expects the government to instruct its witnesses not to testify regarding a suppressor and to properly redact any documents related to the subject." *Id.*

The government ignored that order.[83] To lay a foundation for Murphy's process-of-elimination reasoning, the prosecutor asked, "What weapon systems were you familiar with at the time?"[84] Murphy responded, "I was familiar with the 203, the M4, the 249, the 240, and

---

[83] The prosecutor admitted doing so, though he equivocated as to why. Immediately after Murphy's testimony, he feigned surprise: "I can say that I did not instruct [Murphy] beforehand because he had never mentioned a suppressor as being on that weapon or suggest that there was a suppressor, and it's contrary to his grand jury testimony." 11/7/18 PM Tr. 1059:8-14. Of course, that was false—Murphy offered nearly identical testimony regarding a suppressor a few months earlier in the second trial; the prosecutor personally referenced that exact testimony in a letter to defense counsel before the third trial, *see* ECF No. 1121-6 at 3; and the defense extensively cited Murphy's second-trial testimony in a pre-third-trial motion about this precise issue, *see* ECF No. 956. So in a letter to the Court the next day, the prosecutor distanced himself from that "unintentional misstatement" and explained he "did not anticipate Mr. Murphy would reference a suppressor" because he "forgot aspects of Mr. Murphy's testimony from the retrial this summer and had not re-reviewed it in his entirety before putting Mr. Murphy on the stand" in the third trial. ECF No. 1121-9 at 3. But the day after that, the government changed its tune again, now advancing the incredible suggestion that the Court should have been clearer its order: "[T]he government believed, based on the context in which the Court's . . . Order was issued, that the admonishment directive applied to those witnesses testifying to [the] issuance of a suppressor to Defendant, and the supporting documents—namely, Jonathan Webb, the [convoy's] armorer." ECF No. 1120 at 14. That statement beggars belief. The "context" of the Court's order was dismissing as moot Slatten's motion *to exclude Murphy from testifying about a suppressor*, and its content was unambiguous: "Based on [the government's] representation [conceding the motion in limine], the Court expects the government to instruct its witnesses not to testify regarding a suppressor and to properly redact any documents related to the subject." ECF No. 956. So finally, on his fourth try, the prosecutor fessed-up: "[W]e in good faith thought we could lead [Murphy] to the first portion [that he ruled out all other sounds but Slatten's SR-25], and, again, give the defense the option, if they wanted to, to go into other bases, question his bases [for that conclusion], and potentially elicit the notion that Mr. Slatten had a suppressor at the time, but he did not believe it was on the weapon at the time." 11/9/18 AM Tr. 1148:5-9.

[84] 11/7/18 PM Tr. 1018:2.

unsuppressed SR-25."[85] A few minutes later, defense counsel asked to approach: "I just am concerned that [Murphy] used the word 'unsuppressed' before, and I want to make sure we protect against that."[86] Defense counsel asked the prosecutor: "Has [Murphy] been instructed that he's not supposed to talk about suppressed versus unsuppressed?"[87] In response, the prosecutor promised "to try to lead as much as I can. . . . Consistent with his testimony last time, when he uses the word 'suppressed,' he means being inside the vehicle at the time. So I think I can lead through this, but if we're anywhere close, we could just take a break."[88]

But Murphy could not be led. Seconds after the prosecutor resumed direct examination, the following exchange ensured:

> Q: And you had never heard Mr. Slatten's sniper rifle being fired while Mr. Slatten was inside a vehicle?
>
> A: I don't believe so.
>
> Q: And when you had previously said "suppressed," is that what you're referring to? In other words, you had not heard his weapon being fired within a vehicle?
>
> A: That's not what I meant, but I had not heard that, no.
>
> Q: You had not heard that? Okay. But the bottom line is, you had not heard that weapon being fired from inside the vehicle?
>
> A: No, I had not.
>
> Q: At some point later on, did you conclude that those first two hollow pops that you heard at the very beginning of the shooting incident were attributable to Mr. Slatten firing that weapon within the command vehicle?
>
> A: I did.
>
> Q: How did you arrive at that conclusion?
>
> A: Because it's the only sound that could emanate from within our team that makes sense.
>
> Q: What do you mean by that?
>
> A: Because nobody else has a weapon like that, has anything that would produce that noise. And I know that he had a suppressor for

---

[85] *Id.* at 1018:3-4.

[86] *Id.* at 1021:14-16.

[87] *Id.* at 1021:22-24.

[88] *Id.* at 1021:17–1022:3.

the rifle. And to me, it sounded—suppressors aren't like a Hollywood depiction where it's—[89]

Defense counsel interjected and cut off the testimony.[90] Immediately thereafter, the prosecutor rushed to clean-up the spill:

> Q: Let me be clear in my questions. You did not see Mr. Slatten with a suppressor that day?
> A: No.
> Q: Okay. And whether he had been issued one or not, you're not saying you saw him with a suppressor on the rifle that day?
> A: Nope, I'm certainly not.
> Q: But—and you had not heard him fire his weapon inside of the command vehicle or inside another vehicle?
> A: No.
> Q: And you're not entirely sure what that would have sounded like?
> A: That's correct.
> Q: But nonetheless, you attributed those first two hollow pops to him?
> A: Yes.[91]

Before testimony resumed on the next day of trial,[92] the Court read the following instruction— drafted by defense counsel, *see* ECF No. 1121-11—to the jury:

> On direct examination on Wednesday, the government elicited testimony from Mr. Murphy about the sounds he claims to have heard in Nisour Square on September 16th, 2007. The government does not contend, and there is no evidence, that Mr. Slatten had or used a suppressor in Nisour Square during the September 16, 2007 incident at issue in this case. Mr. Murphy's testimony regarding a suppressor has been stricken from the record, and you must disregard it in its entirety.[93]

---

[89] *Id.* at 1022:17–1023:14.

[90] *Id.* at 1023:15–1024:12.

[91] *Id.* at 1024:14–1025:3.

[92] The mishap occurred during the afternoon of Wednesday, November 7, 2018; the Court canceled trial on Thursday, November 8 because of Slatten's medical treatment; the jury did not sit on Friday, November 9; and Monday, November 12 was Veteran's Day; so the jury next sat on Tuesday, November 13.

[93] 11/13/18 AM Tr. at 1168:21–1169:3.

Today, the Court concludes these curative measures adequately avoided prejudicing Slatten.[94] Putting aside the prosecutor's extraordinary conduct, Murphy only said that he knew Slatten had a suppressor—defense counsel interrupted before he could even explain what a suppressor was or how it would affect an SR-25's sound. The very next testimony the jury heard was Murphy forcefully clarifying he did not see Slatten use a suppressor in Nisour Square. And the Court unequivocally instructed the jury to disregard Murphy's statement about a suppressor in its entirety, an instruction courts "generally presume that a jury will follow . . . absent 'an overwhelming probability that the jury will be unable to.'" *United States v. Crews*, 856 F.3d 91, 97 (D.C. Cir. 2017) (quoting *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)).

No probability exists here. Most importantly, Murphy's mention of a suppressor was fleeting, interrupted, and incomplete. And not for nothing, Murphy used the term "suppressor," not the more common (and more charged) synonym "silencer." To the extent either word conjures images of "assassins and hit men," Mot. New Trial 16, it seems far more likely to be "silencer" (what Murphy didn't say) than "suppressor" (what he did say). Indeed, many people do not even realize a suppressor and a silencer are the same thing. *See, e.g.*, *Are firearms with a silencer 'quiet'?*, Wash. Post (March 20, 2017), https://www.washingtonpost.com/news/fact-checker/wp/2017/03/20/are-firearms-with-a-silencer-quiet/?utm_term=.f977c4f52d1f.

Moreover, Murphy's slip was harmless. For one, Murphy's suppressor theory was neither his only nor his modal justification for attributing the initial sounds to Slatten's SR-25—he repeatedly and more consistently posited Slatten's SR-25 sounded differently since Slatten shot

---

[94] Slatten now complains these were only "half-measures" since the Court did not allow him to impeach Murphy with his prior statement that the two pops did not sound suppressed or to otherwise cross-examine him. Mot. New Trial 17-19. But in the immediate wake of Murphy's testimony, Slatten forewent both opportunities, moving to strike the testimony and for a curative instruction, which the Court granted. And once the Court struck the testimony (again, at Slatten's request), allowing impeachment or cross-examination would have been improper. *See* Fed. R. Evid. 611(b) ("Cross-examination should not go beyond the subject matter of the direct examination . . . .").

from inside the vehicle. And the government's case certainly holds up without Murphy's suppressor theory, since a jury previously convicted Slatten at a trial where Murphy did not mention a suppressor. *See also Slatten*, 865 F.3d at 795-97 (ratifying the record's sufficiency). What's more—setting aside the government's disregard for a court order—the Court remains unsure whether Murphy's testimony was actually improper: Slatten's possession of a suppressor (which the government can unquestionably prove) provides an alternative explanation for the distinctive "hollow popping" noises multiple witnesses reported, and for why eyewitnesses on the ground did not notice Slatten shooting, both making it at least slightly more likely Slatten fired the initial shots.[95]

Nor is this case like *United States v. Eccleston*, a case Slatten cites for the proposition that courts should grant mistrials where inadmissible testimony directly incriminates a defendant in an otherwise "slight and circumstantial" prosecution since the "danger of prejudice . . . [i]s so great because of the weakness of the government's case." 960 F.2d 955, 960-61 (D.C. Cir. 1992). In *Eccleston*, only the inadmissible testimony directly incriminated the defendant. *See id.* at 961. But here, another witness also identified Slatten as the initial shooter. *See supra* note 10 and accompanying text.

The bottom line is that the prosecutor's mistake—though profound—was not prejudicial. Even still, the Court reminds the prosecution team that "[t]he institutions of our federal government cannot continue to exist if they cannot be trusted." *Cobell*, 37 F. Supp. 2d at 38. Here, the government's gross negligence risked countless amounts of time, taxpayer resources,

---

[95] A fair question: if it wasn't necessary for the government to follow this Court's order, why issue it in the first place? Well, because Slatten requested it. After the government's foreswore this evidence in its response to Slatten's motion in limine, Slatten's reply "respectfully request[ed] that the government be required to instruct its witnesses accordingly in order to avoid any inadvertent testimony on this . . . subject." ECF No. 1008. And the government did not oppose this request. So regardless of its own views, the Court issued an order formalizing the parties' consensus.

and international goodwill, all because of an unfortunate and easily avoidable situation. It cannot happen again.

## B.  The government properly relied on Jimmy Watson's testimony.

As subsection I.A.1 noted, Jimmy Watson cannot recall everything that happened in Nisour Square. So as in the previous two trials, the government spent much of Watson's time on the stand impeaching him with his 2013 grand jury testimony, which provides details about the Nisour Square incident he no longer remembers with clarity.

Slatten identifies two problems with this approach. *First*, Slatten argues the government should not have been able to call Watson just to impeach him, citing *United States v. Johnson*, 802 F.2d 1459 (D.C. Cir. 1986). But *Johnson* held no such thing—and even if it did, Slatten's argument remains procedurally improper and substantively unpersuasive. *Second*, Slatten argues the government and the Court improperly bolstered Watson's grand jury testimony. But any misuse was harmless. So the government properly relied on Jimmy Watson's testimony.

### 1.  *Johnson* did not preclude Watson's testimony.

In 1975, Rule 607 abandoned the long-standing prohibition on a litigant impeaching its own evidence to instead allow "[a]ny party, including the party that called the witness, [to] attack the witness's credibility." Despite this expansive language, Slatten argues *Johnson* narrowed Rule 607 to forbid litigants from calling hostile witnesses merely to impeach them with prior statements. That legal argument fails for several reasons.

First and foremost, Slatten waived it. As he acknowledges, the government has always planned to impeach Watson with his grand jury testimony—even during Slatten's first trial. Slatten appealed his conviction from that trial, but did not raise this issue. And "a party waives a 'contention that could have been but was not raised on [a] prior appeal.'" *Laffey v. Nw. Airlines,*

*Inc.*, 740 F.2d 1071, 1089 (D.C. Cir. 1984) (alteration in original) (quoting *Munoz v. Cty. of Imperial*, 667 F.2d 811, 817 (9th Cir. 1982)). In other words, a "legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, [governs] future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time." *United States v. Thomas*, 572 F.3d 945, 949 (D.C. Cir. 2009) (emphasis in original) (internal quotation marks omitted) (quoting *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995)); *see also Yakus v. United States*, 321 U.S. 414, 444 (1944) (holding waiver rules apply to all cases and all rights).

Yet even if Slatten could dodge waiver, he would run into the mandate rule, which forbids lower "courts from reconsidering issues that have already been decided in the same case." *Indep. Petrol. Ass'n of Am. v. Babbitt*, 235 F.3d 588, 597 (D.C. Cir. 2001) (quoting *LaShawn A.*, 87 F.3d at 1393 n.3). True enough, the doctrine does not apply to issues not raised and thus not decided. *See Yesudian ex rel. United States v. Howard Univ.*, 270 F.3d 969, 972 (D.C. Cir. 2001). But it does apply to decisions the appellate court "necessar[il]y impli[ed].". *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 251 (D.C. Cir. 1987). And in his earlier appeal, Slatten raised—and the Court of Appeals rejected—a sufficiency challenge. Because that record prominently featured Watson's grand jury testimony impeaching his live testimony, the Circuit sub silentio sanctioned the approach.

And even if Slatten could hurdle law-of-the-case, his argument lands on shaky ground. Slatten stakes his case on the following passage from *Johnson*:

> Impeachment evidence is to be used solely for the purpose of impeachment, and it may not be employed as mere subterfuge to get before the jury evidence not otherwise admissible. This type of bootstrapping is impermissible, and it is an abuse of [Rule 613], in a criminal case, for the prosecution to call a witness that it knows

> will not give it useful evidence, just so it can introduce hearsay
> evidence against the defendant.

802 F.2d at 1466 (internal quotation marks, alterations, and citations omitted). This passage

suffers from two obvious flaws. *First*, it principally relies on a Fourth Circuit case predating

Rule 607's revision. *See id.* (citing *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975));

*see also United States v. DeLillo*, 620 F.2d 939, 946-947 (2d Cir. 1980) (disavowing *Morlang*

accordingly). *Second*—and more importantly—it's dicta: since "defense counsel[] fail[ed] to

object to introduction of the statement as impermissible bootstrapping," the *Johnson* court was

"constrained to hold" the defendant "waive[d]" the issue. *Johnson*, 802 F.2d at 1466. And in the

thirty-three years since *Johnson*, the D.C. Circuit has never (*not once*) acknowledged this

dictum—let alone adopted it—in *any* opinion, published or otherwise. If anything, the Circuit

suggested the contrary in *United States v. Milton*, 8 F.3d 39, 46-47 (D.C. Cir. 1993), by affirming

the district court's decision to admit grand jury testimony under Rule 801(d) after a witness

"testified that she could remember almost nothing about the [incident in question] or what she

told the grand jury." So *Johnson* does not bind this Court.

What's more, *Johnson* had very different facts. In *Johnson*, the witness's live testimony

incriminated himself and exculpated the defendant; the government impeached this testimony

with the witness's prior statement fingering the defendant. 802 F.2d at 1463. In other words, the

*Johnson* witness's prior statement directly contradicted his live testimony. But here, Watson just

said he couldn't remember what happened[96]—which, as *Milton* points out, doesn't necessarily

contradict his grand jury testimony.[97] So to the extent *Johnson* prevents the government from

calling a witness it knows will directly contradict a prior statement, it wouldn't apply to Watson.

---

[96] *See* 11/14/18 PM Tr. 1478:22–1518:24.

[97] Other circuits agree. *See, e.g.*, *United States v. Gajo*, 290 F.3d 922, 930-32 (7th Cir. 2002).

That's all the more true because no one honestly knew what Watson would say on the stand. Anyone who saw Watson testify—in any of the trials—understands his proclivity to blurt out wildly irrelevant and sometimes shocking testimony.[98] His sui generis combination of physical, mental, and emotional injuries tragically renders his testimony uniquely unpredictable, a circumstance absent from *Johnson*. In effect, the Court does not believe anyone who claims to have known with certainty exactly what Watson would say during the third trial.

That said, the government did two things before the third trial betraying an expectation Watson would again be unable to remember what he saw or said: *First*, the government moved to pre-admit Watson's grand jury testimony. *See* ECF No. 1096. *Second*, the government's opening statement acknowledged Watson "may" say things inconsistent with his grand jury testimony.[99] Yet that expectation stems from the government's experience trying the same case with the same witnesses and the same evidence a few weeks earlier; less than four months separated Watson's second and third appearances. Because of this quirk, Slatten tries to slash Watson from the case. But that would be an exceedingly odd rule: any time a government witness surprised prosecutors with pro-defendant testimony on the stand, the government would be unable to recall him in a subsequent retrial.

Indeed, the closer one looks at *Johnson*, the more distinctions appear. In *Johnson*, the witness testified in the government's rebuttal case, and neither the witness's live testimony nor his prior statement necessarily bore on the defendant's guilt; the government called the witness only to rebut a defense witness's alibi. *See Johnson*, 802 F.2d at 1463. So to the extent *Johnson* signifies anything, it's that the government can't go through the charade of calling a witness it

---

[98] *See, e.g.*, 7/17/18 PM Tr. 2835:17-23.

[99] *See* 11/5/18 AM Tr. 532:10-24.

knows will be unfavorable if it's only seeking to impeach someone else. It's quite a leap from there to chisel out a broad exception to "the familiar, standard rule that the prosecution is entitled to prove its case by evidence of its own choice."[100] *Old Chief*, 519 U.S. at 186-87. The Court sides with that rule and with Rule 607's plain text to conclude *Johnson* did not preclude Watson's testimony.

### 2. Any misuse of Watson's grand jury testimony was harmless.

Slatten complains about three boosts to Watson's grand jury testimony, blaming one on the Court and two on the government. But the Court did not err, and even if the government did, it was harmless.

*First*, Slatten argues the Court improperly admitted an excerpted transcript of Watson's grand jury testimony as a physical exhibit, instead of just reading it into the record. But Slatten points to no binding authority limiting the Court's discretion as to how to receive evidence under Rule 801(d),[101] especially where—as here—the Court sees good reason to let the jury access the transcripts: Watson gave the sworn testimony much closer to the shooting, it was widely used at trial, and Slatten could contextualize it on cross-examination. Moreover, the Court went out of its way to discourage the jury from giving the transcripts improper weight:

> Certain prior testimony excerpts have been admitted as evidence and exhibits in this case. You may consider a witness' prior sworn testimony, taken under oath, as evidence similar to in-court testimony. You should take into account that the excerpts of prior testimony for which you have a transcript may lack context because they're only excerpts. You must not give prior testimony for which you have a transcript more weight or credit than the testimony you

---

[100] *United States v. DeLillo*, which the *Johnson* court relied on, further illustrates *Johnson*'s narrowness. In *DeLillo*, the Second Circuit allowed the government to call an adverse witness in order to impeach him with a prior sworn statement since the government agreed with some (but not all) of the witness's testimony. *See* 620 F.2d at 946. That's also true here: prosecutors endorse much of Watson's testimony. *See* 11/14/18 PM Tr. 1478:22–1518:24. So if not *Johnson* itself, at least the cases *Johnson* cites clarify Watson's testimony falls well within Rule 607.

[101] To the extent the Confrontation Clause has any relevance, it does not support Slatten's argument that the *form* (as opposed to the *substance*) of Watson's prior testimony caused prejudice.

> heard presented during trial. Subject to these considerations, you
> may give this evidence such weight as in your judgment it's
> otherwise fairly entitled to receive.[102]

Slatten never explains that instruction's insufficiency, especially given the presumption "that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985).

All the same, the Sixth Circuit "has held that a district court abuses its discretion when it allows for grand jury testimony to be presented as an exhibit to the jury," since it "creates a potential for double exposure to selected testimony that may improperly influence a jury." *United States v. LaVictor*, 848 F.3d 428, 453 (6th Cir. 2017) (citing *United States v. Smith*, 419 F.3d 521, 527 (6th Cir. 2005)). But that Circuit caveats that "not all decisions to admit transcript testimony amount to an abuse of discretion" and that "any prejudice from having grand jury testimony admitted can be ameliorated by watching the witness testify." *Id.* Thus the Court's decision here wouldn't constitute error in the Sixth Circuit either, "because the jury had the benefit of seeing [Watson] testify," Slatten "had a full opportunity to cross-examine [him] and place [his] grand-jury testimony in context," and Watson's grand jury testimony was not the only evidence incriminating Slatten. *Id.*

*Second*, Slatten claims the government improperly called attention to the fact that the undersigned approved his 2013 immunity order pursuant to his duties as the Chief Judge of this District. Troublingly, the government promised the defense to redact any reference to the undersigned from Watson's immunity order, but with Watson on the stand, the government went ahead and told the jury anyways:

---

[102] 12/12/18 AM Tr. 4482:4-14.

> Q: . . . And then in March—March 8th, 2013, you get immunity?
> A: Yes.
> Q: Do you remember that? Okay. So—and actually a federal district judge, this judge right here, Judge Lamberth, signs an order saying you are compelled to testify in front of the grand jury. And that is March 8th 2013?
> A: Yes sir.[103]

A best prosecutorial practice? No. But it wasn't prejudicial error either, since the Court issued the following curative instruction later that day:

> Before lunch, the government elicited testimony from Mr. Watson that I issued an immunity order compelling Mr. Watson to testify before the grand jury. You are instructed that a judge's role in granting immunity and ordering testimony before a grand jury is purely ministerial, and the Court must issue the order upon a request from the prosecution. The decision as to whether or when to grant immunity to a witness rests exclusively with the prosecution. The fact that I signed Mr. Watson's immunity order when I was chief judge of the court should play no role in your consideration.[104]

*See United States v. Burroughs*, 935 F.2d 292, 295 (D.C. Cir. 1991) ("Unless there is some good reason for finding otherwise, and here there is none, trial courts and appellate courts proceed on the basis that the jury does comply [with curative instructions].").[105]

*Third*, Slatten objects to the government's closing-argument exhortation to credit Watson's grand jury testimony more than his live testimony because he was neither confronted by Slatten nor subjected to cross-examination before the grand jury:

> Many of these men got up there and talked to you about how important it is in their minds to serve with other individuals in the Armed Forces, and in the trenches, that bond, that camaraderie is strong. How difficult would that be to get in open court like this and

---

[103] 11/15/18 AM Tr. 1645:7-15.

[104] 11/15/18 PM Tr. 1690:4-18.

[105] *Burns v. Gammon*, 260 F.3d 892 (8th Cir. 2001) is inapposite. There, the Eighth Circuit held prosecutors unconstitutionally "use[d] the defendant's exercise of specific fundamental constitutional guarantees against him at trial" by "ask[ing] the jury, while considering guilt and sentencing, to consider the fact that [the defendant], by exercising his constitutional right to a jury trial and to confront witnesses, forced the victim to attend trial, take the stand, and relive the attack." 260 F.3d at 896. By contrast, these prosecutors skirt the issue by merely arguing the relative weight due each kind of testimony.

say something that might hurt a brother in arms? In the grand jury, though, your obligation is to tell the truth, and there is no one facing you down, and that truth may come a little bit easier in the grand jury.[106]

Regardless of whether this statement amounts to legal error,[107] the Court does not think the Department of Justice should be in the business of shading a defendant's confrontation right, our legal system's "principal means of undermining the credibility of a witness whose testimony is false or inaccurate," *United States v. Salerno*, 505 U.S. 317, 328 (1992) (Stevens, J., dissenting), and "beyond any doubt the greatest legal engine ever invented for the discovery of truth." 5 J. Wigmore, Evidence § 1367 (Chadbourn rev. 1974). That said, "[t]he touchstone of a prosecutorial misconduct claim is prejudice: the court must consider 'the probable effect the prosecutor's [statements] would have had on the jury's ability to judge the evidence fairly.'" *United States v. Thomas*, 114 F.3d 228, 246 (D.C. Cir. 1997) (alteration in original) (quoting *United States v. Young*, 470 U.S. 1, 12 (1985)). "To determine whether improper remarks by the prosecutor have substantially prejudiced a defendant's trial, the court looks to 'the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks.'" *Id.* (quoting *United States v. Williams-Davis*, 90 F.3d 490, 507 (D.C. Cir. 1996)). Here, the Court's instructions corrected the prosecutor's fleeting misstatement with an instruction directing jurors to "consider a witness' prior sworn testimony, taken under oath, as evidence similar to in-court testimony" but to "not give [it] more weight or credit than the

---

[106] 12/11/18 PM Tr. 4403:21–4404:4; *see also* 12/11/18 AM Tr. 4218:4-18 ("Now he's saying he's not sure about the sequence. Now he's saying, upon the suggestion of questions by defense counsel, that it was very chaotic, it was just very difficult to understand. And certainly war can be chaotic, but the very beginning of this incident, the very thing that sets it off, there is no reason for Mr. Watson to forget about that. And those things he said in 2013 were not in answer to leading questions. They were their own words. Okay? His own words. So in terms of the sequence . . . . we are asking you to credit the sequence he gave in 2013.").

[107] It certainly does not amount to improper vouching—the prosecutor merely argued about what testimony the jury should credit, and did not rely on extra-record evidence to do so. *Cf. United States v. Boyd*, 54 F.3d 868, 871-72 (D.C. Cir. 1995).

testimony you heard presented during trial. . . . [Y]ou may give this evidence such weight in your judgment as it's otherwise fairly entitled to receive."[108] Slatten does not explain—and the Court does not see—how this instruction failed to cure any error.

## C. Neither the government nor the Court prevented Slatten from corroborating Paul Slough's statements.

On appeal from his first conviction, Slatten persuaded the D.C. Circuit to allow Slough's statements to State Department investigators under Rule 807, prompting the panel to vacate Slatten's conviction and remand for retrial. Now, Slatten claims the government and the Court frustrated his attempts to corroborate those statements. But the three issues he raises do not justify a new trial.

The first concerns the government's cross-examination of Lisa Lopez, a State Department employee who interviewed Slough after the shooting. Slatten called Lopez to lay a foundation for admitting Slough's statements. On cross-examination, the government threw a ball from left field:

> Q: Were you personally aware that at least one member of the team wanted to prosecute Mr. Slough for making false statements to the Department of State?
> A: No.
> Q: You were not aware of that?
> A: No.[109]

The government recognized this question (at least) impermissibly invited Lopez to opine on another witness's credibility. *See* Gov't's Mem. Opp'n 24, ECF No. 1259. So did the Court, promptly instructing the jury that "[t]he government suggested that a State Department agent thought Mr. Slough should be prosecuted for making false statements . . . . That suggestion was

---

[108] 12/12/18 AM Tr. 4482:4-14.

[109] 11/29/18 AM Tr. 3054:20-25.

improper. You should disregard that suggestion in its entirety."[110] Thus the question now is whether this instruction staved off any prejudice. The Court thinks it did, "given the brevity of the offending testimony and the clarity of [the Court's] instruction[]." *United States v. McLendon*, 378 F.3d 1109, 1114 (D.C. Cir. 2004).

The second issue challenges the government's cross-examination of Brandon Giroux, an FBI ballistics expert Slatten called as an expert witness to trace a shell recovered from Nisour Square to Slough's rifle.[111] Giroux's role was limited—he neither personally retrieved the shell from Nisour Square nor personally seized Slough's firearm, testing both later in the FBI laboratory. So the government briefly cross-examined him on this relative lack of personal knowledge:

> Q: . . . Do you know for a fact whether that [round] was recovered from Nisour Square?
> A: No, I do not.
> Q: Do you know where in Nisour Square it was recovered?
> A: No, I do not.
> \*   \*   \*
> Q: And similarly, whether [the rifle you examined] is the weapon that Mr. Slough actually had or used on September 16th, 2007, you have no knowledge of that?
> A: That's correct.
> Q: And sir, for all of these cartridge casings . . . you similarly do not know when those cartridge casings were fired?
> A: That's correct.
> \*   \*   \*
> Q: And you don't know, frankly where they were collected from?
> A: That's correct.[112]

---

[110] 11/29/18 PM Tr. 3079:10-16.

[111] In one of this case's several twists-and-turns, Giroux actually served as a government expert witness in the first trial, when Slatten and Slough were tried jointly, since his analysis contributed to the government's case against Slough. The Court agrees with Slatten that, because the government previously offered Giroux's analysis as true and correct, it cannot now attempt to portray the analysis as incredible. But the government can still contextualize the evidence and point out its drawbacks. That's all the government did here.

[112] 11/26/18 AM Tr. 2319:13–2320:19.

This is garden-variety cross-examination, not legal error.

The third issue revisits the Court's decision to exclude hearsay testimony indicating Slough felt remorse for his role in the incident. Specifically, Slatten argues the Court should have admitted this testimony as evidence of Slough's state of mind under Rule 803(3), or as a prior consistent statement under Rules 806 and 801. But neither exception to the hearsay rule applies.

Although Rule 803(3) permits "a statement of the declarant's then existing state of mind," it excludes "a statement of memory or belief to prove the fact remembered or believed." In other words, it does not permit the declarant to relate what caused the state of mind. So although testimony limited just to Slough's remorse may have been admissible under Rule 803(3), the testimony Slatten planned to elicit—"Did Mr. Slough approach you shortly after the incident and apologize *for what happened that day*?"[113]—was broader, and thus inadmissible.[114]

Slough's statement of remorse fares no better as a prior consistent statement. By way of Rule 801(d)(1)(B), Rule 806 allows prior consistent statements "to rebut an express or implied charge that [a hearsay] declarant recently fabricated" his testimony, or "to rehabilitate the declarant's credibility." Slatten argues Slough's remorse rehabilitates his credibility by countering the government's theory that Slough lied to State Department investigators about how and why he shot the Kia.

That makes no sense. Under the government's theory, Slough lied to State Department investigators to protect himself and his teammates, a motive to fabricate that crystalized the

---

[113] 11/28/18 AM Tr. 2740:11-19 (emphasis added).

[114] *United States v. Samaniego*—the only case Slatten cites—hurts rather than helps. There, in a passage paralleling this Court's reasoning today, the Eleventh Circuit excluded evidence "offered to show not only that [the declarant] was remorseful, but also that he" committed the offense, since "the purpose of . . . Rule 803(3) . . . is 'to narrowly limit those admissible statements to declarations of condition—"I'm scared"—and not belief—"I'm scared because [someone] threatened me."'" 345 F.3d 1280, 1282-83 (2003) (alteration in original) (quoting *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980)).

moment he began shooting. So Slough's post-shooting expression of remorse doesn't rebut Slough's motivation to lie about why he shot—from the government's perspective, Slough was motivated to lie as soon as he pulled the trigger. *See Tome v. United States*, 513 U.S. 150, 165 (1995) (holding Rule 801(d)(1)(B) "permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent fabrication or improper influence or motive"). Nor do the statements shed light on Slough's "character for truthfulness or untruthfulness." Fed. R. Evid. 608(a). So the Court properly excluded Slough's expression of remorse.[115]

## D. The government did not mislead the jury regarding witness availability.

Next, Slatten claims the government made "knowingly false" statements during its summation that "improperly bolstered the credibility of its weak case" by averring it called every eyewitness to the shooting. Mot. New Trial 30-31. If that's really what the government said, it's a problem, since the government neither called every convoy member nor called a third Iraqi police officer who was on the scene.

But the government's closing argument said nothing of the sort. Rather, prosecutors smithed their words carefully:

> During openings the defense made a big deal about the fact that there's not a single eyewitness that can say, "I saw Mr. Slatten shoot Ahmed." And that's true. But you know why that's true? Because he's concealed inside of [the armored vehicle]. . . . So you actually need to build a case by hearing about the people on the outside and the people on the inside and around the vehicle. And ladies and gentlemen, that's what we did. We brought you *at least one person from every single [convoy] vehicle* that was there that day. We

---

[115] In any event, Slough's expression of remorse wouldn't have changed the jury's verdict. Taken fairly, it says nothing about who shot the Kia driver; taken generously, it merely echoes Slough's characterization of what happened in Nisour Square—evidence already before the jury via Slough's statements to State Department investigators.

brought you every single Iraqi civilian *that was willing to come to the states* and that was around the area . . . . where this happened, right, so they could give you between their—what they say, plus what the other people saw, you can build a case, and you can be sure about what happened out there that day.

* * *

Now let's talk about the expected arguments from the defense. . . . [T]his claim that you heard in the opening statement that we were cherry-picking evidence to bring you here? Not true. We brought you *who we could and/or believed was reasonable*, so you could hear and figure out what happened on the circle that day. And true enough, if we're missing some piece of evidence that you need for the elements of the offense, then that's our fault. But there's no cherry-picking. We brought you *everybody that we could* around there. All right. And we presented you all the evidence that we could gather . . . . That's what we did. *Far from perfect*, but we're not cherry-picking.[116]

Moreover, this argument did not mislead the jury. The jury knew not every convoy member testified—throughout trial, the government repeatedly referenced an exhibit including each convoy member's name and photograph, so anyone paying attention recognized relatively few appeared.[117] So too must the jury have realized the trial did not include every driver and passenger from every car in every row of traffic surrounding the Kia. *See United States v. Johnson*, 231 F.3d 43, 48 (D.C. Cir. 2000) (allowing courts to "consider the jurors' common sense in assessing the effect of a prosecutor's statement"). Moreover, the government couldn't call the third Iraqi police officer—the FBI failed to find him, and so (presumably) did Slatten. *See* Email from Pat Martin to Krystal Commons (Oct. 10, 2018, 11:07 AM), ECF No. 1219-12.

That said, the prosecutor did go further in rebuttal:

[W]e gave you every witness conceivable right around [the Kia], every single witness, even Mr. Ridgeway, who didn't fit with the sequence, the theory of the government. We gave you that witness.

---

[116] 12/11/18 AM Tr. 4190:2-22, 4224:2-23 (emphases added).

[117] *See, e.g.*, 11/7/18 PM Tr. 982:18-20, 1051:4-6; 11/14/18 PM Tr. 1527:16-20; 11/26/18 PM Tr. 2365:16-21; 11/27/18 PM Tr. 2633:14-17, 2664:3-6; 11/29/18 PM Tr. 3084:2-5 (citing Gov't's Ex. 330).

> There are no 30 other witnesses with some lunging forward. They just don't exist.[118]

But "[i]n assessing the import of a statement made in [rebuttal] argument, context is key." *United States v. Venable*, 269 F.3d 1086, 1090 (D.C. Cir. 2001). And properly contextualized, this statement neither misled the jury nor relied on extra-record evidence. Hearkening back to its summation arguments, the government responded to two of Slatten's points: a general point that the government "cherry-picked" its witnesses,[119] and a specific point that Captain Peter Decareau (an Army platoon leader who arrived in Nisour Square shortly after the incident to interview witnesses) testified that roughly thirty Iraqis told him the Kia "punched forward toward the convoy" before shooting began.[120] But as the prosecutor noted, Decareau's testimony has serious flaws. For one, Decareau could not name a single witness he spoke to. And more critically, these anonymous accounts conflict with every eyewitness who testified at trial, all of whom maintain the Kia didn't move until after shooting began.[121] That's the exact point the prosecutor made here.[122]

---

[118] 12/11/18 PM Tr. 4398:6-11.

[119] 12/11/18 AM Tr. 4244:3-12.

[120] 12/11/18 PM Tr. 4366:15–4368:4.

[121] *See* evidence cited *supra* notes 6, 15.

[122] Here's his whole statement, for context:

> Now we have to talk about Decareau. . . . First thing about Decareau, he wasn't there. You know he wasn't there at the time of the shooting. You know that. Second thing about Decareau is, his first contact on the scene, the first person he talked to was a [convoy member]. . . . Now, could that [convoy member] person have been one of the 30 people that he talked to supposedly over the course of two hours, two and a half hours that told him this car punched forward? Perhaps, perhaps, because we don't know. But that is the first person he talked to. Then he spent another 15 to 20 minutes talking to, I think, General Baja. . . . So another Iraqi witness, Iraqi national. . . . Who does he have no contact with? He has absolutely no contact with, in the one day over the three and a half hours that he's investigating what happened out there, he has no contact with any members of [the convoy], those eyewitnesses, no contact with any of the victims. They've already left because they've gone to the hospital. And no contact with any other testifying witnesses. . . . And the reason you know that is because for any number of reasons. One is, he has this notebook, apparently, that he's writing the names down in. But you saw his first report, his first sworn report. His first report, by the way, makes no reference to a car. 5:00 p m., three and a half hours after the incident, a very significant event in Baghdad, he's reporting up to his superiors. He is supposed to report the most salient, most

58

The Court trusts the jury understood this contrast, and additionally that no "substantial prejudice" resulted. *United States v. Monaghan*, 741 F.2d 1434, 1443 (D.C. Cir. 1984). That's all the more true since the government's comments must be understood against the backdrop of both

provable information, and no reference whatsoever to this car or its movements. None. That should tell you something. That should tell you whether he believed the information he claims to have gotten was reliable. If it's not reliable enough to put in his report and give to his supervisors, is it reliable enough for you? . . . You have sat in this jury box for five weeks. You have seen these Iraqi witnesses get up here. It's not their fault. They're speaking a foreign language. Somebody is interpreting. Sometimes a question will be asked, and there will be this long conversation, right, between the interpreter and the witness, and it takes like 30 seconds, 40 seconds, and then the answer will be no. And you're like, how did that happen? What did we miss? How is it that Pete Decareau, back in that time frame, is able to talk to 30 witnesses in two and a half hours when you can't get through a single witness in less than half an hour or 60 minutes? It can't happen, people. It can't happen. The reason why you know that is false as well and that those 30 witnesses didn't have anything to do with supposed information on movement is because the only two witnesses with Iraqi national names in his report on September 22nd is, I believe, General Hussein—and again, you'll have to review the exhibit yourself—and then a man by the name of Abbas. General Hussein wasn't an eyewitness. He showed up later. He was a high Iraqi general. Abbas was not an eyewitness. He was the brother of a deceased. So there's not a single eyewitness name in his report. Where are all the other names? Now, the defense said, well, the notes got destroyed, and that's why we asked him the question: Sir, did you have your notes? Did you have your notes when you were preparing your sworn statement? And do you remember his answer? At that time, yes; at that time, yes. So if you had your notes, sir, and you had these named witnesses with contact information that could have provided your chain of command and anybody else that wanted to know about the movements of this vehicle that was eviscerated on the scene, couldn't he have put a few of those names into the report? Again, not faulting him. He's not a criminal investigator. He wasn't there for that purpose. But we have no names. And it's not because he didn't have his notes at the time. He had his notes. Did he himself think that was reliable information? Apparently not, because he didn't put the names into his report, or if the names even existed. The bottom line is, you have no real evidence, no real evidence of what these 30-odd witnesses actually saw. You have no real evidence. What you have is a line, one line in this report that says words to the effect of "based on my conversations or discussions with the witnesses, it appeared, it appeared." So that's Decareau drawing a conclusion. "It appeared driver mistakenly pushed gas, not break." Where is the word "punched"? Where is the word "lunged"? That's not in there. Where does that come? That comes some time later. The Decareau report doesn't have details, because he's relying upon some unknown, unspecified witnesses. We don't know who he talked to. Both parties are deprived of that information, but it's not evidence before you. And what does that lead to? What we talked about before is, you cannot base your decision on speculation. That would be pure speculation. You haven't seen a single one of those eyewitnesses, not a single witness that said to you that vehicle was moving prior to the shots. Not one witness. And as Mr. Campoamor-Sanchez told you, *we gave you every witness conceivable right around that vehicle, every single witness, even Mr. Ridgeway, who didn't fit in the sequence, the theory of the government. We gave you that witness. There are no 30 other witnesses with some lunging forward. They just don't exist.* Compare that with the FBI investigation. They get there in October. They talked to 124 people, 57 Iraqi witnesses. 57 Iraqi witnesses. There's no lack of effort. There's no cherry-picking. There's no lack of effort on behalf of the FBI to try to find out if there are other eyewitnesses out there that can talk to that vehicle, whether it's moving or not.

12/11/18 PM Tr. 4394:9–4398:17 (emphasis added).

summations, *see Johnson*, 231 F.3d at 48, and since "[s]tatements made in the heat of [rebuttal] argument are not and cannot be read with an editor's red pencil in hand." *Venable*, 269 F.3d at 1090.

**E. The government's re-direct examination of Sarhan Moniem did not mislead the jury.**

Slatten contends the government's re-direct examination of Iraqi police officer Sarhan Moniem "was improperly designed to mislead the jury." Mot. New Trial 36. But some explanation is needed to understand why—and even then, it might not make total sense. As subsection I.A.1 notes, Moniem testified that after hearing the initial shots, he approached the Kia and saw a hole in Al-Rubia'y's forehead.[123] Yet that conflicts with a victim impact statement Moniem submitted after Slatten's 2014 trial, when he said he "was afraid and stayed in [his] police booth . . . unable to move or think" during the incident. *See* Def.'s Ex. 6258 at 2.

Moniem's victim impact statement swings from lurid to puzzling, but consistently conflicts with his in-court testimony. The statement describes

> s[eeing] a mother crying for her son, who was a doctor and she had a feeling that he would be killed. She was unable to move, and her son was trying to get her out of that damned car, but I was unable to move and help him. So I gave up and just watched. The mother cried and hugged her son as she was telling him "don't go, don't go, we will be killed." The son was telling her "get out of the car, we'll be killed", she was hugging him and begging him not to go. The son was killed by you then the mother started crying crazily and then she was killed, too. The damned car was exploded and they were burned inside the car, and I am watching the scene without doing anything. I just hid in that booth, and since then I learned that life is worthless and I will be killed one day anyway. I still hear that women [sic] and her son's voices until now. I still tell myself that I am [a] coward. They died because of me, because I did not help them. But I could not help them, because I was unable to move, and I was thinking of my mother and my kids. . . . What hard days these days were. I still dream and imagine some scenes as if it has just happened.

---

[123] *See* 11/19/18 AM Tr. 1981:25–1984:15.

*Id.* When asked to name a loved one killed, Moniem wrote "Many People Including a Doctor and His Mother." *Id.* at 1. When asked to declare his relationship to that person, he wrote "Childhood Friends, Workmates, and My Neighbor." *Id.*

To reconcile the apparent conflict, Moniem now explains he wrote his impact statement "as a play, as a narrative," trying "to express [his] own feelings, what happened, how did [he] feel during the incident, stress, exhaustion as a result" and to talk "about [him]self and the victims."[124]

Compounding the confusion are dueling translations of the statement (the original is in Arabic) differing in slight but important degree. The above passage comes from a translation used during Slatten's original sentencing in 2015 and during the most recent (third) trial.[125] But during the second trial, the defense relied on a different translation, which repeated the words "as if": "The mother wept and hugged her son *as if* to say to him no, don't go, we will be killed." Def.'s Ex. 6257 at 3, ECF No. 1219-14. That version—unlike Slatten's current favorite—further shows Moniem was responding to the following question: "How did this crime effect [sic] you and those who are close to you?" *Id.* Notably, Slatten told neither the government nor the Court that he switched translations before the third trial.

With that background, here is Moniem's exchange with the government that Slatten claims violated his due process rights:

> Q: So when you were answering that question [on the victim impact statement form], tell the jurors: What were you trying to tell the Court?
> A: It was a very difficult situation, and I didn't know how to express how I felt.
> Q: So how did you choose to express how you felt?

---

[124] *See* 11/19/18 AM Tr. 2017:16-21.

[125] *See id.* at 2071:20–2072:9.

A: So I explained my emotions, and I put myself in the place of the victims.

Q: And when you told the jurors and defense counsel that in your statement, your written statement, you had said, "as if"?

A: Yes, as if.

Q: Are you referring to the language you wrote in Arabic?

A: Yes.

Q: Now, defense counsel was reading to you from an English translation?

A: Yes.

Q: But you wrote in Arabic; is that correct?

A: Yes, exactly.

Q: And you are telling this jury that somewhere within the Arabic form you had included the phrase "as if" in describing the event?

A: Yes, it is written in the Arabic.

Q: Why did you choose to write it as if you were one of the victims?

A: Because the question—the question was asking me what— how it had an impact on me and those close, which—the victims.[126]

Slatten argues "the government falsely implied that buried somewhere either in the unredacted Arabic text or redacted English text is a statement by Mr. Moniem that he wrote the statement 'as if' he were one of the victims." Mot. New Trial 37.

But the phrase "as if" isn't buried at all—it appears once in the version Slatten used in the third trial, and twice in the version Moniem, the attorneys, and the Court relied on a few months earlier at Slatten's second trial. And that doesn't even account for the possibility Moniem's translator reconverted the translated English back into Arabic using words or tenses adding additional nuance. So there was no error. The prosecutor had a legitimate basis for asking the question, and Moniem's testimony was neither incorrect nor misleading—only a juror who "lacks common sense" would have been confused. *United States v. Law*, 528 F.3d 888, 902 (D.C. Cir. 2008). And even if they were, Slatten would not have been prejudiced: the primary

---

[126] *Id.* at 2090:8–2091:8.

significance of Moniem's victim impact statement (and the brunt of defense counsel's cross-examination[127]) turned on its account of how Moniem hid in the police kiosk during the incident. The fleeting exchange describing how Moniem retold some details from other victims' perspectives was a side show.

## F.  No legal error resulted from Scott Patterson's testimony.

At all three trials, the government called firearms and ballistics expert Scott Patterson to testify about demonstrative testing of an SR-25, of an M-4, and of armored steel plates. Now, Slatten argues the government mischaracterized the first two tests in its summation, and

---

[127] *See id.* at 2067:16–2071:6 ("Q: Sir, does this remind you that when you submitted this letter to the Court, you told the Court that you actually remained in your police kiosk when the shooting happened? A: No, I didn't stay in the kiosk. This was written after . . . . the incident, and I was talking about that after everything had finished—was finished—, I sat and I was sitting in the kiosk, and this—I was talking about that here. Q: Well, what you say is that you stayed in your police booth, unable to move. A: Yes. This was after, after everything. Q: Okay. So your letter is accurate, an accurate reflection of what happened that day? A: No. I was here. I was explaining the psychological situation I was in that day. Q: Were you making things up about that incident? A: Yes. It's not like an interrogation, a question and answer. This is me expressing my psychological status at the time of the incident, what I saw and the people that were burned, and I was—I was kind of blaming myself because I wasn't able to help them. So this was reflecting my psychological status at the time. Q: Excuse me. My question was a little different. Were you making things up about the incident as you went along? A: No. I—I'm not a writer, and I'm not making stories up. I was expressing myself. Q: Okay. And what you said in your letter to the Court was that you heard the son telling the mother to get out of the car. A: Okay. Here—no. This was—what it was, I was imagining myself in the car and I was in their place, and if I were the son, I would be telling the mother to get out of the car. So and then I also spoke—I put myself in the mother's situation as she was burning, in addition to how I personally was feeling at the time. Q: So when you said in your letter to the Court, 'The son was telling her, "Get out of the car,"' that was really you pretending to be him? A: Yes, my feelings. I felt that this is what the son was telling his mother. Because he's a young man. He's still at the beginning of his life, and he died, and I was expressing how—his situation, and he was killed. Q: Okay. So that's not actually what happened? A: No. This was about reflecting my feelings and emotions at the time, but this is—this is not an interrogation between me and the FBI. Q: Right. This was a letter that you wrote to the Court? A: Yes, but this reflects my feelings, my emotions. Q: Okay. As opposed to what actually happened? A: No. It's not different. It's just me expressing my feelings about what—I'm putting myself there. Q: When you say, 'I just hid in that booth,' that is different than what you told the jury today. A: Yes. Yes, because this is—was written after the incident, and I was explaining that after everything had happened, I went and sat inside the kiosk and I was blaming myself for everything that had happened. Q: Well, what you say in your letter was not that you went to the kiosk later, you said, 'I was afraid and stayed in my police booth. I was unable to move.' A: Yes. . . . this was after the incident. Q: And what you say in your letter is that you overheard the son talking to the mother? A: As if he was speaking to his mother. Q: Well, you put it in quotes, sir. A: No. Even—even in the statement I said as if he was speaking and saying so-and-so."). Significantly, the second trial's translation did not include quotation marks anywhere in the statement—a further sign either that Moniem was thinking of that version, or that the various language conversions provided additional gloss. *See* Def.'s Ex. 6257 at 3.

improperly elicited testimony about the third during Patterson's direct examination. Both arguments lack merit.

### 1. The government's closing argument properly referenced Patterson's comparison of SR-25 and M-4 rounds.

This gripe is no gripe at all. After comparing SR-25 bullets fired through glass into a gelatin block and M-4 bullets fired through glass into a gelatin block, Patterson testified the recovered SR-25 rounds were larger than the recovered M-4 rounds. *See* Gov't's Ex. 9276. And earlier in the trial, Sarhan Moniem independently described seeing a hole in Al-Rubia'y's forehead so "big" he "could see it from a distance," with blood "coming out of the hole."[128] So in its summation, the government married the two pieces of evidence:

> [T]he first shots that were fired, that's what killed Ahmed. Majed, Sarhan, and Ali, as they rushed to the car, or looked towards the car, and they see the two holes or holes in the windshield, and they see— specifically Sarhan sees that huge hole that he described for you in his forehead, consistent with Exhibit 9276 of that test that Patterson did of that slug that he fired and recovered.[129]

That wasn't an error[130]—let alone a prejudicial one, since Slatten took advantage of his ample opportunity to argue Patterson's full analysis actually suggested the injury Moniem described was more consistent with an M-4 impact than an SR-25 impact.[131]

---

[128] 11/16/18 PM Tr. 1983:13–1984:15.

[129] 12/11/18 AM Tr. 4178:2-8.

[130] True enough, the Court sustained Slatten's objection to Patterson himself opining on the size of an entrance wound that an SR-25 bullet would make in a human skull, since Patterson had never examined actual human remains shot with an SR-25. *See* 12/03/18 PM Tr. 3524:24–3527:16. The prosecutor heeded this ruling in his summation, limiting his discussion of Patterson's analysis to the government's properly admitted exhibit 9276, and not to Patterson's precluded opinion.

[131] *See* 12/11/18 PM Tr. 4314:6–4317:8.

## 2. Patterson properly testified about AK-47 impact marks on steel armor.

Slatten next claims the government violated its obligation under Federal Rule of Criminal Procedure 16(a)(1)(G) to provide a pretrial "written summary of [Patterson's] testimony the government intend[ed] to use" that "describe[ed his] opinions, the bases and reasons for those opinions, and [his] qualifications." The challenged exchange concerns the government's attempt to rebut testimony describing bullet-like dents on Slatten's vehicle after the incident, buoying Slatten's claim there were armed insurgents in the traffic circle and contradicting the government's theory the pockmarks were actually caused by a convoy member's M-203 grenade detonated close to the vehicle. Specifically, the government had Patterson fire an AK-47 (the insurgents' standard weapon) into an armored steel plate to contrast the resultant impact marks from the marks on Slatten's vehicle.

Before Slatten's first trial in 2014, the government notified Slatten that Patterson would testify regarding "various forms of demonstrative firearms testing," including "live-fire tests" with an "AK-47 assault rifle . . . to capture the effects fired rounds from those weapons would have on sheet metal, 5mm plated armor, and ballistic gelatin blocks at various distances." Letter from T. Patrick Martin to defense counsel at 8 (Mar. 28, 2014), ECF No. 1219-15. The government further disclosed "it may choose to augment that testimony through the use of visual aids and exhibits, such as video footage . . . and the actual physical targets that were fired upon." *Id.* at 9. It did just that at the first trial, eliciting that Patterson fired an AK-47 round into 6-millimeter-thick steel armor, leaving a "very light colored circle" where bullet fragments "abrad[ed]" the surface, an effect he described as similar to shooting an AK-47 into other steel targets (though he didn't offer any specific comparisons).[132]

---

[132] 7/8/14 AM Tr. 75:15–84:20 ("Q: . . . And in terms of the type of material here, have you shot things other than steel plates before? A: I have. Q: In terms of the finish on this, is there any type of particular finish or I don't know

Before Slatten's second trial in July 2018, the government supplemented its disclosure to include "the entirety of" Patterson's "in-court testimony . . . at the first trial." Letter from T. Patrick Martin to defense counsel at 1 (Apr. 23, 2018), ECF No. 1219-16. At that trial though, the government tendered Patterson as an expert "with respect only to the first portion of [his] anticipated testimony, which is involving ballistics-gelatin-block testing done in this case," calling him as a fact witness for all other purposes.[133] So when Patterson discussed firing an AK-47 into the steel armor, he technically did so a fact witness—and without any objection. During that exchange, the government asked Patterson to specifically compare the plate to the armor protecting Slatten's vehicle:

> Q: Do you have any familiarity, at all, with armored vehicles, and whether they use steel consistent with that or not consistent?
> A: I have shot armored cars in testing and they have steel which is, at times, consistent with this. Other times it's significantly thicker.
> Q: Have you ever shot any of those with AK47 rounds?
> A: I believe we did . . . fire an AK47 at an armored vehicle. And I have shot AK47 rounds into steel plates multiple times, such as this (indicating).
> Q: The same type of impact mark?
> A: They are.[134]

---

if that's the right word, but on this particular plate? A: The Rhino lining, that plastic lining they put in the bed of pickup trucks, it's a very thin plastic. We had those plates sealed in Rhino lining, it didn't do anything other than prevent water from getting on the plate for us, and that would aid in preventing rust. For this, so that they could get a clear image of it striking that, I cut the Rhino lining off the front and the back of the plate. We have shot other things, we paint steel targets at our range and shoot into them with great frequency. Q: Let me ask you a question about that, if you were to paint this steel plate a grayish color or off gray, would you still visibly be able to see the starburst effect of an AK-47 round impacting it? A: You would because it would remove the paint. Q: It would actually remove the paint? A: Uh-huh. Q: And this— A: It would. Q: —starburst effect is caused by what again? A: The very tiny fragments of the bullet. As they hit, they want to go somewhere, and so they're going to go in any direction they can away from that point of impact. Q: Are they doing something to the actual surface there? A: I believe they are abrading it.").

[133] 7/11/18 PM Tr. 2138:15-22.

[134] 7/12/18 AM Tr. 2208:8-19.

The prosecution took the same approach during the third trial in December 2018. With

Patterson testifying as a fact witness, the government asked:

> Q: . . . [H]ow often have you actually fired an AK-47 round . . . at armor, whether an armored vehicle or an armor plate?
> A: So a number of times. I would say at least six different times. We've done a number of different armor shoots. But I would say it's fair to say six times or so.
> Q: Have you ever seen something other than a starburst effect when an AK-47 round hits steel?
> A: I have not.
> Q: In terms of armored vehicles, are you generally familiar with those?
> A: I am.
> Q: Do you do tests in terms of firing rounds, AK-47 rounds and otherwise, at armored vehicles?
> A: I have, and I do, yes, sir.
> Q: Have you ever yourself fired an AK-47 round, regardless of the make or model, at an armored vehicle with similar-type steel, if you will?
> A: Yes.[135]

At that point, defense counsel objected, arguing this testimony was inadmissible under both

Federal Rule of Evidence 701 (because it relied on scientific, technical, or otherwise specialized

knowledge), and Rule 702 (because Patterson was "not designated as an expert on the effect of

AK-47 shells on armored vehicles").[136] The prosecutor disagreed:

> Your honor, he was both disclosed as expert in terms of this test, and as a part of that disclosure, we included a disclosure as to what he's testified previously. He will testify that he does test against armored vehicles . . . for the very purpose of whether they can withstand ammunition along these lines. So the purpose of the test in this case is very relevant to the jury, not just because it's a steel plate, but because as has [sic] experienced and as he testified previously and as part of his disclosure because we have noticed it as such, that he can testify that yes, the steel plate is just a smaller version of the side of an armored vehicle. And therefore, in every single test he's done of an AK-47 against an armored vehicle that has a steel side, he has seen the similar starburst effect. And that has clearly been disclosed

---

[135] 12/3/18 PM Tr. 3430:16–3431:9.

[136] *Id.* at 3431:13-18.

> in prior testimony. . . . [W]hen we [originally] identified Mr. Patterson as an expert witness, this testimony was included in it. At the urging, if you will, of defense counsel at the last trial, we tried to separate [it] out. I will qualify him right now as an expert in these types of tests. We certainly disclosed him as such.[137]

The prosecutor went on to qualify Patterson "as an expert in test firing of AK-47 rounds and the effects and impacts of those rounds on armored vehicles," which the Court accepted over Slatten's objection the testimony exceeded Patterson's disclosure.[138]

The Court disagreed with Slatten then, and still disagrees now. The government originally disclosed Patterson as an expert on the effects of firing an AK-47 round into sheet metal and armored plates, and he testified as an expert in the 2014 trial about shooting AK-47 rounds into various steel targets. In its amended disclosure before Slatten's second trial, the government affirmed this testimony as a potential topic for Patterson's future testimony, which it was at the second trial (as a fact witness) and at the third trial (as an expert witness). Given the government's original and amended disclosures, eliciting Patterson's testimony wasn't error.

And even if it was, it could not have been prejudicial. In the second trial, the testimony came in under Rule 701, and it could have again at the third trial—the record establishes Patterson's vast personal experience visually comparing AK-47 impact marks on armored cars.[139] Moreover, because Patterson gave virtually identical testimony at the second trial weeks earlier, Slatten had ample warning and opportunity to prepare his cross-examination accordingly.

## G. The government properly presented evidence under Rule 404(b).

Since Rule 404(b) allows evidence of a defendant's prior bad acts to prove a defendant's motive, opportunity, intent, preparation, or plan, the Court permitted the government to introduce

---

[137] *Id.* at 3431:19–3432:25.

[138] *Id.* at 3435:1–3437:2.

[139] *See, e.g.*, *id.* at 3433:13–3436:20.

(i) Slatten's repeated anti-Iraqi invective; (ii) evidence Slatten previously engaged in non-defensive firing; and (iii) evidence Slatten used an SR-25 modified to fire on a hair trigger. Now, Slatten argues that the evidence should have been excluded altogether, or that the government misused the evidence, and that the Court improperly instructed the jury on the evidence's significance. None of his contentions hold water.

### 1. The Court properly received evidence of Slatten's contempt for Iraqis, of his prior preemptive shootings, and of his SR-25's modified trigger mechanism.

Slatten raises three reasons to exclude this evidence all together. *First*, he says his anti-Iraqi animus doesn't bear on his intent or motive since other convoy members also disliked Iraqis. *Second*, he argues his prior reckless shootings do not bear on his intent to commit first-degree murder. *Third*, he argues evidence he used an SR-25 modified to fire on a hair trigger was both irrelevant and outweighed by its prejudicial impact.

These are not new legal arguments. Slatten made variants of them before all three trials. *See* ECF Nos. 17, 735, 964.[140] But the Court rejected them each time. *See* ECF Nos. 73, 831, 1036. And unfortunately for Slatten, the fourth time isn't the charm.

*First*, Slatten's hostility towards Iraqis is relevant regardless of how common it was among his colleagues. Slatten acknowledges detesting and disparaging Iraqis, but claims since several other convoy members also disliked Iraqis, his screeds were too mundane to establish motive. *See* Mot. New Trial 45. That bristling argument suffers from two flaws. For one, Slatten's anti-Iraqi animus remains relevant whether unique or unremarkable, since it still tends

---

[140] Notably, Slatten did not raise them in his prior appeal to the D.C. Circuit, so he technically waived them. *See Laffey*, 740 F.2d at 1089. And even more critically, the mandate rule bars them, since the D.C. Circuit *sotto voce* rejected them by embracing the 404(b) evidence on appeal. 865 F.3d at 795-97; *see Williamsburg Wax Museum, Inc.*, 810 F.2d at 251.

to make it more likely he killed Al-Rubia'y. Second, and more importantly, Slatten soft-pedals the record: even among his colleagues, Slatten's hatred for Iraqis stood out.[141]

*Second*, evidence Slatten shot without provocation in other non-defensive situations sufficiently relates to his alleged actions in Nisour Square to suggest he intended to kill Al-Rubia'y. Put simply, Rule 404(b) does "not require[] the sort of exact congruence that [Slatten] suggests": "What matters is that the evidence be relevant 'to show a pattern of operation that would suggest intent' and that tends to undermine the defendant's innocent explanation." *Long*, 328 F.3d at 661 (quoting 2 Weinstein's Federal Evidence § 404.20[2][a] (2d ed. 2003)); *see also United States v. DeLoach*, 654 F.2d 763 F.2d 763, 769 (D.C. Cir. 1980) ("[T]he admissible bad acts evidence need not show incidents identical to the events charged, so long as they are closely related to the offense . . . ."). In this first-degree murder trial, evidence of Slatten's willingness to shoot indiscriminately at potentially occupied buildings clears that hurdle by evincing Slatten's hostility and disregard for Iraqis.[142]

*Third*, the Court affirms its prior rulings that Slatten's use of a hair-triggered SR-25 suggests he "desire[d] to fire quickly" and bears on his intent and motive. *See* Order 1-2, ECF No. 1036. To the extent the government's inability to prove Slatten personally modified the trigger mechanism diminishes this evidence's probative value, it does not extinguish it, since even willingly using a hair-triggered rifle bears on intent and motive. That's all the more true

---

[141] *See* evidence cited *supra* note 57.

[142] *United States v. Foskey*, 636 F.2d 517, 524 (D.C. Cir. 1980), does not teach otherwise—it only "stands for the proposition that it is error to introduce evidence of a prior bad act of one's companion, committed in one's presence, to prove intent in a subsequent possession case." *United States v. Hernandez*, 780 F.2d 113, 118 n.7 (D.C. Cir. 1986).

because Slatten could—and did—point out this evidentiary gap while questioning the government's witness who testified about the modification.[143]

## 2. The government accurately represented this evidence during its summation.

In the alternative, Slatten identifies three potential misuses of the 404(b) evidence during the prosecutor's closing argument: his interpretation of Slatten's anti-Iraqi vituperation; his reliance on Slatten's sniper training; and his characterization of Slatten's prior non-defensive shooting. None were error.

*First*, the prosecutor reasonably interpreted Slatten's out-of-court comment that "he was getting payback for 9/11, and that he's well on his way" to mean Slatten "was getting a lot of kills out there."[144] Since "'[t]he sole purpose of closing argument is to assist the jury in analyzing the evidence,' . . . the prosecutor (as well as defense counsel) is afforded some leeway in 'stat[ing] conclusions drawn from the evidence.'" *United States v. Moore*, 651 F.3d 30, 52-53 (D.C. Cir. 2011) (second alteration in original) (quoting *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997)). In particular, "the prosecutor may . . . draw inferences from evidence that support the government's theory of the case." *Id.* at 53. That's exactly what the prosecutor did here, reasonably inferring that by basking in his misguided attempt to avenge 9/11, Slatten meant he had killed many Iraqis.[145]

---

[143] 11/29/19 PM Tr. 3213:13-15 ("Q: . . . To be clear, you don't know who also modified this trigger, do you? A: No, sir, I don't."). To be sure, the Court denied Slatten's request to read into the record a passage from the government's second-trial summation admitting "we don't know who [modified Slatten's SR-25]. I can't prove that. But this weapon that he got issued had a hair trigger. It had been modified from the 2 stage to the 1 stage when the FBI, ultimately, examined it." 8/16/18 AM Tr. 4788:17-20; *see* 12/10/18 PM Tr. 4134:23–4138:4. After all, a prosecutor's summation isn't a statement by a party opponent under D.C. Circuit law. *See* 12/10/18 PM Tr. 4134:23–4138:4. But as the accompanying text notes, Slatten effectively exposed this vulnerability through other avenues.

[144] 12/11/18 AM Tr. 4181:19-21.

[145] That's true even though the Court forbid the government from asking the witness who relayed Slatten's out-of-statement to explicitly join in this interpretation during the third trial. *See* 11/27/18 PM Tr. 2621:14–2622:11.

*Second*, the prosecutor appropriately utilized Slatten's sniper training to help the jury understand the process of shooting an SR-25. During trial, Army sniper training instructor Sergeant Eric Doolittle testified about how a sniper identifies and shoots both short- and long-range targets.[146] And here's how the prosecutor used that testimony to show "the killing was planned and deliberate":

> You have even some evidence of the sniper's role. And you heard something from Doolittle about that, about acquiring targets and looking through a scope, right, and about the time that it requires to do that, right? In order to be able to think about it, like, you have to get the scope, right? It has to be open. You have to set the right magnification that you want to it. Then you got to get behind it, and you got to look, and you got to decide. And even, I think, Doolittle testified about the breath, take the breath, and then pull the trigger, right? That's your only time. And as the judge is going to tell you, even seconds are enough, in terms of forming the intent to kill, thinking about it, and then making the decision to act.[147]

As a threshold matter, the Court wonders why Rule 404 matters at all for this evidence—Slatten's sniper training is not a prior bad act, so Rule 404(b) didn't bear on its admission.[148] Slatten claims (without any legal authority) the prosecutor's summary was a prohibited propensity argument, but the Court chalks it up as reasonably describing Doolittle's testimony. And to the extent Rule 404(b) matters at all, the evidence proves opportunity: that Slatten had time to deliberate before making the shot.[149] So the prosecutor did not overstep in either direction.

---

Interestingly though, that witness was permitted to—and did—join this interpretation while testifying in the second trial, a fact underscoring the reasonableness of the prosecutor's interpretation during his third-trial summation.

[146] *See* 12/6/18 AM Tr. 3839:13–3843:3.

[147] 12/11/18 AM Tr. 4234:6-18.

[148] Rather, the Court allowed this evidence to rebut Slatten's argument that his training to surveil long-range targets made it less likely he would have taken the short-range shot to kill Al-Rubia'y. *See* Order, ECF No. 1165.

[149] Although the Court had already ruled Doolittle's testimony could not be used to prove identity, *see* ECF No. 1078, after it came into the record through another door, the government remained free to marshal it in support of opportunity.

*Third*, the prosecutor permissibly reminded the jury that Slatten previously engaged in unprovoked violence against Iraqis, sometimes expressing a hope to spark a firefight.[150] In his motion, Slatten protests that the prosecutor saying Slatten had "done this previously" amounted to a propensity argument, but context shows it actually bore on Slatten's motive, intent, plan, identity, absence of mistake, and lack of accident:

> [M]alice [ a]forethought. Some examples of the evidence you received about that. Here we're talking about the killing being deliberate and unintentional [sic], so no mistake, right, like, done on purpose. Here's where the evidence of his hatred about the Iraqi people come[s] in, and the witnesses have testified about that, right? The fact that he had previously initiated shootings without provocation, right? This indent [sic] to strike out first, even when there's no threat. [Three different convoy members] testified about that. In fact, even Watson, now that I recall, I don't know if you remember how he described that after they left the circle and they were up north, the defendant sort of said, "Hey, there's a—there's a person that might be a threat or with a weapon," and Watson would say, "don't shoot the"—again, excuse me—"Don't shoot the [expletive]," right? Again he is—*he has done this previously*, and you have the evidence of that, right? And that can give you an inkling clinic [sic] in terms of his deliberateness and his intentions, the malice [ a]forethought. And you even have evidence of him celebrating, right?[151]

The prosecutor did not err.

### 3. The Court properly instructed the jury about this evidence.

In his last ditch, Slatten complains the Court described the 404(b) evidence too vividly in its jury instructions. Here's what the Court said:

> You've heard evidence that the defendant engaged in acts or conduct not charged in the indictment. Specifically, the government presented evidence that, it contends, shows that before [the date of the incident], the defendant made statements showing that he harbored a low regard for and hostility toward Iraqis. In addition, the government offered

---

[150] *See* evidence cited *supra* note 58.

[151] 12/11/18 AM Tr. 4233:13–4234:5 (emphasis added).

evidence that, it contends, showed that on specific occasions before [the date of the incident], the defendant intentionally fired his weapons at Iraqi targets without any apparent provocation or justification. You must decide whether this evidence is true. If you decide the evidence is not true, ignore it. If you decide it is true, you may only use the evidence for two purposes: One to determine whether the evidence helps to establish a motive for why the defendant may have engaged in the alleged criminal conduct . . . ; and two, to determine whether the evidence tends to help prove beyond a reasonable doubt that the defendant had the intent to act deliberately or intentionally as to the crime charged in the indictment. You may not consider this evidence for any other purpose. The law does not allow you to convict or to punish him simply because you believe he may have done other things, even bad things, not specifically charged as crimes in this case.[152]

Slatten would have preferred the Court to reference abstract "comments [he] made to [his] teammates" and "his alleged discharge of his firearm on other occasions." *See* Def.'s Proposed Jury Instrs. & Objs. 7, ECF No. 1171. But following an exceedingly complicated six-week trial, it was entirely appropriate for the Court to specifically identify the evidence it was talking about, explain its permissible purposes, and safeguard against impermissible use. Indeed, that's part and parcel of the Court's requirement to "provide the jury with sufficient understanding of the issues and applicable standards." *United States v. Washington*, 106 F.3d 983, 1002 (D.C. Cir. 1997); *see United States v. McGill*, 815 F.3d 846, 889 (D.C. Cir. 2016) (noting "with approval jury instructions that identify the *specific* purpose for which a particular piece of 'other crimes' evidence has been admitted," praising instructions that "identified with . . . targeted specificity and relevance the uses to which [404(b)] evidence could be put," and laying down the "general rule" that "a proper Rule 404(b) jury instruction should identify the evidence at issue and the

---

[152] 12/12/18 AM Tr. 4483:3-25.

particular purpose for which a jury could permissibly use it, rather than providing an incomplete description of the evidence at issue").

### H. Slatten's groundless witness tampering claim merits neither an evidentiary hearing nor a new trial.

All because one foreign-language witness switched a single synonym, Slatten claims the prosecution violated its ethical obligations and trampled his due process rights. The Court need not even entertain a hearing on that specious claim, let alone force a new trial.

In short: Moniem has consistently—through various translators—maintained the first shots came from a turret gunner on either the second or third (Slatten's) convoy vehicle. Yet he has been less consistent in describing his basis for this conclusion. In a statement to the FBI a month after the incident, Moniem didn't mention the turret gunners at all, but swore "he was 100% sure the firing was from" the middle two vehicles despite "not see[ing]" and "only hear[ing] the firing," reporting "[t]he firing sounded like it came from a rifle." ECF No. 1140-1 at 2. At the 2014 trial, however, Moniem first suggested he could see the turret gunners shoot, but quickly clarified he merely believed the turret gunners shot first "[b]ecause they were the only ones that [we]re outside the vehicle itself and the sound was coming from that area."[153] He gave slightly stronger testimony during Slatten's second trial, saying he "notic[ed] that the [men] on the turrets were shooting,"[154] and describing watching them shoot.[155]

So a few weeks later, during his opening statement at Slatten's third trial, the prosecutor drew on this prior testimony to theorize (as he also did during the second trial) that Moniem concluded the turret gunners fired first by "d[oing] what many of us would do in such a

---

[153] 6/23/14 Tr. 10:11–11:9.

[154] 7/5/18 PM Tr. 1391:10-24.

[155] *See* 7/6/18 AM Tr. 1475:12–1476:16.

circumstance, [he] assumed, [he] made an assumption. Not an unreasonable assumption, but an assumption nonetheless and a wrong assumption, because all the evidence will point to the defendant being the first shooter."[156] Defense counsel challenged this theory during its opening statement, arguing Moniem "never said, 'I'm assuming.' He said, 'I saw it.'"[157] But as luck would have it, Moniem's testimony eleven days later vindicated the government's theory: "I did not see [the turret gunners] fire, but I am assuming that to be, from what I heard, that the gunfire was coming from them. . . . Because the sound was coming from the convoy."[158]

Such variability is the nature of live witness testimony. Moniem's statements don't contradict each other; "believe" and "assume" are synonyms, and both fit Moniem's inference about who shot based on what he heard and who he could see. Indeed, even native English speakers could use "believe" and "assume" interchangeably in this context. *See, e.g.*, *Assume*, Roget's II (3d ed. 1995) (listing "belief" as a synonym). So a slight variance from a witness testifying multiple times on direct and cross-examination over the course of a decade through multiple different translators is hardly sensational.

But without pausing to consider these obvious realities, Slatten crashes through the looking glass to conclude "Moniem's use of the same language used by the government in its opening statement cannot be a serendipitous coincidence." Mot. New Trial 50. He reckons this one-word shift provides "strong reason to believe that the government rehearsed this testimony with Mr. Moniem" and "strongly suggest[s]" a government cover-up. *Id.* at 47-50; *accord id.* at

---

[156] 11/5/18 AM Tr. 509:4-9.

[157] 11/5/18 PM Tr. 568:7-12.

[158] 11/16/18 PM Tr. 1979:19-24; *accord* 11/19/18 AM Tr. 2041:15–2045:22 ("Q: . . . And those initial shots that you saw were by the turret gunners? A: I believe so. . . . Q: . . . That was your sworn testimony [that you could tell the turret gunners fired first], sir, isn't it? A: Yes, this is my testimony, but I—what I said is, and I said it several times, that I heard and I saw—I assumed that [the shots] w[ere] coming from [the turret gunners].").

49 ("*It strains credulity* that Mr. Moniem's use of the term 'assume,' in relation to the central

issue in the case, was merely a coincidence. . . . If the government rehearsed this aspect of Mr.

Moniem's testimony with him . . . *as appears likely*, the defense was entitled to a . . . disclosure

[under *United States v. Giglio*, 405 U.S. 150 (1972)]." (emphasis added)).

The Court does not share Slatten's conspiratorial impulse.[159] The government avows it

has "never coached Moniem and has complied with its disclosure obligations under" *Giglio*,

Gov't Mem. Opp'n 49, and the Court takes it at its word. The Court further notes the

government didn't just start using the word "assume"; prosecutors used a similar locution during

their second-trial opening[160] and closing[161] statements.

In any event, Moniem's word change was harmless: a jury convicted Slatten in 2014

(when Moniem used "believe") just as another jury did in 2018 (when Moniem used "assume").

And in all events, because Slatten's witness tampering claim lacks both objective support and

prejudicial effect, the Court declines his request for an evidentiary hearing and for a new trial.

## I. The government's garbled presumption-of-innocence argument did not affect Slatten.

The government recognizes it "inartfully" concluded its closing argument, fumbling its

description of the presumption-of-innocence standard: "[N]ow that you have heard the evidence,

---

[159] But Slatten's attorneys apparently do. Indeed, the Court notes with regret that—at least on this issue—defense counsel from Williams and Connolly LLP lost sight of their duty "to maintain[] a professional, courteous and civil attitude toward all persons involved in the legal system." Model Rules of Prof'l Conduct pmbl. ¶ 9 (Am. Bar Ass'n 2018). During the break following Moniem's use of the word "assume," the firm's then–managing partner threatened to refer the prosecutor to the D.C. bar, and one of his partners physically accosted the prosecutor, prompting a clear-headed associate to hold him back and the Court to instruct the entire defense "team to tone it down a notch." 11/16/18 PM Tr. 1987:5–1990:8.

[160] *See* 6/28/18 AM Tr. 557:16-20 ("Moneim will say, 'Well, I'm looking at this vehicle. There is one visible person up there. And I'm assuming it was that person. He was pointing a weapon at this vehicle, the white Kia, and I assume it was the person on top.").

[161] *See* 8/6/18 AM Tr. 4835:9-19 ("[Moniem] was pretty far. So he is, actually, not facing [Slatten's] vehicle, and he hears a sound. He looks. He knows it is coming from the third vehicle. He's surprised. But he is assuming that the only person he can see, which is on top of the vehicle, must be the one that took the shot. And, I mean, nobody can fault him for that. All right? But he's just not correct. And he doesn't know what you know.").

ladies and gentlemen, the presumption of innocence is over. Please, in light of the evidence, find the defendant guilty as charged and hold him accountable for Ahmed's death. Thank you."[162] Gov't's Mem. Opp'n 50-51. Luckily, Slatten moved for "an immediate curative instruction," which the Court granted, promptly reminding the jury that "Mr. Slatten is presumed to be innocent as he sits here today, unless and until the jury finds him guilty beyond a reasonable doubt. I'll instruct you on the presumption of innocence again after the closing arguments in my final instructions."[163] As promised, the Court echoed that instruction in its formal charge the next day, directing the jury that

> every defendant in a criminal case is presumed to be innocent. This presumption of innocence remains with the defendant throughout the trial unless and until the government has proven he is guilty beyond a reasonable doubt. This burden never shifts throughout trial. The law does not require Mr. Slatten to prove his innocence or to produce any evidence at all. If you find that the government has proven beyond a reasonable doubt every element of the offense with which Mr. Slatten is charged, it is your duty to find him guilty of that offense. On the other hand, if you find the government has failed to prove any element beyond a reasonable doubt, it is your duty to find Mr. Slatten not guilty. The government has the burden of proving Mr. Slatten guilty beyond a reasonable doubt as to the charge against him. Some of you may have served as jurors in civil cases where you were told that if—that it is only necessary to prove that a fact is more likely true than not true. In criminal cases, the government's proof must be more powerful than that. It must be proof beyond a reasonable doubt for each element of the offense. Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of this evidence, you're firmly convinced that Mr. Slatten is guilty of the crime charged, you must find him guilty. If, on the other hand, you think there is a real possibility that Mr. Slatten is not guilty, you must give him the benefit of the doubt and find him not guilty.[164]

---

[162] 12/11/18 AM Tr. 4236:16-19.

[163] Id. at 4236:25-17, 4243:14-19.

[164] 12/12/18 AM Tr. 4473:4–4474:7.

Those swift and strong instructions distinguish this case from Slatten's best case, *United States v. Perlaza*, which held a prosecutor erred by arguing the presumption of innocence "vanish[es]" and a "presumption of guilt" takes over during jury deliberations. 439 F.3d 1149, 1169 (9th Cir. 2006). The divided Ninth Circuit panel required reversal because of the district judge's weak-kneed response: he initially embraced the remark, telling the prosecutor in front of the jury, "That's proper . . . . Go ahead. You are all right," only to double-back and give a curative instruction over fifty-transcript-pages later—and even then, the instruction was "inadequate" because "it fail[ed] to set forth the Government's proper burden of persuasion— namely, guilt beyond a reasonable doubt." *Id.* at 1170-72.[165]

Because this Court quickly, forcefully, and repeatedly corrected the prosecutor's erroneous insinuation that the presumption of innocence no longer applied, Slatten wasn't prejudiced. *See also United States v. Foster*, 557 F.3d 650, 656 (D.C. Cir. 2009) (reiterating the presumption jurors follow "strong, curative instruction[s]").

---

[165] In dicta, the majority noted the "instruction was flawed in other respects as well," including that "[i]t did not specify that the presumption of innocence 'go[es]' with the jury when it deliberates,'" that it "did not tell the jury that the prosecutor had been wrong," and—"[m]ost importantly"—that it "never told the jury of the earlier mistake when the judge ratified the prosecutor's burden-shifting statement." *Id.* at 1172 (second alteration in original) (quoting *United States v. Cummings*, 468 F.2d 274, 280 (9th Cir. 1972)).

Slatten's other cases fall further afield of his own: in *Mahorney v. Wallman*, the 10th Circuit granted habeas relief after the prosecutor made an even stronger misstatement and the trial court "did not thereafter attempt to cure or minimize the problem through admonishment or special instruction" and its "overall charge on the presumption of innocence and burden of proof was not sufficiently specific," 917 F.2d 469, 471-74 (1990); in *Pagano v. Allard*, a district court judge vacated a habeas petitioner's conviction after the prosecutor made a similar misstatement and the trial judge failed to "sustain[] the petitioner's timely objection and [to] give[] a curative instruction," 218 F. Supp. 2d 26, 35 (D. Mass. 2002); in *People v. Cowan*, California's intermediate appellate court held a prosecutor's comment "that the presumption of innocence is in place 'only when the charges are read,' and that the 'presumption is gone thereafter'" constituted error under state law since it "was the last explanation about reasonable doubt the jury heard," 214 Cal. Rptr. 3d 576, 581-85 (Cal. Ct. App. 2017).

**J. Slatten cannot cut the jury off from evidence necessary to contextualize Slatten's post-shooting conduct, Slough's post-shooting statements, and evidence suggesting mitigating circumstances.**

The government organized their case into three chapters: Chapter One, when the convoy stopped traffic and Slatten fired the fatal shots; Chapter Two, when the now-driverless Kia rolled forward, attracting fire from the turret gunners; and Chapter Three, when the rest of the convoy opened fire.[166] The government urged the jurors "to focus your attention on [Chapter One], . . . [when] defendant shoots first at Ahmed":

> The only reason chapters two and three will be relevant to you is because, one, they will show that the defendant actually achieved his intended purpose. Not only in killing Ahmed, but starting a massive shooting. But the second reason it will be relevant to you is because you're going to hear about this man, Paul Slough, and certain statements he gave to the Department of State after the fact, and you are going to want to listen about Paul Slough's actions out there in chapters two and three to evaluate whether the statements he gave to the Department of State afterwards are anywhere near credible, and for many reasons and we'll talk about those later, you'll find them incredible.[167]

The overall thrust of the government's case was unmistakable: though Chapters Two and Three provide necessary context, "we want you to look at this case, we submit, at chapter 1. Look at that."[168]

---

[166] *See* 11/5/18 AM Tr. 501:24–502:15.

[167] 11/5/18 AM Tr. 502:5–503:1.

[168] *Id.* at 536:3-4; *accord, e.g.*, *id.* at 516:7-10 ("As promised, we submit, at least, that your focus should be on chapter 1, but we will talk about chapters two and three primarily so you can view the conduct of Mr. Slough, and put into context his statements later on."); *id.* at 517:11-14 ("Chapter 3 is everything afterwards. And again, we'll focus on this just so you can focus on Mr. Slough's conduct and see if it matches at all what is going to be in his post-incident statements to the Department of State."); *id.* at 526:4-9 (discussing Slough's statements and describing each as "an excuse, not an admission, an excuse. And you will know because you will be focusing on chapter 2 and 3 in Mr. Slough's conduct during 2 and 3 that those were lies. You will not be able to find them truthful."); *id.* at 528:3-9 ("And you will have some evidence that may suggest that there was incoming fire. That evidence will occur in chapters 3 primarily, a little bit in chapter 2. It won't happen at the very beginning, which is where your focus in our view should be, which is those first shots on Ahmed, but there will be some evidence primarily in chapter 3 after the Kia that there may have been some incoming fire, and this will be the evidence of it."); 12/11/18 AM Tr. 4179:4-8 ("We divided this into chapters to make it easier for all of us to talk about and understand how that evidence came in. And the evidence that goes to the elements of the offense, what happened that day, is Chapter 1."); 12/11/18 PM

Yet Slatten wants to shred Chapters Two and Three altogether. Arguing that Chapters Two and Three flunk Rule 402's relevancy requirement, that their reliance on other's bad acts upends Rule 403's protection against unfairly emotion-flaming testimony, and that they exceed Rule 404's limits on the use of bad acts as evidence, Slatten seeks to slam the book shut after Chapter 1.

But Slatten cannot just rip out the rest of the story. For one, Chapters Two and Three have three-fold relevancy: they tend to make it more likely that Slatten planned to incite a shooting, that Slatten shot first, and that there were no mitigating circumstances. *First*, they tend to make it more likely Slatten planned to incite a shooting. Chapters Two and Three connect (i) Slatten's prior attempts to draw out fire with preemptive shooting (pre–Chapter One) to (ii) Slatten calling his teammate's attention to the Kia as it rolled forward (Chapter Two) and to (iii) Slatten celebrating his teammates after the incident (post–Chapter Three) in a way that unmasks Slatten's plan to provoke a shooting. In other words, Chapters Two and Three provide an evidentiary bridge increasing the likelihood that killing Al-Rubia'y came from Slatten's twisted design to avenge 9/11. *Second*, Chapters Two and Three make it more likely Slough lied to investigators, thus decreasing the likelihood Slough shot first and increasing the likelihood Slatten did. Of course, Slatten disagrees with this conclusion, pointing out Slough's statements themselves already show Slough had some motivation to lie about shooting the Kia. But Chapters Two and Three reveal the depth of that incentive: without a satisfactory explanation to investigators, Slough would have been liable not just for one Iraqi death, but for fourteen. Against that backdrop, Slough's statements merit even less credit, making it that much less likely

---

Tr. 4371:23–4372:8 ("Our suggested approach . . . is focus on chapter 1. Why? Because one, that's the time frame for which and under which this murder occurred. It didn't happen in chapter 2. It didn't happen in chapter 3. . . . That's why we're focusing you on chapter 1 and not chapters 2 and 3.").

he was the shooter—and that much more likely Slatten was. *Third*, Chapters Two and Three make it more likely there were no mitigating circumstances. That the convoy's extended fusillade in Chapters Two and Three went unanswered makes it more likely no armed insurgents were in the traffic circle for Chapter One (if there were, they would have likely shot back). Alternatively, to the extent one thinks the AK-47 shells recovered in another quadrant of the circle came from Iraqis firing during the shooting, Chapters Two and Three increase the likelihood they came in response to the convoy's broadside, therefore decreasing the likelihood Slatten initially shot in self-defense.

Additionally, Chapters Two and Three's probative value outweighs their prejudicial effect—even though they capture bad acts by Slatten's teammates, not Slatten himself—because his teammates' actions reasonably and foreseeably followed his own Chapter One decisions. Two cases Slatten cites—*United States v. Hernandez*, 780 F.2d 113 (D.C. Cir. 1986), and *United States v. Sampol*, 636 F.2d 621 (D.C. Cir. 1980)—actually prove the point. In *Hernandez*, a divided D.C. Circuit panel shielded a defendant from evidence his codefendant beat up a gas station attendant while the defendant stood on the sidelines and shouted unintelligible words, since his involvement was so "nebulous" that the evidence's only probative value was "a slightly refined version of guilt by association." 780 F.2d at 116-18. So too in *Sampol*, where the D.C. Circuit shielded a defendant charged with lying to the grand jury from evidence of his codefendants' "intentional and extremely violent assassination scheme, the gory details of which were described with extreme accuracy to the jury:"

> The amount and provocative nature of the evidence required to prove the charges against his co-defendants so exceeded and varied from that which was necessary or relevant to the charges against [him] that it was unfair to him, and unrealistic to expect a jury not to be influenced by such extraneous testimony in its assessment of his guilt upon the lesser charges for which he was tried.

636 F.2d at 646-47. In comparison, Slatten's contribution to his teammates' bad acts was not so speculative or peripheral. By shooting Al-Rubia'y in the head, Slatten caused the Kia to roll forward; by pointing out the rolling Kia to his teammates, he caused them to rain bullets and grenades into the crowded intersection. Nor were the teammates' bad acts so divorced from Slatten's charged conduct, or so much more serious that they would lull the jury into finding him guilty by association. (If anything, it's the opposite—the grand jury charged Slatten with first-degree murder; his teammates skirt by with manslaughter). In sum, because his teammates' bad acts in Chapters Two and Three flowed naturally from Slatten's conduct in Chapter One, their probative value outweighs their prejudicial impact.

Finally, to the extent Chapters Two and Three implicate Rule 404(b)(2), they color inside the lines. As already noted, Chapters Two and Three support Slatten's motive to shoot Al-Rubia'y, his intent and plan to precipitate a mass shooting, and his identity as the initial shooter. Simply put, Slatten cannot stop the jury from reading Chapters Two and Three.

## K.  To the extent the Court erroneously rebuked defense counsel, it was harmless.

Already a month into the trial, the government called an Iraqi civilian who was stopped in traffic near Al-Rubia'y's Kia to buttress other witnesses' testimony about the shooting sequence. The witness, Hayder Ahmed Rabie Hussain Al-Khafaji, testified once he "heard the shot and the screaming, and then the commotion around" him, he "and others around [him]" began "trying to turn around and head backwards."[169] As he started turning, the entire convoy opened fire, shooting Hussain as he clambered out his car's passenger door and crawled to shelter.[170]

---

[169] 12/6/18 PM 3875:16-24.

[170] *See id.* at 3876:19–3877:22.

That slightly contradicts what he told the FBI in 2007, when he indicated he first tried to turn around even before the initial shots began:

> HUSSAIN stated that when the vehicles stopped in the [traffic circle], he made hand signals to one of the convoy personnel asking if he could turn around. HUSSAIN stated that beside him, and to his left was a white Kia car. HUSSAIN could not recall what, if any, vehicle was to his right. HUSSAIN labeled the convoy vehicles in the [traffic circle] and drew an additional diagram on the back of the map to show positioning of the different vehicles.
>
> HUSSAIN stated that he heard shooting and then a woman crying "Abu, Abu" [my son, my son]. He looked behind him and saw a car crash and a black pickup truck trying to escape from the area. HUSSAIN started to turn his taxi to the right. At that time, he saw the white Kia move forward and burst into flames. HUSSAIN could not turn his taxi more and so he exited his taxi on the passenger side and got down on the ground by the curb.
>
> HUSSAIN reiterated that he was trying to communicate with the white convoy vehicle but the turret gunner never responded. Right after the woman cried out, he again signaled that the wanted to turn but again received no response.

Def.'s Ex. 2535 (alteration in original).

After a long day of testimony, one of Slatten's attorneys sought to impeach Hussain about this inconsistency. But as she did, she elided part of his statement and imposed the phrase "then stated," overstating the chronological implications of Hussain's actual account:

> Q: [After giving Hussain a copy of his FBI interview notes] Now, does this remind you that when you met with the FBI less than a month after the incident, you said that when the vehicle stopped in the Nisur Square traffic circle, you made hand signals to one of the convoy personnel asking if you could turn around?
> A: Yes.
> Q: And that you *then stated* that you heard shooting and a woman crying, Abou, Abou—
> THE COURT: Let's not do it that way. "Then stated" means— that's very misleading, the way you're wording it. He didn't say and *then* that happened. You're saying, in the chronology, he then stated—you're trying to mix that up there.
> [DEFENSE ATTORNEY]: I'm just reading the order of the FBI.
> THE COURT: Well, read the words out of there. Don't try to interpolate with "he then stated." Read it the way it is there.

[DEFENSE ATTORNEY]: Okay.[171]

Fresh off her attempt to layer Hussain's words with her own chronological gloss, the

Court grew concerned she did it again:

> Q: "Hussain stated that the heard shooting and then a woman crying, Abou, Abou."
>
> THE COURT: That's very misleading.
>
> [DEFENSE ATTORNEY]: [(to the witness)] Is that [what you said]?
>
> A: One more time. I'm sorry.
>
> Q: "Hussein stated that he heard shooting, and then a woman crying, Abou, Abou"; is that correct?
>
> A: Correct.
>
> Q: And right after the woman cried out, you again signaled—
>
> THE COURT: Is "again" in the wording in that?
>
> [DEFENSE ATTORNEY]: Yes, your Honor, it is.
>
> THE COURT: "Again" is in there?
>
> [DEFENSE ATTORNEY]: Yes, your honor. Would you like me to approach and show you?
>
> THE COURT: No, that's all right. I want you to use the words in there. The FBI words are in—again, is in the FBI statement?
>
> [DEFENSE ATTORNEY]: Yes, your honor. Would you like me too approach and show you?
>
> THE COURT: No, I accept what you said. That's why I want you to use the words that are in there, and he's got to tell you whether that's what he said.
>
> [DEFENSE ATTORNEY]: Okay.
>
> Q: "Right after the woman cried out, he again signaled—
>
> THE COURT: "Right after" is in there too?
>
> [DEFENSE ATTORNEY]: Yes, your Honor. I will approach so we are all on the same page, your Honor.
>
>       *   *   *
>
> [DEFENSE ATTORNEY]: [(to the witness)] So you then told the FBI that right after the woman cried out, you again signaled that you wanted to turn but again received no response?
>
> THE COURT: You're not testifying. You're saying, is that what he told—
>
> [DEFENSE ATTORNEY]: That's what I said.
>
> Q: Isn't that what you told the FBI?
>
> A: Yes.[172]

---

[171] 12/6/18 PM Tr. 3917:12–3918:9 (emphasis added).

[172] *Id.* at 3918:11–3920:9.

After reviewing Hussain's statement alongside the trial transcript, the Court realized—following her initial exchange—the defense attorney really just read from the statement, although neither the Court nor the jury could tell where the quotes stopped and started. And adding to the confusion, the defense attorney wasn't reading Hussain's actual words, but rather an FBI agent's who interviewed Hussain and memorialized his notes in what's often referred to as a "302 memorandum." But nevertheless—as the Court told counsel the next trial session—its comments were "too strong."[173] Even though the defense attorney's questions were slightly misleading, it was inappropriate for the Court to say so before the jury. So the Court gave the following instruction:

> On Thursday you heard an exchange between the Court and defense counsel . . . regarding the content of Mr. Hayder's October 13th, 2007 FBI 302 memorandum. I hereby instruct you that in Ms. Common's reading what was in that FBI memorandum, she was not being misleading as I initially said.[174]

The Court regrets its mistake. It recognizes that its "influence . . . on the jury is necessarily and properly of great weight, and that [its] lightest word or intimation is received with deference, and may prove controlling." *Starr v. United States*, 153 U.S. 614, 626 (1894). But luckily, its influence can be used for good as well as ill. And here, since the Court unequivocally retracted its comment and assured jurors that defense counsel did not mislead the Court, there was no lasting prejudice to Slatten. *See United States v. Meadows*, 867 F.3d 1305, 1317-18 (D.C. Cir. 2017) ("This court has consistently reaffirmed the principle that '[t]he jury is presumed to follow the instructions' it is given." (quoting *United States v. Hall*, 610 F.3d 727, 742 (D.C. Cir. 2010)).

[173] 12/10/18 AM Tr. 3975:2–3981:14.

[174] *Id.* at 3991:10-17.

Two factors reinforce this conclusion. *First*, the exchange's limited scope: it was a brief back-and-forth involving just one of the many witness called during the six-week-long trial. *Second*, the exchange's limited subject. The Court merely questioned whether an attorney misread the FBI's notes while she impeached a belts-and-suspenders witness. It did not attack the witness directly, or the defendant, or even interrupt a singularly critical examination.[175]

## L.  To the extent the government's summation hit below the belt, it was harmless.

Slatten identifies three instances where prosecutors questioned the defense's credibility before the jury, claiming those comments struck not just hard blows, but foul ones. One came when prosecutors suggested Watson's grand jury testimony deserved more credit than his in-person testimony because the former's lack of confrontation.[176] The Court debunked that

---

[175] The Court further notes that its comments fell within its "discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior," and well short of the kinds of judicial comments justifying reversal. *United States v. Donato*, 99 F.3d 426, 434 (D.C. Cir. 1996) (reversing where the judge called a defendant a liar); *Hardy v. United States*, 335 F.2d 288, 290 (D.C. Cir. 1964) (reversing where the trial judge "states as facts, rather than as testimony to be considered by the jury in deciding the facts, the whole case of the prosecution"); *Blunt v. United States*, 244 F.2d 355, 363 (D.C. Cir. 1957) (reversing where the judge examined the defendant's expert with "insistent questioning" designed to persuade the jury that the expert's "testimony was entitled to little weight because not based on fact"); *Peckham v. United States*, 210 F.2d 693, 704 (D.C. Cir. 1953) (reversing where the trial judge yelled that if defense counsel said "another word, I will have the Marshal stick a gag in your mouth"). *See generally Offutt v. United States*, 348 U.S. 11, 17 (1954) (noting the "modicum of quick temper that must be allowed even judges" when it comes to "a rare flareup" or "a show of evanescent irritation"); *United States v. Liddy*, 509 F.2d 428, 438-39 (D.C. Cir. 1974) (en banc) (recognizing the danger of a trial judge "repeated[ly] interrupt[ing] the examination of [one side's] witnesses," but noting that a judge need not "be inert": "The trial judge is properly governed by the interest of justice and truth, and is not compelled to act as if he were merely presiding at a sporting match. He is not a 'mere moderator.'"). If anything, this case comes closer to *United States v. Edmond*, 52 F.3d 1080, 1101 (D.C. Cir. 1995), and *United States v. Logan*, 998 F.2d 1025, 1029 (D.C. Cir. 1993), where the Court of Appeals excused the trial court's imprudent comments because the comments were directed at defense counsel, and not defendants themselves.

[176] *See* 12/11/18 PM Tr. 4403:21–4404:4 ("Many of these men got up there and talked to you about how important it is in their minds to serve with other individuals in the Armed Forces, and in the trenches, that bond, that camaraderie is strong. How difficult would that be to get in open court like this and say something that might hurt a brother in arms? In the grand jury, though, your obligation is to tell the truth, and there is no one facing you down, and that truth may come a little bit easier in the grand jury.").

statement in subsection II.B.2 of this Memorandum Opinion and sees no reason to discuss it further here, other than to again dismiss it as harmless.

Another instance occurred when the government implied defense counsel manipulated witnesses' testimony through leading questions on cross-examination.[177] This is standard shtick for prosecutors, applicable to virtually every case. It also happens to be correct: "A leading question is one which puts the answer (which the attorney desires) into the mouth of the witness, or which suggests the answer to him. It is called leading because it virtually 'leads' the witness to the desired answer." *Leading Question*, Black's Law Dictionary (11th ed. 2019) (internal quotation marks omitted) (quoting Samuel Weiss, *How to Try a Case* 53-54 (1930)). Notably, the government steered clear of impugning Slatten's right to use leading questions on cross-examination under Rule 611; it merely pointed out his questions sometimes "suggest[ed] the answer" to the witness. *Id.* (internal quotation marks omitted) (quoting *Notable Cross-Examinations* xiii-xiv (Edward Wilfrid Fordham ed., 1951)). That's fair game.

The final instance turns on an innocuous fight over a protractor. As subsection I.A.1 noted, on the last day of trial, one of Slatten's attorneys used a protractor to hand-draw angles onto an aerial picture of Nisour Square while cross-examining the FBI agent who conducted the

---

[177] *See* 12/11/18 AM Tr. 4202:4-11 ("And more importantly, ladies and gentleman, except for the ones we read from the transcript, you saw these people come in here, sit in this chair, in their own words tell you what they saw happened, be tested by what the defense said happened in their questions and their leading questions about what happened. You saw that. You can evaluate their credibility, what you think about it, how they struck you and you make that determination about what you believe."), 4218:4-12 ("Now [Watson]'s saying he's not sure about the sequence [of shooting]. Now he's saying, upon the suggestion of questions by defense counsel, that it was very chaotic, it was just very difficult to understand. And certainly war can be chaotic, but the very beginning of this incident, the very thing that sets it off, there is no reason for Mr. Watson to forget about that. And those things he said in 2013 were not in answer to leading questions. They were his own words. Okay? His own words."); 12/11/18 PM Tr. 4376:6-25 (telling the jury in rebuttal that "a lot of what we're being accused of in terms of cherry-picking actually is also occurring on the other side. . . . [W]hen you're getting these little squibs [in defense counsel's closing argument presentation] . . . often its coming in often in their cross-examination with a witness that might even be hostile to the government. . . . But it's your recollection that controls. It's not these little squibs, these little excerpts that are pulled out, likely out of context in many instances, so that they can tell some story to you.").

government's demonstrative shootings.[178] Later that morning, when cross-examining Slatten's own crime-scene-examination instructor, the government sought to test that analysis's accuracy:

> Q: . . . Now, I believe you're also qualified, aren't you, sir, to testify when asked about scene reconstruction?
> A: Yes, sir.
> Q: Shooting reconstruction?
> A: Yes, sir.
> Q: And, in fact, you were not asked to do that in this case; is that right?
> A: That's right, sir.
> Q: And not to undermine your opinion here today, but that is a very involved process?
> A: Yes, sir.
> Q: There are a number of variables that you have to know in order to give a competent, if you will, scene reconstruction–type of opinion?
> A: Yes, sir.
> Q: All right. And can you do that with just a protractor?
> A: Yes, sir.
> Q: You can completely reconstruct a scene with a protractor?
> A: There's many ways of doing it. You can do—if a protractor can give you an angle, you can use a protractor. . . .
> [PROSECUTOR]: [(To the defense attorney)] [M]ay I borrow your protractor? [(To the witness)] I want to make sure, sir, you understand my question.
> [DEFENSE ATTORNEY]: I admit that I don't walk around with a protractor.
> [PROSECUTOR]: Oh, I know you've got it somewhere on your person. Okay. All right. [(Giving up on the protractor and resuming questioning the witness)]
> Q: You know what a protractor is correct?
> A: Yes, sir, I do.
> Q: Now, maybe I wasn't clear in my question. You cannot reconstruct a scene of a shooting that occurred in October of 2007 with a protractor alone? With just a protractor? Do you have one on you, sir?
> A: Perhaps I'm not following your question, sir, but I would think that I would have to have some kind of angle measuring device, and a protractor is an angle measuring device . . . . I would have to be able to see what the scene is and whether or not I could do it. Is it one item or a hundred items? If it's a hundred items, I

---

[178] *See supra* notes 42–52 and accompanying text.

would like to have a total workstation to do it, but if it's one item, I could use a protractor to determine an angle . . . .

Q: . . . A total station is where you literally put this camera-type device in the middle of a scene, it shoots out all these lasers, it measures every single thing in the room and can recreate in a 3D computer-type setting what this room would look like?

A: That's correct.

Q: Much more advanced than the little plastic D shaped protractor that you've just described?

A: Yes, sir . . . .

Q: . . . But all things being equal, if you had to reconstruct a scene, actually reconstruct a scene out in Nisour Square October 2007 and identify distances and angles from any number of objects, not just two, you're not going to be able to do that with a protractor, you need the total station?

A: That would be the best thing to do.

Q: Okay. And you would need that?

A: Yes, sir.[179]

The transcript does not fully capture the tone of the exchange. Despite having just used a protractor in front of the jury, the defense attorney rose with a smile, opened his suit jacket for all to see, turned out its pockets, and patted down his pants, drawing laughter throughout the courtroom. *See* Decl. Fernando Campoamor Sánchez ¶¶ 5–7, ECF No. 1259-3. Only now—in a declaration appended to Slatten's new trial motion—does the defense attorney explain he took the protractor back to his team's "war room" during the intervening break. *See* Decl. Simon A. Latcovich ¶ 5, ECF No. 1219-22.

The exchange resurfaced the next day during the government's summation:

Now let's talk about the expected arguments from the defense. . . . [They'll say], of course, the FBI conducted a shotty investigation. All right. . . . Even yesterday we had that exchange with the missing protractor. Remember? [The defense attorney] had this protractor

---

[179] 12/10/18 AM Tr. 4062:7–4065:9. The latter part of this exchange gave the prosecutor leeway to argue in rebuttal that the expert

> had all of the experience in the world, [but] he didn't want to give you the correct answer, which is, with a protractor alone, I can't do my job. He didn't want to give you that, because [defense] counsel had gotten up here with his protractor and drawn some lines and sought to testify effectively what the angles were in that particular situation out there based on a photograph and a protractor.

12/10/18 PM Tr. 4407:7-17.

with [the FBI agent] and drew all this stuff, and then when [a government attorney]—actually with an expert on border reconstruction—say, "hey, where's the—where's the protractor?" Nowhere to be found. Okay. That's fine. But you know what all that was about? Inviting to you [sic] speculate. There's absolutely no evidence of angles.[180]

This picayune argument and sophomoric strategy befitted neither the government nor defense counsel. It represents one of several occasions each side's attorneys forgot "that sarcasm and ridicule are not the stuff of good argument or good taste in judicial proceedings." *Carter v. United States*, 437 F.2d 692, 694 (D.C. Cir. 1970). But bad taste is not legal error, and these antics do not justify a new trial.

**M.  The Court properly instructed the jury.**

With its final instructions, the Court "guide[s] the jury by appropriate legal criteria through the maze of facts before it." *Bollenbach v. United States*, 326 U.S. 607, 613 (1946). Here, Slatten claims the Court took the jury on three wrong turns: first by instructing the jury only on perfect self-defense, then by allowing the jury to consider Slatten's weapon in deciding whether he acted with malice aforethought, and finally by not instructing the jury on venue or MEJA. But none were error.

*First*, self-defense. For a typical murder defendant, self-defense helps in one of two ways. On one hand, if the defendant *reasonably* resorted to self-defense (what's known as "perfect self-defense"), it is a complete defense. On the other hand, if the defendant *unreasonably* resorted to self-defense ("imperfect self-defense"), it reduces the charge to voluntary manslaughter. But of course, this is not the typical case. Practically speaking, because its five-year statute of limitations has expired, Slatten cannot be convicted of manslaughter—it's first-degree murder or

---

[180] 12/11/18 AM Tr. 4224:2–4226:10.

nothing. So, Slatten argues, the Court should have portrayed self-defense as a complete defense regardless of its reasonableness.

Slatten's grievance is better directed to the ubiquitous "Redbook," the time-tested compendium of D.C. criminal jury instructions relied on by judges, prosecutors, and defense attorneys alike. The Court lifted its self-defense instruction almost verbatim from that anthology.[181] The Court did not see a need to deviate from those instructions and to offer what would be a technically incorrect statement of law. Instead, the Court incorporated Slatten's desired point into its instruction on mitigating circumstances, itself taken from the Redbook:

> Mitigating circumstances . . . exist when a person actually believes that he or another person is in danger of serious bodily injury, and actually believes that the use of deadly

---

[181] *Id.* at 4489:25–4492:4 ("Self-defense or defense of others is a complete defense to murder where Mr. Slatten actually believed that he or another person was in danger of serious bodily injury, and actually believed that the use of deadly force was necessary to defend against that danger and both of these beliefs were reasonable. Every person has the right to use a reasonable amount of self-defense or defense of others if: One, he actually believes he or another person is in imminent danger of bodily harm; and if, two, he has reasonable grounds for that belief. The question is not whether looking back on the incident you believe that the use of force was necessary. The question is whether Mr. Slatten, under the circumstances as they appeared to him at the time of incident, actually believed he or another person was in imminent danger of bodily harm, and could reasonably hold that belief. A person may use a reasonable amount of force in self-defense, including, in some circumstances, deadly force. Deadly force is the force that is likely to cause death or serious bodily harm. A person may use deadly force in self-defense if he actually— deadly force is a force likely to cause death or serious bodily harm. A person may use deadly force in self-defense if he actually and reasonably believes at the time of the incident that he or another person is in imminent danger of death or serious bodily harm from which he can save himself or the other person only by using deadly force. Even if the other person is the aggressor and Mr. Slatten is justified in using self-defense in defense of others, he may not use any greater force than he actually and reasonably believes to be necessary under the circumstances to save his life or the life of others or avoid serious bodily harm. In deciding whether Mr. Slatten used excessive force in defending himself or others, you may consider all the circumstances under which he acted. A person acting in the heat of passion caused by an assault does not necessarily lose his claim of self-defense by using greater force than would seem necessary to a calm mind. In the heat of passion, a person may actually and reasonable [sic] believe something that seems unreasonable to a calm mind. If Mr. Slatten actually and reasonable [sic] believes that he or another person is in imminent danger of death or serious bodily harm and that deadly force is necessary to repel such danger, he may use deadly force in self-defense. He may do so even though afterward it turns out that the appearances are false because either Mr. Slatten or the others were not actually in imminent danger or deadly force was not necessary. The law does not require a person to retreat or consider retreating when he actually and reasonably believes that he or another person is in danger of death or serious bodily harm and that deadly force is necessary to repel that danger. But the law does say that a person should take reasonable steps, such as stepping back or walking away, to avoid the necessity of taking a human life, so long as those steps are consistent with the person's own safety and the safety of others who are in danger. In deciding whether Mr. Slatten acted reasonably, you should therefore consider whether he could have taken those steps, consistent with his own safety, and the safety of his teammates."); *cf.* Barbra Bergman, *Criminal Jury Instructions for the District of Columbia* §§ 9.500, 9.501(B)–(C), 9.503 (5th ed. 2018).

force is necessary to defend against that danger. Mitigating circumstances exist even if one or both of those beliefs were not reasonable. . . . It's the government's burden to prove beyond a reasonable doubt the absence of self-defense or defense of others and the absence of mitigating circumstances. If the government has failed to do so, you must find Mr. Slatten not guilty.[182]

Taken as a whole, these instructions were not only straightforward, but—more importantly—legally correct. There was no error.

*Second*, Slatten's use of a weapon. Here too the Court borrowed from the Redbook to charge the jury that "[i]n determining whether the killing was with malice aforethought, you may consider the use of a weapon or instrument and you may consider the manner in which the death was caused."[183] Notably, that's actually much weaker than the Redbook's suggested language,[184] since that fact that Slatten was required to have a weapon in Nisour Square weakens the consideration's relevancy. But that fact doesn't render the consideration totally irrelevant, especially because the record suggests Slatten improperly used a hair-triggered SR-25. So the instruction was proper.

*Third*, venue and MEJA. As a pure legal question the Court already answered, *see supra* Section I.C, a venue instruction wasn't needed. *See United States v. Gaudin*, 515 U.S. 506, 513-14 (1995). And a MEJA instruction wasn't required either, since the Court included the relevant legal criteria as elements of the actual offense.[185] Accordingly, no error resulted.

---

[182] 12/11/18 AM Tr. 4489:19–4492:11; *cf.* Bergman, *supra* note 181, at § 4.211.

[183] 12/11/18 AM Tr. 4488:5-7.

[184] *See* Bergman, *supra* note 181, at § 4.201.

[185] 12/11/18 AM Tr. 4487:12–4494:5 ("The elements of this offense, each of which the government must prove beyond a reasonable doubt, [include] . . . [that] the act was done in the City of Baghdad, in the Republic of Iraq; and [that], at the time he caused the death of Mr. Al Rubia'y, Mr. Slatten was employed by the Armed Forces outside the United States. . . . For the purposes of this case, the definition of 'employed by the Armed Forces outside the United States' includes not only a direct employee or contractor of the Armed Forces of the United States, but also a

## N. Slatten's juror misconduct allegation does not justify an evidentiary hearing.

To the Court's dismay, the morning after the verdict, the *Washington Post* quoted the jury foreperson "sp[ea]k[ing] on the condition of anonymity due to concern about possible retribution from supporters of the Blackwater[186] guards." Tom Jackman & Spencer S. Hsu, *Jury Convicts Blackwater Security Guard of Murder in Iraqi Civilian Massacre*, Wash. Post, Dec. 20, 2018, at A7. Slatten now claims those comments "raise a colorable possibility" the foreperson "consulted extra-record material during trial," arguing the "reference to 'supporters of the Blackwater guards' evokes the online treasure trove of information about the Nisur Square incident." Mot. New Trial 63-64.

The Court disagrees. The bar to raise a colorable juror misconduct claim turns on "the strength and seriousness of the allegations," and Slatten's allegation does not clear it. *United States v. White*, 116 F.3d 903, 929 (D.C. Cir. 1997) (noting that "[a] hearing is not always required to determine the factual underpinning of a juror misconduct claim" and relately that

---

contractor (including a contractor [sic] at any tier) or an employee of a contractor (or subcontractor at any tier) is present or residing outside the United States in connection with such employment; and three, the contractor or employee of the contractor (or subcontractor at any tier) is not a national or ordinary resident in the host nation, in this case Iraq. Thus, when considering whether the defendant was employed by the Armed Forces outside the United States, you do not have to find the defendant was an employee of, or otherwise worked for, the Department of Defense or any branch of the U.S. military. Rather, the government may prove that the defendant was employed by the Armed Forces by establishing that, [([A[)] the defendant was employed by a contractor, or an employee of a contractor (including a subcontractor at any tier) of any federal agency, and [([B[)], the defendant's employment related to supporting the mission of the Department of Defense overseas. When considering whether the defendant's employment related to supporting the mission of the Department of Defense, you should consider the following definition of those terms: [([A[)], the phrase 'relates to' means 'a connection with' or 'reference to' or 'having some purpose or effect' that is not merely the result of accident or coincidence; [([B[)], the term 'supporting' means to promote the interests or cause of something or someone; to help, to aid, or to assist. Therefore, in the context of this case, the phrase 'employment related to supporting' would include the employment of contractors or subcontractors of any federal agency whose employment in the Republic of Iraq at the time of the offense bears some relationship to supporting the mission of the Department of Defense in that country. Finally, when considering whether the defendant was a national of, or ordinarily resident [sic] in, the host nation, in this case Iraq, you may consider whether the defendant owed permanent allegiance to the Republic of Iraq, was a citizen of the Republic of Iraq, whether he ordinarily resided in the Republic of Iraq separate and apart from his employment.").

[186] "Blackwater" is short for Blackwater Worldwide, the private military company who employed Slatten and the other convoy members.

"the [C]ourt has broad discretion in deciding how to investigate such a claim"). In all the cases Slatten found where courts held a hearing to examine misconduct allegations, jurors submitted affidavits concretely attesting to credible misconduct. *See United States v. Boylan*, 898 F.2d 230, 257-58 (1st Cir. 1990) (holding a hearing after a juror contacted a defense attorney "complaining that the jury had been predisposed to find the defendants guilty" and that "a questionable magazine article had circulated in the jury room"); *Williams-Davis*, 90 F.3d at 495 (holding a hearing after four jurors and one alternate "gave affidavits after trial saying that the forewoman said that her husband told her to 'nail' the defendants"); *United States v. Edelin*, 283 F. Supp. 2d 8, 10-11 (D.D.C. 2003) (holding a hearing after a defense attorney was "approached at the dry cleaner by an alternate juror" who claimed a juror "had an inappropriate relationship with the Deputy Marshal in charge of the case," that the juror "revealed the tally of votes and the jury's split to the Deputy Marshal," and that "jurors improperly deliberated before being instructed," and another defense attorney "ran into" another alternate juror "at a community meeting" who corroborated the allegations). No case compels what Slatten calls for here: piling inference upon inference onto a third-party account looking for a whiff of misconduct. And this particular whiff is exceptionally fleeting: the day of the verdict, the Court excused the jurors before lunchtime, so the foreperson had all day to research the case before talking to the *Post*. Not that he or she would have needed it—a quick smartphone search while leaving the courthouse would have turned up more than enough information to deter the average person from publicly identifying themselves as a juror.[187] Absent any objective basis to infer the foreperson conducted outside

---

[187] Indeed, the *Post*, NBC News, the *Wall Street Journal*, the *Guardian*, and the *New York Times* all tweeted news of the verdict and accompanying background within hours—some within minutes—of it being read. *See, e.g.*, The Washington Post (@washingtonpost), Twitter (Dec. 19, 2018, 12:16 PM), https://twitter.com/washingtonpost/status/ 1075439711376778241; NBC News (@NBCNews), Twitter (Dec. 19, 2018, 2:28 PM), https://twitter.com/ NBCNews/status/1075472853376606208; The Wall Street Journal (@WSJ), Twitter (Dec. 19, 2018, 2:30 PM), https://twitter.com/WSJ/status/1075473373076090880; The Guardian (@guardian), Twitter (Dec. 19, 2018, 3:10

research during the trial, the Court presumes, as it must, the foreperson followed the Court's preliminary admonishment[188] and daily refrain[189] to the contrary. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

PM), https://twitter.com/guardian/status/1075483433219080192; NYT Politics (@nytpolitics), Twitter (Dec. 19, 2018, 6:41 PM), https://twitter.com/nytpolitics/status/1075536519333584896.

[188] *See* 11/5/18 PM Tr. 478:4–483:18 ("You may consider only evidence properly admitted in the case . . . . You're not permitted to discuss the case with anyone until the case is submitted to you for a decision at the end of my final instructions. This means that until the case is submitted to you, you may not talk about it, even with your fellow jurors. This is because we don't want you making any decisions until you've heard all the evidence or lack of evidence and my instructions on the law. In addition, you may not talk about the case with anyone else. It should go without saying you may also not write about the case electronically through any blog posting or any other communication, including social networking sites such as Facebook or Twitter or Tweeting or any of those things as we talked about the other day. Don't do them. Jurors get in more trouble with that silliness than any other thing and I'll tell you just don't do it. This is because you must decide the case based on what happens here in this courtroom, the evidence that we take here in this courtroom and not what someone may tell or not tell you outside this courtroom. . . . You must also warn people not to say anything to you or write anything to you about your jury service on the case and that includes face-to-face, phone, computer, and again Twitter, Tweet and all those things. I know at my age and some of you are a lot younger than me and you do that Twitter and Tweet, I don't do it, but in the age of electronic communication I must stress to you, do not use electronic devices or computers to talk about the case, including Twitter, Tweeting, texting, blogging, e-mailing, posting information on Website [sic] or chat room[s] or any other means at all. . . . Don't disclose thoughts about your jury service or ask for advice on how to decide the case. . . . You must decide this case based on the evidence, or lack of evidence presented in this courtroom according to the legal principles that I'll discuss with you in my final instructions. You're not permitted during the course of the trial to conduct any independent investigation or research about the case. That means, for example, you cannot use the Internet to do research about the facts or the law or the people involved in the case. Research includes something even simple, seemingly harmless such as using the Internet to look up the legal term or view a satellite photo of the scene of the alleged crime. Don't do it. Let me explain the reason why you should not conduct your own investigation. All the parties have a right to have the case decided only on the evidence or lack of evidence and the rules that they know about and that they have a chance to respond to. Relying on information that you get outside of the courtroom is unfair, because the parties would not have a chance to refute, correct, or explain it. Unfortunately, information we get over the Internet or from other sources may be incomplete, to say the least, or misleading, or just plain wrong. It's up to you to decide whether or not to credit any information presented here in the courtroom, and only information in court and evidence in court or lack of evidence may be considered. If evidence or legal information is not presented in court, you cannot rely on it. Moreover, if any of you do your own research about the facts of [sic] the law that may result in—it may result in different jurors basing their decisions on different information. Each juror needs to make his or her decision based on the same information, the same evidence under the same rules. In this case there may be reports in the newspapers or on radio or TV or the Internet concerning this case while the trial is going on. You must not read, listen to, or watch any such reports about this case because you must decide this case solely on the evidence or lack of evidence presented in this courtroom. This includes any coverage of the case on any electronic or social media, including blogs, chat rooms, Websites, Facebook, Twitter, or any media of any kind. If any publicity about this trial inadvertently comes to your attention during the trial, do not discuss it with jurors or anyone else. Let me or my clerk know as soon as after that as it happens so that I can briefly talk to you about it. If you happen to see something, set it aside, don't read it once you realize it might have any connection to this case. Just tell me about it so we can talk about it. After I submit the case to you, you may discuss it only when I instruct you to do so, and only in the jury room and only in the presence of all your fellow jurors.").

[189] *See, e.g.*, 12/6/18 PM Tr. 3948:11-14 ("Please don't discuss the case with anyone. Don't let anyone talk to you about the case. Don't Twitter or Tweet. Don't do any investigation of the case.").

Additionally, both sides speculate the foreperson was Juror 10, who during voir dire apparently admitted to vaguely recalling news reports about the Nisour Square incident, being familiar with overseas security contracting work, and having experience working closely with the State Department in the Middle East. *See* Gov't's Mem. Opp'n 67 n.14; *see also* Mot. New Trial 63. If true, the foreperson's reluctance to be identified publicly is even less surprising—if not predictable. And even if false, the foreperson still could have reasonably anticipated Slatten and his teammates were causes célèbres; veterans accused of war crimes frequently attract public acclaim. So at bottom, Slatten's juror misconduct allegation is so weak and speculative the Court need not entertain an evidentiary hearing, let alone a new trial.

## O. The government adequately disclosed classified information.

Notwithstanding the classified information the government already provided him, Slatten claims the government withholds additional details suggesting people in Nisour Square had ties to insurgent groups, hamstringing his ability to rebut evidence there were no mitigating circumstances.

That claim is overblown. In accordance with the Classified Information Procedures Act, 18 U.S.C. app. §§ 1–16, the Court reviewed the relevant intelligence ex parte and in camera and determined both that the summaries provided to Slatten sufficiently comported with due process, and also that further information would be neither relevant nor helpful to his defense. The Court affirmed that determination three times, *see* ECF Nos. 825, 1049, 1183, and does so again today. Slatten received classified information summaries to the extent required by law.

## III. Conclusion

For these reasons, the Court denies Slatten's motion for acquittal and his motion for a new trial. A separate order follows.

July 30, 2019

Royce C. Lamberth
United States District Judge