**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 14-107 (RCL)** |
| | : | |
| **v.** | : | |
| | : | |
| **NICHOLAS ABRAM SLATTEN** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR A NEW TRIAL**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to defendant Nicholas Slatten's motion for a new trial and his two supplemental memoranda (Dkt Nos. 1320, 1325, 1336) (collectively, the "Motion").

In his Motion, the defendant artificially inflates the significance of a single piece of "other crimes" evidence of a collateral incident occurring six days prior to the charged murder (*i.e.*, the "DART Incident")[1] to urge this Court to throw out a guilty verdict based on substantial and compelling proof of his guilt. The evidence concerning the DART Incident, however, represented an insignificant fraction of the overall record evidence. Indeed, it was introduced as just one of more than a dozen pieces of evidence demonstrating that the defendant premeditated the charged murder and acted with malice aforethought. And, in arguing the case, the government relied very little on the DART Incident to prove the elements of the crime.

The defendant claims that four documents regarding the DART Incident that were not produced prior to trial would have so substantially swayed the jury as to undermine confidence in

---

[1] "DART" is an acronym for Downed Aircraft Recovery Team.

the guilty verdict.   This argument is specious, especially because the core information in the four documents also appeared in documentation disclosed to the defendant long before trial and was materially consistent with the trial testimony.

The defendant fails to identify any "newly discovered evidence" that could possibly have resulted in an acquittal or undermined confidence in the verdict, as is his burden to do so.   *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004) (requiring a showing of "substantial and injurious effect or influence in determining the . . . verdict"); *United States v. (Sirocco) Johnson*, 592 F.3d 164, 170 (D.C. Cir. 2010) (newly discovered *Brady* evidence must "undermine confidence in the verdict").   The motion must be denied.

## FACTUAL BACKGROUND

**A.     The Fall 2018 Trial**

On December 19, 2018, a jury found the defendant guilty of murdering Ahmed Haithem Ahmed Al-Rubia'y by shooting him in the head while Al-Rubia'y sat in the driver's seat of his stopped car in Nisour Square, Baghdad, Iraq, on September 16, 2007, in connection with his role in a day of "human carnage" (Dkt No. 1304, Memorandum Opinion, at 4, *citing United States v. Slatten*, 865 F.3d 767, 824 (D.C. Cir. 2017) (Rogers, J., concurring-in-part and dissenting-in-part). In killing Al-Rubia'y, the defendant set the day's horrors into motion.[2]

---

[2]  The defendant was originally charged by indictment on December 4, 2008, but the United States later voluntarily dismissed that indictment without prejudice.   A second indictment was dismissed by the D.C. Circuit Court of Appeals as time-barred.   The third indictment, upon which the defendant stood trial on three separate occasions (twice found guilty, one hung jury), was returned by the grand jury on May 8, 2014.   *(Dkt No. 1304 at 4, n.5.)*

**General Background**

The trial lasted around six weeks in the fall of 2018, and included testimony from almost 30 government witnesses.  The Court examined the evidence in detail in its July 30, 2019 memorandum opinion, and concluded that "the record establishes [the defendant] committed each element of first-degree murder beyond a reasonable doubt" (Dkt No. 1304, Memorandum Opinion, July 30, 2019, at 5).

The overwhelming focus of the government's evidence at trial was on the defendant's role at the very outset of the horrific events of September 16, 2007, including: that the defendant was the Blackwater convoy's designated sniper; that the defendant was well-trained and equipped with his sniper rifle; that the Blackwater convoy (referred to during the trial by its team name of "Raven 23") brought all traffic to a complete standstill in Nisour Square, including a white Kia driven by Al-Rubia'y with his mother sitting in the passenger seat; that the defendant made a calculated choice to fire his sniper rifle at Al-Rubia's head, killing the innocent young man instantly; various evidence that collectively demonstrated beyond a reasonable doubt that it was the defendant who fired those first shots; the slow forward motion of the white Kia after its driver was killed; the hail of bullets and grenades, and the shouts of fear and the sight of death, that followed; and the macabre celebration carried out by the defendant and others in the aftermath of the horror (*see, e.g.*, Dkt No. 1304, Memorandum Opinion, at 7-12; Dkt No. 1257 at 2-6).  The evidence regarding September 16, 2007, included that there was no threat to the Blackwater convoy and no basis to fire a weapon in self-defense.  (Dkt No. 1304, Memorandum Opinion, at 13-14, n.17.)

**Premeditation and Malice Aforethought**

The government also presented evidence from numerous sources that the defendant acted with premeditation and malice aforethought; that he intended to kill and "deliberated – at least for a few seconds," before doing so (Dkt No. 1304, Memorandum Opinion, at 6).   This included the following categories of evidence and more:

*First*, the defendant was a highly-trained marksman and sniper employing a precision weapon, which he fired at the forehead of a human being from close range.   Such conduct forcefully demonstrated that he made a conscious decision to kill.

*Second*, the SR-25 sniper rifle required time and preparation to fire successfully, further reinforcing the defendant's intent in Nisour Square that day (Dkt No. 1304, Memorandum Opinion, at 72 (referencing testimony from a sniper training instructor, including the preparation and time needed to successfully fire a sniper rifle, to show that "the killing was planned and deliberate")).

*Third*, there was no threat to the Blackwater convoy in Nisour Square prior to the first fatal shots fired by the defendant (*id.* at 13-14, n.17), and the defendant consequently had time to pick his target, focus his attention, and scope his shot.

*Fourth*, the defendant "modified – or allowed someone else to modify – his gun before the shooting, changing it from a two-stage trigger (more accurate, but takes longer to fire) to a hair trigger (allowing for quicker and easier firing)" (*id.* at 25-26, n.60-61).

*Fifth*, the defendant described himself prior to the shooting as "well on his way [to] getting payback for 9/11," a statement indicating his "determination to kill Iraqis in a twisted hunt for

revenge" (*id*. at 24-25, n.59).

*Sixth*, the defendant expressed extreme animus towards Iraqi civilians prior to the shooting, describing them as "not worth anything, they are not even human, they are animals" (*id*. at 23, n.57).

*Seventh*, the defendant bragged in graphic terms about killing Iraqis prior to Nisour Square, including once describing that he had "turned one guy's head into a canoe," a phrase that was interpreted to mean "hollowing somebody's head out" (*id*. at 23-24, n.57).

*Eighth*, as the Blackwater convoy left the scene of the massacre, the defendant drew his teammates' attention to an unarmed man walking down the street, prompting the team leader to loudly shout, "Don't shoot, motherfucker" to the defendant (11/14/18 PM Tr. 1517-1518; 11/15/18 AM Tr. 1629-1632).  This exchange revealed concern on the part of the team leader that the defendant may have been inclined to kill another unarmed civilian who posed no threat.

*Ninth*, the defendant celebrated after the Nisour Square shooting by "high-fiving and back-slapping other team members" in a "defiant" and "chest-beating" display (Dkt No. 1304, Memorandum Opinion, at 23, n.54-55), showing boisterous satisfaction at the loss of life he had instigated.

*Tenth*, after the shooting, the defendant gloated that he had "popped [a man's] grape" (*id*. at 23, n.53), a vulgar turn of phrase revealing not just a lack of remorse for the senseless loss of life, but a desire to attract personal attention for his role.

*Eleventh*, the defendant privately "mused [that] something was wrong with him since he did not feel remorseful" after Nisour Square (*id*. at 23, n.56).

*Twelfth*, prior to September 16, 2007, the defendant "openly encourage[ed] teammates to shoot innocuous targets," and fired his weapon himself "without provocation on multiple instances" (*id*. at 24, n.58). For this last category of evidence of the defendant's mental state (firing his weapon without provocation, and encouraging teammates to do the same), the government presented evidence about several incidents that occurred in Iraq prior to the September 16, 2007, Nisour Square shooting.

First, Mark Mealy, a former Blackwater contractor and teammate of the defendant, testified that, while stuck in traffic on a bridge after a firefight near the Amanat City Hall in Baghdad, the defendant referred to a man on a roof and told Mealy to, "Shoot that motherfucker." (Dkt No. 1304 at 24, n.58; 11/26/18 PM Tr. at 2381.) Mealy did not oblige the defendant because the man on the roof merely had a "hose or a broom or something" in his hands, and Mealy "did not perceive him as a threat" (*id*.).

Second, Jeremy Ridgeway, a former Blackwater contractor and teammate of the defendant, testified that the defendant once referred to a shed near the Blackwater vehicle parking lot, and said, "If I was an armed insurgent, that's where I would attack us from, because they ha[ve] a clear view of our vehicles" (Dkt No. 1304 at 24, n.58; 11/27/18 PM Tr. at 2641). Ridgeway testified that the defendant said he "was going to shoot at [the shed] when [they] were exiting the facility and try to draw out any fire if there was anyone in there" (*id*.). The defendant went a step further and told Ridgeway to "fire along with [him]" (*id*.). Ridgeway testified that the defendant actually fired on the shed (nobody fired back), despite that there was no reason to do so (*id*., 11/27/18 PM Tr. at 2643).

6

Third, the defendant fired without provocation during an operation in which Blackwater and Army personnel sought to recover sensitive equipment in a downed Blackwater helicopter six days prior to the Nisour Square incident.   It is the evidence concerning this single incident, the DART Incident, to which the defendant artificially ascribes disproportionate weight and prominence, which forms the basis for the defendant's current motion for a new trial.

**The DART Incident**

Only two of the government's 28 witnesses provided brief testimony about the DART Incident: former Blackwater employees Matthew Murphy and Jeremy Ridgeway.   Their combined testimony totaled 446 pages, just 26 pages of which related to the DART Incident.   The DART Incident itself amounted to around one percent of the trial testimony.[3]

*Matthew Murphy's Testimony*

Murphy testified on direct examination about the DART Incident, explaining that a small Blackwater transport helicopter returning to Baghdad from the south "went down" in the week prior to the September 16, 2007, Nisour Square shooting.   (11/07/18 PM Tr. 995-996.)   When he testified, Murphy did not know whether the helicopter was "hit by ground fire . . . [or] if it had a mechanical failure . . .," but he knew that it "had to land."   (*Id.* at 996.)   Murphy flew to the site

---

[3] The testimony of the 28 government witnesses resulted in over 2,000 transcript pages, and the DART Incident was mentioned by only Murphy and Ridgeway in approximately 26 pages (approximately 1% of the total witness testimony).   Murphy testified over the course of three days totaling around 237 transcript pages (11/07/18 AM Tr. 907-953; 11/07/18 PM Tr. 977-1096; 11/13/18 AM Tr. 1169-1241), and he mentioned the DART Incident in approximately 12 pages. Ridgeway testified over the course of two days totaling around 209 transcript pages (11/27/18 PM Tr. 2625-2708; 11/28/18 AM Tr. 2744-2792), and he mentioned the DART Incident in approximately 14 pages.

of the downed helicopter with a Blackwater team to provide security so that sensitive items from the downed helicopter could be recovered.   (*Id*. at 996-998.)   In addition to Murphy, the Blackwater security team included the defendant, "Dave Bynum, who was temporarily filling in as a team leader that day," and several other personnel.   (*Id*. at 997.)

Murphy testified that there was already "an Army unit there, two vehicles there when we arrived."   (11/07/18 PM Tr. 998.)   The Blackwater security personnel "spread out in like a circle" and the defendant was in Murphy's "immediate vicinity[,]close enough to hear what [the defendant] was saying without straining."   (*Id*. at 998-999.)   Murphy described the location of the downed helicopter as "a very vulnerable spot.   We were out in an open area surrounded by buildings."   (*Id*. at 999.)   Murphy recalled that the defendant was armed with his SR-25 sniper rifle.   (*Id*.)

Murphy testified that he saw and heard the defendant fire his sniper rifle that day. (11/07/18 PM Tr. 999, 1022, 1025.)   When the prosecutor inquired "how that occurred," Murphy explained that the defendant "went from just kind of being on security like everybody to kind of hunkering down behind the rifle, getting in position to shoot, and he fired at least once.   I think he fired like twice to begin with."   (*Id*.)   The defendant then stated that "he shot at a guy in a window with a rifle, raising up with a rifle."   (*Id*.)   Murphy later clarified the language that the defendant had used: "He said there was a guy in the window raising up with a rifle in his hands." (*Id*. at 1000.)

The prosecutor inquired about Murphy's observations of the moments prior to the defendant taking these initial shots:

Q: Prior to Mr. Slatten, the defendant, shooting, had you heard any gunshots?
A: No.
Q: Incoming gunshots?
A: No.
Q: Did anyone else with either Raven 23 or the Army fire prior to the defendant?
A: No.

(11/07/18 PM Tr. 1000.)

Murphy testified that he "could see the building [the defendant had shot at], but not – [he] couldn't pick anything out" because of "the distance."   (11/07/18 PM Tr. 999-1000.)   After the defendant's shots, Murphy observed that "[b]asically, everybody fired at that same building."   (*Id*. at 1000.)   Murphy fired his weapon at the building as well, believing there was "a deadly threat in that building, and we were extremely vulnerable."   (*Id*. at 1000-1001.)   The basis of Murphy's belief in a deadly threat was "[b]ecause Slatten said there was."   (*Id*. at 1001.)[4]

Murphy then saw the Army officer "from that small unit . . . sp[eak] directly to [the defendant]."   (11/07/18 PMR Tr. 1001.)   Murphy could hear the conversation, and he testified that the defendant "directed the Army officer's attention to the building where he said he had seen the person with the rifle."   (*Id*.)   The Army officer then communicated with a helicopter overhead, and the helicopter "fired a Hellfire [air-to-surface] missile into a building."   (*Id*. at 1002.)   The defendant then said to the Army officer something along the lines of, "Not that building, the other one," and after additional radio communication, an air-to-surface missile was

---

[4]  Murphy was not asked (on direct or cross-examination) whether: (1) there were armed Iraqi individuals in the area; (2) there had been any shots fired prior to his arrival at the downed helicopter site; or (3) the downed helicopter site received any incoming fire after the defendant and then "[b]asically everybody" fired at the building.

fired by a helicopter "into the other building." (*Id*. at 1002-1003.) The two buildings struck by the missiles were "directly adjacent to each other." (*Id*. at 1003.)

Finally, Murphy described the concerning statement made by the defendant after the downed helicopter mission (*i.e.*, the DART Incident) was complete. Murphy testified that back in the International Zone, "other guys on the team who hadn't gone with [them]" to the downed helicopter site had brought pizza. (11/07/18 PM Tr. 1004.) While eating the pizza, the defendant said, "A guy was raising up . . . *like* he had a rifle in his hands." (*Id*.) (emphasis added). In Murphy's view, "there's a big difference between a guy in a window with a rifle overlooking you and a guy in a window without a rifle overlooking you." (*Id.*)

*Jeremy Ridgeway's Testimony*

Ridgeway testified on direct examination about the DART Incident, explaining that some weeks prior to the Nisour Square incident, his team had been "ordered to go to the airport and board a helicopter because another one of our helicopters had been shot down" (11/27/18 PM Tr. 2643-44). Ridgeway testified that "we were going to secure the helicopter and retrieve passengers," but then elaborated that he was "not sure what we were doing" because he could not remember. (*Id*. at 2644.) Ridgeway recalled that the defendant participated in the operation that day, and that the Blackwater team traveled to the recovery site in another helicopter. (*Id*.)

Upon arriving at the downed helicopter recovery site, the Blackwater team "formed a perimeter around the helicopter, or that area . . . [f]or security." (11/27/18 PM Tr. 2644.) Ridgeway was positioned next to the defendant, and the two of them had a conversation. (*Id*. at 2644-45.) The defendant said to Ridgeway that "if he was the shooter that shot down the

10

helicopter – I think it was those words – that he would have – he would be from that building."
(*Id*. at 2645.)   Ridgeway testified that the defendant "even pointed out the window" where he
believed the shooter would have been located, but Ridgeway explained that he was not "100
percent sure" about that recollection.   (*Id*.)   The defendant said to Ridgeway that he was "going
to fire on the building, and when he does, that [Ridgeway] should fire along with him."   (*Id*.)
Ridgeway agreed with the prosecutor's inquiry that the defendant's statement was "[k]ind of
similar to the shed situation" (discussed above, where the defendant had fired at a shed near the
Blackwater parking lot because, in the defendant's words, "If I was an armed insurgent, that's
where I would attack us from").   (*Id*.)

     After the conversation, the defendant "did fire," and several members of the Blackwater
team, including Ridgeway, fired after the defendant.   (11/27/18 PM Tr. 2645.)   Afterwards, the
defendant said to the team that he had seen "someone taking aim at us through the window," and
that is why he had fired.   (*Id*. at 2645-46).   Ridgeway testified that the military was present and
also opened fire after the defendant fired, using armored vehicles and air assets.   (*Id*. at 2646.)
The building was, "for the most part . . . destroyed."   (*Id*.)

     On cross-examination, Ridgeway testified that the DART Incident occurred on September
10, 2007 (six days prior to the Nisour Square shooting).   (11/28/18 AM Tr. 2760.)   Ridgeway
agreed that the Army was already at the site of the downed helicopter when the Blackwater security
team arrived.   (*Id*.)   Ridgeway was asked by defense counsel whether he had previously told the
FBI "that the Army was firing before [his] Blackwater team was involved in the incident," and
Ridgeway did not deny having made that statement ("I guess not.   I mean, it's in here [the

interview summary report], so . . .").[5]   (*Id.* at 2761.)

Also on cross-examination, Ridgeway testified that the building at which the defendant had fired was located several hundred meters away, and that the defendant's weapon had a high-powered magnification scope that was not present on Ridgeway's weapon.   (11/28/18 AM Tr. 2762.)   Ridgeway agreed with defense counsel that "immediately after [the defendant] fired his weapon, other gunfire erupted" and that the Blackwater team "began taking incoming fire from insurgents from that same building or around that building . . ." (A. "Yes, sir.").   (11/28/18 AM Tr. 2762.)   Ridgeway also agreed with defense counsel that the Army has "pretty good optics" and that "Army tanks and Apache helicopters also fired on the buildings" (*Id.* at 2763).   Finally, Ridgeway agreed with defense counsel's "recap of the incident" that (1) "insurgents shot down a helicopter" (A. "Yes, sir"); and (2) "there was a hostile two-way engagement between insurgents on the one hand and Blackwater and the Army on the other" (A. "Yes, sir").   (*Id.*)

On redirect examination, Ridgeway testified that the Blackwater security team ("you guys") was not receiving fire prior to the defendant taking his shot.   (11/28/18 AM Tr. 2788.)

**Opening Statements and Closing Arguments**

The government's opening statement on November 5, 2019, comprised 52 transcript pages and specifically discussed the DART Incident in just six sentences adding up to around one-half of a page of transcript.[6]   The prosecutor introduced this evidence by describing it as one of "a couple of instances where [the defendant] showed that he wanted to bring lethal force to bear when

---

[5] Defense counsel interrupted the witness with a new question and did not allow Ridgeway to complete the sentence.   (11/28/18 AM Tr. 2761.)
[6] This was less than 1% of the government's opening statement.

it was not authorized, when there was no provocation" (11/05/18 AM Tr. 489, 495):

> One instance you'll hear about is when he and his team members went out to a field.   An Army helicopter had gone down, there was sensitive equipment there.   They had been brought to surround the helicopter and they were providing security.   He was laying down, he looked at a distant building, and he would say out loud, I see someone with a rifle in this distant building, this window.

> Now his teammates can't see that, but the defendant will fire his weapon, his teammates, based on his word and his actions, will do the same thing, only to find out after the fact from him that he had only seen a man raising up his arms in the window.   He will after the fact leave out the most important fact that he had previously said existed, which is that the man had a rifle and was honing in on the team on the ground.

(11/05/18 AM Tr. 496-496.)

After also describing the similar evidence about the defendant's conduct (1) on the bridge, and (2) at the shed (11/05/18 AM Tr. 496-497), the prosecutor characterized these three occasions as "instances . . . of aggression . . . where there was no reason to act, no provocation whatsoever, and that will be important for you to understand when you assess this man's conduct in Nisour Square on September 16, 2007" (*id*. at 497).

The prosecutor concluded the opening statement by urging the jury to focus its attention on the events of September 16, 2007, and specifically the defendant's role in instigating the mass killing: "We're providing you all this other information because *we think you need it on the periphery*, but look at chapter 1, look at the acts committed in the first minute or so when they were in the circle, because what you will conclude at the end of the day . . . is that [the defendant] murdered Ahmed Rubia'y, not out of fear for his own safety or the safety of the convoy, but out of prejudice and hatred" (11/05/18 AM Tr. 536) (emphasis added).

The defendant's opening statement addressed the DART Incident as well, as part of his

13

chronology meant to emphasize the dangers for United States personnel in Iraq (as defense counsel put it, "the most dangerous place in the world"), where, "almost everyone is trying to kill you" (11/05/18 PM Tr. 586-590):

> Monday, September 10, 2007, a Blackwater helicopter is shot down.  Nick and his teammates are a part of the rescue mission.  They arrive by aircraft.  They set up a 360-degree perimeter around the aircraft and its passengers to protect them.  Army, Apache helicopters, and Raven 23 members, including [the defendant], fire into a building where insurgents had been seen.  Sometimes the enemy can be almost invisible.

(*Id*. at 589.)

The government's closing argument comprised 60 pages of transcript, and the prosecutor addressed the facts of the DART Incident in slightly more than one page of transcript (12/11/18 AM Tr. 4184-85).[7]   The prosecutor introduced the downed helicopter evidence by reminding the jury about the various "specific incidents where [the defendant] either takes unprovoked shots where no threat is present, or he urges other people to do that" (*id*. at 4183), including the incidents at the shed (*id*.), and on the bridge (*id*. at 4185).   The prosecutor relayed the general facts about the DART Incident, including that the defendant fired a shot, and then claimed that he had seen an insurgent with a weapon raised towards them (*id*. at 4184).   The prosecutor specifically discounted that the defendant had anything to do with the Army's decision to fire missiles at the building that the defendant and others had fired at: "[L]et me be clear.   There's no evidence that there was any communication [sic] between what he said and what the Army did, but that's the sequence of events is, after Raven 23 starts firing, the Army then fires as well."   (12/11/18 AM Tr. 4184.)   The prosecutor then addressed how the defendant later changed his story about seeing

---

[7] This was less than 2% of the government's closing argument.

a weapon, telling teammates that he just saw a man raising his arms (*id.*).

Without mentioning the DART Incident specifically, the prosecutor later said that the defendant "initiated shootings without provocation" in a summary of some of the evidence that the defendant acted with malice aforethought (12/11/18 AM Tr. 4233). And near the end of the closing argument, the prosecutor referenced various pieces of evidence that the defendant acted with intent to kill:

> You know that this man, with this rifle, decided to take Ahmed's life for no reason, for his misguided notions of revenge, for his hatred of Iraqi people, and decided to take that shot, like he had taken unprovoked shots in the past. . . . And maybe, just maybe, if you're looking at a human being through this scope, it is even easier to make somebody be less than human.

(*Id.* at 4236.)

The defendant addressed the DART Incident in his closing argument by emphasizing the evidence that the Blackwater security team came under fire:

> [A] helicopter had been shot down by insurgents, and the Raven team and the Army were both firing into buildings in a two-way firefight. Not out there innocently picking off innocent civilians, but a two-way firefight where it started with a helicopter being shot down by insurgents.

(12/11/18 PM Tr. 4349-50.)

In its rebuttal argument, the government briefly mentioned the DART Incident to make the point that the defendant's SR-25 sniper rifle sounded different than the M4 assault rifle used by other members of the Blackwater team, and more broadly stated that the defendant had "tried to

instigate these deadly force incidents before."   (12/11/18 PM Tr. 4372, 4391.)[8]

## B.  Information about the DART Incident Disclosed Prior to Trial

The government produced to the defendant significant material regarding the DART Incident prior to the trial, including at least the following.

### Incident Report -- September 10, 2007

A Blackwater "Incident Report" dated September 10, 2007 ( attached as Exhibit A), was produced on or around February 13, 2009.   The Incident Report provided a synopsis of the DART Incident as follows:

> On 10 Sep 07 at approximately 1545 Raven 23, a Downed Aircraft Recovery Team (DART) was providing support for a downed RSO [Regional Security Officer] Air Asset. While providing security for the recovery of aircraft equipment *the team and supporting U.S. Army units were engaged with SAF* [small arms fire] *from various locations surrounding the crash site*.   Clearly identifying the sources of the SAF, members of the DART, along with members of the Army ground support units, returned fire to suppress the attack.   Additional engagement of the threat was conducted by U.S. Army attack aviation.   There were no injuries to CoM[9] or US Army personnel.

(Exhibit A (emphasis added).)

The Incident Report further noted that the "[c]ontractor [i]nvolved" was "Blackwater," that the incident occurred "12.9 miles southeast of LZ Washington," and that the report was released by the "RSO TOC Commander" named Anthony Sanganetti, who we understand was employed by Blackwater at the time.   (Exhibit A.)

---

[8]  This was less than ½ of a page of the 39-page transcript of the government's rebuttal argument (12/11/18 PM Tr. 4370-4409), or approximately around 1% of the total.
[9]  "CoM" or "COM" is an acronym for "Chief of Mission" and refers to personnel or assets belonging to the U.S. Ambassador – *i.e.*, the Department of State.

**Spot Report – September 10, 2007**

A Blackwater "Spot Report" dated September 10, 2007 (attached as Exhibit B)  was produced on or around February 13, 2009.   The Spot Report included the government seals from the Department of State and its Diplomatic Security Service, but stated that it was drafted by an individual named Darren Hanner ("RSO TOC Watch Officer, Baghdad"), who was employed by Blackwater at the time.   The Spot Report included a summary of events from the perspective of the downed helicopter and its occupants:

> On 10 September 2007 at 15:05 hours, two COM air assets were en route from Al Hillah to the International Zone (IZ) with sixteen COM personnel.   They were *engaged by insurgents with a rocket propelled grenade* (RPG) twelve miles to the south of the IZ. One aircraft, carrying eight personnel, was struck in flight by the RPG and forced to make a hard landing.   All COM personnel were cross loaded into the other aircraft and flown to the IZ without further incident.   Additional COM air assets flew back to the crash site and recovered all sensitive items, with *direct support from U.S. military air and ground forces*. Only one COM person was injured during the incident, having incurred a minor laceration.

(Exhibit B (emphasis added).)

The Spot Report went on to describe the actions taken by the Blackwater Regional Security Office:

> The RSO TOC monitored and directed assets for assistance.   Fire and medical personnel were staged at LZ Washington.   U.S. Army was notified for fire support and safe extraction of all COM personnel if necessary.   The damaged aircraft was not recoverable and subsequently destroyed in place by the U.S. military.   DS/CC was notified.

(Exhibit B.)

**After Action Report – September 11, 2007**

An "After Action Report" ("AAR") dated September 11, 2007 (attached as Exhibit C) was produced on or around February 13, 2009.  The After Action Report, a "Blackwater USA" document, described the "[w]eapons [d]ischarge" that occurred on September 10, 2007, at "1538 hours."   The AAR was authored by Blackwater contractor David Bynum, who was identified as the "Team Leader/Medic" of the Blackwater security team.  (Exhibit C at 1.)  The AAR described the incident as "a small arms engagement with hostile forces" at the crash site of a Blackwater aircraft (Exhibit C at 1).   Blackwater personnel involved in the incident were identified as including the defendant, Murphy, Ridgeway, Bynum, two former co-defendants Evan Liberty and Paul Slough, Tommy Vargas, Adam Frost, Jeremy Krueger, and Dean Wagler, among others (*id.*).

The AAR reported that at "approximately 1500 hours," the Blackwater security team learned that a Blackwater aircraft had crashed, and that there would be a "Downed Aircraft Recovery Team ('DART') mission."   (Exhibit C at 1.)  After the team leader (Bynum) briefed the team on topics like "rules of engagement, firearms policy, escalation of force," etc., the team members were flown to the crash site on helicopters (*id.*).   Upon arrival, "the team formed a 360 degree outer perimeter around the crashed aircraft" (*id.*).   The AAR stated that the Blackwater team was not alone – also located at the crash site were "several US Army personnel in HMMWV's, a Bradley Armored Fighting Vehicle, and Army Attack Helicopters circling above assisting with site security."   (*Id.*)

The AAR reported that "Army personnel advised the team to watch *for suspicious activity*

18

*occurring in the tree line located on the southwest side of the site*" (Exhibit C at 1 (emphasis added).)   There were "[t]wo clusters of buildings" near the crash site – "[t]he first set was approximately 550 yards to the southwest . . . and the second was over 1200 yards to the west" – and "[a] tree line separated the two clusters of buildings."   (*Id.*)

The AAR explained the basis for the "suspicious activity" warning delivered by the Army. "Shortly after arriving on location[,] Army assets were observed in a firefight around the buildings located over 1200 yards to the west of the crash site."   (Exhibit C at 1.)   An Army Captain informed the Blackwater team, as detailed in the AAR, that "*several armed subjects in civilian clothing were seen running toward the* [other set of] *buildings located to the southwest*" (*id.* (emphasis added)).   The Army Captain stated that "Army attack helicopters [had] engaged the subjects; however, they [the Army] believed *several of the armed subjects made it through* to the buildings located at the southwest" (*id.* (emphasis added)).

The AAR then provided several details about the defendant's personal observations, thoughts, and actions once he arrived at the crash site:

> After several minutes on the ground, [the defendant] observed, through his scoped SR-25 rifle, several armed men in civilian clothing enter the buildings located toward the southwest.   [The defendant] observed one of the men enter a building and appear in a window with what appeared to be a scoped rifle.   [The defendant] advised all of the team members of his observations while closely watching the subject with the scoped rifle in the window.   [The defendant] observed the subject present the scoped weapon pointing it in the direction of the team apparently about to fire.   Fearing for the lives of himself and his team, [the defendant] fired his Department of State SR-25 rifle at the suspect at which time the hostile suspect dropped out of site and did not appear again.

(Exhibit C at 1.)

The AAR described what occurred immediately after the defendant fired his weapon:

19

Almost simultaneously, *the team began receiving small arms fire* from windows and rooftops of the buildings to the southwest, at ground level in a grassy area, and from the tree line.  All DART personnel repositioned in a line on the southwest except for PSS Kruger who remained to cover the rear with an Army HMMWV and MRAB Mine-sweeping vehicle. . . . *DART and Army personnel continued to receive small arms fire* from the above mentioned locations.  Fearing for their lives and the lives of the team, all team members except Krueger returned accurate fire at visible threats using their Department of State issued M240 Machine guns, M249 machine guns and SR-25 scoped rifle. Additionally, the Army engaged the same targets with their Bradley 25mm main gun and 50 caliber machine guns.  A US Army Captain met with DART personnel and advised he was calling in an air strike.  A short time later, the Army attack helicopters attacked the enemy firing positions stopping the threat.

(Exhibit C at 2 (emphasis added).)

The AAR reported that there were no injuries to any members of the Blackwater security team (Exhibit C at 2).  After the downed helicopter was "sanitized," first the air mechanics and crew members were flown away on helicopters, and then around ten minutes later the Blackwater team was flown away on helicopters.  The AAR concluded by stating that "[a]ll command members were later apprised of the complete details of the incident" (*id.*).

[SEALED INSERT #1]

**Murphy Interview Report – September 2, 2009**

Murphy provided information about the DART Incident to law enforcement, including an FBI interview on September 2, 2009 (attached as Exhibit D).  According to the FBI interview report, Murphy said that "[a] crowd had gathered" at the site of the downed helicopter, "*and the Army fired warning shots*" (Exhibit D at 7) (emphasis added).  The FBI interview report says that Murphy heard the defendant announce that he "saw a man with a scoped rifle in a nearby building"

20

and that the defendant "subsequently fired at him" (*id.*).   Murphy "could see the building but not the man [the defendant] was referring to because Murphy did not have a scope" (*id.* at 7-8). Murphy described the sound made by the defendant's rifle.   He reported that when the team returned after the incident, the defendant said that he had shot a person "raising up like he had something in his hands," a statement that made Murphy "suspicious of [the defendant's] motives" (*id.* at 8).   According to the interview report, Murphy said that the Blackwater shift leader at the time (recorded by the FBI as "Dave Binem") was not present when the shooting occurred, and that Murphy did not know whether the incident "was written up" (*id.*).

### Ridgeway Interview Report – December 1, 2008

Ridgeway provided information to law enforcement about the DART Incident, including an FBI interview on December 1, 2008 (attached as Exhibit E).   The interview report states that Ridgeway "did not see anyone in the window, but at the time he did not doubt [the defendant]." (Exhibit E at 13.)   According to the interview report, Ridgeway stated that he "believed that *the US Army was firing prior to his convoy's involvement*" (*id.* (emphasis added)).

### Ridgeway Interview Report – November 29, 2012

Ridgeway also provided information to law enforcement about the DART Incident to the FBI on November 29, 2012 (attached as Exhibit F).   According to the interview report, Ridgeway stated to the FBI that a helicopter had gone down one or two weeks prior to the Nisour Square shooting, and his Blackwater security team went to the crash site to assist.   Ridgeway stated to the FBI that "[t]he U.S. Army was already on the scene and there was a crowd forming to the west of the team's location" (Exhibit F at 4).   The interview report states that the defendant "told

Ridgeway there was a shooter in the crowd and gave Ridgeway a wink and a nod" (*id.*).   Ridgeway reported that the defendant "expected Ridgeway to shoot . . . [but] Ridgeway did not shoot because he did not see anyone."   According to the interview report, Ridgeway explained that he and a number of other team members "did . . . provide suppressive fire towards a small building in the area," and that suppressive fire ("a high volume of rounds shot on a specific area to keep the enemy down") "was not permitted in the Blackwater rules of engagement" (*id.*).   Ridgeway told the interviewers that "he should not have laid down the suppressive fire and it was wrong of him to do so" (*id.*).

### Ridgeway Grand Jury Testimony – May 9, 2013

Ridgeway testified in the grand jury on May 9, 2013 (portions of the transcript attached as Exhibit G).   Ridgeway testified that a Blackwater helicopter "had crashed," and though he wasn't sure of the reason for the crash, he recalled that the helicopter had been "receiving fire."   (Exhibit G at 41.)   Ridgeway testified that "the Army, U.S. Army, was there[,] . . . provid[ing] security until we could arrive" (*id*. at 42).   Ridgeway explained that the Army's "explosive ordinance team was . . . working on a – from my understanding, an IED [improvised explosive device] in that vicinity of where the crash site was . . ." (*id*.).   Ridgeway was "part of the team that went in to provide security and get the passengers out of the area and [to] destroy the helicopter if need be" (*id*.).

Ridgeway testified that the defendant "told [him] that he saw a combatant, an armed combatant, in a building approximately 200 meters, maybe 300 meters, . . . he gave me a kind of a wink and a nod . . . [h]e had told me that . . . again, this is my interpretation, that there wasn't

anything there, that he was going to fire on that building" (Exhibit G at 42).   Ridgeway did not see any targets in that building (*id.*).

### Murphy Prior Trial Testimony - 2014 and 2018

Murphy testified about the DART Incident at both of the prior trials – the initial trial in 2014 and the first retrial in 2018 (portions of the transcripts are attached as Exhibit H (2014) and Exhibit I (2018)).

At the first trial in 2014, Murphy testified on direct examination that a Blackwater helicopter had "made a kind of rough but controlled landing," and that he did not know whether it was "mechanical failure or if [the helicopter] was actually shot down."   (Exhibit H, 06/30/14 PM Tr. 98.)   The Blackwater security team "took up position" in "[k]ind of a perimeter type of thing," and Murphy described that they were "very vulnerable . . . in an open field surrounded by buildings . . . [and] there was a sniper threat."   (*Id*. at 99.)   Murphy testified that the defendant "had the scope on his rifle and he said there's a guy in the window [of a building] with a rifle."   (*Id*. at 100.)   The building was described as more than 300 yard away, "far enough away that [Murphy] could not make out any . . . distinguishing anything on the building," and he "never saw a person in a window."   (*Id*. at 100-102.)   Murphy was asked, "who among the team was the first to fire at the building," and he replied that it was the defendant.   (*Id*. at 101.)   Murphy was also asked whether he "received any incoming fire," and he replied, "Not to my recollection.   I mean, we may have, but I don't remember."   (*Id*. at 102.)   Murphy also described the comments the defendant made later, that the defendant "saw a guy raising his hands up" rather than saw a rifle. (*Id*.)

On cross-examination at the 2014 trial, Murphy testified that the U.S. Army had informed Blackwater that the Army had "seen armed men in the area already," and that Murphy understood there were "[a]rmed men" in the area.   (Exhibit H, 07/02/14 AM Tr. 36-37.)   Murphy agreed with defense counsel that the defendant could see further than Murphy, because the defendant had a "sniper rifle with the optics on it" (*id*. at 38).   Defense counsel asked whether there was a "firefight" after the defendant fired a shot, and Murphy replied, "I don't know if it's fair to call it a firefight, but there was gunfire," including weapons fired by the Army   (*Id*. at 39.)   Defense counsel asked whether "the enemy [was] fighting back," and Murphy did not deny it but explained that he did not observe any fire (*id*.).

On direct examination at the first retrial in 2018, Murphy relayed similar testimony, including that "there was a military unit already on scene" when the Blackwater security team arrived.   (Exhibit I, 07/09/18 PM Tr. 1632.)   Murphy testified that an Army officer told the team that before the team arrived, "there had been people approaching the helicopter," and that Murphy "believe[d] he said they saw weapons."   (*Id*. at 1632-33.)   Murphy explained that there were a "wide range of potential threats," but he did not see a "specific threat."   (*Id*. at 1633.)   After the defendant fired the first shot, "a number of [others] fired towards the building that [the defendant] was firing at," and the order of who fired weapons was, "[f]irst, us; then the Army."   (*Id*. at 1635.)[10]

**Ridgeway Prior Trial Testimony – 2014 and 2018**

Ridgeway also testified about the DART Incident at the two prior trials – the first trial in

---

[10] The defendant did not inquire about the DART Incident during Murphy's cross-examination at the first retrial in 2018.

2014 (portions of transcript attached as Exhibit J) and the first retrial in 2018 (portions of transcript attached as Exhibit K).

At the first trial in 2014, Ridgeway testified on direct examination consistent with his other statements, including that the defendant said, "if he was an insurgent," he "would have shot that helicopter down from that building."   (Exhibit J, 07/30/14 PM Tr. 72.)   The defendant said that "he was going to draw out fire from that building" (*id*.).   On cross-examination, Ridgeway affirmed that the defendant had told the team members that, prior to firing, he saw a potential target in the building pointing a weapon at the team (*id*., 07/31/14 PM Tr. 67-68).   Ridgeway also testified that the team "did receive some incoming fire . . . shortly after" the defendant fired his weapon.   (*Id*., 07/31/14 PM Tr. 68-69.)   Ridgeway also testified at the first retrial on July 23, 2018, that the team took "incoming fire" from in or around the building the defendant had fired at. (Exhibit K, 07/23/18 PM Tr. 3565.)

**C.   The Defendant's Request for a New Trial**

**Motion for a New Trial (Slide Presentation) – August 27, 2019**

The defendant filed a motion for a new trial on August 27, 2019, around 13 days after he was sentenced.   The motion alleges that the defendant obtained newly discovered evidence about the DART Incident and that, had the evidence been known earlier, it would have probably resulted in an acquittal (Dkt No. 1320).

The motion for a new trial states that on August 12, 2019 (two days prior to his sentencing date), the defendant's sister received an e-mail message from a former Blackwater employee Darren Hanner.   (Hanner had drafted the September 10, 2007, Spot Report, Exhibit A, discussed

above and previously disclosed to the defendant in 2009).   The defendant's motion states that Hanner's e-mail included as an attachment a 29-page slide presentation titled "412 Incident 10 Sep 07."   This slide presentation (attached here as Exhibit L) forms the basis of the defendant's August 27 request for a new trial.   (Dkt No. 1320.)    The presentation contains the following information about the DART Incident:

First, the slide presentation contains a map purporting to show "recent activity and threats" in the Baghdad area (Exhibit L at 4).

Second, there is a timeline purporting to provide a statement of the events that day, including that the helicopter was "down" at the time of 1505, and that the site was "receiving small arms fire" at the time of 1718 (Exhibit L at 6).

Third, the slide presentation includes a written statement of events purportedly provided by a Blackwater helicopter pilot involved in the incident named Anthony Acosta.   Acosta's statement includes that there was "minimal threat at crash site" even after the helicopter went down and its personnel were flown away (Exhibit L at 7).   Acosta's statement describes that two other helicopters subsequently flew to the crash site "to insert security team first with a maintenance team to follow . . ." (*id*.).

Fourth, the slide presentation includes an "after action report" purportedly written by the team leader of the Blackwater security team, David Bynum.   The language used is identical to the AAR discussed above (Exhibit C) and previously produced to the defense in discovery.

Fifth, the slide presentation includes various maps and photographs of the downed helicopter site, providing a "sequence of events" (Exhibit L at 10-23).   One of the photographs

includes text that the downed helicopter "perform[ed] a hard landing" (*id*. at 15).   A subsequent

photograph includes stating:

> While mechanics are attempting to recover any salvageable equipment, Ground assets are
> engaged by Anti-Iraqi Forces (AIF) from the southwest . . . . Both US MIL and RSO assets
> return fire.   AH-64 fires missiles, rockets, and cannon into building occupied by AIF.

(*Id*. at 18.)   (This is the first mention in the sequence of events of any fire directed at the military

or the Blackwater security team.)

Sixth, the slide presentation includes some photographs of the downed helicopter site

(Exhibit L at 20-23).

Finally, the slide presentation includes two "additional statements" made by individuals

who were not at the scene of the DART Incident, but instead were in a tactical operations center

at the Regional Security Office.   The first statement was purportedly made by a Blackwater

operations chief named Kurt Scheuermann (Exhibit L, 25-26), and the second statement by an

Army employee named Joseph M. Huston (*id*. at 27-29).

The statement from Scheuermann includes that he learned one of the Blackwater

helicopters had "gone down", and that he asked Huston to contact other relevant parties.

Scheuermann reported that the second of the two helicopters (the one that was not downed) arrived

back at the International Zone and off-loaded the personnel and items that were recovered.

Subsequently, two helicopters with mechanics on board "departed LZ Washington to pull security

and over watch on the crash site."   (Exhibit L at 25.)

Scheuermann's statement goes on to say that he spoke with a "Maj. Schwartz," who was

described as the "Joint Operations Commander . . . in charge of the Battalion who owned the battle

27

space."   The statement does not state that "Maj. Schwartz" was personally at the site of the downed helicopter.   Schuermann reported that Schwartz told him that the area was "too hot" and he "didn't want his people sitting out there that long."   (Exhibit L at 25.)   Later:

> Maj. Schwartz called back and said his troops on the ground were 'taking IDF' and wanted to know what our plan of action was.   I told him we were flying mechanics out to recover as much of the aircraft as possible; this may require a few trips.

(*Id.* at 26).[11]

Scheuermann's statement then describes a third conversation with "Maj. Schwartz": "Maj[or] Schwartz called and advised that his troops and the RSO assets on the ground were taking small arms fire (SAF) from a nearby building and attack aircraft were engaging."   (*Id.*)

Huston's statement includes that his base was notified of a downed aircraft at around 1505 (Exhibit L at 27).[12]   At around 1513, Huston spoke by phone with the "Battle Space owner" and asked if that person's command "would be able to offer any assistance or ground support" (*id.*). At 1514, Huston informed the "Battle Space owner" that the personnel on board the downed aircraft "had been evacuated" (*id.*).   At around 1532, Huston "received a call" from a "Major Schwartzman, asking [Huston] what the situation was" (*id.*).   (This exchange makes clear that Major Schwartzman, like Huston, was not at the scene of the downed helicopter.)   At 1536,

---

[11] Scheuermann's statement does not specify *when* his troops were "taking IDF", or whether it was before or after the Blackwater security team arrived.   As discussed above, the slideshow separately indicates at page six that the Blackwater security team was already at the site of the downed helicopter while "personnel [were] on route for equipment recovery" (Exhibit L at 6). The Acosta statement at page seven also confirms this: "[a] new flight of two 412s . . . departed LZ Washington for crash site to insert security team first with a maintenance team to follow" (*id.* at 7).

[12] All references are to 24-hour military time.

Huston received a call from the Battle Space owner "informing [Huston] that he had personnel en-route to the crash site, and they may already be there."   (*Id*. at 28.)   At 1559, the Battle Space owner "called to say his units were on the scene" (*id*.).

Huston's statement includes that at around 1630, 1653, and 1716, Major Schwartzman "called back to ask if they could blow [the downed helicopter] up yet, that it was getting dangerous for his men to be on the scene much longer and that there was confusion as to when they were supposed to blow it up."   (Exhibit L at 29.)   At around 1737, Huston told Major Schwartzman by phone "that the Department of State needed approximately 3x to 4x more runs to finish . . ." (*id*.).

Huston's statement says that Major Schwartzman called again at 1759 and "said that his people were taking fire."   (Exhibit L at 29.)   (This is the first indication in the Huston statement that there was incoming fire at the site of the downed helicopter.)   Huston asked Major Schwartzman "if it was Small Arms or Indirect Fire," and Major Schwartzman replied, "I don't give a shit what kind of fire it is."   (*Id*.)   The Regional Security Officer then told Major Schwartzman to "go ahead and blow it [the downed helicopter] and get out of the area."   (*Id*.)

### Defendant's First Supplemental Memorandum (Blackwater Teletype Event Report) – September 17, 2019

On September 17, 2019, the defendant filed a supplemental memorandum in support of his motion for a new trial (Dkt No. 1325).   This first supplemental memorandum states that another former employee of Blackwater – an individual named Charles Rolling – contacted the defendant's sister by e-mail.   According to the first supplemental memorandum, Rolling participated in the DART Incident as a mechanic.   (Dkt No. 1325 at 2.)   The first supplemental memorandum states that Rolling then sent to defense counsel a document with the title: "(NON-COMBAT EVENT)

ACCIDENT RPT BY BLACKWATER-65: 2 CIV WIA 3 AIF KIA" ("Blackwater Teletype") (attached here as Exhibit M).   (*Id.*)   The defendant argues in the first supplemental memorandum that the Blackwater Teletype was not produced prior to trial and that this alleged failure deprived the defendant of a fair trial (*id.* at 5).

The Blackwater Teletype does not purport to state who wrote it, whether that person worked for the United States government, or if so with what agency; instead, the Blackwater Teletype states in the title that it is "BY BLACKWATER".   (Exhibit M at 1.) Among other information, the Blackwater Teletype states the following:

> 1506: BIG GUNS REPORTS DOWNED A/C ZONE 68. C/S: BLACKWATER . . .
>
> 1513: BG70/76 REPORT THAT ALL SUVIVORS HAVE BEEN PICKED UP BY WINGMAN (BW54) AND ARE ENROUTE TO ZN 1 W/ BG AS ESCORT. . . .
>
> 1517: 1-15 IN SCOUTS BEGINS MOVEMENT TO THE CRASH SITE.
>
> 1518: BW54 ARR WASHINGTON LZ . . .
>
> 1526: 1-15 IN SCOUTS ARRIVES ON SITE.   BLACKWATER HELOS ALSO ON SITE. . . .
>
> 1547: VIPER 54 REPORTS BLACKWATER IS SENDING A HELO TO RECOVER EQUIPMENT FROM DOWN HELO.   WHEN THAT IS COMPLETE EOD WILL CONT. DET. IN PLACE. . . .
>
> 1655: 1-15 IN SCOUTS REPORT SAF FROM THE EAST OF THEIR POSITION AT DOWNED HELO SITE.
>
> 1658: 1-15 IN SCOUTS TALKS VIPER 54 ONTO THE POSITION OF SAF.
>
> 1700: VIPER 54 OBS ARMNED LN.

1703: VIPER 54 ENGAGES POSITION (MB 59295 71107) 2 X HELLFIR ROCKETS AND 150 RDS 30MM AND 4 RKTS.

1704-V54/V55 ENGAGED A BUILDING AT GRID MB 5936 7144 W / 2 HF AND 150 RDS 30MM AND 4 RKTS

GROUND UNIT AT DOWNED HELO SITE WAS TAKING FIRE FROM BUILDING. BUILDING IS DAMAGED AND ON FIRE. GROUND UNIT REQUESTS THAT VP54/55 DESTROY BUILDING.

1729: BLACKWATER PERSONNEL BEGIN EXFIL.

1735: CONTROL DET COMPLETE.

(Exhibit M at 1-3).   The Blackwater Teletype nowhere indicates that (1) the Army received incoming fire before the Blackwater security team arrived; or (2) the Army observed armed individuals inside any buildings, including any buildings located to the west and southwest of the downed helicopter.

### Defendant's Second Supplemental Memorandum (Witness Statements) – December 2, 2019

Though the defendant's filings raised no new, material information about the DART Incident, the government nonetheless initiated a search in Department of Justice files for the two documents at issue: the 29-page slideshow and the Blackwater Teletype.   This included a search of voluminous electronic case files maintained by the United States Attorney's Office for the District of Columbia ("USAO-DC"), as well as voluminous paper files maintained by the USAO-DC, including those provided by members of other Department of Justice litigating components that had earlier had some responsibility for the criminal investigation of the Nisour Square

shooting incident and/or related litigation on *Kastigar* issues.[13]   The FBI conducted a search of its holdings related to the investigation, and was unable to locate either the slideshow or the Blackwater Teletype.

We also asked the Department of State to search its files for those same materials and other documents pertaining to the September 10, 2007, DART Incident.   The Department of State searched various locations, including Embassy Baghdad, the collected holdings of Blackwater files kept at the Bureau of Diplomatic Security, and the Office of the Legal Advisor.   The Department of State forwarded to us all material that it located regarding the DART Incident.

On November 12, 2019, we produced to defense counsel the materials that the Department of State located as part of this search effort.   These materials included a 29-page slide presentation that is very similar to the slideshow that the defendant attached to his initial motion for a new trial, with minor differences in language that do not appear relevant to the issues in dispute (attached here as Exhibit N).   The Department of State did not locate the Blackwater Teletype in any of its files.

Among other materials, the documents that we produced on November 12, 2019, also included witness statements purportedly signed by Murphy and Ridgeway on September 11, 2007, describing the DART Incident using language identical to the AAR discussed above.   (Attached here as Exhibit O (Murphy) and Exhibit P (Ridgeway)).   The government also produced witness statements from other Blackwater personnel who were at the downed helicopter site – Tommy Vargas, Adam Frost, Joseph Baggott, Evan Liberty, Dean Wagler, Freddie Ortiz, Paul Slough.

---

[13] *Kastigar v. United States*, 406 U.S. 441 (1972).

(Together, these statements are attached as Exhibit Q.)The witness statements each included language that they were "made in furtherance of an official administrative inquiry" and the witness' understanding that "neither [his] statements nor any information or evidence gained by reason of [his] statements can be used against [him] in a criminal proceeding," with some exceptions.   (Exhibits O, P, at 1.)   The witness statements ended with language that the witnesses "hereby swear or affirm that the information contained in this statement is the truth to the best of [their] knowledge."   (*Id*. at 3.)   As noted, the description in each witness statement of the DART Incident was identical to the language of the AAR that was produced to defense counsel in 2009.

On December 2, 2019, the defendant filed a second supplemental memorandum in support of his motion for a new trial (Dkt No. 1336), arguing that the Murphy and Ridgeway witness statements also require a new trial.

### Additional Information on Blackwater Witness Statements

The Murphy and Ridgeway witness statements, along with those signed by Vargas, Frost, Baggot, Liberty, Wagler, Ortiz, and Slough, produced on November 12, 2019, all use language to describe the DART Incident that was identical to the language used in the AAR that we produced in 2009.   It is not merely that the statements borrowed certain turns of phrase; these individuals signed the exact same statement.   (*Compare* Exhibits C, O, P, Q.)

**[SEALED INSERT #2]**

As is apparent, the various Blackwater personnel who signed these statements mirrored Blackwater's official narrative of the DART Incident as reflected in the AAR, but were not purporting to detail their own personal observations of the event.   For example, the Blackwater

personnel signed statements acknowledging observations the defendant claimed to have made ("Nicholas Slatten observed, through his scoped SR-25 rifle, several armed men in civilian clothing enter the buildings located toward the southwest . . ."), but transparently did not make the observations themselves.

Blackwater personnel have also acknowledged in testimony that similar witness statements could not be relied upon as accurately setting forth the events that had occurred.  Ridgeway testified that he was "not truthful" in his post-Nisour Square statement to the Department of State because "what [he] did was wrong" (11/27/18 PM Tr. 2690-99).  Ridgeway also acknowledged amending his statement in untruthful ways after reviewing it with Blackwater supervisors (*id*.). A Blackwater team leader named Jimmy Watson testified at the first retrial that he was untruthful with the Department of State regarding Nisour Square in order to minimize paperwork (07/18/18 AM Tr. 2960-61).  And Murphy testified at the first retrial that he gave only a limited report to the Department of State about Nisour Square because his Blackwater leadership instructed him "[s]tick to what you did, stick to your actions" (07/10/18 AM Tr. 1745-77).

**Additional Information on the Government's Search for Documents**

We have taken numerous steps to examine the allegations made in the defendant's motion and supplemental memoranda, including but not limited to a thorough review of electronic and paper case files in the possession of the USAO-DC.

Our investigation has not identified information indicating that the four specific documents at issue in the motion to dismiss – the slide presentation, Blackwater Teletype, and the Murphy and Ridgeway witness statements – were previously produced to the defendant by the government.

34

We located three of the four documents (slide presentation, and the two witness statements) in files of "prior incident reports" compiled in around 2009 by the "filter team" from the Department of Justice's National Security Division.   It appears that these files were produced to the National Security Division filter team by the Department of State in around 2009, in advance of the first *Kastigar* hearing before Judge Urbina.   These files were transferred from the National Security Division to the USAO-DC in around September 2012, almost three years after Judge Urbina's decision dismissing the case was reversed by the D.C. Circuit Court of Appeals, and before the first trial.   None of the USAO-DC trial teams were permitted access to these files, and we did not discover the slide presentation or the Murphy and Ridgeway witness statements at any time before the motion for a new trial.

We have not located the Blackwater Teletype in any files at the Department of Justice, and cannot state whether it is an authentic document.

The need for filter attorneys (first an attorney from the Department of Justice's Criminal Division, then attorneys at the National Security Division, and subsequently at the USAO-DC) stemmed from the decision made by the Department of State to compel members of the Blackwater security team to provide statements immediately after the Nisour Square shooting on September 16, 2007.   Well before the Department of Justice could make a considered decision about whether to grant immunity to any Blackwater employee, members of Raven 23 gave "written sworn statements about the incident to [the State Department], . . . us[ing] a standard form that included a guarantee that the statement and the information or evidence derived therefrom would not be used in a criminal proceeding against the signer."   *United States v. Slough*, 36 F. Supp. 3d 37, 42

35

(D.D.C. 2014).   The sworn statements were subsequently leaked to the media and covered by multiple news sources.   *Id.*   The Department of State's decisions in Iraq in 2007 created challenges for the Department of Justice in investigating and prosecuting the heinous crimes that occurred in Nisour Square while also ensuring that the defendant's and his co-defendants' constitutional rights against compelled self-incrimination were protected.   As the Court put it in 2014, "[i]f the Department of State and Diplomatic Security Service had tried deliberately to sabotage this prosecution, they could hardly have done a better job."   *Id.* at 57.

The filter team at the National Security Division functioned to prevent evidence potentially derived from a defendant's compelled statement from being disclosed to the trial team, and to handle related *Kastigar* litigation.   The National Security Division filter team did not forward the slide presentation or the witness statements to the trial team, and it appears that it also did not disclose the materials to defense counsel.   We understand that in 2009, the National Security Division filter team was primarily focused on the *Kastigar* hearing before Judge Urbina that fall, and on making appropriate disclosures relevant to that hearing.   The case did not proceed to trial for many years after, because Judge Urbina dismissed the indictment on December 31, 2009.

When the case was remanded from the D.C. Circuit Court of Appeals, the USAO-DC assembled new trial teams and filter teams.   The USAO-DC filter team functioned to safeguard the defendants' constitutional rights by reviewing information for any possible taint "before passing it on to the trial team."   *Slough*, 36 F. Supp.3d at 42.   The filter team also conducted interviews of every witness "to ensure that the trial team was not exposed to any potentially tainted testimony."   *Id.*   These processes continued in connection with the retrials in 2018, and the

USAO-DC filter team reviewed large numbers of documents in an effort to ensure that discovery obligations were met and potentially tainted information was not disclosed to the trial team.

We have no information suggesting that the USAO-DC filter team ever located and reviewed the slide presentation or the witness statements at any point prior to the filing of the motion for a new trial; USAO-DC did not knowingly withhold any of these materials.   The USAO-DC filter team frequently searched for information when requested by the trial team, but did not hunt for information independently so as to avoid any suggestion that trial strategy was in any way derived from compelled testimony.

One additional point bears noting.   Blackwater produced to the government in 2008 several of the various reports concerning the DART Incident, including the AAR, the Spot Report, and the Incident Report.   Blackwater also produced to the government a 29-page document (the same number of pages as the slide presentation) titled BLACKWATERDCGJ 005898.   We are unable to view the document, as an error message notes that "the file appears to be damaged, corrupted, or is too large."   We located the original compact disc produced by Blackwater in 2008, and the same error message prevents review of the document.   Blackwater's former counsel recently informed us that the document that was produced back in 2008 cannot be located, but that an internal production log referred to it as a "Powerpoint regarding 412 Incident, 9/10/07."   In 2008, when Blackwater possessed this slide presentation, it also had entered into a joint defense agreement with each of the other defendants.   The defendant, accordingly, may have had access to this document by virtue of that agreement.

**LEGAL STANDARDS**

### Rule 33(a) Motion for a New Trial

Federal Rule of Criminal Procedure 33(a) provides that a court "*may* vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a) (emphasis added). As is apparent from the language of Rule 33(a), "[t]rial courts enjoy broad discretion in ruling on a motion for a new trial." *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014). The broad discretion "extends to both the trial court's 'actual decision' and 'what [it] considers before making that decision.'" *Id.* (quoting *Gaither v. United States*, 413 F.2d 1061, 1078 (D.C. Cir. 1969)). Motions for a new trial under Rule 33(a) are "not favored and are viewed with great caution." *United States v. Blackthorne*, 378 F.3d 449, 452 (5th Cir. 2004). The term "interest of justice" is not defined in the rules, but the D.C. Circuit has held that granting a motion for a new trial is "warranted only in those limited circumstances where 'a serious miscarriage of justice may have occurred.'" *Id.* (quoting *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990)). A new trial should be granted "only in the extraordinary circumstances where the evidence preponderates heavily against the verdict," *Rogers*, 918 F.2d at 213 (internal quotations and citations omitted), and where there is a serious danger that "an innocent person has been convicted," *United States v. Borda*, 786 F. Supp. 2d 25, 32 (D.D.C. 2011) (quoting *United States v. Wilkerson*, 656 F. Supp. 2d 22, 28 (D.D.C. 2009)). The Court may "weigh[] the evidence and evaluate[] the witnesses' credibility" in deciding whether a serious miscarriage of justice may have occurred. *Rogers*, 918 F.2d at 213 (citing *Tibbs v. Florida*, 457 U.S. 31, 38 (1982)).

"Defendants bear the burden of proof under Rule 33 to demonstrate that a new trial is warranted." *Borda*, 786 F. Supp. 2d at 31-32 ("the burden of proof that a new trial is justified

rests with the appellant . . .") (citing *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982) ("the burden of proof that a new trial is justified rests with the appellant . . .")).   "Unless an error, defect, irregularity, or variance affects a defendant's substantial rights, it shall be disregarded."  *Id*. (citing *United States v. Lawson*, 494 F.3d 1046, 1053 (D.C. Cir. 2007)).   Where substantial rights are adversely affected, a new trial is not warranted unless an error had a "substantial and injurious effect or influence in determining the . . . verdict."  *Id*. (citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004)).   The government bears the burden of proving the absence of such a substantial and injurious effect.  *Id*. (citing *United States v. Smith*, 640 F.3d 358, 366 (D.C. Cir. 2011)).   District courts may consider a variety of factors in determining whether any purported error caused harm, including, among others: "(1) the closeness of the case; (2) the centrality of the issue affected by the error; and (3) the steps taken to mitigate the effects of the error."  *United States v. Khatallah*, 313 F. Supp. 3d 176, 187 (D.D.C. 2018) (citing *United States v. Moore*, 651 F.3d 30, 51 (D.C. Cir. 2011)).

When the motion is based upon purported newly discovered evidence, a defendant must establish each of five requirements to justify a new trial:

> (1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) [it must be] of such nature that in a new trial it would probably produce an acquittal.

*United States v. Johnson*, 519 F.3d 478, 487 (D.C. Cir. 2008) (quoting *United States v. Lafayette*, 983 F.2d 1102, 1105 (D.C. Cir. 1993)) (alteration in original).

**Claim of a *Brady* Violation**

A new-trial motion predicated upon an alleged *Brady* violation[14] "present[s] something of a special situation."   *See United States v. Orouche*, 484 F.3d 590, 595 (D.C. Cir. 2007).   *Brady* requires the government to disclose, upon request, "material evidence favorable to a criminal defendant," and the duty to disclose "includes both exculpatory and impeachment evidence held by law enforcement officials."   *United States v. Emor*, 573 F. 3d 778, 782 (D.C. Cir 2009). "There are three components of a true *Brady* violation: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued."   *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).   To satisfy the prejudice component, the withheld evidence must be "material"; that is, there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

In further defining the *Brady* materiality standard, the D.C. Circuit has stated that, "[a] 'probability' reaches the level of 'reasonable' when it is high enough to 'undermine confidence in the verdict.'"   *United States v. (Sirocco) Johnson*, 592 F.3d 164, 170 (D.C. Cir. 2010) (citations omitted).   The mere fact that undisclosed evidence has some probative value, however, is insufficient.   *United States v. Agurs*, 427 U.S. 97, 109-110 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial," is insufficient).   And, a new trial *Brady* claim must be rejected where a defendant "fail[s] to demonstrate that [the claimed *Brady* evidence] 'could reasonably be taken to

---

[14] *Brady v. Maryland*, 373 U.S. 83 (1963).

put the whole case in such a different light as to undermine confidence in the verdict.'" *Emor*, 573 F.3d at 784 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)); *see also Youngblood v. West Virginia*, 547 U.S. 869, 870 (2006) (same); *Strickler*, 527 U.S. at 290 (same).   Indeed, "the omitted evidence [must] create[] a reasonable doubt that did not otherwise exist[.]" *Id.* at 112.[15] Only if the defendant establishes that the government failed to disclose "material" evidence is he is entitled to a new trial.   *Kyles*, 514 U.S. at 421-22.

**Claim of a *Napue* Violation**

A *Napue* violation [16] occurs "when the government introduces false or misleading testimony or allows it to go uncorrected, even though the government knew or should have known that the testimony was false."   *United States v. Straker*, 800 F.3d 570, 603 (D.C. Cir. 2015).   The burden of establishing false testimony is on the defendant, and "[i]f a defendant makes that showing, a new trial is required if there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"   *Id.* (citing *United States v. Gale*, 314 F.3d 1, 4 (D.C. Cir. 2003)).   In other words, any purported false evidence "must also be material to justify a new trial."   *United States v. Ausby*, 916 F.3d 1089, 1092 (D.C. Cir. 2019).   The "burden of proving materiality lies with the defendant," and requires proof that any false testimony "reasonably could have altered the outcome of the case, thereby undermining confidence in the jury's guilty verdict." *Id.* at 1092-93.

---

[15] The D.C. Circuit has observed that reversal is warranted only where "[d]isclosure of [the *Brady* material] would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *(Sirocco) Johnson*, 592 F.3d at 171 (quoting *Kyles*, 514 U.S. at 441).

[16] *Napue v. Illinois*, 360 U.S. 264 (1959).

**Claim of a Jencks Act Violation**

The Jencks Act requires the government to disclose any prior "statement" in its possession made by a prosecution witness that "relates to the subject matter as to which the witness has testified."  18 U.S.C.§ 3500(b); Fed. R. Crim. P. 26.2.  The statute defines a "statement" to include "a written statement by said witness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e).  A violation of the Jencks Act is subject to harmless error analysis.  *See, e.g., Emor*, 573 F.3d at 786 ("In short, [the defendant] has failed to show that disclosure of the [Jencks material] would have affected the trial's outcome, and therefore any error in failing to produce [it] after his testimony on direct examination was harmless").

## ARGUMENT

The DART Incident comprised a tiny fraction of the evidence at trial.  The incident occurred a week before the charged Nisour Square shooting, and was only one of several "other crimes" incidents properly admitted under Rule 404(b), to help establish that the defendant had acted with premeditation and malice aforethought in committing the murder.   The DART Incident was collateral to the charged murder of Mr. Al-Rubia'y and, like the various other "other crimes" evidence, the jury could properly consider it (or not) in deducing the defendant's state of mind on September 16, 2007.   As such, contrary to the defendant's exaggerated claims, the DART Incident was not "key to the government's case" (Dkt No. 1320 at 15), much less "relied heavily" upon and "featured prominently" by the government to prove the murder charge (*Id.* at 1, 3).   The four documents that the defendant relies upon in support of his request for a new trial were not material; the evidence contained in the documents is consistent with the trial testimony about the DART Incident and there is therefore no reason to believe that these documents could possibly have

42

impacted the outcome of the trial.   The interest of justice does not remotely require a new trial, and the defendant's motion must be denied.

## A.   There Was No *Brady* Violation

Most of the information concerning the DART Incident that the defendant claims is newly-discovered was previously disclosed and known to him.   Any undisclosed new information is immaterial and its absence at trial resulted in no prejudice to the defendant.   There was accordingly no *Brady* violation to justify a new trial.

### The DART Incident Was a Very Small Part of the Government's Evidence, and The Evidence of Malice and Premeditation Was Overwhelming

Not surprisingly, the vast bulk of the evidence at trial pertained to the events of September 16, 2007, the date on which the defendant perpetrated the murder.   (*See supra* at 2, Dkt No. 1304, Memorandum Opinion, at 7-23.)   The evidence of what occurred in Nisour Square ranged from the defendant's role and extensive training as the sniper in an armed Blackwater convoy, to the operation of an SR-25 sniper rifle, to the defendant's calculated choice to pull the trigger with no threat present, to the various pieces of evidence that collectively demonstrated it was the defendant who fired those first shots, and to the deadly consequences that the defendant set in motion.   This evidence of what happened in Nisour Square was alone sufficient to prove all the elements of first-degree murder, as it proved that the defendant (a highly-trained marksman operating a precision weapon) aimed and fired a bullet into the head of an innocent human being without provocation.

The government presented numerous other examples of the defendant's "malice" and "premeditation."   This evidence included the "hair-trigger" modification to the sniper rifle, the defendant's pre-Nisour Square statements about wanting revenge, the defendant's animus towards

Iraqi civilians, his graphic boasting about killing, and the defendant's post-Nisour Square celebrating and bragging.  (*See supra* at 3-5, Dkt No. 1304, Memorandum Opinion, at 23-26). Included in this evidence were several different examples of instances prior to September 16 where the defendant fired without provocation or encouraged his teammates to do the same – and the DART Incident was just one of those examples.  *See United States v. Douglas*, 482 F.3d 591, 597 (D.C. Cir. 2007) ("Intent and knowledge are . . . well established non-propensity purposes for admitting evidence of prior crimes or acts.") (citations and quotations omitted).

All in all, the DART Incident was around 1% of the trial testimony, and it was addressed briefly by just two of the government's 28 witnesses (*see supra* at n.6).   As explained above, the minor nature of this evidence was reflected in the government's opening statement and closing arguments, where discussion of the DART Incident constituted around 1%-2% of the total addresses.[17]   One could not reasonably conclude (as the defendant urges) that this evidence was critical to the outcome or that it "featured prominently" (Dkt No. 1320 at 3) in the government's case.

The evidence was relevant, and that is why the government introduced it.   But even if there was no mention of the DART Incident, the trial would still have included overwhelming evidence that the murder was premeditated and done with malice, and the outcome would not have been different.   *See, e.g.*, *United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir. 1999) (in assessing

---

[17]  The defendant emphasizes that the prosecutor used the word "important" in opening statement, but this was in referencing all three instances of the defendant's conduct prior to Nisour Square not just the DART Incident (11/05/18 AM Tr. 496-497), and the term "important" was used to explain *why* we introduced the "other crimes" evidence (to "assess this man's conduct in Nisour Square on September 16, 2007").   In any event, all the relevant evidence was important.

whether new evidence is material, court must "evaluate the impact of the undisclosed evidence not in isolation, but in light of the rest of the trial record") (*citing Agurs*, 427 U.S. at 112); *Oruche*, 484 F.3d. at 597-601 (strength of overall evidence against defendant relevant in finding no *Brady* violation); *Butler v. Stephens*, 625 F. App'x 641, 655-56 (5th Cir. 2015) (unpublished) (finding allegedly suppressed material relating to witness testimony establishing defendant's culpability in other crimes used as aggravating factors in his sentence was not material for *Brady* purposes, where evidence defendant committed other crimes was strong).]"). "Even without the 404(b) evidence, . . . there was ample evidence establishing [the defendant's] knowledge of and intent to [commit the crime]. . . . Accordingly, . . . there is no reasonable probability the jury would have reached a different result with knowledge of the [alleged *Brady* material]." *United States v. Pettiford*, 627 F.3d 1223 (D.C. Cir. 2010)

### The Slide Presentation Is Not Material to the Defense

The vast majority of the information in the slide presentation is not "newly-discovered" and is entirely consistent with the information known to the defendant via pre-trial discovery and the evidence at trial.  And the defendant fails to identify anything exculpatory or impeaching (much less anything material) that would have helped him at trial.   Though it does not appear that the slide presentation was disclosed by the government prior to trial, the defendant presumably had independent access to it through former Blackwater contractor Darren Hanner.[18]   Moreover, the favorability of this evidence to the defense was, at best, slight, and there is no basis to conclude

---

[18]  Hanner, the individual who provided the slide presentation to the defendant's sister (Dkt No. 1320, Exhibit E) was a Blackwater contractor who was previously known to the defendant to have information about the incident because Hanner drafted and was identified in the "Spot Report" the government previously produced to the defendant (see Exhibit B).

that the evidence could have possibly resulted in a different verdict.   The defendant's motion for a new trial directs the Court to several portions of the slide presentation, none of which are helpful to him.

First, the defendant complains that the statements in the slide presentation "make clear that the Army arrived on the scene before the Blackwater [security team]" (Dkt No. 1320 at 8).   But this evidence was already clear at trial.   Murphy testified that when Blackwater arrived at the crash site, there was already "an Army unit there, two vehicles there when we arrived."   (11/07/18 PM Tr. 998.)   And Ridgeway agreed.   (11/28/18 AM. Tr. 2760.)

Second, the defendant argues that, at some point in time, the "Army officer in charge at the Joint Operations Center, Major Schwartz or Schwartzman, reported that 'the area was too hot and [he] didn't want his people sitting out there that long,' and that 'it was getting dangerous for his men to be on the scene much longer.'" (Dkt No. 1320 at 8-9.)   The statements to which the defendant refers (Exhibit L at 25, 29) do not suggest that personnel at the downed helicopter site had been fired on at the time the statements were made.   At trial, Murphy also described the location of the downed helicopter as "a very vulnerable spot," (11/07/18 PM Tr. 999), and Ridgeway did not deny having told the FBI that "the Army was firing before [his] Blackwater team was involved in the incident" (11/28/18 AM Tr. 2761).   Ridgeway also agreed at trial that "insurgents [had] shot down a helicopter", initiating the incident (11/28/18 AM Tr. 2763).   The fact that the downed helicopter site was a dangerous place is not material; the trial evidence was already clear about this point, and the general dangerousness of the location does not in any way rebut that the defendant fired without seeing an actual threat to the team.

In any event, the defendant possessed ample information at trial to further emphasize that the downed helicopter site was a dangerous place.   The defendant had: (1) Ridgeway's December 1, 2008, interview report, which stated that Ridgeway "believed the US Army was firing prior to his convoy's involvement" (Exhibit E at 13); (2) Ridgeway's grand jury transcript, in which he had testified that he believed there was an "IED" in the "vicinity of . . . the crash site" (Exhibit G at 41); (3) Murphy's prior 2018 trial testimony, in which he testified that, according to an Army officer, "there had been people approaching the helicopter," and that Murphy "believe[d] [the officer] said they saw weapons" (Exhibit I, 07/09/18 PM Tr. 1632-33); (4) Murphy's prior 2014 trial testimony, in which he testified that the U.S. Army had informed Blackwater that the Army had "seen armed men in the area already," that Murphy understood there were "[a]rmed men" in the area (Exhibit H, 07/02/14 AM Tr. 36-37); and a "sniper threat" (Exhibit H, 06/30/14 PM Tr. 99); and (5) Murphy's 2009 statement to the FBI, in which he told the FBI that a crowd had gathered "and the Army fired warning shots" (Exhibit D at 7).   The slide presentation merely contained cumulative evidence on these points.[19]

Third, the defendant complains that, according to the slide presentation, "Major Schwartz/Schwartzman reported that 'his troops on the ground were taking IDF [indirect

---

[19] Suppressed impeachment evidence is immaterial under *Brady* if, as here, the evidence is merely cumulative, or it impeaches on a collateral issue.   *See, e.g., Conley v. United States*, 415 F.3d 183, 189 (1st Cir. 2005) ("Suppressed impeachment evidence is immaterial under *Brady*, however, if the evidence is cumulative or impeaches on a collateral issue."); *Carey v. Terhune*, 42 F. App'x 26, 27-28 (9th Cir. 2002) (unpublished) (although prosecutor should have disclosed fact that it had contacted a witness favorable to the defense on a discrete issue, it was not material for *Brady* purposes, because it "was of both limited force and questionable admissibility, and bore only on a collateral and peripheral issue")

fire]'" . . . and that "[t]he TOC reported that the State Department was 'flying mechanics out to recover as much of the aircraft as possible.'"   (Dkt No. 1320 at 8.)   The statement the defendant refers to (Exhibit L at 25) does not indicate *when* the troops were taking indirect fire, whether it was before or after the Blackwater security team arrived; or who knew about or reported that information.[20]   But the evidence at trial was not disputed that "there was a hostile two-way engagement between insurgents on the one hand and Blackwater and the Army on the other" (Ridgeway, 11/28/18 AM Tr. 2762).   As Ridgeway testified, the whole incident began when insurgents shot down a helicopter (*id*.), further making it clear that there were armed, hostile individuals in the area.   Some additional evidence potentially suggesting that the Army was fired upon would have been entirely immaterial, and would not have advanced defendant's defense.[21]

        In any event, the defendant already possessed at trial significant information that he could have used to indicate that the Army came under fire at some point.   This included Murphy's September 2, 2009, interview report indicating that a "crowd had gathered" at the site of the downed helicopter, "and the Army fired warning shots" (Exhibit D at 7).   The Incident Report stated that "the team and supporting U.S. Army units were engaged with SAF [small arms fire] from various locations surrounding the crash site" (Exhibit A).   The AAR detailed that "Army assets were observed in a firefight" and that an Army Captain had reported to the Blackwater team that "armed subjects in civilian clothing were seen running toward the buildings located to the

---

[20]  The slide presentation separately makes clear that the Blackwater security team was at the site of the downed helicopter while mechanics were being flown there.   (Exhibit L at 6.)
[21]  The defense had access at trial to the AAR, which described that, "Shortly after arriving on location[,] Army assets were observed in a firefight around the buildings located over 1200 yards to the west of the crash site" (Exhibit C at 1).

southwest" (Exhibit C at 1).   The AAR was authored by Blackwater team leader David Bynum, an individual whom the defendant identified prior to trial as one of his potential witnesses. (Exhibit R, Defendant's Witness List, at 1.)   The defendant therefore could have called Bynum to testify about all the information contained in the AAR, if he believed (incorrectly) that the information would have been helpful to his defense.   *See Turner v. United States*, 137 S. Ct. 1885, 1894-95 (2017) (undisclosed impeachment evidence relating to eyewitnesses to charged crimes was not material for *Brady* purposes, because it was "largely cumulative of impeachment evidence petitioners already had and used at trial").

Fourth, the defendant describes the slide presentation as including that "Major Schwartz/Schwartzmann . . . called and advised, after the Blackwater team had arrived, 'that his troops *and* the RSO assets on the ground were taking small arms fire (SAF) from a nearby building *and attack aircraft were engaging*'" (Dkt No. 1320 at 9) (emphasis in defendant's motion).   The defendant also refers to a map attached to the slide presentation showing the direction of fire at the security team, from the southwest (*id.*).   But these slides are actually consistent with the undisputed evidence at trial: Ridgeway agreed with defense counsel that "immediately after [the defendant] fired his weapon, other gunfire erupted" and the Blackwater team "began taking incoming fire from insurgents from that same building or around that building . . ." (A. "Yes, sir.") (11/28/18 AM Tr. 2762).   Ridgeway also agreed that what happened was "a hostile two-way engagement between insurgents on the one hand and Blackwater and the Army on the other" (A.

"Yes, sir.") (*Id*.).[22]   Both Murphy and Ridgeway testified that an Army helicopter fired from the air as well (11/07/18 PM Tr. 1002-1003; 11/27/18 PM Tr. 2646).[23]

Fifth, the defendant draws the Court's attention to the Acosta statement (Exhibit L at 7) and points out that Acosta heard an announcement that the other helicopter was "going down" and that he saw the downed helicopter "lying on its side" (Dkt No. 1320 at 9).   But Murphy also described at trial that the helicopter "went down" (11/07/18 PM Tr. 995-996), and Ridgeway testified that it had been "shot down" by "insurgents" (11/27/18 PM Tr. 2643-44; 11/28/18 AM Tr. 2763).[24]

In sum, the slide presentation is not material, and would not have impeached the testimony of Murphy or Ridgeway, and thus was not admissible as impeachment evidence.   The significance of the DART Incident at trial was in the defendant's statements to teammates: that he fired his weapon after seeing "[a] guy rais[e] up . . . *like* he had a rifle in his hands" (11/07/18 PM Tr. 1004)

---

[22]  Murphy was not asked about whether there was incoming fire after the defendant took his shot, but at trial the defendant had access to Murphy's prior trial testimony, where he described that the team "may have" received incoming fire (Exhibit H, 06/30/14 PM Tr. 102), and that while it may not be "fair to call it a firefight, . . . there was gunfire" (*id*. at 39).

[23]  The defendant had access at trial to the AAR (and Bynum, its author), which stated that hostile fire came "from . . . the southwest" after the defendant fire his shot (Exhibit C at 2).

[24]  Anthony Acosta was a Blackwater contractor at the time of the DART Incident.   Upon information and belief, the defendant has had relatively easy access (although sometimes through counsel) to then current and now former Blackwater personnel since the outset of this investigation and could have readily identified Acosta and other Blackwater personnel based on documentation previously produced by the government or provided to him by Blackwater.   As to Acosta, his account indicates that he was only present at the scene at the time the helicopter went down and reported that event (ECF 1320 Exhibit E); he does not appear to have been present when the defendant and other Blackwater personnel arrived on the scene and engaged the building to the southwest of the downed helicopter.

(emphasis added), and after speculating that "if he was the shooter that shot down the helicopter . . . he would be from that building" (11/27/18 PM Tr. 2645).   In other words, the defendant claimed that he fired at something other than a visible threat, *i.e.*, without provocation.   Nothing in the slide presentation sheds further light on this part of the event or the defendant's role in it.   And Bynum's "after action report," the narrative of which the slide presentation incorporates verbatim (Exhibit L at 8-9), was already available to the defendant at trial (Exhibit C).

For these same reasons, there is no basis for the defendant's allegation of a *Napue* violation, that the government "used false testimony" to obtain a conviction.   There was nothing false in Murphy's or Ridgeway's testimony about the DART Incident, and the slide presentation does not suggest in any way that there was.

The defendant's real complaint appears to be with statements made by the government in closing argument, that there were "specific incidents where [the defendant] either takes unprovoked shots where no threat is present, or he urges other people to do that" (Dkt No. 1320 at 16).   But the prosecutor's statements in closing were entirely supported by the evidence.   There were various incidents, besides the DART Incident, where the defendant took such unprovoked shots, including the downed helicopter and the mechanic shed incident.   And, the defendant urged another team member (Mark Mealy) to do so at the bridge incident as well.[25]   Thus, additional evidence about the DART Incident, even if admissible, would not have changed the prosecutor's ability to make these arguments.   The defendant was free to argue that there were indeed threats

---

[25] The defendant complains that the prosecutor argued in closing that the defendant "struck first at the incident" (citing 12/11/18 AM Tr. 4184), but the transcript does not support this allegation.

present, and he did so in his closing argument: "[A] helicopter had been shot down by insurgents, and the Raven team and the Army were both firing into buildings in a two-way firefight" (12/11/18 PM Tr. 4349-50).

Even if the slide presentation had been disclosed prior to trial, it could not have impacted the trial evidence in a material way because it was inadmissible.   As previously explained, the presentation was not admissible as impeachment evidence.   Nor does the presentation fall within any of the exceptions to the rule against hearsay.   Contrary to the defendant's claims, he could not have called Huston, Scheuermann, and/or Schwartz/Schwartzmann to testify at trial (Dkt No. 1320 at 16-17), as these individuals were not at the site of the downed helicopter and could not have provided eyewitness testimony as to what occurred there.[26]   The presentation is not admissible as a present sense impression exception, where the putative witnesses did not experience an event, and where there was no "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it," Fed. R. Evid. 803(1)).

---

[26] Defendant's assertion that he was unaware of these individuals until he received the slide presentation is belied by the discovery record and his independent and easy access to former Blackwater personnel.   Blackwater "RTOC Commander" Tony Sanganetti, the individual who notified Blackwater Operations Chief Scheuermann of the incident (Exhibit L at [pages]), was the Blackwater contractor who authored the previously produced "Incident Report" and was therefore known to the defendant at trial.   Scheuermann, like Sanganetti and Acosta, was also a Blackwater contractor.   According to the slide presentation, Huston was present in the Tactical Operations Center with Scheuermann and simply overheard or facilitated communications between Scheurmann and Schwartz/Schwartzmann (ECF 1320 Exhibit E), and therefore was also a hearsay witness, at best.   And, although it appears that defendant did not know of Schwartz/Schwartzmann before receiving the slide presentation, like Scheurmann and Huston, Schwartz/Schwartzmann was not present at the scene.   Rather, he was commanding the Joint Operations Center and coordinating the overall response by military personnel (ECF 1320 Exhibit E).

The defendant also incorrectly argues that he could have introduced the slide presentation as an "agency record" under Federal Rule of Evidence 803(8), as an exception to the rule against hearsay (Dkt No. 1320 at 16).   He presents nothing supporting his view that the collection of hearsay statements contained in the slide presentation would qualify as "a record or statement of a public office [of] its activities" concerning "a matter observed while under a legal duty to report . . . ."   *See* Fed. R. Evid. 803(8); *see also United States v. El–Mezain*, 664 F.3d 467, 497–507 (5th Cir. 2011) (holding reports inadmissible under Rule 803(8) absent information as to "where or how [the declarant] obtained the information," the "circumstances under which the documents were created, the duty of the authors to prepare such documents, [or] the procedures and methods used to reach the stated conclusions"); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 571 (E.D.N.Y. 2012) (finding official reports of the Israeli Security Agency inadmissible under Rule 803(8) because, inter alia, they relayed "information of uncertain provenance").   Furthermore, the defendant offers no information about when the individual statements were provided for compilation, who authored the documents, or when they were compiled.   *Gilmore v.Palestinian Interim Self-Gov't Auth.*, 53 F. Supp. 3d 191, 203 (D.D.C. 2014), *aff'd,* 843 F.3d 958 (D.C. Cir. 2016) ("[W]ithout knowing anything about the source of the information the Court cannot conclude that it sets out matters personally observed . . . no less one with a 'legal duty to report,' or factual findings from a legally authorized investigation.").

Finally, the defendant speculates that he could have "identif[ied] other participants in the incident" to testify (Dkt No. 1320 at 16), but he has failed to do so (even now, more than seven months after receiving the slide presentation).   Speculative evidence is not sufficient to meet the

burden on a motion for a new trial.  *Agurs*, 427 U.S. at 109-110 (mere possibility of admissible evidence insufficient); *Cf. Bradley v. Nagle*, 212 F.3d 559, 567 (11th Cir. 2000) (affirming denial of 2255 motion predicated on claimed late "*Brady*" disclosure of various items of hearsay indicating that someone other than the defendant killed the victim because defendant "present[ed] only speculation that he would have uncovered any admissible evidence" from the hearsay leads). Nothing prevented the defendant from further investigating the DART Incident over the last 12 years.  He knew of and identified as defense trial witnesses numerous individuals who participated in and therefore had first-hand knowledge of the event, including Bynum, Tommy Vargas, Evan Liberty, Dean Wagler, and Paul Slough.  Tellingly, he called none of these witnesses to testify at trial.

### The Blackwater Teletype Is Not Material to the Defense

The Blackwater teletype, which was not found in the government's holdings, is not material.  On the face of the document, it appears that Blackwater created the Blackwater Teletype.  Like the slide presentation, the information contained in the Blackwater Teletype is largely consistent with the evidence known to the defendant before trial and the evidence presented at trial.  The favorability of any additional evidence contained in the report to the defendant appears slight at best, and the defendant fails to establish anything material to his defense.  As we have noted, the Blackwater Teletype was not suppressed, as the government has seen no information that it was in possession of the document.  Additionally, nor did the Department of State possess the Blackwater Teletype, and we cannot confirm whether the document is authentic.

But even if the document had been suppressed, it would present no basis for a new trial under *Brady*.

The defendant argues that one line of the Blackwater Teletype demonstrates that "the Army Apache helicopters also reported seeing armed local nationals in the building – just as [the defendant] had said in real time" (Dkt No. 1325 at 5-6) (arguing that the report constitutes "powerful corroboration of [the defendant's] contemporaneous statement (*id.*)).   Not surprisingly, however, the defendant misinterprets the report in a light most favorable to his argument.

First, the language of the Blackwater Teletype does not indicate that armed insurgents actually entered the particular building the defendant fired at first, much less that one presented in a window of that building and took aim at personnel at the downed helicopter site before the defendant fired.   Instead, the report states that, five minutes *after* small arms fire was reported from "east" of the downed helicopter site (*i.e.*, at 1700 hours (5:00 p.m.)) (a time when, by all accounts, the Blackwater security team was present): "VIPER 54 OBS ARMNED LN" (Exhibit M at 3).   There is no suggestion in this ambiguous language of exactly *where* armed people were observed, much less that they were observed in a specific building.   Then, the report indicates that the Army fired upon two separate clusters of buildings in the area of the downed helicopter.   First, at 1703 hours (5:03 p.m.), Army helicopters and personnel fired at a cluster of buildings at one military grid location (see 1703 entry referenced "MB 59295 71107") (Exhibit M at 2).   Second, at 1704 hours (5:04 p.m.), Army helicopters and personnel engaged a second cluster of buildings at another grid location (see 1704 entry referencing "Grid MB 5936 7144"), followed by an explanatory notation of "Ground Unit at downed helo site was taking fire from building, building

55

is damaged and on fire. Ground unit request that VP54/55 destroy building". Contrary to the defendant's interpretation, the Blackwater Teletype suggests only that Army elements observed armed local nationals in the general area of the downed helicopter site and engaged two separate clusters of buildings, the second of which at the "request" of personnel at the site. This sequence of events is entirely consistent with the information known to the defendant before trial and the evidence presented at trial.

Second, the presence of armed individuals after small arms fire broke out (if this is indeed what the language means) is entirely consistent with the undisputed trial testimony that gunfire erupted after the defendant fired his shot. Ridgeway agreed with defense counsel that "immediately after [the defendant] fired his weapon, other gunfire erupted" and the Blackwater team "began taking incoming fire from insurgents from that same building or around that building . . ." (A. "Yes, sir.") (11/28/18 AM Tr. 2762). Ridgeway also agreed that what happened was "a hostile two-way engagement between insurgents on the one hand and Blackwater and the Army on the other" (A. "Yes, sir.") (*Id*.).[27] It would be entirely consistent with the trial testimony if an Army helicopter had observed armed local nationals at this time, in a building or otherwise.

The defendant misconstrues the trial evidence and its import. There was already evidence at trial that the Blackwater security team took incoming fire *after* the defendant fired his initial shot. But there is no evidence (at trial or in any of the documents) that the Blackwater team was under fire *before* the defendant took his shot. And there is nothing in the Blackwater Teletype

---

[27] Murphy did not testify about this at the trial, but in earlier trial testimony he described that the team "may have" received incoming fire (Exhibit H, 06/30/14 PM Tr. 102), and that while it may not be "fair to call it a firefight, . . . there was gunfire" (*id*. at 39).

that in any way discredits or impeaches the testimony from Murphy and Ridgeway that the defendant did not fire at an actual threat, but instead at something he claimed to see and announced as a threat.   That people fired back after the defendant's initial shot came out through the trial testimony, and does not in any way help the defendant's case.

The prosecutor did not "present[] a false chronology of the event in the closing argument to suggest that [the defendant] even provoked the Army to shoot at the building" (Dkt No. 1325 at 6).   To the contrary, the prosecutor simply laid out the chronology of events, consistent with the evidence, that would allow the jury to reasonably infer that the defendant's first shot prompted others, including the Army, to follow suit (*i.e.*, "[L]et me be clear.   There's no evidence that there was any communication [sic] between what he said and what the Army did, but that's the sequence of events is, after Raven 23 starts firing, the Army then fires as well."   (12/11/18 AM Tr. 4184))

The Blackwater Teletype, then, is not material, as the information could not have resulted in a different outcome at trial.   And for these same reasons, there was no *Napue* violation, because the government did not "use[] false testimony" to obtain a conviction.   *Napue*, 360 U.S. at 269.

**The Murphy and Ridgeway Witness Statements Are Not Material to the Defense**

Finally, neither the Murphy nor the Ridgeway witness statements regarding the DART Incident are material to the defense, and indeed the witness statements are also consistent with the trial testimony.

As we have explained, both the Murphy and Ridgeway witness statements use the same, identical language as the AAR to describe what happened at the DART Incident.   The defendant had access to the AAR (purportedly written by the Blackwater team leader, David Bynum) at trial, and could have used the information in that document during cross-examination to impeach either witness, and then called Bynum to prove up the impeachment.   Bynum was identified as one of the defendant's witnesses (Exhibit R at 1), meaning that the defendant had Bynum available at trial.   But the defendant chose not to do this.   In fact, the trial testimony was consistent with the AAR and the witness statements, and introduction of further evidence would not have been helpful to the defendant.

First, the defendant draws the Court's attention to the description in the witness statements and the AAR that:

> Shortly after arriving on location Army assets were observed in a firefight around the buildings located over 1200 yards to the west of the crash site.   An Army Captain advised [the Blackwater security team] that several armed subjects in civilian clothing were seen running toward the buildings located to the southwest.   The Captain stated Army attack helicopters engaged the subjects, however, they believed several of the armed subjects made it through to the buildings located at the southwest.

(Dkt No. 1336 at 7).   But at trial, there was no dispute that the Army had been involved in a firing incident before the Blackwater team arrived.   Ridgeway did not deny having told the FBI that "the Army was firing before [his] Blackwater team was involved in the incident" (11/28/18 AM Tr. 2761), and this amounted to the undisputed evidence on this point at trial.   Murphy also described

58

the location of the downed helicopter as "a very vulnerable spot," (11/07/18 PM Tr. 999), but was not asked whether there was any fire before the Blackwater security team arrived.[28]

Murphy's trial testimony was not that there were no shots fired by anyone prior to the defendant; instead, Murphy was only asked about his observations of the moments prior to the defendant taking his shot:

> Q: Prior to Mr. Slatten, the defendant, shooting, had you heard any gunshots?
> A: No.
> Q: Incoming gunshots?
> A: No.
> Q: Did anyone else with either Raven 23 or the Army fire prior to the defendant?
> A: No.

(11/07/18 PM Tr. 1000.)   And nothing in the witness statements is inconsistent with these observations.

Second, the defendant's personal observations about seeing, "through his scoped SR-25 rifle," armed men enter the buildings, and one of them appear in a window with a rifle pointed at the Blackwater team (Dkt No. 1336 at 7-8), which were contained in the statement, are also consistent with the testimony at trial.   These statements about what the defendant could view through his rifle scope made it into the after action reports from only one possible source: the defendant himself.   The team members, if they thought of it at all, appropriately presumed that the defendant had access to information (whether real or concocted) that no other member could

---

[28] At trial, the defendant had access to the report of Murphy's September 2, 2009, interview, including that "[a] crowd had gathered," at the site of the downed helicopter, "and the Army fired warning shots" (Exhibit D at 7).   The defendant also had access to the report of Ridgeway's interview from May 9, 2013, including Ridgeway's statement that the Army's "explosive ordinance team was . . . working on a – from my understanding, an IED [improvised explosive device] in that vicinity of where the crash site was . . ." (Exhibit G at 42).

know to be accurate.   And the same statements of the defendant were heard by the jury.   Murphy testified at trial that the defendant stated "he shot at a guy in a window with a rifle, raising up with a rifle . . . [the defendant] said there was a guy in a window raising up with a rifle in his hands" (11/07/18 PM Tr. 999-1000).   Ridgeway similarly testified about the defendant's statements, that he had seen "someone taking aim at us through the window," and that is why he had fired (11/27/18 PM Tr. 2645-46).   The trial testimony, then, consistently relayed the defendant's version of events as based on his purported observations.   But, the jury was free to believe or disbelieve that self-serving version of events.

Third, the defendant focuses on information from the witness statements that, "A US Army Captain met with [Blackwater] personnel and advised he was calling in an air strike" (Dkt No. 1336 at 8).   But of course there was no suggestion at trial that the defendant was the one who ordered an Army helicopter to fire missiles at the building; only the Army could do that. Murphy's testimony was just that the defendant "directed the Army officer's attention to the building where he said he had seen the person with the rifle", and the Army officer subsequently communicated (directly or through an intermediary) with the helicopter overhead (11/07/18 PM Tr. 1001).   Ridgeway just testified that the military was present and also fired after the defendant, using armored vehicles and air assets (11/27/18 PM Tr. 2646).

The Murphy and Ridgeway witness statements were consequently consistent with the trial testimony, and as explained above, impeachment evidence is immaterial under *Brady* where it merely cumulative or deals with a collateral issue.

For these same reasons, there is nothing to support the defendant's allegation of a *Napue*

violation.

The witness statements do not include the information that is actually relevant to the defendant's criminal culpability – the statements he made to Murphy and Ridgeway indicating he fired without actually seeing a threat.   One could argue that in this one respect (the absence of the inculpatory information), the witness statements would have provided some marginal impeachment value.   But that limited impeachment value is severely diminished or erased when one considers that the witness statements were actually identical in every way to the Bynum AAR, and that other members of the Blackwater detail also signed identical statements.   It is obvious here that these statements do not constitute the observations of the signers, but instead amounted to the "party line" set forth by Blackwater manager Bynum in this instance.   And as discussed above, witnesses including Ridgeway and Murphy have acknowledged signing similar witness statements that were factually inaccurate either in the information they conveyed or in the information they omitted.

**B.**     **The Interest of Justice Does Not Require a New Trial**

For the same reasons discussed above, the defendant has failed to meet his burden of demonstrating that a new trial is appropriate under Rule 33(a), which requires him to demonstrate each of the following:

> (1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) [it must be] of such nature that in a new trial it would probably produce an acquittal.

*Johnson*, 519 F.3d at 487.

All of the evidence identified by the defendant is "merely cumulative" of the trial testimony and other information known to the defendant prior to trial, or marginally impeaching on collateral issues.   There can be no claim that these items were material, or that there is any possibility they could have produced an acquittal.

## C.    Any Jencks Act Violation was Harmless

To whatever extent the Murphy and Ridgeway witness statements constituted Jencks material, it is abundantly clear that these materials would not have affected the trial's outcome, and therefore "any error in failing to produce [them]" was "harmless".   *See, e.g.*, *Emor*, 573 F.3d at 786.

Murphy and Ridgeway both testified extensively about the events of September 16, 2007, and devoted only a tiny portion of their testimony to the DART Incident.   And the DART Incident itself was mentioned by just two of the government's 28 trial witnesses, totaling around 1% of the trial testimony.   The DART Incident was relevant to the defendant's mental state, but it was just one part of one of over a dozen categories of evidence that the government introduced on these points, and one of three examples of other crimes evidence that were all consistent with malice and premeditation.   Even if the jury had never learned about the DART Incident, the evidence of the defendant's malice and premeditation was overwhelming.

There is no basis for a new trial under these circumstances.

## CONCLUSION

For these reasons, the motion for a new trial should be denied.

Respectfully submitted,

62

TIMOTHY J. SHEA
United States Attorney
D.C. Bar Number 437437

By:     /s/ Michael Friedman
T. PATRICK MARTIN
D.C. Bar Number 471965
KAREN P. SEIFERT
N.Y. Bar Number 4742342
MICHAEL J. FRIEDMAN
N.Y. Bar Number 4297461 Assistant
United States Attorneys National Security
Section
United States Attorney's Office 555
4th Street NW, 11th Floor
Washington, D.C. 20530
Michael.friedman@usdoj.gov
202-252-6765

ALEXANDRA HUGHES
VA Bar Number 91593
Special Assistant United States Attorneys National
Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530