**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 1:14-cr-107-RCL |
| | : | |
| NICHOLAS A. SLATTEN, | : | |
| | : | |
| *Defendant.* | : | |

**MEMORANDUM OPINION**

On December 19, 2018, a jury convicted defendant Nicholas Slatten of voluntary

manslaughter. ECF No. 1200. Mr. Slatten has since filed two motions for a new trial.

Defendant's First Motion for New Trial argues that he is entitled to a new trial based on new

evidence that the government allegedly failed to turn over to the defense. ECF No. 1320.

Defendant's Second Motion for New Trial argues that he is entitled to a new trial based on

testimony that Paul Slough gave at his resentencing. ECF No. 1328. Upon consideration of the

motions, supplements (ECF Nos. 1325 & 1336), oppositions (ECF Nos. 1332 & 1347), and

replies (ECF Nos. 1333 & 1352), the Court will **DENY** both motions.


**LEGAL STANDARDS**

**I. FEDERAL RULE OF CRIMINAL PROCEDURE 33(a)**

Under Federal Rule of Criminal Procedure 33(a), courts "may vacate any judgment and

grant a new trial if the interest of justice so requires." The defendant bears the burden of proof to

demonstrate that a new trial is warranted. *United States v. Borda*, 786 F. Supp. 2d 25, 32 (D.D.C.

2011). Courts have "broad discretion" in ruling on these motions. *United States v. Wheeler*, 753

F.3d 200, 208 (D.C. Cir. 2014). New trial motions are "not favored and are viewed with great

caution." *United States v. Blackthorne*, 378 F.3d 449, 452 (5th Cir. 2004). A new trial should be

granted "only in the extraordinary circumstances where the evidence preponderates heavily

against the verdict." *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990). In determining

whether the error that the defendant alleges occurred actually harmed the defendant, courts

generally consider "(1) the closeness of the case; (2) the centrality of the issue affected by the

error; and (3) the steps taken to mitigate the error's effects." *United States v. Becton*, 601 F.3d

588, 598 (D.C. Cir. 2010). When the motion for a new trial under Rule 33(a) is based specifically

on newly discovered evidence, the defendant must prove the following five elements before the

Court can grant a new trial:

> (1) the evidence must have been discovered since trial; (2) the party seeking the
> new trial must show diligence in the attempt to procure the newly discovered
> evidence; (3) the evidence relied on must not be merely cumulative or impeaching;
> (4) it must be material to the issues involved; and (5) [it must be] of such a nature
> that in a new trial it would probably produce an acquittal.

*United States v. Johnson*, 519 F.3d 478, 487 (D.C. Cir. 2008).


## II. *BRADY* VIOLATIONS

When the motion is based on an alleged *Brady* violation, the standard is somewhat

different. *See generally Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405

U.S. 150 (1972). *Brady* requires that upon request, the government must disclose "material

evidence favorable to a criminal defendant," including "both exculpatory and impeachment

evidence held by law enforcement officials." *United States v. Emor*, 573 F.3d 778, 782 (D.C.

Cir. 2009). In order to establish a "true *Brady* violation," the defendant must meet the following

three-pronged test:

> (1) the evidence at issue must be favorable to the accused, either because it is
> exculpatory, or because it is impeaching; (2) that evidence must have been
> suppressed by the [government], either willfully or inadvertently; and (3) prejudice
> must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). There can be no prejudice unless the withheld evidence is material, meaning that there is a "reasonable likelihood that it could have affected the judgment of the jury." *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (per curiam). Essentially, courts must ask whether the withheld evidence "undermine[s] confidence in the verdict." *United States v. Johnson*, 592 F.3d 164, 170 (D.C. Cir. 2010). The mere fact that undisclosed evidence has some probative value is insufficient to warrant a new trial. *United States v. Agurs*, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial" is insufficient).

## III. *NAPUE* VIOLATIONS

The government commits a *Napue* violation when it "introduces false or misleading testimony or allows it to go uncorrected . . . even though the government knew or should have known that the testimony was false." *United States v. Straker*, 800 F.3d 570, 603 (D.C. Cir. 2015); *see generally Napue v. Illinois*, 360 U.S. 264 (1959). In order to obtain a new trial, the defendant must prove both that there was false testimony and that there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (citing *United States v. Gale*, 314 F.3d 1, 4 (D.C. Cir. 2003)). This means that the defendant must prove that the allegedly false testimony is "material" in order "to justify a new trial." *United States v. Ausby*, 916 F.3d 1089, 1092 (D.C. Cir. 2019).

## IV. JENCKS ACT VIOLATIONS

The Jencks Act requires that the government disclose any prior statement in its possession that a prosecution witness made "relat[ing] to the subject matter as to which the

witness has testified." 18 U.S.C. § 3500(b). A statement includes "a written statement made by said witness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1). In determining whether a Jencks Act violation warrants a new trial, courts apply the harmless error test, meaning that the defendant must show that disclosure of the Jencks material "would have affected the trial's outcome." *Emor*, 573 F.3d at 786.

## ANALYSIS

After applying the relevant legal standards, the Court has concluded that both of Mr. Slatten's motions for a new trial should be denied.

## I. DEFENDANT'S FIRST MOTION FOR NEW TRIAL

In his first motion, Mr. Slatten argues that new evidence related to the Downed Aircraft Recovery Team ("DART") Incident entitles him to a new trial. On August 12, 2019, Mr. Slatten's sister received an email from former Blackwater employee Darren Hanner, which included a 29-page slide presentation titled "412 Incident 10 Sep 07." ECF No. 1320, Exh. E. The presentation contained the following information about the DART Incident:

- A map purporting to show recent activity and threats in the Baghdad area (ECF No. 1320, Exh. F at 4-5)
- A timeline purporting to provide a statement of the day's events, including that a helicopter was "down" at 15:05 and that the site was "receiving small arms fire at 17:18 (*Id.* at 6-7)
- A written statement of events purportedly provided by a Blackwater helicopter pilot— Anthony Acosta—who was involved in the incident (*Id.* at 8)
    - Mr. Acosta's statement includes that there was "minimal threat at crash site" even after the helicopter went down and its personnel were flown away (*Id.*)
    - Mr. Acosta's statement includes that two other helicopters subsequently flew to the crash site "to insert security team first with a maintenance team to follow" (*Id.*)
- An "after action report" purportedly written by Blackwater security team leader David Bynum (*Id.* at 9-10)
- Various maps and photographs of the downed helicopter site that purport to provide a "sequence of events" (*Id.* at 11-24)

- One photograph includes a statement that "[w]hile mechanics [were] attempting to recover any salvageable equipment, Ground assets [were] engaged by Anti-Iraqi Forces (AIF) from the southwest . . . Both US MIL and RSO assets return fire. AH-64 fires missiles, rockets, and cannon into building occupied by AIF (*Id.* at 19)
- Two "additional statements" from individuals who were in a tactical operations center at the Regional Security Office during the DART Incident (*Id.* at 25-30)
    - The first statement was purportedly made by Blackwater operations chief Kurt Scheuermann. His statement includes that he learned one of the Blackwater helicopters had "gone down" and that he asked Huston to contact other relevant parties. Scheuermann reported that the second of the two helicopters arrived back at the International Zone and off-loaded the personnel and items that were recovered. Subsequently, two helicopters with mechanics on board "departed LZ Washington to pull security and over watch on the crash site." Scheuermann spoke with Major Schwartz, the "Joint Operations Commander . . . in charge of the Battalion who owned the battle space." Major Schwartz supposedly told him that the area was "too hot" and he "didn't want his people sitting out there that long." Major Schwartz eventually called back and said his troops on the ground were taking IDF and wanted to know what the action plan was, and Scheuermann told him that they were flying mechanics out to recover as much of the aircraft as possible. Major Schwartz later told him that his troops and the RSO assets on the ground were taking small arms fire from a nearby building and attack aircraft were engaging." (*Id.* at 26-27)
    - The second statement was purportedly made by Army employee Joseph Huston. Huston's statement includes that his base was notified of a downed aircraft at around 15:05. Around 15:13, Huston spoke by phone with the Battle Space owner and asked if that person's command "would be able to offer any assistance or ground support." At 15:14, Huston informed the Battle Space owner that the personnel on board the downed aircraft has been evacuated. Around 15:32, Huston received a call from Major Schwartzman asking what the situation was, and at 15:36 he received a call from the Battle Space owner informing him that personnel were en route to the crash site and may already be there. At 15:59, the Battle Space owner called to say that his units were on the scene. Huston's statement includes that around 16:30, 16:53, and 17:16, Major Schwartzman called back to ask if they could blow the downed helicopter up yet, as it was getting dangerous for his men to remain on the scene. At 17:59 Major Schwartzman called again and told Huston that his people were taking fire, so the Regional Security Officer told Major Schwartzman to blow up the downed helicopter and get out of the area. (*Id.* at 28-30)

On September 17, 2019, Mr. Slatten filed a supplemental memorandum stating that another former Blackwater employee—Charles Rolling—contacted Mr. Slatten's sister by email. ECF No. 1325. Mr. Rolling purportedly participated in the DART Incident as a mechanic. *Id.* at 2. His email contained a document titled "(NON-COMBAT EVENT) ACCIDENT RPT BY

BLACKWATER-65: 2 CIV WIA 3 AIF KIA." ECF No. 1325, Exh. B.[1] The defendant argues

that the Blackwater report was not produced prior to trial and thus he was deprived of a fair trial.

It is not entirely clear who wrote the Blackwater report, though the title suggests that Blackwater

is the author. The Blackwater report purports to provide a timeline of the events that occurred

during the DART Incident.

On December 2, 2019, Mr. Slatten filed a second supplemental memorandum. ECF No.

1336. After he brought forth the slide presentation and Blackwater report, the government

initiated a search in the Department of Justice's files for those two documents. The government

found a slide presentation very similar to the one that was emailed to Mr. Slatten's sister—there

are only a few minor discrepancies that do not appear to be relevant to the defendant's motion

for a new trial. The government did not find the Blackwater report, but it did find sworn witness

statements purportedly signed by Murphy and Ridgeway on September 11, 2007 describing the

DART Incident. The government also found sworn witness statements from other Blackwater

personnel at the downed helicopter site: Tommy Vargas, Adam Frost, Joseph Baggott, Evan

Liberty, Dean Wagler, Freddie Ortiz, and Paul Slough. All of these statements included language

that they were "made in furtherance of an official administrative inquiry" and that the witnesses

understood that the statements generally could not be used against them in any criminal

proceedings. According to the government, all of these statements were identical to the language

used in the AAR, which the government turned over to the defense in 2009. Once the

government found these additional pieces of evidence, it promptly turned them over to the

defense.

---

[1] The Court will refer to this document as the "Blackwater report."

### A. Mr. Slatten is Not Entitled to a New Trial Under *Brady*.

As previously explained, to establish a *Brady* violation, the defendant must first show that the evidence at issue is favorable to him. *Strickler*, 527 U.S. at 281-82. Mr. Slatten claims that the slide presentation, Blackwater report, and witness statements impeach the government's 404(b) evidence regarding the DART Incident, while the government argues that the defense already had access to much of this information and that it does not actually impeach the government's account of the DART Incident. The defendant must also show that the government suppressed the evidence. *Id.* Although it does not appear that the government intentionally withheld these materials, inadvertence on the government's part is sufficient to meet this requirement. *Id.*

Even assuming that the defendant can satisfy the first two factors, however, the defendant certainly cannot meet the third factor, which requires prejudice. The government and the defendant make numerous nuanced arguments about whether the defendant already had access to some of this information, whether this information actually impeaches the government's account of the DART Incident, whether this information is admissible or could have led to other admissible information, etc. Because Mr. Slatten is unable to demonstrate prejudice, however, there is no need to resolve these underlying issues. Even if this information does have impeachment value, Mr. Slatten has not demonstrated that the government's withholding of these materials resulted in prejudice. Prejudice requires materiality, meaning that there must be a reasonable probability that disclosing the evidence to the defense "could have affected the judgment of the jury." *Wearry*, 136 S. Ct. at 1006. The slide presentation, Blackwater report, and witness statements do not "undermine confidence in the verdict." *Johnson*, 592 F.3d at 170. The vast majority of the evidence presented at trial pertained to the events surrounding the Nisour

Square Incident. The evidence regarding what happened on September 16, 2007 alone was sufficient to prove the charges against Mr. Slatten. That evidence showed that Mr. Slatten chose to pull the trigger of his sniper rifle with no threat present, resulting in the death of Ahmed Al-Rubia'y. The slide presentation, Blackwater report, and witness statements do not undermine the evidence regarding the chain of events in Nisour Square.

Although Mr. Slatten argues that the slide presentation, Blackwater report, or witness statements have probative value in relation to the DART Incident, "[t]he mere possibility that an item of undisclosed information might have helped the defense" is insufficient to establish a *Brady* violation. *Agurs*, 427 U.S. at 109-10. The government presented numerous pieces of evidence pertaining to the defendant's "malice" and "premeditation," including the hair-trigger modification to the sniper rifle, Mr. Slatten's statements about revenge before the Nisour Square Incident, Mr. Slatten's animus towards Iraqi civilians, and Mr. Slatten's boasting about killing (including his bragging and celebrating after the Nisour Square Incident). Additionally, the government presented evidence under Rule 404(b) that prior to September 16, 2007, Mr. Slatten fired without provocation or encouraged his teammates to fire without provocation. One of the examples that the government used was the DART Incident.

The government and defense disagree about whether the slide presentation, Blackwater report, or witness statements actually undermine the contention that Mr. Slatten fired without provocation during the DART Incident, but even assuming that these materials constitute impeachment evidence, that evidence is not material. The defendant seems to forget that although the government did present some evidence pertaining to the DART Incident, Mr. Slatten was not actually on trial for his role in the DART Incident—he was on trial for his role in the Nisour Square Incident. Even if the evidence at issue had been admitted at trial, it is

8

extremely unlikely that it would have affected the jury's judgment. As the government points
out, the DART Incident constituted approximately 1% of the trial testimony, and of the
government's twenty-eight witnesses, only two briefly addressed it.[2] *See* ECF No. 1347 at 7 n.3.
Although the DART Incident was probative of Mr. Slatten's state of mind on September 16,
2007, it was only one "brick in the wall"—a wall that would still stand without that one brick.
*See, e.g., United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir. 1999) (explaining that when
courts assess materiality, they must "evaluate the impact of the undisclosed evidence not in
isolation, but in light of the rest of the trial record") (citing *Agurs*, 427 U.S. at 112).

Even if the government had declined to mention the DART Incident altogether, there was
still ample evidence pertaining to Mr. Slatten's state of mind. The defense attempts to argue that
the DART Incident "was the single most compelling evidence of intent and motive," ECF No.
1352 at 13. If this truly was the "single most compelling" piece of evidence against Mr. Slatten,
one must wonder why the government chose to mention it so few times during its opening
statement and closing argument.[3] Although the DART Incident was certainly relevant 404(b)
evidence, Mr. Slatten acts as if he was convicted for his actions during the Nisour Square
Incident solely because of his involvement in the DART Incident, and the defense's motion,
supplemental memoranda, and reply completely overlook all of the other evidence that the
government presented. For example, Mr. Slatten ignores that his own celebratory and
braggadocios statements regarding the killing of Iraqis provided extremely powerful evidence of
his state of mind and likely played a major role in his conviction. Because the defendant has

---

[2] Although the number of times that an issue was addressed during trial is not dispositive of materiality, it is still a
relevant consideration.
[3] The government notes that the DART Incident comprised less than 1% of its opening statement and less than 2%
of its closing argument. ECF No. 1347 at 12, 14 n.6-7. Again, while the number of times that an issue was addressed
during trial is not dispositive of materiality, it is still a relevant consideration.

failed to show any reasonable probability that the DART Incident would have significantly impacted the jury's assessment of the evidence, he cannot demonstrate materiality, meaning that he has failed to establish a *Brady* Violation.

To the extent that the defendant argues any impeachment of Murphy and Ridgeway's testimony regarding the DART Incident could also lead a jury to doubt their testimony regarding the Nisour Square Incident (ECF No. 1352 at 22), that argument is speculative, attenuated, and insufficient to warrant a new trial. Failure to disclose potential impeachment material does not violate *Brady* when it "would have been negligible and cumulative of similar evidence that was presented to the jury." *United States v. Oruche*, 484 F.3d 590, 599 (D.C. Cir. 2007). Even without the evidence related to the DART Incident, defense counsel already impeached Ridgeway's testimony with inconsistent statements he made to the FBI about the DART incident. *See* 11/27/18 PM Tr. 2761:1–24. Although that testimony was not given under oath like his witness statement, it was still made under the threat of prosecution for false statements under 18 U.S.C. § 1001. Therefore, the Court is not persuaded that additional impeachment evidence would have altered the jury's view of Ridgeway's testimony. As for Murphy, although defense counsel did not question him specifically about the DART Incident, defense counsel did use prior inconsistent statements to impeach him on other topics. *See, e.g.*, 11/13 AM Tr. 1175:17– 1176:17, 1177:21–1178:15, 1180:22–1181:7. Because defense counsel already attacked his reliability and honesty multiple times, it is unlikely that his witness statement would have materially affected the jury. *See United States v. Brodie*, 524 F.3d 259, 269 (D.C. Cir. 2008) (treating additional impeachment evidence as "simply another illustration of [the witness's] untruthfulness"); *see also Doan v. Carter*, 548 F.3d 449, 461 (6th Cir. 2008) (treating withheld prior inconsistent statement as cumulative where jury otherwise heard evidence of a witness's

untruthful statements). Essentially, Mr. Slatten has not shown that the additional DART Incident evidence would have materially altered the jury's view of the DART Incident or of Murphy and Ridgeway's testimony generally. Therefore, the verdict is "worthy of confidence," *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), and *Brady* does not entitle Mr. Slatten to a new trial.

### B. Mr. Slatten is Not Entitled to a New Trial Under *Napue*.

As previously explained, to establish a *Napue* violation, the defendant must show that the government "introduce[d] false or misleading testimony or allow[ed] it to go uncorrected, even though the government knew or should have known that the testimony was false." *Straker,* 800 F.3d at 603. The defendant is not entitled to a new trial unless the allegedly false testimony is "material," *Ausby*, 916 F.3d at 1092, meaning that there is a "reasonable likelihood that [it] could have affected the judgment of the jury," *Gale*, 314 F.3d at 4. The government and the defense disagree about whether the slide presentation, Blackwater report, and witness statements demonstrate that the testimony regarding the DART Incident was false and whether the government should have known that the testimony regarding the DART Incident was false. Even assuming that both of these issues were decided in Mr. Slatten's favor, however, he is still not entitled to a new trial under *Napue*. For the reasons already stated in the section of this Memorandum Opinion explaining why there was no *Brady* violation, the pieces of evidence at issue are not material. Even if these new pieces of evidence had been admitted at trial (or even if the government had not introduced any evidence pertaining to the DART Incident at all), the defendant has failed to establish a reasonable likelihood that the jury's assessment would have been impacted. Therefore, Mr. Slatten is not entitled to a new trial under *Napue*.

**C. Mr. Slatten is Not Entitled to a New Trial Under the Jencks Act.**

As previously explained, to establish a Jencks Act violation, the defendant must show

that the government failed to disclose a prior statement in its possession that a prosecution

witness made "relat[ing] to the subject matter as to which the witness has testified." 18 U.S.C. §

3500(b). Before a defendant is awarded a new trial under the Jencks Act, the defendant must

show that disclosure of the Jencks material "would have affected the trial's outcome." *Emor*, 573

F.3d at 786. For the reasons already stated in the section of this Memorandum Opinion

explaining why there was no *Brady* violation, the pieces of evidence at issue are not material.

Even if these new pieces of evidence had been admitted at trial (or even if the government had

not introduced any evidence pertaining to the DART Incident at all), the defendant has failed to

establish that the trial's outcome would have been any different. Therefore, any error was

harmless, and Mr. Slatten is not entitled to a new trial under the Jencks Act.

**D. Mr. Slatten is Not Entitled to a New Trial Under Federal Rule of Criminal Procedure 33(a).**

As previously explained, the defendant must meet five requirements before the Court will

grant a new trial based on newly discovered evidence:

> (1) the evidence must have been discovered since trial; (2) the party seeking the
> new trial must show diligence in the attempt to procure the newly discovered
> evidence; (3) the evidence relied on must not be merely cumulative or impeaching;
> (4) it must be material to the issues involved; and (5) [it must be] of such a nature
> that in a new trial it would probably produce an acquittal.

*Johnson*, 519 F.3d at 487. The government and the defense disagree about whether all of the

evidence at issue is truly "new" (i.e. whether the same information was already available to the

defense through another source). Even assuming that the evidence is new and is not merely

cumulative or impeaching, Mr. Slatten is still not entitled to a new trial. For the reasons already

12

stated in the section of this Memorandum Opinion explaining why there was no *Brady* violation, the pieces of evidence at issue are not material. Even if these new pieces of evidence had been admitted at trial (or even if the government had not introduced any evidence pertaining to the DART Incident at all), the defendant has failed to establish that he likely would have been acquitted. Therefore, the slide presentation, Blackwater report, and witness statements are unlikely to alter the verdict, meaning that Mr. Slatten is not entitled to a new trial under Rule 33(a).

## II. DEFENDANT'S SECOND MOTION FOR NEW TRIAL

The defendant's second motion argues that the testimony of Paul Slough at his resentencing on September 5, 2019 entitles Mr. Slatten to a new trial under Federal Rule of Criminal Procedure 33(a). During his resentencing, Mr. Slough stated:

> Your Honor, this time and this experience has been crushing, and I am beyond horrified that innocent life was taken that day. Your Honor, I take full acceptance for my own actions, and I thank God for his providence that Mr. Rubia'y knows who I am and that some day I might find forgiveness in his eyes and the two of us may, indeed, be healed.

Resentencing Hr'g Tr., No. 08-360, Sept. 5, 2019, 106:8-13. Mr. Slatten argues that this testimony constitutes persuasive new evidence that Mr. Slough and not Mr. Slatten shot and killed the driver of the white Kia. The Court disagrees.

As previously explained, a motion for a new trial based on newly discovered evidence requires that the defendant meet five requirements:

> (1) the evidence must have been discovered since trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) [it must be] of such a nature that in a new trial it would probably produce an acquittal.

*Johnson*, 519 F.3d at 487.

Mr. Slough's September 5, 2019 statements do not constitute newly discovered evidence sufficient to warrant a new trial. Mr. Slough's statements did express remorse for what happened, but his "full acceptance for [his] own actions" was vague and not directly linked to any specific action. During the resentencing, the Court specifically noticed that Mr. Slough's apology was made in the passive voice. For example, he said, "I am beyond horrified that innocent life was taken that day," rather than "I am horrified that *I* took innocent life that day." Essentially, he did not take responsibility for any specific death, nor did he state that he was the one who fired the fatal shots. Mr. Slough's statement is thus not the kind of direct confession that suggests the wrong person was convicted. Although Mr. Slough spoke of his desire to have the forgiveness of Dr. Al-Rubia'y, the Court interpreted this statement as seeking forgiveness for the part he played in the Nisour Square Incident that led to the death of Dr. Al-Rubia'y's loved ones rather than a confession to a crime for which he was not charged. The overwhelming evidence at Mr. Slatten's trial showed that it was Mr. Slatten who fired the first shots and killed Ahmed Al-Rubia'y. Mr. Slough, in contrast, was found guilty of manslaughter for launching grenades at the white Kia, thereby causing it to explode into flames and burn the bodies of Dr. Al-Rubia'y's loved ones. The most rational explanation for Mr. Slough's statements at his resentencing is that he was apologizing for launching the grenades—his statements do not imply that he was confessing to a crime for which a jury already convicted Mr. Slatten.

Even if Mr. Slough *had* specifically stated that he killed Ahmed Al-Rubia'y, that would still not constitute newly discovered evidence. The requirement that there be newly discovered evidence "is not met simply by offering the post-trial testimony of a co-conspirator who refused to testify at trial." *United States v. Dale*, 991 F.2d 819, 839 (D.C. Cir 1993). The distinction

14

between "newly discovered" evidence and "newly available" evidence is critical. Mr. Slatten already knew that Mr. Slough admitted to firing numerous rounds from a machine gun at the white Kia while it was in motion, and Mr. Slatten specifically introduced evidence of that fact at his trial. Mr. Slough's statements would thus be cumulative, immaterial, and unlikely to result in Mr. Slatten's acquittal.[4] Therefore, Mr. Slatten has failed to prove the existence of newly discovered evidence that would warrant a new trial, and the Court must deny his Second Motion for New Trial.

## CONCLUSION

Based on the foregoing, the defendant's First Motion for New Trial (ECF No. 1320) and the defendant's Second Motion for New Trial (ECF No. 1328) will be **DENIED**.

A separate Order accompanies this Memorandum Opinion.

Date: August 6, 2020

Royce C. Lamberth
United States District Court Judge

---

[4] The Court disagrees with the government's argument that Mr. Slough's statements would not be admissible if Mr. Slatten were granted a new trial. The statements clearly fall within Federal Rule of Evidence 803(3), as Mr. Slough did not give a mere statement of memory or belief to prove the fact remembered or believed. Instead, he explained the feelings he had *at that particular moment* during his resentencing and expressed hope for *future* forgiveness. Such statements fall squarely within the confines of Rule 803(3), thus constituting an exception to Rule 802's ban on hearsay. The admissibility of these statements, however, does not affect the Court's ruling, as these statements do not entitle Mr. Slatten to a new trial in the first place.